## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

FILED

APR 30 2012

USDC WP SDNY

| | |
|---|---|
| JEFFREY LAYDON, on behalf of himself and all others similarly situated,<br><br>                Plaintiff,<br><br>        - against -<br><br>MIZUHO BANK, LTD., THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., SUMITOMO MITSUI BANKING CORPORATION, RESONA BANK, LTD., MIZUHO CORPORATE BANK, LTD., THE BANK OF YOKOHAMA, LTD., MITSUBISHI UFJ TRUST AND BANKING CORPORATION, MIZUHO TRUST AND BANKING CO., LTD., THE SUMITOMO TRUST AND BANKING CO., LTD., CITIBANK, JAPAN LTD., JPMORGAN CHASE BANK, NA, THE ROYAL BANK OF SCOTLAND GROUP PLC, DEUTSCHE BANK AG., UBS AG, BNP PARIBAS S.A., SHINKIN CENTRAL BANK, THE SHOKO CHUKIN BANK, THE NORINCHUKIN BANK, BARCLAYS BANK PLC, HSBC HOLDINGS PLC, CITIBANK NA, CRÉDIT AGRICOLE CIB, LLOYDS BANKING GROUP PLC, SOCIÉTÉ GÉNÉRALE, AND RABOBANK GROUP<br><br>                Defendants. | Docket No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>12 CV 3419<br><br>JUDGE DANIELS |

Plaintiff Jeffrey Laydon ("Plaintiff"), by his undersigned attorneys, brings this action against Defendants Mizuho Bank, Ltd., The Bank of Tokyo-Mitsubishi UFJ, Ltd., Sumitomo Mitsui Banking Corporation, Resona Bank, Ltd., Mizuho Corporate Bank, Ltd., The Bank of Yokohama, Ltd., Mitsubishi UFJ Trust and Banking Corporation, Mizuho Trust and Banking Co., Ltd., The Sumitomo Trust and Banking Co., Ltd., Citibank, Japan Ltd., JPMorgan Chase Bank, NA, The Royal Bank of Scotland Group PLC, Deutsche Bank AG., UBS AG, BNP Paribas S.A., Shinkin Central Bank, The Shoko Chukin Bank, The Norinchukin Bank, Barclays

Bank PLC, HSBC Holdings PLC, Citibank NA, Crédit Agricole CIB, Lloyds Banking Group

PLC, Société Générale and Rabobank Group (collectively, "Defendants"), pursuant to, *inter alia,*

the Commodity Exchange Act, as amended, 7 U.S.C. § 1, *et seq.* (the "CEA"), and Sherman

Antitrust Act, 15 U.S.C. § 1, on behalf of himself and all others who purchased or sold

exchange-traded Euroyen futures and options contracts on the Chicago Mercantile Exchange

("CME") during the period of *at least* June 1, 2006 through and including September 2010 (the

"Class Period").[1]

Plaintiff's allegations as to himself and his own actions are based upon his personal

knowledge and to information obtained during the course of his attorneys' investigation, and

upon information and belief as to all other matters, as follows:

## SUMMARY OF ALLEGATIONS

1.      This action arises from Defendants' unlawful manipulation of two daily reference

rates: the Tokyo Interbank Offered Rate ("Tibor"), a daily reference rate based on the interest

rates at which banks offer to lend unsecured funds to other banks in the Japanese wholesale

money market (or interbank market) and the London Interbank Offered Rate ("Libor"), a daily

reference rate based on the interest rates at which banks borrow unsecured funds from other

banks in the London wholesale money market (or interbank lending market).

2.      Defendants unlawful manipulation relates to the Defendants submissions of false

rates in the setting of the Japanese Bankers Association (the "JBA") Euroyen Tibor and the

British Bankers Association (the "BBA") Yen Libor.

3.      **Overt Acts and Means of Manipulation**:   Tibor rates are published by the JBA,

an organization funded primarily by subscriptions from its members.  Beginning in mid-2006

---

[1] Plaintiff reserves the right to amend the Class Definition, including, without the limitation, the
Class Period.

and continuing through at least September 2010, the Defendants herein, as Tibor reference banks

(as further described below), intentionally caused and created artificial Tibor rates.

4.      Similarly, beginning as early as mid-2006 and continuing through at least

September 2010, the Defendants herein, as Yen Libor contributor banks (as further described

below), intentionally caused and created artificial Libor rates, including artificially suppressed

Libor rates.  Libor is owned by the BBA, an organization funded primarily by subscriptions from

its members.

5.      The JBA designates a minimum of 8 reference banks to provide daily rate quotes

for the calculation of Tibor rates.

6.      The BBA maintains a reference panel of between 7 and 18 contributor banks for

each currency calculated.  As of November 2011, there are 15 contributor banks to the BBA's

Yen Libor panel.

7.      According to the JBA, "[t]he selection of reference banks is based on four factors:

1) market trading volume…, 2) yen asset balance, 3) reputation, and 4) track record in providing

rate quotes. (The selection also takes into account JBA TIBOR continuity and the variety of

financial sectors to which reference banks belong.)."

8.      The BBA website similarly states that each "reference panel of banks ... reflects

the balance of the market by country and by type of institution.  Individual banks are selected

within this guiding principle [on the basis] of scale of market activity, reputation and perceived

expertise in the currency concerned."

9.      On each business day at 11:00 a.m. Tokyo time and by 11:20 a.m. Tokyo time on

the same day, each reference bank quotes Tibor rates for 13 maturities (1 week and 1-12 months)

for the Japanese Yen Tibor rate which, according to the JBA, is supposed to reflect borrowing

rates in the unsecured call market, and the Euroyen Tibor rate which, according to the JBA, is supposed to reflect rates for yen-denominated deposits held in banks outside Japan.

10.     For each currency and maturity, Libor contributor banks submit to Thomson Reuters ("Reuters") the rate at which a contributing bank believes it could borrow funds should it wish to do so, by asking for and then accepting interbank offers in a reasonable market size just prior to the fix time (11:00 am UK time). For the Yen-denominated Libor, the Defendants, as contributor banks, submitted daily rate quotes to the BBA.  The rates submitted by each contributor bank is supposed to be reflective of the credit conditions facing each bank on a daily basis, and based upon the rate a bank could borrow funds at, not the rate at which the bank actually borrowed funds.  Thus, Libor depends on the integrity of the contributor banks.  Rather than submit Libor rates which reflected the rate that each bank could borrow funds should it wish to do so, by asking for and then accepting interbank offers in a reasonable market size just prior to the Libor fix time of 11:00a.m. U.K. time, the Defendants, during the Class Period, as Libor contributor banks, knowingly submitted false Libor rates which did not reflect their true borrowing costs with the intent to create artificial Libor rates.

11.     In calculating Tibor rates, the JBA discards quotes from the two highest and the two lowest financial institutions and averages the remaining rates.   The quotes submitted by each reference bank is supposed to be reflective of the credit conditions facing each bank on a daily basis, and based upon the rate a bank could borrow funds at, not the rate at which the bank actually borrowed funds.  Thus, Tibor rates depend on the integrity of the reference banks.

12.     According to the JBA, in submitting their quotes, reference banks quote what they deem to be prevailing market rates unaffected by their own positions.  As described by the JBA, the rates quoted by reference banks are not intended for use in trading by the reference banks.

13.     Rather than submit Tibor rates which reflected the rate that each bank could borrow funds should it wish to do so, by asking for and then accepting interbank offers in a reasonable market size just prior to the Tibor fix time of 11:00 a.m. Tokyo time, the Defendants, during the Class Period, as Tibor reference banks, knowingly submitted false Tibor rates with the intent to create artificial Tibor rates.

14.     **Causation**: Euroyen Tibor and Yen Libor serve as the pricing benchmark (or "underlying commodity") for Euroyen-based futures and options contracts traded on the CME. As an intended, proximate and direct result of Defendants' manipulation of Euroyen Tibor and Yen Libor rates through the submission of false Tibor rates to the JBA and false Yen Libor rates to the BBA, exchange-traded Euroyen futures and option contracts, traded at artificial and manipulated price levels, including artificially suppressed levels during the Class Period.

15.     **Manipulative Intent**: By intentionally reporting false Euroyen Tibor and Yen Libor rates, Defendants intended to manipulate these reference rates and the prices of exchange-traded Euroyen futures and option contracts. The submission of false reports, such as the submission of false Tibor or Yen Libor rates, is a traditional means of market manipulation. *See, e.g., In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 509 (S.D.N.Y. 2004). Defendants' motivations to manipulate were many. Among other reasons, they were loath to disclose the true risk premium based upon their financial conditions that the market was attaching to them. Disclosing that the market was charging any individual bank a much higher interest rate than others would have shown the market that the bank was at greater risk of default than others. Defendant banks did not want the market to identify them as risky. Defendants also falsely reported Euroyen Tibor and Yen Libor rates in order to manipulate exchange-traded

Euroyen futures and option contracts, and financially benefit Euroyen-based derivative positions held by them.

16.  **Governmental Investigations, Recommendations for Administrative Proceedings, and Findings**.  On December 9, 2011, the Japanese Securities and Exchange Surveillance Commission (the "JSESC") recommended that Japan's Financial Services Agency punish the local brokerage unit of Citigroup Global Markets Japan Inc., Defendant Citibank Japan Ltd. and Defendant UBS AG for submitting false Tibor rates.

17.  According to the JSESC's recommendation for administrative action against Defendant Citibank  [referred to as the Company below]:

a.  The Head of the G10 Rates in the Company (at that time; hereinafter referred to as "Director A") had continuously conducted approaches such as requesting a person in charge of submitting the TIBOR rates of Citibank Japan Ltd. (hereinafter referred to as "Submitting Personnel") to change its rates since around April 2010 at the latest, and a [Japanese Yen] Rates trader at the G10 Rates (hereinafter referred to as "Trader B") had continuously conducted approaches such as requesting persons in charge of submitting the TIBOR rates of other banks (or securities firms belonging to their financial conglomerates, hereinafter, including Submitting Personnel, referred to as "Submitting Personnel, etc.") since Trader B joined the Company in December 2009, for the purpose of fluctuating TIBOR so as to give advantages to the Derivatives Transactions related to yen rates which Director A and Trader B were conducting.

b.  The actions conducted by Director A and Trader B are acknowledged to be seriously unjust and malicious, and could undermine the fairness of the markets, considering that three-month TIBOR is the underlying asset of Three-month Euroyen Futures listed on Tokyo Financial Exchange Inc., Director A and Trader B conducted transactions of Three-month Euroyen Futures on Tokyo Financial Exchange Inc., and TIBOR is a significantly important financial index as a basic interest rate when banks raise or lend money. Therefore, the aforementioned actions by Director A and Trader B are acknowledged to have a serious problem from the viewpoints of the public interest and protection of investors.

c.  Furthermore, Trader B had also continuously conducted inappropriate approaches such as requesting to change the Yen-LIBOR rates that Citibank group submitted, since December 2009.

d.  In spite of recognizing these actions, the President and CEO (hereinafter referred to simply as the "CEO"), who was also responsible for the G10 Rates, overlooked these

actions and the Company did not take appropriate measures, therefore, the Company's internal control system is acknowledged to have a serious problem.

     e.     As mentioned above, i) Director A and Trader B are acknowledged to have conducted approaches against Submitting Personnel, etc. for Market Transactions of Derivatives which they were conducting under the Company's proprietary trading legally defined as Financial Instruments Business, ii) the actions are acknowledged to be unjust and malicious, from the viewpoints of the public interest and protection of investors, and could undermine the fairness of the markets, iii) Trader B conducted approaches regarding not only TIBOR but also Yen-LIBOR, and iv) the Company's internal control system is acknowledged to have a serious problem. Therefore, the Company's actions are acknowledged to fall under Article 52, paragraph 1 (ix) of the FIEA, which stipulates "when a wrongful act or extremely unjust act has been conducted with regard to Financial Instruments Business, and when the circumstances are especially serious".

    18.     According to the JSESC's recommendation for administrative action against

Defendant UBS [referred to as the Company below]:

     a.     A yen rates trader at the Rates Department of the Fixed Income, Currencies and Commodities Division in the Company (at that time; hereinafter referred to as "Trader A") had continuously conducted approaches such as requesting a person in charge of submitting the TIBOR rates of UBS AG, Tokyo Branch (hereinafter referred to as "Submitting Personnel") to change its rates since around March 2007 at the latest, and also had continuously conducted approaches such as requesting persons in charge of submitting the TIBOR rates of other banks (hereinafter, including Submitting Personnel, referred to as "Submitting Personnel, etc.") since around February 2007 at the latest, for the purpose of fluctuating TIBOR so as to give advantages to the Derivative Transactions related to yen rates which Trader A was conducting.

     b.     The actions conducted by Trader A are acknowledged to be seriously unjust and malicious, and could undermine the fairness of the markets, considering that three-month TIBOR is the underlying asset of Three-month Euroyen Futures listed on Tokyo Financial Exchange Inc., Trader A conducted transactions of Three-month Euroyen Futures on Tokyo Financial Exchange Inc., and TIBOR is a significantly important financial index as a basic interest rate when banks raise or lend money. Therefore, the aforementioned actions conducted by Trader A are acknowledged to have a serious problem from the viewpoints of the public interest and protection of investors.

     c.     Furthermore, Trader A had also continuously conducted inappropriate approaches such as requesting to change the Yen-LIBOR rates that UBS group submitted, since around June 2007 at the latest.

     d.     The Company's internal control system is also acknowledged to have a serious problem, since the approaches have been overlooked for long periods and no appropriate measures have been taken.

e.      As mentioned above, i) Trader A is acknowledged to conduct approaches against Submitting Personnel, etc. for Market Derivatives Transactions, which he was conducting under the Company's proprietary trading legally defined as Financial Instruments Business, ii) the actions are acknowledged to be unjust and malicious, from the viewpoints of the public interest and protection of investors, and could undermine the fairness of the markets, iii) Trader A conducted approaches regarding not only TIBOR but also Yen-LIBOR, and iv) the Company's internal control system is acknowledged to have a serious problem. Therefore, the Company's actions are acknowledged to fall under Article 52, paragraph 1 (ix) of the Financial Instruments and Exchange Act, which stipulates "when a wrongful act or extremely unjust act has been conducted with regard to Financial Instruments Business, and when the circumstances are especially serious".

19.     *The Wall Street Journal,* in a February 7, 2012 article, reported that Thomas Hayes, who joined UBS in 2006, is the UBS trader referenced in the JSESC's recommendation for administrative action.

20.     The same *Wall Street Journal* article reported that Christopher Cecere, a former managing director and a trader for Citigroup Global Markets Japan Inc., as the Citigroup trader referenced in the JSESC's recommendation for administrative action.

21.     According to the same report, "Mr. Cecere supervised Mr. Hayes when the former UBS trader joined Citigroup in December 2009.  The Japanese regulator concluded that Mr. Cecere was persuaded by Mr. Hayes to 'continuously conduct' attempts to influence the Tibor rate."

22.     In addition to Japanese regulators, as reported by the *Wall Street Journal* on February 13, 2012, government regulators in the U.S., Europe and Canada are all presently investigating Defendants' manipulation of yen interbank lending rates in both Tibor and Libor.

23.     According to a report in the *Financial Times* on December 9, 2011, "[i]nquiries were extended to the Tibor rate in Japan after UBS gave the US Department of Justice information about the setting of yen and dollar rates in Japan in exchange for partial immunity."

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. § 1331 and 1337, respectively.

25.     Venue is proper in the Southern District of New York, pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c) and 28 U.S.C. § 1391(b) and (c).  Each of the Defendants transacted business in the Southern District of New York and a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

26.     Defendants, directly and indirectly, singly and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

## PARTIES

27.     Plaintiff Jeffrey Laydon transacted in exchange-traded Euroyen futures contracts during the Class Period at artificial prices.  Plaintiff was damaged by reason of Defendants' unlawful conduct, which deprived Plaintiff and the Class of a non-manipulated, competitive market in exchange-traded Euroyen futures and option contracts.

28.     Defendant Mizuho Bank, Ltd. ("Mizuho Bank") is a subsidiary of Mizuho Financial Group a Japanese financial institution headquartered in offices in Tokyo, Japan. During the Class Period, Mizuho Bank was a reference bank for the JBA's Euroyen Tibor panel.

29.     Defendant The Bank of Tokyo-Mitsubishi UFJ Ltd. ("Bank of Tokyo-Mitsubishi") is a subsidiary of Mitsubishi UFJ Financial Group, Inc. (MUFG) and is headquartered in Tokyo, Japan.  During the Class Period, Bank of Tokyo-Mitsubishi was a

reference bank for the JBA's Euroyen Tibor panel and a contributing member of the British

Bankers' Association's Japanese Yen Libor panel.

30.     Defendant Sumitomo Mitsui Banking Corporation ("Sumitomo Mitsui") is a

subsidiary of Sumitomo Mitsui Financial Group, Inc. (SMFG) and is headquartered in Tokyo,

Japan. During the Class Period, Sumitomo Mitsui was a reference bank for the JBA's Euroyen

Tibor panel and a contributing member of the British Bankers' Association's Japanese Yen Libor

panel.

31.     Defendant Resona Bank, Ltd., ("Resona Bank") is a Japanese commercial bank

and a member of Resona Holdings, Inc., a Japanese financial services group headquartered in

Tokyo, Japan. During the Class Period, Resona Bank was a reference bank for the JBA's

Euroyen Tibor panel.

32.     Defendant Mizuho Corporate Bank, Ltd. ("Mizuho Corporate Bank") is a

subsidiary of Mizuho Financial Group headquartered in Tokyo, Japan. During the Class Period,

Mizuho Corporate Bank was a reference bank for the JBA's Euroyen Tibor panel and a

contributing member of the British Bankers' Association's Japanese Yen Libor panel.

33.     Defendant The Bank of Yokohama, Ltd. ("The Bank of Yokohama") is a regional

bank based in Yokohama City, Kanagawa Japan. During the Class Period, The Bank of

Yokohama was a reference bank for the JBA's Euroyen Tibor panel.

34.     Defendant Mitsubishi UFJ Trust and Banking Corporation ("Mitsubishi UFJ

Trust") is a core operating company of Mitsubishi UFJ Financial Group (MUFG) and is

headquartered in Tokyo, Japan. During the Class Period, Mitsubishi UFJ Trust was a reference

bank for the JBA's Euroyen Tibor panel.

35.     Defendant Mizuho Trust and Banking Co. ("Mizuho Trust") is a subsidiary of

Mizuho Financial Group headquartered in Tokyo, Japan.  During the Class Period, Mizuho Trust was a reference bank for the JBA's Euroyen Tibor panel.

36.    Defendant The Sumitomo Trust and Banking Co., Ltd. ("The Sumitomo Trust") is a Japanese trust bank and a member of the Sumitomo Mitsui Trust Group headquartered in Tokyo, Japan. During the Class Period, The Sumitomo Trust was a reference bank for the JBA's Euroyen Tibor panel.

37.    Defendant Citibank, Japan Ltd. ("Citibank") is a wholly owned subsidiary of the United States financial services corporation Citigroup Inc., which is headquartered in New York, New York. During the Class Period, Citibank was a reference bank for the JBA's Euroyen Tibor panel.

38.    Defendant JP Morgan Chase Bank, NA ("JP Morgan Chase") is a subsidiary of J.P. Morgan Chase & Co. a Delaware financial holding company headquartered in New York, New York. During the Class Period, JP Morgan Chase was a reference bank for the JBA's Euroyen Tibor panel and a contributing member of the British Bankers' Association's Japanese Yen Libor panel.

39.    Defendant The Royal Bank of Scotland Group PLC ("Royal Bank of Scotland") is a United Kingdom public limited company headquartered in Edinburgh, Scotland.  During the Class Period, Royal Bank of Scotland was a reference bank for the JBA's Euroyen Tibor panel and a contributing member of the British Bankers' Association's Japanese Yen Libor panel.

40.    Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany. During the Class Period, Deutsche Bank was a reference bank for the JBA's Euroyen Tibor panel and a contributing member of the British Bankers' Association's Japanese Yen Libor panel.

41.     Defendant UBS AG ("UBS") is a Switzerland company based in Basel and Zurich, Switzerland. During the Class Period, UBS was a reference bank for the JBA's Euroyen Tibor panel and a contributing member of the British Bankers' Association's Japanese Yen Libor panel.

42.     Defendant BNP Paribas S.A. ("BNP Paribas") is a France-based bank group headquartered in Paris, France. During the Class Period, BNP Paribas was a reference bank for the JBA's Euroyen Tibor panel.

43.     Defendant Shinkin Central Bank ("Shinkin") is a Japan-based financial institution headquartered in Tokyo, Japan. During the Class Period, Shinkin was a reference bank for the JBA's Euroyen Tibor panel.

44.     Defendant The Shoko Chukin Bank, Ltd. ("Shoko Chukin") is joint-stock company and is headquartered in Tokyo, Japan. During the Class Period, Shoko Chukin was a reference bank for the JBA's Euroyen Tibor panel.

45.     Defendant The Norinchukin Bank is a Japanese cooperative bank headquartered in Tokyo, Japan. During the Class Period, The Norinchukin Bank was a reference bank for the JBA's Euroyen Tibor panel and a contributing member of the British Bankers' Association's Japanese Yen Libor panel.

46.     Defendant Barclays Bank PLC, ("Barclays") is a United Kingdom public limited company headquartered in London, England. During the Class Period, Barclays Bank PLC was a contributing member of the British Bankers' Association's Japanese Yen Libor panel.

47.     Defendant HSBC Holdings PLC ("HSBC") is a United Kingdom public limited company headquartered in London, England. During the Class Period, Barclays Bank PLC was a contributing member of the British Bankers' Association's Japanese Yen Libor panel.

48.     Defendant Citibank NA, ("Citibank") is a wholly owned subsidiary of the United States financial services corporation Citigroup Inc., which is headquartered in New York, New York.  During the Class Period, Citibank NA was a contributing member of the British Bankers' Association's Japanese Yen Libor panel.

49.     Defendant Crédit Agricole CIB is the Corporate & Investment Banking arm of the Crédit Agricole group, a retail bank based in France. During the Class Period, Crédit Agricole CIB was a contributing member of the British Bankers' Association's Japanese Yen Libor panel.

50.     Defendant Lloyds Banking Group PLC ("Lloyds") is a United Kingdom public limited company headquartered in London, England. Lloyds was formed in 2009 through the acquisition of HBOS PLC ("HBOS") by Lloyds TSB Bank plc ("Lloyds TSB").  During the Class Period, Lloyds Banking Group was a contributing member of the British Bankers' Association's Japanese Yen Libor panel.

51.     Defendant Société Générale is a major European financial services company and is headquartered in Paris, France.  During the Class Period, Société Générale was a contributing member of the British Bankers' Association's Japanese Yen Libor panel.

52.     Defendant Rabobank Group ("Rabobank") is a financial services provider with offices worldwide and its main headquarters in the Netherlands.   During the Class Period, Rabobank was a contributing member of the British Bankers' Association's Yen Libor panel.

## SUBSTANTIVE ALLEGATIONS

**I.     Background**

    **A.     The Tokyo Interbank Offered Rate**

53.     Tibor is a daily reference rate based on the interest rates at which banks offer to lend unsecured funds to other banks in the Japanese wholesale money market (or interbank market).

54.     Tibor's primary function is to provide a point of reference for unsecured loans between Japanese based banks.  As such, it measures the cost of capital for a Tibor reference bank.  The higher the credit risk for a Tibor bank, the higher the rate that bank would have to pay for borrowed funds, thus leading to higher Tibor rates.  Tibor is published each business day by the JBA.

55.     Tibor is calculated on each business day as of 11:00 a.m. Tokyo time and by 11:20 a.m. Tokyo time on the same day, each Tibor reference bank quotes Tibor rates for 13 maturities (1 week and 1-12 months) for the Japanese Yen Tibor rate which, according to the JBA, is supposed to reflect borrowing rates in the unsecured call market, and the Euroyen Tibor rate which, according to the JBA, is supposed to reflect rates for yen-denominated deposits held in banks outside Japan.

56.     The JBA designates a minimum of 8 reference banks to provide daily rate quotes for the calculation of Tibor rates.

57.     According to the JBA, "[t]he selection of reference banks is based on four factors: 1) market trading volume…, 2) yen asset balance, 3) reputation, and 4) track record in providing rate quotes. (The selection also takes into account JBA TIBOR continuity and the variety of financial sectors to which reference banks belong.)."

58.     In calculating Tibor rates, quotes are discarded from the two highest and the two lowest financial institutions and the remaining rates are then averaged.   The quotes submitted by each reference bank is supposed to be reflective of the credit conditions facing each bank on a daily basis, and based upon the rate a bank could borrow funds at, not the rate at which the bank actually borrowed funds.

59.     According to the JBA, "the rates quoted by reference banks are not intended for use in trading by the reference banks."

60.     The JBA outsources with an outside service provider for some of its JBA Tibor publication services including: "1) [t]abulation of reference rates quoted by reference banks[;] 2) [c]alculation of the JBA TIBOR[;] 3) [t]ransmission of the JBA TIBOR and reference rates…to information providers."

**B.      The Japanese Yen Libor**

61.     Libor is the interest rate at which banks can borrow funds, in marketable size, from other banks in the London interbank market.  Libor's primary function is to provide a point of reference for unsecured loans between London based banks.  As such, it measures the cost of capital for a Libor contributor bank.  The higher the credit risk for a Libor bank, the higher the rate that bank would have to pay for borrowed funds, thus leading to higher Libor rates.  Libor is owned by the BBA, an organization funded primarily by subscriptions from its members.

62.     Libor is calculated and published by Reuters on behalf of the BBA after 11:00 a.m. (and generally around 11:45 a.m.) each day UK time for 10 major currencies (*i.e.*, Japanese yen) and for several maturities, ranging from overnight to one year.  The four major Libor currencies include the Japanese Yen.

63.     The BBA selects only 15 banks to provide daily rate quotes for the calculation and setting of Japanese Yen Libor.  The BBA website states that this "reference panel of banks ... reflects the balance of the market by country and by type of institution.  Individual banks are selected within this guiding principle on the basis of reputation, scale of market activity, and perceived expertise in the currency concerned."   For each currency and maturity, Libor contributor banks submit to Reuters the rate at which a contributing bank believes it could borrow funds should it wish to do so, by asking for and then accepting interbank offers in a reasonable market size just prior to the fix time (11:00 am UK time). The rates submitted by each contributor bank is supposed to be reflective of the credit conditions facing each bank on a daily basis, and based upon what a bank could do, not what it has done.  Thus, Libor depends on the integrity of the contributor banks.

C.     **Euroyen-Based Derivatives**

64.     Euroyen-based derivatives allow individuals and entities with yen interest rate exposure to change the nature of that risk.  Euroyen-based derivatives can be used to, *inter alia*, (1) hedge Euroyen loans, swaps, and deposits; (2) hedge yen forward foreign exchange exposure; and (3) spread against other interest rate derivatives.

65.     Euoyen Tibor and Yen Libor serves as the basis for settlement (or "underlying commodity") of Euroyen interest rate futures and options contracts traded on the CME.[2]  In particular, the underlying commodity for each Euroyen futures contract is a Euroyen time deposit having a principal value of ¥ 100,000,000 with a three-month maturity.

---

[2] The CME has been designated by the U.S. Commodity Futures Trading Commission ("CFTC") as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7.  The CME submits to the CFTC various rules and regulations for approval through which the CME design, create the terms of, and conduct trading in various commodity futures, options and swap contracts, including Tibor-based derivatives, Euroyen futures and options contracts.

66.     According to the CME, the Euroyen futures contract is the most actively traded non-US interest rate contract in the world.  "Euro" interest rates are rates of interest banks charge each other on loans of foreign currency deposits.  By way of example, according to the CME, "in the U.S. a transaction involving a Japanese yen deposit would be negotiated at the Euroyen rate because the yen would be considered the foreign currency."   As a result, on the futures exchange, Euroyen futures prices are meant to reflect market expectations for interest rates on Euroyen deposits for specific dates in the future.

67.     CME Euroyen futures are cash settled based on the last trading day to the Final Settlement Figure for the Singapore Exchange's (SGX) 3-Month Euroyen (TIBOR) futures contract as determined by SGX.

68.     The CME Euroyen futures contract is quoted in terms of the IMM One-Month Libor index points or 100 minus the deposit rate on an annual basis over a 360 day year (e.g., a deposit rate of 7.20 shall be quoted as 92.80).  One basis point is the equivalent of 2,500 Yen.

69.     The contract months for CME Euroyen futures contracts are March, June, September, and December, extending out 5 years (total of 20 contract months).

70.     Trading in a CME Euroyen futures terminates at 11:00 a.m. Tokyo Time on the second Tokyo bank business day immediately preceding the third Wednesday of the contract month ("contract expiration").

71.     Trading in a CME Euroyen quarterly options contract terminates on the same date and time as the underlying futures contract.  Trading in expiring contracts closes at 11:00 am Tokyo time on the last trading day.

## II.      **The Defendants' Unlawful Manipulation of Euroyen Tibor and Yen Libor Rates**

72.     Beginning as early as July 1, 2006 and continuing through at least September 2010, the Defendants herein, as Euroyen Tibor reference banks and Yen Libor contributor banks, intentionally caused and created artificial Euroyen Tibor and Yen Libor rates, including artificially suppressed Euroyen Tibor and Yen Libor rates, by submitting false Euroyen Tibor rates to the JBA and Yen Libor rates to the BBA.  Such artificial Euroyen Tibor and Yen Libor rates, as Defendants knew and intended, directly and proximately caused exchange-traded Euroyen futures and option contracts to trade at artificial levels, including artificially depressed prices, during the Class Period in violation of the CEA, the Sherman Act, and other law.

73.     During the Class Period, three major sets of news items were announced in the public press which have been pointed by many as the "official start" of the worst financial crisis since the Great Depression, including: (a) a "coordinated intervention" by the European Central Bank, the Federal Reserve Bank, and the Bank of Japan; (b) AIG warning that defaults were spreading beyond the subprime sector; and (c) BNP Paribas suspension of three funds that held mortgage backed securities.

74.     Notwithstanding the incredible stresses on banks caused by the severe financial crisis, the Defendants herein continued to report Tibor and Yen Libor rates to the JBA in a narrow band when these rates are supposedly submitted independently and on a daily basis, without knowledge of the quotes by all other Euroyen Tibor or Yen Libor reference banks, and despite the fact that the reference banks have very different lending and financing requirements.

75.     Rather than submit Euroyen Tibor or Yen Libor rates which reflected the rate that each bank could borrow funds should it wish to do so, by asking for and then accepting interbank offers in a reasonable market size just prior to the Tibor fix time of 11:00 a.m. Tokyo time or Yen Libor fix time of 11:00 am London time, the Defendants, during the Class Period, as

Euroyen Tibor and Yen Libor reference banks, knowingly submitted false Euroyen Tibor and Yen Libor rates with the intent to create artificial Euroyen Tibor and Yen Libor rates as to profit from their own positions in Euroyen-based derivatives.

76.     On December 9, 2011, *Bloomberg* reported that the Securities and Exchange Surveillance Commission of Japan recommended penalties against UBS and Citigroup because "[e]mployees of the local operations of [UBS and Citigroup] repeatedly asked bankers to change the rates they submit for setting Tibor to gain an advantage."

77.     On December 9, 2011, *CNBC* reported that "[t]he [Japanese] Securities and Exchange Surveillance Commission said a trader in his 30s lobbied other banks to offer higher or lower rates to move the Tokyo interbank offered rate, or Tibor, to the advantage of his derivatives trading."

78.     On December 11, 2011, the *Wall Street Journal*, summarized the statement of a JSESC official noting, "[t]he official said at a news conference that a trader who worked for UBS and later Citi in Tokyo lobbied a number of participating banks via online chats and emails to change their quotes for short-term yen rates [including Tibor as well as Yen-Libor]."

79.     On February 7, 2012, as reported in the *Wall Street Journal*, "[p]eople familiar with the ongoing [interest rate] probe said investigators in Japan have found dozens of emails and online chat messages from traders who appeared to be trying to influence other bank employees who submitted Libor or Tibor quotes involved in the interest-rate-setting process."

80.     On February 10, 2012, the *Financial Times* reported that, as a result of the actions of Defendant Citibank, Citigroup "was forced to write off" $50 million dollars in losses after it unwound its own market positions.

81.     The same article reported that, "[i]n December, [Japanese] regulators found that two former Citigoup employees in Tokyo…pressured colleagues and employees at other banks involved in the rate-setting process for…Tibor."

82.     In the same article, the *Financial Times* noted that the manipulation of Tibor was "uncovered after another Citi employee in London reported the activity.  Citi took a $50m loss when it unwound the traders' positions and reported the matter to regulators…However, other Citi sources suggested the losses were significantly in excess of that amount.  The investigation…in recent weeks, with more than a dozen [interest rate] traders at banks including Royal Bank of Scotland, Deutsche, UBS and JPMorgan Chase, fired, suspended or placed on administrative leave."

**B.     Governmental Investigations**

83.     Investigations into manipulation of Tibor rates were first publicly disclosed on March 15, 2011 when UBS disclosed in its annual report that it had received subpoenas from the Commodity Futures Trading Commission, U.S. Department of Justice and other U.S. government agencies, as well as an information request from the Japanese Financial Supervisory Agency, relating to its interest rate submissions.  UBS has been granted conditional leniency by the Antitrust Division of the DOJ "in connection with potential antitrust or competition law violations related to submissions for Yen LIBOR and Euroyen TIBOR."

84.     According to a report in the *Financial Times* on December 9, 2011, "[i]nquiries were extended to the Tibor rate in Japan after UBS gave the US Department of Justice information about the setting of yen and dollar rates in Japan in exchange for partial immunity."

85.     As indicated above (¶¶ 16-18), Japan's JSESC has recommended administrative sanctions against Defendants Citibank and UBS for their involvement in the manipulation of interest rates tied to Euroyen-based derivatives.

86.     On February 3, 2012, the *Wall Street Journal* reported that UBS AG, Credit Suisse Group AG, Bank of Tokyo-Mitsubishi UFJ Ltd., Citigroup Inc., Deutsche Bank AG, HSBC Holdings Plc, J.P. Morgan Chase & Co., Mizuho Financial Group Inc., Rabobank International, Royal Bank of Scotland Group Plc, Societe Generate SA and Sumitomo Mitsui Banking Corp., among others, are under investigation from Comco, the Swiss competition regulatory body, for colluding with one another to manipulate Tibor and Libor rates and the prices of Euroyen-based derivatives.

87.     Also on February 3, 2012, *Bloomberg* reported that "Comco said it opened the investigation after receiving an application for its 'leniency program,' which indicated that traders from various banks might have influenced the rate."

88.     As reported in the same *Bloomberg* article, "[d]erivatives traders might have colluded to manipulate the difference between the ask price and the bid price of derivatives based on these reference rates to the detriment of their clients."

89.     On February 13, 2012, the *Wall Street Journal* reported that Canada's Competition Bureau joined U.S., European and Japanese regulators in investigations into reference banks collusion and resulting manipulation of Yen Libor and Tibor.

90.     On February 17, 2012, the *Wall Street Journal* reported that Canada's Competition Bureau said "lawyers acting for the cooperating bank had told it that traders at six banks on the yen Libor panel—Citigroup Inc., Deutsche Bank AG, HSBC Holdings PLC, J.P.

Morgan Chase & Co., Royal Bank of Scotland Group PLC and UBS—'entered into agreements to submit artificially high or artificially low' quotes..."

91.    The same article reported that according to court documents, "[t]he traders used emails and instant messages to tell each other whether they wanted 'to see a higher or lower yen Libor [rate] to aid their trading positions(s),'…Each of the traders would then 'communicate internally' with the person at their bank who was responsible for submitting the Libor quote, before letting each other know if this attempt to influence the quote had worked."

92.    According to Canadian court documents,

a.    Counsel for the Cooperating Party has provided the Bureau with information that, during the Material Time, the Participant Banks, at times facilitated by the Case Brokers, entered into agreements to submit artificially high or artificially low London Inter-Bank Offered Rate ("LIBOR" submissions in order to impact the Yen LIBOR interest rates published by the British Bankers Association (the "BBA"). This was done for the purpose of adjusting the prices of financial instruments that use Yen LIBOR rates as a basis. Counsel for the Cooperating Party indicated that the Participant Banks submitted rates consistent with the agreements and were able to move Yen LIBOR rates to the overall net benefit of the Participants.

**b.    The Conspiracy to Enhance the Value of IRDs through Manipulating Yen LIBOR**

c.    Counsel for the Cooperating Party has proffered that, during the Material Time, the Participant Banks communicated with each other and through the Cash Brokers to form agreements to fix the setting of Yen LIBOR. Counsel for the Cooperating Party proffered that this was done for the purpose of benefiting trading positions, held by the Participant Banks, on IRDs [Interest Rate Derivatives]. By manipulating Yen LIBOR, the Participant Banks affected all IRDs that use Yen LIBOR as a basis for their price, including IRDs with Canadian counterparties.

d.    Counsel for the Cooperating Party has proffered that the alleged communications and agreements in relation to Yen LIBOR occurred outside Canada but affected IRDs based on Yen LIBOR on a worldwide basis, including in Canada.

e.    The Alleged Offenses were carried out through e-mails and Bloomberg instant messages between IRD traders at the Participant Banks and employees of Cash Brokers (who had influence in the setting of Yen LIBOR rates).

f.     Bloomberg Terminals allow the user to access Bloomberg Professional financial data. A feature of this service is instant messaging using the Bloomberg Terminal. These terminals and the service are in use at most large law firms.

g.     IRD traders at the Participant Banks communicated with each other their desire to see a higher or lower Yen LIBOR to aid their trading position(s). These requests for changes in Yen LIBOR were often initiated by one trader and subsequently acknowledged by the trader to whom the communication was sent. The information provided by counsel for the Cooperating Party showed that the traders at Participant Banks would indicate their intention to, or that they had already done so, communicate internally to their colleagues who were involved in submitting rates for Yen LIBOR. The traders would then communicate to each other confirming that the agreed upon rates were submitted. However not all attempts to affect LIBOR submissions were successful.

h.     The Cash Brokers were asked by IRD traders at the Participant Banks to use their influence with Yen LIBOR submitters to affect what rates were submitted by other Yen LIBOR panel banks, including the Participant Banks.

93.    According to these same documents, Defendant HSBC,

a.     Counsel for the Cooperating Party has proffered that, during the Material Time, one of its IRD traders ("Trader A") had communications with an IRD trader at HSBC. Trader A communicated his trading positions, his desire for a certain movement in Yen LIBOR and instructions for the HSBC trader to get HSBC to make Yen LIBOR submissions consistent with his wishes. Attempts through the HSBC trader to influence Yen LIBOR were not always successful. Trader A also communicated his desire for a certain movement in the Yeh LIBOR rate with the Cash Brokers. He instructed them to influence the Yen LIBOR submitters of HSBC. The Cash Brokers acknowledged making these attempts. However, not all of the attempts, by the Cash Brokers, to influence the Yen LIBOR submissions of HSBC were successful. Trader A communicated to the Cash Brokers a plan involving HSBC, Deutsche, and the Cooperating Party to change Yen LIBOR through a series of staggered submissions.

b.     For the reasons stated in paragraphs 51 and 52, I believe that the HSBC trader described in the preceding paragraph is Peter O'Leary, a trader with HSBC in London, UK. During at least a portion of the Material Time, he was registered by HSBC Bank PLC with the FSA.

c.     HSBC Bank Canada is a Schedule II bank. Schedule II banks are incorporated pursuant to the *Bank Act* and are subsidiaries of foreign banks.

d.     HSBC Bank Canada is a subsidiary of HSBC Canada Holdings (UK) Limited, which in turn is a subsidiary of HSBC Holdings PLC.

e.      HSBC Bank PLC, one of the Participant Banks, is also a subsidiary of HSBC Holdings PLC.

f.      HSBC Bank Canada is an affiliate of HSBC Bank PLC under subsection 2(2) of the Act as both are subsidiaries of the same corporation, HSBC Holdings PLC, which is located in the UK.

g.      I believe that HSBC Bank PLC is in possession or control of records that are relevant to the Inquiry as I believe that HSBC Bank PLC is involved in Yen LIBOR submissions and has employees involved in the Alleged Offences.  Records described in **Schedule "A"** are, in my experience, records that would ordinarily be kept by firms doing business in the areas set out in this Affidavit and that are in possession or control of HSBC Bank Canada's affiliate, HSBC Bank PLC, which is located outside of Canada.

94.      According to these same documents, Defendant Deutsche,

a.      Counsel for the Cooperating Party has proffered that, during the Material Time, Trader A had communications with two IRD traders at Deutsche regarding its Yen LIBOR submissions.  Trader A communicated his trading positions, his desire for a certain movement in Yen LIBOR and asked for the Deutsche IRD trader's assistance to get Deutsche to make Yen LIBOR submissions consistent with his wishes.  The Deutsche IRD trader also shared his trading positions with Trader A.  The Deutsche IRD trader acknowledged these requests.  Trader A also aligned his trading positions with the Deutsche IRD trader to align their interests in respect of Yen LIBOR.  The Deutsche IRD trader communicated with Trader A considerably during the period of time, mentioned previously, when Trader A told a Cash Broker of a plan involving the Cooperating Party, HSBC,and Deutsche to change Yen LIBOR in a staggered and coordinated fashion by the Cooperating Party, HSBC, and Deutsche.  Not all attempts to change the LIBOR rate were successful.

b.      For the reasons stated in paragraphs 51 and 52, I believe that the Deutsche IRD trader described in the preceding paragraph is Guillaume Adolph, a trader with Deutsche in London, UK.  During at least a portion of the Material Time, he was registered by Deutsche Bank AG with the FSA.

c.      Deutsche Bank AG (Canada Branch) is a Schedule III authorized foreign bank. Schedule III authorized foreign banks are branches of foreign banks permitted to carry on business in Canada pursuant to the *Bank Act*.

d.      Deutsche Bank AG (Canada Branch) is a subsidiary of Deutsche Bank AG, a Participant Bank.

e.      Deutsche Bank AG (Canada Branch) is an affiliate of Deutsche Bank AG under subsection 2(2) of the Act as it is a subsidiary of Deutsche Bank AG, which is located in Germany.

f.      I believe that Deutsche Bank AG is in possession or control of records that are relevant to the Inquiry as I believe that Deutsche Bank AG is involved in Yen LIBOR submissions and has employees involved in the Alleged Offences.  Records described in **Schedule "A"** are, in my experience, records that would ordinarily be kept by firms doing business in the areas set out in this Affidavit and that are in possession or control of Deutsche Bank AG's (Canada Branch) affiliate, Deutsche Bank AG, which is located outside of Canada.

95.     According to these same court documents, Defendant RBS,

a.      Counsel for the Cooperating Party has proffered that, during the Material Time, Trader A had communications with IRD traders at RBS regarding its Yen LIBOR submissions.  Trader A explained to one RBS IRD trader who his collusive contacts were and how had and was going to manipulate Yen LIBOR.  Trader A also communicated his trading positions, his desire for a certain movement in Yen LIBOR and gave instructions for the RBS IRD trader to get RBS to make Yen LIBOR submissions consistent with Trader A's wishes.  The RBS IRD trader acknowledged these communications and confirmed that he would follow through.  Trader A and the RBS IRD trader also entered into transactions that aligned their trading positions in regard to Yen LIBOR.  Trader A also communicated with another IRD trader at RBS his trading positions, his desire for a certain movement in Yen LIBOR and instructions for the IRD trader to get RBS to make Yen LIBOR submissions consistent with his wishes.  The second RBS IRD trader agreed to do this.  Not all attempts to change the LIBOR rate were successful.

b.      For the reasons stated in paragraphs 51 and 52, I believe that the RBS IRD traders described in the preceding paragraph are Brent Davies and Will Hall, both traders with RBS in London, UK.  During at least a portion of the Material Time, they were registered by The Royal Bank of Scotland PLC with the FSA.

c.      The Royal Bank of Scotland N.V. (Canada Branch) is a Schedule III bank.

d.      The Royal Bank of Scotland N.V. (Canada Branch) is a subsidiary of The Royal Bank of Scotland N.V., which is in turn a subsidiary of RFS Holdings B.V., which in turn is a subsidiary of The Royal Bank of Scotland Group PLC, an Alleged Participant.

e.      The Royal Bank of Scotland N.V. (Canada Branch) is an affiliate of The Royal Bank of Scotland PLC under subsection 2(2) of the Act as they are both subsidiaries of The Royal Bank of Scotland Group PLC, which is located in the UK.

f.      I believe that The Royal Bank of Scotland N.V. and The Royal Bank of Scotland PLC are in possession or control of records that are relevant to the Inquiry as I believe that The Royal Bank of Scotland Group PLC and The Royal Bank of Scotland PLC are involved in Yen LIBOR submissions and have employees involved in the Alleged Offences.  Records described in **Schedule "A"** are, in my experience, records that would ordinarily be kept by firms doing business in the areas set out in this Affidavit and that are in possession or control of The Royal Bank of Scotland N.V. (Canada Branch)'s affiliates, The Royal Bank of Scotland Group PLC and The Royal Bank of Scotland PLC, which are located outside of Canada.

96.     According to these same court documents, Defendant JP Morgan,

a.      Counsel for the Cooperating Party has proffered that, during the Material Time, Trader A had communications with IRD traders at JP Morgan regarding its Yen LIBOR submissions.  Trader A communicated his trading positions, his desire for a certain movement in Yen LIBOR and gave instructions for them to get JP Morgan to make Yen LIBOR submissions consistent with his wishes.  Trader A also asked if the IRD traders at JP Morgan required certain Yen LIBOR submissions to aid their trading requests.  The JP Morgan IRD trader acknowledged these requests and said they would act on them.  On another occasion one of the JP Morgan IRD traders asked Trader A for a certain Yen LIBOR submission, which Trader A agreed to help with.  Trader A admitted to an IRD trader at RBS that he colluded with IRD traders at JP Morgan.  Not all attempts to change the LIBOR rate were successful.

b.      For the reasons stated in paragraphs 51 and 52, I believe that the JP Morgan IRD traders described in the preceding paragraph are Paul Glands and Stewart Wiley, both traders with JP Morgan in London, UK.  During at least a portion of the Material Time, they were registered by J.P. Morgan Securities Ltd. with the FSA.

c.      J.P. Morgan Bank Canada is a Schedule II bank.

d.      J.P. Morgan Bank Canada is a subsidiary of J P Morgan International Finance Ltd., which is in turn a subsidiary of Bank One International Holdings Corporation, which in turn is a subsidiary of J.P. Morgan International Inc., which in turn is a subsidiary of JPMorgan Chase Bank, National Association, which in turn is a subsidiary of JPMorgan Chase & Co., one of the Participant Banks.

e.      J.P. Morgan Securities Ltd. is an affiliate of J.P. Morgan Chase International Holdings, which in turn is a subsidiary of J.P. Morgan Chase (UK) Holdings Ltd., which in turn is a subsidiary of JPMorgan Chase & Co.

f.      J.P. Morgan Bank Canada is an affiliate of J.P. Morgan Securities Ltd. under subsection 2(2) of the Act as they are both subsidiaries of JPMorgan Chase & Co.  J.P. Morgan Bank Canada is also an affiliate of JPMorgan Chase & Co. under subsection 2(2) of the Act as it is a subsidiary of JPMorgan Chase & Co.

g.      I believe that JPMorgan Chase & Co. and its subsidiary J.P. Morgan Securities Ltd. are in possession or control of records that are relevant to the Inquiry as I believe that JPMorgan Chase & Co. and J.P. Morgan Securities Ltd. are involved in Yen LIBOR submissions and have employees involved in the Alleged Offences.  Records described in **Schedule "A"** are, in my experience, records that would ordinarily be kept by firms doing business in the areas set out in this Affidavit and that are in possession or control of J.P. Morgan Bank Canada's affiliates, JPMorgan Chase & Co. and J.P. Morgan Securities Ltd., which are located outside Canada.

97.     According to these same court documents, Defendant Citi,

a.      Counsel for the Cooperating Party has proffered that, during the Material Time, Trader B of the Cooperating Party communicated with an IRD trader at Citi.  They discussed their trading positions, advance knowledge of Yen LLIBOR submissions by their banks and others, and aligned their trading positions.  They also acknowledged efforts to get their banks to submit the rates they wanted.  Not all attempts to change the LIBOR rate were successful.

b.      For the reasons stated in paragraphs 51 and 52, I believe that the Citi IRD trader described in the preceding paragraph is a former employee of the Cooperating Party.

c.      Citibank Canada is a Schedule II bank.

d.      Citibank Canada is a subsidiary of Citibank Overseas Investment Corporation., which in turn is a subsidiary of Citigroup Inc., the parent of a Participant Bank.

e.      Citibank N.A. is a subsidiary of Citigroup Inc.

f.      Citibank Canada is an affiliate of Citibank N.A. under subsection 2(2) of the Act as they are both subsidiaries of Citigroup Inc.  Citibank Canada is also an affiliate of Citigroup Inc. under subsection 2(2) of the Act as it is a subsidiary of Citigroup Inc.

g.      I believe that Citigroup Inc. and its subsidiary Citibank N.A. are in possession or control of records that are relevant to the Inquiry as I believe that Citigroup Inc. and Citibank N.A. are involved in Yen LIBOR submissions and have employees involved in the Alleged Offences.  Records described in **Schedule "A"** are, in my experience, records that would ordinarily be kept by firms doing business in the areas set out in this Affidavit and that are in possession or control of Citibank Canada's affiliates, Citigroup Inc. and Citibank N.A., which are located outside Canada.

## CLASS ACTION ALLEGATIONS

98.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure ("FRCP") on his own behalf and as representative of a class ("Class")

defined as all persons, corporations and other legal entities (other than Defendants, their employees, affiliates, and co-conspirators) that transacted in exchange-traded Euroyen futures and option contracts during the period from at least June 1, 2006 through and including September 2010 (the "Class Period").

99.     The Class is so numerous that the individual joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least thousands of geographically dispersed Class members transacted in exchange-traded Euroyen futures and option contracts during the Class Period.

100.    Common questions of law and fact exist as to all members of the Class and predominate over any questions that affect only individual members of the Class.  These common questions of law and fact include, without limitation:

    a.     Whether Defendants' acts constituted a manipulative or unlawful act;

    b.     Whether Defendants injected into Euoryen Tibor and Yen Libor rates and exchange-traded Euroyen futures and option contracts illegitimate forces of supply and demand;

    c.     Whether Defendants manipulated the prices of exchange-traded Euroyen futures and option contracts to artificial levels in violation of the CEA;

    d.     Whether Defendants combined, agreed, or conspired to suppress, fix, maintain, or stabilize Euoryen Tibor and Yen Libor rates and exchange-traded Euroyen futures and option contract prices in violation of the antitrust laws;

    e.     The character, extent, and duration of Defendants' manipulation of Euroyen Tibor and Yen Libor rates and exchange-traded Euroyen futures and option contracts;

f.     Whether Defendants' unlawful conduct caused injury to the business or property

of Plaintiff and the Class;

g.     The fact and degree of impact on Euroyen Tibor and Yen Libor rates and the

prices of exchange-traded Euroyen futures and option contracts resulting from

Defendants' course of unlawful conduct; and

h.     The appropriate measure of relief.

101.    Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff

and all members of the Class sustained damages arising out of Defendants' common course of

conduct in violation of law as complained of herein.  The injuries and damages of each member

of the Class were directly caused by Defendants' wrongful conduct in violation of law as alleged

herein.

102.    Plaintiff will fairly and adequately protect the interests of the members of the

Class.  Plaintiff is an adequate representative of the Class and has no interests which are adverse

to the interests of absent Class members.  Plaintiff has retained counsel who have substantial

experience and success in the prosecution of complex class action litigation, including

commodity futures manipulation and antitrust class action litigation.

103.    A class action is superior to other methods for the fair and efficient adjudication

of this controversy.  Treatment as a class action will permit a large number of similarly situated

persons to adjudicate their common claims in a single forum simultaneously, efficiently, and

without the duplication of effort and expense that numerous individual actions would engender.

Class treatment will also permit the adjudication of claims by many class members who could

not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the

court system of adjudication of such individualized litigation would be substantial.  The

prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

104.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

### EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

105.    By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self-concealing.  Defendants engaged in secret and surreptitious activities in order to manipulate Euroyen Tibor and Yen Libor rates to artificial levels.

106.    Defendants fraudulently concealed their manipulative acts by, among other things, willfully concealing from the market their unlawful manipulation of Euroyen Tibor and Yen Libor rates reported to the JBA and BBA, respectively.  Because of such fraudulent concealment, and the fact that Defendants' manipulation is inherently self-concealing, Plaintiff and the members of the Class could not have discovered the existence of Defendants' manipulation any earlier than public disclosures thereof.

107.    As a result, Plaintiff and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by the exercise of due diligence on or before March 15, 2011, when UBS disclosed in its annual report that it had received subpoenas from the Commodity Futures Trading Commission, U.S. Department of Justice, and other U.S. government agencies, as well as an information request from the Japanese Financial Supervisory Agency and received conditional leniency from the Antitrust Division of the U.S. Department of Justice in connection with potential antitrust or competition law violations related to submissions of Euroyen Tibor and Yen Libor rates.

108.     As a result of the concealment of Defendants' unlawful conduct, and the self-concealing nature of Defendants' manipulative acts, Plaintiff asserts the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiff.

109.     Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

**AS AND FOR A FIRST CLAIM FOR RELIEF**
**MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT**
(7 U.S.C. § 1, *et seq.*)

110.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

111.     By their intentional misconduct, the Defendants each violated Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), and caused prices of exchange-traded Euroyen futures and option contracts to be artificial, including artificially suppressed, during the Class Period.

112.     Defendants' trading and other activities alleged herein constitute market power manipulation of the prices of exchange-traded Euroyen futures and option contracts in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a).

113.     Defendants' foregoing extensive manipulative conduct deprived Plaintiff and other traders of a lawfully operating market during the Class Period.

114.     Plaintiff and others who transacted in exchange-traded Euroyen futures and option contracts during the Class Period transacted at artificial and unlawful prices resulting from Defendants' manipulations in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*, and as a direct result thereof were injured and suffered damages.

115.     Plaintiff and the Class are each entitled to damages for the violations of the CEA alleged herein.

## AS AND FOR A SECOND CLAIM FOR RELIEF
## VICARIOUS LIABILITY FOR MANIPULATION

116.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

117.    Each Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

## AS AND FOR A THIRD CLAIM FOR RELIEF
## AIDING AND ABETTING VIOLATIONS OF THE COMMODITY EXHANGE ACT

118.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

119.    Defendants knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein.  Defendants did so knowing of each other's manipulation of Euroyen Tibor and Yen Libor rates, and willfully intended to assist these manipulations, which resulted in exchange-traded Euroyen futures and option contracts to reach artificial levels, including artificially depressed levels, during the Class Period in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

## AS AND FOR A FOURTH CLAIM FOR RELIEF
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT AND SECTION 4 OF THE
## CLAYTON ACT

120.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

121.    Defendants entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

122.    During the Class Period, Defendants possessed market power in the setting of Euroyen Tibor and Yen Libor rates and the prices of exchange-traded Euroyen futures and option contracts.

123.    The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, suppressed and/or made artificial Euroyen Tibor and Yen Libor rates and the prices of exchange-traded Euroyen futures and option contracts.  Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

124.    Defendants' conspiracy, and resulting impact on Euroyen Tibor and Yen Libor rates and exchange-traded Euroyen futures and option contracts, occurred in or affected interstate and international commerce.

125.    As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property.

126.    As a consequence, Plaintiff and the Class are each entitled to treble damages for the Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining Defendants from engaging in additional anticompetitive conduct.

### AS AND FOR A FIFTH CLAIM FOR RELIEF
### VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT
(815 ILCS §505/1 *et seq.*)

127.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

128.    Defendants engaged in unfair competition and unfair or deceptive acts or practices in violation of the Illinois Consumer Fraud Act, 815 ILCS §505/1 *et seq.* when the

Defendants herein, as Tibor reference banks and Yen Libor reference banks, respectively, knowingly submitted false Euroyen Tibor and Yen Libor rates.  Defendants did so knowing of each other's manipulation of Euroyen Tibor and Yen Libor rates, and willfully intended to assist these manipulations, which resulted in Euroyen-based derivatives to reach artificial levels, including artificially depressed levels, during the Class Period. As a direct and proximate result of Defendants' unfair competition and unfair or deceptive acts or practices, Plaintiff and Class transacted in Euroyen-based derivatives at artificial prices during the Class Period, and as a direct result thereof were injured and suffered damages.

**AS AND FOR A SIXTH CLAIM FOR RELIEF**
**VIOLATION OF NEW YORK'S GENERAL BUSINESS LAW**
(§ 349 N.Y. G.B.L.)

129.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

130.    Defendants engaged in deceptive acts or practices in violation of New York's General Business Law,  § 349 N.Y. G.B.L., when the Defendants herein, as Tibor reference banks and Yen Libor reference banks, respectively, knowingly submitted false Euroyen Tibor and Yen Libor rates.  Defendants did so knowing of each other's manipulation of Euroyen Tibor and Yen Libor rates, and willfully intended to assist these manipulations, which resulted in the prices of exchange-traded Euroyen futures and option contracts to reach artificial levels, including artificially depressed levels, during the Class Period.  As a direct and proximate result of Defendants' deceptive acts or practices, Plaintiff and Class transacted in Euroyen futures and option contracts at artificial prices during the Class Period, and as a direct result thereof were injured and suffered damages.

**AS AND FOR A SEVENTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT AND RESTITUTION**

131.   Plaintiff incorporates by reference and re-alleges the preceding allegations, as though fully set forth herein.

132.   Defendants financially benefited from their unlawful acts.  These unlawful acts caused Plaintiff and other members of the Class to suffer injury, lose money, and transact Euroyen-based derivatives at artificial prices.

133.   As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner.

134.   Each Defendant should pay restitution or its own unjust enrichment to Plaintiff and members of the Class.

135.   Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

## PRAYER FOR RELIEF

(A)   For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative, and their counsel as Class counsel;

(B)   For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

(C)   For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the federal antitrust laws, in an amount to be trebled in accordance with such laws;

(D)     Ordering injunctive relief, preventing and restraining Defendants and all persons acting on their behalf from further engaging in the unlawful acts alleged herein;

(E)     For a judgment awarding Plaintiff and the Class damages against Defendants for their unfair or deceptive acts or practices in violation of 815 ILCS §505/1, *et seq*.;

(F)     For a judgment awarding Plaintiff and the Class damages against Defendants for their unfair or deceptive acts or practices in violation of § 349 of New York's General Business Law, in an amount to be trebled in accordance with such law, or fifty dollars, whichever is greater;

(G)     For a judgment awarding Plaintiff and the Class any and all sums of Defendants' unjust enrichment;

(H)     For an order imposing a constructive trust temporarily, preliminarily, permanently or otherwise on Defendants' unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiff and the Class;

(I)     For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(J)     For such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff respectfully demands a trial by jury.

Dated:  White Plains, New York
        April 30, 2012

                                    LOWEY DANNENBERG COHEN
                                    & HART, P.C.

                                    By: _____
                                    Vincent Briganti, Esq.
                                    Geoffrey Horn, Esq.
                                    One North Broadway
                                    White Plains, New York, 10601
                                    Tel.: 914-997-0500
                                    Fax: 914-997-0035

                                    *Attorneys for Plaintiff Jeffrey Laydon and
                                    the Euroyen Exchange Traded Class*