**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**



| | |
|---|---|
| JEFFREY LAYDON, on behalf of himself and all others similarly situated, | |
| Plaintiff, | Docket No. 12-cv-3419 (GBD) |
| - against - | ECF Case |
| MIZUHO BANK, LTD., THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., THE SUMITOMO TRUST AND BANKING CO., LTD., THE NORINCHUKIN BANK, MITSUBISHI UFJ TRUST AND BANKING CORPORATION, SUMITOMO MITSUI BANKING CORPORATION, RESONA BANK, LTD., J.P. MORGAN CHASE & CO., J.P. MORGAN CHASE BANK, NATIONAL ASSOCIATION, J.P. MORGAN SECURITIES PLC, MIZUHO CORPORATE BANK, LTD., DEUTSCHE BANK AG, MIZUHO TRUST AND BANKING CO., LTD., THE SHOKO CHUKIN BANK, LTD., SHINKIN CENTRAL BANK, UBS AG, UBS SECURITIES JAPAN CO. LTD., THE BANK OF YOKOHAMA, LTD., SOCIÉTÉ GÉNÉRALE SA, THE ROYAL BANK OF SCOTLAND GROUP PLC, ROYAL BANK OF SCOTLAND PLC, RBS SECURITIES JAPAN LIMITED, BARCLAYS BANK PLC, CITIBANK, NA, CITIGROUP, INC., CITIBANK, JAPAN LTD., CITIGROUP GLOBAL MARKETS JAPAN, INC., COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., HSBC HOLDINGS PLC, HSBC BANK PLC, ICAP PLC, R.P. MARTIN HOLDINGS LIMITED AND JOHN DOE NOS. 1-50, | **SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION………. .........................................................................................1

JURISDICTION AND VENUE ..............................................................................21

PARTIES…………………...................................................................................23

AGENTS AND UNNAMED CO-CONSPIRATORS ..............................................32

SUBSTANTIVE ALLEGATIONS ...........................................................................33

I.      Background ................................................................................................33

        A.      Euroyen TIBOR and Yen-LIBOR ...........................................................33

        B.      Euroyen TIBOR Futures Contracts ..........................................................35

        C.      U.S. Based Transactions in Euroyen TIBOR Futures Contracts ..............38

                1.      The  CFTC Granted No-Action Relief to TFX for the Domestic
                        (U.S. Based) Trading of Euroyen TIBOR Futures Contracts.........................38

                2.      The CFTC Granted No-Action Relief to LIFFE for the
                        Domestic (U.S. Based) Trading of Euroyen TIBOR Futures
                        Contracts ...............................................................................45

                3.      SGX and CME Sign Historic Mutual Offset System Agreement
                        and the CFTC Grants No-Action Relief to SGX for the
                        Domestic (U.S. Based) Trading of Euroyen TIBOR Futures
                        Contracts ...............................................................................47

                4.      TFX Signs Memorandum of Understandings (MOUs) With
                        Euronext LIFFE and SGX Relating to the Trading of Euroyen
                        TIBOR Futures Contracts..............................................................49

II.     Defendants Intentionally Manipulated Euroyen TIBOR Futures Prices by Falsely
        Reporting Euroyen TIBOR and Yen-LIBOR Rates to the JBA and BBA .......................50

III.    Defendants Manipulated Euroyen TIBOR Futures Prices By Their Illegitimate,
        Non-Bona Fide Trading of Euroyen TIBOR Contracts and Other Derivatives ...............50

IV.     Defendants' Unlawful Conduct Has Led to Deferred Criminal Prosecution
        Agreements, Criminal Charges, Guilty Pleas and Settlements Resulting in the
        Payment of Fines and Penalties in Excess of $2.5 Billion to Governmental
        Authorities in the U.S. and Abroad ..............................................................51

        A.      The UBS Settlement.....................................................................51

A.1.   UBS Settlement - DOJ Statement of Facts ....................................52

    a.    Overview ..................................................................52

    b.    Manipulation Within UBS of its Yen LIBOR and Euroyen TIBOR Submissions .............................................55

    c.    The Role of UBS Managers ...............................................61

    d.    Use of Brokers to Manipulate Yen-LIBOR .........................................63

        i.    Use of Brokers to Disseminate Misinformation.........................63

        ii.    UBS's Use of Brokers as Conduits to Other Banks ...................69

        iii.    Compensation of Brokers............................................70

        iv.    Knowledge of Yen-LIBOR Manipulation Through Cash Brokers ..............................................................70

    e.    Collusion with Other Banks to Manipulate Yen-LIBOR ...................71

    f.    Implications of UBS's Derivatives Traders' Requests ........................76

    g.    Directions by UBS Managers to Submit LIBOR Contributions in Order to Avoid Reputational Harm ...................................78

A.2.   UBS Settlement  - CFTC Order....................................................80

    a.    Conflicts of Interest and Lack of Internal Controls Allowed the Misconduct at UBS to Flourish For Years............................80

    b.    UBS Made False Reports to Manipulate Euroyen TIBOR and Yen-LIBOR to Financially Benefit UBS's Derivatives Positions........82

    c.    The Senior Yen Trader's Illegal Manipulative Conduct.......................84

    d.    UBS's Internal Requests to Adjust Submissions ..................................85

    e.    Reconciliation of Conflicting Internal Trading Positions....................88

    f.    The Senior Yen Trader-Submitter's Knowledge that the Conduct Was Improper ...................................................89

    g.    Collusion with Other Panel Banks .......................................90

    h.    Collusion with Interdealer Brokers .......................................93

i. Knowledge of Yen-LIBOR Manipulation Through Cash Brokers ...................................................................................95

j. UBS's Use of Brokers as Conduits to Other Banks ..............................96

k. Using False "Run-Throughs" of Predicted Yen-LIBORs ....................96

l. Using Interdealer Brokers to Help Pressure Other Banks ...................98

m. Publishing False Market Rates to Panel Banks on Broker Screens .............................................................................................99

n. "Spoofing:" Publication of False Bids and Offers ..............................99

o. The Senior Yen Trader Ensured Interdealer Brokers Were Compensated for Assisting the Manipulative Scheme  .....................100

p. Extra Trades to Generate Unearned Commissions ............................101

q. "Wash" Trades to Generate Commissions ........................................101

r. UBS Paid a Special "Bonus" for Cash Broker A................................102

s. Summer 2009 Schemes: the "Turn Campaign" and "Operation 6M" ...............................................................................................104

  i. The Turn Campaign.................................................................105

  ii. Operation 6M .........................................................................109

t. Avoiding Conflict with Yen Bank F Trader-Submitter's Interests ....................................................................................112

u. The Last Phase of Operation 6M ......................................................113

v. UBS's Continued Manipulative Conduct Concerning Euroyen TIBOR and Yen-LIBOR After the Senior Yen Trader Leaves UBS  .............................................................................................114

w. Legal Findings ................................................................................115

A.3. UBS Settlement - The FSA Final Notice.....................................................118

a. Manipulation of UBS's Yen-LIBOR Submissions ............................118

b. Collusion With Brokers and Other Yen-LIBOR Panel Banks............119

c. Managerial Awareness of the Manipulation ......................................121

|        |      | d. | Requests to Tailor "Run Throughs"................................................... 121 |
|        |      | e. | Requests to "Spoof" the Market ...................................................... 122 |
|        |      | f. | Requests to Manipulate Screens ..................................................... 122 |

| B. |      | The RBS Settlement ................................................................................ 123 |
|    | B.1. | RBS Settlement- DOJ Statement of Facts ............................................... 123 |
|    |      | a. | Overview ......................................................................... 123 |
|    |      | b. | Manipulation Within RBS of its Yen-LIBOR Submissions .............. 126 |
|    |      | c. | The Role of RBS Managers .................................................. 131 |
|    |      | d. | Interbank Coordination of Yen-LIBOR Submissions......................... 132 |
|    |      | e. | Implications of RBS's Derivatives Traders' Requests ...................... 140 |
|    | B.2. | RBS Settlement  - CFTC Order .......................................................... 142 |
|    |      | a. | Summary ....................................................................... 142 |
|    |      | b. | Conflicts of Interest and Lack of Internal Controls Allowed the Misconduct at RBS to Flourish For Years .......................................... 144 |
|    |      |    | i.  | RBS's Money Market Traders Determined RBS's Yen-LIBOR Submissions................................................ 144 |
|    |      |    | ii. | RBS Organized Trading Desks to Encourage Money Market and Derivatives Traders to Communicate ................... 145 |
|    |      | c. | RBS Made False Reports to Manipulate Yen-LIBOR to Benefit RBS's Derivatives Positions............................................... 147 |
|    |      | d. | Internal Yen Requests by the Senior Yen Trader and Others............. 149 |
|    |      | e. | The Knowing Participation of the Yen Manager ................................ 151 |
|    |      | f. | The Senior Yen Trader Expected His Requests to Be Followed........ 151 |
|    |      | g. | RBS Traders Were Aware of Other Banks That Were Also Manipulating Yen-LIBOR ................................................ 152 |
|    |      | h. | RBS's Primary Yen-LIBOR Submitter Based Certain of RBS's Yen-LIBOR Submissions on Traders' Requests or on His Own Trading Positions ...................................... 153 |

|   | i. | RBS's Main Backup Yen-LIBOR Submitter, a Yen Derivatives Trader, Based Submissions on Trading Positions | 154 |
|   | j. | RBS Colluded with UBS | 154 |
|   | k. | Coordination With an Interdealer Broker | 156 |
|   | l. | RBS Yen Trader 1 Manipulated Yen-LIBOR through Interdealer Brokers and Engaged in Wash Trades to Compensate Dealers for Their Assistance | 156 |
|   | m. | RBS Continued to Manipulate LIBOR even after Being Placed on Notice of the CFTC's Investigation of RBS's U.S. Dollar LIBOR Practices | 159 |
|   | n. | Legal Findings | 161 |
| B.3. | RBS Settlement – The FSA Final Notice | | 164 |
|   | a. | Overview | 164 |
|   | b. | Manipulation of RBS's Own Submissions to Benefit Derivatives Trading Books | 165 |
|   | c. | Collusion with Panel Banks and Broker Firms | 166 |
|   | d. | Wash Trades | 166 |
|   | e. | Management Awareness of the Manipulation | 167 |
|   | f. | Motive | 167 |
|   | g. | Inappropriate Submissions by Money Market Traders | 167 |
|   | h. | Failure to Identify and Manage Risks of Inappropriate Submissions | 168 |
|   | i. | Absence of Any Submissions-Related Systems and Controls Until March 2011 | 169 |
|   | j. | Inadequate Transaction Monitoring Systems and Controls | 169 |
|   | k. | Failures of Management Oversight | 169 |
| C. | The Barclays Settlement | | 170 |
| C.1. | Barclays Settlement - DOJ Statement of Facts | | 170 |
| C.2. | Barclays Settlement – The CFTC Order | | 173 |

a.      Overview ............................................................ 173

b.      Legal Findings ................................................. 175

C.3.    Barclays Settlement - The FSA Final Notice .............................. 177

D.      Thomas Hayes and Roger Darin Criminal Complaint ............................ 179

V.      Defendants' Unlawful Conduct Has Also Led to Investigations,
        Issuance of Findings of Misconduct and Administrative
        Sanctions with Governmental Authorities in the U.S. and Abroad .................. 179

A.      Recommendations and Findings by the Japanese Securities and Exchange
        Surveillance Commission and Administrative Action by the Japanese
        Financial Services Agency ......................................................... 179

        1.      UBS ................................................................. 180

        2.      Citigroup/Citibank .......................................... 182

        3.      RBS ................................................................. 186

B.      Swiss Competition Commission Investigation ............................... 187

C.      Canadian Competition Bureau Investigation ............................... 188

        1.      HSBC ................................................................. 192

        2.      Deutsche Bank ............................................. 193

        3.      RBS ................................................................. 194

        4.      JPMorgan Chase ............................................ 195

        5.      Citibank/Citigroup ......................................... 196

        6.      Records Sought by the CCB from the Participant Banks and
                Others ........................................................ 197

D.      Singapore Proceedings ........................................................ 199

E.      The BBA's and JBA's Re-Evaluation of Rate Setting Process ............... 202

F.      Recent Disclosures By Defendants Confirm the Existence of Investigations,
        Disclose Additional Investigations and/or Efforts to Reach Potential
        Settlements with Regulators .................................................. 203

G.      Dozens of Defendants' Employees Are Under Investigation and/or
        Have Resigned, or Been Suspended, or Fired or Arrested ................... 207

1.   RBS...................................................................................207

2.   Citibank/Citigroup.........................................................208

3.   UBS ..................................................................................209

4.   JPMorgan..........................................................................210

5.   Deutsche Bank.................................................................211

6.   HSBC................................................................................211

7.   Barclays ...........................................................................212

8.   Bank of Tokyo-Mitsubishi UFJ/Mitsubishi UFJ Financial Group..............212

9.   Rabobank..........................................................................212

10.  R.P. Martin .......................................................................212

11.  ICAP .................................................................................213

VI.    A Dramatic Decrease in Variability Between the Quotes Among All
       Reporting Contributor Bank Defendants Evidences Collusion During
       the Class Period ...........................................................................213

VII.   Plaintiff's Economic Analyses Show that Yen-LIBOR Impacted
       Euroyen TIBOR During the Class Period ...................................242

VIII.  Independent Analyses Demonstrate that Euroyen TIBOR and Yen-LIBOR
       Were Artificial During the Class Period........................................248

       A.   Euroyen TIBOR and Yen-LIBOR Diverged Dramatically
            From their Historical Relationship with the Euroyen Deposit Rate.....................248

       B.   Analyses  of the Defendant Banks' Euroyen TIBOR and/or Yen-LIBOR
            Quotes Submitted During the Class Period, as Compared to the then
            Prevailing EYDR, Further Demonstrates Artificiality.................................256

            1.   Euroyen TIBOR.........................................................256

            2.   Yen-LIBOR ................................................................278

       C.   During the Class Period, Euroyen TIBOR and Yen-LIBOR Diverged
            Dramatically From their Historical Relationship with Each Other.......................294

       D.   The Defendant Banks That Served on Both Panels Submitted Lower
            Individual Euroyen TIBOR Quotes than Yen-LIBOR...........................................297

IX.    Defendants Engaged in a Conspiracy in Restraint of Trade by Collusively
Providing Euroyen Tibor and Yen Libor Submissions....................................................306

    A.    Direct Evidence Reveals That Defendants, Including UBS And RBS,
Conspired To Fix Euroyen Tibor And Yen Libor Rates.........................................306

    B.    "Plus Factors" Support The Plausible Inference That The Yet-Non-Settling
Contributor Bank Defendants Participated In The Conspiracy..............................307

        1.    Plaintiffs' Econometric Analyses Demonstrate "Market Phenomena That
Cannot Be Explained Rationally Except As the Product of Collusion"
Involving the Contributor Bank Defendants' Euroyen TIBOR and
Yen-LIBOR Submissions During the Class Period. .......................................308

        2.    The Structures of the Euroyen TIBOR and Yen Libor Rate-Setting Processes
Lent Themselves—As the Evidence Amassed Thus Far By The Regulators
Reveals—To Successful Collusion...............................................................308

        3.    The Public Evidence Provides Circumstantial Evidence That The Yet-Non-
Settling Contributor Bank Defendants Participated in the Conspiracy ..........309

            a)    The Evidence Revealed By the Government Investigations (Which They
State Constitutes Only a Slight Fraction of All of the Evidence of
Collusion) Shows A Number of Yen-LIBOR Contributor Banks Were
Solicited to Participate or Did Participate in the Conspiracy................315

            b)    Employees At Certain Yet-Non-Settling Contributor Bank
Defendants Were Fired for Cause, Suggesting Complicity In Rate
Manipulation, At the Least..................................................................317

            c)    Settlements With Other Rate-Setting Banks Are Pending....................317

            d)    Investigations Reveal That Certain Yet-Non-Settling
Contributor Bank Defendants Participated in the Conspiracy ..............317

X.    The Conspiracy To Fix Euroyen Tibor And Yen Libor Submissions Constituted An
Agreement In Restraint Of Trade ...............................................................................318

    A.    The Conspirators Were Horizontal Competitors In the
Market For Lending Based On The Euroyen TIBOR and Yen LIBOR Fixes.......319

    B.    The Collusive Euroyen TIBOR and Yen-LIBOR Rate Submissions
Impeded The Ordinary Give-and-Take of the Antecedent Euroyen Interbank
Lending Market ..................................................................................................319

    C.    Specifically Citing Antitrust Concerns, the JBA Euroyen TIBOR Publication Rules
Explicitly Proscribe Advance Information Exchange and Coordination Among
Rate-Setting Banks .............................................................................................319

CLASS ACTION ALLEGATIONS ...................................................................323

EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT ........................................325

CLAIMS FOR RELIEF .............................................................................329

FIRST CLAIM FOR RELIEF (For Manipulation In Violation of
The Commodity Exchange Act, 7 U.S.C. §§ 1, et seq.)
Against all Defendants...........................................................................329

SECOND CLAIM FOR RELIEF (For Principal-Agent Liability In Violation of
The Commodity Exchange Act, 7 U.S.C. § 1 et seq.) Against All Defendants ........................332

THIRD CLAIM FOR RELIEF (For Aiding and Abetting Manipulation In Violation of The
Commodity Exchange Act, 7 U.S.C. § 1 et seq.)  Against All Defendants................................333

FOURTH CLAIM FOR RELIEF (For Violation of Section 1 of the Sherman Act,
15 U.S.C. § 1, et seq.) Against All Defendants ........................................................334

FIFTH CLAIM FOR RELIEF (For Unjust Enrichment)
Against the Contributor Bank Defendants.................................................................335

PRAYER FOR RELIEF ...............................................................................336

Plaintiff Jeffrey Laydon ("Plaintiff") complains, upon knowledge as to himself and his own acts, and upon information and belief as to all matters, against Defendants (defined at ¶¶57-85), as follows:

## INTRODUCTION

1.  **Nature of the Action**.  This action arises from Defendants' unlawful combination, agreement and conspiracy to fix and restrain trade in, and intentional manipulation of, Euroyen TIBOR (the Tokyo Interbank Offered Rate), Yen-LIBOR (the London Interbank Offered Rate for the Japanese yen), and the prices of Euroyen TIBOR futures contracts during the period of at least January 1, 2006 through at least December 31, 2010 (the "Class Period"), in violation of the Commodity Exchange Act, as amended 7 U.S.C. § 1, *et seq.* (the "CEA"), the Sherman Act, 15 U.S.C. § 1, *et seq.*, and common law.

2.  **Background**.  Euroyen TIBOR and Yen-LIBOR are intended to reflect the rate of interest charged on short-term loans of unsecured funds denominated in Japanese yen between banks in the offshore wholesale money (or interbank) market, also known as the Euroyen market. In addition to pricing loans in the Euroyen market, Euroyen TIBOR and Yen-LIBOR are used to price, settle and benchmark Euroyen TIBOR futures contracts (the most actively traded non-US interest rate contract in the world) and other Euroyen derivative contracts traded in the U.S. and abroad.

3.  The Japanese Bankers Association (the "JBA") calculates and publishes Euroyen TIBOR based on rate submissions received from JBA Euroyen TIBOR contributor banks as of 11:00 a.m. Tokyo time each business day.  The British Bankers Association (the "BBA") calculates and publishes Yen-LIBOR based on rate submissions received from BBA Yen-LIBOR contributor banks as of 11:00 a.m. London time each business day.  The contributor banks are

required to submit rates they deem to be prevailing rates in the Euroyen market at 11:00 a.m.

Tokyo time assuming transactions between prime banks unaffected by their own positions (for

Euroyen TIBOR) and rates reflecting what they could borrow funds in the Euroyen market if

they were to ask for and then accept inter-bank offers in a reasonable market size just prior to 11

a.m. London time (for Yen-LIBOR).   Under no circumstances are JBA Euroyen TIBOR or BBA

Yen-LIBOR contributor banks allowed to report rates that are reflective of factors unrelated to

prevailing costs of borrowing unsecured funds in the Euroyen market.

4.     The Contributor Bank Defendants (as defined in ¶¶78-81) served as JBA Euroyen

TIBOR and/or BBA Yen-LIBOR reference banks during the Class Period.  In that capacity, they

were directly responsible for the setting of JBA Euroyen TIBOR and BBA Yen-LIBOR during

the Class Period, and thereby controlled pricing for Euroyen and Euroyen derivatives, including

Euroyen TIBOR futures contracts.

5.     The Contributor Bank Defendants, either directly or through their securities

subsidiaries or affiliates, many of which are members of the CME and/or other exchanges upon

which Euroyen TIBOR futures contracts trade, engaged in for-profit trading of Euroyen TIBOR

futures and other Euroyen derivatives contracts which were benchmarked, traded and/or price-

settled to Euroyen TIBOR and/or Yen-LIBOR during the Class Period.

6.     **ACPERA**.  Pursuant to the Antitrust Criminal Penalty Enhancement and Reform

Act (Pub. L. No. 108-237, tit. II, 118 Stat. 661, 665, extended by Pub. L. No. 111-190, 124 Stat.

1275), Defendant UBS AG ("UBS"), has been granted conditional leniency from the U.S.

Department of Justice ("DOJ") for alleged anticompetitive conduct relating to its submissions of

Euroyen TIBOR and Yen-LIBOR during the Class Period.  Defendant UBS, pursuant to its

obligations under ACPERA, has agreed to provide cooperation to Plaintiff in connection with prosecution of the claims alleged herein.

7. **Government Settlements and Admissions of Unlawful Manipulative and Anticompetitive Conduct**. Defendants' unlawful conduct has resulted in agreements with government regulators resulting in the collective payment – to date – of over **$2.5 billion** in fines and penalties (among other relief) by Defendants UBS, Royal Bank of Scotland plc ("RBS"), and Barclays PLC, Barclays Bank PLC, and Barclays Capital Inc. (collectively, "Barclays").

8. The settlements resolve DOJ, U.S. Commodity Futures Trading Commission ("CFTC"), and Britain Financial Services Authority ("FSA") criminal and/or civil charges relating to restraints of trade and manipulation of Euroyen TIBOR, Yen-LIBOR, Euroyen TIBOR futures and other Euroyen derivatives contracts.

9. The factual findings that accompanied the UBS, RBS and Barclays settlements each include a "Statement of Facts" (of which UBS, RBS and Barclays, respectively, admitted as true and accurate) that are attached to, and incorporated by reference in, various non-prosecution or deferred prosecution agreements entered with the Department of Justice's Criminal Division, Fraud Section. The admissions by UBS, RBS, and Barclays include, *inter alia*:

a. During the period of at least January 2005 to at least June 2010, UBS made knowingly false submissions of Euroyen TIBOR and Yen-LIBOR to the JBA and BBA, respectively, deliberately to move these rates in an artificial direction that financially benefitted UBS's Euroyen derivative trading positions (and, on certain occasions, the Euroyen derivatives trading positions of other Contributor Bank Defendants). UBS made approximately 2,000 written internal and external requests to manipulate Yen-LIBOR in just a three-year period

(during 2006-2009), accounting for 75% of the days in which BBA Yen-LIBOR submissions were made by UBS during that period.

        b.      Commencing in at least mid-2006 and continuing through 2010, RBS made false Yen-LIBOR submissions to benefit its Euroyen derivatives and Euroyen money market trading positions.  At times, RBS also aided and abetted other Contributor Bank Defendants' manipulative acts involving Yen-LIBOR.  This misconduct involved more than a dozen RBS derivatives and money market traders, one manager, and multiple offices around the world, including London, Singapore and Tokyo.  During the period of mid-2006 through 2010, RBS's Yen trading desk was responsible for generating nearly $200 million in revenues from Yen interest rate derivatives trading.

        c.      Barclays' interest rate derivatives traders, from at least as early as August 2006 through approximately June 2007, and also in June 2009, made at least 26 internal requests to Barclays' submitters to manipulate Yen-LIBOR rates in a direction that would benefit Barclays' Euroyen related positions.  Certain Barclays' swaps traders made requests of interest rate derivatives traders at other Contributor Bank Defendants for favorable submissions from those banks.  In addition, certain Barclays' interest rate derivatives traders received requests from traders at other Contributor Bank Defendants for artificial Yen-LIBOR submissions from Barclays' rate submitters, so as to coordinate their manipulative and anticompetitive conduct.

      10.     The UBS, RBS and Barclays Settlements are also memorialized in "CFTC Orders" and "FSA Final Notices" which include additional factual allegations consistent with the admissions contained in the DOJ "Statement of Facts" regarding unlawful acts by Defendants UBS, RBS, and Barclays.

11.    **Guilty Pleas**.  Defendant UBS Securities Japan Co., Ltd. ("UBS Securities
Japan"), a wholly owned subsidiary of Defendant UBS AG, agreed to waive indictment and
plead guilty to a one-count criminal information filed in the District of Connecticut by the
Criminal Division, Fraud Section, of the DOJ charging UBS Securities Japan with wire fraud, in
violation of 18 U.S.C. § 1343 and 2.  UBS Securities Japan agreed to cooperate with the DOJ's
investigation of false reporting of Euroyen TIBOR and Yen-LIBOR (among other unlawful
conduct) and agreed to a pay a fine of $100 million.

12.    Defendant RBS Securities Japan Limited ("RBS Securities Japan"), a wholly
owned subsidiary of Defendant RBS, agreed to waive indictment and plead guilty to a one-count
criminal information filed in the District of Connecticut by the Criminal Division, Fraud Section,
of the DOJ charging RBS Securities Japan with wire fraud.  RBS Securities Japan agreed to
cooperate with the DOJ's investigation of false reporting of Yen-LIBOR (among other unlawful
conduct) and agreed to pay a fine of $50 million.

13.    **Primary Commodity Exchange Act Violations**.  Defendants utilized diverse
and pervasive means to manipulate Euroyen TIBOR, Yen-LIBOR and Euroyen TIBOR futures
contract prices to artificial levels during the Class Period in violation of the CEA, including by:
(i) making false reports prohibited in Section 4b(a) of the CEA, 7 U.S.C. § 6b, and criminalized
in Section 9(a) of the CEA, 7 U.S.C. § 13(a); (ii) engaging in wash sales or accommodation
trades, criminalized and prohibited by Section 4c(a) of the CEA, 7 U.S.C. § 6c(a); (iii) floating
false rumors, criminalized and prohibited in Section 9(a) of the CEA, 7 U.S.C. § 13(a); (iv)
engaging in abusive cash market trading, criminalized and prohibited by Section 4c(a) of the
CEA, 7 U.S.C. § 6c(a); (v) abusing dominant market positions, criminalized and prohibited in
Section 9(a) of the CEA, 7 U.S.C. § 13(a); (vi) making fictitious trades, criminalized and

prohibited by Section 4c(a) of the CEA, 7 U.S.C. § 6c(a); and (vii) making "spoof" offers and bids, criminalized and prohibited by Section 4c(a) of the CEA, 7 U.S.C. § 6c(a).  Plaintiff has a private right of action under Section 22(a) of the CEA, 7 U.S.C. § 25(a), for each and every of the foregoing manipulative acts by Defendants.

14.     **Direct Evidence of Manipulative and Anticompetitive Conduct**.  Defendants intentionally and systematically manipulated Euroyen TIBOR and Yen-LIBOR to artificial levels for the express purpose of obtaining hundreds of millions (if not billions) in ill-gotten trading profits on Euroyen TIBOR futures and other Euroyen derivative contracts held by them or others, the prices of which (and thus profits or losses) were determined in whole or part to Euroyen TIBOR, Yen-LIBOR, or both.  As an intended and direct consequence of Defendants' unlawful conduct, the prices of Euroyen TIBOR futures contracts were manipulated to artificial levels by Defendants throughout the Class Period.

15.     Although only a small fraction of Defendants' communications have thus far been made public in connection with the UBS, RBS and Barclays settlements, those communications already include what courts have characterized as "rare," "smoking gun," and "direct" evidence of blatant market manipulation and illicit conspiratorial conduct.  Defendants' employees, including UBS, RBS, other Contributor Bank Defendants' traders and submitters, and other co-conspirators, including derivative and cash brokers employed by Broker Defendants, are captured in documents and other communications speaking freely, unapologetically and unambiguously of their desire to manipulate Euroyen rates in an artificial direction so as to financially benefit Euroyen derivatives positions held by them.

16.     Defendants' own words are unencumbered by any concern of market oversight, internal supervision, legal recourse, the far reaching, negative and material impact of their

misconduct on the Euroyen market and public investors. They did so in communications in which the following words and phrases were used: "pressure," "fix," "smack," "set low," "take down," "give an extra notch," "push," "knock," "pull back," "shade," "bump," "plant," "hold down," "squeeze," "game," "crash," "move," and "collapse."

17.     **Other Indicia of Unlawful Conduct: The Role of Managers**. Unlike prior manipulation cases where a rogue trader singularly concocted and orchestrated a manipulation, the manipulation here had the blessing – and in many instances was at the immediate direction – of senior managers of Defendants who were charged with supervising for-profit Euroyen derivatives trading at the firm as well as Euroyen TIBOR and/or Yen-LIBOR submissions to the JBA and/or BBA. The following emails between UBS trading managers (referred to as Senior Manager D, Manager E, and Senior Manager B), made public in connection with the UBS Settlement, are indicative of such knowing misconduct by UBS senior managers:

> December 11, 2007
>
> Manager E emailed Senior Manager D asking:
>
> How much pressure can we exert on [the Yen-LIBOR submitter] to raise up our 3 [month] yen fixing over the next week?
>
> We have 2 [million/per basis point] fixing risk expiring on Dec imm [IMM Date and settlement date of December 2007 Euroyen TIBOR futures contract]. We have been riding a wave on this trade, but everyone will be trying to influence the fixing next Monday [17 December 2007] reflecting their positions. If we don't do the same we risk an adverse PL [*i.e.*, an adverse impact on UBS's profits from its Euroyen derivatives positions].
>
> Currently we are in the bottom quartile [of the submitting banks], a move into the middle [where we can influence the resulting fix] is worth 500k . . . .
>
> Senior Manager D's response, which copied Senior Manager E, was: I will talk to [Senior Manager B].
>
> Senior Manager E, who had been copied into the email, replied to Manager E stating: I will call you from the airport for an update on this.

December 14, 2007:

Manager E emailed Senior Manager D and asked:

How was the discussion with [Senior Manager B]? ... I need some assurance they will put their rate up please...our rate input can make a significant difference.

One minute later Senior Manager D emailed back: I will try to talk with [Senior Manager B] today . . . .

18.    **Other Indicia of Unlawful Conduct:  Motive To Manipulate Euroyen**.

Plaintiff disclaims any need to plead motive for their claims.  Defendants' express admissions of their desire to manipulate Euroyen TIBOR and Yen-LIBOR so as to financially benefit Euroyen futures and other Euroyen derivatives positions held by them, Defendants' unlawful conduct in the setting of Euroyen, and data demonstrating that Defendants consistently succeeded in manipulating Euroyen and Euroyen futures prices to artificial levels, all indicate Defendants' manipulative intent.  However, another indication of the Defendants' intent is the large financial motive they had to manipulate.  The high-stakes nature and tremendous amounts of money that was waged on the manipulation and then realized on its success, *i.e.*, hundreds of millions (if not billions) in ill-gotten trading profits from Euroyen derivatives positions held by the Contributor Bank Defendants (translating into hundreds of millions in illegitimate bonus and other compensation paid to the banks' traders and submitters), fueled an obsessive need to manipulate the Euroyen market.

19.    Instant messages and other documents thus far made public capture traders and other co-conspirators of Defendants exulted about the success of the manipulation and the amount of money they were reaping from it.  In one such communication, a UBS trader and an interdealer broker [employed by a Broker Defendant] congratulate each other of the financial success of the manipulation: "mate yur getting bloody good at this libor game....think of me whn

yur on yur yacht in monaco wont you."  In another communication, traders at RBS bragged: "its just amazing how libor fixing can make you that much money" and that the manipulation was a "good way to boost share price."  Traders also routinely thanked rate submitters for carrying out their instructions to submit false Euroyen rates that benefitted their Euroyen derivatives positions, remarking "cheers" "thanks mate" and "thanks for that."

  20. **Other Indicia of Unlawful Conduct: Knowledge of Unlawfulness and Conduct to Escape Detection**.  Defendants continued their Euroyen manipulation long-after authorities had launched investigations into false reporting and manipulation of U.S. Dollar LIBOR.  By way of example, RBS traders and submitters acknowledged internally by at least September 2010 that regulators were investigating false reporting of U.S. Dollar LIBOR, but nonetheless agreed that they were going to continue to manipulate at least Yen-LIBOR.  RBS traders and submitters, however, recognized that they should be more careful to cover their tracks to avoid detection, including avoiding openly discussing in writing their manipulation of Euroyen at least while regulators were snooping around in U.S. Dollar LIBOR.

  21. For example, in one exchange on September 24, 2010, a Senior Yen Trader at RBS requests another RBS Yen Trader to contact the RBS's primary rate submitter "to push 6m JPY Libor up 2 bps to 44."  The Yen-Trader responds: "ha . . . i will mention it ... no emails anymore . . . ."  In another exchange, on November 22, 2010, a RBS Yen Trader and Senior Yen Trader acknowledge that "at the moment the FED are all over us about USD libors" but because they didn't "think anyone cares [about] JPY libor" at least "not yet" – they acknowledged they had the green light to continue with their manipulation of Euroyen.

  22. In another exchange on November 24, 2010, RBS's primary submitter warns a RBS Senior Yen-Trader to no longer put in writing his manipulative requests. The warning first

appears in writing when the submitter diverts an instant message request from the Yen-Trader for an artificial Yen-LIBOR rate by responding spontaneously with the off-topic-question of: "how you doing with all the volatilities these days?", *i.e.,* code to change the subject. The trader responds "ok no prob….wouldn't want to cause any problem….thanks mate." Shortly after the instant message exchange, in a follow up telephone conversation, the submitter is more blunt in his warning, saying "we're just not . . . allowed to have those conversations on [instant messages] . . . because of the BBA thing." After they had a good laugh about it, the submitter confirmed he is still on board with the manipulation, *i.e.,* submitting false Yen-LIBOR rates that benefitted the trader's Euroyen derivatives positions, saying: "So yeah, leave it with me, and uh, it won't be a problem." The trader responds "Ok, great."

      23.    The corruption in the Euroyen market had become so widespread that in the words of one of RBS's Senior Yen Traders, the banks setting Yen-LIBOR had become a "cartel." Other instant messages and communications produced in connection with the UBS and RBS Settlements evidence that the knowing submission of false Euroyen TIBOR and Yen-LIBOR rates to financially benefit Euroyen derivatives positions was the norm and submitting rates reflective of prevailing (true) Euroyen interbank borrowing costs in accordance with JBA and BBA rules was the exception.

      24.    **Direct Evidence of Anticompetitive Conduct**. The communications made public so far evidence rampant collusion and other agreements to restrain trade, including "back scratching," *i.e*, explicit agreements by co-conspirators to submit artificial Euroyen rates to financially benefit other co-conspirators' Euroyen derivatives positions in return for the other co-conspirators' agreement to return the favor sometime in the future. The foregoing conduct is evidenced in numerous communications, including, for example, the following instant messages

between a UBS trader (referred to as Senior Yen Trader) and traders at numerous other

Contributor Bank Defendants (referred to as Yen Bank B, C and F):

    <u>April 20, 2007</u>:

| | | |
|---|---|---|
| Senior Yen Trader: |  –  | i know i only talk to you when i need something but if you could ask your guys to keep 3m low wd be massive help as long as it doesn't interfere with your stuff tx in advance … mate did you manage to spk to your cash boys? |
| Yen Bank B Trader 1: | | yes u owe me they are going 65 and 71 |
| Senior Yen Trader: | | thx mate yes i do in fact i owe you big time mater they Set 64! thats beyond the call of duty! |

    <u>September 18, 2008</u>:

| | |
|---|---|
| Senior Yen Trader: | you got any ax on 6m fix tonight? |
| Yen Bank F Trader-Submitter: | absolutely none but i can help |
| Senior Yen Trader: | can you set low as a favour for me? |
| Yen Bank F Trader-Submitter: | done |
| Senior Yen Trader: | i'll return favour when i can just ask have 75m m jpy a bp tonight |
| Yen Bank F Trader-Submitter: | np |
| Senior Yen Trader: | thanks so much |

       25.    Contributor Bank Defendants, aided and abetted by Broker Defendants, also

agreed to stagger false reporting of Euroyen rates over successive trading days (e.g., agree that

an artificially low rate would be submitted by manipulator A today, by manipulator B tomorrow

and manipulator C the next day, etc.) in order to exert greater and longer-lasting manipulative

pressure on Euroyen prices and to mask such false reporting from other market players.  The

following instant message exchange between a UBS Trader and a broker employed by one of the

Broker Defendants (referred to as Derivatives Broker A1), is reflective of such unlawful conduct:

July 22, 2009:

| | |
|---|---|
| Derivatives Broker Al: | if you drop your 6m dramatically on the 11th mate, it will look v[ery] fishy, especially if [Yen Bank J] and [Yen Bank F] go with you I'd be v[ery] careful how you play it, there might be cause for a drop as you cross into a new month but a couple of weeks in might get people questioning you. |
| Senior Yen Trader: | don't worry will stagger the drops ie 5bp then 5bp |
| Derivatives Broker Al: | ok mate, don't want you getting into sh it |
| Senior Yen Trader: | us then [Yen Bank F] then [Yen Bank J] then us then [Yen Bank F] then [Yen Bank J] |
| Derivatives Broker Al: | great the plan is hatched and sounds sensible |

26.   **The Critical Assistance Provided By Broker Defendants in Driving the Success of the Manipulation and Restraint of Trade**.  Broker Defendants played a critical role in carrying out and driving the success of the manipulation of and restraint of trade of Euroyen and Euroyen futures contract prices.  They acted as the proverbial hub in the conspiratorial wheel in coordinating and directing the submission of false reports and other manipulative conduct between Contributor Bank Defendants.

27.   By way of example, in a recorded communication on July 18, 2007, a broker employed by one of the Broker Defendants (referred to as Broker B at Broker Firm A) contacted a rate submitter employed by one of the Contributor Bank Defendants (referred to as Panel Bank 1 submitter) to inquire about Yen-LIBOR submissions that the bank was going to contribute. The submitter was extremely diffident about his bank's submission -- saying "It makes no difference to me" --  and agreed to make the submission requested by Broker B.  Broker B confirmed that the request came from a trader at UBS (referred to as Trader A).  The conversation proceeded as follows:

July 18, 2007

| | |
|---|---|
| Panel Bank 1 submitter: | Alright, well make sure he [Trader A] knows |
| Broker B: | Yeah, he will know mate.  Definitely, definitely, definitely |
| Panel Bank 1 submitter: | You know, scratch my back yeah an all |
| Broker B: | Yeah oh definitely, yeah, play the rules |

28.     Other instant messages and other communications made public in connection with the UBS Settlement evidence that UBS traders routinely enlisted the help of Broker Defendants to influence numerous other Contributor Bank Defendants to submit artificial Euroyen rates. Examples include the following instant messages between UBS traders (referred to as Senior Yen Trader and Trader-1) and brokers (referred to as Derivatives Broker B1 and Broker C) regarding influencing artificial rate setting by numerous other Contributor Bank Defendants (referred to as Yen Banks A, B, D, G, H, I, J, K):

<u>March 19, 2009</u>

| | |
|---|---|
| Senior Yen Trader: | need low everything pls try really hard to get [Yen Bank J] down |
| Derivatives Broker B1: | ok did he put them down yesterday ? |
| Senior Yen Trader: | nah same |
| Derivatives Broker B 1: | ok |
| Senior Yen Trader: | [Yen Bank I] too for 3m the people are [Yen Bank I] at 63 [Yen Bank J] 62 [Yen Bank H] 62 [Yen Bank B] 62 [Yen Bank K] 63 he def should be lower [Yen Bank A] 62 [Yen Bank G] 63 all those we can get down •to 60 or 61 . . . |
| Senior Yen Trader: | ok try for [Yen Panel Bank J] and the Japanese [panel banks] and [Yen Bank I] as priority pls |
| Derivatives Broker B 1: | kkk |
| Senior Yen Trader: | thx ... pls push really hard |

Derivatives Broker B 1:  yes already had a word with a couple of them [Yen Bank J]
            n [Yen Bank B] said they should be lower workin on [Yen
            Bank A] n [Yen Bank K]

Senior Yen Trader:    ta

48 minutes later, Broker-B resumed the chat, confirming that he had spoken to the banks:

Broker-B:       yes already had a word with a couple of them [Bank-D] and
            [Bank- A] said they should be lower . . . workin on [Bank-
            G] and [Bank-J]

29. In addition to coordinating the submission of false Euroyen rates between and among Contributor Bank Defendants, the Broker Defendants, with the purpose and intent of manipulating Euroyen rates in order to benefit derivatives position held by Contributor Bank Defendants, disseminated false "run-throughs" of suggested Yen-LIBOR rates to Contributor Bank Defendants,  published false Euroyen rates over certain dedicated electronic screens available to other Contributor Bank Defendants; and made fake ("spoof") bids and offers to signal or drive false rate submissions of other Contributor Bank Defendants.

30. The foregoing unlawful conduct is memorialized in numerous communications, including, for example, the following instant message between a UBS trader (referred to as Senior Yen Trader) and a broker employed by one of the Broker Defendants (referred to as Derivatives Broker B):

<u>March 30, 2009</u>

Senior Yen Trader:    i REALLY REALLY need lm down to 35 and 3 [month]
            down to 59 6 [month] i'd prefer unchanged ... use the turn
            to push l [month] and 3m down as much as you can ... but
            need 3 [month] lower pls by 2bp or so

Derivatives Broker B1:   ok mate ustd ill get on the case ... ok im gonna get some
            spoof offers on the baord 1 3s

Senior Yen Trader:    ... you working hard for me?

Derivatives Broker Bl:      sure mate of course i know the rules"

31.     In return for their critical assistance, Broker Defendants were paid handsomely in the form of bribes and other illicit and illegitimate compensation by UBS traders.  In one exchange on July 18, 2007, a UBS Trader writes to a broker employed by one of the Broker Defendants that "if you keep 6s [six-month Yen-LIBOR] unchanged today. . . .**I will f\*\*\*ing do one humungous deal with you....Like a 50,000 buck deal, whatever....I need you to keep it as low as possible....if you do that....I'll pay you, you know, 50,000 dollars, 100,000 dollars....whatever you want....I'm a man of my word."**

32.     **Strong Circumstantial Evidence of Conspiracy Implicating the Contributor Bank Defendants**.  While the direct evidence implicates conclusively Defendants UBS, RBS, Deutsche Bank, Citibank, J.P. Morgan and HSBC in the antitrust conspiracy (*see* ¶¶670-682, *infra*), the vast majority of the Contributor Panel Banks are under investigation by various regulators, and news reports reveal that many are poised to settle their claims with certain of them.  Moreover, the small sampling of instant messages and other evidence publicly released thus far demonstrates that a substantial number of the Contributor Bank Defendants (whose names are masked by designations such as "Bank B").

33.     There are at least 55 publicly available instant messages showing collusion between UBS and several of the Contributor Panel Banks.  In one message alone, UBS Trader Tom Hayes enlisted a broker to solicit 9 of the 16 Contributor Panel banks to join the conspiracy to lower Yen-LIBOR.  Other messages show that one additional bank (the 10th) agreed to collude with UBS to artificially increase Yen-LIBOR on March 31, 2009.

34.     Plaintiff's economic analysis also reveals that all of the Defendants' submission data demonstrates a marked change in variability from those of other Contributor Panel Banks,

beginning with the commencement of the conspiracy. The material differences between the variability of rates that existed in 2005 as compared to that during 2006 and continuing through 2009 are highly probative of collusion. The only way the Contributor Panel Banks' relative submissions could have become so correlated during the Class Period is, as the instant messages show, if they knew what rates their competitors would be submitting in advance and then colluded to submit equivalent rates.

35. **Japanese Regulators Sanction Defendants UBS, Citigroup and RBS**. On December 16, 2011, the Japanese Financial Services Agency ("JFSA"), based upon December 9, 2011 Recommendations for Administration Action by the Japanese Securities and Exchange Surveillance Commission ("JSESC"), issued two (2) separate Orders sanctioning Defendants Citigroup Global Markets Japan Inc. and UBS Securities Japan Ltd. (collectively, the "JFSA Orders"). The JFSA Orders, relying on specific findings of fact by the JSESC, detail manipulation of Euroyen futures contract prices by Defendants Citigroup and UBS and other unidentified co-conspirators.

36. On April 12, 2013, the JFSA, based upon April 5, 2013 Recommendations for Administrative Actions by the JSESC, took administrative action against Defendant RBS Securities Japan Limited for a violation of the Financial Instruments and Exchange Act relating to RBS's submission of false Yen-LIBOR rates during the period from around middle 2006 to early 2010.

37. **Disciplinary Proceedings, Terminations, Resignations and Withdrawal from Rate Setting Panels**. Both RBS and UBS have since withdrawn from the JBA's Euroyen TIBOR panel. In addition, more than 25 people have resigned from UBS following an internal review of the bank's involvement in the alleged manipulation of Euroyen TIBOR and Yen-

LIBOR rates.  RBS has also fired 4 employees, and is reportedly weighing further disciplinary

proceedings against additional employees.  Barclays Chairman Marcus Agius, and its Chief

Executive Officer, Robert E. Diamond, Jr., resigned within days of the announcement of the

Barclays Settlement.  In connection with his resignation, Mr. Diamond revealed that at least 14

traders at Barclays were involved in rate setting wrongdoing at the bank.   On April 12, 2013 *The

Wall Street Journal* reported that the Chief Executive of Defendant RBS Securities Japan

Limited had resigned in the wake of the JFSA's administrative sanctions against Defendant RBS

Securities Japan Limited.

      38.    **Pending Governmental Investigations of Contributor Bank Defendants and**

**Others**.  A number of Contributor Bank Defendants remain under investigation by government

regulators in the U.S. and abroad for alleged rate setting manipulation.  For example,

      a.    **Swiss Competition Commission Investigation.** The Swiss Competition

Commission ("COMCO") is currently investigating UBS, Credit Suisse, and ten other

Contributor Bank Defendants based on information it received from a bank panel member

seeking conditional leniency (believed to be Defendant UBS) regarding unlawful agreements

among Euroyen TIBOR and Yen-LIBOR rate setting banks and their derivatives traders to

conspire and manipulate Euroyen futures and other Euroyen derivatives that use Euroyen TIBOR

and Yen-LIBOR as a component of their price.  According to the Secretariat of COMCO, the

information it received from the leniency applicant evidences that "derivatives traders working

for a number of financial institutions might have manipulated these [Euroyen TIBOR and Yen-

LIBOR] submissions by coordinating their behavior, thereby influencing these reference rates in

their favour."  The Secretariat also reported that "derivatives traders might have colluded to

manipulate the difference between the ask price and the bid price (spread) of derivatives based on these reference rates [Euroyen TIBOR and Yen-LIBOR] to the detriment of their clients."

      b.    **Canadian Competition Bureau Investigation**. The Canadian Competition Bureau's investigation was prompted by information and documents provided to the agency by a "Cooperating Party" (believed to be Defendant UBS).  Among the banks being investigated by the Canadian Competition Bureau include HSBC Bank Canada, Royal Bank of Scotland N.V., (Canada) Branch, Deutsche Bank AG, J.P. Morgan Bank Canada, and Citibank Canada (collectively referred by the Canadian Competition Bureau with the "Cooperating Party" as the "Participant Banks").   According to Canadian court documents filed in connection with the Canadian Competition Bureau's investigation, the "Cooperating Party" and its counsel has proffered to the Canadian Competition Bureau that, *inter alia*, during the period of at least 2007 through June 25, 2010, the "Cooperating Party" along with the Participant Banks conspired to and did falsely report, fix and manipulate Yen-LIBOR rates for the specific purpose of benefitting trading positions in interest rate derivatives ("IRDs") that use Yen-LIBOR as a component of their price held by the Participant Banks.  Further, Brokers were asked by IRD traders at the Participant Banks to use their influence with Yen-LIBOR submitters to affect what rates were submitted by other Yen-LIBOR panel banks, including the Participant Banks.

      c.    **Related Singapore Proceedings**.  There are also court proceedings in Singapore involving allegations that Defendant RBS's managers and other high ranking RBS officials condoned and participated in the rigging of Euroyen interest rates during the Class Period.

      39.    **Defendants Acknowledge They Are Under Investigation by Numerous Government Authorities**. A number of Defendants have recently acknowledged in their

financial public filings the existence of additional governmental investigations and/or efforts to reach settlements with regulators.

40.    For example, on February 26, 2013, Defendant Rabobank acknowledged "[g]overnment authorities in various jurisdictions are investigating…Rabobank, in connection with the LIBOR setting process." The same day public reports stated that Rabobank was "next in line" to reach a settlement with the DOJ, CFTC and FSA over claims Rabobank manipulated Yen-LIBOR (among other rates).

41.    On November 6, 2012, Defendant Citigroup disclosed that it has "received additional requests for information and documents from various domestic and overseas regulators and enforcement agencies, including the Monetary Authority for Singapore and a consortium of state Attorneys General."

42.    In a Form 20-F filed with the SEC on July 23, 2012, Mitsubishi UFJ Financial Group, Inc. disclosed that it has "received requests and subpoenas for information from government agencies in some jurisdictions, including the United States and Europe, which are conducting investigations into past submissions made by panel members, including us, to the bodies that set various interbank offered rates. We are cooperating with these investigations."

43.    In an Interim Report published in July 2012, Defendant HSBC Holdings plc confirmed that various authorities and enforcement authorities around the world, including in the U.S., U.K. and Asia are conducting investigations related to submissions made by panel banks in connection with the setting of LIBOR and other interest rates. HSBC added that: "As certain HSBC entities are members of such panels, HSBC and/or its subsidiaries have been the subject of regulatory demands for information and are cooperating with those investigations."

44.     On November 28, 2012, *The Wall Street Journal* reported that Defendant Deutsche had admitted to the German Parliament that it had failed to uphold interest rate reporting standards at the bank.

45.     **Criminal Arrests**.  In December 2012, Thomas Hayes, a former Yen-trader at Defendants RBS, UBS and Citigroup was arrested by the City of London Police.  Thomas Hayes and another UBS Yen-trader, Roger Darin, were both charged with conspiracy to commit wire fraud in a criminal complaint unsealed in Manhattan federal court in December 2012.  Hayes also faces wire fraud and Sherman Act charges from alleged anticompetitive conduct in relation to Yen-LIBOR.   *See* Complaint filed in *United States of America v. Tom Alexander William Hayes, and Roger Darin*, 12 MAG 3229 (S.D.N.Y. Dec. 12, 2012).  Terry Farr and Jim Gilmour, two former employees of Broker Defendant RP Martin Holdings Ltd, have also been arrested in connection with alleged rate manipulation.

46.     **Public Officials and Other Market Participants Acknowledge The Existence of Cartels and Wide-Spread Collusion in Euroyen Rate Setting**.  Joaquin Alumnia, Vice-President of the European Commission, has publicly stated in connection with the RBS settlement: "We suspect the existence of cartels between certain actors in the market for derivative products — banks, but also brokers."

47.     CFTC Chairman Gary Gensler expressed a similar sentiment, stating that: "Barclays, UBS and RBS were fined $2.5 billion for manipulative conduct by the CFTC, the UK Financial Services Authority (FSA) and the Justice Department.  At each bank, the misconduct spanned many years, took place in offices in several cities around the globe, included numerous people – sometimes dozens, even included senior management, and involved multiple benchmark rates and currencies. In each case, there was evidence of collusion."

48.     In February 2013, a former yen money market derivatives trader in Tokyo during the Class Period at Barclays and Deutsche Bank published a book entitled The Manipulation of the LIBOR fixing, and the doubt over the artificial TIBOR fixing (Hideto "Eddy" Takata, Gentosha Renaissance, Inc., February 20, 2013).  The former traded, Eddy Takata, alleges the large increase of Euroyen TIBOR over Yen-LIBOR since 2009 was the result of collusion amongst the Euroyen TIBOR rate setting banks so that the banks could borrow Yen-LIBOR at a lower rate and lend at the higher Euroyen TIBOR rate.

49.     **Further Evidentiary Support**.  Given the pervasive nature of the wrongdoing, Plaintiff believes that further evidentiary support for his claims alleged herein will be unearthed after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

50.     This action arises under Section 22 of the CEA, 7 U.S.C. § 25, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and common law, respectively.

51.     Euroyen is a "commodity" and is the "commodity underlying" Euroyen TIBOR futures contracts, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

52.     This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), and 28 U.S.C. §§ 1331 and 1337, respectively.  This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy, and under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

53.     Venue is proper in the Southern District of New York, pursuant to, among other statutes, Section 22 of the CEA, 7 U.S.C. §25(c), Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. §1391(b), (c) and (d).  One or more of the Defendants resided, transacted business, were found, or had agents in the District, and a part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

54.     Defendants, directly and indirectly, singly and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate and/or international commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

55.     Euroyen TIBOR, Yen-LIBOR and Euroyen TIBOR futures contracts are each a commodity that trades in U.S. interstate commerce.  Defendants' restraint of trade and manipulation of Euroyen TIBOR, Yen-LIBOR and Euroyen TIBOR futures contract prices had direct, substantial, and reasonably foreseeable effects in the U.S., and on Plaintiff and members of the Class.  Euroyen TIBOR futures contracts are traded on the CME and domestically on electronic boards of trade and exchanges accessible within the U.S.  Defendants, as sophisticated Euroyen market participants, knew, or had good reason to know, that Euroyen TIBOR and Yen-LIBOR rates published and compiled by and on behalf of the JBA and BBA, respectively, are disseminated in the U.S., and are used to price, settle, and benchmark Euroyen TIBOR futures contracts and/or other Euroyen derivative contracts traded in the U.S. and by U.S. investors   For these reasons, Defendants knew, or had good reason to know, that misreporting of Euroyen TIBOR and Yen-LIBOR rates to the JBA and BBA, respectively, as well as other manipulative and collusive conduct in the Euroyen market, would, and did, have direct, substantial and

reasonably foreseeable effects in the United States, including on the prices of Euroyen TIBOR

futures contracts transacted domestically.

## PARTIES

56.     Plaintiff Laydon, a natural person residing in Sanford, Florida, initiated short

positions in CME Euroyen TIBOR futures contracts during the Class Period and suffered net

losses on such contracts due to the presence of artificial Euroyen TIBOR futures prices

proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged

herein.  Plaintiff Laydon's losses due to the presence of artificial Euroyen and Euroyen TIBOR

futures prices proximately caused by Defendants represents one measure of actual damages to

Plaintiff Laydon that he is entitled to recover.  Plaintiff Laydon was also deprived of transacting

in a lawful, non-manipulated Euroyen market, and otherwise suffered legal injury as a direct

result of Defendants' unlawful conduct.

57.     Defendant Mizuho Bank, Ltd. ("Mizuho Bank") is a subsidiary of Mizuho

Financial Group, a Japanese financial institution headquartered in Tokyo, Japan.  During the

Class Period, Mizuho Bank was a reference bank for the JBA's Euroyen TIBOR panel.

    a.     In April 2005, Mizuho Bank entered into a business collaboration with

The Bank of New York in the area of distribution of investment trust products in Japan.  It also

entered into separate business collaborations with Wachovia Bank and Wells Fargo Bank

respectively.  Moreover, Mizuho Bank's process agent, Mizuho Corporate Bank, Ltd, New York

Branch, ("Mizuho Corporate Bank") is a New York resident, and the businesses conducted by

Mizuho Bank and Mizuho Corporate Bank are indistinguishable.  Their collective businesses

include (i) deposits, bank debentures, lending (including non-recourse loans and commitment

facilities), (ii) foreign exchange, (iii) derivatives, (iv) payment and settlement services (bill/check

clearing, payment and others), (v) e-solution business (firm banking, CMS, debit cards), (vi)

corporate bond trustee services, investment trust, defined contribution pension business, (vii)

treasury, and (viii) syndicated loans.   In November 2011, Mizuho Bank and Mizuho Corporate

Bank announced their plan to merge.  This transformation into one bank will remove the barriers

between the two banks by around the first half of fiscal 2013.

58.      Defendant The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("Bank of Tokyo-

Mitsubishi") is a subsidiary and the banking unit of Mitsubishi UFJ Financial Group, Inc. and is

headquartered in Tokyo, Japan.  During the Class Period, Bank of Tokyo-Mitsubishi was a

reference bank for the JBA's Euroyen TIBOR panel and a reference bank for the BBA's Yen-

LIBOR panel.  The Bank of Tokyo-Mitsubishi's New York branch is a New York resident

located at 1251 Avenue of the Americas, New York, NY 10020.

59.      Defendant The Sumitomo Trust and Banking Co., Ltd. ("Sumitomo Trust") is a

Japanese trust bank and a member of the Sumitomo Mitsui Trust Group headquartered in Tokyo,

Japan.  During the Class Period, Sumitomo Trust was a reference bank for the JBA's Euroyen

TIBOR panel.  In December 2011, Sumitomo Trust acquired (and is the successor-in-interest) to

Defendant Chuo Mitsui Trust & Banking Co. Ltd. ("Chuo Mitsui"). During the Class Period,

Chuo Mitsui was a reference bank for the JBA's Euroyen TIBOR panel and maintained a

representative office located in this District at 655 3rd Avenue, New York, NY 10017.

60.      Defendant The Norinchukin Bank is a Japanese cooperative bank headquartered

in Tokyo, Japan.  During the Class Period, The Norinchukin Bank was a reference bank for the

JBA's Euroyen TIBOR panel and a reference bank for the BBA's Yen-LIBOR panel.  The New

York branch of The Norinchukin Bank is located at 245 Park Avenue, 21st Floor, New York, NY

10167.

61.     Defendant Mitsubishi UFJ Trust and Banking Corporation ("Mitsubishi UFJ Trust") is a core operating company of Mitsubishi UFJ Financial Group (MUFG) and is headquartered in Tokyo, Japan.  During the Class Period, Mitsubishi UFJ Trust was a reference bank for the JBA's Euroyen TIBOR panel.  Mitsubishi UFJ Trust's New York branch is a New York resident located at 520 Madison Avenue, 25th Floor, New York, NY 10022.

62.     Defendant Sumitomo Mitsui Banking Corporation ("Sumitomo Mitsui") is a subsidiary of Sumitomo Mitsui Financial Group, Inc. and is headquartered in Tokyo, Japan. During the Class Period, Sumitomo Mitsui was a reference bank for the JBA's Euroyen TIBOR panel and a reference bank for the BBA's Yen-LIBOR panel.   Sumitomo Mitsui's New York branch is a New York resident located at 277 Park Avenue, New York, NY 10172.

63.     Defendant Resona Bank, Ltd., ("Resona Bank") is a Japanese commercial bank and a member of Resona Holdings, Inc., a Japanese financial services group headquartered in Tokyo, Japan.  During the Class Period, Resona Bank was a reference bank for the JBA's Euroyen TIBOR panel.

64.     Defendant J.P. Morgan Chase & Co. ("JPMorgan Chase") is a Delaware financial holding company headquartered in New York, New York.  Defendant J.P. Morgan Chase Bank, National Association, is a federally chartered national banking association headquartered in New York, New York and a wholly owned subsidiary of Defendant JPMorgan Chase.  During the Class Period, JPMorgan Chase NA was a reference bank for the JBA's Euroyen TIBOR panel and JPMorgan Chase was a reference bank for the BBA's Yen-LIBOR panel.  Defendant J.P. Morgan Securities plc (formerly J.P. Morgan Securities Ltd.) is a wholly owned subsidiary of JPMorgan Chase.

65.     Defendant Mizuho Corporate Bank, Ltd. ("Mizuho Corporate Bank") is a subsidiary of Mizuho Financial Group and is headquartered in Tokyo, Japan.  During the Class Period, Mizuho Corporate Bank was a reference bank for the JBA's Euroyen TIBOR panel and a reference bank for the BBA's Yen-LIBOR panel.  Mizuho Corporate Banks' New York branch is a New York resident, located at 1251 Avenue of the Americas, New York, NY 10020.

66.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany.  During the Class Period, Deutsche Bank was a reference bank for the JBA's Euroyen TIBOR panel and a reference bank for the BBA's Yen-LIBOR panel.  The New York branch of Deutsche Bank is a New York resident located at 60 Wall Street, New York, NY 10005.

67.     Defendant Mizuho Trust and Banking Co. Ltd. ("Mizuho Trust") is a subsidiary of Mizuho Financial Group headquartered in Tokyo, Japan.  During the Class Period, Mizuho Trust was a reference bank for the JBA's Euroyen TIBOR panel.

a.     Mizuho Trust & Banking Co. (USA) ("Mizuho Trust (USA)") is Mizuho Trust's process agent, and is a New York resident located at 135 W 50th Street, 16th Floor, New York, NY 10020.  Mizuho Trust (USA) is a wholly owned subsidiary of Mizuho Trust and the sole custody business arm in the United States of the Mizuho Financial Group.  Operating in New York, Mizuho Trust (USA) provides integrated custody service.  As a Japanese custodian, Mizuho Trust (USA) serves Japanese investors and provides solutions to U.S. securities-related requirements arising from the Japanese business environment.  Mizuho Trust (USA) is an agent of Mizuho Trust.

68.     Defendant The Shoko Chukin Bank, Ltd. ("Shoko Chukin") is joint-stock company and is headquartered in Tokyo, Japan.  During the Class Period, Shoko Chukin was a

reference bank for the JBA's Euroyen TIBOR panel.  Shoko Chukin maintains a New York office in this District at 666 Fifth Avenue, 14th Floor, New York, NY 10103.

69.     Defendant Shinkin Central Bank ("Shinkin") is a Japan-based financial institution headquartered in Tokyo, Japan.  During the Class Period, Shinkin was a reference bank for the JBA's Euroyen TIBOR panel.  Shinkin has a representative office located in this District at 114 West 47th Street, Suite 2420, New York, NY 10036.

70.     Defendant UBS AG ("UBS") is a Swiss banking and financial services company headquartered in Zurich and Basel, Switzerland that provides investment banking, asset management and wealth management services for private, corporate and institutional clients worldwide. It has operations in over 50 countries, including the United States. During the Class Period, UBS was a reference bank for the JBA's Euroyen TIBOR panel and a reference bank for the BBA's Yen-LIBOR panel.  UBS has two New York branches located at 1285 Avenue of the Americas, New York, NY 10019, and at 299 Park Avenue, New York, NY 10171.  UBS Securities Japan Co., Ltd. is the successor company to UBS Securities Japan, Ltd., ("UBS Securities Japan") which is a wholly-owned subsidiary of UBS and engaged in investment banking operations and was a securities broker-dealer. It had a branch office in Tokyo, Japan.

71.     Defendant The Bank of Yokohama, Ltd. ("The Bank of Yokohama") is a regional bank based in Yokohama City, Kanagawa Japan.  During the Class Period, The Bank of Yokohama was a reference bank for the JBA's Euroyen TIBOR panel.  The Bank of Yokohama has a representative office located in this District at 780 Third Ave, 32nd Floor, New York, NY 10017.

72.     Defendant Société Générale SA ("Société Générale") is a major European financial services company and is headquartered in Paris, France.  During the Class Period,

Société Générale was a reference bank for the BBA's Yen-LIBOR panel. Société Générale maintains offices in this District, including at 1221 6th Avenue, New York, NY 10020.

73.    Defendant The Royal Bank of Scotland Group plc ("RBS") is a British banking and financial services company headquartered in the United Kingdom ("U.K."). It has operations in approximately forty (40) countries and territories, including the United States and Singapore. Defendant Royal Bank of Scotland plc is a wholly owned subsidiary of RBS. On December 31, 2012, The Royal Bank of Scotland plc was provisionally registered as a swap dealer with the CFTC. During the Class Period, RBS was a reference bank for the JBA's Euroyen TIBOR panel and was a reference bank for the BBA's Yen-LIBOR panel. The New York branch of RBS is a New York resident, located at 101 Park Avenue, New York, NY 10178. Defendant RBS withdrew from the JBA's Euroyen TIBOR panel in or around June 2012. Defendant RBS Securities Japan Limited is a wholly owned subsidiary of RBS engaged in market operations and is a securities broker-dealer. It has an office in Tokyo. RBS, a financial services corporation, has banking divisions and subsidiaries around the world, including in the United States, with its United States headquarters located in Stamford, Connecticut. From 2006 to 2010, one of RBS's divisions was Global Banking and Markets ("GBM"). The GBM division had employees in multiple legal entities associated with RBS, including RBS Securities Japan Limited ("RBSSJ"). RBSSJ is a wholly-owned subsidiary of RBS that engages in investment banking operations, including derivatives trading, with its principal place of business in Tokyo, Japan.

74.    Defendant Barclays Bank PLC, ("Barclays") is a United Kingdom public limited company headquartered in London, England. During the Class Period, Barclays was a reference bank for the BBA's Yen-LIBOR panel. The New York branch of Barclays is located in this District at 200 Park Avenue, New York, NY 10166.

75.     Defendant Citibank, N.A., ("Citibank") is a federally chartered national banking association headquartered in New York, New York, and a wholly owned subsidiary of Defendant Citigroup Inc.   During the Class Period, Citibank, N.A. was a reference bank for the BBA's Yen-LIBOR panel.   Defendant Citibank, Japan Ltd. ("Citibank Japan") is a Japanese commercial bank headquartered in Tokyo, Japan, and a wholly-owned subsidiary of Defendant Citigroup Inc.   During the Class Period, Citibank Japan was a reference bank for the JBA's Euroyen TIBOR panel.  Defendant Citigroup Global Markets Japan Inc. ("Citigroup Global Markets") is a Japanese wholesale investment bank headquartered in Tokyo, Japan. Citigroup Global Markets is a wholly-owned subsidiary of Defendant Citigroup, Inc. and an affiliate of Citibank Japan.  Defendant Citigroup Inc., which controlled Defendants Citibank, Citibank, Japan Ltd., and Citigroup Global Markets Japan Inc., reaped significant financial benefit from, and actively participated in, the unlawful conduct alleged herein.

76.     Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") is a financial services provider with offices worldwide and its main headquarters in the Netherlands.   During the Class Period, Rabobank was a reference bank for the BBA's Yen-LIBOR panel.  The New York branch of Rabobank Nederland is located in this District at 245 Park Avenue, 37th Floor, New York, NY 10167.  Rabobank withdrew from the BBA's Yen-LIBOR panel in mid-2012.

77.     Defendant HSBC Holdings plc ("HSBC") is a United Kingdom public limited company headquartered in London, England.  Defendant HSBC Bank plc is a United Kingdom public limited company headquartered in London, England and a wholly owned subsidiary of HSBC.  During the Class Period, HSBC was a reference bank for the BBA's Yen-LIBOR panel.

78.     The following bank defendants served as JBA Euroyen TIBOR panel banks during the Class Period: (i) The Bank of Tokyo-Mitsubishi UFJ, Ltd.; (ii) Mizuho Bank, Ltd.; (iii) The Sumitomo Trust and Banking Co., Ltd.; (iv) The Norinchukin Bank; (v) Mitsubishi UFJ Trust and Banking Corporation; (vi) Sumitomo Mitsui Banking Corporation; (vii) Resona Bank, Ltd.; (viii) J.P. Morgan Chase Bank, NA; (ix) Mizuho Corporate Bank, Ltd.; (x) Chuo Mitsui Trust & Banking Co. Ltd.; (xi) Deutsche Bank AG; (xii) Mizuho Trust and Banking Co. Ltd.; (xiii) The Shoko Chukin Bank, Ltd.; (xiv) Shinkin Central Bank; (xv) UBS AG; (xvi) The Bank of Yokohama, Ltd.; (xvii) The Royal Bank of Scotland Group PLC.;  and (xviii) Citibank, Japan Ltd.

79.     The following bank defendants served as BBA Yen-LIBOR panel banks during the Class Period: (i) The Bank of Tokyo-Mitsubishi UFJ, Ltd.; (ii) The Norinchukin Bank; (iii) Sumitomo Mitsui Banking Corporation; (iv) J.P. Morgan Chase & Co.; (v) Mizuho Corporate Bank, Ltd.; (vi)  Deutsche Bank AG; (vii) UBS AG; (viii) Société Générale; (ix) The Royal Bank of Scotland Group PLC; (x) Barclays Bank PLC; (xi) Citibank, N.A.; (xii) Rabobank; and (xiii) HSBC.

80.     The following bank defendants served as both JBA Euroyen TIBOR and BBA Yen-LIBOR panel banks during the Class Period: (i) The Bank of Tokyo-Mitsubishi UFJ, Ltd.; (ii) The Norinchukin Bank; (iii) Sumitomo Mitsui Banking Corporation; (iv) J.P. Morgan Chase Bank, & Co./J.P. Morgan Chase NA, (v) Mizuho Corporate Bank, Ltd.; (vi) Deutsche Bank AG; (vii) UBS AG; and (viii) The Royal Bank of Scotland Group PLC; and (ix) Citibank, NA /Citibank Japan Ltd.

81.     The defendants that served on the JBA Euroyen TIBOR and/or BBA Yen-LIBOR panels during the Class Period are collectively referred to herein as the "Contributor Bank Defendants."

82.     Defendant ICAP PLC ("ICAP") is the world's premier voice and electronic interdealer broker and provider of post trade services with its head office in London, United Kingdom.  ICAP is active in the wholesale markets in interest rates, credits, commodities, FX, emerging markets and equity derivatives.  ICAP has businesses in more than 32 countries, including six U.S. offices including in this District.   ICAP and certain of its subsidiaries are involved in the brokering of cash deposits and derivatives based on Euroyen TIBOR and Yen-LIBOR between banks, including Contributor Bank Defendants.

83.     Defendant R.P. Martin Holdings Limited ("R.P. Martin") is originally a United Kingdom-based market-leading wholesale broking firm in the financial markets.  R.P. Martin brings together buyers and sellers of fixed income cash flow, bonds, currency and financial derivatives in the international money and capital markets.  R.P. Martin has offices throughout the world.  R.P. Martin and certain of its subsidiaries are involved in the brokering of cash deposits and derivatives based on Euroyen TIBOR and Yen-LIBOR between banks, including Contributor Bank Defendants.

84.     Defendants ICAP and R.P. Martin, along with additional yet-unidentified derivative and cash broker defendants, are collectively referred to herein as the "Broker Defendants."

85.     John Doe Defendants Nos. 1-50 are other entities or persons, including banks, interdealer brokers, cash brokers and other co-conspirators whose identities are currently unknown to Plaintiff.  The John Doe Defendants participated in, furthered, and/or combined,

conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of Euroyen TIBOR, Yen-LIBOR and Euroyen TIBOR futures contracts.

## AGENTS AND UNNAMED CO-CONSPIRATORS

86.    Various other entities and individuals, including, but not limited to, securities-dealers subsidiaries and/or affiliates of Contributor Bank Defendants participated as co-conspirators and manipulators in the acts complained of and performed acts and made statements that aided and abetted and furthered the unlawful conduct as alleged herein.  The unnamed co-conspirators, along with the above-named Defendants, performed, participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of Euroyen TIBOR, Yen-LIBOR and Euroyen TIBOR futures contracts.

## SUBSTANTIVE ALLEGATIONS

I.    **Background**

A.    **Euroyen TIBOR and Yen-LIBOR**

87.    Euroyen TIBOR and Yen-LIBOR are daily reference rates intended to reflect the interest rates at which banks offer to lend unsecured funds denominated in Japanese Yen to other banks in the offshore wholesale money market (or interbank market), also known as the Euroyen market.  The higher the credit risk for a bank (or credit risk environment), the higher the rate that bank would (should) have to pay for borrowing unsecured funds denominated in Japanese Yen in the Euroyen market.

88.    Interest rate Yen-denominated issues that are settled during European trading hours generally use the BBA Yen-LIBOR rate as their pricing basis, while interest rate Yen-

denominated issues that are settled during Asia-Pacific trading hours generally use the JBA's Euroyen TIBOR rate for their pricing, but either rate may be used. *See* ¶¶619-26 (discussing the interrelationship of Euroyen TIBOR and Yen-LIBOR).

89.     In addition to their use as benchmarks in pricing loans, Euroyen TIBOR and Yen-LIBOR are used as the basis for settlement of interest rate derivatives contracts traded on major futures and options exchanges and in over-the-counter markets. Euroyen TIBOR is used as the settlement benchmark for Three-month Euroyen TIBOR futures contracts, the most actively traded non-US dollar interest rate contract in the world. Billions in notional value of domestic (U.S. based) transactions in Euroyen TIBOR futures contracts were transacted during the Class Period.

90.     Euroyen TIBOR is set through the JBA by its member banks. The JBA designates a minimum of 8 reference banks to provide daily rate quotes for the calculation of Euroyen TIBOR rates. According to the JBA, "[t]he selection of reference banks is based on four factors: 1) market trading volume…, 2) Yen asset balance, 3) reputation, and 4) track record in providing rate quotes. (The selection also takes into account JBA TIBOR continuity and the variety of financial sectors to which reference banks belong.)."

91.     Euroyen TIBOR is calculated on each business day as of 11:00 a.m. Tokyo time. Each Euroyen TIBOR reference bank quotes Euroyen TIBOR rates for 13 maturities (1 week and 1-12 months).

92.     In calculating Euroyen TIBOR rates, quotes are discarded from the two highest and the two lowest financial institutions and the remaining rates are then averaged.