UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
JEFFREY LAYDON, on behalf of himself and         :
all others similarly situated,                                     :
                                                                              :
                         Plaintiff,                      :    Case No: 12-cv-3419 (GBD)
                                                                              :
                      v.                                       :
                                                                              :
MIZUHO BANK, LTD., THE BANK OF                 :    **ORAL ARGUMENT REQUESTED**
TOKYO-MITSUBISHI UFJ, LTD, THE                  :
SUMITOMO TRUST AND BANKING CO.,             :
LTD., THE NORINCHUKIN BANK,                       :
MITSUBISHI UFJ TRUST AND BANKING           :
CORPORATION, SUMITOMO MITSUI                  :
BANKING CORPORATION, RESONA                    :
BANK, LTD., J.P. MORGAN CHASE & CO.,          :
J.P. MORGAN CHASE BANK, NATIONAL            :
ASSOCIATION, J.P. MORGAN SECURITIES         :
PLC, MIZUHO CORPORATE BANK, LTD.,            :
DEUTSCHE BANK AG, MIZUHO TRUST              :
AND BANKING CO., LTD., THE SHOKO             :
CHUKIN BANK, LTD., SHINKIN CENTRAL         :
BANK, UBS AG, UBS SECURITIES JAPAN          :
CO. LTD., THE BANK OF YOKOHAMA,              :
LTD., SOCIÉTÉ GÉNÉRALE SA, THE                  :
ROYAL BANK OF SCOTLAND GROUP,                :
PLC, ROYAL BANK OF SCOTLAND PLC,            :
RBS SECURITIES JAPAN LIMITED,                    :
BARCLAYS BANK PLC, CITIBANK, NA,              :
CITIGROUP, INC., CITIBANK, JAPAN LTD.,      :
CITIGROUP GLOBAL MARKETS JAPAN,             :
INC., COÖPERATIEVE CENTRALE                       :
RAIFFEISEN-BOERENLEENBANK B.A.,               :
HSBC HOLDINGS PLC, HSBC BANK PLC,          :
ICAP PLC, R.P. MARTIN HOLDINGS                  :
LIMITED AND JOHN DOES NOS. 1-50,              :
                                                                              :
                         Defendants.                :
------------------------------------------------------------x

**SUPPLEMENTAL REPLY MEMORANDUM OF LAW OF
MIZUHO BANK, LTD., MIZUHO TRUST & BANKING CO., LTD., MIZUHO
CORPORATE BANK, LTD., THE NORINCHUKIN BANK, SUMITOMO MITSUI
BANKING CORPORATION, AND SOCIÉTÉ GÉNÉRALE IN FURTHER SUPPORT OF
<u>THE MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT .................................................................................................................................. 2

PLAINTIFF FAILS TO STATE A CLAIM AGAINST THE NO-ALLEGATIONS BANKS .......................................................................................................................................... 2

    I.    The Submission Of Lower Yen LIBOR Rates On March 31, 2009 By Certain No-Allegations Banks Does Not Support An Inference Of Wrongdoing ................................................................................................................. 3

    II.    Plaintiff's Purported Economic Analysis Of The No-Allegations Banks' Rate Submissions Does Not Support An Inference Of Wrongdoing ..................... 5

    III.    Public Reports That Regulators Have Requested Information From The No-Allegations Banks As Part Of An Industry-Wide Investigation Do Not Support An Inference Of Wrongdoing ................................................................... 7

    IV.    Membership On The Yen LIBOR And/Or Euroyen TIBOR Panels Does Not Support An Inference Of Wrongdoing ............................................................. 8

CONCLUSION ............................................................................................................................... 8

## TABLE OF AUTHORITIES

**CASES**            **Page**

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140 (2d Cir. 2011) ........................ 4

*In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386 (S.D.N.Y. 2010) ................................ 8

*In re Bear Stearns Mortg. Pass-Through Certs. Litig.*,
   851 F. Supp. 2d 746 (S.D.N.Y. 2012) ......................................................................... 8

*In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677 (2d Cir. 2009) .............. 8

*DeBlasio v. Merrill Lynch & Co.*, 2009 WL 2242605 (S.D.N.Y. July 27, 2009) ........... 4

*Felske v. Hirschmann*, 2012 U.S. Dist. LEXIS 29893 (S.D.N.Y. Mar. 2, 2012) ........ 5, 8

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002) ............ 7

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106 (S.D.N.Y. 2011) ....... 8

*King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334
   (S.D.N.Y. 2010) ........................................................................................................... 4

*Local No.38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
   724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd*, 430 Fed. App'x. 63 (2d Cir. 2011) ...... 6

*Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010) .................................... 7

**RULES**

Fed R. Civ. P. 12(b)(6) ..................................................................................................... 1

Fed. R. Civ. P. 9(b) .......................................................................................................... 1

Defendants Mizuho Bank, Ltd., Mizuho Trust & Banking Co., Ltd., Mizuho Corporate Bank, Ltd., The Norinchukin Bank, Sumitomo Mitsui Banking Corporation, and Société Générale (collectively, the "No-Allegations Banks") respectfully submit this supplemental reply memorandum of law in further support of their motion to dismiss the Second Amended Class Action Complaint ("SAC") pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 9(b).[1]

## PRELIMINARY STATEMENT

Despite submitting a 93-page opposition brief, Plaintiff fails to rebut the No-Allegations Banks' central argument that they should be dismissed from this lawsuit because the SAC affirmatively pleads that certain banks, including the No-Allegations Banks, did not participate in the alleged conspiracy, but instead were unwittingly influenced by alleged misinformation from the cash brokers. To the contrary, Plaintiff reinforces the rationale for dismissal by (i) repeatedly stating in his opposition brief that the scheme alleged in the SAC depends on the "use of brokers to influence other Contributor Panel Banks' Yen-LIBOR submissions by disseminating misinformation," and (ii) attaching to his opposition brief news articles that describe the alleged dissemination of misinformation by the cash brokers.[2] On this basis alone, the claims against the No-Allegations Banks should be dismissed.

Plaintiff cannot escape the basic inconsistency in his position. On the one hand, he asks the Court to accept as true that one group of defendants duped another group of defendants. But at the same time, he argues that *all* defendants participated in the purported scheme. Plaintiff

---

[1] The No-Allegations Banks join the Reply Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Antitrust and Unjust Enrichment Claims and Reply Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Commodity Exchange Act Claims. "NAB Br." refers to the No-Allegations Banks' supplemental memorandum of law in support of the motion to dismiss, dated June 14, 2013 (Dkt. 211). "Opp. Br." refers to Plaintiff's memorandum of law in opposition to defendants' motion to dismiss, dated August 13, 2013 (Dkt. 226).

[2] Opp. Br. at 19. *See also id*. at 25, 33, 42-44, 75, 83-84, 84 n.76, and Ex. 2, 3, and 8.

cannot have it both ways. It simply makes no sense that one group of defendants would need to spread misinformation to another group of defendants in order to influence their rate submissions if all the defendants were participating in the alleged conspiracy. The only plausible inference from Plaintiff's allegations is that not all the defendants participated – especially since, despite huge volumes of publicly available information and a complaint that totals more than 400 pages (including an appendix), Plaintiff still cannot identify a single specific allegation of wrongdoing by the No-Allegations Banks. The No-Allegations Banks should not have to incur millions of dollars in discovery costs to prove what is obvious from the face of the SAC: they were not involved in any alleged collusion or manipulation, and should be dismissed.

## ARGUMENT

### PLAINTIFF FAILS TO STATE A CLAIM AGAINST THE NO-ALLEGATIONS BANKS

In his opposition brief, Plaintiff does not identify any allegations of wrongdoing by the No-Allegations Banks. (Opp. Br. at 91.) Nor does he refute the observation that the allegations forming the core of his complaint undermine his theory that the No-Allegations Banks participated in any putative conspiracy. Instead, Plaintiff asks the Court to infer that the No-Allegations Banks engaged in collusive and manipulative conduct based on (i) allegations that certain No-Allegations Banks lowered their Yen LIBOR rates on March 31, 2009, (ii) "economic analysis" by Plaintiff's purported experts, (iii) public reports that certain No-Allegations Banks received requests for information from government entities, and (iv) the No-Allegations Banks' membership on the Yen LIBOR and/or Euroyen TIBOR panels and participation as a Tokyo Financial Exchange ("TFX") trading and clearing member. (*Id*. at 39-42, 91.) None of these points gives rise to any inference of wrongdoing.[3]

---

[3] Plaintiff refers to the banks against which he has no evidence, including the No-Allegations Banks, as the

2

### I. The Submission Of Lower Yen LIBOR Rates On March 31, 2009 By Certain No-Allegations Banks Does Not Support An Inference Of Wrongdoing

Plaintiff asks this Court to infer that the submission of lower Yen LIBOR rates on March 31, 2009 by certain banks, including three No-Allegations Banks, is evidence that they "participate[d] in the hub-spoke conspiracy orchestrated by UBS." (Opp. Br. at 78.) But Plaintiff misreads his own sources. In fact, Plaintiff's inference is directly contradicted by the UBS DOJ Statement of Facts ("DOJ SOF"), which Plaintiff cites as his source, and which on its face describes how cash brokers allegedly spread misinformation to panel banks that were *not* part of the alleged conspiracy. (Dkt. 207, Ex. A. at 17-26; SAC ¶¶ 684-85.)

A discussion of activity on March 31, 2009 appears in a section of the DOJ SOF entitled: "Use of Brokers to Disseminate Misinformation." (*Id.* Ex. A. at 18.) In that section, the DOJ describes how "[c]ertain UBS Yen derivatives traders sought and received assistance from cash brokers by asking them to disseminate false market information to Yen LIBOR submitters at other Contributor Panel banks." (*Id.* ¶ 42.) The DOJ identified three tactics the cash brokers allegedly used to disseminate false information about market rates. First, they allegedly sent panel banks a set of "suggested LIBORS" (covering multiple time periods) on a daily basis that were supposed to "represent where that broker thought Yen LIBOR should be set that day based on his/her market knowledge and experience," but which were purportedly adjusted at the request of a trader. (*Id.* ¶ 44.) Second, they allegedly spread false information through "telephone conversations between brokers and Yen LIBOR submitters at other panel banks." (*Id.* ¶ 51.) Third, the cash brokers allegedly "disseminate[d] misinformation through a technique known as 'spoof bids,' whereby brokers . . . would describe a potential opportunity to engage in

---

"Yet-To-Settle Defendants." (*See, e.g.*, Opp. Br. at 78.) The term is loaded, misleading, and ultimately meaningless. It is correct to say that the No-Allegations Banks have not settled with the government. It is incorrect to use the word "yet" because there is no factual basis for them to do so.

3

certain money market transactions to Contributor Panel banks," but in fact, "there was no intention of going through with the purported money market transactions, and the fictional bids were designed solely to influence Yen LIBOR." (*Id*. ¶ 55.) After explaining how the cash brokers allegedly spread misinformation, the DOJ provided the March 31, 2009 example, in which a trader allegedly asked a cash broker "to help influence 9 of the 16 Contributor Panel banks by convincing them to lower their LIBOR submissions from the previous day." (*Id*. ¶ 53.) Based on the cash broker's efforts, the DOJ stated that "6 of the 9 Contributor Panel banks listed above lowered their 1-month Yen LIBOR submissions relative to the previous day." (*Id*.)[4]

Plaintiff asserts that this example is evidence that certain No-Allegations Banks participated in a "conspiracy orchestrated by UBS." (Opp. Br. at 78.) But that assertion is flatly contradicted by the DOJ SOF. The DOJ did not even remotely suggest that the banks that submitted lower rates on March 31, 2009 participated in a conspiracy. Rather, the DOJ used that day to illustrate how cash brokers purportedly spread misinformation to panel banks that were *not* part of the alleged conspiracy. To the extent that the DOJ had any examples of purported collusion, it provided them in the next section of the DOJ SOF entitled: "Efforts to Collude with Other Banks to Manipulate Yen LIBOR." (Dkt. 207, Ex. A. at 26-30.) The No-Allegations Banks are not mentioned in that section. The Court should therefore reject Plaintiff's inference as being directly contradicted by the very document upon which he bases it.[5]

---

[4] In any event, the rate decline on March 31, 2009 was part of a downward trend in which Yen LIBOR rates declined significantly in the weeks before and after March 31, 2009. *See, e.g.,* http://www.bloomberg.com/quote/JY0001M:IND/chart; *see also King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 344 (S.D.N.Y. 2010) (taking judicial notice of publicly available rates).

[5] *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) (affirming dismissal and stating that "where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true"); *DeBlasio v. Merrill Lynch & Co*., 2009 WL 2242605, at *25 (S.D.N.Y. July 27, 2009) (granting motion to dismiss where the plaintiffs' allegations were "not supported by the documents upon which Plaintiffs rely").

## II. Plaintiff's Purported Economic Analysis Of The No-Allegations Banks' Rate Submissions Does Not Support An Inference Of Wrongdoing

Plaintiff's opposition ignores the No-Allegations Banks' primary argument against Plaintiff's purported economic analysis: namely, that the explanation for any similarities between the rates submitted by the No-Allegations Banks and the rates submitted by other banks is that the No-Allegations Banks' submissions were unknowingly influenced by the dissemination of inaccurate market information by certain banks and brokers.[6] The alleged similarities in the rates thus provide no basis to infer that any of the No-Allegations Banks participated in the alleged conspiracy. Plaintiff's failure to respond to this argument effectively concedes it is true. *See Felske v. Hirschmann*, 2012 U.S. Dist. LEXIS 29893, at *9 (S.D.N.Y. Mar. 2, 2012) (ruling that a "plaintiff effectively concedes a defendant's arguments by his failure to respond to them").[7]

The Court should reject the inference Plaintiff seeks to draw from the purported economic analysis for a second reason: namely, that even if the economic analysis is accepted as true, it does not support an inference that the No-Allegations Banks engaged in any wrongdoing. For example, Plaintiff claims that the decline in the "Intraday Coefficient of Variation" at the beginning of the Class Period is "strongly indicative of collusion" and "cannot be explained rationally." (Opp. Br. at 79, 80, citing SAC Figs. 1-2.) But basic math and the facts alleged in the SAC demonstrate that the rise in borrowing costs during the financial crisis, which led to higher rate submissions, caused the coefficient of variation to decline. Far from lacking a

---

[6] *See* NAB Br. at 12-13; *see also id.* at 7 (citing more than 85 paragraphs in the SAC in which Plaintiff alleges that brokers allegedly assisted certain banks in spreading inaccurate market information).

[7] Plaintiff asserts that "[t]here is no inconsistency in the allegation that a defendant could at times unwittingly submit false rates while at the same time participate in a conspiracy." (Opp. Br. at 76 n. 73.) But Plaintiff does not explain why banks would *ever* use intermediaries (the cash brokers) to disseminate misinformation to other banks if those other banks were their own co-conspirators. Moreover, Plaintiff himself alleges that the banks and brokers purportedly worked together to distribute false information to other banks on a daily basis, not just "at times." (*See, e.g.*, SAC ¶¶ 180, 260, 274.)

rational explanation, the decline in the coefficient of variation is fully consistent with lawful, independent action having nothing to do with alleged collusion.

Simple math makes this clear.  According to Plaintiff, the coefficient of variation is calculated by dividing the standard deviation (*i.e.*, how much rates deviate from the mean) by the mean of the banks' daily rate submissions.  (SAC ¶ 607.)  Prior to the Class Period, the banks' mean rate submissions for Yen LIBOR and Euroyen TIBOR (*i.e.*, the denominator in Plaintiff's equation) were very low (*see* SAC at Figs. 25, 27), which resulted in a high coefficient of variation (*see id*. at Figs. 1, 2).  As the banks' borrowing rates rose during the financial crisis, the mean rate submission rose, too, and the coefficient of variation, by the laws of arithmetic, automatically declined.[8]  Because of this phenomenon – which has to do with global economic conditions and basic arithmetic, not collusion – Figures 25 and 27 in the SAC, which measure the banks' rate submissions, are the inverse of Figures 1 and 2 in the SAC, which measure the coefficient of variation.[9]  Thus, based on Plaintiff's own charts, the reason for the decline in the coefficient of variation at the beginning of the Class Period is the increase in borrowing rates from the financial crisis, not collusive or manipulative conduct.

The Court need not accept self-serving economic analysis that does not support the plaintiff's position.[10]  Because Plaintiff's economic analysis does not support an inference of wrongdoing by the No-Allegations Banks, it is not a basis to deny their motion to dismiss.[11]

---

[8]   To see why the coefficient declines when the mean rate submission rises, consider the following example: 6/1 = 6, but 6/3 = 2.  The denominators in each example represent the mean rate submission.  If the mean rate submission rises and the standard deviation remains the same, the coefficient of variation declines.

[9]   In graphic terms, Figures 25 and 27 are shaped like a mountain (the lines are low at the beginning of the Class Period, rise in the middle of the Class Period, and decline at the end of the Class Period).  Figures 1 and 2 are shaped like a valley (the lines are high at the beginning of the Class Period, decline in the middle of the Class Period, and rise at the end of the Class Period).

[10]   *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co*., 724 F. Supp. 2d 447, 462-63 (S.D.N.Y. 2010), *aff'd*, 430 Fed. App'x. 63 (2d Cir. 2011) (dismissing plaintiffs' claims, in part, because plaintiffs' charts defied "common sense"); *see also* NAB Br. at 13 (citing cases).

### III. Public Reports That Regulators Have Requested Information From The No-Allegations Banks As Part Of An Industry-Wide Investigation Do Not Support An Inference Of Wrongdoing

Plaintiff argues that the Court should infer that the No-Allegations Banks engaged in misconduct simply because they received requests for information from government regulators. (Opp. Br. at 82-83.) The case law says otherwise. As explained in our opening brief, courts routinely rule that the mere existence of a government investigation is insufficient to plead antitrust and CEA claims. (NAB Br. at 11-12.) Plaintiff cites *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314 (2d Cir. 2010) in support of his position that the "existence" of a government investigation is sufficient to plead a conspiracy. (Opp. Br. at 82.) But *Starr* does not say, or even remotely suggest, that the mere "existence" of a government investigation is sufficient to plead a conspiracy. In *Starr*, the court identified fourteen specific facts that suggested that the defendant music companies were engaged in an antitrust conspiracy. *See Starr*, 592 F.3d at 323-24. For example, the court cited, among other things, (i) a secret side agreement between the defendants, (ii) communications noting that the secret side letter was a "bad idea" because of "legal/antitrust reasons," and (iii) evidence that the defendants enforced a wholesale pricing floor. *Id.* at 323-24. In passing, the court also mentioned that the defendants were being investigated by the New York Attorney General and U.S. Department of Justice. *Id.* at 324. At that point in the analysis, however, the court had already identified twelve specific facts that demonstrated collusion among the defendants. *Id.*

Here, by contrast, Plaintiff has not identified any specific evidence of wrongdoing by any of the No-Allegations Banks: no secret side agreements, no improper communications, and no

---

<sup>11</sup> Plaintiff's reliance on *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 654-55 (7th Cir. 2002) for the proposition that "a plaintiff may present evidence of a conspiracy through economic analysis" is irrelevant. (Opp. Br. at 79.) Nothing in *High Fructose* supports the notion that untested economic analysis is sufficient to support an inference of conspiracy on a motion to dismiss where, as here, there are no allegations of specific misconduct leveled against the defendants.

7

suspicious activities. Where, as here, Plaintiff fails to allege any direct factual evidence of wrongdoing, the mere existence of a government investigation is insufficient to plead manipulation or collusion. (NAB Br. at 11-12.)[12]

## IV. Membership On The Yen LIBOR And/Or Euroyen TIBOR Panels Does Not Support An Inference Of Wrongdoing

Plaintiff also contends that the Court should infer wrongdoing from the No-Allegations Banks' membership on the Yen LIBOR and/or Euroyen TIBOR panels, or from their participation as a TFX trading and clearing member. (Opp. Br. at 39-42.) As explained in our opening brief, allegations of "guilt by association" through membership in a trade association or other group are not sufficient to allege participation in a conspiracy. (NAB Br. at 10-11.) Plaintiff's failure to address this argument "effectively concedes" that the No-Allegations Banks' argument is correct. *See Felske*, 2012 U.S. Dist. LEXIS 29893, at *9.[13]

## CONCLUSION

Because the SAC affirmatively pleads that the No-Allegations Banks did not engage in any collusive or manipulative conduct, the SAC should be dismissed in its entirety against the No-Allegations Banks, with prejudice.

---

[12] Plaintiff's other citations are completely off the mark. (Opp. Br. at 10 n.5.) One, *Hinds County, Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106, 115-16 (S.D.N.Y. 2011), supports the No-Allegations Banks' position, because the court ruled that, despite criminal indictments against other firms in the derivatives industry, the plaintiff could not sustain his claims against defendants through "guilt by association." The other two – *In re Bear Stearns Mortgage Pass-Through Certificates Litigation*, 851 F. Supp. 2d 746, 767-68 n.24 (S.D.N.Y. 2012) and *In re Beacon Associates Litigation*, 745 F. Supp. 2d 386, 406 (S.D.N.Y. 2010) – also do not say that the pendency of a government investigation supports antitrust claims.

[13] Plaintiff's CEA claims should also be dismissed because he has not alleged any facts giving rise to a strong inference that the No-Allegations Banks intentionally manipulated the price of Euroyen TIBOR futures contracts. (NAB Br. at 9.) Plaintiff asserts that he has met his burden of pleading manipulative intent by alleging that "Defendants stood to gain . . . hundreds of millions (if not billions) in ill-gotten trading profits from Euroyen derivative positions held by the Contributor Bank Defendants." (Opp. Br. at 28.) Despite his grand claim, Plaintiff has not alleged any facts indicating that the No-Allegations Banks held, traded, or profited from Euroyen future contracts. Plaintiff tries to overcome this fatal defect by making allegations against "defendants" generally and citing to paragraphs that refer to other panel banks. (*Id.*). "In a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009). Plaintiff has not met this standard, and his CEA claims should be dismissed.

8

Dated:  New York, New York
        September 27, 2013          MAYER BROWN LLP

                                    By:  /s/ Steven Wolowitz
                                         Steven Wolowitz
                                         Henninger S. Bullock
                                         Andrew J. Calica

                                    1675 Broadway
                                    New York, New York 10019
                                    Telephone:  212-506-2500
                                    Facsimile:  212-262-1910
                                    swolowitz@mayerbrown.com
                                    hbullock@mayerbrown.com
                                    acalica@mayerbrown.com

                                    *Attorneys for Defendant Société Générale*


                                    SHEARMAN & STERLING LLP

                                    By:  /s/ Jerome S. Fortinsky
                                         Jerome S. Fortinsky
                                         John A. Nathanson
                                         Jeffrey J. Resetarits

                                    599 Lexington Avenue
                                    New York, NY  10022
                                    Telephone:  212-848-4000
                                    Facsimile:  212-848-7179
                                    jfortinsky@shearman.com
                                    john.nathanson@shearman.com
                                    jeffrey.resetarits@shearman.com

                                    *Attorneys for Defendants Mizuho Corporate Bank, Ltd., Mizuho Bank, Ltd., and Mizuho Trust & Banking Co., Ltd.*

SIDLEY AUSTIN LLP

By: /s/ Andrew W. Stern
    Alan M. Unger
    Andrew W. Stern
    Nicholas P. Crowell

787 Seventh Avenue
New York, NY 10019
Telephone: 212-839-5300
Facsimile: 212-839-5599
aunger@sidley.com
astern@sidley.com
ncrowell@sidley.com

*Attorneys for Defendant The Norinchukin Bank*

BINGHAM MCCUTCHEN LLP

By: /s/ Jon R. Roellke
    Jon R. Roellke
    Michael Lloyd Spafford

2020 K Street, NW
Washington, D.C 20006-1806
Telephone: 202-373-6000
Facsimile: 202-373-6001
jon.roellke@bingham.com
michael.spafford@bingham.com

*Attorneys for Defendant*
*Sumitomo Mitsui Banking Corporation*