## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

JEFFREY LAYDON, on behalf of himself and all
others similarly situated,

               Plaintiff,

          - against -

MIZUHO BANK, LTD., THE BANK OF TOKYO-
MITSUBISHI UFJ, LTD., THE SUMITOMO TRUST
AND BANKING CO., LTD., THE NORINCHUKIN
BANK, MITSUBISHI UFJ TRUST AND BANKING
CORPORATION, SUMITOMO MITSUI BANKING
CORPORATION, RESONA BANK, LTD., J.P.
MORGAN CHASE & CO., J.P. MORGAN CHASE
BANK, NATIONAL ASSOCIATION, J.P. MORGAN
SECURITIES PLC, MIZUHO CORPORATE BANK,
LTD., DEUTSCHE BANK AG, MIZUHO TRUST
AND BANKING CO., LTD., THE SHOKO CHUKIN
BANK, LTD., SHINKIN CENTRAL BANK, UBS
AG, UBS SECURITIES JAPAN CO. LTD., THE
BANK OF YOKOHAMA, LTD., SOCIÉTÉ
GÉNÉRALE SA, THE ROYAL BANK OF
SCOTLAND GROUP PLC, ROYAL BANK OF
SCOTLAND PLC, RBS SECURITIES JAPAN
LIMITED, BARCLAYS BANK PLC, CITIBANK,
NA, CITIGROUP, INC., CITIBANK, JAPAN LTD.,
CITIGROUP GLOBAL MARKETS JAPAN, INC.,
COÖPERATIEVE CENTRALE RAIFFEISEN-
BOERENLEENBANK B.A., HSBC HOLDINGS
PLC, HSBC BANK PLC, ICAP PLC, R.P. MARTIN
HOLDINGS LIMITED AND JOHN DOE NOS. 1-50,

               Defendants.

Docket No. 12-cv-3419 (GBD)

ECF Case

## PLAINTIFF'S SUR-REPLY IN OPPOSITION TO
## DEFENDANTS' MOTIONS TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

ARGUMENT ............................................................................................................................... 1

I.     PLAINTIFF HAS CEA STANDING ............................................................................. 1

II.    PLAINTIFF'S ALLEGATIONS THAT HE SUFFERED NET LOSSES
EXCEED REQUIREMENTS FOR PLEADING INJURY AND ACTUAL
DAMAGES UNDER THE CEA ....................................................................................... 4

III.   PLAINTIFF ADEQUATELY PLEADS MANIPULATIVE INTENT ............................ 5

      A.    The *USD LIBOR II* Reconsideration Decision ...................................................... 6

      B.    The *USD LIBOR II* Court May Not Have Fully Appreciated The Reasons
Why Allegations of False Reporting By Themselves Satisfy the CEA
*Mens Rea* Requirements .......................................................................................... 6

      C.    The *USD LIBOR II* Court Did Not Review The Unique Motive
and Opportunity Allegations Here ........................................................................... 8

      D.    The *USD LIBOR* Court Did Not Review This Complaint's Allegations
Which "Identify[] Circumstances Indicating Conscious Misbehavior or
Recklessness" By Defendants Beyond Motive and Opportunity ......................... 11

IV.   PLAINTIFF PLAUSIBLY ALLEGES ANTITRUST INJURY ...................................... 12

CONCLUSION.......................................................................................................................... 15

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Absolute Activist Master Value Fund Ltd. v. Ficeto*,
    No. 09 Civ. 8862, 2013 WL 1286170 (S.D.N.Y. Mar. 28, 2013) ............................................. 9

*Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*,
    459 U.S. 519 (1983) .................................................................................................... 12

*Dandong v. Pinnacle Performance Ltd.*,
    No. 10 Civ. 8086, 2011 WL 5170293 (S.D.N.Y. Oct. 31, 2011) .............................................. 9

*Dodona I, LLC v. Goldman Sachs & Co.*,
    847 F. Supp. 2d 624 (S.D.N.Y. 2012) ....................................................................................... 9

*Hershey v. Energy Transfer Partners L.P.*,
    610 F.3d 239 (5th Cir. 2010) ................................................................................................... 10

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*,
    376 F. Supp. 2d 385 (S.D.N.Y. 2005) ...................................................................................... 9

*Gatt Communications, Inc. v. PMC Assocs., L.L.C.*,
    711 F.3d 68 (2d Cir. 2013) ..................................................................................................... 12

*In re Amaranth Natural Gas Commodities Litig.*,
    587 F. Supp. 2d 513 (S.D.N.Y. 2008) ...................................................................................... 7

*In re Amaranth Natural Gas Commodities Litig.*,
    612 F. Supp. 2d 376 (S.D.N.Y. 2009) ................................................................................. 9, 11

*In re Amaranth Natural Gas Commodities Litig.*,
    269 F.R.D. 366 (S.D.N.Y. 2010) ............................................................................................. 5

*In re Commodity Exchange, Inc., Silver Futures and Options Trading Litig.*,
    11 Md. 2213 (RPP), 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012) ........................................ 10

*In re Crude Oil Commodity Futures Litig.*,
    No. 06 Civ. 6677 (NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007) ................................. 10

*In re Crude Oil Commodity Futures Litig.*,
   913 F. Supp. 2d 41 (S.D.N.Y. 2012) ......................................................................... 5

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
   No. 11-MD-2262, 2013 WL 1285338 (S.D.N.Y. Mar. 29, 2013) ......................................... 2, 6

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
   No. 11-MD-2262, 2013 WL 4504769 (S.D.N.Y. Aug. 23, 2013) ..................................... *passim*

*In re Natural Gas Commodity Litig.*,
   337 F. Supp. 2d 498 (S.D.N.Y. 2004) ..................................................................... 7, 11

*In re Natural Gas Commodity Litig.*,
   358 F. Supp. 2d 336 (S.D.N.Y. 2005) ....................................................................... 12

*In re Rough Rice Commodity Litig.*,
   No. 11 C 618, 2012 WL 473091 (N.D. Ill Feb. 9, 2012) ................................................. 10

*Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013) ................................................................................... 15

*Transnor (Bermuda) Ltd. v. BP North America Petroleum*,
   736 F. Supp. 511 (S.D.N.Y. 1990) .............................................................................. 4

## **Statutes**

7 U.S.C. § 1a(19) ................................................................................................... 3
7 U.S.C. § 9(1)(A) .................................................................................................. 7
7 U.S.C. § 9 ......................................................................................................... 3
7 U.S.C. § 13(a)(2) ............................................................................................. 3, 7
7 U.S.C. § 13b ....................................................................................................... 3
7 U.S.C. § 25(a) .................................................................................................... 1

In their September 27, 2013 reply memoranda, Defendants rely extensively on a recent decision in *In re Libor-Based Fin. Instruments Antitrust Litig*., No. 11-MD-2262, --- F. Supp. ---, 2013 WL 4504769 (S.D.N.Y. Aug. 23, 2013) ("*USD LIBOR II*").  Plaintiff filed his opposition brief on August 13, 2013, ten days before *USD LIBOR II* was issued.  Dkt. 226 ("*Pl. Mem.*").[1]  This Sur-reply responds to Defendants' arguments based on *USD LIBOR II*.

## ARGUMENT

### I.   PLAINTIFF HAS CEA STANDING

In his opposition brief, Plaintiff detailed extensive factual content plausibly demonstrating (*i.e.*, beyond a "sheer possibility") that when Defendants manipulated Yen-LIBOR and Euroyen TIBOR through their false reports and other rate-related misconduct, they manipulated both the price of Euroyen TIBOR futures contracts and the "commodity" underlying these futures contracts within the meaning of Section 22(a)(1)(D) of the CEA.[2]  *See Pl. Mem.* at 15-24.  In response, Defendants do not challenge Plaintiff's standing to assert CEA claims for manipulation of the price of CME Euroyen TIBOR futures contracts.  *Def. CEA. Reply Br*. at 6 (conceding that "Plaintiff has standing … to allege manipulation of the prices of his CME-traded Euroyen TIBOR futures contracts.").  Rather, Defendants *only* contest Plaintiff's standing to bring CEA claims for manipulation of the "commodity" underlying Euroyen TIBOR futures contracts, relying principally on *USD LIBOR* decisions (*see Def. CEA Br*. at 8-10; *Def. CEA Reply Br*. at 2-6) reviewing a complaint with different factual allegations than those alleged here.

In *USD LIBOR II*, the Court denied plaintiffs' motion for interlocutory appeal concerning "[w]hether LIBOR is the 'commodity underlying' Eurodollar futures contracts within the

---

[1] Unless otherwise noted, abbreviations to Defendants' opening briefs are the same as set forth in the "Table of Abbreviations" in *Pl. Mem.* at xvi-xvii. References to Defendants' "Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss Plaintiff's Commodity Exchange Act Claims" (Dkt. 233) are referred to herein as "*Def. CEA Reply Br.*" References to Defendants' "Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss Plaintiff's Antitrust and Unjust Enrichment Claims" (Dkt. 232) are referred to herein as "*Def. Antitrust Reply Br.*"

[2] Section 22(a) provides private litigants a right of action to sue for manipulation of **either or both** (i) the price of a commodity futures contract and/or; (ii) "the price of the commodity underlying" such futures contract.  7 U.S.C. §25(a)(1)(D) (emphasis added).

meaning of Section 22(a)(1)(D) of the [CEA]." The Court concluded that the "few stray clauses" in the Barclays CFTC settlement order finding that USD LIBOR is "'a commodity in interstate commerce for purposes of Sections 9(a)(2) and 6(c) of the CEA" did not give rise to a substantial ground for difference of opinion warranting interlocutory appeal. *USD LIBOR II*, 2013 WL 4504769, at *2, 4.

Plaintiff does not begin to know how many findings by the federal regulator charged with overseeing the commodities markets in a settlement order with a market participant are necessary to hurdle the pejorative "stray" characterization. But it does not matter. The allegations here, recounting **admissions** that Yen-LIBOR and Euroyen TIBOR, each a commodity in interstate commerce within the meaning of the CEA, were falsely submitted for the express purpose of benefitting Euroyen TIBOR futures contract positions, are dispositively different.[3]

For example, Defendant UBS admits its fictitious "Yen-LIBOR and Euroyen TIBOR contributions affected or tended to affect the price of commodities, including futures contracts." ¶ 222.[4] Defendants acknowledge that there was no actively traded Yen-LIBOR futures contract during the Class Period. *Def. CEA Br.* at 13, n. 11.[5] This confirms the plausibility of Plaintiff's allegations that the only futures contract impacted by UBS's manipulation of Yen-LIBOR and Euroyen TIBOR are Euroyen TIBOR futures contracts. *See, e.g.*, *Pl. Mem.* at 50-51 and Argument II.B.

---

[3] The *USD LIBOR* Court repeatedly emphasized that it did not consider Euroyen TIBOR and Yen-LIBOR facts in the *USD LIBOR* case. Excerpts of Transcript of Hearing, at 9, *In re LIBOR-Based Financial Instruments Antitrust Litig.*, 11-MD-2262 (NRB) (S.D.N.Y. Mar. 5, 2013) ("Let's remember, this case only involves US dollar LIBOR, okay?"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 11 MD 2262 NRB, 2013 WL 1285338, at *45 (S.D.N.Y. Mar. 29, 2013) ("*USD LIBOR I*") ("plaintiffs will only be able to recover on [their CEA vicarious liability] claim with regard to [Defendants'] employees involved in the manipulation of USD LIBOR, not of other indices such as Yen LIBOR or [Euroyen] TIBOR . . . .").

[4] Citations to the Second Amended Class Action Complaint (Dkt. No. 150) are indicated as "¶____."

[5] Recognizing the damage done by this concession, Defendants now claim that TFX's Six-Month Euroyen LIBOR futures contract was an active Yen-LIBOR futures contract traded during the Class Period. *Def. CEA Reply Br.*, at p. 13, n.14. A review of the TFX's website (www.tfx.co.jp) reveals that the TFX first introduced the Six-Month Euroyen LIBOR Futures contract after the Class Period in January 2012, that only 10,983 of such contracts have ever traded (about half of the daily volume of the TFX Three-Month TIBOR futures contract), and there has been no trading volume in such contracts since September 2012.

Additionally, the CFTC has *repeatedly* found that Yen-LIBOR and Euroyen TIBOR are each a "commodity" within the meaning of the CEA, and that Defendants' false reporting of same violated Sections 6(c), 6(d), and 9(a)(2) of the CEA, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006).[6]   *E.g.*, ¶¶ 301, 305, 438, 486, 488.  The CFTC could not have made these findings if Euroyen TIBOR and Yen-LIBOR were mere "price benchmarks," rather than a "commodity" within the prosecutorial reach of the CEA's anti-manipulation provisions.[7]   The CFTC continues to make this finding, including in its recently-announced settlements against another previously unknown (and yet-to-be-named) defendant.[8]

Further distinguishing this case from the "stray" *USD LIBOR II* findings, Plaintiff here pleads detailed factual content (based on scholarly articles, market participants, and other reliable sources) demonstrating that Yen-LIBOR and Euroyen TIBOR are the interest rate charged on (*i.e.*, price of) offshore Euroyen time deposits.  *See Pl. Mem.* at Argument III.C.  Thus, even if the jury ultimately adopts Defendants' competing argument that the "commodity" underlying Euroyen TIBOR futures contracts are (and only are) Euroyen time deposits, it is academic. Plaintiff still has standing under Section 22(a)(1)(D) because Defendants manipulated the price of such Euroyen time deposits—concededly a "commodity" within the meaning of the CEA (*see*

---

[6] Section 9(a)(2) makes it a crime for "[a]ny person to manipulate . . .the price of any commodity in interstate commerce . . . or knowingly to deliver . . .false or misleading reports . . . that affect or tend to affect the price of any commodity in interstate commerce . . . ."  7 U.S.C. § 13(a)(2).

[7] The Court's holding in *USD LIBOR II* that LIBOR is not a commodity for purposes of the CEA (*USD LIBOR II*, 2013 WL 4504769, at *3) also directly contradicts the CEA's definition of "Excluded Commodity" which includes interest rates.  *See* 7 U.S.C. § 1a(19)(formerly 1a(13)) ("The term 'excluded commodity' means (i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure . . . .").  Excluded commodities are subject to all CFTC anti-manipulation rules, including Section 9(a)(2), which criminalizes the dissemination of false market information.

[8] On September 25, 2013, the CFTC and the U.K. Financial Conduct Authority announced an $87 million settlement with ICAP Europe Limited, a subsidiary of Defendant ICAP plc, whose involvement in manipulating Yen-LIBOR was previously unknown to Plaintiff.  *Supp. Reply Mem. of Law of ICAP PLC* [Dkt. 237], at n. 4.  The CFTC specifically determined that ICAP Europe Limited manipulated the price of a commodity in interstate commerce, Yen-LIBOR, and violated Sections 6(c), 6(d), and 9(a)(2) of the CEA during the period from at least October 2006 through at least January 2011.  Again, the CFTC's findings are that ICAP, through its brokers, including one known as "LORD LIBOR," knowingly disseminated false and misleading information concerning Yen borrowing rates to market participants.  *In the Matter of: ICAP Europe Limited*, CFTC Docket No. 13-28, Order Instituting Proceedings Pursuant to Sections 6(c), 6(d), and 9(a)(2) of the Commodity Exchange Act Making Findings and Imposing Remedial Sanctions .  A copy of the ICAP CFTC Order is available on the CFTC's website at: http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enficaporder092513.pdf

*Def. CEA Br.* at 8-9)—by submitting false Yen-LIBOR and Euroyen TIBOR reports.  *See Pl. Mem.* at Argument II.D; Section 9(a)(2) (criminalizing false reports that affect the price of any commodity in interstate commerce).

## II. PLAINTIFF'S ALLEGATIONS THAT HE SUFFERED NET LOSSES EXCEED REQUIREMENTS FOR PLEADING INJURY AND ACTUAL DAMAGES UNDER THE CEA

On actual damages, Plaintiff alleges that (i) he "initiated short positions in CME Euroyen TIBOR futures contracts during the Class Period and suffered net losses on such contracts due to the presence of artificial Euroyen TIBOR futures prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein." ¶ 56.[9]  These allegations are specific and satisfy the *USD LIBOR II* actual damages pleading standard.[10] *USD LIBOR II*, 2013 WL 4504769, at *12 ("[P]laintiffs need only allege that they engaged in a transaction at a time during which prices were artificial as a result of defendants' alleged trader-based manipulative conduct, and that the artificiality was adverse to their position."). Contrary to Defendants' argument (*see Def. CEA Reply Br.* at 14-16), Plaintiff need not plead precise trading losses to adequately allege actual damages under the CEA.  Actual damages[11] are presumed when a plaintiff alleges he transacted at artificial prices.  *In re Amaranth Natural Gas Commodities*

---

[9] The Complaint also alleges that "Plaintiff Laydon's losses due to the presence of artificial Euroyen and Euroyen TIBOR futures prices proximately caused by Defendants represents one measure of actual damages to Plaintiff Laydon that he is entitled to recover.  Plaintiff Laydon was also deprived of transacting in a lawful, non-manipulated Euroyen market, and otherwise suffered legal injury as a direct result of Defendants' unlawful conduct."  ¶ 56.

[10] In *USD LIBOR II*, the Court held that plaintiffs' allegations that each of the named plaintiffs "transacted in Eurodollar futures and options on Eurodollar futures on exchanges such as the CME [during the Class Period] and were harmed by Defendants' manipulation of LIBOR" insufficient to adequately allege actual damages.  *USD LIBOR II*, at *11.  Plaintiff alleges much more here. The Complaint identifies that Plaintiff was short Euroyen TIBOR futures contracts when the prices of such contracts were being driven in an artificial direction adverse to his position, and as a result of such manipulation (and price artificiality proximately caused by such manipulation), Plaintiff suffered a net loss on his position. ¶ 56.  Nothing more is required to plead CEA actual damages.  *See Pl. Mem.* at Argument III.D.

[11] "Actual damages" in Section 22 of the CEA is a qualitative limitation on recovery not a quantitative pleading requirement.  That is, plaintiff's actual damages must occur in the commodity futures markets.  *Transnor (Bermuda) Ltd. v. BP North America Petroleum*, 736 F. Supp. 511, 523 and n.15 (S.D.N.Y. 1990) (it was "clear from this [House of Representatives] report that the 'actual damages' provision was added to limit a plaintiff's recovery to damages to assets which are traded on a commodities market," quoting H.R.Rep. No. 565, 97th Cong., 2d Sess. at 57 ("Report"), 1982 U.S.C.C.A.N. at 3906.).

*Litig.*, 269 F.R.D. 366, 379-80 (S.D.N.Y. 2010) ("case law suggests that because plaintiffs transacted at artificial prices, injury may be presumed."); *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 59-60 (S.D.N.Y. 2012) (rejecting that a plaintiff must allege the date and price of the specific derivatives they bought and sold, and the specific losses from those transactions to allege actual damages).

### III.   PLAINTIFF ADEQUATELY PLEADS MANIPULATIVE INTENT

Plaintiff pleads numerous classic indicators of CEA manipulative intent, based on extraordinary admissions, findings, conspiratorial communications and well-supported allegations of systemic for profit manipulation of Yen-LIBOR, Euroyen TIBOR and the prices of Euroyen TIBOR futures contracts.  These allegations plausibly demonstrate in independently sufficient ways each Defendants' manipulative intent.  *See Pl. Mem*. at Argument III.B.  Defendants rely on *USD LIBOR II* in response.  *See Def. CEA Reply Br*. at 16-20.

*First*, with respect to Yen-LIBOR, Defendants argue that because "Yen-LIBOR is not at issue in this case[,]" the "overwhelming" evidence of Yen-LIBOR false reporting contained in the Complaint is "irrelevant" to this Court's determination of whether CEA manipulative intent has been adequately pled under *USD LIBOR II*.  *Def. CEA Reply Br*. at 16-19, n.17.  Not so.[12]

*Second*, for Euroyen TIBOR, Defendants argue that the "handful of allegations" relating to Euroyen TIBOR are "too generic and conclusory to support a strong inference" that any Defendant specifically intended to manipulate the price of CME-traded Euroyen TIBOR futures contracts.  *Def. CEA Reply Br*. at 19-20.  Again, not so.  *See Pl. Mem*. at Argument III.B.4

---

[12] Plaintiff plausibly alleges (and certain Defendants' factual admissions make clear) that: (i) a manipulation of Euroyen TIBOR and Yen-LIBOR results in a manipulation of the "commodity underlying" a Euroyen TIBOR futures contract; (ii) the one active financial market for Euroyen-based derivatives (including Euroyen TIBOR futures contracts) uses Euroyen TIBOR and Yen-LIBOR interchangeably; (iii) price discovery in the Euroyen market begins with the daily setting of Yen-LIBOR such that movements in Yen-LIBOR cause predictable changes in the Euroyen TIBOR fix, and the prices of actively traded Euroyen TIBOR futures contracts; and (iv) the reporting of false and inaccurate Yen-LIBOR and Euroyen TIBOR can (and did) directly cause artificial Euroyen TIBOR futures contract prices, including artificial settlement prices of Euroyen TIBOR futures contracts.  *See Pl. Mem*. at Argument III.C.

(demonstrating motive and opportunity to manipulate, conscious misbehavior and/or recklessness, and numerous classic acts of manipulative intent).

*Third*, Defendants mistakenly rely on, and misread *USD LIBOR II* (a decision based on a very different complaint in a different procedural context) to construct an erroneous, hyper-inflated pleading standard that conflicts with controlling pleading standards for manipulation.

### A.   The *USD LIBOR II* Reconsideration Decision

In *USD LIBOR I*, the Court held that plaintiffs may plead CEA manipulative intent by, *inter alia*, "alleging facts to show that defendants had both motive and opportunity to commit fraud."  *USD LIBOR I*, 2013 WL 1285338, at *37.  The Court determined that plaintiffs' manipulative intent allegations were sufficient and concluded "plaintiffs have adequately pleaded motive by alleging that defendants stood to gain concrete benefits from manipulating the price of Eurodollar futures contracts…[and] defendants undeniably had the opportunity to manipulate Eurodollar contract prices by submitting artificial LIBOR quotes[.]"  *USD LIBOR I*, 2013 WL 1285338, at *38.  Three of the sixteen *USD LIBOR* Contributor Bank defendants sought reconsideration.  *USD LIBOR II*, 2013 WL 4504769, at *6.  The Court *denied* reconsideration and invited further briefing on specified issues.  *Id.* at *9, n.13.  We do not yet know what the *USD LIBOR* Court will ultimately conclude concerning this element.

### B.   The *USD LIBOR II* Court May Not Have Fully Appreciated The Reasons Why Allegations of False Reporting By Themselves Satisfy the CEA *Mens Rea* Requirements

Defendants point to the statement in *USD LIBOR II* that the Court does not "accept the notion that intentionally submitting false LIBOR quotes is tantamount to intending to manipulate Eurodollar futures contracts."  *USD LIBOR II*, 2013 WL 4504769, at *7, n.8.  There are several reasons that this Court should accept the submissions of false Yen-LIBOR and Euroyen TIBOR themselves as sufficient allegations of CEA manipulative intent.

The *mens rea* pleading standard for private CEA claims is designed to ensure that cases involving what may be legitimate trading conduct are not mistakenly determined to be illegal.  A

6

market participant could take a large position in a commodity or in a futures contract for innocent reasons and the effect of that trade was not intended to manipulate prices.  As a result, courts have imposed a "specific intent" requirement so that "trading pattern[s] . . . supported by a legitimate economic rationale" such as "the mere acts of buying and holding large positions" do not give rise to CEA liability.  *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 534-35 (S.D.N.Y. 2008).  In these so-called "market power" cases, the courts require a pleader to allege "something more" than seemingly legitimate trading activity to infer manipulative intent.  *Id.* at 534 ("'something more' is anything that distinguishes a transaction made for legitimate economic purposes from an attempted manipulation . . .a legitimate transaction combined with an improper motive is commodities manipulation.").

But in commodity manipulation cases involving conscious dissemination of false information, as here, there is no alternative, legitimate economic explanation for the lie.  The lies cannot be mistaken for innocent trading strategies; they have no legitimate qualities.  By definition, false reports (such as Defendants' Yen-LIBOR and Euroyen TIBOR submissions), carry inherent "*scienter*" with them into the marketplace; there is no reason to impose a requirement to allege anything beyond the knowing dissemination of the false information to satisfy the "something more" embodied in the CEA specific intent requirement.  *See In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 500 (S.D.N.Y. 2004) (false reports of *physical* natural gas trading data and positions alone sufficient to plead manipulative intent of *futures* contract prices) ("*Natural Gas I*"); CEA Section 9(a)(2), 7 U.S.C. § 13(a)(2) ("knowingly . . . deliver[ing] . . . false or misleading or knowingly inaccurate reports concerning . . . market information or conditions that effect or tend to effect the price of any commodity in interstate commerce" violates the CEA).[13]

---

[13] False report manipulation has recently been codified in the Dodd Frank Act, making explicit what has always been true: that mere recklessness satisfies manipulative intent for false report price manipulation.  *See* 7 U.S.C. § 9(1)(A) ("Special provision for manipulation by false reporting" stating that "[u]nlawful manipulation" includes the dissemination of a false report: "knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.").

In this context, Defendants' demand that Plaintiffs moor specific lies to specific Euroyen TIBOR futures contracts they held is unreasonable.  It is unreasonable first because, as the Court observed in *USD LIBOR II*, several "informational handicaps"[14] provide pleading obstacles that threaten to allow CEA manipulation violations unprosecuted due to premature dismissals.  It is further unreasonable because no marginal benefits are gained by imposing the elevated standard; the lies, coupled with the allegations and admissions that they were intended to effect Euroyen TIBOR futures contract prices, provide all of the *scienter* necessary to plead this case.

### C.  The *USD LIBOR II* Court Did Not Review The Unique Motive and Opportunity Allegations Here

Defendants argue that the Court somehow "clarifie[d]" its *USD LIBOR I* opinion" in a manner that "undercuts Plaintiff's position" on the sufficiency of Plaintiff's allegations that Defendants' had both the motive and opportunity to manipulate Euroyen TIBOR, Yen-LIBOR and the prices of Euroyen TIBOR futures contracts.  *Def. CEA Reply Br.* at 19, n. 17 (citing *USD LIBOR II*, 2013 WL 4504769, at *7).  The *USD LIBOR* Court reviewed dispositively different allegations.  The allegations in Plaintiff's Complaint show enhanced evidence of Defendants' unique and specific motives and opportunities that were not present in *USD LIBOR*.

On motive, Plaintiff specifically alleges Defendants stood to gain outsized, economically irrational profits from manipulating Euroyen TIBOR and Yen-LIBOR, *i.e.*, hundreds of millions (if not billions) in ill-gotten trading profits from Euroyen derivatives positions, including Euroyen TIBOR futures contract positions, held by the Contributor Bank Defendants.  The instant messages cited in the Complaint tie these profit opportunities directly to successful efforts

---

[14] In *USD LIBOR II*, the Court acknowledged three "informational handicaps" limiting a plaintiffs' ability to specifically plead what was in the minds of defendants' employees, *i.e.*, manipulative intent.  *USD LIBOR II*, 2013 WL 4504769, at *8-9.  The Court understood that plaintiffs could not identify "the particular contracts and transactions on which the moving defendants allegedly sought to profit.  *Id.* (citations omitted).  Moreover, plaintiffs could not show a "defendant executed a transaction that yielded a concrete benefit to it as the result of the defendants' manipulative conduct.  *Id.*  Also, pleading "appear[ed] to be impossible" because plaintiffs could not know the nature of defendants' positions prior to discovery and could not demonstrate the degree of artificiality caused by manipulation at varying times in the market.  *Id.*

to rig Yen-LIBOR and Euroyen TIBOR.  *See, e.g.*, ¶¶ 14-19, 28-31, 148, 195-98, 202-13, 218-19, 245, 252, 277, 328, 332, 384, 393, 408, 417, 472-75.

These allegations show that the Contributor Bank Defendants (and their brokers) exploited a position of trust as a Contributor Bank to gain a special economic advantage, unavailable to other market participants.  This illegitimate financial incentive fueled the persistent manipulation.  Plaintiff does not allege a legitimate profit motive from holding large futures positions in the hopes that they will gain value through traditional market gyrations. Rather, he alleges motive to manipulate through Defendants' acts of false reporting that created the very price gyrations themselves (and thereby preordaining the market movements).  Rigging a market is not a traditional, legitimate profit motive of futures traders.[15]  Far from a "generalized motive possessed by most corporate defendants," (*Def. CEA Reply Br.* at 19), Plaintiff alleges that "Defendants engaged in self-dealing by abusing their nonpublic knowledge and position of power to benefit themselves." *Dodona I, LLC v. Goldman Sachs & Co.*, 847 F. Supp. 2d 624, 645 (S.D.N.Y. 2012).[16]

On opportunity, Plaintiff specifically alleges that by virtue of Defendants' roles as: (i) JBA Euroyen TIBOR and/or BBA Yen-LIBOR Contributor Banks (*e.g.*, ¶¶ 4, 78-81); and (ii) intermediaries to other Euroyen market participants in the case of both the Broker and Contributor Bank Defendants  (*e.g.*, ¶¶ 178, 260, 428, 720), Defendants had the opportunity to influence and did indeed influence – (*e.g.*, ¶¶ 629-64, 721) Yen-LIBOR, Euroyen TIBOR and the prices of Euroyen TIBOR futures contracts.  Again, by sitting on the panels (and, in the case of the Broker Defendants, colluding with those who did), Defendants were in a unique position to

---

[15] *See In re Amaranth Natural Gas Commodities Litig.*, 612 F. Supp. 2d 376, 383 (S.D.N.Y. 2009) ("*Amaranth II*") ("Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.").

[16] *See also Absolute Activist Master Value Fund Ltd. v. Ficeto*, No. 09 Civ. 8862 (GBD), 2013 WL 1286170, at *6 (S.D.N.Y. Mar. 28, 2013) (defendants' "deliberate self-dealing, selling securities that they owned . . . at artificially high prices to enrich themselves" was motive sufficient to establish strong inference of *scienter*); *Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086, 2011 WL 5170293, at *12 (S.D.N.Y. Oct. 31, 2011) ("Plaintiffs have succeeded in pleading more than 'a generalized motive'. . . . [t]hey have pled what amounts to self-dealing" based on defendants' undisclosed structuring of CDO to favor their "short" position; *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 404 (S.D.N.Y. 2005) (self-dealing sufficient motive to establish *scienter*).

manipulate Euroyen TIBOR futures contract prices.  No trader—no matter how large—not a member of this select club could have manipulated the way Defendants did here.

In *USD LIBOR II*, the Court questioned (but did not decide) whether *In re Crude Oil Commodity Litigation*, No. 06 Civ. 6677(NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007) ("*Crude Oil*") or *In re Commodity Exchange, Inc., Silver Futures and Options Trading Litigation*, No. 11 MD 2213 (RPP), 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012) ("*Silver*") altered the Court's finding in *USD LIBOR I* that motive had been adequately pled.  *USD LIBOR II*, 2013 WL 4504769, at * 7; *Def. CEA Reply Br.* at 19-20.   Neither of these cases involved the illegitimate false reporting and self-dealing at issue here, and are therefore inapposite.  For example, unlike the generalized motive allegations in *Crude Oil* (2007 WL 1946553, at *8), motive here can be attributed *only* to Defendants.  The largest trader of Euroyen TIBOR futures contracts on Earth could not have shared Defendants' specific motive (and opportunity) *unless* it too was a Euroyen TIBOR and Yen-LIBOR contributor bank or a broker agent of such banks.[17] Similarly, in *Silver*, plaintiffs alleged that a defendant's intent to manipulate silver prices could be inferred based on that defendant's status as a large holder of silver futures contracts and a series of purportedly suspicious trades.  *Silver*, 2012 WL 6700236, at *10.  As the Court noted, the plaintiffs failed to identify any "specific actions which exhibited an actual intent to bring about" the conditions that would benefit the defendant's market positions.  *Id*.  Unlike *Silver*, Plaintiff here identifies the actions exhibiting the intent to bring about the manipulation: repeated and pervasive false Euroyen TIBOR and/or Yen-LIBOR submissions in order to benefit Euroyen derivatives positions, including futures contracts.  These illegal rate submissions, unlike the suspicious trades in *Silver*, were inherently illegitimate on their face.

---

[17] Defendants here had unique market power far greater from that present in *Hershey v. Energy Transfer Ptnrs, L.P.*, 610 F.3d 239, 249 (5th Cir. 2010) or *In re Rough Rice Commodity Litig.*, 11 Civ. 618, 2012 WL 473091, at *6-7 (N.D. Ill. Feb. 9, 2012) (alleging price manipulation solely through position limit violations).  *See Pl. Mem.* at Argument III.B.5.

**D. The *USD LIBOR* Court Did Not Review This Complaint's Allegations Which "Identify[] Circumstances Indicating Conscious Misbehavior or Recklessness" By Defendants Beyond Motive and Opportunity[18]**

As Defendants' authority reveals, *Def. CEA Reply Br.* at 17, n.16, even without allegations of "motive and opportunity," a CEA plaintiff may still plead *scienter* by identifying circumstances indicating conscious misbehavior and/or recklessness by the defendant. *See Amaranth II*, 612 F. Supp. 2d at 383. Given the extensive admissions and factual content pled in the Complaint, Plaintiff amply satisfies this alternative pleading avenue as well. *See Pl. Mem.*, at 29-44. An inference of conscious misbehavior (or at a minimum, recklessness) is especially appropriate here because Defendants are not only sophisticated participants in the Euroyen derivatives market (fully familiar with Euroyen TIBOR futures trading and pricing), but they were also solely responsible for setting Yen-LIBOR and/or Euroyen TIBOR. These Defendants *knew* (or were reckless in not knowing) the intended impact of their false reports on Euroyen TIBOR futures contract pricing. *Id*. at 29, 31. *See Natural Gas I*, 337 F. Supp. 2d at 500 (the court was "not persuaded that these Defendants are ingénues making their first appearance at the debutante ball").

Among other factual content, Plaintiff: (i) identifies via economic analysis hundreds of false Euroyen TIBOR and/or Yen-LIBOR submissions by *each* of the Defendants; (ii) recounts hundreds of manipulative and conspiratorial communications regarding the rigging of Yen-LIBOR and Euroyen TIBOR for the purpose of profiting Euroyen derivatives positions; (iii) reverse engineers the identities of numerous defendants, including Citigroup, HSBC, Deutsche and JPMorgan, in conspiratorial communications;[19] (iv) performs econometric analyses that demonstrate market phenomena that cannot be explained rationally except as the product of manipulative activity involving the Contributor Bank Defendants; and (v) identifies twelve

---

[18] The *USD LIBOR* Court did not consider admissions, findings and/or facts revealed in connection with government settlements involving the rigging of Euroyen TIBOR and/or Yen-LIBOR. *See* note 3, *supra*.

[19] These Defendants have foregone two briefing opportunities to claim they were falsely identified.

classic manipulative acts (including seven admitted manipulative acts by UBS, Barclays and RBS). *Pl. Mem.* at 28-44.  CEA manipulative intent has more than adequately been pled.[20]

## IV.   PLAINTIFF PLAUSIBLY ALLEGES ANTITRUST INJURY

In his opposition brief, Plaintiff cited the governing three-part antitrust injury test in *Gatt Communications, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013), and explained how his allegations meet the test.  He highlighted the Second Circuit's directive to assume that the practice in question violates the antitrust laws for purposes of evaluating antitrust injury.  *Pl. Mem.* at 57 (citing *Gatt*, 711 F.3d at 76 n.9); *see also Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 528 (1983) (noting that court of appeals "properly assumed" that defendant's alleged conduct "might violate" the antitrust laws when evaluating antitrust injury).

In reply, Defendants dodge *Gatt*, then ask the Court to violate it.  Defendants want this Court to determine that Plaintiff has not pled antitrust injury because there is no competition in either Euroyen rate-setting, lending market, or the futures market, so the antitrust laws are not violated.  *Def. Antitrust Reply Br.* at 2.  Instead of assuming a violation, Defendants want the Court to conclude as a matter of law there was none, by following the Court's *USD LIBOR II* rationale that "none of plaintiff's allegations make plausible that there was an arena in which competition occurred."  *USD LIBOR II*, 2013 WL 4504769, at *17.  The *USD LIBOR II* Court did not apply the *Gatt* antitrust injury test; this Court should not make the same error.

Moreover, the Court should refuse Defendants' invitation to conclude that there are no allegations of restraints on competition in this Complaint by diverting the Court's attention to the

---

[20] These allegations surpass those deemed sufficient to infer manipulative intent in *In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d 336 (S.D.N.Y. 2005).  None of the specific false reports were pled by plaintiffs in *In re Natural Gas,* nor did plaintiffs identify communications regarding the manipulation of futures prices via such false reports.  *Id.* at 344 (finding that plaintiff's false report allegations sufficient to state a CEA manipulation claim without mention of any specific intent element).  As in *In re Natural Gas*, because Plaintiff alleges that Defendants knowingly disseminated false market information, Plaintiff has established the requisite mental state for a CEA violation.

separate *USD LIBOR* proposed amended complaints.[21]   As he demonstrated in his opposition

brief, Plaintiff, unlike the *USD LIBOR* plaintiffs, did allege with specific facts that Yen-LIBOR

and Euroyen TIBOR rate-setting was a competitive experience.  *Pl. Mem.* at 73 (citing ¶¶ 691-

99).  Plaintiff provides an example of this competition from the many collusive instant messages

compiled in the Appendix to the Complaint.  ¶ 697 (citing July 29, 2009 message).  In one

message, a broker and a UBS trader discuss how UBS and two other Contributor Bank

Defendants (referenced as the "three muscateers [sic]") will cause a trader at a fourth Contributor

Bank "a fair bit of damage" as a result of collusive efforts to falsely report lower-than-

competitive Yen-LIBOR rates.  *Id*.  Because the Contributor Bank Defendants "had competing

financial interests in where the rates came out," they "competed in setting the rates."  *Id*.  The

*USD LIBOR* plaintiffs had no similar allegations of competition, rendering the result reached by

the Court when evaluating those complaints inapposite.

   Putting aside the pleading differences, and focusing instead solely on the "cooperation"

versus "competition" characterization of rate-setting, several alleged facts support what

Defendants' traders knew all too well—that the act of setting Yen-LIBOR and Euroyen TIBOR

was a fiercely competitive battle that yielded huge spoils in the futures and derivatives markets

for the victors.  Taking the pleaded facts as true, common sense commands this conclusion.  For

if, as *USD LIBOR II* improperly concluded as a matter of law, rate setting was simply a

cooperative experience:

- why did UBS bribe brokers to help it "cooperate"?  (¶¶ 31, 276-84);

- why did RBS concoct a false story it would tell the BBA when other banks
  complained about its low 6-month fix?  (¶ 414);

- why did the submitters hide their "cooperative" efforts through the use of code
  words? (¶¶ 21-22, 201, 266-67, 712);

---

[21] Defendants have it backwards when they claim that Plaintiff "replicat[ed] many of the proposed antitrust amendments in the[] three sets of USD LIBOR MDL [complaints] . . . ." *Def. Antitrust Reply Br.* at 2.  Plaintiff filed his Amended Complaint on April 15, 2013, more than one month before the USD LIBOR plaintiffs submitted their proposed amended complaints on May 17, 2013.  Replication was temporally impossible.

- why did management at the Contributor Bank Defendants ban their traders from "cooperating"?  (¶¶ 17, 349-56, 434-36);

- why did Contributor Bank Defendants at times lie to other banks through their brokers about where they intended to set their rates?  (¶¶ 26-31, 260-73);

- why did UBS' lawyers, upon learning of the "cooperation" efforts of their traders, find it necessary to seek leniency from the Antitrust Division of the U.S. Department of Justice?  (¶ 6);

- why did some traders hide their "cooperation" from investigators? (¶¶ 175, 348-52, 414); and

- why did the Antitrust Division of the U.S. Department of Justice settle enforcement actions against certain of the Contributor Bank Defendants based on the evidence of their "cooperation"?  (¶¶ 142-229, 324-90, 466-82).

There are no answers to these questions if rate-setting was a "cooperative" rather than "competitive" experience.  The pleaded facts show instead that the Contributor Bank Defendants viewed rate-setting competitively and minimized their risk of losing the rate-setting battle by forming a cartel.  *See, e.g.*, ¶ 417 ("Yen-LIBOR is a cartel now…").

The *USD LIBOR* Court did not review a shred of evidence of competitive rate-setting instant messages when it concluded that the USD LIBOR rate-setting process was cooperative.  Rather than "plead around" the "fact" that the "TIBOR setting process[] [was] fundamentally cooperative (rather than rivalrous)," Plaintiff pleads and demonstrates with evidence just the opposite.  *Def. Antitrust Reply Br.* at 3.  And Defendants implicitly concede that rate-setting was competitive when they argue that certain Contributor Bank Defendants were defrauded at times by brokers acting at the behest of other Contributor Bank Defendants.  *See, e.g.*, *Self-Styled "No Allegations Banks" Supp. Br.* at 7-9.  *See also Pl. Mem.* at 76, n.73.

Insofar as the *USD LIBOR* plaintiffs did plead new allegations of competition, the Court concluded that they did not plead that defendants "failed to act in [their] independent individual self-interest."  *USD LIBOR II*, 2013 WL 4504769, at *17.  This presumably led to the legal conclusion that without such pleading, plaintiffs' complaints were deficient.

Whatever the propriety of this reasoning as applied to the *USD LIBOR* case, it has no application here, for two reasons. *First*, the Complaint here contains admissions and plentiful factual content of persistent collusion in the setting of Yen-LIBOR and Euroyen TIBOR. This is not a case where acts contrary to a defendant's independent individual self-interest matter. As the Second Circuit has held, this concept does not apply when there is an admitted conspiracy, as in this case. *Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136-37 (2d Cir. 2013) (describing the "two ways" of pleading an antitrust conspiracy: "assert[ing] direct evidence" or circumstantial evidence in the nature of "plus factors" which "may include" "evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged co-conspirators") (citation omitted). Even if the concept applied, Plaintiff satisfies it because he ***has*** pleaded acts that are contrary to certain defendants' independent individual self-interest. For example, Plaintiff pleads that UBS and RBS paid brokers large sums of money both directly and through commissions resulting from illegal wash trades as an inducement to help it collude. ¶¶ 31, 197-98, 260, 276-84, 395, 428-33. It was not in these banks' independent individual self-interest to pay bribes. Unlike the *USD LIBOR* plaintiffs, therefore, Plaintiff here has satisfied a deficiency described by the *USD LIBOR II* Court that lead to dismissal of those complaints.

## CONCLUSION

For the foregoing reasons and the reasons stated in Plaintiff's Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss (Dkt. 226), Defendants' motions to dismiss should be denied in their entirety.

Dated:  White Plains, New York
        October 9, 2013

LOWEY DANNENBERG COHEN
& HART, P.C.

By: /s/ Vincent Briganti
    Vincent Briganti, Esq.
    Geoffrey M. Horn, Esq.
    Peter D. St. Phillip, Esq.
    Raymond Girnys, Esq.
    One North Broadway
    White Plains, New York 10601
    Tel.: 914-997-0500
    Fax: 914-997-0035

    *Interim Lead Class Counsel*

## CERTIFICATE OF SERVICE

I, Vincent Briganti, hereby certify that, on the 9th day of October, 2013, I caused Plaintiff's Sur-Reply in Opposition to Defendants' Motions to Dismiss to be electronically filed with the Clerk of this Court using the Court's ECF system, which will automatically serve a copy of same upon all attorneys of record.

Dated: October 9, 2013.

<u>/s/ Vincent Briganti</u>