UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JEFFREY LAYDON, on behalf of himself and all
others similarly situated,

                  Plaintiff,

              v.

MIZUHO BANK, LTD., THE BANK OF TOKYO-
MITSUBISHI UFJ, LTD, THE SUMITOMO
TRUST AND BANKING CO., LTD., THE
NORINCHUKIN BANK, MITSUBISHI UFJ
TRUST AND BANKING CORPORATION,
SUMITOMO MITSUI BANKING
CORPORATION, RESONA BANK, LTD., J.P.
MORGAN CHASE & CO., J.P. MORGAN CHASE
BANK, NATIONAL ASSOCIATION, J.P.
MORGAN SECURITIES PLC, MIZUHO
CORPORATE BANK, LTD., DEUTSCHE BANK
AG, MIZUHO TRUST AND BANKING CO.,
LTD., THE SHOKO CHUKIN BANK, LTD.,
SHINKIN CENTRAL BANK, UBS AG, UBS
SECURITIES JAPAN CO. LTD., THE BANK OF
YOKOHAMA, LTD., SOCIÉTÉ GÉNÉRALE SA,
THE ROYAL BANK OF SCOTLAND GROUP,
PLC, ROYAL BANK OF SCOTLAND PLC, RBS
SECURITIES JAPAN LIMITED, BARCLAYS
BANK PLC, CITIBANK, NA, CITIGROUP, INC.,
CITIBANK, JAPAN LTD., CITIGROUP GLOBAL
MARKETS JAPAN, INC., COÖPERATIEVE
CENTRALE RAIFFEISEN-BORENLEENBANK
B.A., HSBC HOLDINGS PLC, HSBC BANK PLC,
ICAP PLC, R.P. MARTIN HOLDINGS
LIMITED AND JOHN DOES NOS. 1-50,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM
DECISION AND ORDER

12-cv-3419 (GBD)

GEORGE B. DANIELS, District Judge:

This case involves the alleged manipulation of Euroyen TIBOR (the Tokyo Interbank Offered Rate), Yen-LIBOR (the London Interbank Offered Rate for Japanese Yen) and the prices of Euroyen TIBOR futures contracts during the period from January 1, 2006 through December 31, 2010 (the "Class Period") by the Defendants. The Defendants are various banks and financial institutions. Plaintiff brings this action to recover for losses that he suffered when he initiated short positions in Euroyen TIBOR Futures contracts during the Class Period, and on behalf of all those similarly situated, allegedly due to the presence of artificial Euroyen TIBOR future prices proximately caused by Defendants' unlawful manipulation and restraint of trade. Plaintiff brings claims under the Commodity Exchange Act, 7 U.S.C. § 1 *et seq* ("CEA"), Section 1 of the Sherman Act, 15 U.S.C. § 1, and a state law claim for unjust enrichment. Plaintiff alleges five causes of action against all Defendants: (1) manipulation in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, et seq.; (2) principal-agent liability in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, et seq.; (3) aiding and abetting manipulation in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, et seq; (4) violation of Section 1 of the Sherman Act, 15 U.S.C. §§ 1, et seq.; and (5) unjust enrichment. Defendants jointly move to dismiss Plaintiff's Second Amended Class Action Complaint (ECF 204).[1]

Plaintiff has adequately pled a claim under the Commodity Exchange Act for price manipulation and aiding and abetting against all defendants. Defendants' motion to dismiss those claims is denied. Defendants' motion to dismiss Plaintiff's vicarious liability, antitrust and unjust enrichment claims is granted.

---

[1] Defendants that move to dismiss are: The Bank of Tokyo-Mitsubishi UFJ, Ltd.; Mitsubishi UFJ Trust and Banking Corporation; The Bank of Yokohama, Ltd.; Barclays Bank PLC; Citibank, N.A.; Citigroup Inc.; Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.; Deutsche Bank AG; HSBC Holdings plc; HSBC Bank plc; ICAP plc; JPMorgan Chase & Co.; JPMorgan Chase Bank, N.A.; J.P. Morgan Securities plc; Mizuho Corporate Bank, Ltd.; Mizuho Bank, Ltd.; Mizuho Trust & Banking Co., Ltd.; The Norinchukin Bank; Resona Bank, Ltd.; R.P. Martin Holdings Limited; Shinkin Central Bank; Société Générale; The Shoko Chukin Bank, Ltd.; Sumitomo Mitsui Banking Corporation; and Sumitomo Mitsui Trust Bank, Ltd; Royal Bank of Scotland Group,plc; Royal Bank of Scotland plc; RBS Securities Japan Limited; UBS AG; UBS Securities Japan Co., Ltd (ECF 204).

## BACKGROUND

Euroyen TIBOR is set through the JBA by its member banks (Compl. ¶ 90). The JBA designates a minimum of 8 reference banks to provide daily rate quotes for the calculation of Euroyen TIBOR rates (*Id.*). According to the JBA, [t]he selection of reference banks is based on four factors: 1) market trading volume, 2) Yen asset balance, 3) reputation, and 4) track record in providing rate quotes (the selection also takes into account JBA TIBOR continuity and the variety of financial sectors to which reference banks belong) (*Id.*). Euroyen TIBOR is calculated on each business day as of 11:00am Tokyo time (Compl. ¶ 91). Each Euroyen TIBOR reference bank quotes Euroyen TIBOR rates for 13 maturities (1 week and 1-12 months) (*Id.*). In calculating Euroyen TIBOR rates, quotes are discarded from the two highest and two lowest financial institutions and the remaining rates are then averaged (Compl. ¶ 92). The reference banks quote what they deem to be the prevailing market rates, assuming transactions between prime banks on the Japanese offshore market as of 11:00am, unaffected by their own positions (Compl. ¶ 93).

Yen-LIBOR is set through the BBA by its member banks (Compl. ¶ 94). Yen-LIBOR is calculated each business day as of 11:00am London time (Compl. ¶ 95). Each Yen-LIBOR reference bank quotes Yen-LIBOR for 15 maturities (*Id.*). In calculating Yen-LIBOR, contributed rates are ranked in descending order and the arithmetic mean of only the middle two quantities is used to formulate the resulting BBA Yen-LIBOR calculation (Compl. ¶ 96). The contributor banks respond to the BBA's question: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?" (*Id.*).

A three-month Euroyen TIBOR futures contract is an agreement to buy or sell a Euroyen time deposit having a principal value of 100,0000,000 Japanese Yen with a three-month maturity commencing on a specific future date (Compl. ¶ 98). Three-month Euroyen TIBOR futures contracts

are exchange-listed financial instruments that are traded within the United States on the floor of the CME and electronically on the CME's Globex platform, as well as on boards of trade and exchanges accessible by U.S. investors from within the United States, including the Tokyo Financial Exchange Inc. ("TFX"), Singapore Exchange ("SGX"), and NYSE Euronext LIFFE ("LIFFE") (Compl. ¶ 99).  Three-month Euroyen TIBOR futures contracts are standardized contracts, which are identical to one another except for the trading hours (Compl. ¶ 100).

The CME and SGX operate pursuant to a Mutual Offset System which allows Three-month Euroyen TIBOR futures contracts that are opened on one exchange to be liquidated on or held at the other (Compl. ¶ 101).  Three-month Euroyen TIBOR futures contracts are quoted in terms of 100 minus the Three-month Euroyen TIBOR rate on an annual basis over a 360 day year (Compl. ¶ 102).  The contract months for a Three-month Euroyen TIBOR futures contract are March, June, September, and December, extending out 5 years (Compl. ¶ 104).  The third Wednesday of those months are the four quarterly dates of each year in which most futures and options contracts use as their scheduled maturity date or termination date (*Id.*).  Euroyen TIBOR futures contracts terminate trading at 11:00am Tokyo Time of the second Tokyo bank business day immediately preceding the third Wednesday of the contract's named month of delivery (Comp ¶ 105).

The final settlement price of a Three-month Euroyen TIBOR futures contract is defined as cash settlement to 100 minus the Three-month TIBOR rate published by the JBA at 11:00am Tokyo time on the second Tokyo bank business day immediately preceding the third Wednesday of the contract month's named month of delivery (Compl. ¶ 106).

Plaintiff alleges that Defendants manipulated prices of Euroyen TIBOR futures contracts and other Euroyen derivatives through their deliberate and systematic submission of false Euroyen TIBOR

4

and Yen-LIBOR rates to the JBA and BBA, respectively, throughout the Class Period (Compl. ¶ 135). In support of this, Plaintiff cites many governmental investigations and settlements (Compl. pp. 38-213).

Defendants move to dismiss Plaintiff's CEA claims (causes of action one through three)  on the grounds that: (i) Plaintiff lacks standing to bring claims based on alleged manipulation of Yen-LIBOR or Euroyen TIBOR because these benchmarks are not the commodities underlying the Euroyen TIBOR futures contracts Plaintiff claims to have held; (ii) Plaintiff fails to allege the required proximate causation between Defendants' alleged conduct and supposedly artificial prices in Euroyen TIBOR futures contracts; (ii) Plaintiff cannot plead specific intent to manipulate Euroyen TIBOR futures prices because the only factually allegations to specific intent pertain to Yen-LIBOR; and (iv) Plaintiff fails to plead a plausible claim for aiding and abetting or vicarious liability (Def. Supp. Br. 1 at 3-7). Defendants move to dismiss Plaintiff's antitrust claim (cause of action four) on four grounds: (i) Plaintiff does not have antitrust standing because he has failed to allege an antitrust injury and is not an "efficient enforcer" of the antitrust law; (ii) Plaintiff fails to allege a restraint of trade, as required by Section 1 of the Sherman Act; (iii) Plaintiff is barred by the Foreign Trade Antitrust Improvements Act ("FTAIA"); (iv) Plaintiff fails to plausibly allege an antitrust conspiracy (Def. Supp. Br. 2 at 2-5). Finally, Defendants move to dismiss Plaintiff's unjust enrichment claim (cause of action five) on the grounds that Plaintiff has failed to allege sufficient facts to state a claim for unjust enrichment (Def. Supp. Br. 2 at 5).

Additionally, various Defendants filed nine supplemental memoranda in support of the motion to dismiss (*see* ECF 210, 211, 212, 213, 214, 217, 218, 220, 221).  In each, a certain subset of the Defendants argues that the Plaintiff fails to plead sufficient facts to support their claims against those Defendants.

Plaintiff argues that he has sufficiently alleged a CEA claim because he: (i) does have proper standing; (ii) pleads manipulative intent sufficiently; (iii) pleads proximate cause sufficiently; and (iv) states claims for aiding and abetting and vicarious liability sufficiently under the CEA (Pl. Opp. Br. at 3-5). Plaintiff further argues that he sufficiently alleged an antitrust claim because he: (i) has proper antitrust standing; (ii) sufficiently pleads a "restraint of trade" as required by the Sherman Act; (iii) is not barred by the FTAIA; and (iv) properly pleads a conspiracy under *Twombly* (Pl. Opp. Br. at 5-7). Plaintiff also argues that he sufficiently alleged an unjust enrichment claim (Pl. Opp. Br. at 7). Additionally, Plaintiff disputes the arguments advanced in the supplemental memoranda and argues that he has pled facts sufficient to support his claims against all Defendants (Pl. Opp. Br. At 86-92).

## MOTION TO DISMISS STANDARD

"To survive a motion to dismiss," a complaint subject to Federal Rule of Civil Procedure 8(a) must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 8(a), 12(b)(6). A complaint must include more than "a formulaic recitation of the elements of a cause of action," *Twombly*, 550 U.S. at 555; it must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678. Although a court should assume the truth of factual allegations that are "well-pleaded," it should not accept as true any "legal conclusion couched as a factual allegation." *Id.* at 678-79. Accordingly, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Complaints containing only "conclusory, vague, or general allegations," and thus supported by only "speculation and conjecture," "cannot withstand a

motion to dismiss." *Gallop v. Cheney*, 642 F.3d 364, 368-69 (2d Cir. 2011) (internal quotation marks omitted).

Where the claims are premised on allegations of fraud, the heightened pleading standard of Rule 9(b) applies. *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* The elements of a claim for fraud are: "(1) a misrepresentation or a material omission of fact which was false and known to be false by [plaintiff]; (2) made for the purpose of inducing the other party to rely upon it; (3) justifiable reliance of the other party on the misrepresentation or material omission; and (4) injury." *Major League Baseball Properties, Inc. v. Opening Day Prods., Inc.*, 385 F. Supp. 2d 256, 269 (S.D.N.Y. 2005) (quoting *G&R Moojestic Treats, Inc. v. Maggiemoo's Int'l, LLC*, No. 03 Civ. 10027, 2004 WL 1110423, at *9 (S.D.N.Y. May 19, 2004)).; *see also AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 208 (2d Cir. 2000).

## PLAINTIFF SUFFICIENTLY PLED CEA CLAIMS

Section 22 of the CEA grants a private plaintiff who purchased or sold a futures contract standing to sue for "manipulation of the price of any such contract . . . or the price of the commodity underlying such contract," among other conditions precedent. 7 U.S.C. § 25(a)(1)(D) (2012) (emphasis added). To survive a motion to dismiss a claim for direct violations of the CEA under Section 22, a private plaintiff must plead facts to show both that the defendant violated the CEA and that the defendant "'stand[s] in an appropriate relationship to the plaintiff with respect to' the alleged CEA violation." *In re MF Global Holdings Ltd. Inv. Litig.*, 11 Civ. 7866 VM, 2014 WL 667481, at *10 (S.D.N.Y. Feb. 11, 2014) (quoting *Nicholas v. Saul Stone & Co. LLC*, 224 F.3d 179, 186 (3d Cir. 2000).

To establish price manipulation in violation of the CEA, a Plaintiff must demonstrate that: "(i) the accused had the ability to influence market prices; (ii) [he] specifically intended to do so; (iii) artificial prices existed; and (iv) the accused caused the artificial prices." *DiPlacido v. Commodity Futures Trading Comm'n*, 364 F. App'x 657, 661 (2d Cir. 2009) (internal citations omitted); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig. ("USD LIBOR Litig.)*, 935 F. Supp. 2d 666, 713 (S.D.N.Y. 2013).

To recover on an aiding and abetting claim under the CEA, a Plaintiff must prove that the Defendant (1) had knowledge of the principal's intent to violate the CEA; (2) intended to further that violation; and (3) committed some act in furtherance of the principal's objective. *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 599 (S.D.N.Y. 2011) (citations omitted).

Defendants move to dismiss Plaintiff's CEA claims on the grounds that: (i) Plaintiff lacks standing under the CEA to bring claims for manipulation of Yen-LIBOR and Euroyen TIBOR as a "commodity underlying" Euroyen TIBOR futures contracts because these benchmarks are not the "commodities underlying" the Euroyen TIBOR futures contracts Plaintiff claims to have held; (ii) Plaintiff fails to state a CEA manipulation claim because his allegations regarding the second element (specific intent) and the fourth element (causation) are deficient; and (iii) Plaintiff fails to state a claim for aiding and abetting liability under the CEA.

Plaintiff has standing to sue under the CEA. The CFTC has repeatedly found that Yen-LIBOR and Euroyen TIBOR are each a "commodity" within the meaning of the CEA, and that Defendants' false reporting of same violated Sections 6(c), 6(d), and 9(a)(2) of the CEA, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006). *See e.g.*, UBS Order, CFTC Docket No. 13-14 at 41 ("UBS regularly attempted to manipulate the official fixings of and knowingly delivered false, misleading or knowingly inaccurate reports concerning Yen-LIBOR, Swiss Franc LIBOR, Sterling LIBOR, Euro LIBOR, Euribor and

8

Euroyen TIBOR, *which are all commodities in interstate commerce*.") (emphasis added); *see also id.* at 4, 52-53, 56; RBS Order, CFTC Docket No. 13-14 at 31, 33, 36.  Furthermore, Section 22(a) of the CEA provides Plaintiff with standing to sue under the CEA not for manipulation of the commodity itself (according to Defendants, an offshore Japanese Yen deposit) but for manipulation of the price of (*i.e.*, interest on) that commodity (deposit), which is none other than Euroyen TIBOR and Yen-LIBOR.  As a purchaser of a Euroyen TIBOR futures contract, Plaintiff has shown that he stands in an appropriate relationship to the Defendants with respect to the alleged CEA violation.  *In re MF Global Holdings Ltd. Inv. Litig.,* 11 Civ. 7866 VM, 2014 WL 667481, at *10 (S.D.N.Y. Feb. 11, 2014).

Plaintiff adequately alleges a CEA manipulation claim.  A CEA Plaintiff must demonstrate a causal relationship between the purportedly manipulative conduct and the alleged market response.  *In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, No. 11 MD 2213 RPP, 2012 WL 6700236, at *15 (S.D.N.Y. Dec. 21, 2012) (citing *DiPlacido*, 364 F. App'x at 661).  Defendants' argument that Plaintiff does not allege facts to support a finding that any purported artificiality in the price of Euroyen TIBOR futures contracts was proximately caused by alleged manipulation of the separate Yen-LIBOR benchmark fails.  Euroyen TIBOR and Yen-LIBOR both represent the rate of interest charged on short-term loans of unsecured funds denominated in Japanese yen between banks in the offshore interbank market.  The allegations in the Complaint are sufficient to show that during the Class Period Yen-LIBOR significantly impacted Euroyen TIBOR.  Plaintiff alleges that economic analyses show that Yen-LIBOR impacted Euroyen TIBOR prices during the Class Period and that false reporting of Yen-LIBOR caused artificial Euroyen TIBOR rates (Compl. ¶ 619); the financial markets use Euroyen TIBOR and Yen-LIBOR interchangeably and have a very high correlation (Compl. ¶ 620); changes in Yen-LIBOR are immediately reflected in Euroyen TIBOR rates once Euroyen TIBOR opens and the subsequent Euroyen TIBOR JBA rate (Compl. ¶ 624); price discovery in the Euroyen market

begins with the daily setting of Yen-LIBOR such that movements in Yen-LIBOR impact changes in the following day's Euroyen TIBOR fix (Compl. ¶ 625); and analyses comparing the Euroyen TIBOR and Yen-LIBOR submissions with the prevailing Euro Yen Deposit Rate demonstrates artificiality (Compl. ¶¶ 643, 646).

Plaintiff adequately alleges scienter. Plaintiffs may demonstrate scienter "either (a) by alleging facts to show that Defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Crude Oil Commodity Litig.*, 2007 WL 1946553, at \*8 (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006)) (internal quotation marks omitted). On motive, the Complaint contains sufficient allegations that Defendants stood to gain tremendous profits from manipulating Euroyen TIBOR and Yen-LIBOR, *i.e.*, hundreds of millions (if not billions) in ill-gotten trading profits from Euroyen derivatives positions held by the Contributor Bank Defendants (translating into hundreds of millions in illegitimate bonus and other compensation paid to the banks' traders and submitters) (*see, e.g.*, Compl. ¶¶ 14, 16, 18-19, 28-31, 148, 195, 197-98, 202-13, 218-19, 245, 252, 277, 328-29, 332, 384-85, 393, 408, 417, 472-75, 478). Additionally, individual traders had the motive to commit fraud because their compensation was tied to success in trading financial products (Compl. ¶¶ 328, 384, 389, 393, 472). On opportunity, Defendants' roles as: (i) JBA Euroyen TIBOR and/or BBA Yen-LIBOR Contributor Banks (Compl. ¶¶ 78-80); (ii) members, directly or through their affiliates, of the CME and/or other exchanges upon which Euroyen TIBOR futures contracts actively trade (Compl. ¶¶ 129 (clearing members of SGX), 130 (clearing members of CME); and (iii) intermediaries to other Euroyen market participants in the case of both the Broker and Contributor Bank Defendants gave them the ability to influence Yen-LIBOR, Euroyen TIBOR and the prices of Euroyen TIBOR futures contracts.

The Complaint also includes overwhelming factual content from which this Court could infer

manipulative intent, particularly based on direct evidence from certain Defendants' communications (*see* Compl. ¶¶ 148-49, 157-58, 172-75, 199, 218, 223-29 (UBS), ¶¶ 327-30, 353-54, 384 (RBS), ¶¶ 469-72 (Barclays), ¶¶ 2, 4-5, 17, 78-81, 137, 358, 417, 606-18, 623, 629-47, 720, Figures 29-63 (Yet-Non-Settling Contributor Banks, generally), ¶¶ 197-98, 280-84, 526, 529, 571, 604-05 (ICAP), ¶¶ 25, 526, 529, 603, 682, 712 (R.P. Martin).  For example, Defendants allegedly permitted traders—whose compensation was directly connected to their success in trading financial derivative products tied to Yen-LIBOR and/or Euroyen TIBOR-–to directly or indirectly exercise improper influence over that Defendant's Yen-LIBOR and/or Euroyen TIBOR submissions, thus creating inherent conflicts of interest and an environment ripe for its derivatives traders and trader-submitters to abuse (Comp ¶¶ 148-49, 218 (UBS); ¶¶ 327-30, 353-54, 384; ¶¶ 469-72 (Barclays)); and Defendants are alleged to have actively concealed their violations of law from regulators and innocent market participants by, *inter alia*: (i) avoiding discussing the rigging of Yen-LIBOR and/or Euroyen TIBOR in public forums as well as following instructions to curb internal written communications of same (Compl. ¶¶ 434-36); (ii) agreeing to stagger their submission of false reports over successive trading days (e.g., agree that an artificially low rate would be submitted by manipulator A today, by manipulator B tomorrow and manipulator C the next day, etc.) in order to exert greater and longer-lasting manipulative pressure and to mask such false reporting from other market players (Compl. ¶¶ 25, 211); (iii) concocting false stories they could give if questioned about their false rate submissions (Compl. ¶ 414); (iv) lying to attorneys and others during internal investigations of rate manipulation (Compl. ¶ 175); (v) using cash and derivatives brokers to disseminate false rate information (Compl. ¶¶ 176-96, 260, 269-75); and (vi) engaging in wash trades and other illicit, non-bona fide trades to surreptitiously pay and facilitate corrupt brokerage payments to broker co-conspirators (Compl. ¶¶ 260, 314, 395, 422, 428-33).

Plaintiff pleads sufficient facts to support a claim of aiding and abetting.[2] The Complaint contains numerous allegations giving rise to an inference that Defendants knew of the other Defendants' unlawful and manipulative conduct and assisted each other in the furtherance of the violation.  These allegations include: (i) false reporting of Yen-LIBOR and Euroyen TIBOR was epidemic and done openly during the Class Period (*see* Compl. ¶¶ 199, 233, 243, 246-47, 317-18, 354, 417, 446, 485); (ii) Defendants are sophisticated market participants who were responsible for the global setting of Yen-LIBOR and Euroyen TIBOR during the Class Period (*see* Compl. ¶¶ 4, 78-81, 221, 387, 479, 720); (iii) Defendants, either directly or through their securities subsidiaries/affiliates, traded Euroyen-based derivatives, including Euroyen TIBOR futures contracts, for profit (*see*  Compl. ¶¶ 2, 5, 119, 125, 129-30, 137, 146, 151, 222, 417); (iv) Defendants had a large financial incentive to manipulate Yen-LIBOR, Euroyen TIBOR, and the prices of Euroyen TIBOR futures contracts (*see*  Compl. ¶¶ 197-98, 218, 245, 328, 332, 384, 408); (v) Defendants were in continuous communications with each other with respect to Yen-LIBOR and/or Euroyen TIBOR rates (*see* Compl. ¶¶ 24-33, 178-96, 202-15, 285-97, 357-81); (vi) Defendants worked to report misinformation specifically intended to manipulate Yen-LIBOR, Euroyen TIBOR, and the prices of Euroyen TIBOR futures contracts (*see* Compl. ¶¶ 15, 17, 202-215, 236-259, 269-272, 274, 275) ; (vii) Defendants furthered the manipulation by reporting false Euroyen TIBOR and Yen-LIBOR rates to financially benefit their Euroyen derivatives positions rather than rates reflective of prevailing (true) Euroyen interbank borrowing costs (*see*  Compl. ¶¶ 14, 16, 18-19, 24, 218, 259, 393); (viii) Defendants traded Euroyen based derivatives, including Euroyen TIBOR futures contracts, at times when prices were being manipulated (*see* Compl. ¶¶ 137, 221-22); and (ix) Broker Defendants, including ICAP and RP Martin, knowingly facilitated the manipulation of Yen-LIBOR, Euroyen

---

[2] Defendants also move to dismiss Plaintiff's claim for vicarious liability (second claim for relief).  Plaintiff has not alleged: (1) the principal's manifestation of intent to grant authority to the agent; (2) agreement by the agent; and (3) the principal must also maintain control over key aspects of the undertaking. *In re Amaranth,* 587 F. Supp. 2d at 531.  Accordingly, Plaintiff's second claim for relief is dismissed.

TIBOR, and Euroyen TIBOR futures contract prices during the Class Period (*see* Compl. ¶¶ 25-31, 176-201, 211, 260-274, 426-433, 577, 604, 605).

## PLAINTIFF'S ANTITRUST CLAIMS ARE DISMISSED

Plaintiff asserts a cause of action for violation of section 1 of the Sherman Act (Compl. ¶¶ 736-742). Section 1 of the Sherman provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (2006).

Plaintiff claims that he was injured when Defendants engaged in collusive rate-setting of Euroyen TIBOR and Yen-LIBOR (Compl. ¶¶ 736-742). This, he argues, is a conspiracy in restraint of trade, in violation of Section 1 of the Sherman Act. Accordingly, Plaintiff brings suit pursuant to Section 4 of the Clayton Act. 15 U.S.C. § 15 (2006). Defendants move to dismiss this claim on four grounds: (i) Plaintiff does not have antitrust standing because he has failed to allege an antitrust injury and is not an "efficient enforcer" of the antitrust law; (ii) Plaintiff fails to allege a restraint of trade, as required by Section 1 of the Sherman Act; (iii) Plaintiff is barred by the Foreign Trade Antitrust Improvements Act; (iv) Plaintiff fails to plausibly allege an antitrust conspiracy[3] (Def. Supp. Br. at 2-5).

### 1.  Plaintiff Does Not Have Antitrust Standing

In order for a private party Plaintiff to bring suit pursuant to Section 4 of the Clayton Act, that Plaintiff must have proper standing. *See Associated General Contractors of Calif. Inc. v. Calif. State Council of Carpenters ("AGC")*, 459 U.S. 519, (1983). To establish standing, an antitrust Plaintiff must show (1) an antitrust injury, and (2) that he is a proper Plaintiff in light of four "efficient enforcer" factors. *In re DDVAP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009)(citations and internal quotations omitted).

---

[3] As the antitrust claim is dismissed for lack of antitrust standing and restraint of trade, the remaining issues are not decided.

### a.   Antitrust Injury

The requirement that Plaintiffs demonstrate antitrust injury when bringing a private antitrust action "ensures that the harm claimed by the Plaintiff corresponds to the rationale for finding an antitrust violation in the first place." *Atlantic Richfield v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990).  The rationale behind the antitrust laws is evidenced by the legislative history of the Sherman Act.  The Court in *AGC* notes that the legislative history behind § 7 of the Sherman Act indicates that Congress was primarily interested in creating an effective remedy for consumers who were forced to pay excessive prices by the giant trusts and combinations that dominated interstate markets. *AGC*, 459 U.S. 519 (1983).  Thus, the antitrust laws were enacted "for the protection of *competition*, not *competitors*." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. at 488 (emphasis in original)(quoting *Brown Shoe v. United States*, 370 U.S. 294, 320 (1962).  It is important to note that the question of whether an antitrust violation occurred is different from whether the Plaintiff has standing to pursue it. *Daniel v. American Bd. of Emergency Medicine*, 428 F.3d 408 (2d Cir. 2005).

The Second Circuit recently described a three-step process for determining whether Plaintiff has sufficiently alleged an antitrust injury:

> (1) The party asserting that it has been injured by an illegal anticompetitive practice must identify the practice complained of and the reasons such a practice is or might be anticompetitive; (2) the court must identify the actual injury the Plaintiff alleges, which requires looking to the ways in which the Plaintiff claims it is in a worse position as a consequence of the Defendant's conduct; (3) the court compares the anticompetitive effect of the specific practice at issue to the actual injury the Plaintiff alleges.  It is not enough for the actual injury to be causally linked to the asserted violation.  Rather, in order to establish antitrust injury, the Plaintiff must demonstrate that its injury is of the type the antitrust laws were intended to prevent and that flows from that which makes [or might make] Defendants' acts unlawful.

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C. ("Gatt")*, 711 F.3d 68, 76 (2d Cir. 2013)(citations and internal quotation marks omitted).

Plaintiff fails to plead an antitrust injury.  Plaintiff alleges only that he "initiated short positions in CME Euroyen TIBOR futures contracts during the Class Period and suffered net losses on such contracts due to the presence of artificial Euroyen TIBOR future prices proximately caused by Defendants' unlawful manipulation and restraint of trade" (Compl. ¶ 56).  Plaintiff fails to plead facts sufficient to establish that this "is or might be anticompetitive." *Gatt*, 711 F.3d at 76.  The Complaint does not allege facts that competition was harmed in any way.

At most, Plaintiff alleges that prices were distorted.  Plaintiff, however, does not allege that this was a result of a reduction in competition.  "[I]t is not sufficient that the plaintiffs paid higher prices because of defendants' collusion; that collusion must have been anticompetitive, involving a failure of defendants' to compete where they otherwise would have." *USD LIBOR Litig.*, 935 F. Supp. 2d 666, 688-89 (S.D.N.Y. 2013).  As Judge Buchwald recognized in the *USD LIBOR Litig.*, the setting of the USD LIBOR benchmark rate is not competitive; rather it is a cooperative effort wherein otherwise competing banks agreed to submit estimates of their borrowing costs to facilitate calculation of an interest rate index. *Id.* at 688.

Furthermore, Plaintiff's allegations are insufficient because they "do not demonstrate an adequate connection between the alleged misconduct and the effect" on the market, and "the alleged injury is too attenuated from the source of the alleged misconduct." *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 402 (S.D.N.Y. 2011).  Specifically, Plaintiff fails to provide any detail about the short positions he initiated, such as when they were initiated, how long they were held, and whether he exited those positions by entering into offsetting transactions or held them until their settlement dates.  Plaintiff does not allege the prices at which he entered into these short positions, the prices of any offsetting positions he may have taken, or the prices of the futures contracts on their settlement dates.  Plaintiff does not identify or describe a single actual transaction underlying his claim, and does not indicate whether it was

an increase or a decrease in the price of Euroyen TIBOR futures contracts that caused his purported losses.

### b.  "Efficient Enforcer"

The four "efficient enforcer" factors are: (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries. *In re DDAVP*, 585 F.3d at 688 (citations omitted).  The factors are balanced to determine whether Plaintiff is an "efficient enforcer" of the alleged antitrust violation. *Id* at 689.

Defendants argue that the first and third factors weigh heavily against Plaintiff.  As to the first factor—the directness or indirectness of the asserted injury—an examination of the causation between the asserted injury and the alleged restraint is necessary. *See, e.g., AGC*, 459 U.S. at 540.  Where the chain of causation between the asserted injury and the alleged restraint in the market "contains several somewhat vaguely defined links," the claim is insufficient to provide antitrust standing. *Id*.  Moreover, where the causal relationship between the Defendants' actions and the Plaintiff's injury is too attenuated, the claim is too indirect to support an antitrust claim. *Reading Industrial, Inc. v. Kennecott Copper Corp., et al.*, 631 F.2d 10, 12-13 (2d Cir. 1980); *see also Ocean View Capital, Inc. v. Sumitomo Corp. of America*, No. 98-cv4067 (LAP), 1999 WL 1201701, at *5 (S.D.N.Y. Dec. 15, 1999); *DeAtucha v. Commodity Exchange, Inc.*, 608 F. Supp. 510, 516-18 (S.D.N.Y. 1985).

Plaintiff alleges a causal chain with at least four discrete links, requiring a complicated series of market interactions, including: (i) that Defendants allegedly conspired to make artificial Euroyen TIBOR and Yen-LIBOR submissions to the banking associations that publish Euroyen TIBOR and Yen-

LIBOR; (ii) the banking associations compiled those submissions, threw out certain high and low

submissions, and then calculated Euroyen TIBOR and Yen-LIBOR benchmark rates that were also

allegedly artificial; (iii) the artificial Euroyen TIBOR and Yen-LIBOR current benchmark rates then

impacted the market's perception of what Euroyen TIBOR benchmark rates would be at various times in

the future; and (iv) perception impacted the prices of Euroyen TIBOR futures contracts that were bought

and/or sold by Plaintiff.  Plaintiff cannot point to any direct, clearly traceable means by which

Defendants' alleged manipulation of one benchmark led to a loss to him on contracts linked to an

entirely separate benchmark.

   Plaintiff's argument that the banks had control over the prices in the Euroyen futures market via their

submissions does not establish the directness of the injury (Compl. ¶ 224).  First, the allegations of

collusive submissions involve two different benchmarks, the Euroyen TIBOR and the Yen-LIBOR.

Plaintiff alleges that the Yen-LIBOR was manipulated, which in turn affected Euroyen TIBOR which in

turn resulted in the prices of Euroyen TIBOR futures contracts being artificially manipulated (Compl. ¶¶

619-28).  But the degree to which these different rates actually influenced prices is uncertain.  Further,

Euroyen TIBOR futures contracts are traded based on what Euroyen TIBOR is expected to be in the

future (Compl. ¶ 110).  Plaintiff's injury is thus dependent upon perception of what the rate would be in

the future.  Furthermore, consumers were free to take various positions in the market, including long and

short.  This attenuated causation between the alleged conspiracy and the asserted injury is too indirect to

support antitrust standing.  *See Reading*, 631 F.2d at 13; *Ocean View Capital* at *4; *DeAtucha*, 608 F.

Supp. at 518.

   The third factor—the speculativeness of the alleged injury—involves an inquiry into the calculation

of damages.  *See, e.g. AGC*, 459 U.S. 519; *Reading*, 631 F.2d 10.  Indirectness of damages and

independent factors contributing to the effect on the Plaintiff are two considerations indicative of

17

damages being too speculative to support antitrust standing. *ACG*, 459 U.S. at 542. Where the "theory of antitrust injury depends upon a complicated series of market interactions," the damages are speculative. *Reading*, 631 F.2d at 13. This is because "countless other market variables" could affect pricing decisions. *Id.* at 13-14.

Analysis of Plaintiff's injury would require the reconstruction of hypothetical "but-for" Euroyen TIBOR and Yen-LIBOR benchmark rates during the period Plaintiff held his positions. The Court cannot hypothesize the impact of these "but-for" benchmark rates on the perceptions of the market participants whose activities would have influenced the prices of Euroyen TIBOR futures contracts. Plaintiff's alleged injury is too remote and speculative. First, the injury is indirect. Second, Plaintiff's theory of antitrust injury involves a complicated series of market interactions. There are many independent factors that could influence perceptions in the market, and pricing decisions. The speculative nature of the derivatives market, based on what the interest rate is and where it will be in the future, compounded with consumers own beliefs of where they expect the interest will be in the future make the but-for test difficult.

Because Plaintiff has failed to allege an antitrust injury, and because the efficient enforcer factors weigh against Plaintiff, Plaintiff lacks antitrust standing. Yet, even if Plaintiff had established antitrust standing, Plaintiff's antitrust claims still fail because Plaintiff failed to allege a restraint of trade.

### 2.  Plaintiff Has Failed to Allege a Restraint of Trade

Section 1 of the Sherman Act prohibits only conspiracies "in restraint of trade or commerce." 15 U.S.C. §1. Under the Act, only those restraints that are unreasonable are prohibited. *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). "To establish a claim under section 1, the Plaintiff must establish that the Defendants contracted, combined or conspired among each other, that the combination or conspiracy produced adverse, anticompetitive effects within relevant product and

geographic markets, that the objects of and conduct pursuant to that contract or conspiracy were illegal and that the Plaintiff was injured as a proximate result of that conspiracy." *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 804 (6th Cir. 1988)(quoting *Davis-Watkins Co. v. Service Merchandise*, 686 F.2d 1190, 1195-96 (6th Cir. 1982). "The essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms to prevent dismissal of the complaint on a Defendant's 12(b)(6) motion." *Crane & Shovel Sales Corp.,* 854 F.2d at 804.

There are two tests that courts use in analyzing antitrust claims: *per se* and rule of reason. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 457-58 (1986). *Per se* illegality "is reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 222 (3d Cir. 2011)(quoting *Deutsher Tennis Bund. v. ATP Tour, Inc.*, 610 F.3d 820, 830 (3d Cir. 2010). Once applied, "no consideration is given to the intent behind the restraint, to any claimed pro-competitive justifications, or to the restraint's actual effect on competition." *In re Cardizem CD Antitrust Ltiig.*, 332 F.3d 896, 907 (6th Cir. 2003)(quoting *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768 (1984). This standard, however, is applied infrequently and only where other courts have reviewed the same type of restraint. *In re Southeastern Milk Antitrust Litig.*, 739 F.3d 262, 271 (6th Cir. 2014).

"Unless the restraint falls squarely into a *per se* category, the rule of reason should be used." *Id*. Under the rule of reason analysis, "the Plaintiff 'bears the initial burden of showing that the alleged [agreement] produced an adverse, anticompetitive effect within the relevant geographic market.'" *Burtch,* 662 F.3d at 222 (quoting *Ins. Brokerage Antitrust Litig*., 618 F.3d 300, 317 (3d Cir. 2010). For a restraint to be unreasonable, there must be some anticompetitive aspect of it. *Moore v. Boating Industry Associations*, 819 F.2d 693, 696 (7th Cir. 1987). Where, however, the conduct is only unfair, impolite or unethical, there can be no liability under the Sherman Act. *See Indiana Grocery, Inc. v.*

*Super Valu Stores*, Inc., 864 F.2d 1409, 1413 (7th Cir. 1989). For instance, an agreement among industry participants to create a policy benchmark that nonetheless leaves members free to compete in the marketplace does not restrain trade. *See Schchar v. American Academy of Ophthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989); *see also United States v. Am. Soc'y of Anesthesiologists, Inc.*, 473 F. Supp. 147, 155 (S.D.N.Y. 1979).

Defendants argue that Plaintiff cannot allege that the challenged Euroyen TIBOR or Yen-LIBOR submissions are sold in commerce or that they constitute trade (ECF 206 at 30-31). They argue that the Euroyen TIBOR and Yen-LIBOR were merely informational benchmarks that were not binding on the actual price of Euroyen TIBOR futures contracts *(Id.)*. Furthermore, Defendants argue that Plaintiff has not alleged that trades in Euroyen TIBOR futures contracts were in any way restrained by the challenged conduct *(Id.)*. Finally, defendants argue that each Defendant remained fully incentivized to compete against other banks and other market participants for transactions in the Euroyen TIBOR futures market, if it so chose *(Id.)*.

Plaintiff, in opposition, argues that their allegations involve collusive benchmark price-fixing (ECF 226 at 65-66). Plaintiff argues that in submitting agreed-upon rates, Defendants restrained trade *(Id.)*. Plaintiff argues that the collusion affected billions of dollars of derivatives *(Id.)*.

There is no evidence that Defendants' conduct was *per se* illegal. The alleged collusion is not so clearly anticompetitive to justify using the *per se* test. Instead, the rule of reason is applied. Plaintiff must show that the alleged conduct had anticompetitive effects.

Plaintiff fails to sufficiently plead that Defendants have restrained trade under the Sherman Act. Plaintiff claims that the collusive rate setting restrained trade across a variety of channels of competition (Compl. ¶ 691). Plaintiff argues that the collusion: (i) restrained the competition to influence the final Euroyen TIBOR and Yen-LIBOR rates; (ii) skewed the Euroyen interbank lending market away from

what the rates were supposed to be- rates set by supply and demand; and (iii) affected prices of Euroyen TIBOR futures contracts that were traded, price settled and benchmarked to the collusively-set Euroyen TIBOR and Yen-LIBOR (Compl. ¶¶ 691).

Plaintiff alleges that the panel banks "competed with one another when they submitted rates" (Compl. ¶ 693). However, the evidence shows that the rate-setting process was not competitive. In no way did the panel banks compete in making their submission. Rather, each bank was supposed to independently contribute its submission to be evaluated collectively with other bank submissions.

Plaintiff also alleges that "the collusively-set Euro TIBOR and Yen-LIBOR rates had a reverberetory anticompetitive effect on the Euroyen interbank lending market, the Euroyen TIBOR and Yen-LIBOR future rate setting submission and on the enormous number of derivative instruments, including Euroyen TIBOR futures contracts" (Compl. ¶ 694). Plaintiff alleges that supply and demand factors were altered on the determination of price for Euroyen interbank lending prices which are incorporated into the Euroyen rate-setting process (Compl. ¶ 694). Plaintiff further alleges that the alleged rate setting collusion harmed competition among sellers and buyers of Euroyen derivatives, including Euroyen TIBOR futures contracts. These allegations, however, are also conclusory. *See Crane & Shovel Sales Corp.*, 854 F.2d at 810 (finding that supported conclusory allegations are not given a presumption of truthfulness). The alleged collusion occurred in the rate setting process of the benchmark, not in the actual Euroyen TIBOR futures market. Plaintiff merely alleges that prices may have been different. Plaintiff does not, however, allege that trades in Euroyen TIBOR futures contracts were in any way restrained by the alleged misconduct.

Moreover, Plaintiff does not plead facts sufficient to support any anticompetitive aspect or effect of Defendants' alleged conduct. There are no allegations that banks competed less, or were forced out of any of these markets. Nor is there any allegation that output of Euroyen futures contracts was

eliminated or diminished.  Absent any such allegations, Plaintiff's claim does not sufficiently plead a violation of the Sherman Act.

## PLAINTIFF'S UNJUST ENRICHMENT CLAIM IS DISMISSED

To state a claim for unjust enrichment under New York law, Plaintiff must allege (1) that the Defendant received a benefit; (2) at the Plaintiff's expense; and (3) that "equity and good conscience" require restitution. *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000).  Plaintiff thus must plead facts showing how each of the Defendants has been enriched at Plaintiff's expense. *See, e.g., In re Amaranth Natural Gas Commodities Litig.,* 587 F. Supp. 2d 513, 532 (S.D.N.Y. 2008).

Under New York law, "[t]here is no requirement that the aggrieved party be in privity with the party enriched at his or her expense." *See Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215 (2007).  An unjust enrichment claim, however, "requires some type of direct dealing or actual, substantive relationship with a Defendant." *Reading Int'l, Inc. v. Oaktree Capital Mgmt.*, 317 F. Supp. 2d 301, 334 (S.D.N.Y. 2003).  Where the connection between the purchaser and the seller of a product is too attenuated, the claim for unjust enrichment must be dismissed. *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215 (2007); *see Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 519 (2012).

Defendant argues that Plaintiff fails to plead sufficient facts showing how each of the Bank Defendants has been enriched at Plaintiff's expense (*see* ECF 206 at 55-56).  Additionally, Defendant contends that Plaintiff does not allege any direct dealing or relationship with any of the Defendants (*see id.*).

Plaintiff asserts that privity between the aggrieved party and enriched party is not required under New York unjust enrichment law (*see* ECF 226 at 84-86).  Plaintiff further contends that he has sufficiently alleged a direct relationship between himself and Bank Defendants.

However, Plaintiff's conclusory assertions that Bank Defendants "financially benefited from the unlawful manipulation" and that "[t]hese unlawful acts caused Plaintiff . . . to suffer injury," (Compl. ¶¶ 745-47), fail to satisfy Plaintiff's pleading burden.

*In USD LIBOR Litig.*, 2013 WL 1285338, at *61, Judge Buchwald held:

> [T]he relationship between Plaintiffs and Defendants, to the extent that there was any relationship, is surely too attenuated to support an unjust enrichment claim. Although Plaintiffs have alleged that they "purchased standardized CME Eurodollar futures contracts" and that "Defendants . . . manipulated and directly inflated CME Eurodollar futures contract prices to artificially high levels," they have not alleged that they purchased Eurodollar contracts from Defendants or that they had any other relationship with Defendants. In other words, even if Plaintiffs are correct that "the direct and foreseeable effect of the Defendants' intentional understatements of their LIBOR rate was to cause Plaintiffs and the Class to pay supra-competitive prices for CME Eurodollar futures contracts," this does not establish a relationship, of any sort, between Plaintiffs and Defendants.

*See also In re Amaranth*, 587 F. Supp. 2d at 547 (dismissing unjust enrichment claim based on alleged market manipulation that impacted prices of natural gas futures contracts because Plaintiffs did not "allege[ ] any direct relationship, trading or otherwise, between themselves and any [Defendant]"); *Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 516-19 (2012) (where Plaintiff and Defendant "simply had no dealings with each other," their relationship is "too attenuated" to support an unjust enrichment claim); *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215-16 (N.Y. App. 2007) (affirming dismissal of unjust enrichment claim where plaintiff alleged that chemical manufacturers entered into a price fixing agreement to overcharge tire manufacturers for certain chemicals, and that the overcharges "trickled down the distribution chain to consumers" such as the plaintiff).

Because Plaintiff does not allege any relationship between himself and any of the Defendants or how Defendants benefitted at Plaintiff's expense, Plaintiff has failed to plead facts to support an unjust enrichment claim.

## CONCLUSION

Plaintiff has adequately pled a claim under the Commodity Exchange Act for price manipulation, and aiding and abetting against all defendants. Defendants' motion to dismiss those two claims is DENIED. Plaintiff's vicarious liability, antitrust and unjust enrichment claims against all defendants are dismissed. Defendants' motion to dismiss those claims is GRANTED.

Dated:   March 28, 2014
New York, New York

SO ORDERED:

GEORGE B. DANIELS
United States District Judge

24