# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEFFREY LAYDON, OKLAHOMA POLICE PENSION & RETIREMENT SYSTEM, and STEPHEN P. SULLIVAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>- against -<br><br>MIZUHO BANK, LTD., THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., THE SUMITOMO TRUST AND BANKING CO., LTD., THE NORINCHUKIN BANK, MITSUBISHI UFJ TRUST AND BANKING CORPORATION, SUMITOMO MITSUI BANKING CORPORATION, RESONA BANK, LTD., J.P. MORGAN CHASE & CO., J.P. MORGAN CHASE BANK, NATIONAL ASSOCIATION, J.P. MORGAN SECURITIES PLC, MIZUHO CORPORATE BANK, LTD., DEUTSCHE BANK AG, MIZUHO TRUST AND BANKING CO., LTD., THE SHOKO CHUKIN BANK, LTD., SHINKIN CENTRAL BANK, UBS AG, UBS SECURITIES JAPAN CO. LTD., THE BANK OF YOKOHAMA, LTD., SOCIÉTÉ GÉNÉRALE SA, THE ROYAL BANK OF SCOTLAND GROUP PLC, THE ROYAL BANK OF SCOTLAND PLC, RBS SECURITIES JAPAN LIMITED, BARCLAYS BANK PLC, CITIBANK, NA, CITIGROUP, INC., CITIBANK, JAPAN LTD., CITIGROUP GLOBAL MARKETS JAPAN, INC., COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., HSBC HOLDINGS PLC, HSBC BANK PLC, LLOYDS BANKING GROUP PLC, ICAP PLC, ICAP EUROPE LIMITED,  R.P. MARTIN HOLDINGS LIMITED, MARTIN BROKERS (UK) LTD., TULLETT PREBON PLC, AND JOHN DOE NOS. 1-50,<br><br>Defendants. | Docket No. 12-cv-3419 (GBD)<br><br>ECF Case<br><br>**[PROPOSED] THIRD AMENDED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

**TABLE OF EXHIBITS**

| Exhibit ("Ex.") Reference | Description |
| --- | --- |
| Ex. A-1 | United States Department of Justice, Criminal Division, Fraud Section Non-Prosecution Agreement and Appendix A Statement of Facts with UBS AG (Dec. 18, 2012) |
| Ex. A-2 | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act Making Findings and Imposing Remedial Sanctions against UBS AG and UBS Securities Japan Co., Ltd., CFTC Docket No. 13-09 (Dec. 19, 2012) |
| Ex. A-3 | Financial Services Authority Final Notice against UBS AG, FSA Ref. No. 186958 (Dec. 19, 2012) |
| Ex. A-4 | United States Department of Justice, Criminal Division, Fraud Section Criminal Information against UBS Securities Japan Co., Ltd. 12-cr-00268 (Dec. 19, 2012) |
| Ex. A-5 | United States Department of Justice, Criminal Division, Fraud Section Plea Agreement with UBS Securities Japan Co., Ltd. 12-cr-00268 (Dec. 19, 2012) |
| Ex. A-6 | United States Department of Justice, Criminal Division, Fraud Section and Antitrust Division Criminal Complaint against Tom Alexander William Hayes and Roger Darin, 12-mag-03229 (S.D.N.Y. Dec. 12, 2012) |
| Ex. B-1 | United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Deferred Prosecution Agreement and Attachment A Statement of Facts with The Royal Bank of Scotland plc, (Feb. 6, 2013) |
| Ex. B-2 | United States Department of Justice, Criminal Division, Fraud Section and Antitrust Division Plea Agreement and Statement of Facts with the RBS Securities Japan Limited (Apr. 12, 2013) |
| Ex. B-3 | United States Department of Justice, Fraud Section, Criminal Division and Antitrust Division Criminal Information against RBS Securities Japan Limited (Apr. 12, 2013) |

| | |
|---|---|
| Ex. B-4 | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions against The Royal Bank of Scotland plc and RBS Securities Japan Limited, CFTC Docket No. 13-14 (February 6, 2013) |
| Ex. B-5 | Financial Services Authority Final Notice against The Royal Bank of Scotland plc, FSA Ref. No. 121882 (Feb. 6, 2013) |
| Ex. C-1 | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions against ICAP Europe Limited, CFTC Docket No. 13-38 (Sept. 25, 2013) |
| Ex. C-2 | Financial Conduct Authority Final Notice against ICAP Europe Ltd., FCA Ref. No. 188984 (Sept. 25, 2013) |
| Ex. C-3 | United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Criminal Complaint against Darrell Read, Daniel Wilkinson, and Colin Goodman, 13-mag-2224 (S.D.N.Y. Sept. 13, 2013) |
| Ex. D-1 | United States Department of Justice, Criminal Division, Fraud Section and Antitrust Division Deferred Prosecution Agreement and Attachment A Statement of Facts with Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. (Oct. 29, 2013) |
| Ex. D-2 | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions against Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., CFTC Docket No. 14-02 (Oct. 29, 2013) |
| Ex. D-3 | Financial Conduct Authority Final Notice against Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., FCA Ref. No. 171596 (Oct. 29, 2013) |
| Ex. D-4 | United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Criminal Information against Coöperatieve |

| | |
|---|---|
| | Centrale Raiffeisen-Boerenleenbank B.A. (Oct. 29, 2013) |
| Ex. D-5 | United States Department of Justice Criminal Division, Fraud Section, and Antitrust Division Criminal Complaint against Paul Robson, Paul Thompson, and Tetsuya Motomura, 14-mag-0069 (S.D.N.Y. Jan. 13, 2014) |
| Ex. D-6 | United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Superseding Information against Takayuki Yagami, 14-cr-00272 (S.D.N.Y. June 10, 2014) |
| Ex. E-1 | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions against RP Martin Holdings Limited and Martin Brokers (UK) Ltd., CFTC Docket No. 14-16 (May 15, 2014) |
| Ex. E-2 | Financial Conduct Authority Final Notice against Martin Brokers (UK) Ltd., FCA Ref. No. 187916 (May 15, 2014) |
| Ex. F-1 | The European Commission Press Release, "Antitrust: Commission fines banks € 1.71 billion for participating in cartels in the interest rate derivatives industry," IP/13/120 & Memo/13/1090 (Dec. 4, 2013) |
| Ex. G-1 | United States Department of Justice, Criminal Division, Fraud Section, and Antitrust Division Non-Prosecution Agreement and Appendix A Statement of Facts with Barclays Bank PLC (June 26, 2012) |
| Ex. G-2 | Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, As Amended, Making Findings and Imposing Remedial Sanctions against Barclays PLC, Barclays Bank PLC and Barclays Capital, Inc. CFTC Docket No. 12-25 (June 27, 2012) |
| Ex. G-3 | Financial Services Authority Final Notice against Barclays Bank PLC, FSA Ref. No. 122702 (June 27, 2012) |

Plaintiffs Jeffrey Laydon, Oklahoma Police Pension & Retirement System, and Stephen P. Sullivan (collectively, "Plaintiffs") complain, upon knowledge as to themselves and their own acts, and upon information and belief as to all other matters, against Defendants (defined in ¶¶ 56-89), as follows:[1]

## INTRODUCTION

1.      This action arises from Defendants' unlawful combination, agreement, and conspiracy to fix and restrain trade in, and intentional manipulation of Euroyen TIBOR (the Tokyo Interbank Offered Rate), Yen-LIBOR (the London Interbank Offered Rate for the Japanese yen), and the prices of Euroyen-based derivatives (defined in ¶¶ 102-34) during the period of at least January 1, 2006 through at least December 31, 2010 (the "Class Period") in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq*. (the "CEA"), the Sherman Act, 15 U.S.C. § 1, *et seq*., the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"), and common law.

2.      Defendants' manipulation and rigging of Yen-LIBOR, Euroyen TIBOR, and the prices of Euroyen-based derivatives during the Class Period was intentional, persistent, and knowingly unlawful.  Defendants' misconduct, and the far-reaching, harmful impact on financial markets worldwide, is detailed in numerous guilty pleas, government settlements, deferred prosecution agreements, criminal charges, and findings of fact released in connection with investigations and regulatory actions by governmental agencies in the U.S. and abroad.

3.      The breadth and impact of the wrongdoing alleged herein is staggering.  As the U.S. Department of Justice ("DOJ") put it last week in connection with the guilty plea of a former Rabobank trader:

---

[1] Plaintiff and the members of the class expressly preserve for appeal all claims that were dismissed in the March 28 Order, and as to which they do not seek to amend on this motion.

This conduct distorted transactions and financial products around the world. Manipulating LIBOR effectively rigs the global financial system, compromising the fairness of world markets.

\* \* \*

This was the ultimate inside job. As alleged, traders illegally influenced the very interest rate on which their trades were based, using fraud to gain an unfair advantage. Takayuki Yagami is the ninth person charged by the Justice Department in connection with the industry-wide LIBOR investigation, and we are determined to pursue other individuals and institutions who engaged in this crime.

4.     Defendant UBS AG ("UBS") has already self-reported criminal cartel activity to the DOJ pursuant to the Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") for its admitted manipulation of Yen-LIBOR, Euroyen TIBOR and the prices of Euroyen-based derivatives.

5.     Following UBS AG's footsteps, Defendants UBS Securities Japan Co., Ltd. ("UBS Japan") and RBS Securities Japan Limited ("RBS Japan") have agreed to waive indictment and plead guilty to a one-count criminal information filed in the District of Connecticut by the Criminal Division, Fraud Section, and the Antitrust Division of the DOJ charging each with wire fraud, in violation of 18 U.S.C. § 1343 in connection with their manipulation of Yen-LIBOR and/or Euroyen TIBOR, and the prices of Euroyen-based derivatives. As part of its Deferred Prosecution Agreement with the DOJ, RBS Japan's corporate parent The Royal Bank of Scotland plc ("RBS") was also charged with wire fraud and price-fixing in violation of Section 1 of the Sherman Act in connection with its manipualtion of Yen-LIBOR and the prices of Euroyen-based derivatives..

6.     Defendant Rabobank also waived indictment to wire fraud as part of its own Deferred Prosecution Agreement with the DOJ. Former Rabobank Trader, Takyuki Yagami,

pleaded guilty to conspiracy to commit wire and bank fraud for his role in the conspiracy to

manipulate Yen-LIBOR and the prices of Euroyen-based derivatives.

7.        Numerous other cartel members, including RBS, Deutsche Bank AG ("Deutsche

Bank"), Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank"), JPMorgan Chase

& Co. ("JPMorgan"), Citigroup, Inc. ("Citigroup"), Barclays PLC, Barclays Bank PLC, and

Barclays Capital Inc. (collectively, "Barclays"), R.P. Martin Holdings Limited ("R.P. Martin"),

and ICAP Europe Limited ("ICAP"), have agreed to historic settlements with regulators,

collectively paying (with UBS) over **$4.5 billion** in criminal fines and penalties.  The settlements

resolve DOJ, U.S. Commodity Futures Trading Commission ("CFTC"), the U.K. Financial

Services Authority ("FSA"),[2] and European Commission ("EC") charges relating to restraints of

trade and manipulation of Yen-LIBOR, Euroyen TIBOR, and the prices of Euroyen-based

derivatives.

8.        The factual findings that accompanied the UBS, RBS, Rabobank and Barclays

settlements each included a "Statement of Facts" ("SOF") (of which UBS, RBS, Rabobank and

Barclays, respectively, admitted as "true and accurate") that are attached to, and incorporated by

reference in, various non-prosecution or deferred prosecution agreements entered with the DOJ's

Criminal Division, Fraud Section.  The admissions by UBS, RBS, Rabobank, and Barclays

include, *inter alia*:

9.        **UBS**.  During the period of at least January 2005 through at least June 2010, UBS

orchestrated a sustained, wide-ranging and systematic scheme to manipulate Yen-LIBOR,

Euroyen TIBOR and the prices of Euroyen-based derivatives through (i) their intentional and

deliberate false reporting of UBS' own Yen-LIBOR and Euroyen TIBOR submissions; (ii)

---

[2] On April 1, 2013, the Financial Services Authority changed its name to the Financial Conduct Authority ("FCA").

conspiring with and paying bribes to interdealer brokers (employed by the Broker Defendants) to disseminate false and misleading Euroyen rates; and (iii) colluding directly with other interest rate derivatives traders to increase the likelihood of a successful manipulation on the prices of Euroyen-based derivatives.

10.     **RBS**.  As part of its Deferred Prosecution Agreement, RBS admitted that it manipulated Yen-LIBOR and the prices of Euroyen-based derivatives from at least 2006 through 2010 through hundreds of instances in which RBS (i) falsely reported its own Yen-LIBOR submissions; and (ii) colluded directly with UBS and interdealer brokers.

11.     **Rabobank**.  As part of its own Deferred Prosecution, Rabobank admitted that it manipulated Yen-LIBOR and the prices of Euroyen-based derivatives from May 2006 through November 2010 in order to illegitimately profit on their own Euroyen-based derivatives positions.  Rabobank also admitted that from as early as May 2006 and continuing at least through October 2008, Rabobank colluded with a trader at another Yen-LIBOR Contributor Panel bank (identified by Plaintiffs as Defendant Lloyds) and agreed that they would, upon request, manipulate their own Yen-LIBOR submissions to benefit each other's Euroyen-based derivatives positions or the trading positions of other traders.

12.     **Barclays**.  Barclays admitted that its interest rate derivatives traders, from at least as early as August 2006 through approximately June 2007, and also in June 2009, made at least 26 requests to its rate submitters to manipulate Barclays' Yen-LIBOR submissions in a direction that would benefit Barclays' Euroyen-based derivatives positions.  Barclays further admitted that certain of its swaps traders colluded with traders at other Contributor Bank Defendants to make Yen-LIBOR false reports, and on occasion accommodated requests for false Yen-LIBOR reports made by other trades, so as to coordinate their manipulative and anticompetitive conduct.

13.     The UBS, RBS, Rabobank, and Barclays Settlements are also memorialized in "CFTC Orders" and "FSA Final Notices" which include additional factual allegations consistent with the admissions contained in the DOJ statement of facts regarding unlawful acts by Defendants UBS, RBS, Rabobank, and Barclays.  *See infra*.

14.     In December 2013, the European Commission ("EC") collectively fined Defendants UBS, RBS, Deutsche Bank, JPMorgan, Citigroup, and R.P. Martin more than $870 million for participating in "Yen Interest Rate Derivatives cartels" between 2007 and 2010.  The EC uncovered seven (7) distinct "infringements" lasting between 1 and 10 months and found that these Defendants colluded to manipulate Yen-LIBOR, Euroyen TIBOR, and the prices of Euroyen-based derivatives.

15.     **The Broker Defendants' Critical Role in the Success of the Manipulation and Restraint of Trade**.   As detailed herein, the critical role of the Broker Defendants in carrying out and driving the success of the manipulation of and restraint of trade of Yen-LIBOR, Euroyen TIBOR, and the prices of Euroyen-based derivatives cannot be overstated.  They acted as the proverbial hub in the conspiratorial wheel in coordinating and directing the submission of false reports and other manipulative conduct between the Contributor Bank Defendants.

16.     To date, Broker Defendants ICAP Europe Limited and R.P. Martin have reached settlements with the CFTC and FCA agreeing to pay $87 million (ICAP Europe Limited) and $2.2 million (R.P. Martin), respectively.  Both ICAP Europe Limited and R.P. Martin, with newly identified and named Broker Defendant Tullett Prebon PLC ("Tullett Prebon"), remain under investigation by the U.K. Serious Fraud Office, among other global regulators.

17.     **ICAP.**  UBS, in particular former UBS Senior Yen Trader Thomas Hayes, colluded with ICAP Yen brokers and requested their assistance more than 400 times in

manipulating Yen-LIBOR during the Class Period. ICAP brokers readily agreed and accommodated those and other manipulative requests by issuing, via a Yen cash broker, group emails to panel banks and others containing "Suggested LIBORs" for Yen-LIBOR. The Suggested LIBORs reflected artificial rates that would financially benefit UBS' and Hayes' Euroyen-based derivatives positions, not an honest and objective assessment of prevailing Yen-LIBOR rates.

18.     This manipulative strategy was successful as almost all of the Yen-LIBOR Contributor Banks received the Suggested LIBORs, and several improperly relied on them in making their Yen-LIBOR submissions. Recognizing their success in manipulating Yen-LIBOR and Euroyen-based derivatives prices, the ICAP brokers referred to the Contributor Bank Yen-LIBOR submitters as "sheep" when they copied the Yen cash broker's Suggested LIBORS. In fact, the CFTC determined that at least two Contributor Banks' submissions mirrored the Suggested LIBORs up to 90% of the time. This occurred, despite express British Bankers' Association ("BBA") guidelines that prohibited Contributor Banks from relying on brokers "Suggested LIBORs" when making their Yen-LIBOR submissions.

19.     ICAP Yen brokers were well compensated for colluding with UBS receiving hundreds of thousands of dollars in bribes and kick backs for their "LIBOR services."

20.     **R.P. Martin**. Like ICAP brokers, R.P. Martin brokers on its Yen desks knowingly disseminated false and misleading information concerning Yen borrowing rates to market participants to manipulate Yen-LIBOR, and the prices of Euroyen-based derivatives. R.P. Martin brokers did so primarily to aid and abet former UBS Senior Yen Trader Hayes. The FCA determined that, during the Class Period, UBS made at least 600 manipulative requests to R.P. Martin. R.P. Martin, in turn, provided misleading recommendations to Yen-LIBOR

submitters regarding where they should set certain Yen-LIBOR tenors.  R.P. Martin also contacted certain Yen-LIBOR submitters directly and asked them to move their submissions in an artificial direction that would benefit UBS' and Senior Yen Trader Hayes' Euroyen-based derivatives positions.  R.P. Martin brokers also colluded with UBS to publish "spoof" bids, to the Euroyen-based derivatives market, which included Yen-LIBOR submitters, again to manipulate Yen-LIBOR and Euroyen-based derivatives prices for the benefit of UBS and Senior Yen Trader Hayes.  In exchange for their unlawful assistance, R.P. Martin brokers accepted bribes and other illicit compensation from UBS and other Contributor Bank Defendants totaling more than $400,000.

21.   **Direct Evidence of Manipulative and Anticompetitive Conduct**.  Although only a small fraction of Defendants' communications have thus far been made public in connection with the UBS, RBS, Rabobank, ICAP, R.P. Martin, and Barclays settlements, those communications already include what courts have characterized as "rare," "smoking gun," and "direct" evidence of blatant market manipulation and illicit conspiratorial conduct.  Defendants' own words are unencumbered by any concern of market oversight, internal supervision, legal recourse, or the far reaching, negative, and material impact of their misconduct on the prices of Euroyen-based derivatives.  Corruption of the Euroyen market became so widespread that in the words of an RBS Senior Yen Trader, the banks setting Yen-LIBOR had become a "cartel."

22.   **Other Indicia of Unlawful Conduct: Motive to Manipulate Yen-LIBOR, Euroyen TIBOR, and the Prices of Euroyen-Based Derivatives**.  Defendants' express admissions of their desire to manipulate Euroyen TIBOR, Yen-LIBOR, and the prices of Euroyen-based derivatives to financially benefit Euroyen-based derivatives positions held by them, Defendants' unlawful conduct in the setting of Yen-LIBOR and Euroyen TIBOR, and data

demonstrating that Defendants consistently succeeded in manipulating Yen-LIBOR, Euroyen

TIBOR, and Euroyen-based derivatives prices to artificial levels, all indicate Defendants'

manipulative intent.

23.     Defendants' intent is made clear by the large financial motive.  The high-stakes

nature and tremendous amounts of money waged on its manipulation and then realized on its

success, *i.e.*, hundreds of millions (if not billions) in ill-gotten trading profits from Euroyen-

based derivatives positions held by the Contributor Bank Defendants (translating into hundreds

of millions in illegitimate bonus and other compensation paid to the banks' traders and

submitters), fueled an obsessive need to manipulate.

24.     Instant messages and other documents thus far made public capture traders and

other co-conspirators of Defendants exulted about the success of the manipulation and the

amount of money they reaped from it.  In one communication, a UBS trader and an interdealer

broker [employed by Broker Defendant R.P. Martin] congratulated each other on the financial

success of the manipulation: "**mate yur getting bloody good at this libor game….think of me**

**whn yur on yur yacht in monaco wont you**" (emphasis added).   In another communication,

traders at RBS bragged: "**its just amazing how libor fixing can make you that much money**"

and that the manipulation was a "good way to boost share price" (emphasis added).

Additionally, traders routinely thanked rate submitters for carrying out their instructions to

submit false Euroyen rates that benefitted their Euroyen-based derivatives positions, remarking

"cheers," "thanks mate," and "thanks for that."

25.     **Other Indicia of Unlawful Conduct: Knowledge of Unlawfulness and**

**Conduct to Escape Detection**. Defendants continued their pervasive manipulation of Yen-

LIBOR, Euroyen TIBOR and the prices of Euroyen-based derivatives long-after authorities

launched investigations into false reporting and manipulation of U.S. Dollar LIBOR.  For example, RBS traders and submitters acknowledged internally by at least September 2010 that regulators were investigating false reporting of U.S. Dollar LIBOR, but nonetheless agreed that they were going to continue to manipulate at least Yen-LIBOR.   RBS traders and submitters, however, recognized that they should be more careful to cover their tracks to avoid detection, by no longer discussing in writing their manipulation of Yen-LIBOR, at least while regulators investigated U.S. Dollar LIBOR manipulation.

26.     For example, in one exchange on November 22, 2010, a RBS Yen Trader and Senior Yen Trader acknowledged that "at the moment the FED are all over us about USD libors" but because they did not "think anyone cares [about] JPY [Yen] libor" at least "not yet, " – they had the green light to continue with their manipulation of the prices of Euroyen-based derivatives.

27.     Other instant messages and communications produced in connection with the government settlements evidence that the knowing submission of false Euroyen TIBOR and/or Yen-LIBOR rates to financially benefit Euroyen-based derivatives positions was the norm, while submitting rates reflective of prevailing (true) Euroyen interbank borrowing costs in accordance with Japanese Bankers' Association and BBA rules was the exception.

28.     **<u>Other Indicia of Unlawful Conduct: The Role of Managers</u>**.  Unlike prior manipulation cases where a rogue trader singularly concocted and orchestrated a manipulation, the manipulation here had the blessing—and in many instances was at the immediate direction—of senior managers of the Contributor Bank and Broker Defendants who were charged with supervising for-profit Euroyen-based derivatives trading at the firm.  For example, on December 11, 2007, an unidentified UBS Manager emailed a UBS Senior Manager to see "how much

9

pressure" they could "exert" on UBS's upcoming Yen-LIBOR submissions because UBS had a

potential exposure of "2[million/per basis point]" on the approaching December International

Monetary Market ("IMM") date.[3]  To justify the manipulation, UBS Manager "E" stated that

since "everyone will be trying to influence the [upcoming Yen-LIBOR] fixing," UBS could lose

on its Euroyen-based derivatives positions if UBS did not "do the same."  In response, UBS

Senior Manager "D" promised he would handle the situation and discuss it with another UBS

senior manager.  A distressed Manager "E" followed up with Senior Manager "D" three days

later, on December 14, 2007, to see if the manipulation had been approved:  "How was the

discussion… I need some assurance they will put their rate up please… our rate input can make a

significant difference."

       29.    **Other Indicia of Unlawful Conduct: Spoofing the Market and False Euroyen
Derivative Price Reports**.  The Contributor Bank Defendants and Broker Defendants also

colluded to manipulate Euroyen-based derivative prices by publishing false Euroyen-based

derivatives transactions prices and by disseminating false Euroyen-based derivative transactions

bids and offers.  UBS asked Broker Defendants, including ICAP, to display on the Broker

Defendants' electronic trading screens prices of non-existent Euroyen-based derivatives

transactions with the same tenors as the Yen-LIBOR and Euroyen TIBOR rates for the purpose

of manipulating both the prices of Euroyen-based derivatives and Yen-LIBOR and Euroyen

TIBOR rates. The Broker Defendants' electronic trading screens were available to Euroyen-

based derivatives dealers and traders including many of the Contributor Bank Defendants.  UBS

also asked Broker Defendants to post and disseminate "spoof" bids and offers for Euroyen-based

derivatives with the same tenors as the Yen-LIBOR and Euroyen TIBOR rates for the purpose of

---

[3] IMM dates are standard quarterly final settlement dates each year in March, June, September and December.
Many Euroyen-based derivatives either settle or reset on IMM dates.

manipulating both the price of Euroyen-based derivatives and Yen-LIBOR and Euroyen TIBOR rates. Defendants colluded to disseminate spoof bids and offers through various means including through Broker Defendants' Yen Desk "squawk boxes" and through the Broker Defendants' electronic screens which allowed the UBS and the Broker Defendant to disseminate the "spoof" bids and offers to a multitude of Euroyen-based derivatives traders, including multiple Contributor Bank Defendants.

30.     **Direct Evidence of Anticompetitive Conduct**. The communications made public so far show rampant collusion and agreements to restrain trade in the Euroyen derivatives market.  The competing banks agreed to "back scratching," arrangements, whereby co-conspirators explicitly agrred to submit artificial Euroyen rates to financially benefit other co-conspirators' Euroyen-based derivatives positions in return for reciprocity sometime in the future.

31.     The Contributor Bank Defendants, aided and abetted by Broker Defendants, agreed to stagger false reporting of Yen-LIBOR rates over successive trading days (*e.g.*, agree that an artificially low rate would be submitted by manipulator A today, by manipulator B tomorrow and manipulator C the next day, etc.) in order to exert greater and longer-lasting manipulative pressure on Euroyen prices and to mask their false reporting.  In one such example, an ICAP Broker developed a strategy in July 2009 with former UBS Senior Yen Trader Hayes to artificially lower the six-month Yen-LIBOR.  The ICAP Broker cautioned Hayes that, "if you drop your 6m dramatically on the 11th [of August] mate, it will look v[ery] fishy, especially if [Yen Bank J] and [Yen Bank F] go with you[,] I'd be v[ery] careful how you play it... might get people questioning you."  UBS Senior Yen Trader Hayes, seasoned in this practice, said, "don't worry will stagger the drops ie 5bp then 5bp...us then [Yen Bank F] then [Yen Bank J] then us

then [Yen Bank F] then [Yen Bank J].[4]  The ICAP Broker confirmed their agreement to collusively manipulate six-month Yen-LIBOR artificially lower and said, "great the plan is hatched and sounds sensible."

32.     **Strong Circumstantial Evidence of Conspiracy Implicating the Contributor Bank Defendants**. While the direct evidence so far implicates conclusively Defendants UBS, RBS, Deutsche Bank, Citigroup, J.P. Morgan, Rabobank, ICAP, R.P. Martin, Tullett Prebon, Lloyds, HSBC, Norinchukin and the Bank of Tokyo-Mitsubishi in the antitrust conspiracy (*see* ¶¶ 274-427, 672-78, 681-93), the vast majority of other Contributor Bank Defendants are also under investigation by various regulators.  News reports reveal that many are poised to settle their claims with certain government regulators.  Moreover, the small sampling of instant messages and other evidence publicly released thus far demonstrates that a substantial number of other Contributor Bank Defendants (whose names are masked by designations such as "Bank B") are implicated in this wrongful conduct.

33.     There are at least 110 publicly available instant messages showing collusion between UBS, RBS, Rabobank, ICAP and R.P. Martin and several of the Contributor Bank Defendants.  In one message alone, former UBS Senior Yen Trader Hayes enlisted a broker to solicit 9 of the 16 Contributor Panel banks to join the conspiracy to manipulate Yen-LIBOR. Other messages show that one additional bank (the 10th) agreed to collude with UBS to artificially increase Yen-LIBOR on March 31, 2009.

34.     **Defendants' Former Traders and Rate-Submitters Have Been Criminally Charged in this District and Abroad**. Former RBS, UBS and Citigroup Yen Trader Thomas Hayes, along with another UBS Yen-Trader, Roger Darin, were charged with conspiracy to

---

[4] Upon information and belief, Yen Bank F is Defendant Deutsche and Yen Bank J is Defendant HSBC.  *See* ¶ 693, *infra*.

commit wire fraud in a criminal complaint unsealed in Manhattan federal court in December

2012.  Hayes also faces wire fraud and Sherman Act charges from alleged anticompetitive

conduct in relation to Yen-LIBOR from at least September 2006 through September 2009.  *See*

Ex. A-6, Complaint filed in *United States of America v. Tom Alexander William Hayes, and*

*Roger Darin*, 12 MAG 3229 (S.D.N.Y. Dec. 12, 2012).

35.     The DOJ also charged three former ICAP brokers, Darrell Read, Daniel

Wilkinson and Colin Goodman, with conspiracy to commit wire fraud and wire fraud in

connection with the manipulation of Yen-LIBOR from at least July 2006 through September

2010.  *See* Ex. C-3, Complaint filed in *United States of America v. Darrell Read, Daniel*

*Wilkinson, and Colin Goodman*, 13 MAG 2224 (S.D.N.Y. Sept. 13, 2013).

36.     The DOJ also charged three former Rabobank traders, Paul Robson, Paul

Thompson and Tetsuya Motomura with conspiracy to commit wire fraud and bank fraud, as well

as wire fraud, all in connection with the manipulation of Yen-LIBOR from May 2006 through

early 2011.  *See* Ex. D-5,  Complaint filed in *United States of America v. Paul Robson, Paul*

*Thompson, and Tetsuya Motomura*, 14 MAG 0069 (S.D.N.Y. Jan. 13, 2014).  Another former

Rabobank Yen derivatives trader, Takayuki Yagami, pled guilty to conspiracy to commit wire

fraud and bank fraud for his role in the manipulation of Yen-LIBOR.  *See* Ex. D-6.

37.     In June 2013, the U.K. Serious Fraud Office ("SFO") charged former UBS and

Citigroup Senior Yen Trader Hayes with eight counts of conspiracy to defraud and directly

implicated Defendants (i) UBS AG; (ii) Citigroup Global Markets Japan Limited, (iii) Deutsche

Bank AG, (iv) UBS Japan, (v) JP Morgan Chase & Co., (vi) RBS, (vii) HSBC, and (viii)

Rabobank, as well as Broker Defendants (i) ICAP plc, (ii) R.P. Martin Holdings Limited and (iii)

Tullett Prebon plc in the manipulation of Yen-LIBOR and "other interbank offered rates" from August 2006 through December 2010.

38.     In July 2013, the U.K. SFO also charged former R.P. Martin broker Terry Farr and James Gilmour with conspiracy to defraud from August 2006 through September 2010 in connection with the manipualtion of Yen-LIBOR.

39.     In addition, in March 2014, the SFO charged former ICAP brokers Danny Wilkinson, Darrell Read, and Colin Goodman with conspiracy to defraud charges from August 2006 through September 2010 in connection with the manipulation of Yen-LIBOR.

40.     **Disciplinary Proceedings, Terminations, Resignations and Withdrawal from Rate Setting Panels**. Both RBS and UBS have since withdrawn from the JBA's Euroyen TIBOR panel.  In addition, more than 25 people resigned from UBS following an internal review of the bank's involvement in the alleged manipulation of Euroyen TIBOR and Yen-LIBOR rates. RBS has also terminated four (4) employees, and is reportedly weighing further disciplinary proceedings against additional employees.  Barclays Chairman Marcus Agius, and its Chief Executive Officer, Robert E. Diamond, Jr., resigned within days of the announcement of the Barclays Settlement.  In connection with his resignation, Mr. Diamond revealed that at least 14 traders at Barclays were involved in rate setting wrongdoing at the bank.   The Chief Executive of Defendant RBS Japan had resigned in the wake of the JFSA's administrative sanctions against Defendant RBS Japan.

41.     **Public Officials and Other Market Participants Acknowledge The Existence of Cartels and Wide-Spread Collusion in the Euroyen Market**.  In connection with the European Commission's announcement of a $870 million penalty against Defendants UBS, RBS, Deutsche Bank, JP Morgan, Citigroup and R.P. Martin for their participation in "Yen

Interest Rate Derivatives Cartels," Joaquin Aluminia, Vice-President of the EC commented, "What is shocking about the LIBOR…scandal[] is not only the manipulation of benchmarks, which is being tackled by financial regulators worldwide, but also ***the collusion between banks who are supposed to be competing with each other***.  Today's decision sends a clear message that the Commission is determined to fight and sanction these cartels in the financial sector. Healthy competition and transparency are crucial for financial markets to work properly, at the service of the real economy rather than the interests of a few."  (Emphasis added).

42.     CFTC Chairman Gary Gensler expressed a similar sentiment, stating that: "Barclays, UBS and RBS were fined $2.5 billion for manipulative conduct by the CFTC, the UK Financial Services Authority (FSA) and the DOJ.  At each bank, the misconduct spanned many years, took place in offices in several cities around the globe, included numerous people – sometimes dozens, even included senior management, and involved multiple benchmark rates and currencies. In each case, there was evidence of collusion."

43.     In February 2013, Eddy Takata, a former yen money market derivatives trader in Tokyo during the Class Period at Barclays and Deutsche Bank published a book entitled THE MANIPULATION OF THE LIBOR FIXING, AND THE DOUBT OVER THE ARTIFICIAL TIBOR FIXING (HIDETO "EDDY" TAKATA (Gentosha Renaissance, Inc.), February 20, 2013).  The former trader alleges the large increase of Euroyen TIBOR over Yen-LIBOR since 2009 was the result of collusion amongst the Euroyen TIBOR rate setting banks so that the banks could borrow Yen-LIBOR at a lower rate and lend at the higher Euroyen TIBOR rate.

44.     In May 2014, the *Financial Times* reported "gaps between Tibor rates and rates in actual interbank transactions" revealing that in the first part of 2014, the actual market rate for three-month funds was .14% whereas three-month Euroyen TIBOR was significantly higher at

.215%.  The same report also revealed price anomalies in the spread between Yen-LIBOR and

Euroyen TIBOR, showing that the average spread was 14 basis points between 2009 and 2012.

However, this "gap narrowed sharply in the first three months of 2013" following criminal

probes and allegations by former Barclays and Deutsche trader Eddy Takata that Japanese banks

were conspiring to keep Euroyen TIBOR artificially high.

45.    **Plaintiffs' Economic Analyses Also Reveal Defendants Successfully**

**Manipualted Yen-LIBOR, Euroyen TIBOR, and the Prices of Euroyen-Based Derivatives**

**to Artificial and Anticompetitive Levels**.  Plaintiffs' economic analyses reveal that all of the

Contributor Bank Defendants' submission data contained a marked change in variability from

those of other Contributor Panel Banks, beginning with the commencement of the conspiracy.

The material decrease between the variability of rates that existed in 2005 as compared to that

during 2006 and continuing through 2009 are highly probative of collusion.  The only way the

Contributor Bank Defendants' relative submissions could have become so correlated during the

Class Period is, as the instant messages show, if they knew what rates their competitors would be

submitting in advance and then colluded to submit equivalent rates.

46.    **Further Evidentiary Support**.  Given the pervasive, yet-secret nature of the

wrongdoing, Plaintiffs believe that further evidentiary support for their claims alleged herein will

be unearthed after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

47.    This action arises under Section 22 of the CEA, 7 U.S.C. § 25, Section 1 of the

Sherman Antitrust Act, 15 U.S.C. § 1, Section 1964 of RICO, 18 U.S.C. § 1964, and common

law, respectively.

48.     Yen-LIBOR and Euroyen TIBOR are each are a "commodity" and each is the "commodity underlying" Euroyen-based derivatives, including Euroyen futures contracts, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

49.     This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), Section 1964 of RICO, 18 U.S.C. § 1964, and 28 U.S.C. §§ 1331 and 1337, respectively.  This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy, and under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

50.     Venue is proper in the Southern District of New York, pursuant to, among other statutes, Section 22 of the CEA, 7 U.S.C. §25(c), Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, Section 1965 of RICO, 18 U.S.C. § 1965, and 28 U.S.C. §1391(b), (c) and (d).  One or more of the Defendants resided, transacted business, were found, or had agents in the District, and a part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

51.     Defendants, directly and indirectly, singly and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate and/or international commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

52.     Defendants' restraint of trade and manipulation of Euroyen TIBOR, Yen-LIBOR, and the prices of Euroyen-based derivatives had direct, substantial, and reasonably foreseeable effects in the U.S., and on Plaintiffs and members of the Class.  Euroyen-based derivatives are actively traded in the United States, including on the CME, and by U.S.-based counterparties. Defendants, as sophisticated market participants, knew, or had good reason to know, that Euroyen TIBOR and Yen-LIBOR rates published and compiled by and on behalf of the JBA and BBA, respectively, are disseminated in the U.S. through electronic means, and are used to price, settle, and benchmark Euroyen-based derivatives traded in the U.S. and by U.S. investors.  For these reasons, Defendants knew, or had good reason to know, that the misreporting of Euroyen TIBOR and Yen-LIBOR rates to the JBA and BBA, respectively, as well as Defendants' other manipulative and collusive conduct would, and did, have direct, substantial and reasonably foreseeable effects in the United States, including on the prices of Euroyen-based derivatives transacted domestically.

## PARTIES

53.     Plaintiff Jeffery Laydon ("Laydon"), a natural person residing in Sanford, Florida engaged in U.S. based-transactions of Euroyen-based derivatives during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein, and as of consequence thereof was damaged and suffered legal injury.  *See* ¶¶ 645-50, *infra*.

54.     Plaintiff Oklahoma Police Pension & Retirement System ("OPPRS"), established in 1981, provides retirement pension benefits for members who are qualified police officers and/or their beneficiaries of participating municipalities.  OPPRS engaged in U.S. based-transactions of Euroyen-based derivatives during the Class Period at artificial prices proximately

18

caused by Defendants' unlawful manipulation and restraint of trade as alleged herein, and as of consequence thereof was damaged and suffered legal injury.  *See* ¶¶ 654-70, *infra*.

55.     Plaintiff Stephen P. Sullivan ("Sullivan"), a natural person residing in Chicago, Illinois, engaged in U.S. based-transactions of Euroyen-based derivatives during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein, and as of consequence thereof was damaged and suffered legal injury. *See* ¶¶ 651-53, *infra*.

56.     Defendant Mizuho Bank, Ltd. ("Mizuho Bank") is a subsidiary of Mizuho Financial Group, a Japanese financial institution headquartered in Tokyo, Japan.  During the Class Period, Mizuho Bank was a reference bank for the JBA's Euroyen TIBOR panel.

a.     In April 2005, Mizuho Bank entered into a business collaboration with The Bank of New York in the area of distribution of investment trust products in Japan.  It also entered into separate business collaborations with Wachovia Bank and Wells Fargo Bank respectively.  Moreover, Mizuho Bank's process agent, Mizuho Corporate Bank, Ltd., New York Branch, ("Mizuho Corporate Bank") is a New York resident, and the businesses conducted by Mizuho Bank and Mizuho Corporate Bank are indistinguishable.  On July 1, 2013, Mizuho Bank and Mizuho Corporate Bank formally merged into one bank.  Their collective businesses include (i) deposits, bank debentures, lending (including non-recourse loans and commitment facilities), (ii) foreign exchange, (iii) derivatives, (iv) payment and settlement services (bill/check clearing, payment and others), (v) e-solution business (firm banking, CMS, debit cards), (vi) corporate bond trustee services, investment trust, defined contribution pension business, (vii) treasury, and (viii) syndicated loans.

57.     Defendant Mizuho Corporate Bank, Ltd. ("Mizuho Corporate Bank") is a subsidiary of Mizuho Financial Group and is headquartered in Tokyo, Japan.  During the Class Period, Mizuho Corporate Bank was a reference bank for the JBA's Euroyen TIBOR panel and a reference bank for the BBA's Yen-LIBOR panel.  Mizuho Corporate Bank's New York branch is located in this District at 1251 Avenue of the Americas, New York, NY 10020.

58.     Defendant The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("Bank of Tokyo-Mitsubishi") is a subsidiary and the banking unit of Mitsubishi UFJ Financial Group, Inc. and is headquartered in Tokyo, Japan.  During the Class Period, Bank of Tokyo-Mitsubishi was a reference bank for the JBA's Euroyen TIBOR panel and a reference bank for the BBA's Yen-LIBOR panel.  The Bank of Tokyo-Mitsubishi's New York branch is located in this District at 1251 Avenue of the Americas, New York, NY 10020.

59.     Defendant The Sumitomo Trust and Banking Co., Ltd. (now known as Sumitomo Mitsui Trust Bank, Ltd.) ("Sumitomo Trust") is a Japanese trust bank and a member of the Sumitomo Mitsui Trust Group headquartered in Tokyo, Japan.  During the Class Period, Sumitomo Trust was a reference bank for the JBA's Euroyen TIBOR panel.  In December 2011, Sumitomo Trust acquired (and is the successor-in-interest) to Defendant Chuo Mitsui Trust & Banking Co. Ltd. ("Chuo Mitsui").  During the Class Period, Chuo Mitsui was a reference bank for the JBA's Euroyen TIBOR panel and maintained a representative office located in this District at 655 3rd Avenue, New York, NY 10017.

60.      Defendant The Norinchukin Bank is a Japanese cooperative bank headquartered in Tokyo, Japan.  During the Class Period, The Norinchukin Bank was a reference bank for the JBA's Euroyen TIBOR panel and a reference bank for the BBA's Yen-LIBOR panel.  The New

York branch of The Norinchukin Bank is located at 245 Park Avenue, 21st Floor, New York, NY 10167.

61.      Defendant Mitsubishi UFJ Trust and Banking Corporation ("Mitsubishi UFJ Trust") is a core operating company of Mitsubishi UFJ Financial Group (MUFG) and is headquartered in Tokyo, Japan.  During the Class Period, Mitsubishi UFJ Trust was a reference bank for the JBA's Euroyen TIBOR panel.  Mitsubishi UFJ Trust's New York branch is a New York resident located in this District at 520 Madison Avenue, 25th Floor, New York, NY 10022.

62.      Defendant Sumitomo Mitsui Banking Corporation ("Sumitomo Mitsui") is a subsidiary of Sumitomo Mitsui Financial Group, Inc. and is headquartered in Tokyo, Japan.  During the Class Period, Sumitomo Mitsui was a reference bank for the JBA's Euroyen TIBOR panel and a reference bank for the BBA's Yen-LIBOR panel.   Sumitomo Mitsui's New York branch is located in this District at 277 Park Avenue, New York, NY 10172.

63.      Defendant Resona Bank, Ltd., ("Resona") is a Japanese commercial bank and a member of Resona Holdings, Inc., a Japanese financial services group headquartered in Tokyo, Japan.  Resona Bank was a reference bank for the JBA's Euroyen TIBOR panel during the Class Period.

64.      Defendant J.P. Morgan Chase & Co. ("JPMorgan") is a Delaware financial holding company headquartered in New York, New York.  Defendant J.P. Morgan Chase Bank, National Association, is a federally chartered national banking association headquartered in New York, New York and a wholly owned subsidiary of Defendant JPMorgan Chase.  During the Class Period, JPMorgan Chase NA was a reference bank for the JBA's Euroyen TIBOR panel and JPMorgan Chase was a reference bank for the BBA's Yen-LIBOR panel.  Defendant J.P.

Morgan Securities plc (formerly J.P. Morgan Securities Ltd.) is a wholly owned subsidiary of JPMorgan Chase.

65.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany.  During the Class Period, Deutsche Bank was a reference bank for the JBA's Euroyen TIBOR panel and a reference bank for the BBA's Yen-LIBOR panel.  The New York branch of Deutsche Bank is located in this District at 60 Wall Street, New York, NY 10005.

66.     Defendant Mizuho Trust and Banking Co. Ltd. ("Mizuho Trust") is a subsidiary of Mizuho Financial Group headquartered in Tokyo, Japan.  During the Class Period, Mizuho Trust was a reference bank for the JBA's Euroyen TIBOR panel.

a.      Mizuho Trust & Banking Co. (USA) ("Mizuho Trust (USA)") is Mizuho Trust's process agent, and is a New York resident located at 135 W 50th Street, 16th Floor, New York, NY 10020.  Mizuho Trust (USA) is a wholly owned subsidiary of Mizuho Trust and the sole custody business arm in the United States of the Mizuho Financial Group.  Operating in New York, Mizuho Trust (USA) provides integrated custody service.  Mizuho Trust (USA) is an agent of Mizuho Trust.

67.      Defendant The Shoko Chukin Bank, Ltd. ("Shoko Chukin") is joint-stock company and is headquartered in Tokyo, Japan.  During the Class Period, Shoko Chukin was a reference bank for the JBA's Euroyen TIBOR panel during the Class Period.  Shoko Chukin maintains a New York office in this District at 666 Fifth Avenue, 14th Floor, New York, NY 10103.

68.     Defendant Shinkin Central Bank ("Shinkin") is a Japan-based financial institution headquartered in Tokyo, Japan.  Shinkin was a reference bank for the JBA's Euroyen TIBOR

panel during the Class Period.  Shinkin has a representative office located in this District at 114 West 47th Street, Suite 2420, New York, NY 10036.

69.     Defendant UBS AG ("UBS") is a Swiss banking and financial services company headquartered in Zurich and Basel, Switzerland that provides investment banking, asset management and wealth management services for private, corporate and institutional clients worldwide. It has operations in over 50 countries, including the United States.  UBS' United States headquarters are located in New York, New York and Stamford, Connecticut.  During the Class Period, UBS was a reference bank for the JBA's Euroyen TIBOR panel and a reference bank for the BBA's Yen-LIBOR panel.  UBS has two New York branches located at 1285 Avenue of the Americas, New York, NY 10019, and at 299 Park Avenue, New York, NY 10171. Defendant UBS Securities Japan Co., Ltd. is the successor company to UBS Securities Japan, Ltd., (collectively, "UBS Japan") which is a wholly-owned subsidiary of UBS and engaged in investment banking operations and was a broker-dealer.  UBS employs derivatives traders throughout the world – including in Stamford, London, Zurich, and Tokyo – who trade financial instruments tied to Yen-LIBOR and Euroyen TIBOR, including interest rate swaps and Euroyen futures contracts.

70.     As part of its Plea Agreement with the DOJ, Criminal Division, Fraud Section, Defendant UBS Japan admitted that "a meaningful portion of the total value of the transactions entered into by [its] most successful Yen derivatives trader from 2007 through 2009 involved U.S.-based counterparties."  UBS Japan also admitted that it "entered into interest rate derivatives transactions tied to LIBOR and Euroyen TIBOR – such as derivatives, forward rate agreements, and futures – with counterparties to those transactions.  Many of those counterparties were located in the United States.  Those United States counterparties included,

among others, asset management corporations, mortgage and loan corporations, and insurance companies.  Those counterparties also included banks and other financial institutions in the United States or located abroad with branches in the United States."  In addition, as part of the DOJ's criminal complaint against former UBS (and UBS Japan) Senior Yen Trader Thomas Hayes, the DOJ alleges that the following overt acts, among others, were committed in the Southern District of New York: (a) on or about September 12, 2007 and on or about July 15, 2008, Hayes entered into trades with a counterparty based in Purchase, New York; (b) at various time relevant to the DOJ complaint, including on or about March 29, 2007 and on or about April 28, 2008, former UBS and UBS Japan Yen Trader Roger Darin engaged in electronic chats with Hayes; and (iii) at various times relevant to the DOJ complaint, Hayes and Darin, and others known and unknown, caused the publication of manipulated Yen-LIBOR rates in New York, New York.  Further, Hayes caused confirmations on or about September 12, 2007 and on or about July 15, 2008, to be transmitted from outside the U.S. to a counterparty based in Purchase, N.Y., for transactions involving interest rate derivative products tied Yen-LIBOR which Hayes was secretly manipulating.

71.     Defendant The Bank of Yokohama, Ltd. ("The Bank of Yokohama") is a regional bank based in Yokohama City, Kanagawa Japan.  During the Class Period, The Bank of Yokohama was a reference bank for the JBA's Euroyen TIBOR panel.  The Bank of Yokohama has a representative office located in this District at 780 Third Ave, 32nd Floor, New York, NY 10017.

72.     Defendant Société Générale SA ("Société Générale") is a major European financial services company and is headquartered in Paris, France.  Société Générale was a

reference bank for the BBA's Yen-LIBOR panel during the Class Period.  Société Générale maintains offices in this District, including at 1221 6th Avenue, New York, NY 10020.

73.     Defendant The Royal Bank of Scotland Group plc ("RBS") is a British banking and financial services company headquartered in the UK.  It has operations in approximately forty (40) countries and territories, including the U.S. and Singapore. Defendant Royal Bank of Scotland plc is a wholly owned subsidiary of The Royal Bank of Scotland Group plc (collectively, "RBS").  RBS's U.S. headquarters are located in Stamford, CT.  During the Class Period, RBS was a reference bank for the JBA's Euroyen TIBOR panel and was a reference bank for the BBA's Yen-LIBOR panel.  The New York branch of RBS is located in this District at 101 Park Avenue, New York, NY 10178.   Defendant RBS withdrew from the JBA's Euroyen TIBOR panel in or around June 2012.  RBS employed money market traders and derivatives traders throughout the world, including in New York, London, and Tokyo, who traded financial instruments tied to Yen-LIBOR.  Defendant RBS Securities Japan Limited ("RBS Japan") is a wholly owned subsidiary of RBS and engaged in market operations and is a broker-dealer.  It has an office in Tokyo.  As part of its Plea Agreement with the Fraud Section of the Criminal Division and Antitrust Division of the DOJ, Defendant RBS Japan admitted as true and accurate that "the market for derivatives and other financial products linked to Yen LIBOR is global and is one of the largest and most active markets for such products in the world.  A number of these products are traded in the United States – such as Yen-based swaps contracts traded over the counter – in transactions involving U.S.-based counterparties.  For example, more than 15% of the total notional value of the transactions entered into by RBS's Yen derivatives traders from 2006 through 2010 involved U.S.-based counterparties often acting through their overseas offices."

74.     Defendant Barclays Bank PLC, ("Barclays") is a U.K.public limited company headquartered in London, England.  Barclays was a reference bank for the BBA's Yen-LIBOR panel during the Class Period.  Barclays' New York branch is located in this District at 200 Park Avenue, New York, NY 10166.  Barclays employs derivatives traders in New York, New York and London, England who trade financial instruments tied to Yen-LIBOR (among other rates).

75.     Defendant Citibank, N.A., ("Citibank") is a federally chartered national banking association headquartered in New York, NY, and a wholly owned subsidiary of Defendant Citigroup Inc.   Citibank, N.A. was a reference bank for the BBA's Yen-LIBOR panel during the Class Period.   Defendant Citibank, Japan Ltd. ("Citibank Japan") is a Japanese commercial bank headquartered in Tokyo, Japan, and a wholly-owned subsidiary of Defendant Citigroup Inc. Citibank Japan was a reference bank for the JBA's Euroyen TIBOR panel during the Class Period.  Defendant Citigroup Global Markets Japan Inc. ("Citigroup Global Markets") is a Japanese wholesale investment bank headquartered in Tokyo, Japan. Citigroup Global Markets is a wholly-owned subsidiary of Defendant Citigroup, Inc. and an affiliate of Citibank Japan. Defendant Citigroup Inc. ("Citigroup"), which controlled Defendants Citibank, N.A., Citibank, Japan Ltd., and Citigroup Global Markets Japan Inc., reaped significant financial benefit from, and actively participated in, the unlawful conduct alleged herein.

76.     Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") is a financial services corporation with headquarters located in Utrecht, the Netherlands. Rabobank is structured as a cooperative.  Rabobank "Member Banks" are independent cooperatives that are members of a centralized entity called Rabobank Nederland (in the Netherlands) and Rabobank International (outside of the Netherlands) (collectively, "Rabobank").  In addition to supporting the Rabobank Member Banks, Rabobank operates its

own banking business and conducts other activities such as supervising the Rabobank Member Banks on behalf of financial regulators. Rabobank has banking divisions and branches around the world, including in the United States, with its United States branch headquartered in New York. The New York branch of Rabobank Nederland is located in this District at 245 Park Avenue, 37th Floor, New York, NY 10167. Rabobank employs derivatives traders throughout the world - including in New York, London, Utrecht, Tokyo, Hong Kong, and Singapore - who trade financial instruments tied to Yen-LIBOR, including interest rate swaps. Rabobank was a reference bank for the BBA's Yen-LIBOR panel during the Class Period. (Rabobank's Yen-LIBOR submissions were made by money markets desks submitters in London until December 2008, and in Utrecht starting in January 2009.) Rabobank withdrew from the BBA's Yen-LIBOR panel in mid-2012.

77.   Defendant HSBC Holdings plc is a United Kingdom public limited company headquartered in London, England. Defendant HSBC Bank plc is a United Kingdom public limited company headquartered in London, England and a wholly owned subsidiary of HSBC (collectively, "HSBC"). HSBC was a reference bank for the BBA's Yen-LIBOR panel during the Class Period.

78.   Defendant Lloyds Banking Group plc ("Lloyds") is a United Kingdom public limited company headquartered in London, England. Defendant Lloyds was formed in 2009 through the acquisition of Defendant HBOS plc ("HBOS"), a United Kingdom banking and insurance company headquartered in Edinburgh, Scotland, by Llloyds TSB Bank plc. Lloyds was a reference bank for the BBA's Yen-LIBOR panel during the Class Period.

79.   **Euroyen TIBOR Panel.** The following Contributor Bank Defendants served on the JBA Euroyen TIBOR panel during the Class Period: (i) The Bank of Tokyo-Mitsubishi UFJ,

Ltd.; (ii) Mizuho Bank, Ltd.; (iii) The Sumitomo Trust and Banking Co., Ltd.; (iv) The

Norinchukin Bank; (v) Mitsubishi UFJ Trust and Banking Corporation; (vi) Sumitomo Mitsui

Banking Corporation; (vii) Resona Bank, Ltd.; (viii) J.P. Morgan Chase Bank, NA; (ix) Mizuho

Corporate Bank, Ltd.; (x) Chuo Mitsui Trust & Banking Co. Ltd.; (xi) Deutsche Bank AG; (xii)

Mizuho Trust and Banking Co. Ltd.; (xiii) The Shoko Chukin Bank, Ltd.; (xiv) Shinkin Central

Bank; (xv) UBS AG; (xvi) The Bank of Yokohama, Ltd.; (xvii) The Royal Bank of Scotland

Group PLC.;  and (xviii) Citibank, Japan Ltd.

80.     **Yen-LIBOR Panel.**  The following Contributor Bank Defendants served on the

BBA Yen-LIBOR panel during the Class Period: (i) The Bank of Tokyo-Mitsubishi UFJ, Ltd.;

(ii) The Norinchukin Bank; (iii) Sumitomo Mitsui Banking Corporation; (iv) J.P. Morgan Chase

& Co.; (v) Mizuho Corporate Bank, Ltd.; (vi)  Deutsche Bank AG; (vii) UBS AG; (viii) Société

Générale; (ix) The Royal Bank of Scotland Group PLC; (x) Barclays Bank PLC; (xi) Citibank,

N.A.; (xii) Rabobank; (xiii) HSBC; and (xiv) Lloyds.

81.     The following Contributor Bank Defendants served on both the JBA Euroyen

TIBOR and BBA Yen-LIBOR panels during the Class Period: (i) The Bank of Tokyo-Mitsubishi

UFJ, Ltd.; (ii) The Norinchukin Bank; (iii) Sumitomo Mitsui Banking Corporation; (iv) J.P.

Morgan Chase Bank, & Co./J.P. Morgan Chase NA, (v) Mizuho Corporate Bank, Ltd.; (vi)

Deutsche Bank AG; (vii) UBS AG; and (viii) The Royal Bank of Scotland Group PLC; and (ix)

Citibank, NA /Citibank Japan Ltd.

82.     The defendants that served on the JBA Euroyen TIBOR and/or BBA Yen-LIBOR

panels during the Class Period are collectively referred to herein as the "Contributor Bank

Defendants."

83.     Defendant ICAP plc is a leading voice and electronic interdealer broker and provider of post trade services with its head office in London, England.  ICAP is active in the wholesale markets in interest rates, credits, commodities, FX, emerging markets and equity derivatives.  ICAP has businesses in six U.S. offices including in this District.  ICAP and certain of its subsidiaries are involved in the brokering of cash deposits and derivatives based on Euroyen TIBOR and Yen-LIBOR between banks, including Contributor Bank Defendants.  Defendant ICAP Europe Limited is a wholly owned subsidiary of ICAP Group Holdings plc ("ICAP Group"), a wholly owned subsidiary of Defendant ICAP plc, and is headquartered in London, England.  It manages some of ICAP Group's brokering business in Europe, including the brokering business conducted by Yen brokers and other brokers.  Defendants ICAP plc and ICAP Europe Limited are collectively referred to herein as "ICAP."

84.     The DOJ alleged that three former ICAP brokers committed the following overt acts, among others, in the Southern District of New York: (a) on various dates relevant to the DOJ complaint, including on or about October 24, 2006, and on or about June 25, 2008, former UBS Senior Yen Trader Hayes entered into Yen interest rate derivatives  trades brokered by ICAP broker Darrell Read and others with counterparties located in New York, New York, for which trade confirmations were transmitted in interstate and foreign commerce, including to and from New York, NY on or about the following dates: October 24, 2006; November 9, 2006; July 4, 2008; and July 8, 2008; (b) on various dates relevant to the DOJ Complaint, including on or about June 7, 2007, on or about February 21, 2008, and on or about July 22, 2009, former ICAP brokers Read and Wilkinson and former UBS Senior Yen Trader Hayes and others engaged in electronic chats located in New York, New York; (c) on various dates relevant to the DOJ Complaint, including on or about November 20, 2008, and on or about November 21, 2008,

former ICAP broker Goodman distributed a Yen "run thru" email message that was received by certain individuals through a server located in New York, New York; (d) on various dates relevant to the DOJ Complaint, including on or about May 9, 2007, and on or about July 22, 2008, former ICAP broker Goodman distributed a "run thru" email message to a colleague located in the U.S.; and (e) at various times relevant to the DOJ complaint, former ICAP brokers Read, Wilkinson and Goodman and others known and unknown, caused and engaged in conduct that contributed to the publication of manipulated Yen-LIBOR rates in New York, New York.

85.     Defendant R.P. Martin Holdings Limited is a U.K.-based market-leading wholesale broking firm in the financial markets.  R.P. Martin brings together buyers and sellers of fixed income cash flow, bonds, currency and financial derivatives in the international money and capital markets.  R.P. Martin has offices throughout the world.  Defendant Martin Brokers (UK) Ltd. is a wholly owned subsidiary of Martin Brokers Group Ltd., a wholly owned subsidiary of R.P. Martin Holdings, and is headquartered in London, England.  R.P. Martin and certain of its subsidiaries, including Martin Brokers (UK) Ltd., are involved in the brokering of cash deposits and derivatives based on Euroyen TIBOR and Yen-LIBOR between banks, including Contributor Bank Defendants.  R.P. Martin Holdings Limited and Martin Brokers (UK) Ltd. are collectively referred to herein as "R.P. Martin."

86.     Defendant Tullett Prebon PLC ("Tullett Prebon") is an interdealer broker headquartered in London, England.  Tullett Prebon facilitates the trading activities of its clients, in particular commercial and investment banks.  Tullett Prebon offers a variety of market information services. Tullett Prebon has four U.S. branch offices, including one located in this District at 1 Seaport Plaza, New York, NY.

87.     Defendants ICAP, R.P. Martin and Tullett Prebon, along with additional yet-unidentified derivative and cash broker defendants, are collectively referred to herein as the "Broker Defendants."

88.     John Doe Defendants Nos. 1-50 are other entities or persons, including banks, interdealer brokers, cash brokers and other co-conspirators whose identities are currently unknown to Plaintiffs.  The John Doe Defendants participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of Euroyen TIBOR, Yen-LIBOR and the prices of Euroyen-based derivatives.

## AGENTS AND UNNAMED CO-CONSPIRATORS

89.     Various other entities and individuals, including, but not limited to, dealer subsidiaries and/or affiliates of the Contributor Bank and Broker Defendants participated as co-conspirators and manipulators in the acts complained of and performed acts and made statements that aided and abetted and furthered the unlawful conduct as alleged herein.  The unnamed co-conspirators, along with the above-named Defendants, performed, participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of Euroyen TIBOR, Yen-LIBOR and the prices of Euroyen-based derivatives.

## SUBSTANTIVE ALLEGATIONS

I.      **BACKGROUND**

**Euroyen TIBOR and Yen-LIBOR**

90.     Euroyen TIBOR and Yen-LIBOR are daily reference rates intended to reflect the interest rates at which banks offer to lend unsecured funds denominated in Japanese Yen to other

banks in the offshore wholesale money market (or interbank market), also known as the Euroyen market. The higher the credit risk for a bank (or credit risk environment), the higher the rate that bank would (should) have to pay for borrowing unsecured funds denominated in Japanese Yen in the Euroyen market.

91.     Interest rate Yen-denominated issues that are settled during European trading hours generally use the BBA Yen-LIBOR rate as their pricing basis, while interest rate Yen-denominated issues that are settled during Asia-Pacific trading hours generally use the JBA's Euroyen TIBOR rate for their pricing, but either rate may be used. *See, e.g.*, ¶¶ 565-74 (discussing the interrelationship between Euroyen TIBOR and Yen-LIBOR).

92.     In addition to their use as benchmarks in pricing loans, Euroyen TIBOR and Yen-LIBOR are used as the basis for settlement of interest rate derivatives contracts traded on major futures and options exchanges and in over-the-counter markets. Euroyen TIBOR is used as the final settlement benchmark for Three-month Euroyen TIBOR futures contracts, the most actively traded non-U.S. dollar interest rate contract in the world. Billions in notional value of domestic (U.S. based) transactions in Euroyen futures contracts were transacted during the Class Period.

93.     Euroyen TIBOR is set through the JBA by its member banks. The JBA designates a minimum of eight (8) reference banks to provide daily rate quotes for the calculation of Euroyen TIBOR rates. According to the JBA, "[t]he selection of reference banks is based on four factors: (1) market trading volume…, (2) Yen asset balance, (3) reputation, and (4) track record in providing rate quotes. (The selection also takes into account JBA TIBOR continuity and the variety of financial sectors to which reference banks belong.)."

94.     Euroyen TIBOR is calculated on each business day as of 11:00 a.m. Tokyo time. Each Euroyen TIBOR reference bank quotes Euroyen TIBOR rates for thirteen (13) maturities (1 week and 1-12 months).

95.     In calculating Euroyen TIBOR rates, quotes are discarded from the two highest and the two lowest financial institutions and the remaining quotes are then averaged.

96.     The reference banks quote what they deem to be the prevailing market rates, assuming transactions between prime banks on the Japanese offshore market as of 11:00 a.m., unaffected by their own positions.

97.     Yen-LIBOR is set through the BBA by its member banks.  According to the BBA, each contributor bank is selected to "reflect[] the balance of the market."   Each contributor bank is selected based upon the following criteria "the scale of market activity, reputation and perceived expertise in the currency concerned."

98.     Yen-LIBOR is calculated each business day as of 11:00 a.m. London time.  Each Yen-LIBOR reference bank quotes Yen-LIBOR for fifteen (15) maturities, ranging from overnight to twelve months, including three months.

99.     In calculating Yen-LIBOR, contributed rates are ranked in descending order and the arithmetic mean of only the middle two quartiles is used to formulate the resulting BBA Yen-LIBOR calculation.  The contributor banks respond to the BBA's question: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?"

100.     Thomson Reuters ("Reuters") serves as the BBA's agent for the collection, calculation, publication and dissemination of the daily Yen-LIBOR.

101.    Both the JBA and BBA prohibit banks from reporting rates that reflect factors unrelated to prevailing costs of borrowing unsecured funds in the Euroyen market, *i.e.,* submissions that are based on the banks' Euroyen-based derivatives positions.  Notwithstanding this blanket prohibition, the Contributor Bank Defendants, aided and abetted by the Broker Defendants, systematically reported false, Yen-LIBOR and Euroyen TIBOR rates to the BBA and JBA in order to skew those rates in artificial direction that financially benefitted their Euroyen-based derivatives positions.

**Euroyen-Based Derivatives**

102.    Euroyen-based derivatives are financial instruments that are benchmarked, priced and/or settled to Yen-LIBOR and/or Euroyen TIBOR.  These include: (i) exchange-traded Euroyen TIBOR futures contracts and exchange-traded Yen currency futures contracts (collectively, "Euroyen futures contracts"); (iii) Yen-LIBOR and/or Euroyen TIBOR interest rate swaps; (iv) Yen currency forward agreements; and (v) Yen-LIBOR and/or Euroyen TIBOR forward rate agreements.

### 1.  Euroyen TIBOR Futures Contracts

103.    A three-month Euroyen TIBOR futures contract is an agreement to buy or sell a Euroyen time deposit having a principal value of 100,000,000 Japanese Yen with a three-month maturity commencing on a specific future date.

104.    Three-month Euroyen TIBOR futures contracts are exchange-listed financial instruments that are traded within the U.S. on the floor of the CME and electronically on the CME's Globex platform, as well as on boards of trade and exchanges accessible by U.S. investors from within the U.S., including the Tokyo Financial Exchange Inc. ("TFX"), Singapore Exchange ("SGX"), and NYSE Euronext LIFFE ("LIFFE").  The foregoing boards of trade and

exchanges provide U.S. investors with virtually 24-hour access to domestically trade three-month Euroyen TIBOR futures contracts.

105. Three-month Euroyen TIBOR futures contracts are standardized contracts and the specifications of a three-month Euroyen TIBOR futures contract are identical to one another, with the exception of trading hours.

106. For over twenty years the CME and the SGX have operated pursuant to a Mutual Offset System (MOS) Agreement which allows three-month Euroyen TIBOR futures contracts that are opened on one exchange (*i.e.,* on the SGX) to be liquidated on (offset) or held at the other (*i.e.*, on the CME), providing complete fungibility in three-month Euroyen TIBOR futures contracts. As per the CME, both the CME and SGX "operate under similar rules, philosophies, systems and trading facilities. As such, market participants may actually regard the two exchanges as providing a single marketplace for MOS [*i.e.*, three-month Euroyen TIBOR futures] contracts."

107. Three-month Euroyen TIBOR futures contracts are quoted in terms of 100 minus the three-month Euroyen TIBOR rate on an annual basis over a three hundred sixty (360) day year. For example, if the three-month Euroyen TIBOR rate is 5.50% then the Euroyen TIBOR futures price will be 94.50 (100.00-5.50). Given this price index construction, if the three-Month Euroyen TIBOR rate rises, the price of the Euroyen TIBOR futures contract would fall, and vice-versa. For example, to profit from a decrease in Euroyen TIBOR rates, a trader would need to buy a Euroyen TIBOR futures contract (*e.g*., go long); whereas to profit from an increase in Euroyen TIBOR rates, a trader would need to sell a Euroyen TIBOR futures contract (*e.g*., go short).

108.    The CME's Standard Portfolio Analysis of Risk ("SPAN") system, designed to evaluate the overall risk in an entire portfolio is used for three-month Euroyen TIBOR futures contracts.

109.    The contract months for a three-month Euroyen TIBOR futures contract are March, June, September, and December, extending out five (5) years (for a total of twenty (20) contract months that are actively trading at any point in time).  Most futures and options contracts use the third Wednesday of March, June, September and December, also known as IMM dates, as their scheduled maturity or termination date.

110.    Euroyen TIBOR futures contracts terminate trading at 11:00 a.m. Tokyo Time on the second Tokyo bank business day immediately preceding the third Wednesday of the contract's named month of delivery (*e.g.*, March, June, September or December).

111.    The final settlement price of a three-month Euroyen TIBOR futures contracts is defined as cash settlement to 100 minus the three-month Euroyen TIBOR rate published by the JBA at 11:00 am Tokyo time on the second Tokyo bank business day immediately preceding the third Wednesday of the contract month's named month of delivery.  The JBA Euroyen TIBOR rate is included in the Euroyen TIBOR future contract's definition and represents the final settlement price of the futures contract.  Three-month Euroyen TIBOR futures contracts have no final settlement price on their own without reference to the JBA's published three-month Euroyen TIBOR rate.  Any fluctuation or manipulation of three-month Euroyen TIBOR rate will have a direct and immediate impact on the final settlement price of three-month Euroyen TIBOR futures contracts and on their actively traded prices.

112.    For instance, if Euroyen TIBOR rates were driven artificially lower, then at the time of expiration, the final settlement price for three-month Euroyen TIBOR futures contracts

would be artificially high.  This is because the underlying value of the three-month Euroyen TIBOR futures contract is inversely related to the interest rate.  Thus, the lower/higher the three-month Euroyen TIBOR rate, the higher/lower the three-month Euroyen TIBOR futures contract final settlement price.

113.    Any manipulation of short term Euroyen rates is a manipulation of the commodity underlying (*i.e.*, Euroyen) the three-month Euroyen TIBOR futures contract.  This is because three-month Euroyen acts as any other commodity in final settlement and price discovery.  It is the reference price for the Euroyen TIBOR futures contract.

114.    A purchaser of a short or long three-month Euroyen TIBOR futures contract can cancel or offset his future obligation to the contract market or exchange by selling an offsetting long or short three-month Euroyen TIBOR futures contract.  The difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

115.    Traders who exit their positions before final settlement are still affected by Euroyen manipulation because three-month Euroyen TIBOR futures contracts trade based on what Euroyen is expected to be in the future.  To the extent that Euroyen is manipulated in the present, expectations of what Euroyen prices will be in the future (*i.e.,* then-present Three-month Euroyen TIBOR futures contract prices) will also be skewed.

a.    **U.S. Based Transactions in Euroyen TIBOR Futures Contracts**

116.    Billions in notional value of U.S. based transactions in Euroyen TIBOR futures contracts were transacted during the Class Period.  Such domestic transactions include: (i) Euroyen TIBOR futures contracts transacted on the CME and (ii) TFX, SGX, and LIFFE Euroyen TIBOR futures contracts transacted by U.S. investors from within the U.S.

117.   U.S. based trading of TFX, SGX and LIFFE Euroyen TIBOR futures contracts by U.S. investors is specifically authorized by the CFTC, the independent agency of the United States Government that regulates futures and option markets, in no-action letters and other relief issued over the past 20 years.  *See* CFTC Staff Letter No. 99-31 (July 291999) CFTC Staff Letter No. 06-25 (Sept. 29, 2006); CFTC Staff Letter No. 99-63 (Dec. 17, 1999); CFTC Staff Letter No. 06-21 (Sept. 22, 2006).

118.   In 1984, the SGX and CME entered into a Mutual Offset System Agreement which allows Three-month Euroyen TIBOR futures and options contracts that are opened on one exchange (*i.e.,* on the SGX) to be liquidated on (offset) or held at the other (*i.e.*, on the CME) through an Mutual Offset System ("MOS") Link between the CME and SGX, providing complete fungibility in Euroyen Three-month TIBOR futures and options contracts traded on the exchanges.  As per the CME, both the CME and SGX "operate under similar rules, philosophies, systems and trading facilities.  As such, market participants may actually regard the two exchanges as providing a **single marketplace** for MOS [*i.e.*, CME Three-month Euroyen TIBOR futures] contracts." (emphasis added).   The Mutual Offset System Agreement was renewed by CME and SGX in October 2006 for an additional three years, from 2007 through 2010.

119.   On January 12, 1998 and January 16, 1998, TFX signed Memorandum of Understanding (MOU) with the SGX and LIFFE, respectively, in which the exchanges agreed to cooperate for the development and efficient operation of the markets and the listing of Three-month Euroyen TIBOR futures contracts.

120.   TFX and LIFFE also established a "fungible link" which enables "clients and members of both exchanges to trade Three-month Euroyen futures contracts on Euronext.liffe in

the knowledge that their positions will form part of the large open interest that exists on TFX."

According to TFX, the fungible link provided "access" to TFX's Three-month Euroyen futures

contracts "in European and American time-zone" markets, "thereby creating an extended trading

day for those involved with yen-denominated swaps, forward rate agreements , hedging or

speculation."

121.    As per the MOU between TFX and Euronext LIFFE, Three-month Euroyen

TIBOR futures contracts traded on LIFFE are transferred to TFX after the closing of LIFFE's

trading day and are replaced as Three-Month Euroyen TIBOR futures contracts on TFX.  The

TFX transferred Three-month Euroyen TIBOR futures contracts are added to, or offset against,

existing positions on TFX.   Further, TFX transferred Three-Month Euroyen TIBOR futures

contracts from LIFFE are cleared by TFX members at the TFX settlement price for Euroyen

TIBOR futures contracts, and form part of the open interest in such contracts on TFX.

122.    The following Defendants and/or their subsidiaries or affiliates serve as TFX

trading and clearing members: (i) Citigroup Global Markets Japan Inc. (trading and clearing

member); (ii) The Bank of Tokyo-Mitsubishi UFJ, Ltd. (trading and clearing member); (iii) The

Bank of Yokohama, Ltd. (trading and clearing member); (iv) Barclays Securities Japan

Limited(trading and clearing member); (v) Deutsche Securities Inc. (trading and clearing

member); (vi) JPMorgan Securities Japan, Co., Ltd. (trading and clearing member); (vii)

Mitsubishi UFJ Trust and Banking Corporation(trading and clearing member); (viii) Mizuho

Bank, Ltd. (trading and clearing member);  (ix) Mizuho Corporate Bank, Ltd. (trading and

clearing member); (x) Mizuho Securities Co., Ltd. (trading and clearing member); (xi) Mizuho

Trust & Banking Co., Ltd. (trading and clearing member); (xii) The Norinchukin Bank (trading

and clearing member); (xiii) Resona Bank, Ltd. (trading and clearing member); (xiv) Shinkin

Central Bank (trading and clearing member); (xv) The Shoko Chukin Bank, Ltd. (trading and clearing member); (xvi) Sumitomo Mitsui Banking Corporation (trading and clearing member); (xvii) Sumitomo Mitsui Trust Bank, Limited (trading and clearing member); (xviii) UBS Securities Japan Co., Ltd. (trading and clearing member); (xix) RBS Securities Japan Limited (trading and clearing member); (xx) Societe Generale Securities (North Pacific) Ltd. (trading and clearing member); (xxi) HSBC Securities (Japan) Ltd. (trading member only).

123.    The following Defendants, their affiliates and/or subsidiaries are members of LIFFE:  (i) Barclays Bank Plc; (ii) Barclays Capital Securities Limited; (iii) Citigroup Global Markets Limited; (iv) Deutsche Bank AG; (v) HSBC Bank Plc; (vi) ICAP Securities Limited; (vii) J.P. Morgan Securities Plc; (viii) Mizuho Securities USA Inc.; (ix) Rabobank International; (x) Societe Generale; (xi) The Royal Bank of Scotland Plc; (xii) UBS Limited; and (xiii) Lloyds Banking Group plc.

124.    The following Defendants, their affiliates and/or subsidiaries are trading or clearing members of the SGX:  (i) Barclays Bank PLC (clearing member); (ii) Barclays Capital Futures (Singapore) Private Limited (trading and clearing member); (iii) Citibank N.A. (clearing member); (iv) Citigroup Global Markets Singapore Securities PTE Ltd. (trading and clearing member); (v) Deutsche Bank AG (clearing member); (vi) Deutsche Futures Singapore PTE Ltd. (trading and clearing member); (vii) J.P. Morgan Securities Singapore Private Limited (trading and clearing member); (viii) Mizuho Securities (Singapore) PTE Ltd. (trading and clearing member); (ix) The Royal Bank of Scotland PLC (trading and clearing member); (x) UBS AG (clearing member); (xi) UBS Futures Singapore Ltd. (trading and clearing member); (xii) UBS Securities PTE Ltd. (trading member).

125.     The following Defendants, their affiliates and/or subsidiaries are clearing members of the CME: (i) Barclays Capital Inc.; (ii) Deutsche Bank Securities Inc.; (iii) HSBC Securities (USA) Inc.; (iv) J.P.Morgan Securities LLC; (v) Mizuho Securities USA Inc.; (vi) RBS Securities Inc.; (vii) Societe Generale; (viii) The Royal Bank of Scotland plc; and (ix) UBS Securities LLC.

126.     Clearing members assume full financial and performance responsibility for all transactions executed through them and cleared by the Clearing House. They are responsible and accountable for every customer position they carry.  In every matched transaction executed through the Clearing House's facilities, the Clearing House is substituted as the buyer to the seller and the seller to the buyer, with a clearing member assuming the opposite side of each transaction.  Source: http://www.cmegroup.com/company/membership/files/cme-group-clearing-membership-handbook.pdf.

### 2.   Japanese Yen Currency Futures Contracts

127.     Japanese Yen currency futures contracts are exchange-listed financial instruments traded within the United States on the floor of the CME and electronically on the CME's Globex platform.

128.     The size of a Japanese Yen currency futures contract is ¥ 12,500,000.

129.     The contract months for a Japanese Yen currency futures contract are March, June, September and December extending out five years (for a total of twenty (20) contract months that are actively trading at any point in time).  The third Wednesday of March, June, September and December also known as IMM dates, are the four quarterly dates of each year in which futures contracts use as their scheduled maturity date or termination date.

130.     Japanese Yen currency futures contracts terminate trading at 9:16 a.m. Central Time (CT) on the second business day immediately preceding the third Wednesday of the contract month.

131.     A manipulation of Yen-LIBOR and Euroyen TIBOR manipulates the price of Japanese Yen currency futures contracts, and manipulates the price of a commodity underlying such Japanese Yen currency futures contracts.

### 3.   Interest Rate Swaps

132.     An interest rate swap ("swap") is a financial derivatives instrument in which two parties agree to exchange interest rate cash flows.  If, for example, a party has a transaction in which it pays a fixed rate of interest but wishes to pay a floating rate of interest tied to a reference rate (*e.g.*, Yen-LIBOR or Euroyen TIBOR), it can enter into a swap to exchange its fixed rate obligation for a floating rate one.  For example, Party A pays a fixed rate to Party B, while Party B pays a floating interest rate to Party A indexed to a reference rate like Yen-LIBOR or Euroyen TIBOR.  There is no exchange of principal amounts, which are commonly referred to as the "notional" amounts of the swaps transactions.  Interest rate swaps indexed to Yen-LIBOR and/or Euroyen TIBOR were widely traded in the U.S. during the Class Period.

### 4.   Forward Agreements

133.     A currency forward sets the currency exchange rate to be paid or received on a fixed amount of currency obligation beginning on a future date.  The contract will determine the exchange rate to be used along with the termination date and notional value.  On this type of agreement, it is only the differential that is paid on the notional amount of the contract.

134.     A forward rate agreement ("FRA") is an interest rate forward contract.  The contract sets rate of interest to be paid or received on an obligation beginning at a future start date.  The contract will determine the interest rate to be used along with the termination date and

notional value.  On this type of agreement, it is only the differential that is paid on the notional amount of the contract.

## II.   DEFENDANTS RESTRAINED TRADE AND INTENTIONALLY MANIPULATED EUROYEN-BASED DERIVATIVES PRICES BY FALSELY REPORTING EUROYEN TIBOR AND YEN-LIBOR RATES TO THE JBA AND BBA.

135.   Defendants methodically and purposefully manipulated the prices of Euroyen-based derivatives through their deliberate and systematic submission of false Euroyen TIBOR and Yen-LIBOR rates to the JBA and BBA throughout the Class Period.  Defendants did so in order to unlawfully profit financially from the trading Euroyen-based derivatives held by them or their co-conspirators.

136.   The Contributor Bank Defendants' Euroyen TIBOR and/or Yen-LIBOR submitters regularly and improperly conspired with and agreed to change their bank's Euroyen TIBOR and/or Yen-LIBOR submissions at the request of Euroyen interest rate derivatives traders employed by that or other Contributor Bank Defendants.  As revealed by the settlements to date, this was an open, common and pervasive practice of the Contributor Bank Defendants' trading desks, even involving traders discussing their manipulative requests before they sent their manipulative requests to their Euroyen TIBOR and/or Yen-LIBOR submitters.  As a direct, intended and proximate consequence of the Contributor Bank Defendants' unlawful conduct, the prices of Euroyen-based derivatives were manipulated to artificial levels by the Contributor Bank Defendants throughout the Class Period.

137.   The Contributor Bank Defendants' interest rate derivatives traders also regularly and improperly conspired with each other and with traders and brokers at other Contributor Bank and Broker Defendants to set the false Euroyen TIBOR and/or Yen-LIBOR rate that each trader would request of their own respective Euroyen TIBOR and/or Yen-LIBOR submitters.  Thereby,

Defendants maximized the manipulative and anticompetitive effect on the Euroyen TIBOR and Yen-LIBOR fixings and the profits derived and benefits flowing from such artificiality on the Contributor Bank Defendants' Euroyen-based derivatives trading positions.

138.    Defendants knew that the false rates they submitted were used by the JBA and BBA in calculating and publishing Euroyen TIBOR and Yen-LIBOR.  Defendants also knew that their false Euroyen TIBOR and Yen-LIBOR submissions as well as the false resulting Euroyen TIBOR and Yen-LIBOR fix were transmitted throughout the world, including from within and into the U.S.  They also knew, as sophisticated market participants, that the (mis)information they reported impacted the prices of Euroyen-based derivatives traded by U.S. investors.

## III.     **DEFENDANTS RESTRAINED TRADE AND MANIPULATED THE PRICES OF EUROYEN-BASED DERIVATIVES BY THEIR ILLEGITIMATE, NON-BONA FIDE TRADING OF EUROYEN-BASED DERIVATIVES**.

139.    As alleged herein, Defendants' traded Euroyen-based derivatives at times they knew the prices of such financial instruments were being distorted by Defendants' systematic false reporting of Euroyen TIBOR and Yen-LIBOR (among other unlawful collusive and manipulative conduct).  This destroyed the legitimizing price discovery function of Euroyen-based derivatives, created or contributed to prices which were not reflective of legitimate forces of supply and demand, and furthered Defendants' conspiracy to manipulate and unlawfully restrain trade in and fix prices of Euroyen-based derivatives to artificial levels during the Class Period to the detriment of Plaintiffs and the Class.   Because Defendants' positions were illegitimate and manipulative parts of the supply-demand equation for Euroyen-based derivatives, Defendants' impact on Euroyen-based derivatives was necessarily an artificial one that restrained trade and caused artificial prices.

140.    Defendants' derivatives traders, by knowing their Euroyen-based derivatives positions, knew the amount of their exposure to movements in Euroyen TIBOR and Yen-LIBOR.  For example, on any given day, the derivatives traders may have had exposure to Euroyen TIBOR and/or Yen-LIBOR in particular maturities if payments were owed to or by them on OTC interest rate swap contracts or if the derivatives traders had traded Euroyen futures settling on that day.  The amount owed to or by the traders was affected by movements in Euroyen TIBOR and/or Yen-LIBOR.  A beneficial movement (even by as much as one basis point) could have made the derivatives traders a profit or reduced a loss.  In the foregoing context, each Defendant's derivatives traders repeatedly communicated with the Euroyen TIBOR and/or Yen-LIBOR submitters at that Defendant in order to cause their firm to make false Euroyen TIBOR and/or Yen-LIBOR submissions that favored the traders' Euroyen-based derivatives positions.

## IV.    DEFENDANTS' UNLAWFUL CONDUCT HAS LED TO DEFERRED CRIMINAL PROSECUTION AGREEMENTS, CRIMINAL CHARGES, GUILTY PLEAS AND SETTLEMENTS RESULTING IN THE PAYMENT OF FINES AND PENALTIES IN EXCESS OF $4.5 BILLION TO GOVERNMENTAL AUTHORITIES IN THE U.S. AND ABROAD

141.    Defendants' unlawful conduct has resulted in agreements with government regulators resulting in the collective payment – to date – of over **$4.5 billion** in fines and penalties (among other relief) by Defendants UBS ($1.5 billion), RBS ($964 million), ICAP Europe Limited ($87 million), Rabobank ($1 billion), R.P. Martin ($2.5 million), Deutsche Bank ($350 million), JPMorgan ($108 million), Citigroup ($94 million) and Barclays ($450 million) for their manipulation of Yen-LIBOR and/or Euroyen TIBOR (among other rates) and the prices of Euroyen-based derivatives.

142.    The settlements resolve DOJ, CFTC, FSA and EC criminal and/or civil charges relating to restraints of trade and manipulation of Yen-LIBOR, Euroyen TIBOR and the prices of Euroyen-based derivatives.  The factual findings that accompanied the UBS, RBS, Rabobank and Barclays settlements each included a "Statement of Facts" ("SOF") (of which UBS, RBS, Rabobank and Barclays, respectively, admitted as "true and accurate") that are attached to, and incorporated by reference in, various non-prosecution or deferred prosecution agreements entered with the DOJ's Criminal Division, Fraud Section.

143.    Throughout the Class Period, the Contributor Bank and Broker Defendants used several principal and interrelated methods to manipulate Yen-LIBOR, Euroyen TIBOR and the prices of Euroyen-based derivatives including: (i) falsely reporting their own Yen-LIBOR and/or Euroyen TIBOR submissions; (ii) colluding with cash brokers, including the Broker Defendants, to influence other Contributor Banks' Yen-LIBOR and/or Euroyen TIBOR submissions; and (iii) colluding directly with Euroyen-based derivatives traders (among others) at other Yen-LIBOR and/or Euroyen TIBOR Contributor Banks, either directly or through the Broker Defendants, in order to manipulate Yen-LIBOR, Euroyen TIBOR and the prices of Euroyen-based derivatives. Defendants pervasive manipulative and collusive conduct would not have been possible, but for their creation of an environment that promoted, indeed encouraged and rewarded, the manipulation.

**Defendants Created An Environment Ripe For The Pervasive and Persistent Manipulation of Yen-LIBOR, Euroyen TIBOR and the Prices of Euroyen-Based Derivatives**

        **1.   The Contributor Bank Defendants Created Inherent Conflicts of Interest that Corrupted their Yen-LIBOR and Euroyen TIBOR Submission Process and Facilitated Their Unlawful Manipulation and Collusion**

144.    The driving force of Defendants' manipulation of Yen-LIBOR, Euroyen TIBOR and the prices of Euroyen-based derivatives was simple: greed.  Because of the high-notional value of Euroyen-based derivatives, even very small movements in Yen-LIBOR and/or Euroyen

TIBOR would have a significant positive impact on the profitability of the Contributor Bank Defendants' Euroyen-based derivatives positions, and a correspondingly negative impact on their counterparties' (including U.S. counterparties') trading positions.  Thus, because traders' compensation was based in part on the profit and loss calculation of the Contributor Bank Defendants' trading books, the manipulation of prices of Euroyen-based derivatives was a substantial financial benefit to their traders' compensation.

   **a.**  **Defendants Permitted Traders – Whose Compensation Was Directly Linked to Their Success in Trading Euroyen-Based Derivatives – To Improperly Influence Their Yen-LIBOR and Euroyen TIBOR Submissions.**

     **(i)**  **UBS**.

145. Until August 2008, UBS had no specific internal controls or procedures governing its Yen-LIBOR and Euroyen TIBOR submissions to manage the conflicts of interest or ensure that its submissions did not take into account impermissible factors, such as UBS's Euroyen-based derivatives positions. UBS provided no training concerning the benchmark interest rate submission process or how to manage the inherent conflict between making such submissions, and the fact that the trader-submitters were supposed to make money for UBS.

146. UBS made trader-submitters who worked in UBS's Investment Banking Division responsible for making all benchmark interest rate submissions.  From at least January 2005 through September 2009, derivatives traders, who sat on Short Term Interest Rate ("STIR") trading desks in Zurich and traded short-term derivatives products, made submissions for Yen-LIBOR and Euroyen TIBOR.  UBS's derivatives traders traded Yen-LIBOR and Euroyen TIBOR-based swaps, FRAs, and futures contracts.  Many of their derivatives contracts settled or reset on IMM dates, which made the Yen-LIBOR and Euroyen TIBOR rates on these particular dates especially important.

147.    The STIR desk generated significant income for UBS based on trading derivatives products, whose value depended on Yen-LIBOR and Euroyen TIBOR.  STIR also managed UBS's short-term cash position and engaged in cash trading in the money markets for each currency, primarily through traders located in Connecticut, Zurich and Singapore.  STIR was also responsible for hedging UBS's interest rate risk.

148.    Even after conducting a limited review and developing some procedures for its U.S. Dollar LIBOR submission process in mid-to-late 2008, UBS did not remove the inherent conflicts of interest as alleged herein or provide any training to their trader-submitters.  Rather than strengthening internal controls and removing the inherent conflicts of interest, UBS delegated oversight responsibility for Yen-LIBOR and Euroyen TIBOR submissions to managers who not only knew that derivatives traders and trader-submitters were engaged in efforts to manipulate the official fixings of Euroyen TIBOR, Yen-LIBOR and the prices of Euroyen-based derivatives, but who also made their own requests for submissions to benefit their individual Euroyen-based derivatives trading positions.  Certain derivatives traders, trader-submitters and managers completely disregarded the few procedures UBS eventually implemented.

149.    In September 2009, UBS transferred responsibility for determining Yen-LIBOR submissions to Asset and Liability Management ("ALM") located in Zurich. In January 2010, ALM also became responsible for Euroyen TIBOR submissions.

150.    Prior to September 2009, ALM pushed the trader-submitters to consider directions that the Yen-LIBOR and Euroyen TIBOR rates should move and eventually provided the trader-submitters with the exact rate ALM wanted them to submit.  After ALM assumed such responsibility, other UBS derivatives traders continued to demand preferential submissions. The ALM submitters considered that input along with the previous day's submissions.

151.     By allowing interest rate derivatives traders to act as both trader and rate submitter, UBS created an inherent conflict of interest that compromised the integrity of UBS's rate submission process, and established an environment ripe for derivatives traders and trader-submitters to abuse.  UBS's trader-submitters had significant financial interests to make Yen-LIBOR and Euroyen TIBOR submissions that benefited their Euroyen-based derivatives trading positions.  UBS's trader –submitters' financial interests were in direct conflict with UBS's duty to make honest and reliable assessments of Yen-LIBOR and Euroyen TIBOR rates, and ensure its submissions were made in accordance with the JBA and BBA's criteria.

152.     This environment enabled certain derivatives traders to engage in widespread, long-term systematic misconduct to manipulate Yen-LIBOR, Euroyen TIBOR and the prices of Euroyen-based derivatives within UBS, and in concert with other Contributor Banks banks and interdealer brokers.

### (ii)     RBS.

153.     Until March 2012, certain London-based money market traders were responsible for making RBS's Yen-LIBOR submissions.  RBS money market traders were responsible for ensuring that the bank met its funding needs each day in all currencies, including Yen.  To do so, RBS money market traders engaged in both intra-bank and inter-bank borrowing and lending transactions.  RBS money market traders also traded derivatives products that were indexed to, and therefore valued based on, Yen-LIBOR.  One money market trader was primarily responsible for making Yen-LIBOR submissions ("Primary Submitter").

154.     The Primary Submitter considered certain market information in determining RBS's Yen-LIBOR submissions, such as RBS's funding needs, money market transactions, and derivatives prices, "market color" communications with derivatives traders (although against BBA guidelines), information from interdealer brokers, arbitrage transactions, and synthetic cash

49

deposits in various currencies.  But the RBS Primary Submitter also improperly considered requests to benefit derivative traders' positions or his own positions.  The RBS Primary Submitter skewed the Yen-LIBOR submissions to benefit those positions.

155.     RBS Yen derivatives traders traded various Euroyen-based derivatives that were priced based on Yen-LIBOR, which were used to hedge the desk's interest rate risk and also to generate a profit for the desk.  Indeed, the statement of an RBS trader makes this motivation clear: "[I]ts [sic] just amazing how libor fixing can make you that much money."  Many of their derivatives contracts settled or reset on IMM dates.  RBS's derivatives trading books were traded 24 hours a day, from RBS trading desks in the United States, U.K., and Asia under the direction of the Yen Manager and the Senior Yen Trader.  The Senior Yen Trader was assisted by a Yen derivatives trader in Connecticut and Yen Trader 1 located in London. Yen Trader 1 also was the backup Yen-LIBOR submitter. At the end of the trading day in Asia, RBS passed its Yen trading book first to London, then to Connecticut, and back to Asia when trading resumed in Asia.

156.     In October 2006, RBS senior management decided to facilitate collusive communications between derivatives traders and money market traders, some of whom were also Yen-LIBOR submitters, by locating them on the same RBS currency trading desks.  This co-location plan was known as the Short-Term Markets Desk ("STM"). The express purpose of STM was to encourage derivatives and money market traders to communicate about the relevant market conditions that could impact trading and funding decisions.  The seating arrangement, however, exacerbated the preexisting conflict of interest between the profit motive of traders and the responsibility of submitters to assess what the Yen- submissions should actually be.  RBS did not provide any guidance or controls over what constituted appropriate communications between the derivative traders and money market traders in charge of Yen-LIBOR submissions.  The

result was an environment where the RBS Yen traders were able to seize opportunities to manipulate Yen-LIBOR to RBS's and their individual financial benefit.

157.    RBS's Yen derivatives traders did just that and quickly took advantage of this new arrangement.  RBS's Yen derivatives traders routinely told the Primary Submitter their trading positions and pushed him to make artificial Yen-LIBOR submissions that would make their Euroyen-based derivatives positions more profitable.  If the Primary Submitter was not at the desk, the traders made written demands to submit artificial Yen-LIBOR via Bloomberg chats or instant messages.

158.    Substitute submitters also ensured that the Yen-LIBOR submissions were beneficial either to the Euroyen-based derivatives held by other RBS traders, or Euroyen-based derivatives positions held in RBS's Yen money market trading book.

159.    STM was in place formally until mid-2008 and continued informally for Yen traders into 2009.  In the spring of 2009, the trading floor was reorganized, and the derivatives traders and submitters were separated onto different desks.  The seating change did nothing to slow the scheme. When they were no longer in close proximity to the submitters, the traders increased their use of Bloomberg chats and instant messages to continue demanding artificial Yen-LIBOR submissions that benefitted their Euroyen-based derivatives positions, which were frequently accommodated.

### (iii)    Rabobank.

160.    From mid-2005 through early 2011, Rabobank failed to recognize and address the conflicts of interest, and failed to adequately supervise its derivatives traders and submitters. Further, Rabobank did not have any policies, internal controls or procedures for determining, monitoring or supervising its Yen-LIBOR submissions to ensure that Rabobank's submissions

reflected an honest assessment of the costs of borrowing unsecured funds in the interbank market.

161.     Rabobank assigned responsibility for making its LIBOR submissions to individuals who traded both cash and derivatives products.  In 2004, Rabobank combined its money market desks (which were responsible for cash trading) with its short-term derivatives trading desk.  These traders regularly transacted in interbank cash deposits and loans to meet the bank's funding needs each day in all currencies, and in derivatives products, including interest rate swaps, forward rate agreements, foreign exchange forwards, cross-currency swaps, overnight index swaps, and tenor basis swaps. The traders engaged in derivatives transactions not only to hedge risk, but also to generate profits for Rabobank and themselves.  Yen-LIBOR submissions, by definition, should reflect only the costs of borrowing in the relevant markets, and not derivatives trading positions. By assigning the Yen-LIBOR submissions to derivative traders whose profits depended upon the fixings of Yen-LIBOR, Rabobank created an inherent conflict of interest.

162.     This conflict of interest was heightened by the fact that Rabobank had its LIBOR submitters sitting next to and working with the other derivatives traders on trading desks. One dominant derivatives trader simply shouted his requests across the desk to the submitters.

163.     Even Rabobank managers and at least one senior manager expected the traders and submitters to communicate their individual trading positions. A senior manager in London ("Senior Manager 1"), who was Rabobank's representative to the BBA, oversaw cash and derivatives traders, including the traders responsible for Rabobank's Yen-LIBOR submissions. A former LIBOR submitter himself, Senior Manager 1 encouraged communication among the traders and submitters, and even instructed one Yen-LIBOR submitter to contact derivatives

traders in another office to obtain the rates to submit each day. Traders, submitters and Rabobank Senior Manager 1 openly discussed individual trading positions across the trading desks, and also utilized Bloomberg chat terminals and email to provide each other with instant and continuous written communication about such positions. This free flow of information and the encouragement of managers ensured that submitters would improperly make Yen-LIBOR submissions beneficial to Rabobank traders' derivatives trading positions.

164.    Due to the submitters' dual role as submitters and traders, and the open communication policy promoted by senior managers to encourage the sharing of information about trading positions, several submitters routinely used their own and other traders Euroyen-based derivatives trading positions when determining their Yen-LIBOR submissions and thereby skewed their Yen-LIBOR submissions to manipulate Yen-LIBOR.  In addition, certain submitters and traders coordinated, at times, with brokers and traders from at least two other panel banks to manipulate Yen-LIBOR.

165.    By failing to separate responsibilities for the Yen-LIBOR submissions from its trading functions, Rabobank created an inherent conflict of interest that incentivized submitters to prioritize profit over their responsibility to make an honest assessment of the costs of borrowing unsecured funds when submitting rates to the BBA.  Rabobank created an environment that yielded unfettered opportunities to manipulate Yen-LIBOR submissions for the benefit of trading positions held by Rabobank's traders, which Rabobank traders took full advantage of.  Rabobank's manipulative conduct involved over two dozen traders, including desk managers, and the knowing involvement of at least one senior manager.

166.    In April 2010, Rabobank received the CFTC's request to conduct an internal investigation of its U.S. Dollar LIBOR practices.  During this investigation, a Rabobank senior

manager informed submitters that it was inappropriate for derivatives traders to provide the rates

to submit for Yen-LIBOR.  Despite an admonishment resulting from the internal investigation,

Rabobank failed to improve its internal controls or monitor its traders.  Rabobank traders

continued their manipulation of Yen-LIBOR through the use of brokers into early 2011.

167.    Rabobank's failure to provide internal controls to address benchmark interest rate

submissions, allowance of inappropriate communications between traders and Rabobank's

submitters, and financial incentive to manipulate the rates amplified the pattern of misconduct,

which continued for a number of years.

**2.  Defendants Lacked Internal Controls To Oversee Their Yen-LIBOR and Euroyen TIBOR Submission Process As Well As Monitor Their Manipulative and Conspiratorial Communications With Other Banks and Brokers.**
   **a.  ICAP.**

168.    During the Class Period, ICAP failed to implement adequate internal controls and

procedures to govern its Yen brokers' communications and interactions with clients and

prospective clients.  Nor did it adequately supervise and oversee its Yen brokers and the Yen and

Cash Desks.

169.    ICAP used a regional-based system of policies, procedures, and controls that

applied to its entire family of subsidiaries during the Class Period.  ICAP had only a single

dedicated chief compliance officer for the entire firm. This system of compliance failed to detect

and deter the wrongful conduct of the ICAP brokers.

170.    ICAP's regional compliance system lacked internal controls, policies and

procedures to guide and monitor Yen brokers in their communications with clients, or the

provision of market information to clients and other Contributor Panel banks.  Furthermore,

ICAP did not have procedures for approval of the dissemination of market information, or for

verification of the basis for the market information being disseminated by ICAP brokers.

Accordingly, ICAP Cash Broker 1 was able to send out the skewed 'Suggested LIBORs' in his Run Thrus without detection.

171.   ICAP's Yen and Cash Desks were inadequately supervised.  The Yen brokers, including the Yen Desk Head, worked with little to no supervision from senior ICAP management.  Cash Broker 1, the only Yen cash broker at ICAP, operated independently with little to no supervision from the head of the Cash Desk.  Likewise, ICAP left compliance oversight to the Yen and Cash Desk Heads who were expected to report any suspicious conduct to ICAP's compliance officer.  This system of compliance and supervision was of course all but useless as the Yen Desk Head was complicit in the misconduct taking place on the Yen Desk.

172.   These compliance flaws were exacerbated by the fact that the Yen Desk was not perceived as a potential compliance risk, and was not subjected to any compliance reviews or audits during the Class Period.  Since there were no audits of the Yen Desk for more than four years, ICAP did not discover that: (1) UBS and Citigroup Senior Yen Trader Hayes was Derivatives Broker 1's exclusive client and a significant source of revenue for the ICAP Yen Desk; (2) the ICAP Yen brokers regularly engaged in the manipulation of Yen-LIBOR on behalf of the UBS and Citigroup Senior Yen Trader Hayes; and (3) ICAP successfully negotiated a special bonus for Cash Broker 1's "LIBOR services" which were in fact services to disseminate false market information intended to benefit Senior Yen Trader Hayes.

173.   ICAP's failure to provide specific internal controls and procedures to determine permissible market information to be provided by its Yen brokers to clients and others, and the overall lack of supervision of the Yen and Cash Desks, allowed the misconduct to continue unabated throughout the Class Period.

**b.**     **R.P. Martin.**

174.     R.P. Martin failed to establish an adequate compliance function, failed to adequately supervise and oversee its Yen brokers and the Yen Desk, and failed to implement adequate internal controls and procedures to govern its Yen brokers' communications and interactions with clients and prospective clients.

175.     Prior to February 2010, R.P. Martin did not have a single compliance office or compliance department.  Instead, R.P. Martin assigned employees from other departments to handle compliance issues on a part-time basis.  For example, R.P. Martin's head of compliance consisted of an inexperienced officer who had other responsibilities that were in conflict with his compliance duties.

176.     R.P. Martin also failed to ensure that staff were adequately trained and supervised.  Staff received little to no compliance training.  Further, Desk Heads were given little instruction regarding their roles and responsibilities in supervising the brokers on their desks.  Instead, brokers routinely raised concerns and issues directly with senior management, who had earned the reputation of prioritizing the happiness of profitable brokers over ensuring a compliant environment.  Senior Management and dealt with broker complaints as they arose, rather than ensuring pro-active supervision of brokers and desk heads.  R.P. Martin's currency desks, including the Yen Desk, were inadequately supervised.  The Yen brokers, including the Yen Desk Head, worked with minimal supervision from senior management.

177.     As part of this insufficient system of compliance, R.P. Martin did not have adequate internal controls, policies, and procedures to guide and monitor Yen brokers in their communications with clients, or the provision of market information or market color, or for verification of the basis for the market information being disseminated by R.P. Martin brokers.  Accordingly, although the improper communications between former UBS and Citigroup Senior

Yen Trader Thomas Hayes, and R.P. Martin Yen brokers were well-known by most, if not all, of the brokers on the Yen Desk, no one informed compliance or senior management that such improper conversations were taking place.

178.   R.P. Martin's lackadaisical attitude towards compliance was evident when the company became aware of the UBS's improper broker compensation activity.  The R.P. Martin manager who monitored back-office brokerage activity on a daily basis immediately noticed the unusually large commissions generated by the wash trades between UBS and RBS.  However, when he questioned the Yen Desk about these trades, at least one Yen broker said to him, "You really don't want to know."  The R.P. Martin manager discussed the wash trades with at least one member of R.P. Martin senior management but the discussion did not generate any action, and no one at R.P. Martin further investigated why RBS and UBS had agreed to generate unusually large wash trade commissions for the R.P. Martin Yen Desk.

179.   R.P. Martin's lack of specific internal controls and procedures related to external communications, such as what market information Yen brokers can appropriately send to their clients as well as its overall failure to supervise the Yen Desk, allowed the misconduct to continue unabated.

### 3. The Contributor Bank and Broker Defendants' Yen Desk Managers Not Only Knew Their Traders, Submitters and Brokers Were Pervasively And Persistently Manipulating Yen-LIBOR, Euroyen TIBOR and Euroyen-Based Derivatives Prices, They Too Were Active Participants in the Manipulation
#### a. UBS.

180.   UBS managers, and senior managers, were aware of the manipulation of Yen-LIBOR, Euroyen TIBOR and Euroyen-based derivatives prices by their derivatives traders.  For example, former Senior Yen Trader Hayes's manager knew, at least as early as 2007, that internal pressure was placed on UBS Yen-LIBOR submitters, and the Euroyen TIBOR

submitters, to contribute submissions to benefit the Yen trading book.  Further, certain Zurich-based managers and more senior managers heading the derivatives desks in all currencies were informed of the pressure the Yen trading desk placed on the Yen-LIBOR submitters to contribute submissions to benefit UBS and the traders' Euroyen-based derivatives positions.

181.    For example, the FCA determined (a) at least four UBS Managers were directly involved in Internal Requests; (b) at least three further Managers were aware of Internal Requests; (c) at least four Senior Managers were aware of Internal Requests; (d) at least one Manager was directly involved in Broker Requests; (e) at least one further Manager was aware of Broker Requests; (f) at least three Managers were aware of External Requests; and (g) at least one Senior Manager was aware of External Requests.  In total, requests to manipulate Yen-LIBOR directly involved approximately 40 individuals at UBS, 11 of whom were managers. Furthermore, the practice of submitting false Yen-LIBOR submissions to benefit Euroyen-based trading positions was often openly discussed between certain individuals in open chat forums and in group emails, which included at least 70 individuals at UBS.

182.    UBS managers were also on notice of UBS Senior Yen Trader Hayes's communications with his counterpart traders and Yen-LIBOR submitters at other Contributor Panel Banks about obtaining favorable and artificial Yen-LIBOR submissions to benefit his Euroyen-based derivatives positions.  In a July 3, 2009 email, UBS Hayes's manager, in an attempt to keep UBS Hayes from leaving for another bank, lobbied other UBS managers to award a sizable bonus to UBS Hayes.  In the email, Hayes's manager listed some of his attributes, such as "strong connections with Libor setters in London.  This information is invaluable for the derivatives books."  This email was sent to a senior manager of the Investment

Bank in Zurich, who forwarded it to derivatives desk managers, asking for their input.  One

manager replied:

> [Hayes] does also know some of the traders at other banks (from
> his London days) but personally I find it embarrassing when he
> calls up his mates to ask for favours on high/low fixings . . . it
> makes UBS appear to manipulate others to suit our position;
> **what's the legal risk of UBS asking others to move their fixing?**

183.    Despite these communications to UBS managers and senior managers, no one at

UBS disciplined or even reprimanded Hayes, and no one referred the matter to compliance.

Hayes continued working as a derivatives trader at UBS until he left following a compensation

dispute in September 2009 to work for Defendant Citigroup.

184.    The majority of UBS Yen-LIBOR and Euroyen TIBOR submitters, Yen

derivatives traders, and their supervisors – as well as the more senior managers at UBS who were

aware of this conduct – knew that the submission of false Yen-LIBOR and Euroyen TIBOR rates

was inappropriate, yet continued to encourage, allow, and participate in this conduct.  For

example, Hayes's manager, a senior manager in the Investment Bank, the primary Yen-LIBOR

and Euroyen-TIBOR submitters, and other derivatives traders knew it was contrary to the

definition of Yen-LIBOR and Euroyen TIBOR to consider derivative trading positions in making

their Yen-LIBOR or Euroyen TIBOR submissions.  On October 9, 2008, Submitter-1

complained to several other managers that: "one of the things we signed up for when UBS

agreed to join the fixing panel was the condition that fixing contributions shall be made

regardless of trading positions."

185.    As an active participant in the manipulation of the Euroyen rates, a UBS

derivatives desk manager sought to obstruct the investigation of the LIBOR manipulation.  For

example, in December 2010, Submitter-4, the UBS derivatives desk manager who supervised

UBS Submitter-2 in 2009, instructed Submitter-2 to lie to UBS attorneys during the

investigation. Among other things, the UBS manager instructed Submitter-2 to (a) falsely claim

that the UBS Yen trading desks did not have any derivative positions with exposure to Yen-

LIBOR; (b) avoid mentioning Senior Yen Trader Hayes; (c) falsely indicate that the Yen-LIBOR

submission process did not take into account trading positions; (d) falsely claim that they never

moved the Yen-LIBOR submissions to benefit the Yen trading desks; (e) falsely claim that when

contributing Yen-LIBOR submissions, UBS tried to be "as close to the market as possible."

**b.      RBS**.

186.     At least two RBS managers were aware of significant conflicts of interest with

derivatives traders acting as backup Yen-LIBOR submitters.  Moreover, one of these managers

was aware of, and at times participated in, the manipulation of the RBS Yen-LIBOR submissions

by derivatives traders.

187.     For example, on August 22, 2007, Manager-1 (employed by Defendant RBS Japan

at this time) became aware that Trader-2, who acted as a backup Yen-LIBOR submitter that day,

made RBS's submission for his own benefit.  Manager-1 asked, "Hi Mate, where are u calling

the 6m and 3s Libor today?"  Trader-2 responded, "i put in 1.05 and 1.15." Manager-1 said "ok

cool. . . is that close to consensus?" to which Trader-2 responded, "i think my 3s are too high . . .

6s will prob be 1.13 too . . . but i wanted high fixes today."  Later, Trader-2 asked, "well let me

know if you have any preferencves . . . each day."  Manager-1 responded, "thx will do."

188.     In an electronic chat on December 3, 2007, Manager-1 communicated his own

requests for the direction of Yen-LIBOR to Trader-3, with whom he shared a Yen trading book.

Manager-1 said to Trader-3, "for choice we want lower libors... let the MM [money market] guys

know pls."  Trader-3 responded that he was serving as the submitter that day "as [Trader-2] and

cash guy off."  Manager-1 then said "great. . . set it nice and low."  Trader-3 suggested 1.02 "or

lower" for the 6-month Yen-LIBOR submission, to which Manager-1 responded, "yeh lower."

Trader-3 indicated that he could go down one more basis point to 1.01, which he did - making

RBS the lowest of all Contributor Panel Banks whose Yen-LIBOR submissions were counted in

that day's fixing.  *See, e.g.*, Chronological Appendix ("Appendix") at 101, 132, 144 and 146.

### c.    <u>Rabobank.</u>

189.    Rabobank "Submitter-3" in the Rabobank DOJ SOF, was Rabobank's Global

Head of Liquidity and Finance. Submitter-3 was the head of Rabobank's money market desk in

London, directly supervising other Rabobank Yen-LIBOR Submitters.  Submitter-3 knew that

requests were made to Rabobank's Yen-LIBOR submitters to contribute false submissions to

benefit swaps traders' trading books, and he not only tolerated such activity, but directly

participated in it.

190.    Rabobank "Trader-9" later replaced Submitter-3 as the Global Head of Liquidity

and Finance, previously having served as the Head of Liquidity and Finance for Europe.  Trader-

9 was the head of Rabobank's money market desk in Utrecht, directly supervising other

Rabobank LIBOR Submitters.  Trader-9 was informed that Rabobank Trader-5 would forward

requests to the submitters under Trader-9's supervision, but Trader-9 did not act to stop such

conduct.  Further, many of the submitters under Trader-9's supervision were not trained to

calculate LIBOR submissions, which increased the ability for traders to exert substantial

influence on the submitters and for Trader-5 to take over the Yen-LIBOR setting process.

191.    In addition, Rabobank Trader-6 was the head of Global Financial Markets

Trading for Tokyo and, starting in October 2008, the head of Global Financial Markets for

Tokyo. Trader-6 was the head of Rabobank's Yen trading desk in Tokyo, directly supervising

numerous Rabobank traders who made numerous requests to Rabobank's Yen-LIBOR

submitters to financially benefit their trading books.  Trader-6 also made numerous requests to

Rabobank's Yen-LIBOR submitters to benefit his own trading book, was aware of the fact that Rabobank Trader-5 made similar requests, and directed Trader-5 to make requests on Trader-6's behalf.

192.    Further, Rabobank Trader-4 was the Head of Money Markets and Derivatives Trading for Northeast Asia and the Head of Local Currency Trading for Asia Pacific, eventually being promoted to Head of Liquidity and Finance for Asia Pacific in November 2010.  Trader-4 not only was aware of the fact that Trader-5 made requests to Rabobank's Yen-LIBOR submitters to benefit his Euroyen-based derivatives trading book, but Trader-4 previously made numerous such requests on his own behalf.

**Defendants Successfully Manipulated Yen-LIBOR, Euroyen TIBOR and the Prices of Euroyen-Based Derivatives.**

1. **Through Their False Reporting of Yen-LIBOR and Euroyen TIBOR, Among Other Unlawful Conduct, the Contributor Bank and Broker Defendants Successfully Manipulated Yen-LIBOR, Euroyen TIBOR and the Prices of Euroyen-Based Derivatives.**
   a. **UBS.**[5]

193.    Over a period of approximately six years, from at least January 2005 through at least June 2010, UBS Derivatives Traders and Trader-Submitters engaged in sustained, wide-ranging, and systematic efforts to manipulate Yen-LIBOR, Euroyen TIBOR, and the prices of Euroyen-based derivatives to benefit UBS's trading positions.  This conduct encompassed, among other things, hundreds of instances in which UBS employees sought to influence benchmark rates.  During some periods, UBS employees engaged in this activity on nearly a daily basis.

---

[5] *See also* Ex. A-2, pp. 11-17.

194.    For example, the CFTC determined that UBS Derivatives Traders made approximately 2,000 written requests of UBS's trader-submitters, traders at other panel banks and interdealer brokers to manipulate Yen-LIBOR, Euroyen TIBOR and the prices of Euroyen-based derivatives. The written requests of the UBS Derivatives Traders occurred on approximately 570 trading/reporting days, mostly between late 2006 and late 2009, which is approximately 75% of the days UBS participated in the submissions.

195.    Former UBS Senior Yen Trader Hayes made at least 800 requests in writing, on UBS's email and chat systems, to the UBS trader-submitters for adjustments to UBS's Yen-LIBOR submissions, usually focused around the one, three and six-month tenors.  Hayes and others acting on his behalf also made similar demands for adjustments to the Euroyen TIBOR trader-submitters to benefit his and UBS's Euroyen-based derivatives trading positions. Sometimes, Hayes made requests to benefit the trading positions of other UBS Yen Derivatives Traders on the desk, if it happened that Yen-LIBOR or Euroyen TIBOR fixings would not impact his own positions.

196.    UBS's submission of false Yen-LIBOR and Euroyen TIBOR to benefit UBS derivatives traders' positions began to occur far more frequently after July 2006, when UBS hired Hayes.  Beginning in September 2006, and continuing until soon before he left UBS in September 2009, Hayes, and occasionally other UBS Yen derivatives traders, regularly requested that UBS Yen-LIBOR submitters contribute Yen-LIBOR submissions to benefit their trading books.  Hayes and his/her colleagues engaged in this conduct on the majority of total trading days during this more-than-three-year period.

197.    UBS's Yen derivatives traders' requests typically were for the one, three, and six-month tenors for Yen-LIBOR and Euroyen TIBOR. The trader-submitters on many occasions

acquiesced to those requests and made Yen-LIBOR and Euroyen TIBOR submissions with the purpose of benefiting UBS's derivative trading positions.  The requests were made over UBS's email or chat networks and additional requests were made orally by traders who sat near to or spoke by telephone with trader-submitters, with traders at other banks or with brokers.  In addition, certain trader-submitters based submissions at times on his or her own or the desk's trading positions, without consulting with anyone else.

198.    Multiple UBS traders and submitters, including Hayes's supervisor were aware of Hayes's efforts to manipulate Yen-LIBOR and Euroyen TIBOR through his internal requests to the submitters. UBS managers in Tokyo and Zurich also were aware of Hayes's requests.  The UBS managers encouraged and allowed Hayes to engage in his conduct, which ended only when he decided to leave UBS over a pay dispute.  No one involved in or aware of the misconduct reported it as wrongful to more senior management, or to UBS's compliance or legal departments.  On the contrary, some of these individuals, including Hayes's Yen Desk Manager in Tokyo, engaged in the same misconduct by making their own requests to UBS's Trader-Submitters for the manipulation of Yen-LIBOR and Euroyen TIBOR, or facilitating Hayes's requests.

199.    In making requests, Hayes at times identified the tenor and/or direction for which he sought assistance, using terms such as "low 1m" (indicating that he wanted a low submission for the Yen-LIBOR one-month tenor submission), "high 3m" (for the three-month Yen-LIBOR submission) or "unchanged."  The requests were so common that Hayes sometimes merely asked for the "usual axe on libors," meaning his typical requests.  Certain trader-submitters also understood that Hayes had a "standing order," meaning Hayes had a preference for a higher or lower submission and that this preference remained in operation for a period of several days.

Moreover, UBS trader-submitters sometimes initiated contact with Hayes to see if he needed any adjustments made to the Yen-LIBOR submissions.

200.    Hayes also sometimes emphasized to UBS's trader-submitters when one of his requests was particularly important, such as by saying he had a "big fix" or even a "massive fix." At times, Hayes was more specific, quantifying the potential benefit to UBS's derivatives position: "have 385b 6m fix today so really need it low ... half a point is 10mjpy!" As Hayes once exclaimed to the UBS Senior Yen Trader-Submitter: "**I live and die by these libors**, even **dream about them**." (Emphasis added).

201.    UBS trader-submitters regularly accommodated Hayes's requests.  In fact, one UBS Yen trader-submitter indicated that he would at times adjust his submissions by up to several basis points to accommodate the requests of Hayes.  The requests and accommodations occurred on a regular basis even after UBS had received the CFTC Division of Enforcement's demand in October 2008 for information and documents relating to UBS's U.S. Dollar LIBOR submissions.

202.    For example, on Monday, November 20, 2006, Hayes asked the UBS Yen-LIBOR submitter ("Submitter-3"), who was substituting for the regular submitter ("Submitter-1") that day, "hi . . . [Submitter-1] and I generally coordinate ie sometimes trade if ity [sic] suits, otherwise skew the libors a bit."  Hayes went on to request, "really need high 6m [6-month] fixes till Thursday."  Submitter-3 responded, "yep we on the case there . . . will def[initely] be on the high side."  The day before this request, UBS's 6-month Yen-LIBOR submission had been tied with the lowest submissions included in the calculation of the LIBOR fix.  Immediately after this request for high submissions, however, UBS's 6-month Yen-LIBOR submissions rose to the

highest submission of any bank in the Contributor Panel and remained tied for the highest until Thursday – as Hayes had requested.

203.    In early 2007, a new UBS Yen-LIBOR submitter ("Submitter-2") received training from Submitter-1, who was also a UBS manager and Yen derivatives trader.  During that training, Submitter-2 was instructed that the primary factor in determining UBS's Yen-LIBOR submissions each day was the UBS Yen derivatives traders' requests, which were to be accommodated.  Submitter-2 followed that directive, and accommodated Hayes and other UBS Yen derivatives traders' requests for LIBOR submissions through July 2009, when Submitter-2's responsibilities at UBS changed.

204.    From at least August 2007 and at various times through at least September 2009, the manager of one of the Yen derivatives trading desks in Tokyo exerted pressure on Yen-LIBOR submitters to take derivatives traders' positions into account when setting Yen-LIBOR. Yen derivatives traders routinely requested that the submitters contribute Yen-LIBOR submissions to benefit their trading books, and the submitters, in accordance with the instructions from their superiors at UBS, accommodated derivatives traders' requests.

205.    An example of such an accommodation occurred on March 29, 2007, when Hayes asked Submitter-1, "can we go low 3[month] and 6[month] pls? . . . 3[month] esp." Submitter-1 responded "ok", and then the two had the following exchange by electronic chat:

> Hayes:        what are we going to set?
>
> Submitter-1:  too early to say yet . . . prob[ably] .69 would be our
>               unbiased contribution
>
> Hayes:        ok wd really help if we cld keep 3m low pls
>
> Submitter-1:  as i said before - i [don't] mind helping on your fixings, but i'm
>               not setting libor 7bp away from the truth. . . i'll get ubs banned if i
>               do that, no interest in that.

<table>
<tbody>
<tr><td>Hayes:</td><td>ok obviousl;y [sic] no int[erest] in that happening either . . . not asking for it to be 7bp from reality anyway any help appreciated[.]</td></tr>
</tbody>
</table>

206.     Hayes received the help he requested.  Although Submitter-1's "unbiased contribution" of the 3-month Yen-LIBOR submission would have been .69 that day, he lowered his/her submission to .67, as Hayes requested.

207.     As another example, a series of electronic chats between March 12 and 17, 2008, demonstrates that Hayes caused UBS's Yen-LIBOR submission to move three (3) basis points over a five (5) day period.  On Wednesday, March 12, 2008, Hayes asked Submitter-2 to raise the 3-month Yen-LIBOR submission from the previous day's .99 contribution, because "we have [$2 million] usd fix in 3[month Yen-LIBOR] on Monday [March 17] per bp."  Submitter-2 responded: "with yesterdays 99 i was already on the very high side. i need to go down a touch lower on the back to what happened yesterday. . . thought about .97."  Trader-1 responded: "cool no chance of .98? anyway the actual fix is Monady [sic] [March 17] so that's the key day."  Although Submitter-2 had intended to drop his/her Yen-LIBOR contribution down to .97 on March 12, he instead raised his/her Yen-LIBOR submissions to .98.  The following day, he raised it again to .99, and on Monday, March 17, the following exchange occurred:

| Hayes: | been chatting with [your supervisor] . . . can we go . . . high 3[month Yen-LIBOR] . . . obviously with the size of the fix today and confusion over levels if we could push it a bit more than usual it would be great |
|---|---|
| | **** |
| Submitter-2: | Friday fixed 3mt at 0.99 |
| Hayes: | thx [Submitter-2] |
| Submitter-2: | shall I go fro [sic] 1%? |
| Hayes: | pls |

67

<div style="margin-left:2em">

Submitter-2:   ok will do

</div>

208.    As promised, Submitter-2 contributed a Yen-LIBOR submission of 1% that day, three (3) basis points higher than where he had intended to submit a few days earlier.

209.    In a March 28, 2008 electronic chat between Hayes and Submitter-2, Hayes was again successful in manipulating UBS's Yen-LIBOR submission to benefit his trading positions:

<div style="margin-left:2em">

Hayes:          just for my guide [Submitter-2] roughly wher are we going to set 3m and 6m?

Submitter-2:   3m0.92 6m 0.96

Hayes:          can we go lower?

Submitter-2:   sure . . . dont think it will be that low though . . . but can do 090

                ****

Hayes:          so can we set 6m at .94 too? . . . 6m is much more urgent . . . most urgent of the lot

                ****

Submitter-2:   i just put in 0.95 for 6mt

Hayes:          ok . . . Thx

</div>

210.    True to his/her agreement to accommodate Hayes, Submitter-2 lowered UBS's 3-month Yen-LIBOR submission from .92 to .90, and lowered UBS's 6-month submission from .96 to .95.

211.    On some occasions, UBS Yen-LIBOR submitters would also amend, if possible, previously submitted Yen-LIBOR contributions to accommodate UBS's trading positions.  For example, in an April 4, 2008 electronic chat between Hayes and Submitter-2, the following exchange occurred:

<div style="margin-left:2em">

Hayes:          have you put the [Yen] libors in?

Submitter-2:   y[es] . . . any changes?

</div>

> Hayes:          oh was going to ask high 6m if not too late
>
> Submitter-2:  i input 95 . . . which is on the lower side
>
> Hayes:          ok is it too late to change? . . . if not no drama
>
> Submitter-2:  i try to change it now but cannot gaurantee if it gets accepted
>
> *****
>
> Submitter-2:  just cahnged [sic] it to 0.98

212.    The UBS 6-month Yen-LIBOR submission that day was indeed .98, three (3) basis points higher than Submitter-2's originally intended submission.

213.    As another example, on June 29, 2009, Hayes contacted Submitter-2 by electronic chat, explaining that he had huge positions that day and asking, "can we [submit] 6 mlibor high pls."  Submitter-2 stated that based on the information he had, he would submit a 6-month Yen-LIBOR of .7150.  Hayes responded by asking, "can we go 74 or 75 [meaning .74 or .75] . . . we have [$2 million per basis point exposure] for the next week."  Submitter-2 agreed to accommodate this request, responding, "yes sure will.  I go with .75 for you[.]"  Thus, the submitter agreed to move his/her 6-month Yen-LIBOR submission by 3.5 basis points that day to benefit the derivatives trader's position.

214.    From in or around 2007 through 2009, on some occasions, UBS Yen derivatives traders also requested that UBS Euroyen TIBOR submitters contribute Euroyen TIBOR submissions to benefit their Euroyen-based derivativs positions. The TIBOR submitters' manager, Submitter-1, routinely provided suggested TIBOR submissions based on the derivatives traders' positions, and the TIBOR submitters relied upon this input when making UBS' Euroyen TIBOR submissions.

215.    For example, in a November 8, 2007 electronic chat, Submitter-1, who was also a UBS Yen derivatives trader, instructed the TIBOR submitter: "pls remind me tomorrow . . . we need to move the 1mos tibor up . . . maybe +2 tomorrow . . . then 1 bp on each for a few days . . . swap guys having some fixings."  The TIBOR submitter responded "ok, noted".

216.    As another example, on July 23, 2009, Submitter-1 caused UBS's Euroyen TIBOR submissions to decrease for a different improper purpose.  On that day, Submitter-1 had the Euroyen TIBOR submitter drop UBS's 3-month TIBOR submission by four (4) basis points simply to damage Hayes's positions, and not because that is where he perceived Yen cash was trading.  In an electronic chat with Trader-B at another Contributor Panel bank, Hayes explained how he would rectify the situation by manipulating TIBOR settings higher the following week: [Submitter-1, who caused TIBOR to drop] hates me and is going to zurich . . . [his/her] last day is Friday . . . so [s/he] tried to screw my pos[ition] . . . next week we have control . . . so will try to get it back up . . . or rather will do it . . . monday goes back up…."

217.    Later that same day, in a separate electronic chat with an interdealer broker who handled transactions for Hayes ("Broker-A1"), Hayes described how he successfully reached out to the UBS TIBOR submitters to raise UBS's 3-month submission back up:

<u>Hayes</u>:          main thing is 3m tibor . . . i went to meet the guys who set it today

<u>Broker-A1</u>:   you can asist there

<u>Hayes</u>:          they just set where we ask

<u>Broker-A1</u>:   ;-) perfect

i.     **UBS Continued Its Manipulation of Yen-LIBOR, Euroyen TIBOR and the Prices of Euroyen-Based Derivatives After Hayes Left UBS for Defendant Citigroup.**

218.     Traders on the UBS Yen Desk continued to manipulate Euroyen TIBOR, Yen-LIBOR, and the prices of Euroyen-based derivatives to benefit UBS's derivatives trading positions after Hayes left UBS in September 2009.  These traders utilized some of the same methods—internal requests, use of interdealer brokers and coordination with other banks.  At least one broker reached out shortly after Hayes's departure to assure a UBS Yen Derivatives Trader that he would continue to help UBS influence how the rates were submitted by other banks.  For example, on September 10, 2009, UBS Yen Trader 2 reminded Derivatives Broker A1 at Broker Defendant ICAP that "Monday is the d-day" due to big fixes on swap transactions tied to three and six month LIBOR, both of which he needed low.  Derivatives Broker A1, who by then was deeply experienced with the manipulative scheme, assured the Yen Trader 2 that they could influence the three-month fix, and that he stood ready to help:

> "... you realise that you have the ability to influence the 3m fix, you are currently sitting at the upper end of the range. The 6m will have to come down to others as you are already v low .. .i'll remind you to chase your cash boys as well:-)"

219.     UBS Yen Trader 2 also reached out for help to Derivatives Broker B1 at Broker Defendant R.P. Martin, who similarly reassured him that he regularly spoke to at least seven other panel bank submitters and he would try to help Yen Trader 2, if he needed the help.

220.     The UBS Yen Derivatives Traders, on their own and at the direction of the Yen Desk Manager, also continued to manipulate Yen-LIBOR, Euroyen TIBOR and the prices of Euroyen-based derivatives through UBS's submissions in order to manage Hayes's positions or to benefit other UBS Euroyen derivatives trading positions.

b.     **RBS.**[6]

221.    From mid-2006 through late 2010, multiple RBS Yen traders and at least one manager attempted to manipulate Yen-LIBOR by making hundreds of requests of RBS's Primary Submitter and London-based traders, including RBS Yen Traders 1 and 2. At times, they were successful in manipulating Yen-LIBOR. RBS's Senior Yen Trader made most of the requests, but RBS's Yen Manager and other RBS Yen traders also made such requests. London-based Yen derivatives traders also made their own requests of RBS's Primary Submitter, both in person as they sat together, and through Bloomberg chats and other means. RBS's derivatives traders' requests for artificial Yen-LIBOR submissions were common and made openly on the trading floors in Asia and London. At times, at least one RBS manager was present when requests were made.

222.    The requests were often accommodated by RBS's Primary Submitter and by RBS's backup submitters, including most often RBS Yen Trader 1 when he was the backup. Yen derivatives traders' requests for beneficial submissions were usually for the most frequently traded tenors: one-month, three-month, and six-month. At times, the requests covered other tenors as well. Always seeking to maximize profit, the traders either asked for specific rates to be submitted or asked for a directional move, either higher or lower, in RBS's submissions. The requests were either for a particular day or for several days, and on some occasions, even weeks of submissions.

223.    Starting as early as August 2006, a Yen derivatives trader in Japan (employed by Defendant RBSSJ) sent requests for favorable Yen-LIBOR submissions to a Yen derivatives

---

[6] *See also* Ex. B-4, pp. 8-18.

trader in London, who in turn sometimes indicated he would seek accommodations from Submitter-1.

224.     Starting in early 2007, RBS derivatives traders made more frequent requests for manipulations of the Yen-LIBOR submission in order to benefit their trading positions. This increase in 2007 began shortly after Trader-1 (employed by RBSSJ until December 2009) in Tokyo began working with Trader-2 in London on the Yen derivatives book, and Trader-3 joined the Yen derivatives swaps desk in London.

225.     Trader-1 and Trader-2 would often discuss their need for Yen-LIBOR in a specific tenor to move in a particular direction on a specific day or over a period of days to benefit a Yen derivatives trading position, and Trader-2 generally would pass on the request to Submitter-1.

226.     Trader-1 sometimes passed his requests through other money market traders.  For example, in an electronic chat on May 3, 2007, Trader-1 asked a junior derivatives trader who acted as a backup Yen-LIBOR submitter, "can you do me a favour? ..can you drop a note to [Submitter-1] (JPY money mkt dealer) to set low lm and low 3m Yen-LIBOR today please? Thanks."  The junior backup submitter responded, "just gave him a shout, said already on it..."

227.     Trader-2 also served as a backup Yen-LIBOR submitter during times when Submitter-1 was away from the desk, and made Yen-LIBOR submissions to benefit derivatives trading books.  Thus, for example, on August 20, 2007, Trader-1 noted in an electronic chat that "[Trader-2] is the one setting jpy [Yen] libor in london now ..for this week and next."  The reason was that "[Submitter-1] is on leave."  The next day, another Tokyo-based derivatives trader, Trader-4, asked "where's young [Trader-2] thinking of setting it?"  Trader-2 responded, "where would you like it," then "libor that is," then "same as yesterday is call."  Trader-4 said,

"haha, glad you clarified ! mixed feeling but mostly I'd like it all lower so the world starts to make a little more sense."  Trader-1 then weighed in, observing that "the whole HF world will be kissing you instead of calling me if libor move lower."  Trader-2 responded, "ok, i will move the curve down …1 bp…maybe more…if i can."  Trader-1 suggested that the time to move was not now: "maybe after tomorrow fixing hehehe."  Trader-2 responded, "fine…will go with same as yesterday then."

228.    At times, derivatives traders who had different trading books and conflicting interests in the direction of Yen-LIBOR competed for submissions.  On March 27, 2008, for example, Trader-1 and Trader-2 expressed frustration that Trader-3, another Yen derivatives trader based in London, attempted to influence RBS's LIBOR submission.  Trader-1 asked Trader-2, "we change the libor lower?," to which Trader-2 responded, "i was in a novation meeting and [Trader-3] asked [a junior Yen derivatives trader serving as a backup Yen-LIBOR submitter] to put it low."  Trader-1 opined that "[Trader-3] shud have just [squared] it with us if he need it lower...cos i dont think they have as big position as us next few weeks...i dont think [Trader-3] or the long end guys shud ever touch the libor...they shd check with us."  Trader-2 responded, "i know," and Trader-1 complained that "thats probably gonna cost us 200k gbp."

229.    Later in the same March 27, 2008 electronic chat, Trader-1 and Trader-2 discussed their need to increase Yen-LIBOR the next day to benefit their trading position:

| Trader-1: | tomorrow we need to bump it [6-month LIBOR] way up high ..  highest among all if possible |
|---|---|
| | * * * * |
| Trader-1: | we need to bump up all the way in the 3mth libor tomorrow as well |
| Trader-2: | we will put it in tonmorrow morning and no one will touch it i promise you. |

230.    The next day, RBS increased its 3-month Yen LIBOR submission by three basis points, making it the second-highest submission, and increased its 6-month submission by five basis points, making it the third-highest submission.

231.    On at least one occasion, an RBS Yen derivatives trader recognized that it might be necessary to have an excuse for manipulating RBS's Yen-LIBOR contributions that day.  On August 28, 2008, Trader-2 asked Trader-1, "where shall we put libors."  Trader-1 responded, "high 3m ... low 6m."  They then discussed the 1-month LIBOR submission.  Trader 2 said, "1s?", to which Trader-1 responded: "low . . . so we dont need to change 1 today . . . pretend we forgot . . .we can change it tomorrow . . . assuming no one else in bank has any position in 1s."  RBS kept its 1-month Yen-LIBOR submission unchanged that day, tying it for the third lowest of all Contributor Panel Banks.  And, consistent with Trader-1's request, RBS's 3-month Yen-LIBOR submission increased by two basis points, and its 6-month Yen-LIBOR submission declined by one basis point.

232.    Trader-1 and Trader-2 on occasion passed their requests to Submitter-1 for Yen-LIBOR contribution levels through a junior derivatives trader, Trader-5, who worked on the Yen desk in London under Trader-2.  For example, on April 24, 2009, Trader-5 asked Submitter-1, "Can we go with high 3s and high 6s plz today."  Submitter-1 responded, "they are lookingh bit softer, but will try and keep ours unch."[7]  Trader-5 responded, "thnx."  RBS's 3-month and 6-month Yen-LIBOR submissions on that day were unchanged from the day before, and both were above the actual Yen-LIBOR fix.

233.    On another occasion, in an electronic chat on September 23, 2009, Trader-1 said to Trader-5, "hey... can you ask [Submitter-1] if he can lower his 3mth Libor by 1 bp today?  and

---

[7] In the context of the RBS chats, "unch" appears to mean that the LIBOR would be unchanged from the previous day.

everything else unchange."  Trader-5 responded, "yes," then "asking," and finally, "agreed."  On that day, RBS lowered its 3-month Yen-LIBOR submission one basis point compared to the previous day.

234.    On another occasion, on April 22, 2009, Trader-2 asked Submitter-1 in an electronic chat, "can we push up 6m again pls?"  Submitter-1 responded, "ok will try."  Trader-2 then asked, "what do you think we can go for?,"  to which Submitter-1 responded, "77."  That day, RBS's 6-month Yen-LIBOR submission increased by one basis point to 0.77, making RBS the highest submitter among the eight banks included in that day's Yen-LIBOR fixing.  RBS also had increased this submission one basis point on the previous day.

235.    Requests for favorable Yen-LIBOR submissions were often treated in a routine, even casual, manner.  One example is a May 20, 2009 exchange in an electronic chat involving Trader-2 and Submitter-1, among others:

> Trader-2:          high 3s and low 6s pls [Submitter-1]
>
> Submitter-1:      no problems
>
> Trader-2:          grazias amigo . . . where will you lower 6s to?
>
> Submitter-1:      70

236.    RBS's 6-month Yen-LIBOR submission on May 20th dropped two (2) basis points from 0.72 (where it had been the preceding two days) to 0.70, and on the following two days it reverted to 0.72.

237.    A second example is an electronic chat dated September 15, 2009, in which Trader-2 asked, "can we lower our fixings today please [Submitter-1]."  Submitter-1 responded, "make your mind up," then "haha, yes no probs."  Trader-2 stated, "im like a whores drawers."

RBS lowered its 3-month and 6-month Yen-LIBOR submissions on that day, and kept its 1-month submission the same.

238.    The requests from Trader-1 and Trader-2 continued throughout 2010.  For example, on July 20, 2010, Trader-1, in an electronic chat with Trader-2, asked, "can you ask [Submitter-1] to set 6m JPY higher today? 45 would be good..."  Trader-2 responded, "yes i did" and "he will bump it up a point."  On that day, RBS's 6-month Yen-LIBOR submission increased from 0.44 to 0.45.

239.    By at least September 2010, certain RBS Yen derivatives traders became aware of a prohibition on communicating about requests for LIBOR submissions.  On September 24, 2010, in an electronic chat involving Trader-1, Trader-2, and Trader-5, among others, Trader-1 initiated a request by stating, "hey [Trader-2], can you ask [Submitter-1] to push 6m Yen-LIBOR up 2 bps to 44."  Trader-2 responded, "ha . . . i will mention it ... no emails anymore . . . after tom." [8]  Trader-1 replied, "haha...i heard he called up BBA to ask them to change the way they fix the libor."

240.    A month later, on October 28, 2010, Trader-1, in an electronic chat with Trader-2, indicated that he would make his request orally rather than in an electronic communication "after the tomhayes thing":

| | |
|---|---|
| Trader-1: | it would help if [Submitter-1] hike up 1 bp today |
| Trader-2: | i try, after the tomhayes thing its more difficult . . . i feel the more i ask the more he wont . . . out of principal |
| Trader-1: | true |
| Trader-2: | cos i cant type it on chat anymore . . . i have to walk over |

---

[8] The context of the remainder of the electronic chat suggests this is a reference to former UBS Trader Tom Hayes.

241.   In a November 22, 2010, electronic chat, Trader-1 and Trader-2 discussed their view that they should take over submitting Yen-LIBOR on behalf of RBS:

| | |
|---|---|
| <u>Trader-1</u>: | actually we shd just take over the libor setting |
| <u>Trader-2</u>: | hahaha |
| <u>Trader-1</u>: | doesnt make sense for him [Submitter-1] cuz he doesnt have any risk |
| <u>Trader-2</u>: | i agree |
| <u>Trader-1</u>: | [A manager in Singapore] question today why [Submitter-1] sets it when he doesnt even have any risk |
| <u>Trader-2</u>: | but libor i guess technically isnt meant to be set by risk takers |
| <u>Trader-1</u>: | yes but why give it away the advantage? |

242.   Earlier in that same electronic chat, Trader-1 and Trader-2 indicated they were aware that LIBOR was coming under scrutiny, yet they continued to discuss how Yen-LIBOR levels could be manipulated for their benefit:

| | |
|---|---|
| <u>Trader-1</u>: | hey ... you think we be able to convince [Submitter-1] to change the libor today? |
| <u>Trader-2</u>: | i can try |
| <u>Trader-1</u>: | need to drop 3mth Libor and hike 6m Libor |
| Trader-1: | he dropped 6m by 2 bps last friday |
| <u>Trader-2</u>: | at the moment the FED are all over us about libors |
| <u>Trader-1</u>: | thats for the USD? |
| <u>Trader-2</u>: | yers |
| <u>Trader-1</u>: | dun think anyone cares the Yen-LIBOR |
| <u>Trader-2</u>: | **not yet** |

78

(Emphasis added).

243.   In 2010, after RBS began an investigation into U.S. Dollar LIBOR reporting practices in response to inquiries from governmental authorities, the head of money market trading in London instructed other money market traders that they were not to accept requests for LIBOR submissions from derivatives traders.  Nonetheless, on November 24, 2010, after Trader-1 sent an electronic message to Submitter-1 asking to increase the 6-month Yen-LIBOR submission to suit a trading position, Submitter-1 called Trader-1 and stated that "we are not allowed to have those conversations on Mindalign [RBS's Internal Electronic Chat System]." Trader-1 referenced "the BBA thing," after which Submitter-1 stated, "leave it with me and, uh, it won't be a problem. . ."  Trader-1 responded, "ok, great."

### c.   **Rabobank.**[9]

244.   For nearly six years, from at least mid-2005 through at least early 2011, Rabobank, through its submitters and traders, frequently attempted to manipulate Yen-LIBOR and the prices of Euroyen-based derivatives and consistently made false submissions in furtherance of those attempts.  At times, Rabobank successfully manipulated Yen-LIBOR. Several Rabobank traders transmitted hundreds of internal requests to its Yen-LIBOR submitters for preferential (false) LIBOR submissions to benefit the traders' (and Rabobank's) LIBOR-based trading positions.  The submitters accommodated those requests on a regular basis and certain submitters also took into account their own trading positions when making LIBOR submissions.

245.   For example, on October 11, 2006, a Yen-LIBOR trader ("Trader-4") emailed Rabobank's Yen-LIBOR submitter ("Submitter-4") with the subject line: "3mths."  In the email,

---

[9] *See also* Ex. D-2, pp. 12-20, 24-33.

Trader-4 wrote: "If in 2 minds on 3mth yen libor today, prefer u to go higher rather than lower mate if you've got ntg in it."  Submitter-4 replied: "no prob mate...what u want me to set mate 43?....44?"  Trader-4 wrote back: "0.44 if you can keep a straight face.."  Submitter-4 responded: "no prob mate 44 it is!"  That day, as requested, Rabobank's 3-month Yen-LIBOR submission was 0.44, an increase of one basis point.  Rabobank's submission went from being tied as the fifth highest submission on the Contributor Panel on the previous day to being tied as the second highest submission on the Contributor Panel.

246.    Two weeks later, on Wednesday, October 25, 2006, Trader-4 emailed the backup Yen-LIBOR submitter ("Submitter-5) with the subject line: "libors."  In the email, Trader-4 wrote: "I have a few chunky rolls in the 3 mth yen libors in the next few days. I don't want to compromise your integrity., but if you've got ntg in it maybe a smidge lower today (actually shud be anyway as futures are a abt 1 higher anyway) and then high for Thurs and Fri would be great then I will be back in my box for another 2 weeks."  Submitter-5 responded: "sure no problem mate if you have a sec can i have the lvls plse."  That day, Rabobank's 3-month Yen-LIBOR submission was consistent with Trader-4's request, decreasing one basis point from 0.45 to 0.44, whereas the rest of the Contributor Panel stayed approximately the same on average. Rabobank's submission went from being tied as the fourth highest submission on the Contributor Panel on the previous day to being tied as the twelfth highest submission on the Contributor Panel.  On the next day, Thursday, October 26, 2006, Rabobank's contribution was again consistent with Trader-4's request, increasing one (1) basis point, from 0.44 to 0.45, whereas the rest of the Contributor Panel either remained unchanged or decreased their submissions. Rabobank's submission went from being tied as the twelfth highest submission on the Contributor Panel to being tied as the second highest submission on the Contributor Panel.  The

next day, Friday, October 27, 2006, Rabobank's contribution was again consistent with Trader-4's request, remaining at 0.45, whereas the rest of the Contributor Panel decreased its submissions by an average of approximately half a basis point.  Rabobank's submission remained tied as the second highest submission on the Contributor Panel.

247.    Two weeks later, on November 8, 2006, Trader-4 wrote to Submitter-4: "Got a few big 3mth fixings in next 2 days, any chance you cud bump it up a couple?  What do u actually think 3mth today 45.25-45.5 ish?"  Submitter-4 wrote back: "will set them high and dry skip!"  The next day, Trader-4 wrote back: "Thx skip, 1 more today - only has to be 3 mths, others do as you pls, then im relatively square for a while.." Submitter-4 replied: "no prob mate will set it high again...is 46 lvl ok or higher?"  On both days, Rabobank's 3-month Yen-LIBOR submissions were consistent with Trader-4's request.  On November 8, 2006, Rabobank's submission was 0.46, an increase of three (3) basis points from the previous day's submission, whereas the rest of the Contributor Panel stayed approximately the same on average. Rabobank's submission went from being tied as the second lowest submission on the Contributor Panel on the previous day to being tied as the third highest submission on the Contributor Panel. On November 9, 2006, Rabobank's submission was again 0.46, keeping Rabobank's submission tied as the third highest submission on the Contributor Panel.

248.    Requests were regularly accommodated by multiple Yen-LIBOR submitters on the desk, and when one submitter on the desk was out, swaps traders knew to make their requests to substitute submitters to ensure that their requests would be accommodated.  For example, on February 9, 2007, Trader-4 emailed Submitter-4 with the subject line: "3 mth libors."  In the message, Trader-4 wrote: "Mate, be great if you could keep your 3 mth libor unchanged today if you can get away with it and its ok with your posy.  Submitter-4 replied: "you need a high one?

no prob skip." Trader-4 wrote back: "Yes pls mate, my only major fixing for a while, cheers." Submitter-4 replied: "off next week mate so if u need any libor requests next week -give [Submitter-5] a shout." That day, as requested, Rabobank's 3-month Yen-LIBOR submission was 0.55, the same as the previous day, tied as the highest submission on the Contributor Panel. The next week, on February 14, 2007, Trader-4 wrote to Submitter-5 with the subject line "6m yen libor," and asked: "Can you keep your 6m yen libor at 0.62 today if poss as have a large fixing today?" Submitter-5 wrote back: "sure will do mate." That day, as requested, Rabobank's 6-month Yen-LIBOR submission remained at 0.62. Rabobank's submission went from being tied as the third highest submission on the Contributor Panel on the previous day to being the highest submission on the Contributor Panel.

249.    In addition to accommodating swaps trader requests, Rabobank Yen-LIBOR submitters also took their own Euroyen-based derivatives trading positions into account. When multiple Rabobank swaps traders had trading positions that conflicted with each other, submitters had to balance competing requests. For example, on Monday, March 26, 2007, Trader-4 emailed Submitter-4: "On libors, this week have a fair bit of 6mths rolling off, I am short so if you can discreetly drop your 6m by 1-2 bp without any trouble would be great - if not no probs mate" and "Im happy for you to keep your 1 mth high as both [another Yen swaps trader ("Trader-5")] and I are long a fair bit of those till Wed." Submitter-4 wrote back: "sure no prob - all my stuff is mainly 1 mth so will keep that high and drop 6's cheers." On Tuesday, March 27, 2007, as requested, Rabobank's 6-month Yen-LIBOR submission decreased two basis points, from 0.74 to 0.72. Rabobank's submission went from being tied as the second highest submission on the Contributor Panel on the previous day to being tied as the eighth highest submission on the Contributor Panel. Likewise, Rabobank's 1-month Yen-LIBOR submission

decreased three (3) basis points, whereas the other panel banks' submissions decreased by approximately four and three-quarters (4-3/4) basis points on average.  As a result, Rabobank's submission went from being tied as the second highest submission on the Contributor Panel on the previous day to being tied as the highest submission on the Contributor Panel.

250.   Rabobank's Yen-LIBOR submitters accommodated swaps traders' requests to the point of allowing the swaps traders significant influence over the setting process, particularly Trader-5, who made regular requests to Rabobank's London-based Yen setters.  For example, on August 21, 2007, Trader-5 emailed Submitter-5 with the subject line "LIBORS" and asked: "If you can make 1 month LIBOR higher today, that would be a help mate."  Submitter-5 replied: "Ok what level you looking at ?"  Trader-5 wrote back: "If possible, woud prefer it to be 0.82%." Submitter-5 wrote back: "Ok mate will do."  Trader-5 then wrote: "Thank you for help mate. What do you guess tdy's 3m ad 6m yen libors?  Higher or lower?"  Submitter-5 responded: "Hahah you tell me I m not really watching the yen libors all my stuff going a bit mad at mom.""  Trader-5 later asked: "Where are you setting 3mth and 6mth libor today?"  Submitter-5 repeated: "You tell me what you want mate he has no fixing at mom."  Trader-5 responded: "Im 0.82," "3m 1.00," "6m 1.06:" "If you can put those rates,,,, would be nice mate."  Submitter-5 then offered:  "**Great will do if you want to give me them each day ill input whatever you want mate ok cheers.**"  (Emphasis added).  That day, as requested, Rabobank's 1-month Yen-LIBOR submission was 0.82, an increase of four (4) basis points.  Rabobank's submission went from being tied as the eleventh highest submission on the Contributor Panel on the previous day to being tied as the second highest submission on the Contributor Panel.  Likewise, as requested, Rabobank's 3-month Yen-LIBOR submission was 1.00, and its 6-month Yen-LIBOR submission was 1.06.

251.    As another example, on August 24, 2007, Trader-5 emailed Submitter-5 with the subject line "libors" and stated: "I would like today's 6m libor lower today mate," to which Submitter-5 replied:  "Ok mate what level do you want mate."  Later that day, Trader-5 emailed Submitter-5 again and asked: "What rate did you input for libors?"  Submitter-5 responded: "Himmate I have not done them what do u want."  Trader-5 wrote back: "1m 0.78," "3m 0.99," "6m 1.00." Later that day, after the Yen-LIBOR submissions and fixing had been published, Trader-5 replied again: "Ops... Sorry that I meant 6m is 1.10.... Not 1.00%.  Just bit surprised when I saw our 6m libor price."  That day, as requested, Rabobank's 1-month Yen-LIBOR submission was 0.78, and its 3-month Yen-LIBOR submission was 0.99.  Rabobank's 6-month Yen-LIBOR submission was 1.00, consistent with Trader-5's mistaken request, a fifteen (15) basis point decrease from the previous day's submission, whereas the other panel banks' submissions decreased by approximately half a basis point on average.

252.    Rabobank's Yen-LIBOR submitters knew their Yen-LIBOR submissions were false.  For example, on September 21, 2007, Trader-5 emailed Submitter-4 with the subject line "libors," writing: "Wehre do you think today's libors are?  If you can, I would like lmth libors higher today."  Submitter-4 replied: "Bookies reckon lm sets at .85."  Trader-5 wrote back: "I have some fixings in 1 mth so would appreciate if you can put it higher mate."  Submitter-4 replied: "No prob mate let me know your level." Trader-5 responded: "Wud be nice if you could put 0.90% for lmth cheers."  Submitter-4 wrote back: "Sure no prob. I'll probably get a few phone calls but no worries mate!"  Trader-5 replied: "If you may get a few phone calls then put 0.88% then." Submitter-4 responded: "**Don't worry mate – there's bigger crooks in the market than us guys**!"  (Emphasis added). That day, as requested, Rabobank's 1-month Yen-LIBOR submission was 0.90, an increase of seven basis points from its previous submission,

whereas the other panel banks' submissions decreased by approximately a half (1/2) of a basis point on average. Rabobank's submission went from being tied as the tenth highest submission on the Contributor Panel on the previous day to being the highest submission on the Contributor Panel.

253.     Similarly, on October 17, 2008, Trader-5 emailed Submitter-4, and asked: "If possible, could you keep setting 6m libor at 0.80% for a while please?"  Submitter-4 wrote back: "Hi mate - oh yes - we are now setting all libors significantly under the market levels."

254.     On March 19, 2008, Trader-5 emailed Submitter-4 with the subject line "LIBORs," and wrote: "We have loads of 6mth fixings today.  If possible, could you set 6m libor to 1.10% please?  We don't have particular interest in other libors."  Submitter-4 wrote back: "Sry just to confirm 6m you want at 1.10??? Ok will do that but I will prob get a phone call at I set 02 yesterday and brokers reckon everything a little lower today," continuing:  "But will set your level cheers." Trader-5 wrote back: "Actually,,, [another Yen Trader and Trader-5's supervisor ("Trader-6")] would like 6m to be higher today.... If it is not appropriate, it is fine mate, I will explain the situation to him.  He will understand the situation.  He is on holiday today.  He just called me up in this morning to ask you to put libors higher."  Submitter-4 replied: "**Well its no prob mate -1 can set it that high, it will be quite funny to see the reaction!**" (Emphasis added).  Trader-5 wrote back: "I felt that it was a little funny so,,,, if you can put a little higher 6mth up to the lvl you feel comfortable, lbp or a couple of bp would be fine for him mate."  Submitter-4 wrote back: "No worres mate - I'll set it at 1.10…"  That day, as requested, Rabobank's 6-month Yen-LIBOR submission was 1.10, an increase of eight basis points from its previous submission of 1.02, whereas the other panel banks' submissions decreased by approximately a third of a basis point on average.  Rabobank's submission went

from being tied as the tenth highest submission on the Contributor Panel on the previous day to being the second highest submission on the Contributor Panel.

255.    Submitter-3, who supervised the Yen-LIBOR submitters in addition to the U.S. Dollar LIBOR submitters, was aware of the conduct on the desk he supervised and played an active role in it.  As an example, on March 14, 2007, Trader-4 messaged Submitter-3 and asked: "Is [Submitter-5] in mate?"  Submitter-3 replied: "Not yet," and asked: "can I help ?"  Trader-4 wrote back: "No worries mate, I think [Submitter-4] just wanted him to nudge up a few of the LIBORs.. Will send him a mail."  Submitter-3 replied: "Ok cc [additional individual] and [Submitter-1] on it aswell mate, just in case."  Trader-4 replied: "I got hold opf [Submitter-5] mate and he said all in hand, cheers."

256.    In January 2009, new submitters took responsibility for setting LIBOR with limited knowledge of the process and without training.  As a result, Trader-5 began to exercise even more control over the LIBOR setting process. As an example, on January 28, 2009, Trader-5 emailed the new Yen-LIBOR submitter ("Submitter-6"): "Could you set todays libors,,,3mth at 0.65% 6mth at 0.83% pls?"  Later, Trader-5 emailed Submitter-6 again: "If you haven't set 6m libor yet,,, could you set it at 0.82% instead of 0.83% pls? 3mth is ok with 0.65%o."  That day, as requested, Rabobank's 3-month Yen-LIBOR was 0.65.  Likewise, as requested, Rabobank's 6-month Yen-LIBOR submission was 0.82, a decrease of eight basis points from its previous submission, whereas the other panel banks' submissions stayed approximately constant on average.  Rabobank's submission went from being tied as the fourth highest submission on the Contributor Panel on the previous day to being tied as the eleventh highest submission on the Contributor Panel.

257.     After January 2009, Trader-5 would frequently send an entire slate of LIBOR rates to the submitters for them to input.  For instance, on February 25, 2009, Trader-5 wrote to Submitter-6 with the subject line "libors" and wrote: "Could you set libors for today as below please?": "1m 0.39;" "2m 0.60;" "3m 0.65;" "4m 0.71;" "5m 0.76;" "6m 0.80."  The next day, he wrote again to Submitter-6 with the subject line "libors" and wrote: "Could you put the below libors for today pls?": "lm 0.55%;" "2m 0.60%;" "3m 0.65%;" "4m 0.71%;" "5m 0.76%;" "6m 0.80%."  On both days, Rabobank's Yen-LIBOR submissions were made as requested.

258.     Submitters would often seek out Trader-5's input in the setting process.  For instance on January 30, 2009, Submitter-6 messaged Trader-5: "any preferences in fixings today?"  Trader-5 wrote back: "6m 0.82% pls," to which Submitter-6 responded: "will do." That day, as requested, Rabobank's 6-month Yen-LIBOR submission was 0.82, a decrease of three basis points from its previous submission, whereas the other panel banks' submissions decreased by approximately a basis point on average. Rabobank's submission went from being tied as the eighth highest submission on the Contributor Panel on the previous day to being the eleventh highest submission on the Contributor Panel.

259.     Trader-5 monitored Rabobank's Yen-LIBOR submissions and would follow up with the submitters on the occasions when their submissions strayed from his requests. 'For example, on January 30, 2009, Trader-5 emailed Submitter-6 and wrote: "Why did you moved up 3m libor by 10.5bp?  It is ridiculous."  Submitter-6 wrote back: "had again problems with publishing from my sheet," "Wrong figure came across by putting in manual adjustments," "Gonna automatize it today." Trader-5 wrote back: "3m libor could have been below 0.67 if we, Rabo, didn't moved up by 10.5bp!" Submitter-6 responded: "They didn't call from reuters why we were 10.5 tics out which they should have done," continuing: "And they take the outliers out

of their calculations, so the 76.5 price shouldn't be included." Trader-5 explained: "If we have

stayed at 0.66% instead of 0.765, then the 3mth libor should have been 0.668125% instead of

0.67063%. so it is below 0.67%."

260.    On October 18, 2010, Trader-5 emailed Submitter-6's replacement as the Yen-

LIBOR submitter ("Submitter-8") and wrote: "**Why did you put all the Yen-LIBORs higher**

**for today without telling me?  Where is the team play?**  You know my position is? I cant

believe you did this without telling me.  If you had to put them higher for some reason but at

least you could have told me in before hand.  Im really fukked."  (Emphasis added). At around

the same time, Trader-5 messaged Submitter-8: "why did you put libors all higher?" Submitter-8

wrote back: "Hi made I just saw your email and replied.. I fukked up., you gave [the new back-

up Yen-LIBOR submitter ("Submitter-7")] new libors last week., didn't save the sheet and today

I used my own computer for libors..  I fukked up, my mistake., not on perpose mate," "I am

really sorry,"  "And I would never change libors without consulting you."  Trader-5 messaged

back:  "i got so surprised when i saw rabos number, you know my position then put libors

higher," explaining: "some ppl react in this way so i worried as well if you were this kind of a

guy."

261.    At times, Trader-5 made clear to the setters that the purpose of affecting

Rabobank's Yen-LIBOR submission was to affect the final Yen-LIBOR fix.  For example, on

January 29, 2009, Submitter-6 messaged Trader-5 and wrote: "saw the 6m vs 3m basis

collapsing last night.."  Trader-5 wrote back: "because we lowered 6m libor !"  Submitter-6

responded: "heheh absolutely., it comes ur way i presume," and later: "preferences in the fixing

today?"  On October 20, 2010, Submitter-8 chatted with Trader-5, writing: "so whats the reason

that you dont put down Rabo Yen libor numbers? just one tick to see what happens? Or is that

sort of manipulation and not done?  or am I saying something stupid now?"  Trader-5 responded:

"Rabo Yen-LIBOR numbers are already one of the lowest four banks among 16 panel banks so

even if we put them lower further, it wouldnt give any change on yen libors," to which

Submitter-8 replied: "I see.."  Trader-5 then wrote: "and i think just keep libors one of the lowest

four banks is the good, idea because it isnt obvious so that ppl wouldnt notice, **if it is too**

**obvious, ppl could start looking at us manipulating libors**."  (Emphasis added).

262.     Trader-5 had almost complete control over the Yen-LIBOR setting process at

Rabobank after Rabobank's LIBOR submitters moved to Utrecht in January 2009.  For instance,

on August 4, 2009, Trader-5 asked Submitter-7: "have you put todays libors?" Submitter-7 wrote

back: "nope you can set them if you like."  Trader-5 wrote back: "just sent it out now. thank

you."  On June 12, 2009, Trader-5 messaged Submitter-7: "i sent a email about LIBORs... did

you get it?"  Submitter-7 wrote back: "i will input them," to which Trader-5 responded: "thank

you for your help!"  In fact, Trader-5's control of the process was so significant that after

Rabobank prohibited swaps traders from communicating about LIBOR rate setting with

submitters on November 30, 2010, Trader-5 explained to a broker: "Till two weeks ago I was

seting libors for rabo but due to BBA investigation someone out side of europe shudnt have any

influence of libors then I cudnt be involved in libors after then."[10]

263.     Trader-5's own supervisor, and the head of Rabobank's Yen derivatives desk in

Tokyo, Trader-6, was also aware of and intimately involved in Trader-5's conduct, directing

requests to submitters through Trader-5 to benefit Trader-6's trading positions.  For example, on

October 8, 2008, Trader-5 emailed Submitter-4 with the subject line "Todays libors..." writing:

"If is it ok,,, [Trader-6] would like todays 6m libor at 1.10%.  Thank you very much for help."

---

[10] Even after Trader-5 was instructed not to influence Rabobank's Yen-LIBOR submissions, on occasion he
accepted solicitations by brokers to attempt to influence Yen-LIBOR submissions at other Contributor Panel Banks.

Submitter-4 wrote back: "Ok skip."  That day, as requested, Rabobank's 6-month Yen-LIBOR submission was 1.10, a decrease of ten (10) basis points from its previous submission, whereas the other panel banks' submissions increased by approximately one and three-quarters (1-3/4) basis points on average.  Rabobank's submission went from being tied as the fifth highest submission on the Contributor Panel on the previous day to being tied as the twelfth highest submission on the Contributor Panel.

264.    Likewise, on July 24, 2008, Trader-5 wrote to Submitter-4: "As for the today's libors.  Could you set 6m at 0.97% please? [Trader-6] has big fixings over the next couple of weeks so that it would be nice if you could keep it as low as possible for some time."  Submitter-4 responded: "Will do mate."  That day, as requested, Rabobank's 6-month Yen-LIBOR submission was 0.97, a decrease of three (3) basis points, whereas the other panel banks' submissions stayed approximately constant on average. Rabobank's submission went from being tied as the sixth lowest submission on the Contributor Panel on the previous day to being tied as the second lowest submission on the Contributor Panel.

265.    In a call on July 25, 2008, Trader-6 told a third party at another financial institution: "Sometimes if you want the LIBOR to be set, if you want today's LIBOR at a certain price, your desired number [would be achieved]."  After the third party replied: "Really?" Trader-6 explained: "Well, we are the ones who set [the LIBOR]."  Trader-6 continued: "The recent 97 had been set at 97 due to my wishes," explaining: "That is obviously ... that's a little bad ...  **Well, anyway, the person with the strongest wishes gets to decide it [LIBOR]**.  Well, this is the way it is."  (Emphasis added).

266.    On occasion, other traders on Trader-6's desk made requests when Trader-5 was absent.  On May 25, 2009, Submitter-6 forwarded Trader-5's out-of-office message to the junior

trader on Trader-5's desk ("Trader-8").  Trader-8 wrote back: "What can I help you ??"

Submitter-6 responded: "Normally [Trader-5] sends us his preferences for the JPY [Yen] libors.

If you have any let me know."  Trader-8 wrote back: "We don't have any special requests for

libors today."  The next day, Trader-8 replied again: "About libors.. Same as last Friday pls. if no

particular int from others."

267.    On occasion, Trader-6 also made requests directly to Rabobank's Yen-LIBOR

submitters.  For example, on August 4, 2008, Trader-6 messaged Submitter-4:  "Please set

today's 6mth LIBOR at 0.96," continuing: "I have chunky fixing....  Thanks for your help," to

which Submitter-4 replied: "No worries mate."  That day, as requested, Rabobank's 6-month

Yen-LIBOR submission was 0.96, a decrease of three basis points, whereas the other panel

banks' submissions stayed approximately constant on average.  Rabobank's submission went

from being tied as the fourth lowest submission on the Contributor Panel on the previous day to

being the second lowest submission on the Contributor Panel.  Two days later, on August 6,

2008, Trader-6 messaged Submitter-4 again: "I have another side of fixing today and tomorrow,"

continuing: "can we make 6mth LIBOR at 0.98?"  Submitter-4 wrote back: "Ok higher?...sure

thing."  Trader-6 responded: "Yes, only today and tomorrow...thanks."  That day, Rabobank's

6-month Yen-LIBOR submission was even higher than requested, 1.00, an increase of four basis

points, whereas the other panel banks' submissions stayed approximately constant on average.

Rabobank's submission went from being the second lowest submission on the Contributor Panel

on the previous day to being tied as the fourth highest submission on the Contributor Panel.

Rabobank's submission the next day remained the same, as did its submission's place on the

Contributor Panel.

268.     On Friday, August 8, 2008, Trader-6 messaged Submitter-4 again:  "Could you make it 6mth LIBOR at 0.97 today," explaining: "I have big fixing coming two weeks...." That day, as requested, Rabobank's 6-month Yen-LIBOR submission was 0.97, a decrease of three (3) basis points, whereas the other panel banks' submissions stayed approximately constant on average.  Rabobank's submission went from being tied as the fourth highest submission on the Contributor Panel on the previous day to being tied as the second lowest submission on the Contributor Panel. Rabobank's submission remained the same on Monday, August 11, 2008, Tuesday, August 12, 2008, and Wednesday, August 13, 2008.

269.     On August 14, 2008, Trader-6 messaged Submitter-4 yet again and wrote: "Today and 19th Aug are the biggest fixing for us.  Could you set 6m LIBOR at 0.93 today."  That day, Rabobank's 6-month Yen-LIBOR submission was 0.94, a decrease of three (3) basis points, whereas the other panel banks' submissions stayed approximately constant on average.  Rabobank's submission went from being tied as the seventh lowest submission on the Contributor Panel on the previous day to being tied as the second lowest submission on the Contributor Panel.  On August 19, 2008, Rabobank's 6-month Yen-LIBOR submission was 0.93, making it tied as the lowest submission on the Contributor Panel.

270.     Other Rabobank traders continued to make requests as well.  For instance, on June 25, 2009, another Yen trader ("Trader-7") emailed Submitter-7 and wrote: "could you set input for the Yen 6M libor very low today (65 or so).  We have a very large fixing today in the 6 month's."  That day, as requested, Rabobank's 6-month Yen-LIBOR submission was 0.65, a decrease of six basis points from its previous submission, whereas the other panel banks' submissions decreased by approximately a basis point on average.  Rabobank's submission went

from being tied as the eighth lowest submission on the Contributor Panel on the previous day to being tied as the second lowest submission on the Contributor Panel.

271.    Traders and submitters did not hide the fact that traders had influence over the Yen-LIBOR submission process from their supervisors.  The Head of Liquidity and Finance for Europe, and later Submitter-3's replacement as Global Head of Liquidity and Finance ("Trader-9"), was informed that Trader-5 would sometimes email the Yen-LIBOR submitter with requests. On December 9, 2008, Trader-9 emailed Submitter-3 and Submitter-5 with the subject line: "LIBORS."  In the email, Trader-9 wrote: "Good to hear that [Submitter-8] is up and running. Short question: only question mark for me is him sending out the daily Rabo Libor fixings.  He told me that he will just 'copy, paste' the previous days Libors.  Don't blame [Submitter-8] of course, but he has got no clue on this yet.  What you think, is this going ok? Want to prevent that we get questions from BBA on this?"  Submitter-5 replied: "Yes [Submitter-8] is doing fine, regarding the libors," explaining that with: "the yen libors sometimes [Trader-5] will email from Tokyo to ask for any special requests."

272.    In March 2009, when Rabobank conducted an operational audit of the Money Markets desks, the auditor, after meeting with Submitter-6, wrote in her work papers that: "Submitter-6 also inputs the Yen-Libor rates on behalf of the Tokyo team to the BBA as they have no access to do this.  They provide this via email."  Within her work papers, the auditor included an email from Trader-5 to Submitter-6 in which Trader-5 sent LIBOR rates to Submitter-6 for submission.

### d.    Barclays.

273.    From at least as early as August 2006 through approximately January 2007, then on another occasion in approximately June 2009, Barclays Yen swaps traders made requests for favorable Yen-LIBOR submissions to Barclays Yen-LIBOR submitters in order to benefit

Barclays and the Barclays' derivatives traders' Euroyen-based derivatives positions.  Barclays'

Yen-LIBOR submitters accommodated the requests on some occasions.  Specifically, between

August 2006 and June 2009, the FCA (formerly FSA) determined that Barclays' derivatives

traders made at least 26 requests to manipulate Barclays' Yen-LIBOR submissions.

**The Contributor Bank Defendants Colluded With the Broker Defendants to Successfully
Manipulate Yen-LIBOR, Euroyen TIBOR and the Prices of Euroyen-Based Derivatives.**

274.    Interdealer brokers, sometimes known as voice brokers, act as intermediaries

between buyers and sellers in the money markets and derivatives markets.  The brokers match

buyers and sellers in return for commissions, and also can be an important source of market

information for banks.  Typically, commissions are based on a percentage of the notional value

of consummated transactions, which means that brokers get paid more by brokering larger

trades.  Within a brokerage firm, there are brokers for different currencies who intermediate

derivatives transactions ("Derivatives Brokers") and brokers who intermediate cash transactions

("Cash Brokers").  In order to find matching counterparties, brokers provide bid or offer prices

for a financial transaction.  Those prices are conveyed in multiple ways.  Brokers use "squawk

boxes," which are speakerphones that can speak simultaneously to numerous trading desks of

their bank clients at once, to broadly disseminate bid and offer prices.  Brokers also frequently

use Bloomberg instant message chats and other messaging platforms, email, and dedicated

telephone lines.

275.    In addition to brokering transactions, as part of their client services, interdealer

brokers, including the Broker Defendants, frequently provide clients with their views and advice

on market pricing and trends, often called "market color."  Clients, including Yen-LIBOR

submitters and interest rate derivatives traders at panel banks, rely on brokers for such

information.  Because brokers speak to multiple clients at different financial institutions and

share internally the information learned from clients, they have particular market insight about

cash market prices and trends in otherwise opaque markets, offering an important price discovery

function.  In providing this market information, interdealer brokers are implicitly representing

that such market information reflects their third-party unbiased assessment of borrowing costs

and market pricing based on objective, observable data, some of which they uniquely possessed.

### 1. UBS Colluded With the Broker Defendants to Manipulate Yen-LIBOR, Euroyen TIBOR and The Prices of Euroyen-Based Derivatives[11]

276.    From the outset of his employment with UBS, Hayes coordinated on almost a

daily basis with several interdealer brokers employed by at least five different brokerage firms to

manipulate the Yen-LIBOR and, on occasion, Euroyen TIBOR submissions of other panel

banks.  Hayes asked the interdealer brokers to utilize various means of influencing the other

panel banks, including by asking the brokers to: (i) disseminate false "run throughs" of suggested

Yen-LIBORs to many, if not all, of the panel banks; (ii) contact directly other bank submitters;

(iii) publish false market cash rates over certain dedicated electronic screens available to clients;

and (iv) "spoof" or make fake bids and offers.  As alleged further below, in exchange for their

critical assistance, Hayes saw to it that the Broker Defendants were compensated in various ways

such as by directing to brokers commission-generating business including "wash trades," and

even by having UBS structure fees to carve out cash bonuses for brokers. Hayes also kept them

in line by sometimes threatening to move his considerable volume of business to another broker.

During this period of late 2006 to late 2009, Hayes made approximately 1,200 requests to

brokers.

---

[11] *See also* Exs. A-1, pp. 17-25, ¶¶ 40-61; A-2, pp. 20-36; C-1, C-2, E-1, and E-2, *passim.*

a.       **"Suggested LIBORs".**

277.     Hayes also used several interdealer brokers to disseminate false information about Yen-LIBOR and Euroyen TIBOR to other panel banks, expecting that the other banks would rely on that information when they made their own submissions and thereby benefit from the manipulated rate.  For example, some brokers including the Broker Defendants circulated via email or by telephone each morning daily "run-throughs" of the actual rates they expect to be published for key benchmark interest rates that day, such as Yen-LIBOR in various tenors, as well as other pricing information.  The Broker Defendants, also at times, shared with some panel banks the intended LIBOR submissions of other panel banks.

278.     During the Class Period, Defendant ICAP routinely disseminated Yen Run Thrus every morning at approximately 7:00 a.m. London time, well before the BBA's 11:00 a.m. Yen-LIBOR submission deadline.  The Run Thrus contained the following information: (1) a column stating where rates (prices) in basis points for Yen cash trades, for all tenors, were observed the previous trading day, broken down by Japanese and non-Japanese financial institutions; (2) a column stating the spread of rates for Yen cash trades for all tenors that were observed as of the market opening in London and late afternoon Tokyo, broken down by Japanese and non-Japanese financial institutions; and (3) a column titled "Suggested LIBORs," which contained Cash Broker 1's suggestions as to where the published Yen-LIBOR fixing for each tenor between one month and one year would set that day.[12]

i.       **The Critical Assistance of ICAP Brokers in Disseminating False and Misleading "Suggested LIBORs".**

279.     In the fall of 2006, shortly after Hayes joined UBS, he became a client of ICAP Derivatives Broker 1.  Hayes quickly became known as a high volume, aggressive and dominant

---

[12] *See* Ex. C-1, pp. 6-15.

Yen derivatives trader who was injecting significant liquidity into a previously illiquid market. Because he commanded a large trading volume, Hayes was a highly desirable and sought after client of interdealer brokers.

280.    To ensure he received significant business from Hayes, ICAP Derivatives Broker 1, based at that time in London, agreed to work overnight (Tokyo is eight hours ahead of London) to better serve Hayes during Tokyo business hours and became the primary contact for Hayes at ICAP.  As a result, ICAP Derivatives Broker 1 gave up his other London-based clients, and by early 2007 relied almost exclusively on Hayes and UBS for their business and resulting commissions.

281.    From the outset of his client relationship with Hayes and to keep Hayes and UBS's business, ICAP Derivatives Broker 1 routinely and aggressively assisted him in efforts to manipulate Yen-LIBOR and the prices of Euroyen-based derivatives.  When ICAP Derivatives Broker 1 was out of the office, other Yen derivatives brokers on ICAP's Yen Desk, primarily Derivatives Broker 2 or the Yen Desk Head, coordinated with Hayes on his requests to manipulate; at times other brokers on the Yen Desk helped him as well.

282.    To accomplish Hayes's manipulative goals, ICAP Derivatives Broker 1 needed and obtained the critical assistance of ICAP Cash Broker 1.  ICAP Cash Broker 1 had long-standing relationships and daily contact with many of the Yen panel bank submitters.  He often discussed with submitters what their intended Yen-LIBOR submissions would be and what other panel banks might submit. ICAP Cash Broker 1 also issued the daily Suggested LIBORs as part of his Run Thrus upon which Yen-LIBOR submitters improperly relied in whole or in part at times to make their Yen-LIBOR submissions.

283.    As early as October 2006, ICAP Derivatives Broker 1, acting on behalf of Hayes,

began asking ICAP Cash Broker 1 to skew his Suggested LIBORs that he provided in the Run

Thru emails or in calls to traders or submitters to reflect the rates or levels desired by Hayes.

ICAP Cash Broker 1 knew from the outset that such requests were for Hayes.  At times, Hayes

reached out to ICAP Cash Broker 1 directly, such as on March 23, 2007: "hi [ICAP Cash Broker

1] know [ICAP Derivatives Broker 1] is away and this may seem strange given my recent

requests but really need a high/unchanged 1m libor today, low for everything else. thanks as

always [UBS Senior Yen Trader Hayes]."

284.    ICAP Cash Broker 1's skewed Suggested LIBORs sent to Yen-LIBOR submitters

as part of his daily Run Thrus was the primary and most effective method by which certain ICAP

brokers assisted Hayes in his efforts to manipulate the daily Yen-LIBOR fixings.  ICAP Cash

Broker 1's Run Thrus were widely circulated among and valued by Yen market participants at

the panel banks and elsewhere.  More than 100 cash and derivatives traders received Cash

Broker 1's Run Thru emails, including traders from nearly all of the Yen-LIBOR panel banks

and, at different times, submitters from at least eleven of the sixteen Yen-LIBOR panel banks.

Many, if not all of the recipients of the Run Thrus, asked to receive the emails. ICAP Cash

Broker 1 sent skewed Suggested LIBORs even to Bank of England staff.

285.    ICAP Yen brokers, Hayes and others believed that ICAP Cash Broker 1's

Suggested LIBORs directly influenced the Yen-LIBOR submissions by panel banks.  At least

several panel banks considered the Run Thrus when making their Yen-LIBOR submissions, and

at times, some banks simply submitted the very rates suggested by Cash Broker 1.

286.    For example, the Yen-LIBOR submissions of certain panel banks overwhelmingly

mirrored the Suggested LIBORs of Cash Broker 1.  Unidentified Bank A submitted one-month,

three-month, and six-month Yen-LIBORs that were identical to Cash Broker 1's LIBOR suggestions on ninety (90) percent of the submission dates in 2007, and eighty (80) percent of the submission dates in 2008. Similarly, unidentified Bank B submitted one-month, three-month, and six-month Yen-LIBORs that were identical to ICAP Cash Broker 1's LIBOR suggestions on eighty (80) percent of the submission dates in 2008, and seventy (70) percent of the submission dates in 2009.

287.    Even submitters at panel banks that tried to make benchmark interest rate submissions that reflected an assessment of the costs of borrowing funds in the interbank Yen market may have passed on false or misleading submissions because they used ICAP brokers' purported unbiased assessments of Yen borrowing rates and Suggested LIBORs to inform their submissions. Their reliance on ICAP brokers meant that their submissions did not actually reflect borrowing costs, but rather Hayes's manipualted rates. The ICAP brokers believed that the wide dissemination of and reliance on the Suggested LIBORs would increase the chances that they would at times be successful in manipulating Yen-LIBOR submissions, and thereby Yen-LIBOR, for Hayes and others. This was the "libor service" (as coined by the brokers involved) they provided to Hayes.

288.    ICAP Yen brokers gloated over their influence on the Yen market and the Yen-LIBOR fixings. They referred to panel banks as "copying" the Cash Broker's Suggested LIBORs, and called them "sheep" because they followed wherever the Cash Broker led them (**"[Cash Broker 1] sending out higher than he thinks so hopefully the sheep will just copy"** (emphasis added)). Cash Broker 1 believed and boasted that a number of banks were copying his Yen-LIBOR recommendations. Cash Broker 1 referred to himself and was called by others by such monikers as "Mr. LIBOR," "Lord LIBOR," "Lord Bailiff" and "M'Lord." At least

ICAP Derivatives Broker 1 also believed Cash Broker 1 was successful in "moving the market" on a number of occasions.  ICAP Derivatives Broker 1 sold this success to Hayes, noting at various times as follows:

- "[Cash Broker 1] has been doing a number on some of the contributors because a couple of them were edging their libors slightly lower yesterday before he intervened;"

- "morning mate ... seems [Cash Broker 1's] cover does have some influence, people actually took notice of his 87 libor! Will be back on his case again today;"

- "i hope that 6m libor has got me back in your good books! I used all my powers of persuasion on that one;-) ... think [Bank A and Bank B] must have looked at [Cash Broker A's] first suggestion .... they both moved up 11bps to 1.10;" and

- "you have a really big fix tonight i believe? if [Cash Broker 1] sends out 6m at a more realistic level than 1.1 0 i reckon [Bank A and Bank B] will parrot him, it might mean 6m coming down a bit."

289.    Communications between the ICAP Yen brokers and the UBS Senior Yen Trader and among the ICAP brokers reflect the ICAP brokers' willingness and significant efforts to help Hayes.  *See* Appendix at 15, 17-19, 114, 130, 143, 172.  The communications also reflect the ICAP brokers' and Hayes's belief that they had an impact on the Yen-LIBOR fixings, that ICAP Cash Broker 1's suggested rates did not always reflect his true and objective assessment of where Yen-LIBOR would fix, but were designed to help Hayes, and Hayes highly valued the ICAP brokers' special LIBOR services and was willing to pay for them, with gratuities like a curry meal or champagne or additional commission-generating trades, or bonuses as the relationship developed over time.

**ii.     BBA Guidelines Expressly Prohibited the Contributor Bank Defendants From Relying on Interdealer Brokers Market Color When Making Yen-LIBOR Submissions**.

290.     BBA guidelines issued in October 2009 provided that LIBOR submitters "should not ask intermediaries where they believe LIBOR rates will set on a given day and use this as a basis for submissions.  This misses the point of the benchmark, and is a circular process that would rapidly lead to inaccurate rates.  Yet several Yen-LIBOR Contributor Banks considered the Run Thrus when making their Yen-LIBOR submissions, and at times, some banks simply submitted the very rates suggested by Defendant ICAP.  For example, unidentified Bank A submitted one-month, three-month, and six-month Yen-LIBORs that were identical to Defendant ICAP's LIBOR suggestions on 90 percent of the submission dates in 2007, and 80 percent of the submission dates in 2008. Similarly, unidentified Bank B submitted one-month, three-month, and six-month Yen-LIBORs that were identical to Defendant ICAP's LIBOR suggestions on 80 percent of the submission dates in 2008, and 70 percent of the submission dates in 2009.

**b.     Publishing False Market Rates to Panel Banks on Broker Screens.**

291.     Hayes and the Broker Defendants also falsified the purported prevailing market rates that the Broker Defendants displayed on electronic screens made available to the Broker Defendants clients, such as panel banks.  The screens were intended to show prices of actual cash or derivatives trades, which panel banks then could take into consideration in determining Yen-LIBOR submissions.  Hayes wanted the Broker Defendants to report false prices on the screens in an effort to skew other banks' Yen-LIBOR submissions.  Because these screens were available to several, if not all, of the Yen-LIBOR panel members and the submitters used this information at times in determining submissions, dissemination of false market rates had the potential of improperly influencing many of the Yen-LIBOR submissions on any given day.

292.     In the below example Broker Defendant ICAP and Hayes discuss how ICAP would falsify the screen rates artificially low "as the futures open" to aid Hayes's fraudulent influence on other panel bank submissions:

June 3, 2009: (Emphasis added.)

UBS [Hayes]: "**can you get the swasp [swaps] on the screen all lower** lyl8m2y3y ... "

ICAP: " ... **will move the screen as the futures open** , you lioke low everything?"

<center>c.     <u>**"Spoofing": Publication of False Bids and Offers.**</u></center>

293.     The Contributor Bank Defendants and Broker Defendants also colluded to manipulate Euroyen-based derivative prices by disseminating false bids and offers, described by defendants as "spoofs", for Euroyen-based derivatives with the same tenors as the Yen-LIBOR and Euroyen TIBOR rates for the purpose of manipulating both the price of Euroyen-based derivatives and Yen-LIBOR and Euroyen TIBOR rates.  Defendants colluded to disseminate spoof bids and offers through various means including through Broker Defendants' Yen Desk "squawk boxes" which allow the Broker Defendant to disseminate the spoof bids and offers to a multitude of Euroyen-based derivatives traders, including multiple Euroyen rate submitting bank traders, and through OTC electronic exchange systems utilized by Euroyen-based derivatives traders, including multiple Euroyen rate submitting bank traders, to execute Euroyen-based derivatives transactions.

294.     For example, between July 7, 2008 and June 29, 2009, false offers were discussed on the telephone by by Hayes and Broker A on at least 12 occasions.  In one such conversation on January 27, 2009, Broker A explained that he had been: "*… offering … some cheap 3s all morning and I shouted them-down at [Panel Bank 3] as well … we were offering them at 50 mate … that wasn't even true*".

<center>102</center>

295.    As an additional example, during a June 10, 2009 electronic chat, Hayes and

Broker-B referred to "spoofing" when discussing efforts they would make to manipulate the

Yen-LIBOR "game" that day:

> UBS [Hayes]:         LOW 1m [Yen-LIBOR] . . . LOW 3m [Yen-LIBOR]. . .
> HIGH 6m . . . 6m [Yen-LIBOR] is important today mate . .
> . pls spoof bids
>
> Broker-B:            rite ok mate ill make a special effort

Later in the same chat, Broker-B remarked to Hayes:

> mate yur getting bloody good at this libor game . . . think of
> me when yur on yur yacht in monaco wont yu

**The Contributor Bank Defendants Colluded Through the Broker Defendants to
Successfully Manipulate Yen-LIBOR, Euroyen TIBOR and the Prices of Euroyen-Based
Derivatives.**[13]

296.    The Broker Defendants also served as conduits to other Contributor Panel Banks,

passing along requests for specific Yen-LIBOR submissions on particular trading days.

297.    For example, R.P.Martin Yen Broker 1 and Yen Broker 2 contacted their Yen-

LIBOR submitter clients directly and asked them to move their Yen-LIBOR submissions as a

"favor" to UBS and Hayes. R.P. Martin Yen Broker 1 also enlisted the help of certain other

brokers at R.P. Martin, including managers of certain trading desks, to reach out to additional

Yen-LIBOR submitters, in an effort to further manipulate the daily Yen-LIBOR fixing.

> **1.    The Successful Manipulation of Three-Month Yen-LIBOR on February
> 25, 2009.**

298.    On this particular day, UBS Senior Yen Trader Hayes needed a low three-month

and needed six-month Yen-LIBOR to stay "high as a drug addict" in order to financially benefit

his derivatives positions.

---

[13] *See also* Exs. C-1, C-2, E-1 (pp. 10-14) and E-2, *passim*.

299.    R.P. Martin's Yen Broker 1 and UBS Senior Yen Trader Hayes first spoke via Bloomberg chat with the R.P. Martin broker searching for a way to earn a commission as his book was "pear shaped" in the month of February.

> Yen Broker 1:          anything cookjing i can try desperate for a decent trade gone pear shaped this month
>
> Senior Yen Trader:    we can switch 2yrs today i'll talk later in mean time low lm and 3m we must keep 3m down and high 6m act 6m unchanged today try for low on all of em from tomorrow need 6m high as a drug addict
>
> Yen Broker 1:          ok ill do my best for those tday hahahha like it ok

300.    Hayes acquiesced and suggested to "switch 2yrs ***..[at] 150b 2yrs bro both sides" and asked the R.P. Martin Yen Broker to enlist Defendant RBS to take the other side of the wash trade.  The R.P. Martin Yen Broker readily agreed as this one trade alone would "make3 [sic] budget for the month so massive yes."

> Senior Yen Trader:          we can switch 2yrs ***we can do 150b 2yrs bro both sides ask [RBS Yen Trader] will that help?
>
> Yen Broker 1:               ok mate that will make us make3 budget for the month so massive yes.

301.    R.P. Martin Yen Broker 1 and Hayes continued to discuss their scheme by telephone with the two discussing who R.P. Martin may be able to "f*cking lean on a bit today" to artificially lower the three-month Yen-LIBOR "a couple of pips" to benefit UBS's derivatives positions.  They agree that R.P. Martin can lean on RBS and unidentified Bank 2, Bank 5 and Bank 6.

> Yen Broker 1:          Yes, I know, you need the LIBOR stuff.  I know that's really important. I know how important it is, you know how it is so
>
>                        ***

| | |
|---|---|
| Senior Yen Trader: | I mean I'm just trying to think <u>who you might be able to f\*cking</u> lean on a bit today. |
| Yen Broker 1: | yes, go on give me some names. |
| Senior Yen Trader: | it's really important to get the 3's down for me. |
| Yen Broker 1: | 3's more than anything else. |
| Senior Yen Trader: | Yes. Really, well, I mean today I need them all low but, I mean, 3's particularly. \*\*\*Right [Bank 5] put his at 64, mate. Can you get him down? |
| Yen Broker 1: | 64 [Bank 5]. Okay, I'll have a word with him. |
| Senior Yen Trader: | [inaudible] up to 65 |
| Yen Broker 1: | Who's that? [Bank 2]? |
| Senior Yen Trader: | Yes. |
| Yen Broker 1: | Right, I'll go and ask him for a -[Yen Broker 2] off today but I'll go in and I'll get a favor. |
| Senior Yen Trader: | Yes, ask him if he can move it to 63 for the day or something \*\*\*Who else is [inaudible]? |
| Yen Broker 1: | Rabo is all done out of Utrecht now, even though it's still under London. |
| Senior Yen Trader: | RBS is 64 \*\*\*you don't talk to RBS, do you? |
| Yen Broker 1: | No but the guy in the arbi does, I'll see if he can, sort of, see if he can have a word with him for us\*\*\* So [Bank 2], [Bank 5] and RBS, yes? See if I can get that down some, yes? |
| Senior Yen Trader: | Yes, if you could mate. \* \* \* And you don't speak to [Bank 6], do you? |

| Yen Broker 1: | He's on the arbi so I could have a word with the guy that speaks to him and see if he can have a word. See if he can drop his LIBOR a couple of pips today ... |
|---|---|
| Senior Yen Trader: | He's at f*'cking 68 dude * * * if he went to 60 that would be f*cking massive. |
| Yen Broker 1: | Okay, I'll have a word with that as well, mate, alright? |

302.    R.P. Martin Yen Broker 1 next assured Hayes that he or another R.P. Martin

broker made contact with multiple Yen-LIBOR submitters to ensure that their Yen-LIBOR

submissions were consistent with Hayes's needs.  On February 25, R.P. Martin Yen Broker 1

personally contacted submitters at two separate unnamed banks, identified in the R.P. Martin

CFTC Order only as Bank 1 and Bank 2.  Yen Broker 1 also enlisted the assistance of a desk

head from R.P. Martin's Arbitrage Desk ("Arbitrage Desk Head"), who had a relationship with

the Yen-LIBOR submitter at Bank 6.

303.    As set forth below, through contextual reverse engineering, Plaintiff identified

Bank 1 as Defendant HSBC.

304.    In the telephone call between R.P. Martin Yen Broker 1 and Bank 1 (HSBC) Yen-

LIBOR submitter, R.P. Martin Yen Broker 1 asks HSBC to lower its three-month Yen-LIBOR

"a couple of ticks."  The R.P. Martin Yen Broker also makes clear that this request comes

straight from UBS as "he's got a couple of fixings coming":

| Yen Broker 1: | I need a favor. |
|---|---|
| Bank 1 Submitter: | yes. |
| Yen Broker 1: | ***basically I got stuffed in something earlier in an IRS and it would have cost me about 40,000 to get out of it, yes. Geezer [referring to the Senior Yen Trader] dug me out, as a favor back to him he's asked me, for one day today, he's got a couple of fixings coming. He wants to see if he can get LIBORs down a little bit. I've said I'll try and do what I can. Is there any way you might be |

| | |
|---|---|
| | able to set them a little bit lower today just to return the favor? * * * |
| Bank 1 Submitter: | Yeah, well cash is a little bit easier, isn't it so I'll |
| Yen Broker 1: | Yes, if you could get them down a couple of ticks or something today that would be f*cking, like the 3's *** I mean if you could do that for me mate that would be a personal favor to you. |
| Bank 1 Submitter: | Yes, yes, but yes cash is easier so I'll fix a couple up. |

305.    As set forth below, through contextual reverse engineering, Plaintiff identified

Bank 2 as Defendant Bank of Tokyo-Mitsubishi.

306.    In a separate telephone call between R.P. Martin Yen Broker 1 and the Yen-

LIBOR submitter at Bank 2 (Bank of Tokyo-Mitsubishi), the R.P. Martin broker asks that the

Bank of Tokyo-Mitsubishi drop its three-month Yen-LIBOR submission "a tick."  The Bank of

Tokyo-Mitsubishi agrees, even though the Bank of Tokyo-Mitsubishi planned to submit the

same three-month Yen-LIBOR rate as the day before:

| | |
|---|---|
| Yen Broker 1: | Can I ask you a small favor? |
| Bank 2 Submitter: | Yeah. |
| Yen Broker 1: | What are you going to set in your LIBOR 3's today? |
| Bank 2 Submitter: | Ah, same, 65. |
| Yen Broker 1: | Is there any way you might be able to set them down a pip 'cause I'm getting a big trade out of it? |
| Bank 2 Submitter: | Sorry? |
| Yen Broker 1: | I'm getting someone do me a big trade if they said if I help them sort of get LIBORs down a tick today. |
| Bank 2 Submitter: | Yeah, okay. *** |
| Yen Broker 1: | Ah, mate, I appreciate that. |

307.     As set forth below, through contextual reverse engineering, Plaintiff identified

Bank 6 as Defendant Norinchukin.

308.     R.P. Martin Yen Broker 1 enlisted the help of the R.P. Martin Arbitrage Desk

Head to reach out to Bank 6 to manipulate its three-month Yen-LIBOR artificially lower from

.68 to .67. Below is the first telephone exchange:

Telephone calls related to contacting Yen-LIBOR submitter at Bank 6:

      1st telephone call:

          Yen Broker 1:          Can you do me a favor?

          Arbitrage Desk Head:  Only if you tick the arbi box on that deal.

          Yen Broker 1:          We've got a f*cking, yes, we've got a f*cking huge
                                 deal but on the back of it he's asked me to do him a favor
                                and see if I can have a word with a couple of people, see if
                                LIBOR, see if I could get it down a pip. Would you - Bank
                                6 is setting his at 68 at the moment, do you reckon he
                                might, ask him if he might be able to set it at 67 just today
                                for us?

          ***

          Arbitrage Desk Head: 3's LIBOR at 67?

          Yen Broker 1:          Yes, instead of 68. It would be a big favor.

          * * *

          Arbitrage Desk Head: All right, all right.

309.     The R.P. Martin Arbitrage Desk Head readily agreed and made a phone call to

Bank 6 (Norinchukin) who recognized its "month end" and that R.P. Martin made the request on

behalf of another Yen-LIBOR Contributor Bank.

      2nd telephone call:

Arbitrage Desk Head: Where you setting 3's Yen LIBOR?  Today.
Do you set the LIBOR?

Bank 6 Submitter:       Yes.

Arbitrage Desk Head: Where are you setting it?

Bank 6 Submitter:       Actually f*cking can't even remember what I set it
yesterday.

Arbitrage Desk Head: 68, I think.

***

Arbitrage Desk Head: So you wouldn't be setting it at 67?

Bank 6 Submitter:       Why is that a request or?

Arbitrage Desk Head: Well sort of an underlying—

Bank 6 Submitter:       Yes. Potentially. I don't know, it's not going to be a lot
different. If anything, yes, I mean, it's not going to go
higher, let's put it that way.

***

Arbitrage Desk Head: No, someone just said where are people setting the LIBORs
today. I think they got some big fixing, they just wondered.

Bank 6 Submitter:       Ah, yes, month end isn't it.

Arbitrage Desk Head: Set at 67 by any chance, would it be?

Bank 6 Submitter:       Month end doo dah, isn't it? I think, though, that
just looking -I've got a funny feeling ours is quite high in
the 3's at the moment so it almost gets knocked out of the
calculation.

***

Arbitrage Desk Head: ***Alright, well okay, as I said nothing shifty or anything
but just wondered whether you was setting it at 67 today.

Bank 6 Submitter: We'll see.

<u>Arbitrage Desk Head</u>: If you catch my drift. Okay.

310.    R.P. Martin Yen Broker 1 followed up with the R.P. Martin Arbitrage Desk Head to see if Bank 6 (Norinchukin) agreed to go along with the plan.

3rd call telephone:

<u>Arbitrage Desk Head</u>: Did he ask for [Bank 6] in particular?

<u>Yen Broker 1</u>:        He's just given me some names whose LIBORs are quite high at the moment to see if I can get them down a bit. No, not him, not that one bank, just a group of banks.

<u>Arbitrage Desk Head</u>: He thinks that I'll be -he thinks that he's out of the equation anyway.

<u>Yen Broker 1</u>:        Right, okay. Well it just makes a difference if everyone's putting theirs down a bit because I've got a couple of people to put them ... [Bank 2]'s putting his down a pip; [Bank 1]'s putting his down a couple of pips. I mean, if there's a few people putting them down it should set the average better.

<u>Arbitrage Desk Head</u>: He's-I've asked him and he's said we'll see.

<u>Yen Broker 1</u>:        Alright, that's fine.

<u>Arbitrage Desk Head</u>: If I set out on a line then f*cking

<u>Yen Broker 1</u>:        Don't push it, no don't ever push it.

<u>Arbitrage Desk Head</u>: Not that, it's the old auditors as well.

<u>Yen Broker 1</u>:        Absolutely, no problem mate, no problem at all.

311.    R.P. Martin Yen Broker 1 kept Hayes informed throughout the day of February 25, 2009, updating him regarding whether Yen-LIBOR submitters had agreed to manipulate their Yen-LIBOR submissions in a manner that would benefit Hayes.

1st telephone call between the R.P. Martin Yen Broker 1 and Hayes:

110

| Yen Broker 1: | I think I've got [Bank 1] down 2, I've got [Bank 2] down 1. |
|---|---|
| Senior Yen Trader: | Yes. |
| Yen Broker 1: | I think Bank 6's going to come down 1. I'm working on Bank 5. |
| Senior Yen Trader: | Brilliant. Alright mate, I appreciate that. |
| Yen Broker 1 : | Alright, so it should definitely have an impact, alright. |

2nd telephone call between R.P. Yen Broker 1 and Hayes:

| Yen Broker 1: | Yes, I've done it. I've tried to call in some favors, mate, and I think I'll be alright. |
|---|---|
| Senior Yen Trader: | What like the 1's 3'sand 6's though? |
| Yen Broker 1: | Yes. Especially 3's mate, I've made an extra effort on the 3's, alright. I think [Bank 1] will put his down a couple of points for the whole lot. Alright? |
| Senior Yen Trader: | Alright, great. You're a star [Yen Broker 1], mate. |

312. R.P. Martin's efforts on February 25, 2009 on behalf of Hayes were successful. All three banks Bank 1 (HSBC), Bank 2 (Bank of Tokyo Mitsubishi), and Bank 6 (Norinchukin) transmitted lower three-month Yen-LIBOR submissions, resulting in a lower Yen-LIBOR fixing for February 25, 2009.

313. For example, R.P. Martin Yen Broker 1 got [Bank 1] "down 2." The three-month Yen-LIBOR data obtained by Plaintiff shows that the only Yen-LIBOR Contributor Bank to go "down 2" from February 24 to February 25, 2009 was Defendant HSBC dropping from .6 (February 24) to .58 (February 25).

314.    Upon information and belief, Bank 2 is Defendant Bank of Tokyo-Mitsubishi as a review of the same three-month Yen-LIBOR data shows that the Bank of Tokyo-Mitsubishi was the only Yen-LIBOR Contributor Bank to drop from .65 (February 24) to .64 (February 25) consistent with R.P. Martin Yen Broker 1's request.

315.    Upon information and belief, Bank 6 is Defendant Norinchukin Bank as a review of the same three-month Yen-LIBOR data shows that Norinchukin shows that it was the only Yen-LIBOR Contributor Bank to drop from .68 (February 24) to .67 (February 25) consistent with the R.P. Martin Arbitrage Desk Head's request.

**2.    The Successful Manipulation of One-Month Yen-LIBOR on March 31, 2009.**

316.    As another example of the key role of the Broker Defendants in the conspiracy, on March 31, 2009, former UBS Trader Tom Hayes asked unidentified Broker-C to help influence 9 of the 16 Yen-LIBOR Contributor Bank Defendants by convincing them to lower their Yen-LIBOR submissions from the previous day, thus lowering the resulting 1-month and 3-month Yen-LIBOR fix.  This instant message exchange and the resulting one-month Yen-LIBOR fix on this date show that at the very least there were a number of Yen-LIBOR Contributor Banks were solicited to participate or who did participate in the conspiracy.  As Hayes urged Broker-C:

UBS Senior Yen Trader Tom Hayes: mate we have to get 1m and 3m down . . . 1m barely fell yesterday . . . real important

Broker-C:      yeah ok
Trader-1:      banks to have a go w in 1m are
Trader-1:      [Bank-F]
Trader-1:      [Bank-G]
Trader-1:      [Bank-H]
Trader-1:      [Bank-E]
Trader-1:      [Bank-I]
Trader-1:      [Bank-C]
Trader-1:      [Bank-A]

| Trader-1: | [Bank-J] |
| Trader-1: | and [Bank-K] |
| Trader-1: | pls |
| Broker-C: | got it mate |

317.   That day, consistent with Tom Hayes's request, 6 of the 9 Yen-LIBOR

Contributor Panel Banks listed above lowered their 1-month Yen-LIBOR submissions relative to

the previous day, including Contributor Bank Defendants: (i) Mitsui Sumitomo Bank Corp.; (ii)

Mizuho Corporate Bank; (iii) Royal Bank of Scotland; (iv) Barclays; (v) Norinchukin Bank; and

(vi) Rabobank.  As a result, the published 1-month Yen-LIBOR fix dropped by a full basis point

from the day before.

### 3.   The Broker Defendants Were More Than Just Gateways to the Contributor Banks, They Were Also Active Co-Conspirators.

318.   On July 22, 2009, former UBS trader Thomas Hayes along with at least two

additional Yen-LIBOR Contributor banks, identified as "Yen Bank F" and "Yen Bank J," and

unidentified "Derivatives Broker A1" "hatched" a scheme to artificially drive down six-month

Yen-LIBOR by August 11, 2009:

| Senior Yen Trader [Tom Hayes]: | "11th aug is the big date i still have lots of 6m fixings till the l0th" |
| Derivatives Broker Al: | "christ keeps getting extended started off as 14th of this month:-)" |
| Senior Yen Trader [Tom Hayes]: | "i know" |
| Derivatives Broker Al: | **"if you drop your 6m dramatically on the 11th mate, it will look v fishy,** especially if [Yen Bank J] and [Yen Bank F] go with **you I'd be v careful how you play it,** there might be cause for a drop as you cross into a new month but a couple of weeks in might get people questioning you." |
| Senior Yen Trader [Tom Hayes]: | "don't worry **will stagger the drops ie 5bp then 5bp**" |

| Derivatives Broker Al: | "ok mate, don't want you getting into sh it" |
|---|---|
| Senior Yen Trader [Tom Hayes]: | **"us then [Yen Bank F] then [Yen Bank J] then us then [Yen Bank F] then [Yen Bank J]"** |
| Derivatives Broker Al: | "**great the plan is hatched** and sounds sensible" |

319.     As revealed in ICAP's own settlement with the CFTC, Derivatives Broker A1 is a former broker at Broker Defendant ICAP.  Upon information and belief, Yen Bank F is Deutsche Bank and Yen Bank J is HSBC.  To conceal their manipulation, Hayes and his cohorts (HSBC and Deutsche) "staggered" their false reports of six-month Yen-LIBOR to the BBA by UBS, Bank F [Deutsche] and Bank J [HSBC], *i.e.*, the reporting of an artificially low (five (5) basis points lower) submission by UBS on one day, then the reporting of an artificially low submission of Yen Bank F [Deutsche] on another day, and then the same by Yen Bank J [HSBC].  The CFTC determined that from late July 2009 through mid-August 2009, UBS's submission fell twelve (12) basis points, and Yen Bank F and Yen Bank J's submissions fell by fourteen (14) and fifteen (15) basis points, respectively.  6-month Yen-LIBOR data obtained by Plaintiffs shows that UBS's 6-month Yen-LIBOR fell twelve (12) basis points from .72 (on July 22, 2009) to .60 (on August 20, 2009).  The only other Yen-LIBOR bank to drop its 6-month Yen-LIBOR fourteen (14) basis points over this same period was Defendant Deutsche, from .69 (on July 22, 2009) to .55 (on August 20, 2009).  The only other Yen-LIBOR bank to drop its 6-month Yen-LIBOR 15 basis points over this same period was Defendant HSBC, from .7 (on July 22, 2009) to .55 (on August 20, 2009).

**4.   The Contributor Bank Defendants Knew the Broker Defendants Were Actively Aiding and Abetting the Manipulation of Yen-LIBOR.**

320.     Hayes's use of brokers to manipulate Yen-LIBOR was widely known among the traders on the UBS Yen trading desk from 2007 through 2009.  In fact, the desk held daily

morning meetings before Yen-LIBOR was set, in which Hayes commonly announced the direction he intended to manipulate Yen-LIBOR that day.

321.    After Hayes left UBS in September 2009, the more junior trader who replaced him had discussions with the manager of the Yen trading desk.  Based on those discussions, the junior trader felt pressured to continue using brokers to manipulate Yen-LIBOR through January 2010.

322.    UBS's Yen-LIBOR submitters, derivatives traders, and their managers knew this conduct was wrong and therefore attempted to avoid creating evidence of the manipulation. For example, the manager of the Yen derivatives desk cautioned that they should avoid creating written records and should instead use cell phones when contacting brokers. Moreover, to avoid detection of their manipulation, UBS derivatives traders and brokers used coded language in communications to discuss the dissemination of misinformation to other Contributor Panel Banks to influence the ultimate Yen-LIBOR fix.

**The Broker Defendants Reaped Commissions, Bonuses and Accepted Bribes in the Form of Wash Trades from the Contributor Bank Defendants for Their Critical Assistance in the Manipulation of Yen-LIBOR, Euroyen TIBOR and the Prices of Euroyen-Based Derivatives.**[14]

323.    Hayes sought to ensure the cooperation of brokers by offering drinks and bottles of champagne, commission-generating business, and large cash bonuses for a Broker at Defendant ICAP.  The Broker Defendants were compensated for their assistance in several ways: (1) providing them with substantial amounts of business, thus generating fees or commissions; (2) by engaging in circular transactions (two equal and opposite transactions that canceled each other out) solely for the purpose of generating commissions for the brokers; and/or (3) by

---

[14] *See also* Exs. B-4, pp. 21-24; C-1, C-2, E-1, pp. 15-18 and E-2, *passim*.

engineering a special compensation deal between UBS and Broker Defendant ICAP.  Former

UBS Senior Yen Trader Hayes also used his financial leverage with at least one broker for whom

UBS generated significant commissions by threatening to cut off UBS's business with the

brokerage if the firm did not comply with his requests.

### 1.   Extra Trades to Generate Unearned Commissions.

324.    Former UBS Senior Yen Trader Hayes routinely offered brokers at unidentified

Brokerages B, C and D extra transactions or other business, and thus UBS-paid commissions, to

ensure they would provide needed assistance. For example, the former UBS Senior Yen Trader

Hayes told them:

- o   "I still owe you some deals;"

- o   "we'll do some big tix soon i promise;"

- o   "do the bisness and i'll sort you out MASSIVE;"

- o   "if you get 3m down you'll get a decent deal from me tomorrow;"

- o   "if you manage that for the next 2 weeks you will see the benefits;"

- o   "make sure they know that it pays for them to help out;" and

- o   "i need to pay .. to give u a trade."

### 2.   "Wash" Trades to Generate Illegitimate Commissions.

325.    For at least one of the brokers, former UBS Senior Yen Trader Hayes used

"wash" or "switch" trades to generate additional unearned commissions in return for the broker's

assistance.  In such trades, former UBS Senior Yen Trader Hayes was the opposing counterparty

on identical trades with other traders, resulting in a financial nullity for the counterparties, while

generating significant illegitimate commissions to the Broker Defendants, in particular Broker

Defendant R.P. Martin, who brokered both sides of the wash trades.  At R.P. Martin, the

commissions were shared by the entire Yen Desk, giving other R.P. Martin Yen brokers

incentives to assist in former UBS Senior Yen Trader Hayes manipulative schemes.  For

example, wash trades made UBS the second largest client of the R.P. Martin Yen Desk during

2008 and 2009, accounting for nearly 9% of the R.P. Martin Yen Desk's revenue.

326.     Specifically, R.P. Martin Yen Broker 1 brokered at least nine (9) wash trades

between September 2008 and August 2009 (nearly one a month) on behalf of former UBS Senior

Yen Trader Hayes.  These trades alone generated more than $412,000 in illegitimate commission

revenue for the R.P. Martin Yen Desk.  Accordingly, R.P. Martin Yen Broker 1 solicited the

assistance of multiple members of the Yen Desk, who found counterparties for the wash trades

and telephoned additional Yen-LIBOR submitters to ensure their Yen-LIBOR submissions were

consistent with former UBS Senior Yen Trader Hayes manipulative requests.

327.     For example, on September 18, 2008, former UBS Senior Yen Trader Hayes

offered R.P. Martin $50,000 or $100,000 or more in commissions for his assistance in the

manipulation of Yen-LIBOR:

>  "if you keep 6s unchanged today I will do fucking one humongous deal with you
>  ... Like a 50,000 buck deal whatever. I need you to keep it as low as possible ...
>  I'll pay you, you know, 50,000 dollars, 100,000 dollars ... whatever you want. ..
>  I'm a man of my word."

328.     Less than a week later, on September 24, 2008, upon the apparent success of R.P.

Martin, former UBS Senior Yen Trader Hayes used R.P. Martin Yen Broker 1 to engage in a

series of "wash" trades with several derivatives traders at other panel banks to generate the

promised $50,000 in commissions and fees for R.P. Martin.  *See* Appendix 187, 263-64.

### 3.   UBS Paid a Special "Bonus" To Broker Defendant ICAP.

329.     UBS, and in particular former UBS Senior Yen Trader Hayes, were significant

clients of the Broker Defendants.   Former UBS Senior Yen Trader Hayes steered a considerable

amount of business toward the Broker Defendants, resulting in substantial bonuses based on the

amount of commissions his business generated for the Broker Defendants.   For example, beginning in June 2007, UBS paid Broker Defendant ICAP a monthly fixed fee that averaged between 70,000 GBP and 85,000 GBP per month (US $126,000 and US $153,000) for brokerage services performed on behalf of Hayes.  As a result, between April 2007 and March 2009, former UBS Senior Yen Trader Hayes singlehandedly accounted for, on average, approximately fourteen percent (14%) of ICAP's Yen Desk's business (although at times, he accounted for as much as twenty percent (20%) of ICAP's Yen Desk's business), making him ICAP's Yen Desk's biggest individual client.  UBS was ICAP's Yen Desk's overall largest client from October 2006 through January 2011, accounting for, on average, approximately twenty-three percent (23%) of ICAP's Yen Desk's revenue between April 2007 and March 2009 (although at times, it accounted for as much as thirty percent (30%) of the Desk's revenue).

330.    In addition, former UBS Senior Yen Trader Hayes also acted as the counterparty to many transactions facilitated by certain ICAP brokers, thus further increasing the commissions earned by ICAP's Yen Desk.  The Yen Desk earned a fixed fee from UBS, but also received commissions based on the notional value of the transactions from the counterparties to former UBS Senior Yen Trader Hayes's trades.  Because he brought significant business to the Yen Desk, losing former UBS Senior Yen Trader Hayes's business would have been, as stated by one ICAP Yen broker, "a significant loss."

331.    Due to the quickly increasing demands for more substantial compensation by ICAP Cash Broker 1, by as early as the summer of 2007 UBS, at the urging of Hayes, agreed to increase its monthly fee by $9,000, at least partly in recognition of the "LIBOR services" or the "fixing service" offered to former UBS Senior Yen Trader Hayes, which ICAP's Yen Desk Head provided to Cash Broker 1 quarterly as a bonus.

118

332.     ICAP Yen brokers and Hayes believed that Cash Broker 1 was very effective in disseminating false Yen-LIBOR information through the provision of the skewed Suggested LIBORs and his direct contacts with Yen-LIBOR submitters and traders at panel banks. Initially, as Hayes began making his requests in late 2006, ICAP Cash Broker 1 agreed to skew his Suggested LIBORs for promises of an occasional champagne, lunch or dinner, such as "copious amounts of curry," or "bubbly."  ICAP Derivatives Broker 1 constantly used flattery to persuade the Cash Broker 1 to modify his LIBOR recommendations, referring to him in these emails as "Lord Libor," "M'Lord" and "Lord Bailiff."  (In fact, Cash Broker 1 referred to himself using the same monikers.)  But, flattery was not enough.  The Derivatives Broker 1, Yen Desk Head and former UBS Senior Yen Trader Hayes also tried to appease him by giving him a trade with UBS on occasion to intermediate, for which he would earn a broker's commission. For example:

**January 25, 2007:**

| | |
|---|---|
| <u>Cash Broker 1:</u> | I hear through the vine you have a good month.  Hows my bonus pot looking?  Mlord libor |
| <u>Yen Desk Head:</u> | will push one your way today |
| <u>Cash Broker 1:</u> | Ok chief….thks  And im pushing 6mos as low as I can!! |

333.     ICAP Cash Broker 1's demand for greater compensation in return for his skewed Suggested LIBORs quickly escalated, and he threatened to stop providing the "LIBOR services," as Hayes's requests became more persistent and demanding of accommodation.   As the examples below demonstrate, the ICAP Yen Desk Head matter-of-factly called Cash Broker 1's demands as requests for "kick backs," and Hayes recognized that Cash Broker 1 was making him "loads of money."

April 18, 2007 (emphasis supplied)

<u>Cash Broker 1:</u>          Hi [Yen Desk Head] with ubs how much does
                             he appreciate the yen libor scoop?  It seems to
                             me that he has all his glory etc and u guys get
                             his support in other things.  I get the drib and
                             drabs. **Life is tough enough over here
                             without having to double guess the libors
                             every morning and get zipper-de-do-da.
                             How about some form of performance
                             bonus per quarter from your b bonus pool
                             to me for the libor service ...**

<u>Yen Desk Head:</u>         Lord Baliff,  I would suggest a lunch over
                             golden week.Monday or Tuesday if you are
                             around.... **As for kick backs etc we can
                             discuss that at lunch and I will speak to
                             [Senior Yen Trader] about it next time** he
                             comes up for a chat.

334.    ICAP's Yen Desk Head and Derivatives Broker 1 pressed Hayes about paying

Cash Broker 1 an additional bonus.  Hayes readily agreed, and as a result of Hayes's efforts

within UBS to get recognition for the "LIBOR services" that Cash Broker 1 provided to him,

ICAP successfully re-negotiated its fixed fee contract with UBS in July 2007 to increase its

monthly fixed fee by an additional 5,000 GBP (US $9,000) for a total of approximately $72,000.

The ICAP Yen Desk awarded this amount as a quarterly bonus to Cash Broker 1, and retained

the rest as additional bonuses and compensation for the ICAP Yen Desk.

335.    Periodically, when the Yen-LIBOR fixing did not move in the direction he

requested, Hayes threatened to take UBS business from ICAP.   In response, ICAP Derivatives

Broker 1 and Yen Desk Head urgently pressed Cash Broker 1 to modify his Suggested LIBORs.

For example, on June 28, 2007, Cash Broker 1 was resisting sending a revised Suggested LIBOR

reflecting Hayes's preferred six-month rate, after he had already distributed the day's Run Thru.

Derivatives Broker 1 and Yen Desk Head had the following exchange (exclamation by all-capital letters in original):

| | |
|---|---|
| <u>Derivatives Broker 1:</u> | [Yen Desk Head] THIS IS GETTING SERIOUS  [Hayes]  IS NOT HAPPY WITH THE WAY THINGS ARE PROGRESSING HE IS GOING  TO HAVE  A WORD WITH [Competing Broker]  TO RECTIFY THE SITUATION.  CAN YOU PLEASE GET HOLD OF [Cash Broker 1] AND GET HIM TO SEND OUT 6 MOS LIBOR AT 0.865 AND TO GET HIS BANKS SETTING IT HIGH.  **THIS IS VERY IMPORTANT BECAUSE HE IS QUESTIONING MY (AND OUR) WORTH** ...  GET 6MOS HIGH PLEASE. |
| <u>Yen Desk Head:</u> | mailed him spoke to him**, he realises that the carrot might go if this carries on** |

336.    Ultimately, Cash Broker 1 sent the demanded revised Run Thru with the six-month Suggested Yen-LIBOR at the level requested by former UBS Senior Yen Trader Hayes, 0.865.

337.    In early 2009, former UBS Senior Yen Trader Hayes made good on his threat to take business elsewhere when he was not completely satisfied.  At the end of 2008, ICAP Derivatives Broker 1 retired for a brief period.  Former UBS Senior Yen Trader Hayes then moved some of his business to another interdealer broker ("Broker B") because he believed Broker B was more responsive to his requests to manipulate Yen-LIBOR.  Upon Derivatives Broker 1's return to work in April 2009, he restored the relationship by ensuring that former UBS Senior Yen Trader Hayes's  Yen-LIBOR requests were transmitted to Cash Broker 1 on a regular basis:

**April 28, 2009**:

| | |
|---|---|
| <u>Senior Yen Trader</u>: | need 6m up big time when 6m goes over the turn ... |
| <u>Derivatives Broker 1</u>: | ... i'll get to work on [Cash Broker 1] |
| <u>Senior Yen Trader</u>: | thx … |
| <u>Derivatives Broker 1</u>: | ok with you, hasve you asked [Cash Broker 1] for his opinion yet? |
| <u>Senior Yen Trader</u>: | no  to be honest [Derivatives Broker 2] is too busy he has too many lines  i really rarely get [Cash Broker 1's] insoght i rely on [Yen Broker at Broker B] more now |
| <u>Derivatives Broker 1</u>: | ok we can remedy that  :-( i'll give them a kick up the ar se and contact [Cash Broker 1] direct |
| <u>Senior Yen Trader</u>: | yeah would be better |

**Rabobank Colluded With Broker Defendants ICAP and R.P. Martin to Manipulate Yen-LIBOR to Benefit Rabobank's Euroyen-Based Derivatives Positions.**

338.    Despite awareness of an investigation related to LIBOR, Rabobank continued its efforts to manipulate Yen-LIBOR to benefit its Euroyen-based derivatives positions.  Rabobank now began to use the Broker Defendants to facilitate the manipulation.

339.    On November 30, 2010, in the midst of the CFTC's investigation of Rabobank's U.S. Dollar LIBOR submission practices, Rabobank Senior Manager 2 instructed the Yen-LIBOR submitters at that time, Yen Trader-Submitter 3 and Yen Trader-Submitter 4, that it was improper to consider rate requests from traders when making Rabobank's LIBOR submissions and that the practice should stop.   That same day, when Rabobank's Senior Yen Trader sent the daily Yen-LIBOR rates to be submitted, the Yen-LIBOR submitters refused to assist him. Reacting to the loss of his ability to influence the Yen-LIBOR fixings directly, the very next day Rabobank's Senior Yen Trader contacted Broker Defendant ICAP ("ICAP Cash Broker") and

requested his assistance in manipulating Yen-LIBOR to benefit the Rabobank Senior Yen

Trader's Euroyen-based derivatives positions.  The Rabobank Senior Yen Trader admitted to the

ICAP Cash Broker that he previously acted as Rabobank's Yen-LIBOR submitter and

"influence[d]" the LIBOR submissions until November 30, 2010.

340.    The Rabobank Senior Yen Trader continued to request the ICAP Cash Broker's

assistance in his manipulative efforts throughout the end of 2010 and into early 2011.  For

example, on December 1, 2010, the Rabobank Senior Yen Trader wanted three-month and six

month Yen-LIBOR "down" on December 2.  ICAP readily acquiesced and promised to "work

some magic" to lower three-month and six-month Yen-LIBOR.

341.    On at least two occasions, Rabobank also communicated with another broker at

Broker Defendant R.P. Martin and sought R.P. Martin's assistance in manipulating Yen-LIBOR.

For example, on one of these occasions, on January 19, 2011, Rabobank requested R.P. Martin's

assistance in pushing the six-month Yen LIBOR fixing in a favorable direction to benefit

Rabobank's Euroyen-based derivatives positions.

**1.   Rabobank Colluded with Broker Defendant R.P. Martin to Aid UBS's
      Manipulation.**

342.    The Rabobank Senior Yen Trader-Submitter communicated with Broker

Defendant R.P. Martin to discuss the Yen market generally and Yen-LIBOR fixings in particular.

From at least May 2008 through at least September 2008, R.P. Martin asked the Rabobank

Senior Yen Trader-Submitter at times to make particular Yen-LIBOR submissions, and on at

least one occasion stated that the request was intended to benefit the derivatives trading positions

of former UBS Senior Yen Trader Hayes, who was also a client of R.P. Martin.  During the same

period, the Rabobank Senior Yen Trader-Submitter also informed R.P. Martin that he received

requests for particular Yen-LIBOR submissions for certain tenors from the Rabobank Senior Yen

Trader. On at least one occasion, the Rabobank Senior Yen Trader-Submitter indicated he would accommodate R.P. Martin's Yen-LIBOR request on behalf of former UBS Senior Yen Trade Hayes along with the rate preference of the Rabobank Senior Yen Trader when making Rabobank's Yen-LIBOR submissions on that particular day.

343.    The below example reveals "back scratching," *i.e.*, explicit agreements by co-conspirators to submit artificial Yen-LIBOR rates to financially benefit other co-conspirators' Euroyen derivatives positions in return for the other co-conspirators' agreement to return the favor sometime in the future.  On July 18, 2008, R.P. Martin reached out to Rabobank to ask where Rabobank planned on setting its one-month Yen-LIBOR that particular day.  The Rabobank Senior Yen Trader-Submitter had not yet been told where to set Rabobank's one-month Yen-LIBOR and R.P. Martin requested Rabobank set one-month Yen-LIBOR at "65" or "as low as possible basically" at the behest of a "geezer at UBS [Thomas Hayes]."  The Rabobank Senior Yen Trader-Submitter agreed and went further by saying that Rabobank will set its one-month Yen-LIBOR at .63 so long as R.P. Martin let UBS know in order for UBS to "scratch [Rabobank's] back" in the future.  R.P. promised to "definitely" let UBS know in order to "play the rules."  Consistent with his agreement to do so, Rabobank's one-month Yen-LIBOR submission on July 18, 2008 was .63.

**RBS Manipulated Yen-LIBOR through Brokers and Engaged in Wash Trades to Compensate the Broker Defendants for Their Assistance.**

344.    By January 2007, RBS Yen Trader 1 came to suspect that UBS was using interdealer brokers to manipulate Yen-LIBOR.  At that time, RBS Yen Trader 1 commented to another RBS trader, stating: "do you think brokers go and tell small banks where it should be?[ ... ] on behalf of the bigger banks i could imagine UBS telling the brokers to go and get all the small banks to mark libor up."  Several months later, in August 2007, RBS Yen Trader 1

commented again to UBS Senior Yen Trader Hayes about information he learned from R.P. Martin Broker B, "i was out with [R.P. Martin Broker B] yesterday every day [UBS Yen Trader] comes down and asks the jpy desk to tell all the banks to set [Yen] libor low."

345.    Beginning a year later, from September 2008 to August 2009, as requested by at least two interdealer brokers, R.P. Martin Brokers B and C, RBS Yen Trader 1 agreed to execute "wash" or "switch" trades with UBS, to compensate R.P. Martin Brokers B and C for assisting UBS Yen Trader to manipulate Yen-LIBOR.

346.    RBS paid brokerage commissions on some of these wash trades to maintain good relationships with the interdealer brokers.  For example, on September 19, 2008, R.P. Martin asked RBS Yen Trader 1 for a "favour" to enter into a "switch" or wash trade with UBS because UBS wanted to pay R.P. Martin "some bro."  In exchange for entering the wash trade with UBS, R.P. Martin promised to send around lunch to the RBS desk because the trade was so large.  The exchange between Interdealer Broker B [R.P. Martin] and RBS Yen Trader 1 is below:

**September 19, 2008**:

| | |
|---|---|
| R.P. Martin Broker B: | can you do me a favour ... you're not going to get paid any bro for this and we'll send you lunch around for the whole desk.  Can you flat ... can you switch two years semi at 5 3/4, 100 yards [meaning 100 billion] ... between UBS. Just get ... take it from UBS, give it back to UBS. He wants to pay some bro. We won't bro you ... |
| Yen Trader 1: | Yeah, yeah.[ ... ] |
| R.P. Martin Broker B: | Yeah. Yeah. 100 yards ... actually can you make it 150 and I'll send lunch around for everybody? |
| Yen Trader 1: | Yeah. |
| R.P. Martin Broker B: | Thanks very much. Cheers. Cheers, mate and you choose lunch. |

347.     That same day, R.P. Martin asked RBS Yen Trader 1 to accept wash trades with UBS of an additional 100 billion Yen to enable Hayes to pay approximately $31,000 in brokerage fees to R.P. Martin as compensation for the latter's assistance in the manipulation. By agreeing to do so, RBS Yen Trader 1 knowingly assisted the UBS Yen Trader's manipulation because he helped ensure that the interdealer broker was compensated.

348.     RBS Yen Trader 1 also eventually asked R.P. Martin, on at least one occasion, to try to influence other panel banks' Yen-LIBOR submissions to benefit the trading positions of RBS Yen Trader 1.  On June 26, 2009, RBS Yen Trader 1 asked R.P. Martin where UBS wants Yen-LIBORs to be "put" on this particular day.  R.P. Martin tells RBS that UBS wants the one-month and three-month Yen-LIBOR "a little bit lower" and wants the six-month Yen-LIBOR "probably about the same where they are now."  RBS, however, asked R.P. Martin to assist in lowering six-month Yen-LIBOR.  R.P. Martin readily agrees saying "alright….we'll work on it." Later that same day, R.P. Martin reported back to RBS Yen Trader 1 that the R.P. Martin "team" spoke with unidentified Bank F, Bank G, Bank H and Bank I and "a couple of other people" to lower six-month Yen-LIBOR:

| | |
|---|---|
| R.P. Martin Broker B: | Hello mate, [Yen Trader 1]? You all set? |
| Yen Trader 1: | Yeah. |
| R.P. Martin Broker B: | Alright okay, alright listen, we've had a couple words with them. You want them lower, right? |
| Yen Trader 1: | Yeah. |
| R.P. Martin Broker B: | Alright okay, alright, no we're okay just confirming it.  We've, so far we've spoke to [Bank F]. We've spoke to a couple of people so we'll see where they come in alright.  We've spoke, basically one second, basically we spoke to [Bank F], [Bank G], [Bank H], who else did I speak to?  [Bank I]. There's a couple of other people that the boys have |

spoke to but as a team we've basically said we want a bit lower so we'll see where they come in alright?

Yen Trader 1:                Cheers.

R.P. Martin Broker B:        Cheers no worries mate.

349.    Yen Trader 1 then executed a wash trade with UBS to compensate R.P. Martin for its assistance, generating about $20,000 in commissions for R.P. Martin.

**The Contributor Bank Defendants Colluded Directly with One Another To Manipulate Yen-LIBOR, Euroyen TIBOR and the Prices of Euroyen-Based Derivatives.**

### 1.   UBS's Collusion with Other Panel Banks.[15]

350.    Hayes augmented his internal efforts to manipulate Yen-LIBOR and Euroyen TIBOR for multiple tenors and the prices of Euroyen-based derivatives by coordinating with derivative traders at other panel banks.  Thus, former UBS Senior Yen Trader Hayes wanted to better exploit the averaging methodology used to calculate fixings by increasing the likelihood that more than one corrupted submission would be included in, or could impact, the official daily fixing of Yen-LIBOR and Euroyen TIBOR.

351.    Hayes began coordinating regularly with derivatives traders at other panel banks by January 2007.  Hayes coordinated with traders primarily at four panel banks whom he knew or had worked with previously.  Hayes, or others acting on his behalf, made about 100 requests of traders at the other panel banks.  Hayes generally made requests of the other banks' traders, who regularly agreed to pass his requests to their Yen-LIBOR or Euroyen TIBOR submitters. Former UBS Senior Yen Trader Hayes also made requests directly of the submitter of at least one bank.  The other traders often conveyed success with comments such as, "done" and "we normally do well for u!!!"

---

[15] *See also* Ex. A-2, pp. 17-20; Appendix at 33, 38, 46, 66, 75, 119, and 184.

352.    For their own manipulative purposes of benefiting their Euroyen-based derivatives trading positions, certain of the derivatives traders at the other banks sought reciprocating assistance from Hayes to make requests on their behalf to UBS's submitters. Hayes readily agreed to help them and often encouraged them to ask for help as a way to curry favor and ensure his requests were accommodated.

353.    The following are examples of the numerous communications between Hayes and derivatives traders at the other panel banks reveal:

o   descriptions of Hayes's strategy and his success in keeping Euroyen rates "artificially high;"

o   how, as with the internal requests, Hayes pressed traders at the other banks for assistance particularly on key fixing dates around the IMM dates or the turn of the calendar year;

o   how routine the requests were and how the traders believed that Yen-LIBOR was vulnerable to manipulation at their whim and for their benefit;

o   that the requests covered a number of days of Yen-LIBOR submissions at times, such that one request could result in multiple days of false Yen-LIBOR submissions potentially affecting the fixing for the same period;

o   the pressure Hayes felt to keep making money for UBS; and

o   that the traders believed they succeeded at times.

354.    On February 2, 2007, former UBS Senior Yen Trader Hayes described this method of manipulating Yen-LIBOR in an electronic chat with his counterpart Yen derivatives trader ("Trader-A1") at another Contributor Panel bank ("Bank-A"):

| | |
|---|---|
| Hayes: | 3[month Yen] libor is too high cause I have kept it artificially high |
| Trader-A1: | how[?] |
| Hayes: | being mates with the cash desks, [another Contributor Panel bank, ("Bank-C") and I always help each other out too. |
| Trader-A1: | that's useful to know. |

355.    By April 2007, Hayes had requested Trader-A1 to solicit Bank-A LIBOR submitters to contribute submissions which benefited UBS's Yen trading positions.  For example, in an April 20, 2007 electronic chat, Hayes stated to Trader-A1: "I know I only talk to you when I need something but if you could ask your guys to keep 3m [Yen-LIBOR] low wd be massive help as long as it doesn't interfere with your stuff . . . tx in advance."

356.    Approximately 30 minutes later former UBS Senior Yen Trader Hayes and Trader-A1 had the following chat:

> Hayes:      mate did you manage to spk to your cash boys?
>
> Trader-A1:  yes u owe me they are going 65 and 71
>
> Hayes:      thx mate yes I do . . . in fact I owe you big time

357.    Approximately 45 minutes later, after checking to see if Bank-A lowered its 3-month Yen-LIBOR submission to 65, Hayes sent the following message to Trader-A1: "Mate they set 64! . . . that's beyond the call of duty!"

358.    Hayes also occasionally requested his counterpart Yen derivatives trader ("Trader-B") at another Contributor Panel bank ("Bank-B") to have Bank-B[16] contribute Yen-LIBOR submissions to benefit UBS's Yen trading positions.  For example, on May 21, 2009 Trader-1 asked Trader-B: "cld you do me a favour would you mind moving you 6m [Yen] libor up a bit today, I have a gigantic fix."  Trader-B – who also sometimes acted as the Yen-LIBOR submitter for Bank-B – responded "I can do that."  As promised, Trader-B raised Bank-B's 6-month Yen-LIBOR submission by six (6) basis points that day.

359.    Hayes also asked his counterpart Yen derivatives trader ("Trader-C") at a third Contributor Panel bank ("Bank-C") to have Bank-C contribute Yen-LIBOR submissions to

---

[16] Upon information and belief, Bank B is Defendant Deutsche.  Deutsche was the only Yen-LIBOR Contributor Bank to raise its Yen-LIBOR submission by 6 basis points: .65 (on May 20) to .71 (on May 21).

benefit UBS's Yen derivatives trading positions.  For example, in a January 29, 2007 electronic chat with Trader-1, Trader-C asked: "[A]nything you need on [Yen] libors today?  High 6m [Yen-LIBOR] would help me."  Hayes responded, "high 3m I'll sort our 6m rate for you thanks."  As promised, Hayes made a request to the UBS Yen-LIBOR submitter for a high 6-month contribution.

360.    As a final example, Hayes also contacted his counterpart Yen derivatives trader ("Trader-D") at a fourth Contributor Panel bank, ("Bank-D"), in an effort to influence Bank-D's Yen-LIBOR submissions in order to benefit UBS's Euroyen-based derivatives positions.

361.    On June 28, 2007, in an electronic chat with Trader-D, former UBS Senior Yen Trader Hayes asked: "pls ask ur mate for high 6m [Yen-LIBOR] mate . . . wd be really really grateful."  Trader-D responded: "will do, for the record he's def not my 'mate'! . . . but I'll [send him an electronic chat]." As requested, approximately 15 minutes later, Trader-D sent an electronic chat to the Bank-D Yen-LIBOR submitter stating, "high 6m yen libor would be gd according to my brother!"  The Yen-LIBOR submitter responded, "WILL DO MY BEST."

362.    Hayes knew that coordinating with other Contributor Panel Banks to manipulate Yen-LIBOR and Euroyen-based derivatives prices was wrong.  In a July 22, 2009 electronic chat with Broker-A1, Hayes described his plan to coordinate Yen-LIBOR submissions with other Contributor Panel Banks over the next few weeks while staggering drops in submissions so as to avoid detection:

> Hayes:                          11th aug is the big date . . . i still have lots of 6m [Yen-LIBOR] fixings till the 10th
>
> ****
>
> Broker-A1:                    if you drop your 6m [Yen-LIBOR] dramatically on the 11th mate, it will look v fishy, especially if [Bank D] and [Bank B] go with you. I'd be v careful how you play it,

| | |
|---|---|
| | there might be cause for a drop as you cross into a new month but a couple of weeks in might get people questioning you. |
| Hayes: | don't worry will stagger the drops . . . ie 5bp then 5bp |
| Broker-A1: | ok mate, don't want you getting into sh it |
| Hayes: | us then [Bank B] then [Bank D] then us then [Bank B] then [Bank D] |
| Broker-A1: | great the plan is hatched and sounds sensible |

### 2.  RBS Admits To Colluding with UBS to Manipulate Yen-LIBOR.[17]

363.    At least as early as February 2007, an RBS derivatives trader, Trader-3, and former RBS and UBS Senior Yen Trader Hayes ("Hayes") agreed to request that their respective Yen-LIBOR submitters contribute Yen-LIBOR submissions to benefit their Euroyen-based derivatives positions.  In 2008, Hayes and another RBS trader, Trader-6, agreed to make requests to benefit Hayes's trading positions, and, in 2010, after Trader-6 had left RBS and moved to an interdealer broker, Hayes enlisted Trader-6 to convey requests to RBS for the purpose of influencing RBS's Yen-LIBOR submissions.

364.    As early as February 2, 2007, Trader-3 knew that Hayes communicated with another Contributor Panel bank, Bank-A, as part of Hayes's effort to manipulate Yen-LIBOR and the prices of Euroyen-based derivatives.  In an electronic chat that day, Hayes stated:

| | |
|---|---|
| Hayes: | ... 3m libor is too high cause i have kept it artificially high. |
| Trader-3: | how |
| Hayes: | being mates with the cash desks, [Bank-A] and i always help each other out . . . too. |
| Trader-3: | ok thats useful to know. . . |

---

[17] *See also* Ex. B-4, pp. 19-21.

365.     On numerous occasions in 2007, Hayes requested that Trader-3 ask the RBS Yen-LIBOR submitter to move RBS's Yen-LIBOR submission in a particular direction (*i.e.*, up or down) or to contribute a particular LIBOR submission in order to benefit Hayes's Euroyen-based derivatives positions.  Trader-3 often agreed to make the request.  On a few occasions, Trader-3 similarly requested that Hayes ask UBS's Yen-LIBOR submitter to make a contribution that would benefit Trader-3's Euroyen-based derivatives positions, and Hayes agreed to make the requests.

366.     For example, over a period of approximately ten days in February 2007, Hayes and Trader-3 discussed lowering the 1-month Yen-LIBOR to benefit their Euroyen-based derivatives positions, in addition to coordinating requests in other tenors.  In an electronic chat on February 8, 2007, Hayes requested that Trader-3 ask RBS's Yen-LIBOR submitter to contribute a low 1-month Yen-LIBOR submission:

> Hayes:      can you do me a huge favour, can you ask your cash guys to set lm libor low for the next few days . . . i'll return the favour as when you need it ... as long as it doesn't go against your fixes . . . have 30m jpy of fixes over the next few days
>
> Trader-3:   yeah i will try

367.     Later in the same chat, Hayes noted that he "lost lots today. . . hence really need a hand on lm [Yen] lib . . . pls don't forget."  Trader-3 responded, "ok i will try my best."  Trader-3 and Hayes then discussed other topics, and at the end of the conversation, Hayes reminded Trader-3 of his request for a low 1-month Yen-LIBOR:

> Hayes:      oh well i am off home dreaming of a low lm [Yen] libor!
>
> Trader-3:   good luck what sort fo level do u want
>
> Hayes:      if you can get a .42 six that wd be great . . . fix . . . not six

| | |
|---|---|
| Trader-3: | 0 .42 |
| Hayes: | thats the one! |
| Trader-3: | ok will speak to me guy in a sec |

368.    The next day, in an electronic chat dated February 9, 2007, Hayes thanked Trader-

3.  The two traders discussed whether their Euroyen-based derivatives positions, and thus their

preferred Yen-LIBOR levels, were aligned, and Hayes requested a low fixing:

| | |
|---|---|
| Hayes: | thx help lm [Yen-LIBOR] y/day appreciated |
| Trader-3: | no worries |
| | * * * * |
| Hayes: | can you ask for a low lm [Yen-LIBOR] again today pls if ok? . . . todays fix is 12m . . . you need anything on 3m or m? |
| Trader-3: | no my book is still tiny i will go for low [Yen] libor again ... it suits me too as i am short the spreads |
| Hayes: | ok thanks |

369.    Later in the same chat, Trader-3 and Hayes discussed their mutual interest in low

1-month and other Yen-LIBOR submissions, and Hayes told Trader-3 that he would contact

Bank-A as well:

| | |
|---|---|
| Trader-3: | i told my cash guy i want low lm and 3m fixes and high 6 m that suits uu right |
| Hayes: | yes absolutely, is that ok with you? we will be exactly the same . . . am going to talk to [Bank-A] as well |
| Trader-3: |  perfect |
| Hayes: | cool . . . you in monday? |
| Trader-3: | yeah a bit |
| Hayes: | ok get them to set the same fixes monday as well if ok |

Trader-3:          sure

370.     On February 13 and, 14, 2007, Hayes again requested that Trader-3 ask RBS's Yen-LIBOR submitter for a low 1-month Yen-LIBOR contribution, and informed Trader-3 that Hayes would continue to need a low 1-month Yen-LIBOR until February 15, 2007.

371.     In an electronic chat on February 15, 2007, Hayes requested that Trader-3 make a request to the RBS Yen-LIBOR submitter for low 1-month and high 6-month submissions, and Trader-3 agreed to do so:

Hayes:          can you ask for a low lm fix again ...wd really help

* * * *

Trader-3:          sure it suite me to get low 1s and s . . . 3s

Hayes:          thanks need high 6's tho if ok with you?

****

Trader-3:          i have got nothing in 6s until the 19 fix date when i need a high one too

Hayes:          ok thx [Trader-3]

Trader-3:          so yeah thats fine with me my cash guy is rubbish at guessing where [Yen] libors are going to be but he listens to what i say

Hayes:          thats a releif [sic]

372.     Later that same day, Trader-3 asked Hayes "how many people can you get to put this lm [Yen] libor low."  Hayes responded, "well us [Bank-A] and a few others i think."

373.     Within minutes of this exchange, Hayes asked a UBS Yen-LIBOR submitter to contribute a low 1-month and 6-month Yen-LIBOR submission. Hayes then asked the UBS submitter if he knew anyone at another Contributor Panel bank that he "could have a word with .

. . . as a favour."  The submitter replied that he lacked that "edge" but suggested that Hayes "have a word with [Bank-A]."  In response, Hayes stated that he had "already done that . . . and rbs."

374.    Hayes occasionally communicated to Trader-3 his expectations about the direction of an upcoming UBS Yen-LIBOR submission.  In an electronic chat on February 26, 2007, for example, Hayes asked, "can you try to get your guys to leave their 3m and 1m [Yen] libors unchanged."  Trader-3 responded, "yeah i want low ones so that suits me."  Hayes replied by communicating UBS's intention: "gd thx mate ... we are going low too."

375.    On a few occasions, Trader-3 also requested that Hayes ask the UBS Yen-LIBOR submitter to contribute a particular submission or to move UBS's submission in a particular direction (i.e., up or down) in order to benefit Trader-3's trading positions, and Hayes agreed.  In an electronic chat on March 2, 2007, the following exchange occurred:

> Trader-3:       please please low 6m [Yen-LIBOR] fix on monday . . . i
>                 have got a [b]ig fix
>
> Hayes:          sure no worries
>
> * * * *
> Hayes:          how big is the fix mate?
>
> Trader-3:       100 us big for me
>
> Hayes:          10m jpy? . . . yes thats quite lrge 200b 6m

376.    On March 6, 2007, Trader-3 had the following exchange with Hayes in an electronic chat:

> Trader-3:       yeah can u go fr low everything plse . . . i am
>
> Hayes:          will do cld do with high threes but won't get it we are the
>                 lowest

377.    Later that morning, consistent with the request he received from Trader-3, Hayes had the following exchange with UBS's Yen-LIBOR submitter:

| | |
|---|---|
| Hayes: | hi pls don't forget low lm and 6m! :) . . . have lots fixing |
| UBS submitter: | mate i won't |

378.    On a few occasions, Trader-3 reported back to Hayes that he expected Submitter-1 to accommodate a request.  In an electronic chat on April 20, 2007, Hayes requested that Trader-3 ask RBS's Yen-LIBOR submitter for a low 3m Yen-LIBOR submission.  *See* Appendix at 66.

379.    Hayes' requests to Trader-3 continued at various times throughout 2007.  *See* Appendix at 119.

380.    Trader-3's dealings with Hayes were noted by others at RBS.  In an electronic chat on March 27, 2008, Trader-1 asked Trader-2 whether Trader-3's request for a lower submission was done at Hayes's request:

| | |
|---|---|
| Trader-1: | we change the [Yen] libor lower? |
| Trader-2: | [Trader-3] asked [a junior backup submitter] to put it low |
| | **** |
| Trader-1: | does he need it or Tom Hayes ask him to do it? . . . cos UBS wanted low |

381.    During 2008, Hayes, as he had with Trader-3, asked Trader-6 to request that RBS's Yen-LIBOR submitter contribute RBS's Yen-LIBOR submissions at levels that benefitted Hayes's (and UBS's) Euroyen-based derivatives positions.

382.    Trader-6 and Hayes had the following exchange by email on May 7, 2008:

| | |
|---|---|
| Hayes: | Hi [Trader-6] . . . can you please ask for a low 6m in jpy for the next few days. Hope you are ok, was good seeing you last week |
| Trader-6: | Hi mate, I mentioned it to our guy on Friday and he seemed to have no problem with it, so fingers crossed. |

383.   A similar electronic communication occurred on November 3, 2008:

> Hayes:               can you do me a favour and ask your guys for a low JPY
>                      3m fix today if they can? . . . wld be massiive help
>
> Trader-6:            will ask
>
> Hayes:               have monster fix . . . thanks [Trader-6]

384.   In or around July 2009, Trader-6 left RBS, and subsequently began working for an interdealer brokerage firm ("Brokerage-A") as a cash broker.  While at Brokerage-A, Trader-6 maintained his relationship with Submitter-1 at RBS, and continued to assist Hayes in Hayes's efforts to influence RBS's Yen-LIBOR submissions.

385.   For instance, on March 3, 2010, Hayes (who by that time had left UBS and joined Bank-B)[18] had the following exchange with Trader-6, who was now employed as a broker with Brokerage-A:

> Hayes:               i really need a low 3m Yen-LIBOR into the imm . . . any
>                      favours you can get with [Submitter-1] would be much
>                      appreciated . . . even if he on;ly move 3m down lbp . . .
>                      from 25 to 24
>
> Trader-6:            I'll give him a nudge later, see what he can do
>
> Hayes:               thanks mate . . . really really would appreciate that
>
> Trader-6:            haven't seen him since i left so I might buy him a steak to
>                      catch up
>
> Hayes:                yeah

A little less than three hours later, Trader-6 and Submitter-1 had the following conversation:

> Trader-6:             can i pick ur brain?
>
> Submitter-1:         yeah

_____

[18] Upon information and belief, Bank B is Defendant Citibank.

| | |
|---|---|
| Trader-6: | u see 3m Yen-LIBOR going anywhere btween now and imm? |
| Submitter-1: | looks fairly static to be honest, poss more pressure on the upside , but not alot |
| Trader-6: | oh. we hve a mutual friend who'd love to see it go down, no chance at all? |
| Submitter-1: | haha TH[Thomas Hayes] by chance |
| Trader-6: | shhh |
| Submitter-1: | hehehe , mine should remain flat , always suits me if anything to go lower as i rcve funds |
| Trader-6: | gotcha, thanks, and, if u cud see ur way to a small drop there might be a steak in it for ya, haha |
| Submitter-1: | noted ;-) |

386.    The next day, March 4, 2010, RBS's Yen-LIBOR submission moved down by one basis point, from 25 to 24, consistent with Hayes's request, prompting the following exchange between Trader-6 and Submitter-1:

| | |
|---|---|
| Submitter-1: | Libor lower ;-) |
| Trader-6: | good work!!!! |

387.    Submitter-1 lowered RBS's Yen-LIBOR contribution another basis point on March 9, 2010, then dropped it another basis point two days later, tying one other Contributor Panel bank for the lowest Yen-LIBOR submission that day.  RBS's Yen-LIBOR submission remained tied with one other Yen-LIBOR Contributor Panel bank submission through March 17, 2010, the March IMM fixing date originally referenced by Hayes.  On March 17, 2010, RBS's Yen-LIBOR submission was 2.375 basis points below the BBA Yen-LIBOR fix.

### 3. Rabobank Admitted that it Had A Standing Agreement to Collude with Unidentified Bank B.[19]

388.    From as early as May 2006 and continuing at least through October 2008,

Submitter-4 and a trader ("Trader-B") at another Contributor Panel bank ("Bank-B")[20] had an

agreement that they would, upon request, contribute Yen-LIBOR submissions to benefit each

other's Euroyen-based derivatives positions, or the Euroyen-based derivatives positions of other

traders, whenever doing so did not adversely affect their own Euroyen-based derivatives

positions.  As Trader-B explained in an email forwarding a Yen-LIBOR submission request from

Submitter-4 to the Yen-LIBOR submitters at Bank-B: "We usually try and help each other

out...but only if it suits."

389.    On June 27, 2006, for example, Submitter-4 communicated with Trader-B: "i

need a high lmth today - so i will be setting an obseenly high lmth."  Trader-B responded: "sure

mate no worries...give us an idea where and i'll try n oblige...;)," to which Submitter-4 replied:

"ok great - well at mo thinking of setting mine around 17."  Trader-B accommodated

Submitter-4's manipulation request, as Bank-B's one-month submission for that day was 0.17.

390.    On July 6, 2006, Submitter-4 communicated with Trader-B: "for info i need a

high lmth set today - i will be setting something ridiclous like 28 or 29 for info."  That day,

Rabobank's 1-month Yen-LIBOR submission was 0.29, an increase of two basis points, making

Rabobank's submission the highest submission on the Contributor Panel.  Likewise, Bank-B's

1-month Yen-LIBOR submission also increased by two basis points.

391.    On occasions when Submitter-4 or Trader-B was unable to, or failed to,

accommodate the other's Euroyen-based derivativatives positions, an effort was sometimes made

to explain the attendant circumstances and to preserve their agreement.  For example, on March

---

[19] *See also* Ex. D-2, pp. 22-24.

[20] Upon information and belief, Bank-B is Defendant Lloyds.

28, 2008, Submitter-4 preemptively contacted Trader-B to explain that their submissions would be at odds that day: "morning skip - [Trader-5] has asked me to set high libors today - gave me levels of lm 82, 3m 94....6m 1.02."  Trader-B replied: "sry mate cant oblige today...i need em lower!!!" Submitter-4 then explained: "yes was told by [a third party]...just thought i'd let you know why mine will be higher...and you don't get cross with me."

392.    Similarly, on January 5, 2007, Trader-B explained how he had mistakenly failed to accommodate a manipulation request from Submitter-4: "just b4 you beat me up....I was in meeting so didn't do me libors today...thk they put .52 for 1s..." Submitter-4 answered: "hahah no thats fine - thats what i set too cheers skip."

393.    The agreement between Submitter-4 and Trader-B was also used to manipulate Yen-LIBOR to benefit other traders at both Rabobank and Bank-B.  For example, on May 10, 2006, Submitter-4 made a manipulation request of Trader-B on behalf of Trader-4 for a low six-month submission: "re our conversation yesterday about libors...for info i've been asked by my Singapore man to help him out with a silly low 6m fixing today.. ...just for your info." Trader-B responded: "Tell him I'll do same if he gets me a job!!!!"

394.    On July 27, 2006, Submitter-4 contacted Trader-B on behalf of Trader-5 to request a high one-month submission consistent with Rabobank's submission: "[Trader-5] wants a high lm fix from me today....am going to set .37."  Trader-B agreed: "that suits mate," "so happy to oblige."  Bank-B's submission jumped from 0.35 to 0.37 between July 26, 2006, and July 27, 2006, a move that took Bank-B's submission from being tied as the lowest submission on the Contributor Panel to being tied as the second highest submission on the Contributor Panel.

395.    The following day, July 28, 2006, Submitter-4 and Trader-5 conferred internally regarding their mutual desires for another high fixing.  Submitter-4 stated to Trader-5: "setting a

high lm again today - I need it!" to which Trader-5 responded: "yes pls mate...I need a higher lm libor too."  Within approximately 20 minutes, Submitter-4 contacted Trader-B and stated: "morning skipper will be setting an obscenely high lm again today...poss 38 just fyi."  Trader-B responded, "(K)...oh dear..my poor customers....hehehe!! manual input libors again today then!!!!"  Both banks' submissions on July 28, 2006, moved up one basis point, from 0.37 to 0.38, a move which again placed their submissions as the second highest submissions on the Contributor Panel that day.

396.    Upon information and belief, Bank-B is Defendant Lloyds.  On July 27, 2006, Lloyds was one of only two Yen-LIBOR Contributor Banks to move their one-month Yen-LIBOR submission up from .35 (July 26) to .37 (July 27).  In addition, aside from Rabobank, Lloyds was the only other Yen-LIBOR Contributor Bank to move its one-month Yen-LIBOR submission up an additional basis point from .37 (July 27) to .38 (July 28).

397.    As discussed, on March 19, 2008, Submitter-4 agreed to a request from Trader-5 and Trader-6 to submit a six-month Yen-LIBOR rate (1.10%) that Submitter-4 knew to be incorrect.  Submitter-4 then contacted Trader-B pursuant to their understanding to request a similar manipulation of Bank-B's Yen-LIBOR submission for that day: "[Trader-5] needs a high 6m libor if u can help skip - asked me to set 1.10!"  Trader-B answered: "oops my 6s is 1.15!!!," "he'll love me," and "send him my regards the lovely fella....not heard from him in a while….."  Again, upon information and belief, Bank-B is Defendant Llloyds as they were the only Yen-LIBOR contributor bank to submit six-month Yen-LIBOR at 1.15 on March 19, 2008.

398.    Likewise, Trader-B had a July 19, 2007, telephone conversation with another trader at Bank-B ("Trader-C"), in which Trader-C made a manipulation request of Trader-B for

three-month Yen-LIBOR, and Trader-B offered to extend Trader-C's manipulation request to

Submitter-4:

> Trader-C:   I need a little favor today for what it's worth. I don't know what you've been doing in 3 months, but we've got like a fixing of 83 billion on Monday, [unintelligible] Low threes, [unintelligible]

> Trader-B:   What you want to do, what you want me to put low libor in, is that what you are saying?

> Trader-C:   Yeah, low libor in the threes.

> Trader-B:   Yeah, 'course I can, mate. No worries at all.

> Trader-C:   That would be nice.

> Trader-B:   I'll have a word with [Submitter-4] as well, he'll drop it down for you as well I'm sure, [unintelligible] It needs more than one, mate, trust me. [unintelligible] Where do you want it? And I'll just pitch it wherever you want, [unintelligible]

> Trader-C:   Um...roughly where it was yesterday, that's fine. That makes us ten under...well, just under ten under [unintelligible] we've been funding lately.

> Trader-B:   [unintelligible] Yeah, sure.

399.    A short time later, Trader-B followed through and contacted Submitter-4 with

Trader-C's manipulation request: "mrng beautiful if u can would love a low fixing in 3s libor

today...." Submitter-4 then asked: "ok skip - what u need?" to which Trader-B answered: ".77 if

poss but just no higher than yest!!"  Submitter-4 agreed, stating: "no prob."  On that day, both

Rabobank and Bank-B submitted 0.77 for the three-month Yen-LIBOR, placing both banks'

submissions in a tie for the second lowest submission on the Contributor Panel.

### 4.   **The January to May 2007 Campaign to Manipulate Three-Month Yen-LIBOR**

400.    Throughout 2007, UBS Senior Yen Trader Hayes made more than 450

documented requests directed towards manipulating Yen-LIBOR submissions. However, UBS

Senior Yen Trader Hayes had particularly large trading positions tied to three month Yen-LIBOR that matured in January and February 2007 and in April and May 2007.  As a result UBS Senior Yen Trader Hayes embarked on a coordinated campaign to manipulate three-month Yen-LIBOR for the benefit of his Euroyen-based derivatives positions.  For this purpose, UBS Senior Yen Trader Hayes made manipulative requests to UBS's Yen-LIBOR submitters, brokers and other Yen-LIBOR Contributor Banks.  UBS Senior Yen Trader Hayes reciprocated the requests to other Yen-LIBOR Contributor Banks by offering to adjust UBS's Yen-LIBOR submissions to suit their Euroyen-based derivatives positions.

401.    In an electronic chat on February 2, 2007, UBS Senior Yen Trader Hayes explained the aim of the 2007 campaign to an External Trader at another Yen-LIBOR Contributor Bank.  Hayes explained that his manipulative efforts to date were already producing results because he was: *"...mates with the cash desks,* [Panel Bank 3] *and i always help each other out"* with the result that *"3m libor is too high cause I have kept it artificially high."* and that he was currently keeping that Yen-LIBOR rate one basis point too high and that in May 2007, he would manipulate three-month Yen-LIBOR one basis point too low.

402.    In support of his efforts to manipulate three-month Yen-LIBOR, UBS Senior Yen Trader Hayes also sought to manipulate one-month and six-month Yen-LIBOR as well.

403.    **Phase One**.  Between January 17 and February 5, 2007, in the first phase of his campaign, UBS Senior Yen Trader Hayes made at least 18 three-month manipulative requests to UBS' Yen-LIBOR submitters.  He also made at least six Internal Requests for one-month submissions and at least 10 Internal Requests for six-month submissions. The UBS Trader-Submitters agreed to help with every Internal Request.

404.     For example, on January 24, 2007, UBS Senior Yen Trader Hayes contacted Manager A, who supervised and provided input to the Trader-Submitter making UBS's Yen-LIBOR submissions. UBS Senior Yen Trader Hayes asked Manager A to: *"...try to keep 6m and 3m libors up"*. Manager A responded: *"standing order, sir"*.  The same day, Trader-Submitter A, complained to Manager A that UBS Senior Yen Trader Hayes and Trader B wanted conflicting submissions. Trader-Submitter A complained: "*As I said to you, I got to say this is majorly frustrating that those guys can give us shit as much as they like...One guy* [UBS Senior Yen Trader Hayes] *wants us to do one thing and* [Trader B] *wants us to do another....*"

405.     On February 5, 2007, UBS Senior Yen Trader Hayes contacted Manager A and Trader-Submitter A in an electronic chat: " ... *last 3m fix if you cld keep high (6m wd prefer high but not urgent) and if we cld keep 1m low wd be appreciated, if doesn't suit let me know and maybe we can offset our fixes thx any help much appreciated.*" UBS Senior Yen Trader Hayes's offer to *"offset our fixes"* was an express recognition that his requests may conflict with the trading positions of Manager A.  Therefore, in order to safeguard against his requests being rejected, UBS Senior Yen Trader Hayes offered facilitation trades to Manager A to align their interests and *"offset"* any losses that Manager A may incur by carrying out the request.

406.     Throughout this period, UBS was consistently in the top quartile of the Panel Banks for three-month Yen-LIBOR except on one occasion when it fell into the middle of the pack for one day on January 24, 2007.

407.     As part of the same campaign, on at least four occasions in January 2007, UBS Senior Yen Trader Hayes made External Requests to External Traders at Panel Bank 3 to persuade them to cause their bank's submitters to increase their three-month Yen-LIBOR submissions. In return, UBS Senior Yen Trader Hayes offered to ask UBS's Trader-Submitters

to make Yen-LIBOR submissions to suit the positions of the external traders.  For example, on

January 19, 2007 in an electronic chat, UBS Senior Yen Trader Hayes asked External Trader B

at Panel Bank 3 to help him obtain a high three-month Yen-LIBOR submission from Panel Bank

3 because he had: "absolutely massive 3m fixes". UBS Senior Yen Trader Hayes said: "*Anytime*

*i can return the favour let me know as the guys here are pretty accommodating* [sic] *to me*".

408.    UBS Senior Yen Trader Hayes also made at least one Broker Request as part of

the first phase of the 2007 campaign.

409.    **Phase Two**.  Between the end of March to the middle of May 2007, as part of the

second phase of the 2007 campaign, UBS Senior Yen Trader Hayes made at least 27 Internal

Requests for low three-month Yen-LIBOR submissions. In all but one instance (when the request

went unanswered), the Trader-Submitters agreed to the requests.  Over this period, UBS Senior

Yen Trader Hayes also made at least 23 manipulative Internal Requests for Yen-LIBOR

submissions in the six month tenor.  In addition, Manager A solicited Internal Requests from

UBS Senior Yen Trader Hayes on at least one occasion.

410.    Examples of UBS Senior Yen Trader Hayes's Internal Requests include on March

29, 2007, when UBS Senior Yen Trader Hayes requested low three and six-month Yen-LIBOR

submissions from Manager A in an electronic chat.  UBS Senior Yen Trader Hayes asked what

Yen-LIBOR submission UBS was going to set. Manager A replied: "*too early to say yet ...*

*prob*[ably] *.69 would be our unbiased contribution.*" UBS Senior Yen Trader Hayes repeated the

request for a low three-month Yen-LIBOR submission. Manager A responded: "*as i said before*

*- i dun mind helping on your fixings, but i'm not setting libor 7bp away from the truth i'll get ubs*

*banned if i do that, no interest in that*". UBS Senior Yen Trader Hayes replied that he had no

interest in that happening either, and that he was "*not asking for it to be 7bp from reality*" and

concluded "*anyway, any help appreciated*". Consistent with UBS Senior Yen Trader Hayes's requirements, UBS's submission was two basis points less than the *"unbiased"* figure of 0.69%.

411.    In recognition that his request might conflict with Manager A's own trading positions, on April 17, 2007 UBS Senior Yen Trader Hayes said in an electronic chat: " ... *really need low libors today in everything, but esp 6m, let me know if that suits or if not can we do a fra? Thx."* UBS Senior Yen Trader Hayes offered the *"fra"* to Manager A as a facilitation trade in order to eliminate any conflict between their respective positions. In the event, there was no conflict, as reflected in Manager A's positive response: "*I've got nothing today, will keep 'em low*". On 17 April 2007, UBS's one month submission fell 1.5 basis points to 0.625%. The three month submission remained unchanged from the previous day at 0.65%. UBS's six month submission fell two basis points to 0.68%.

412.    Over this period, 34 of the 36 three-month Yen-LIBOR submissions made by UBS were lower than the published rate, consistent with UBS Senior Yen Trader Hayes's requests for low submissions.

413.    In the second phase of the 2007 campaign, UBS Senior Yen Trader Hayes also made at least six External Requests of External Traders at Panel Banks.  For example, on April 20, 2007, UBS Senior Yen Trader Hayes followed up on an earlier request in an electronic chat with External Trader C at Panel Bank 4:

Trader A: *"mate did you manage to spk to your cash boys?"*

External Trader C: *"yes u owe me they are going to 65 and 71"*

45 minutes later the conversation resumed after the submission had been made by Panel Bank 4's submitters:

External Trader C: *"mater* [sic] *they set* [x]*!"*

Trader A: *"thats beyond the call of duty! i wish it was there!"*

414.     In the second phase of the 2007 campaign, UBS Senior Yen Trader Hayes made at least four Broker Requests in connection with the three-month Yen-LIBOR rate.  In addition, UBS Senior Yen Trader Hayes also made at least seven Broker Requests in connection with the one and six-month Yen-LIBOR rate. This included UBS Senior Yen Trader Hayes instructing Broker A of Broker Firm A that he needed to keep cash/interbank lending rates down (the logic being that influencing these rates would indirectly influence the LIBOR submissions of other panel banks).

### 5.   Summer 2009 Manipulative Schemes: The "Turn Campaign" and "Operation 6M".

415.     Throughout his tenure at UBS, the Senior Yen Trader routinely employed each of his means of manipulation—internal requests, collusion with other panel banks, and coordination with brokers.  At times, he used all three means simultaneously for a longer period to achieve his objective.  This is illustrated by two long-term efforts from June through August 2009, which were dubbed the "turn campaign" and "operation 6m."

416.     By June 2009, the Senior Yen Trader had amassed significant positions in Yen interest rate swaps tied to one, three and six-month Yen-LIBOR.  The Senior Yen Trader's positions became so large at various points that he was close to exceeding internal risk limits imposed by UBS.  The largest positions were tied to six-month Yen-LIBOR.  Rather than entering into legitimate hedging positions that would offset his risk, however, the Senior Yen Trader made two coordinated and sustained pushes, to manipulate six-month Yen-LIBOR and Euroyen TIBOR in ways that would benefit his massive positions.

417.     **The Turn Campaign**.  The Turn Campaign commenced in early June 2009.  The Senior Yen Trader's derivatives positions tied to six-month Yen-LIBOR were due to reset or

mature on June 29, 2009 and would benefit from a high six-month Yen-LIBOR.  A single basis

point move in Yen-LIBOR was worth approximately $2 million to UBS.  The Senior Yen Trader

coordinated with the UBS Yen Trader-Submitter 1, the primary four brokers he used, and his

friend, the Trader-Submitter at Yen Bank F, to try to keep six-month Yen-LIBOR high.  He

explained how they should accomplish his objective.  He quantified and emphasized for them the

potential impact on UBS's derivatives trading positions.  He encouraged the brokers to push

submitters at other panel banks for high six-month Yen-LIBOR submissions and to provide

"spoof bids" to the market so market participants believed the rates were rising.  At times, some

of the brokers agreed to enforce the plan by confronting other banks that acted against his

interests.

> 418.    The following are examples of Turn Campaign communications:

June 10, 2009: (Emphasis added.)

> Senior Yen Trader:  "LOW 1m LOW 3m HIGH 6m 6m is important today mate **pls spoof bids**."

> Derivatives Broker B1:  "rite ole mate ill make a special effort"

June 12, 2009: (Emphasis added.)

> Senior Yen Trader:  "i have such big positions on **monday i have 1.5m usd a bp 6m fix** will ask [Yen Bank F Trader/Submitter] for a one day favour we will move up for one day too"

> Derivatives Broker A2:  "i know mate, i'm trying to keep on top of it, if it moves out of line for 10 sees you know i'll see it and pull it back."

June 16, 2009: (Emphasis added.)

> Derivatives Broker A1:  "Good morning mate ..... , **the "turn campaign" begins today.** Will put an e-mail together at lunchtime to [Cash Broker A]."

> Senior Yen Trader:  "thx."

June 17, 2009: (Emphasis added.)

> <u>Senior Yen Trader:</u> **"can you start having chats with your boys about 6m over the turn?** i'd be interested to see what they think it'll go up by anyway low3, low 1m] high 6m"
>
> <u>Derivatives Broker B 1:</u> "ok mate will do"
>
> <u>Senior Yen Trader:</u> "but to be honest am quite happy with them all unchanged so don't bust a gut **main thing now is to start planting the seed of the turn just casual chatting you know**"
>
> <u>Derivatives Broker B1:</u> "yep sure thing mate ill start having the converstaion with some guys here"
>
> <u>Senior Yen Trader:</u> "just ask em what they think it'll move by ... and **say other people think maybe 3bp ie talk it up lots**"
>
> <u>Derivatives Broker B 1:</u> "yes ole mate understood ill do what i can to help"
>
> <u>Senior Yen Trader:</u> "**u da man**"
>
> <u>Derivatives Broker B 1:</u> **"aim to please mate"**

June 24, 2009: (Emphasis added.)

> <u>Senior Yen Trader:</u> "6m is huge for me on monday ..."
>
> <u>Derivatives Broker A1:</u> "i have been putting arbi pressure on [Cash Broker A] and [Brokerage A Yen Manager] ... **would help your cause to also speak to [Brokerage A Yen Manager] on friday regarding the turn squeeze and its importance ... i will remind you."**
>
> <u>Senior Yen Trader:</u> "... thanks i will get [Derivatives Broker B 1] on the case too **remind me to get in touch with [Yen Bank F Trader-Submitter]**."
>
> <u>Derivatives Broker A1:</u> "**yeah need to pull out the big guns for this one**, don't let [Yen Bank F Trader-Submitter] forget either. :-)es"

June 25, 2009:

> <u>Senior Yen Trader:</u> "can you put 6m up on monday when we go through the turn just for a week or so? ... you did say you'd try to help me out!"
>
> <u>Yen Bank F Trader-Submitter:</u> "yes have eno fixing untill 06/07 so i can"
>
> <u>Senior Yen Trader:</u> "thanks mate"

June 26, 2009: (Emphasis added.)

<u>Senior Yen Trader:</u>      **"pls tell your cash boys i need a high 6m is v v important"**

<u>Derivatives Broker C2:</u>  "what lvl shall I suggest? **.. yesterday's drop was a bit of a shocker (in 6m libor) any idea why that happened? ...**"

<u>Senior Yen Trader:</u>  **"2 people moved it 11bp between them"**

<u>Derivatives Broker C2:</u>  **"the cheek who was it?"**

<u>Senior Yen Trader:</u>  **"[Yen Bank M] and [Yen Bank N]. if you can have a word"**

<u>Derivatives Broker C2:</u>  "**will do mate**"

\*\*\*\*\*\*\*

<u>Senior Yen Trader:</u>  "i need you to move 6m up for 2 weeks mate ... but please move 6m up on monday."

<u>Yen Bank F Trader/Submitter:</u>  "understood"

<u>Senior Yen Trader:</u>  "thx **i need you in the panel on Monday"**

<u>Yen Bank F Trader/Submitter:</u>  "ok enough"

419.    On the day of the fixing, June 29, 2009, the Senior Yen Trader made one final push to manipulate higher the six-month Yen-LIBOR fixing.  He confirmed his expectations of a high submission with the UBS Yen Trader-Submitter 1 and Yen Bank F Trader-Submitter.  He also ensured that Derivatives Broker A1 would contact each panel bank.  They discussed the expected submission by each bank and what strategy Brokerage A would employ to try to get each submission higher to meet Senior Yen Trader's goal, such as a "few spoof bids" or direct urging of the various submitters.  The following are excerpts from the numerous conversations the Senior Yen Trader had that day with Yen Bank F Trader-Submitter, UBS Yen Trader-Submitter 1 and the brokers:

June 29, 2009:

*Internal Request:* (Emphasis added.)

Senior Yen Trader:  "hi .... 6m cash crosses the year end today we have huge fixings"

Yen Trader-Submitter 1:  "indeed"

Senior Yen Trader:  "can we set 6m libor high pls? ..."

Yen Trader Submitter 1:  "... we dont have any fix at mom"

Senior Yen: Trader:  "**can we go 74 or 75?** we have 2m usda bp fix for the next week i think a lot of people are going to move it up today well i hope"

Yen Trader-Submitter 1:  "yes sure will. i go with 0. 75 for you."

*******

*External Request to Yen Bank* F: (Emphasis added.)

Senior Yen Trader:  "pls remember 6m today ..."

Yen Bank F Trader-Submitter:  "yah no worries ... 6m libor today good contrib?"

Senior Yen Trader:  "**high pls as high as you can manage we are going 75 anyway whatever you can do** thx."

Yen Bank F Trader-Submitter:  "sure np ..."

*******

*Request to Broker:* (Emphasis added.)

Senior Yen Trader:  "ok lets go thru em one by one."

Derivatives Broker B1:  "sure"

Senior Yen Trader:  "first up try to get all libors up i don't care if 1m and 3m go up too lets go for 3bp on 6m also tibors were up pls use that with the japanese banks"

Derivatives Broker B1:  "ok"

Senior Yen Trader:  "... **make sure [the banks) all know its the turn** ..."

Derivatives Broker B1:  "yeah thats needed bevcasuse sometimes poepel forget and set them the same ..."

Senior Yen Trader:  "... do your best and i'll sort u out."

Derivatives Broker B1:  "[Yen Bank K] rite i know him he speak to my dolla desk thats where r orders come from ill have a word with him amnd ask to get it up ok mate"

Senior Yen Trader:  "v v v important. pls try extra extra hard mate"

Derivatives Broker B1:  "i will mate i know yu need it."

Senior Yen Trader:  "ok mate i going in 3m **pls pls pls try we are going 75 so is [Yen Bank F)"**

Derivatives Broker B 1:  "ok cheers."

Senior Yen Trader:  "get em up mate"

Derivatives Broker B 1:  **"ill trying really hard"**

420.     Although the Yen-LIBOR fixing dropped slowly over the month of June 2009, the fixing rose by three quarters of a basis point on June 29, as compared to the previous fixing on June 26. UBS increased its submission on June 29 by three (3) basis points, and Yen Bank F increased its submission by six (6) basis points. Five other banks in the panel, all of which were discussed by the Senior Yen Trader and Derivatives Broker B1 in their planning call on June 29, also increased their submissions two (2) to five (5) basis points.

421.     **Operation 6M**.  During the Turn Campaign, the Senior Yen Trader began his second effort to push six month Yen-LIBOR high after June 2009, in an effort he dubbed, "Operation 6m." Operation 6m was a campaign by the Senior Yen Trader to manipulate the six-month Yen-LIBOR fixing upwards over several weeks through July, and then to cause the six-month Yen-LIBOR fixing to drop dramatically in mid-August.  The Senior Yen Trader also remained focused on the Euroyen TIBOR fixing, which would impact his Euroyen-based derivatives positions.

422.    The motivation for this effort was clear. If the Senior Yen Trader was successful in causing an increase to the six-month Yen-LIBOR between the end of July and then a drop in the fixing in mid-August, the UBS Yen Desk stood to gain hundreds of millions of dollars.

423.    As with the Turn Campaign, the Senior Yen Trader's key contacts at certain brokerages and his friend Yen Bank F Trader-Submitter were critical to his plan. The Senior Yen Trader emphasized that he was trying to benefit his Euroyen-based derivatives positions and manage his massive risk position. He explained he was under pressure from UBS to reduce his substantial risk position.

424.    The following are examples of the communications surrounding the beginning of Operation 6m in late June and July.

June 24, 2009: (Emphasis added.)

> Derivatives Broker A1:  "Morning ... , [Yen Bank B] must have had  some fixings, not helping"
>
> Senior Yen Trader:  **"he on drugs for once i just want them static and they are falling! ... pls try to keep ly low on screen mate yeah i just need thgis 6m gap for 2weeks"**
>
> Derivatives Broker A1:  "will do my best mate"
>
> Senior Yen Trader:  "then they can all go down· hopefully tibor will stay high *operation 6m.*"
>
> Derivatives Broker AI:              ";-) ..."

June 26, 2009:

> Senior Yen Trader:  "... but for the next 2weeks i really really need you to put 6m higfher"
>
> Yen Bank F Trader-Submitter:  "what is the adte just that i know?"
>
> Senior Yen Trader:  "july 14 ... after that i need 6m to crash off like you."
>
> Yen Bank F Trader-Submitter:  "that is no problem for me, i do nothing with the cash guys until then. . .."

<u>Senior Yen Trader:</u>  "... i will then get our 6m way down after july 18th it is

<u>Yen Bank F Trader-Submitter:</u>  "ok"

<u>Senior Yen Trader:</u>  "and will try to get everyone else down too"

<u>Yen Bank F Trader-Submitter:</u>  "when is the lest fixing date? ... the last july fixing date??"

<u>Senior Yen Trader:</u> "18th ... then i a need low low low ... sry 17th ... i happy for all libors off after that date ... only reason ion bid is i have huge huge position that way so am happy for to come lower after the 17th"

<u>Yen Bank F Trader-Submitter:</u> "ok enough enopugh ..."

July 1, 2009:

<u>Senior Yen Trader:</u> "hi . . . . are we planning on moving libors or just going unch?"

<u>Yen Trader- Submitter 1:</u> "i would have gone slightly lower in 6s but if you wish i can leave it unchanged"

<u>Senior Yen Trader:</u> "thx really need it unch for next 2wk then low as you want"

<u>Yen Trader- Submitter 1:</u> "ok 0.71 unc"

<u>Senior Yen Trader:</u> "ta."

July 7, 2009: (Emphasis added.)

<u>Senior Yen Trader:</u> "mate u gotta help with [Yen Bank J]"

<u>Derivatives Broker B 1:</u> "ill do my best to ask amte ok"

<u>Senior Yen Trader:</u> "**pls if he only goes up 2bp that brings em back 0.25 no one will notice**"

<u>Derivatives Broker B 1:</u> "sure ok mate ill try **ill run him thru a bit higher this mng aswell to try and show it small higher**"

<u>Senior Yen Trader:</u> "**just bid him some as well then he can tell his bosses look its bid here thats all he needs to do say well its bid here and we can't offer it**"

<u>Derivatives Broker B 1:</u> "ok sure mate i can only ask not tell him as yu know ok"

<u>Senior Yen Trader:</u> "y but he loves you mate he told me."

154

> Derivatives Broker B 1: "hahahah rite ill try and be his friend nomn juts his broker"

July 14, 2009:

> Senior Yen Trader to Yen Bank F Trader-Submitter: "... just fyg after eom [end of month] will get 6m down a lot. we will move from top to bottom and so will [Yen Panel Bank J]"

July 15, 2009: (Emphasis added.)

> Derivatives Broker C/D 1: "... ha ha ok mate **i can see you as captain chaos** cash still looking a touch easier but nothing much going on arbi are starting to produce bids so hopefully the offers may go back"

> Senior Yen Trader: "ok i only need 6m high this month then you MUST get it lower a lot lower pls keep 3m and 1m unch."

> Derivatives Broker C/D 1: "ok ..."

425.   **Avoiding Conflict with Yen Bank F Trader-Submitter's Interests**.  During Operation 6m (and at other times), the Senior Yen Trader offered to enter into trades with Yen Bank F Trader-Submitter to ensure that their respective interests aligned and Yen Bank F Trader would not have a conflict that prevented him from helping the Senior Yen Trader with manipulating Yen-LIBOR.  The Senior Yen Trader offered similar offsetting trades to UBS Trader-Submitters when their positions stood to be negatively impacted by a manipulation that favored the Senior Yen Trader.  The Senior Yen Trader urged Yen Bank F Trader: "tell me what you need to see.  i have a vested interest in making sure our fixings match."  As he was so concerned that Yen Bank F not make a competing submission, the Senior Yen Trader offered such trades even at prices that were not beneficial to him to entice Yen Bank F Trader-Submitter, and the latter often accepted.  For example on July 21, 2009, the Senior Yen Trader outlined his plan, the size of his positions, the need to reduce his risk and how Yen Bank F Trader-Submitter could benefit from an attractive trade:

> Senior Yen Trader: "i been asked to reduce risk a bit"

Yen Bank F Trader-Submitter: "ok"

Senior Yen Trader: "i still going for lower 6m next month but position is huge if you want to do some 1y 1/t 1 wid help me on risk limits obviously i am still very much paid and need a low 6m from next week"

Yen Bank F Trader-Submitter: "me paying 1 in 1 y?"

Senior Yen Trader: "y i don't want to do it but **risk are going nuts position is v v big i told them already 6m will be lower next month problem is all my 6m fixes this month rolled and i am left too 1 way** completely up to you if not i'll give some 3m 1/t."

Yen Bank F Trader-Submitter: "... does not suit me taht much today need high 6m libor today ....."

Senior Yen Trader: "same **how about we do Ov6 spot as well? so no fix today i just need to keep the risk guys at bay 200b ly will bring me in limit i will pay you .665 for Ov6 today in same amount to knock the fix out if you need** I think it does nothing today the fix that is wid be a massive favour ... if you do 200b 1y then what net fix are you left with? i will hedge the balance so you are neutral"

Yen Bank F Trader-Submitter: "**can i do 200 and lower my 6m quote? oor we cross fra up to you mate**"

Senior Yen Trader: "**rahter just cross the fra pls**"

Yen Bank F Trader-Submitter: "**that is fair ok we done**"

Senior Yen Trader: "thanks" (Emphasis added.)

426.   **The Last Phase of Operation 6M**.  As Operation 6m moved from the end of July 2009, the Senior Yen Trader shifted his efforts from increasing the six-month Yen-LIBOR higher, to ensuring that the fixing would be lower in August 2009 to benefit UBS's Euroyen-based derivative positions that were due to reset in mid-August.  Derivatives Broker Al advised the Senior Yen Trader to be careful with his efforts and to avoid too obvious changes in the rate.  The Senior Yen Trader assured him not to worry, and that he was coordinated with Yen Panel Banks F and J.

156

427.    In July 2009, the Yen-LIBOR submissions of UBS and Yen Bank F both moved higher consistent with the plan.  In August 2009, the submissions of all three banks, UBS, Yen Bank F and Yen Bank J, all moved lower consistent with the plan. By August 11, 2009, the day of the Senior Yen Trader's desired drop in the fixing, the submissions of all three banks dropped, such that Yen Banks F and J were in the bottom quartile of the submitting banks while UBS ·was included in the fix calculation. Specifically, from late July 2009 through mid-August 2009, UBS's submission fell l2 basis points, and Yen Banks F and J's submissions fell by 14 and 15 basis points, respectively.  In contrast, the largest change in any other submitting bank's submission during this time was a drop of eight basis points and the average change among the other thirteen banks was a decrease of about four basis points.

**The Contributor Bank and Broker Defendants Knew That Other Contributor Bank Defendants Were Manipulating Yen-LIBOR, Euroyen TIBOR and the Prices of Euroyen-Based Derivatives.**

428.    For example, as early as February 2, 2007, RBS Trader-3 knew that former UBS and Citigroup Trader Thomas Hayes communicated with another Contributor Panel bank, unidentified Bank-A, as part of Hayes's efforts to manipulate Yen-LIBOR, Euroyen TIBOR and the prices of Euroyen-based derivatives.   As a result of UBS' collusion with unidentified Bank-A, RBS also knew that UBS had kept three-month Yen-LIBOR "artificially high." This provided RBS "useful" insight into the artificial direction of the manipulation and thus a key informational advantage, *i.e.*, knowing the "artificial[]" trend in the three-month Yen-LIBOR, over other Euroyen market participants.  For example, in an electronic chat on February 2, Hayes stated:

> Hayes:          ... 3m libor is too high cause i have kept it artificially high.
>
> Trader-3:       how
>
> Hayes:          being mates with the cash desks, [Bank-A] and i always
>                 help each other out . . . too.

> Trader-3:          ok thats useful to know. . .

429.   RBS Yen traders also knew that they were engaging in wrongful conduct and that Yen-LIBOR was being manipulated to benefit Euroyen-based derivative positions throughout the market. As the Senior Yen Trader, Yen Manager, and other Yen traders coordinated their requests for beneficial Yen-LIBOR submissions with the Primary Submitter, they discussed at times how the Yen-LIBOR panel was a "cartel" in which rates were being "manipulated."  RBS traders, including the Senior Yen Trader, also discussed how the UBS Yen Trader was manipulating Yen-LIBOR, including by coordinating with others.  Examples of such communications include the following:

**August 20, 2007:**

> Yen Manager:          it seems to be [UBS] is pushing for these [Yen] libors          partnering up with number of cash guys as well [ ... ]
>
> Yen Trader 2:          yeah [UBS Yen Trader] all over it

**August 20, 2007**: (Emphasis added.)

> Senior Yen Trader:          this libor setting is getting nutss [ ... ]
>
> Bank A Trader:          im puzzled as to why 3m libor fixing not coming off after                              the FED action [ ... ]
>
> Bank B Trader:          [UBS] is lending dolls through my currencies in 3 month                              do usee him doing the same in urs [ ... ]
>
> Senior Yen Trader:          yes[,] he always led usd in my mkt[,] **the Yen-LIBOR is a                              cartel now** [ ... ]
>
> Senior Yen Trader:          **its just amazing how libor fixing can make you that                              much money** [ ... ]
>
> Senior Yen Trader:          [ ... ] its a cartel now in london[.] they smack all the 1yr irs                              .. and fix it

> very high or low [.] they smack all the 1yr irs ..
> and fix it very high or low

**December 5, 2007**: (Emphasis added.)

| | |
|---|---|
| <u>Yen Trader 2</u>: | FYI [Yen] libors higher again today [ ... ] |
| <u>Yen Trader 4</u>: | 'ucksake. keep ours low if poss. don't understand why        needs to go up in yen |
| <u>Yen Trader 2</u>: | **no reason dude[,] [Bank C] and [Bank D] went high yest** |
| <u>Yen Trader 4</u>: | send the boys round [ ... ] |
| <u>Yen Manager</u>: | **pure manipulation going on** |

430.    Former Rabobank traders and submitters also recognized that Yen-LIBOR was "definite[ly] manipulate[ed]" throughout the market.  For example, on July 7, 2009, Rabobank Trader-5 shared his impressions with Submitter-4 that "some ppl are talking with each other" to artificially lower the three-month Yen-LIBOR.  Not surprised by Trader-5's impressions, Submitter-4 commented that Yen-LIBOR was manipulated, and in fact "always" is manipulated. Submitter-4 continued to explain that he too "always used to ask if anyone needed a favour and vise versa," recognizing that although this was "unethical" it "always helpd to have fireind [friend] in [the] mrkt."

**<u>As Sophisticated Market Participants, the Contributor Bank and Broker Defendants Knew Their Manipulation of Yen-LIBOR, Euroyen TIBOR and the Prices of Euroyen-Based Derivatives Would Have (And Did Have) Adverse Financial Consequences on Other Euroyen-Based Derivatives Market Participants.</u>**

431.    Defendants were not ingénues in Euroyen-based derivatives trading, but were well aware of the basic features of Euroyen-based derivatives, including Euroyen TIBOR futures contracts, and accordingly understood that to the extent they increased their profits or decreased

their losses in certain transactions from their manipulation of Euroyen rates, other market participants would suffer corresponding adverse financial consequences.

432.    For example, from as early as May 2006 and continuing at least through October 2008, Rabobank Submitter-4 and a trader ("Trader-B") at another unidentified Contributor Panel bank ("Bank-B")[21] had an agreement that they would, upon request, contribute Yen-LIBOR submissions to benefit each other's Euroyen-based derivative positions, or the Euroyen-based derivative positions of other traders.  As Trader-B explained in an email forwarding a Yen-LIBOR submission request from Submitter-4 to the Yen-LIBOR submitters at Bank-B: "We usually try and help each other out...but only if it suits."  This included a manipulation of one-month Yen-LIBOR on July 27-28, 2006.

433.    On July 27, 2006, Rabobank Submitter-4 contacted Trader-B on behalf of Rabobank Trader-5 to request a high one-month submission consistent with Rabobank's submission: "[Trader-5] wants a high 1m fix from me today....am going to set .37."  Trader-B agreed: "that suits mate," "so happy to ablige."  Bank-B's submission jumped from 0.35 to 0.37 between July 26, 2006, and July 27, 2006, a move that took Bank-B's submission from being tied as the lowest submission on the Yen-LIBOR Contributor Panel to being tied as the second highest submission on the Yen-LIBOR Contributor Panel.

434.    The following day, July 28, 2006, Rabobank Submitter-4 and Trader-5 conferred internally regarding their mutual desires for another high one-month Yen-LIBOR fixing. Submitter-4 stated to Trader-5: "setting a high 1m again today - I need it!" to which Trader-5 responded: "yes pls mate...I need a higher 1m libor too."  Within approximately 20 minutes, Submitter-4 contacted Trader-B and stated: "morning skipper will be setting an obscenely high

---

[21]  Upon information and belief, Bank-B is Defendant Lloyds.

lm again today...poss 38 just fyi."  Trader-B responded, "(K)...oh dear..my poor

customers....hehehe!! manual input libors again today then!!!!"  Both banks' submissions on July

28, 2006, moved up one basis point, from 0.37 to 0.38, a move which again placed their

submissions as the second highest submissions on the Contributor Panel that day.

435.    Upon information and belief, Bank-B is Defendant Lloyds.  On July 27, 2006,

Lloyds was one of only two Yen-LIBOR Contributor Banks to move their one-month Yen-

LIBOR submission up from .35 (July 26) to .37 (July 27).  In addition, aside from Rabobank,

Lloyds was the only other Yen-LIBOR Contributor Bank to move its one-month Yen-LIBOR

submission up an additional basis point from .37 (July 27) to .38 (July 28).  Lloyds brazenly

recognized that its "manual input libors" were not only false, but exclaimed that even this one

basis point move would harm Euroyen-based derivatives market participants, including Lloyd's

"poor customers."

**Defendants Concocted False Stories They Could Give In The Event Someone Questioned
Their Manipulation of Yen-LIBOR, Euroyen TIBOR and the Prices of Euroyen-Based
Derivatives.**

436.    The Senior Yen Trader and other RBS Yen traders knew that they could impact

the fixing of the daily Yen-LIBOR and were aware that RBS's Yen-LIBOR submissions could

be questioned by the BBA.  In the following example, the Senior Yen Trader boasts about how

RBS succeeded in moving six-month Yen-LIBOR and then discussed what false story they could

give the BBA to justify the low submission if necessary:

**April 2, 2008:** (Emphasis added.)

| | |
|---|---|
| <u>Senior Yen Trader:</u> - | **nice [Yen] libor[.] our 6m fixing move the entire fixing[.] hahahah** |
| <u>Yen Trader 1</u>: | **the BBA called to ask me about that today** |
| <u>Senior Yen Trader:</u> | really? |

| | |
|---|---|
| Yen Trader 1: | yes – |
| Senior Yen Trader: | **they complain?** |
| Yen Trader 1: | **asked to speak to me about the low 6m rate** |
| Yen Trader 1: | **no[,] just to make sure i was happy with it [ ... ]** |
| Senior Yen Trader: | **i think some banks must have complain** |
| Yen Trader 1 : | **he called b4 any of the other banks saw our data[,] at about 11.15[,] to check it was ok** |
| Senior Yen Trader: | **oh then its fine** |
| Yen Trader 1: | **before publishing** |
| Senior Yen Trader: | i am sure some HF [hedge fund] will complain tomorrow .. tough |
| Yen Trader 1: | tough |
| Senior Yen Trader: | **we will say we lower every tenor .. 1m 3m 6m .. we feel rbs name has very good credit .. no problem getting money in** |
| Senior Yen Trader: | **good way to boost share price!** |
| Senior Yen Trader: | our 3m libor is at top end ... 6m at bottom end ... just the ideal level! |

## Defendants Used Code Words to Conceal Their Manipulation of Yen-LIBOR, Euroyen TIBOR and the Prices of Euroyen-Based Derivatives.

### 1. ICAP Yen Brokers Used Code Words and Personal Cell Phones To Try and Conceal Their Yen-LIBOR Services.

437.    In late 2007 and early 2008, ICAP's Yen Desk Head, Derivatives Broker 1 and

Cash Broker 1 became concerned that ICAP compliance might discover that they were aiding

Hayes's manipulation of Yen-LIBOR and the prices of Euroyen-based derivatives.  To conceal

their unlawful activities, ICAP Derivatives Broker 1 began communicating by personal mobile

telephones and text messages with Cash Broker 1. ICAP Derivatives Broker 1 also alerted Hayes about the need to be careful in their communications when explaining their "views:

November 1, 2007:

> Derivatives Broker 1: **HI MATE, JUST HAD [Yen Desk Head] BACK ON RE-LIBORS, HAD A LOT OF COMPLIANCE PRESSURE RECENTLY DUE TO CREDIT PROBLEMS, WE BOTH NEED TO BE A LITTLE MORE SUBTLE IN OUR "VIEWS"…IE' I THINK THE FWDS ARE SUGGESTING THIS 6MOS LIBOR SHOULD BE LOWER…ETC.  MY E-MAILS ETC. NEED TO BE WORDED MORE CAREFULLY**

438.    In an effort to ensure that former UBS Senior Yen Trader Hayes's requests survived detection from any review by ICAP's compliance staff, ICAP Derivatives Broker 1 and former UBS Senior Yen Trader Hayes also started using code words to mask their discussions about manipulating LIBOR.  ICAP Derivatives Broker 1 and former UBS Senior Yen Trader Hayes used the words "political correctness," "arbitrage," "arb" or "arbi" to denote requests and efforts to push Yen-LIBOR in a particular direction on the UBS Senior Yen Trader Hayes's behalf.

November 13, 2007 (emphasis supplied):

> Derivatives Broker 1: [to Cash Broker 1] in these days of **"political correctness"** is it true that there is a fair bit of pressure holding 6 mos libor down today?  I think this will probably suit.

January 28, 2008 (emphasis supplied):

> Derivatives Broker 1: [Cash Broker 1's] libors..sees 1m and 3m coming in unchanged ... 6m down 1/4bp....**arbi** has made him sent them out a bit higher,but not confident he'll get them up

February 21, 2008 (emphasis supplied):

| | |
|---|---|
| <u>Senior Yen Trader</u>: | **cu know what ineed arbitrage wise?** you |
| <u>Derivatives Broker 1</u>: | high 3m low 6m [Cash Broker 1] reckons 1m could come off 1/2bp today (looks 1bp too high to him at the mom)....3m -1/8th.....6m -1/8th |
| <u>Senior Yen Trader</u>: | **ok lets hope the arby works!** |
| <u>Derivatives Broker 1</u>: | well he has sent the same as yesterday,but just warning us . .. when does your big 1m roll out? |

## 2.   <u>R.P. Martin Brokers and UBS Senior Yen Trader Hayes Attempted to Conceal Their Improper Conduct Surrounding the Wash Trades.</u>

439.    Former UBS Senior Yen Trader Hayes and R.P. Martin Yen Broker 1 were well aware of the improper nature of their conduct.   First, they made an effort to avoid any written communications confirming the wash trades, choosing primarily to communicate via telephone. For example, former UBS Senior Yen Trader Hayes warned R.P. Martin to not put anything on chat:

December 3, 2008:

| | |
|---|---|
| <u>Senior Yen Trader</u>: | **What I'm doing mate, don't f\*cking put it on chat.** |
| <u>Yen Broker 1</u>: | All right. Okay. |
| <u>Senior Yen Trader</u>: | All right. Okay. 90 and three-eighths |
| <u>Yen Broker 1</u>: | Oh, thank you very much, mate. I love you. |
| <u>Senior Yen Trader</u>: | **I just want it but don't put it on f\*cking chat, all right.** |

440.     Second, as noted by another UBS Yen Trader that assisted former UBS Senior

Yen Trader Hayes, they tried to hide the wash trades by "staggering" their execution, as noted in

the example below, to avoid any "questions" about the trades:

February 25, 2009:

| | |
|---|---|
| UBS Yen Trader: | That's alright. **I thought it'd be -raise less questions, than if I did them at the same time.** |
| Yen Broker 1: | Yeah, I understand that, thank you very much. |
| UBS Yen Trader: | What I even did, I even, put on their, do a [inaudible] like me, [Senior Yen Trader], [UBS Senior Yen Trader's Supervisor] and stuff. That people would actually, I would always put traded it on there anyway. |
| Yen Broker 1: | Ah, right |
| UBS Yen Trader: | **I do it for the people, I even just stagger that. Just so if anyone ever questions it.** |
| Yen Broker 1: | Yeah. [inaudible] "geezer did us a favor, couple of times, da da da." \*\*\* |

**After the Contributor Bank Defendants Were Placed on Notice of Government Investigations Into The Manipulation of U.S. Dollar LIBOR, Defendants Continued to Manipulate Yen-LIBOR, Euroyen TIBOR and the Prices of Euroyen-Based Derivatives.**

441.     Defendants continued their Euroyen manipulation long-after authorities had

launched investigations into false reporting and manipulation of U.S. Dollar LIBOR.  By way of

example, RBS traders and submitters acknowledged internally by at least September 2010 that

regulators were investigating false reporting of U.S. Dollar LIBOR, but nonetheless agreed that

they were going to continue to manipulate at least Yen-LIBOR.   RBS traders and submitters,

however, recognized that they should be more careful to cover their tracks to avoid detection,

including avoiding openly discussing in writing their manipulation of Euroyen at least while

regulators were snooping around in U.S. Dollar LIBOR.

442.    For example, in one exchange on September 24, 2010, a Senior Yen Trader at RBS requests another RBS Yen Trader to contact the RBS's primary rate submitter "to push 6m [Yen] Libor up 2 bps to 44."  The Yen-Trader responds: "ha . . . i will mention it ... no emails anymore . . . ."   In another exchange, on November 22, 2010, a RBS Yen Trader and Senior Yen Trader acknowledge that "at the moment the FED are all over us about USD libors" but because they didn't "think anyone cares [about] JPY libor" at least "not yet" – they acknowledged they had the green light to continue with their manipulation of Euroyen.

443.    In another exchange on November 24, 2010, RBS's primary submitter warns a RBS Senior Yen-Trader to no longer put in writing his manipulative requests. The warning first appears in writing when the submitter diverts an instant message request from the Yen-Trader for an artificial Yen-LIBOR rate by responding spontaneously with the off-topic-question of: "how you doing with all the volatilities these days?", *i.e.,* code to change the subject.  The trader responds "ok no prob….wouldn't want to cause any problem….thanks mate."  Shortly after the instant message exchange, in a follow up telephone conversation, the submitter is more blunt in his warning, saying "we're just not . . . allowed to have those conversations on [instant messages] . . . because of the BBA thing."  After they had a good laugh about it, the submitter confirmed he is still on board with the manipulation, *i.e.,* submitting false Yen-LIBOR rates that benefitted the trader's Euroyen derivatives positions, saying: "So yeah, leave it with me, and uh, it won't be a problem."  The trader responds "Ok, great."

444.    The collusive manipulation in the Euroyen-based derivatives market had become so widespread that in the words of one of RBS's Senior Yen Traders, the banks setting Yen-LIBOR had become a "cartel."

445.    UBS continued to engage in all of the manipulative conduct long after it was on notice that the CFTC was investigating UBS in connection with its U.S. Dollar LIBOR practices. UBS received a demand for documents and information from the CFTC's Division of Enforcement in October 2008; yet the conduct of the traders and submitters in relation to Euroyen (and other currencies), including collusive conduct, occurred well into 2010.  The rampant misconduct across Yen-LIBOR, Euroyen TIBOR and other rates at UBS only came to light as a result of the CFTC's subsequent request in April 2010 that UBS conduct an internal investigation relating to its U.S. Dollar LIBOR practices.  *See* Ex. A-2, p. 13.

**Defendants Obstructed Government Investigations and Lied to Their Own Attorneys During Their Own Internal Investigations of LIBOR Manipulation.**

446.    Defendants also sought to obstruct investigations into the manipulation of LIBOR.  For example, in December 2010, a UBS derivatives desk manager instructed a UBS LIBOR Submitter to lie when interviewed by UBS attorneys during the investigation into LIBOR manipulation. Among other things, the UBS derivatives desk manager instructed the UBS Submitter to:

- falsely claim that the UBS Yen trading desks did not have any derivative positions with exposure to Yen -LIBOR;

- avoid mentioning former UBS Senior Yen Trader Thomas Hayes;

- falsely indicate that the Yen-LIBOR submission process did not take into account trading positions;

- falsely claim that they never moved the Yen-LIBOR submissions to benefit the Yen trading desks;

- falsely claim that when contributing Yen-LIBOR submissions, UBS tried to be "as close to the market as possible."

**Legal Findings and Implications of Defendants' Manipulative and Collusive Conduct**

### 1. The CFTC Determined Yen-LIBOR and Euroyen TIBOR are Each a Commodity in Interstate Commerce.

447.    On a daily basis, Defendants, through the transmission of an electronic spreadsheet to the service provider of the BBA and/or JBA who calculates their official fixings (*e.g.*, Thomson Reuters), knowingly delivered or caused to be delivered its Yen-LIBOR and/or Euroyen TIBOR submissions through the mails or interstate commerce. Defendants' submissions were also caused to be delivered through the mails or interstate commerce through the daily dissemination and publication globally, including into the United States, of the panel banks' submissions as well as the daily official benchmark interest rates by at least Thomson Reuters on behalf of the BBA and/or JBA, and other third party vendors.  The panel banks' submissions are, and were used during the Class Period, used to determine the official published rates for Yen-LIBOR and/or Euroyen TIBOR, which are calculated based on a trimmed average of the submissions. Defendants' daily Yen-LIBOR and/or Euroyen TIBOR submissions contained market information concerning the costs of borrowing unsecured funds in particular currencies and tenors, the liquidity conditions and stress in the money markets, and Defendant's ability to borrow funds in the Euroyen market.  Such market information affects or tends to affect the prices of commodities in interstate commerce, including the daily rates at which Yen-LIBOR and Euroyen TIBOR are fixed.

448.    The Broker Defendants also knowingly caused to be delivered through the mails or interstate commerce false or misleading or knowingly inaccurate reports concerning Yen bank borrowing rates, through the form of Suggested LIBORs, which is market information that affects or tends to affect the fixing or pricing of Yen-LIBOR, a commodity in interstate commerce.  Each business day, Yen-LIBOR panel banks, through the transmission of electronic spreadsheets to Thomson Reuters, made Yen-LIBOR submissions in contribution to the daily

168

fixing of Yen-LIBOR for various tenors through the mails or interstate commerce.  Yen-LIBOR

panel banks' submissions were delivered through the mails or interstate commerce by the daily

dissemination and publication globally, including into the United States, of the panel banks'

submissions as well as the daily official Yen-LIBOR fixing by Thomson Reuters on behalf of the

BBA and by other third party vendors.  The panel banks' submissions are used to determine the

official published rates for Yen-LIBOR, which are calculated based on a trimmed average of the

submissions.  The Yen-LIBOR panel banks' submissions contain market information concerning

the costs of borrowing unsecured funds in Yen in particular tenors, the liquidity conditions and

stress in the money markets, and the panel banks' ability to borrow Yen in the London interbank

market.  Such market information affects or tends to affect the prices of commodities in interstate

commerce, including the daily rates at which Yen-LIBOR is fixed.

449.    The Broker Defendants also understood and expected that many of the Yen-

LIBOR panel banks relied on the market information disseminated by the Broker Defendants

concerning, among other things, the Yen borrowing rates in the London interbank market.

Specifically,   ICAP brokers provided oral or written Yen-LIBOR predictions, *i.e.*, the

"Suggested LIBORs," that reflected their unbiased and honest assessment of Yen borrowing

costs in the interbank market. However, to benefit certain ICAP clients, in particular the UBS

Senior Yen Trader, and to assist their efforts to attempt to manipulate the fixing of Yen-LIBOR

on their behalf, ICAP Yen brokers often knowingly disseminated false, misleading and

knowingly inaccurate market information to the Yen Panel banks through two primary means:

(1) Cash Broker 1 or others provided skewed Suggested LIBORs, through the daily Yen-LIBOR

Run Thru emails or oral communications with submitters or traders at the Yen-LIBOR panel

banks; and (2) ICAP brokers directly pressured Yen-LIBOR submitters and traders at panel

banks to submit certain rates, that were skewed to reflect rates beneficial to the Senior Yen Trader and at times other traders.  At times, certain Yen panel banks used ICAP's skewed Suggested LIBORs in determining and making their Yen-LIBOR submissions to the BBA.   As a result, those Yen-LIBOR submissions were false, misleading or knowingly inaccurate because the panel banks' submissions purported to reflect the panel banks' perceived costs of borrowing Yen in the interbank market but in reality, reflected in whole or in part the rates that benefited the trading positions of ICAP's clients.

450.    Similarly, to benefit certain RP Martin clients, specifically the UBS Senior Yen Trader and the RBS Yen Trader, and to assist their efforts to attempt to manipulate the fixing of Yen LIBOR on their behalf, RP Martin Yen brokers at times often knowingly disseminated false, misleading and knowingly inaccurate market information to the Yen Panel banks through three primary means: (1) Yen Broker 1 or others provided skewed Suggested LIBORs through oral communications with submitters or traders at the Yen-LIBOR panel banks; (2) RP Martin brokers directly pressured Yen-LIBOR submitters and traders at panel banks to submit certain rates that were skewed to reflect rates beneficial to the Senior Yen Trader and at times other traders; and (3) RP Martin brokers published "spoof" or nonexistent cash bids to the Euroyen-based derivatives market to benefit their clients, including clients who were Yen-LIBOR submitters, to give the Euroyen-based derivatives market false market price information that a Euroyen-based derivatives market participant was willing to trade Yen cash at a particular price. At times, certain Yen-LIBOR Contributor Banks used RP Martin's skewed Suggested LIBORs in determining and making their Yen-LIBOR submissions to the BBA.  As a result, those Yen-LIBOR submissions were false, misleading or knowingly inaccurate because the panel banks' submissions purported to reflect the panel banks' perceived costs of borrowing Yen in the

interbank market but in reality, reflected in whole or in part the rates that benefited the Euroyen-based derivative positions of R.P. Martin's clients.

451.    Accordingly, the Broker Defendants' actions designed and intended to benefit clients and themselves, knowingly caused the panel banks to deliver through the mails or interstate commerce false or misleading or knowingly inaccurate market information that affects or tends to affect a commodity in interstate commerce, including Yen-LIBOR and violated Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2) (2006).

### 2. As Part of its Non-Prosecution Agreement with the DOJ, UBS Admits That False and Misleading Yen-LIBOR and Euroyen TIBOR Contributions Affected or Tended to Affect the Price of Commodities, Including Futures Contracts.

452.    As part of its Non-Prosecution Agreement with the DOJ, UBS admitted that when the requests of derivatives traders for favorable Yen-LIBOR and Euroyen TIBOR submissions were taken into account by the UBS rate submitters, UBS's rate submissions were false and misleading.  Those false and misleading Yen-LIBOR and Euroyen TIBOR contributions affected or tended to affect the price of commodities, including futures contracts.

### 3. Defendants Admit They Entered Into Interest Rate Derivatives Contracts Tied To Yen-LIBOR and/or Euroyen TIBOR, Including Futures, Swaps and Forward Rate Agreements, With Counterparties in the United States.

453.    UBS entered into interest rate derivatives transactions tied to Yen-LIBOR and Euroyen TIBOR – such as derivatives, forward rate agreements, and futures – with counterparties to those transactions.  Many of those counterparties were located in the United States.  Those United States counterparties included, among others, asset management corporations, mortgage and loan corporations, and insurance companies.  Those counterparties also included banks and other financial institutions in the United States or located abroad with branches in the United States.

454.     RBS, Rabobank, and Barclays also entered into interest rate derivatives transactions tied to Yen-LIBOR - such as swaps and forward rate agreements - with various counterparties, some of which were located in the United States.  Those United States counterparties included, among others, asset management corporations, business corporations, insurance companies, universities and non-profit organizations as well as banks and other financial institutions in the United States or located abroad with branches in the United States.

### 4.  Defendants Admit They Successfully Manipulated Yen-LIBOR and/or Euroyen TIBOR.

455.     For example, as part of its Non-Prosecution Agreement with the DOJ, UBS admitted that when UBS derivatives traders influenced the submissions of other Contributor Panel Banks – either by (1) seeking and receiving accommodations from their counterparts at such banks, or (2) influencing the submissions from other banks with assistance from cash brokers who disseminated misinformation in the marketplace – the manipulation of those submissions affected Yen-LIBOR and Euroyen TIBOR on various occasions.  Similarly, as part of their Deferred Prosecution Agreements with the DOJ, Defendants RBS and Rabobank admitted that when its Yen-LIBOR derivatives traders made requests of RBS's Yen-LIBOR rate submitters in order to influence RBS's Yen-LIBOR submissions, and when the submitters accommodated those requests, the manipulation of the submissions affected the fixed Yen-LIBOR on various occasions.  In addition, when traders, former traders, and/or submitters, including some at RBS, agreed to coordinate requests for favorable Yen-LIBOR submissions, and when Yen-LIBOR submitters accommodated those requests, the manipulation of submissions affected the fixed Yen-LIBOR on various occasions.

**5.   To Date, The CFTC Determined That Contributor Bank Defendants UBS, RBS and Rabobank Successfully Manipulated Yen-LIBOR.**

456.    During the Class Period, Contributor Bank Defendants UBS, RBS, Rabobank and Barclays's submissions for Yen-LIBOR and/or Euroyen TIBOR were false, misleading or knowingly inaccurate because they were based in whole or in part on impermissible and illegitimate factors, including the Euroyen-based derivatives positions of their traders.  By using these impermissible and illegitimate factors in making its Yen-LIBOR and/or Euroyen TIBOR submissions, Defendants conveyed false, misleading or knowingly inaccurate information that the rates they submitted were based on and related solely to the costs of borrowing unsecured funds in the relevant markets and were truthful and reliable. Certain of Defendants' managers, traders and submitters knew that certain of their Yen-LIBOR and/or Euroyen TIBOR submissions contained false, misleading and knowingly inaccurate information concerning the submitted rates.  By such conduct, Defendants violated Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2) (2006).

457.   **Ability to Influence**.  As members of the Yen-LIBOR and/or Euroyen TIBOR panels, Defendants made daily submissions that purported to reflect its assessment of the costs of borrowing funds in the Yen interbank market across tenors.  The official Yen-LIBOR and/or Euroyen TIBOR fixings are calculated using a trimmed average methodology applied to the rates submitted by the panel banks.  By virtue of this methodology, Defendants had the ability to influence and affect the rate that would become the official Yen-LIBOR and/or Euroyen TIBOR for any tenor.

458.   **Specific Intent**.  As evidenced by the extensive communications and other facts alleged herein, Defendants derivatives traders and submitters each specifically intended to affect the rate at which the daily Yen-LIBOR and/or Euroyen TIBOR would be fixed to benefit their

173

Euroyen-based derivatives trading positions or to benefit the Euroyen-based derivatives trading positions of colluding traders at other banks.  Defendants derivatives traders' requests for certain rates to be submitted that would benefit their derivatives trading positions or the derivatives trading positions of traders at other banks, and the trader-submitters making submissions for Yen-LIBOR and/or Euroyen TIBOR reflecting rates beneficial to their derivatives trading positions, rather than reflecting, as required, their assessments of the costs of borrowing unsecured funds, constitute overt acts in furtherance of their intent to affect the fixings of Yen-LIBOR and/or Euroyen TIBOR.

459.   **Causation and Artificial Price**.  Defendants' false, misleading or knowingly inaccurate Yen-LIBOR and/or Euroyen TIBOR submissions were illegitimate factors in the pricing of the daily Yen-LIBOR and/or Euroyen TIBOR fixings and affected the official Yen-LIBOR and/or Euroyen TIBOR for certain tenors, resulting in artificial Yen-LIBOR and/or Euroyen TIBOR fixings.  Thus, Defendants' actions were a proximate cause of the artificial Yen-LIBOR and/or Euroyen TIBOR fixings.

460.   Accordingly, on certain occasions, Defendants manipulated Yen-LIBOR for certain tenors, each a commodity in interstate commerce, in violation of Sections 6(c), 6(d), and 9(a)(2) of the Act.

### 6.   To Date, the CFTC Determined that Broker Defendants ICAP and R.P. Martin Successfully Manipulated Yen-LIBOR.

461.   **Ability to Influence**.  The Broker Defendants communicated on a daily basis with banks that participated on the Yen-LIBOR panel and made submissions that purported to reflect their assessments of their respective banks' costs of borrowing unsecured funds in the London interbank market for Yen across tenors. The official LIBOR fixings are calculated using a trimmed average methodology applied to the rates submitted by the panel banks. By virtue of

this methodology, panel banks had the ability to influence or affect the rate that would become

the official Yen-LIBOR fixing for any tenor. Accordingly, if the Broker Defendants could

influence the rates submitted by the panel banks, then the Broker Defendants had the ability to

influence or affect the rate at which Yen-LIBOR would be fixed.  As alleged herein, Yen-LIBOR

panel banks (in violation of BBA rules) relied upon the market information about Yen borrowing

rates and Suggested LIBORs provided by the Broker Defendants, and, at times, at least certain

panel banks used the rates suggested the Broker Defendants in determining and making their

submissions. As a result, at times, certain Yen-LIBOR panel banks made false or misleading

Yen-LIBOR submissions.

462.   **Specific Intent**. As evidenced by the extensive communications and other facts

alleged herein, in causing certain panel banks at times to make false or misleading Yen-LIBOR

submissions, the Broker Defendants specifically intended to affect the daily Yen-LIBOR fixing

for certain tenors, including the one-month, three-month, and six-month. Their intent is also

evidenced by their motivation to lure and keep the significant business of the UBS Senior Yen

Trader and other derivatives traders by making extensive efforts to ensure that Yen-LIBOR fixed

at rates that benefited their clients' derivatives trading positions.  Their intent is also evidenced

by their expressed interest in earning commissions from the UBS Senior Yen Trader via the

wash trades, which was contingent upon their efforts to ensure that Yen-LIBOR fixed at rates

that benefited their Senior Yen Trader's derivatives trading positions.

463.   **Causation and Artificial Price**.  As a result of the Broker Defendants' influence

on the rates submitted by panel banks, at times some of the panel banks made Yen-LIBOR

submissions, whether knowingly or not, that did not reflect their bank's costs of borrowing

unsecured funds in the London Yen interbank market but instead reflected rates beneficial to the

trading positions of the Senior Yen Trader and other traders.  Accordingly, through the Broker

Defendants' actions, those Yen-LIBOR submissions acted as illegitimate factors in the pricing of

the daily Yen-LIBOR fixings for certain tenors with the result that the official Yen-LIBOR for

certain tenors were artificial on certain occasions.  Thus, the Broker Defendants' actions were a

proximate cause of the artificial Yen-LIBOR fixings.

464.    Accordingly, on certain occasions, the Broker Defendants, through the acts of

certain brokers and a desk manager, manipulated Yen-LIBOR for certain tenors, a commodity in

interstate commerce, in violation of Sections 6(c), 6(d) and 9(a)(2) of the Act.

### 7.   To Date, the CFTC Determined that Contributor Bank Defendants UBS, RBS and Rabobank Aided and Abetted the Manipulation of Yen-LIBOR.

465.    Defendants also aided and abetted traders at other banks to manipulate Yen-

LIBOR and/or Euroyen TIBOR.  As evidenced by the extensive communications, Defendants

traders and submitters and traders at other panel banks coordinated about Yen-LIBOR and/or

Euroyen TIBOR rates that would benefit their banks' or their colluders respective derivatives

trading positions.  Also, the traders at the other panel banks or brokers on behalf of traders at

other banks asked Defendants traders to submit a certain rate, or submit a rate in a direction

higher or lower, that would benefit the cash and derivatives trading positions of the traders at the

other panel banks. Defendants' derivatives traders agreed and made the requests of their Yen-

LIBOR and/or Euroyen TIBOR submitters, who in turn made their Yen-LIBOR and/or Euroyen

TIBOR submissions based on the derivatives traders' or brokers requests.  In addition, at least

one RBS Yen trader knowingly assisted the UBS Yen Trader to manipulate Yen-LIBOR by

agreeing to act as counterparty to wash trades opposite UBS to provide extra brokerage

commissions to the interdealer brokers as payment for their assistance in manipulating Yen-

LIBOR.  By such acts of their derivatives traders, Defendants aided and abetted the traders at

other banks to manipulate Yen-LIBOR and/or Euroyen TIBOR in violation of Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006).

### 8.  **To Date, the CFTC Determined that Broker Defendants ICAP and R.P. Martin Aided and Abetted the Manipulation of Yen-LIBOR.**

466.     As evidenced by the extensive communications, the Broker Defendants aided and abetted and often coordinated with and assisted Euroyen-based derivatives traders at Yen-LIBOR panel banks, primarily the UBS Senior Yen Trader, to manipulate the official Yen-LIBOR fixings for certain tenors by at times causing panel banks to make Yen-LIBOR submissions at rates or levels that that would benefit the derivatives traders' trading positions. The Broker Defendants knew that the UBS Senior Yen Trader and other traders were trying to manipulate Yen-LIBOR to benefit their derivatives trading positions.

### 9.  **To Date, the CFTC Determined Contributor Bank Defendants UBS, RBS, Rabobank, ICAP, R.P. Martin and Barclays Are Vicariously Liable for the Acts of their Employees in the Manipulation of Yen-LIBOR.**

467.     As part of their settlements, the CFTC determined that Contributor Bank Defendants UBS, UBS Japan, RBS, RBS Japan, Rabobank and Barclays as well as Broker Defendants ICAP and R.P. Martin are liable for the acts, omissions and failures of the managers, traders, submitters, and/or brokers who acted as their employees and/or agents and thus violated Sections 6(c), 6(d) and 9(a)(2) of the CEA, 7 U.S.C. §§ 9, 13b and 13(a)(2).

### 10.  **Contributor Bank Defendants UBS, RBS, Rabobank and Barclays Acknowledge Same in their Non-Prosecution and Deferred Prosecution Agreements with the DOJ.**

468.     As part of their Deferred and Non-Prosecution Agreements with the DOJ, Defendants UBS, RBS, Rabobank and Barclays each acknowledged that the wrongful acts described in the DOJ Statement of Facts taken by the participating employees in furtherance of the misconduct were within the scope of their employment at their respective financial institution.  UBS, RBS, Rabobank and Barclays also each acknowledged that the participating

employees intended, at least in part, to benefit UBS, RBS, Rabobank and Barclays through the actions described in the DOJ SOF.

> **11. Contributor Bank Defendants UBS, RBS, Rabobank and Barclays Admit They Engaged in a Deceptive Course of Conduct When They Submitted or Caused to Be Submitted False and Misleading Yen-LIBOR and Euroyen TIBOR Submissions Designed to Derive Illicit Profits at the Expense of Their Counterparties and other Euroyen-Based Derivatives Participants.**

469.     As part of its Non-Prosecution Agreement with the DOJ, UBS admitted that its derivatives traders and submitters were engaged in a deceptive course of conduct in an effort to gain an advantage over their counterparties.  As part of that effort: (1) derivatives traders and submitters submitted and caused the submission of materially false and misleading Yen-LIBOR and Euroyen TIBOR contributions; and (2) derivatives traders, after initiating and continuing their effort to manipulate Yen-LIBOR and Euroyen TIBOR, negotiated and entered into derivative transactions with counterparties that did not know that UBS employees were often attempting to manipulate the relevant rate.

470.     As part of their Deferred Prosecution Agreements with the DOJ, Defendants RBS and Rabobank admitted that when the requests of derivatives traders for favorable Yen-LIBOR submissions influenced the RBS and Rabobank rate submitters' contributions, RBS and Rabobank's Yen-LIBOR rate submissions were false and misleading.  In making and in accommodating these requests, the derivatives traders and submitters (and RBS and Rabobank) were engaged in a deceptive course of conduct in an effort to gain an advantage over their counterparties.  As part of that effort: (1) RBS and Rabobank derivatives traders and submitters submitted, and caused the submission of, materially false and misleading Yen-LIBOR contributions; and (2) RBS and Rabobank derivatives traders, after initiating and while continuing their effort to manipulate Yen-LIBOR contributions, negotiated and entered into

derivatives transactions with counterparties knowing that that those counterparties were unaware of the efforts by RBS and Rabobank employees to manipulate the relevant Yen-LIBOR rate.

471.    When the request of Barclays's swaps traders for favorable LIBOR submissions were taken into account by the rate submitters, Barclays's rate submissions were false and misleading.  In making and in accommodating the requests, the swaps traders and submitters were engaged in a deceptive course of conduct in an effort to gain an advantage over their counterparties.  As part of that effort: (1) swaps traders and submitters submitted and caused the submission of materially false and misleading LIBOR contributions; and (2) swaps traders, after initiating and continuing their effort to manipulate LIBOR, negotiated and entered into derivatives transactions with counterparties that did not know that Barclays employees were intending to manipulate LIBOR.

### 12. Defendants Admit They Were Competitors.

472.    For example, as part of its Deferred Prosecution Agreement with the DOJ, RBS admitted that traders, former traders, and/or submitters at competing financial institutions, including RBS, agreed to coordinate and in fact coordinated with regard to Yen-LIBOR submissions, causing the manipulation of Yen-LIBOR on certain occasions. Because Yen-LIBOR was a pricing component of Euroyen-based derivatives contracts held by the financial institutions, the traders benefited from this agreement by affecting the profitability of the contracts on particular settlement dates.

### Defendants Plead Guilty or Agree to Waive Indictment to Criminal Charges of Wire Fraud in Connection with Their Manipulation of the Prices of Euroyen-Based Derivatives.

473.    In connection with their unlawful manipulation of Yen-LIBOR and/or Euroyen TIBOR, Defendants UBS Japan and RBS Japan, agreed to waive indictment and plead guilty to a one-count criminal information filed in the District of Connecticut by the Criminal Division, Fraud Section, and the Antitrust Division of the DOJ charging each with wire fraud, in violation

of 18 U.S.C. § 1343.  As part of its Deferred Prosecution Agreement with the DOJ, RBS Japan's

corporate parent RBS was also charged with wire fraud and price-fixing in violation of Section 1

of the Sherman Act.  Defendant Rabobank also waived indictment to wire fraud as part of its

own Deferred Prosecution Agreement with the DOJ.  *See* Exs. A-4, B-3 and D-4.  Specifically,

### 1.  **UBS Japan.**

474.    Between approximately 2006 and at least 2009, in the District of Connecticut and

elsewhere, UBS Japan, the defendant, unlawfully, willfully, and knowingly, having devised and

intending to devise a scheme and artifice to defraud and for obtaining money and property by

means of false and fraudulent pretenses, representations, and promises, did transmit and cause to

be transmitted by means of wire, radio, and television communication in interstate and foreign

commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such

scheme and artifice, to wit, the defendant devised and engaged in a scheme to defraud

counterparties to interest rate derivatives trades executed on its behalf by secretly manipulating

benchmark interest rates to which the profitability manipulating benchmark interest rates to

which the profitability of those trades was tied, and in furtherance of that scheme, on or about

February 25, 2009, the defendant transmitted or caused the transmission of electronic

communications—specifically, (1) an electronic chat between a derivatives trader employed by

the defendant and a broker employed at an interdealer brokerage firm, (2) a subsequent Yen

LIBOR submission from a bank to Thomson Reuters, and (3) a subsequent publication of a Yen

LIBOR rate through international and interstate wires, at least one of which passed through,

among other locations and facilities, servers located in Stamford, Connecticut.

### 2.  **RBS Japan.**

475.    Between approximately 2006 and at least 2010, in the District of Connecticut and

elsewhere, RBS Japan, the defendant, through its employees, unlawfully, willfully, and

knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, the defendant, through its employees, engaged in a scheme to defraud counterparties to interest rate derivatives trades executed on its behalf by secretly manipulating benchmark interest rates to which the profitability of those trades was tied, and in furtherance of that scheme, on or about October 5, 2009, the defendant transmitted or caused the transmission of electronic communications -- specifically, (1) an electronic chat between a derivatives trader employed by the defendant and a derivatives trader employed by the defendant's parent company, (2) a subsequent Yen LIBOR submission from a bank to Thomson Reuters, and (3) a subsequent publication of a Yen LIBOR rate—through international and interstate wires, at least one of which passed through, among other locations and facilities, servers located in Stamford, Connecticut.

### 3.   Rabobank.

476.   Between approximately 2005 and at least 2010, Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., the defendant, through its employees, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, the defendant, through its employees, engaged in a scheme to defraud counterparties to interest rate derivatives trades executed on its behalf by secretly manipulating benchmark interest rates to which the

profitability of those trades was tied, and in furtherance of that scheme, on or about April 17, 2008, the defendant transmitted or caused the transmission of electronic communications -- specifically, (1) an electronic chat between a derivatives trader and a money market trader, (2) a subsequent Yen LIBOR submission from the defendant to Thomson Reuters, and (3) a subsequent publication of a Yen LIBOR rate through international and interstate wires.

**Defendants Former Traders and Brokers Have Been Criminally Charged with an Antitrust Violation, Wire Fraud and Conspiracy to Defraud Charges in the U.S. and U.K.**

      1.  **Former UBS and Citigroup Yen Trader Thomas Hayes and Former UBS Yen Trader Roger Darin.**

477.    Hayes and another former UBS Trader, Roger Darin, have been charged by the DOJ with conspiracy to commit wire fraud, wire fraud and antitrust violations in connection with the manipulation of Yen-LIBOR.  *See* Ex. A-6, Complaint filed in *U.S. v. Hayes et al.*, 12 MAG 3229 (S.D.N.Y. Dec. 12, 2012) (the "Hayes/Darin Criminal Complaint").

478.    The Hayes/Darin Criminal Complaint includes numerous communications evidencing blatant market manipulation and illicit conspiratorial conduct between UBS and RBS, among others, while he was employed at Defendant UBS.  *See* Appendix at 65-67, 160, 240. The Hayes/Darin Criminal Complaint also includes communications evidencing manipulative and conspiratorial conduct by Thomas Hayes after he left Defendant UBS to join Defendant Citigroup.

479.    In June 2013, the U.K. SFO also charged former UBS and Citigroup trader Hayes with eight counts of conspiracy to defraud directly implicating Defendants (i) UBS AG; (ii) Citigroup Global Markets Japan Limited, (iii) Deutsche Bank AG, (iv) UBS Japan, (v) JP Morgan Chase & Co., (vi) The Royal Bank of Scotland plc, (vii) HSBC and (viii) Rabobank, as well as Broker Defendants (i) ICAP plc, (ii) R.P. Martin Holdings Limited and (iii) Tullett Prebon plc.  Specifically the U.K. SFO alleges:

a.       Between 12/01/2009 and 09/07/2010 at within the jurisdiction of Central Criminal Court conspired together with other employees of Citigroup Global Markets Japan Limited and associated entities (together "Citigroup") to defraud in dishonestly seeking to manipulate Yen London Inter bank Offered Rates and other inter bank offered rates, by procuring or making the submission of rates by Citigroup as a contributing Panel Bank to Thomson Reuters, with the intention that the economic interests of others would be prejudiced and/or to make personal gain for themselves or another.

b.       Between 12/01/2009 and 09/07/2010 at within the jurisdiction of Central Criminal Court conspired together with employees of UBS AG, Deutsche Bank AG and others to defraud in dishonestly seeking to manipulate Yen London Inter bank Offered Rates and other inter bank offered rates, by procuring or making the submission of rates by contributing Panel Banks to Thomson Reuters, with the intention that the economic interests of others would be prejudiced and/or to make personal gain for themselves or another.

c.       Between 12/01/2009 and 09/07/2010 at within the jurisdiction of Central Criminal Court conspired together with employees of ICAP plc and others to defraud in dishonestly seeking to manipulate Yen London Inter bank Offered Rates and other inter bank offered rates, by procuring or making the submission of rates by contributing Panel Banks to Thomson Reuters, with the intention that the economic interests of others would be prejudiced and/or to make personal gain for themselves or another.

d.       Between 12/01/2009 and 09/07/2010 at within the jurisdiction of Central Criminal Court conspired together with employees of ICAP plc and others to defraud in dishonestly seeking to manipulate Yen London Inter bank Offered Rates and other inter bank offered rates, by procuring or making the submission of rates by contributing Panel Banks to Thomson

Reuters, with the intention that the economic interests of others would be prejudiced and/or to make personal gain for themselves or another.

e.      Between 08/08/2006 and 12/03/2009 at within the jurisdiction of Central Criminal Court conspired together with other employees of UBS Japan and associated entities (together "UBS") to defraud in dishonestly seeking to manipulate Yen London Inter bank Offered Rates and other inter bank offered rates, by procuring or making the submission of rates by UBS as a contributing Panel Bank to Thomson Reuters, with the intention that the economic interests of others would be prejudiced and/or to make personal gain for themselves or another.

f.      Between 08/08/2006 and 12/03/2009 at within the jurisdiction of Central Criminal Court conspired together with employees of JP Morgan Chase & Co, The Royal Bank of Scotland Group plc, Deutsche Bank AG and others  to defraud in dishonestly seeking to manipulate Yen London Inter bank Offered Rates and other inter bank offered rates, by procuring or making the submission of rates by contributing Panel Banks to Thomson Reuters, with the intention that the economic interests of others would be prejudiced and/or to make personal gain for themselves or another.

g.      Between 08/08/2006 and 12/03/2009 at within the jurisdiction of Central Criminal Court conspired together with employees of UBS AG, ICAP plc and others  to defraud in dishonestly seeking to manipulate Yen London Inter bank Offered Rates and other inter bank offered rates, by procuring or making the submission of rates by contributing Panel Banks to Thomson Reuters, with the intention that the economic interests of others would be prejudiced and/or to make personal gain for themselves or another.

h.      Between 08/08/2006 and 12/03/2009 at within the jurisdiction of Central Criminal Court conspired together with employees of UBS AG, R.P. Martin Holdings Limited, Tullett

Prebon plc, Rabobank, HSBC and others  to defraud in dishonestly seeking to manipulate Yen

London Inter bank Offered Rates and other inter bank offered rates, by procuring or making the

submission of rates by contributing Panel Banks to Thomson Reuters, with the intention that the

economic interests of others would be prejudiced and/or to make personal gain for themselves or

another.

### 2.   Former ICAP Brokers.

480.   Three former ICAP brokers, Darrell Read, Daniel Wilkinson and Colin Goodman,

have been charged by the DOJ with conspiracy to commit wire fraud and wire fraud in

connection with the manipulation of Yen-LIBOR.  *See* Complaint filed in *United States of*

*America v. Darrell Read, Daniel Wilkinson, and Colin Goodman*, 13 MAG 2224 (S.D.N.Y. Sept.

13, 2013).  The DOJ alleges the three former ICAP brokers conspired with former UBS trader

Hayes from July 2006 through September 2009.  The same ICAP brokers were also charged by

the U.K. SFO with conspiracy to defraud charges for their manipulation of Yen-LIBOR from

August 8, 2006 through September 7, 2010.

### 3.   Former R.P. Martin Brokers Terry John Farr and James Andrew Gilmour.

481.   In July 2013, the U.K. SFO also charged former R.P. Martin broker Terry Farr

and James Gilmour with conspiracy to defraud charges.  Between August 8, 2006 and December

3, 2009, both Farr and Gilmour are alleged to have conspired to manipulate Yen-LIBOR and

other interbank offered rates with, among others, former UBS trader Tom Hayes and fellow R.P.

Martin broker James Gilmour, as well as other yet-to-be named traders and brokers at

Defendants UBS, Tullett Prebon, Rabobank and HSBC.  Farr is also alleged to have conspired

with Tom Hayes to manipulate Yen-LIBOR between January 12, 2009 and July 9, 2010 when

Hayes was employed by Citi Group Global Markets.

### 4. Former Rabobank Traders.

482. Three former Rabobank traders, Paul Robson, Paul Thompson and Tetsuya Motomura have been charged by the DOJ with conspiracy to commit wire fraud and bank fraud as well as wire fraud all in connection with the manipulation of Yen-LIBOR from May 2006 through early 2011. *See* Complaint filed in *United States of America v. Paul Robson, Paul Thompson, and Tetsuya Motomura*, 14 MAG 0069 (S.D.N.Y. Jan. 13, 2014). A fourth former Rabobank Trader, Takyuki Yagami, pleaded guilty to conspiracy to commit wire and bank fraud for his role in the conspiracy to manipulate Yen-LIBOR and the prices of Euroyen-based derivatives.

## V. DEFENDANTS' UNLAWFUL CONDUCT HAS ALSO LED TO INVESTIGATIONS, ISSUANCE OF FINDINGS OF MISCONDUCT AND ADMINISTRATIVE SANCTIONS WITH GOVERNMENTAL AUTHORITIES IN THE U.S. AND ABROAD

483. Defendants' unlawful conduct has led to numerous government investigations, both domestically and abroad, including by the DOJ, CFTC, SEC, FSA, the Japanese Securities and Exchange Surveillance Commission, the Canadian Competition Bureau, the Swiss Competition Commission, Swiss financial market supervisory authority FINMA and the Monetary Authority for Singapore.

### Recommendations and Findings by the Japanese Securities and Exchange Surveillance Commission and Administrative Action by the Japanese Financial Services Agency

484. The Japanese Securities and Exchange Surveillance Commission ("JSESC") conducted inspections on UBS Japan, Citigroup Global Markets Japan Inc., and RBS Japan, and found violations of the Japanese Financial Instruments and Exchange Act.

485.    On December 9, 2011, the JSESC recommended that the Japanese Financial

Services Agency ("JFSA") take administrative actions against Defendant UBS Securities Japan

Ltd. (hereinafter "the JSESC Recommendation for Administrative Action Against UBS") as well

as against Defendant Citigroup Global Markets Japan Inc. (hereinafter the "JSESC

Recommendation for Administrative Action Against Citigroup").

### 1.  UBS

486.    The JSESC Recommendation for Administrative Action Against UBS provides as

follows:

### 1.    Contents of the Recommendation

Pursuant to Article 20, paragraph 1 of the Act for Establishment of the financial
Services Agency (FSA), today, on December 9, 2011, the Securities and
Exchange Surveillance Commission issued a recommendation that the Prime
Minister and the Commissioner of the FSA take administrative action and any
other appropriate measures against UBS Securities Japan Ltd. (hereinafter
referred to as the "Company").  This recommendation is based on the findings of
an inspection, whereby the following breach of laws and regulations by the
Company was identified.

| | |
|---|---|
| *Location | Chiyoda-Ku Tokyo |
| Representative in Japan | Mr. Toshiharu Kojima |
| Capital | 60,000 million Yen |
| Number of officers and employees | 822 |
| Registration types | Type I Financial Instruments Business Operator |
| | Type II financial Instruments Business Operator |

### 2.    Summary of the findings

Inappropriate actions related to Euroyen TIBOR (hereinafter referred to as
"TIBOR")

A yen rates trader at the Rates Department of the Fixed Income, Currencies and Commodities Division in the Company (at that time; hereinafter referred to as "Trader A") had continuously conducted approaches such as requesting a person in charge of submitting the TIBOR rates of UBS AG, Tokyo Branch (hereinafter referred to as "Submitting Personnel") to change its rates since around March 2007 at the latest, and also had continuously conducted approaches such as requesting persons in charge of submitting the TIBOR rates of other banks (hereinafter, including Submitting Personnel, referred to as "Submitting Personnel, etc.") since around February 2007 at the latest, for the purpose of fluctuating TIBOR so as to give advantages to the Derivative Transactions related to yen rates which Trader A was conducting.

The actions conducted by Trader A are acknowledged to be seriously unjust and malicious, and could undermine the fairness of the markets, considering that three-month TIBOR is the underlying asset of Three-month Euroyen Futures listed on Tokyo Financial Exchange Inc., Trader A conducted transactions of Three-month Euroyen Futures on Tokyo Financial Exchange Inc., and TIBOR is a significantly important financial index as a basic interest rate when banks raise or lend money. Therefore, the aforementioned actions conducted by Trader A are acknowledged to have a serious problem from the viewpoints of the public interest and protection of investors.

Furthermore, Trader A had also continuously conducted inappropriate approaches such as requesting to change the Yen-LIBOR rates that UBS group submitted, since around June 2007 at the latest.

The Company's internal control system is also acknowledged to have a serious problem, since the approaches have been overlooked for long periods and no appropriate measures have been taken.

As mentioned above, i) Trader A is acknowledged to conduct approaches against Submitting Personnel, etc. for Market Derivatives Transactions, which he was conducting under the Company's proprietary trading legally defined as Financial Instruments Business, ii) the actions are acknowledged to be unjust and malicious, from the viewpoints of the public interest and protection of investors, and could undermine the fairness of the markets, iii) Trader A conducted approaches regarding not only TIBOR but also Yen-LIBOR, and iv) the Company's internal control system is acknowledged to have a serious problem. Therefore, the Company's actions are acknowledged to fall under Article 52, paragraph 1(ix) of the Financial Instruments and Exchange Act, which stipulates "when a wrongful act or extremely unjust act has been conducted with regard to Financial Instruments Business, and when the circumstances are especially serious."

487.    On December 16, 2011, based upon the JSESC Recommendation, the JFSA

agreed to take administrative action against UBS.  In particular, the JFSA issued a "Business

Suspension Order" requiring UBS Securities Japan to suspend trading in derivatives transactions related to Euroyen TIBOR and Yen-LIBOR from January 10 to January 16, 2012 (excluding transactions required to perform existing contracts).

488.    The JFSA also issued a "Business Improvement Order" requiring UBS Securities Japan to: "(a) Clarify the responsibility of management and staff regarding the violation.  (b) Secure strict compliance by all management and staff members.  (c) Take preventive measures against recurrence of the above-mentioned violations, including measures to improve the control environment for governance and business operation. [and] (d) Submit a written report to the FSA on the implementation of the above . . . ."

### 2.  Citigroup/Citibank

489.    The JSESC Recommendation for Administrative Action against Citigroup provides as follows:

### 1.  Contents of the Recommendation

Pursuant to Article 20, paragraph 1 of the Act for Establishment of the Financial Services Agency (FSA), today, on December 9, 2011, the Securities and Exchange Surveillance Commission (SESC) issued a recommendation that the Prime Minister and the Commissioner of the FSA take administrative action and any other appropriate measures against Citigroup Global Markets Japan Inc. (hereinafter referred to as the "Company").  This recommendation is based on the findings of an inspection, whereby the following breaches of laws and regulations by the Company were identified.

| *Location | Chiyoda-Ku Tokyo |
|---|---|
| President and CEO | Mr. Brian Mccappin |
| Capital | 96,300 Million Yen |
| Number of officers and employees | 729 |
| Registration types | Type I Financial Instruments Business Operator |

189

Type II financial Instruments Business
Operator

## 2.    Summary of the findings

(1)   Inadequate response to the administrative order

In response to the order by the FSA pursuant to Article 56-2, paragraph 1 of the
Financial Instruments and Exchange Act (FIEA), the Company submitted a report
regarding the involvement of directors/employees in Euroyen TIBOR (hereinafter
referred to as "TIBOR") and Yen-LIBOR.  The SESC, through its inspection, verified
the accuracy and sufficiency of the content of the report, and revealed that the report
lacked a description of important matters regarding inappropriate approaches against
submitting rates and contained an untruthful description, the conclusion of the report
was derived from this untruthful description, and therefore the contents of the report
were inappropriate.

The lack of important matters and the untruthful description in the report are
acknowledged to violate the administrative order by the FSA Commissioner based on
Article 56-2 of the FIEA, and the Company's actions related to the report are
acknowledged to fall under Article 52, paragraph 1(vi) of the FIEA, which stipulates
"violation of the disposition given by government agencies under laws and regulations
pertaining to Financial Instruments Business."

(2)   Inappropriate actions related to TIBOR

The Head of the G10 Rates in the Company (at that time; hereinafter referred to as
"Director A") had continuously conducted approaches such as requesting a person in
charge of submitting the TIBOR rates of Citibank Japan Ltd. (hereinafter referred to as
"Submitting Personnel") to change its rates since around April 2010 at the latest, and a
Yen Rates trader at the G10 Rates (hereinafter referred to as "Trader B") had
continuously conducted approaches such as questioning persons in charge of
submitting the TIBOR rates of other banks (or securities firms belonging to their
financial conglomerates, hereinafter, including Submitting Personnel, referred to as
"Submitting Personnel, etc.") since Trader B joined the Company in December 2009,
for the purpose of fluctuating TIBOR so as to give advantages to the Derivatives
Transactions related to yen rates which Director A and Trader B were conducting.

The actions conducted by Director A and Trader B are acknowledged to be seriously
unjust and malicious, and could undermine the fairness of the markets, considering
that three-month TIBOR is the underlying asset of Three-month Euroyen Futures
listed on Tokyo Financial Exchange Inc., Director A and Trader B conducted
transactions of Three-month Euroyen Futures on Tokyo Financial Exchange Inc., and
TIBOR is a significantly important financial index as a basic interest rate when banks
raise or lend money. Therefore, the aforementioned actions by Director A and Trader

B are acknowledged to have a serious problem from the viewpoints of the public interest and protection of investors.

Furthermore, Trader B had also continuously conducted inappropriate approaches such as requesting to change the Yen-LIBOR rates that Citibank group submitted, since December 2009.

In spite of recognizing these actions, the President and CEO (hereinafter referred to simply as the "CEO"), who was also responsible for the G10 Rates, overlooked these actions and the Company did not take appropriate measures, therefore, the Company's internal control system is acknowledged to have a serious problem.

As mentioned above, i) Director A and Trader B are acknowledged to have conducted approaches against Submitting Personnel, etc. for Market Transactions of Derivatives which they were conducting under the Company's proprietary trading legally defined as Financial Instruments Business, ii) the actions are acknowledged to be unjust and malicious, from the viewpoints of the public interest and protection of investors, and could undermine the fairness of the markets, iii) Trader B conducted approaches regarding not only TIBOR but also Yen-LIBOR, and iv) the Company's internal control system is acknowledged to have a serious problem. Therefore, the Company's actions are acknowledged to fall under Article 52, paragraph 1(ix) of the FIEA, which stipulates "when a wrongful act or extremely unjust act has been conducted with regard to Financial Instruments Business, and when the circumstances are especially serious."

(3)   Sales activity without necessary registration of a Sales Representative by a senior executive

Director A had conducted Market Transactions of Derivatives since November 12, 2009.

However, the Company had not registered Director A as a Class-1 Sales Representative with Japan Securities Dealers Association, which is necessary to conduct Market Transactions of Derivatives, until June 16, 2010.

The CEO has not taken appropriate measures, such as directing related sections including the Compliance Division to address this issue, even after the CEO recognized that Director A conducted sales activities without necessary registration. Therefore, the Company's internal control system is acknowledged to have a serious problem.

The Company had the employee conduct duties of Sales Representatives without necessary registration.  The aforementioned action of the Company is acknowledged to constitute a breach of Article 64, paragraph 2 of the FIEA.

490.     On December 16, 2011, based upon the JSESC Recommendation, the JFSA agreed to take administrative action against Citigroup.  In particular, the JFSA issued a "Business Suspension Order" requiring Citigroup to suspend trading in derivatives transactions related to TIBOR and Yen-LIBOR from January 10 to January 23, 2012 (excluding transactions required to perform existing contracts).

491.     The JFSA also issued a "Business Improvement Order" requiring Citigroup to: "(a) Clarify the responsibility of management and staff regarding the violation.  (b) Secure strict compliance by all management and staff members.  (c) Take preventive measures against recurrence of the above-mentioned violations, including measures to improve the control environment for governance and business operation. [and] (d) Submit a written report to the FSA on the implementation of the above . . . ."

492.     UBS and Citigroup did not deny the JSESC's findings.  A UBS spokesperson stated the bank was taking the findings "very seriously" and had been "working closely with" the SESC and the JFSA "to ensure all issues are fully addressed and resolved."  The UBS spokesperson also added, "We have taken appropriate personnel action against the employee involved in the conduct at issue."  A Citigroup spokesperson similarly stated, "Citigroup Global Markets Japan takes the matter very seriously and sincerely apologizes to clients and all parties concerned for the issues that led to the recommendation.  The company has started working diligently to address the issues raised."

493.     *The Wall Street Journal,* in a February 7, 2012 article, reported that Thomas Hayes, who joined UBS in 2006 "and traded products linked to the pricing of short-term yen-denominated borrowings" is the UBS trader referenced in the JSESC's Recommendation for Administrative Action against UBS.  The same *Wall Street Journal* article reported that

Christopher Cecere, a former managing director and a trader for Citigroup Global Markets Japan

Inc., as the Citigroup trader referenced in the JSESC's Recommendation for Administrative

Action Against Citigroup. According to the *Wall Street Journal*, "Mr. Cecere supervised Mr.

Hayes when the former UBS trader joined Citigroup in December 2009. The Japanese regulator

concluded that Mr. Cecere was persuaded by Mr. Hayes to 'continuously conduct' attempts to

influence the Tibor rate."

494.    On February 10, 2012, the *Financial Times* reported that the manipulation of

TIBOR was "uncovered after another Citi employee in London reported the activity." The

*Financial Times* also reported that "Citi took a $50m loss when it unwound the traders' positions

and reported the matter to regulators. . . .  However, other Citi sources suggested the losses were

significantly in excess of that amount."

### 3. RBS

495.    On April 12, 2013, the JFSA, based upon April 5, 2013 Recommendations for

Administrative Actions by the JSESC, took administrative action against Defendant RBS Japan

for a violation of the Financial Instruments and Exchange Act relating to RBS's submission of

false Yen-LIBOR rates during the period from around middle 2006 to early 2010.

496.    The JFSA Administrative Actions against RBS Japan provides as follows:

### 1. Descriptions of the Recommendation

(1) Inappropriate conducts related to Yen LIBOR

From around middle of 2006 to early 2010, one trader at the Department of Short
Term Market (at the time; hereinafter referred to as "Trader A") and his colleagues at
RBS Securities continuously approached Yen LIBOR submitters of Royal Bank of
Scotland plc (hereinafter referred to as "RBS plc") including through RBS plc's
traders and made requests to change Yen LIBOR submissions in order to affect Yen
LIBOR in favor of the derivative transactions by Trader A and his colleagues.

The above conducts of Trader A and his colleagues could undermine the market
integrity, considering that Yen LIBOR is a significantly important financial index that

serves as a benchmark interest rate for various financial transactions. Therefore, the conducts are acknowledged to be seriously unjust and malicious and have a serious problem from the viewpoints of the public interest and protection of investors.

Furthermore, in light of the fact that RBS Securities has failed to identify these misconducts for a long period of time and has not taken any appropriate measures, it is acknowledged that its internal control system has serious deficiencies.

****

The conducts mentioned above in (1) are acknowledged to be unjust and malicious and have a serious problem from the viewpoints of the public interest and the investor protection, since (i) these conducts are recognized to be made in the course of RBS Securities' business operation and (ii) such conducts could undermine the market integrity. Furthermore, it is acknowledged that its internal control system has significant deficiencies. Therefore, it is acknowledged that the situation of RBS Securities' business operation is a case where administrative action is "necessary and appropriate for the public interest or protection of investors, with regard to a Financial Instruments Business Operator's business operation" as stipulated under Article 51 of the "FIEA".

## Swiss Competition Commission Investigation

497.   On February 3, 2012, the *Wall Street Journal* reported that UBS AG, Credit Suisse Group AG, Bank of Tokyo-Mitsubishi UFJ, Ltd., Citigroup Inc., Deutsche Bank AG, HSBC Holdings Plc, J.P. Morgan Chase & Co., Mizuho Financial Group Inc., Rabobank International, Royal Bank of Scotland Group Plc, Société Générale S.A., and Sumitomo Mitsui Banking Corp., among others, are under investigation by COMCO, the Swiss competition regulatory body, for colluding with one another to manipulate Euroyen TIBOR and Yen-LIBOR rates and the prices of interest rate derivatives benchmarked to these rates.

498.   COMCO's investigation, like other government investigations, was prompted by information and documents provided by a leniency applicant [upon information and belief, by UBS] pursuant to COMCO's antitrust leniency program.

499.   According to a February 3, 2012 press release, COMCO reported that:

COMCO has received information regarding potential unlawful agreements among banks. Specifically, collusion between derivative traders might have influenced the reference rates LIBOR and TIBOR. Furthermore, market

194

conditions regarding derivative products based upon these reference rates might have been manipulated too.  Hence, COMCO has opened an investigation against UBS and Credit Suisse, as well as against more than ten foreign financial institutions and other companies.

The Secretariat of COMCO ("Secretariat") received an application for its leniency program, which indicated that derivatives traders of various banks might have influenced the reference rates LIBOR and fixed with respect to certain currencies. The London Interbank Offered Rate (LIBOR) and the Tokyo Interbank Offered Rate (TIBOR) are reference rates which are aimed at reflecting the interest level in the interbank deposit market.  The British Bankers' Association (for LIBOR) and the Japanese Bankers' Association (for TIBOR) calculate these rates on a daily basis, for a range of currencies, based on submissions by respective panel banks.  Derivative traders working for a number of financial institutions might have manipulated these submissions by coordinating their behaviour, thereby influencing these reference rates in their favour. Moreover, derivative traders might have colluded to manipulate the difference between the ask price and the bid price (spread) of derivatives based on these reference rates to the detriment of their clients.

Beside the two major Swiss Banks, UBS and Credit Suisse, ten foreign banks (Bank of Tokyo Mitsubishi UFJ, Citigroup Inc., Deutsche Bank AG, HSBC Holdings plc, JP Morgan Chase & Co., Mizuho Financial Group Inc., Coöperative Centrale Raiffeisen-Boerenleenbank B.A., Royal Bank of Scotland Group plc, Société Générale S.A., Sumitomo Mitsui Banking Corporation) and other financial intermediaries are subject to this investigation led by the Secretariat.

## C. Disclosures Confirm the Existence of Investigations, Disclose Additional Investigations and/or Efforts to Reach Potential Settlements with Regulators

500.    In a Form 20-F filed with the SEC on July 23, 2012, Mitsubishi UFJ Financial Group, Inc. disclosed that it has "received requests and subpoenas for information from government agencies in some jurisdictions, including the United States and Europe, which are conducting investigations into past submissions made by panel members, including us, to the bodies that set various interbank offered rates.  We are cooperating with these investigations."

501.    In an Interim Report published in July 2012, Defendant HSBC Holdings plc confirmed that various authorities and enforcement authorities around the world, including in the U.S., U.K. and Asia are conducting investigations related to submissions made by panel banks in

connection with the setting of LIBOR and other interest rates.  HSBC added that: "As certain HSBC entities are members of such panels, HSBC and/or its subsidiaries have been the subject of regulatory demands for information and are cooperating with those investigations."

502.    In a Form 10-Q/A dated August 9, 2012, JPMorgan Chase disclosed that it has received subpoenas and requests for documents and, in some cases, interviews, from the DOJ, CFTC, SEC, European Commission, FSA, CCB, and COMCO, relating to, among other matters, JPMorgan's submissions of Yen-LIBOR rates to the BBA and Euroyen TIBOR to the JBA.

503.    On November 6, 2012, Defendant Citibank announced in its quarterly financial filing that the Monetary Authority for Singapore has launched an investigation of its LIBOR and related rate submissions. Citigroup disclosed that it has "received additional requests for information and documents from various domestic and overseas regulators and enforcement agencies, including the Monetary Authority for Singapore and a consortium of state Attorneys General."

504.    In an update to a 2012 Registration Statement filed with the AMF on November 8, 2012, Defendant Société Générale disclosed that "Société Générale, along with other financial institutions, has received requests for information from several authorities in Europe, the United States and Asia, in connection with investigations regarding submissions to the [BBA] for setting certain [LIBOR] . . . as well as trading in derivatives indexed to various rates.  Société Générale is cooperating fully with the investigating authorities."

505.    In February 2013, a former yen money market derivatives trader during the Class Period at Barclays and Deutsche Bank published a book entitled The Manipulation of the LIBOR fixing, and the doubt over the artificial TIBOR fixing (Hideto "Eddy" Takata, Gentosha Renaissance, Inc., February 20, 2013). The former traded, Eddy Takata, alleges the large

increase of Euroyen TIBOR over Yen-LIBOR since 2009 was the result of collusion amongst the Euroyen TIBOR rate setting banks so that the banks could borrow Yen-LIBOR at a lower rate and lend at the higher Euroyen TIBOR rate.

## D. Dozens of Defendants' Employees Are Under Investigation and/or Have Resigned, Been Suspended, or Fired or Arrested

506.    According to public reports, dozens of traders employed by the Contributor Bank and Broker Defendants have been fired or suspended or put under investigation by worldwide regulators for their alleged involvement in the manipulation of benchmark rates.  Such firings, terminations, and/or announced investigations of individuals employed or affiliated with the Defendants include, but are not limited to the following:

### 1.  RBS

507.    According to public reports, Defendant RBS fired at least four employees in connection with their manipulation of Yen-LIBOR:  Paul White, Andrew Hamilton, Neil Danziger, and Tan Chi Min.

508.    Paul White was RBS's principal rate-setter for Yen-LIBOR.  According to *Reuters*, Mr. White was fired by RBS in late 2011 in connection with his involvement in RBS's alleged manipulation of Yen-LIBOR.

509.    Andrew Hamilton was an investment advisor for RBS in its London office. According to *Bloomberg*, Mr. Hamilton was fired by RBS on October 21, 2011.

510.    Neil Danziger was a foreign-exchange trader for RBS in its London office. According to *Bloomberg*, Mr. Danziger was fired by RBS on October 21, 2011.

511.    Tan Chi Min was the head of short-term interest rate trading for Yen at RBS and the head of Delta One trading in Singapore.  Tan was fired on in November 2011.

512.     In addition, other RBS traders have been implicated in the manipulation of Yen-LIBOR.  According to CCB Officer Brian Elliott's May 18, 2011 affidavit, Brent Davies, an RBS trader, was one of the traders believed to be involved in the manipulation of Yen LIBOR. According to the affidavit, Trader A explained to Mr. Davies who his collusive contacts were and how he had and was going to manipulate Yen LIBOR. Trader A also communicated his trading positions, his desire for certain movement in Yen LIBOR and gave instructions for Mr. Davies to get RBS to make Yen LIBOR submissions consistent with Trader A's wishes.  Mr. Davies acknowledged these communications and confirmed that he would follow through. Trader A and Mr. Davies also entered into transactions that aligned their trading interest in regards to Yen LIBOR.

513.     In addition, Will Hall, a derivatives trader at RBS in London, was named in Elliott's May 18, 2011 affidavit as one of the traders believed to be involved in the manipulation of Yen LIBOR.  According to the affidavit, Trader A communicated to Mr. Hall his trading positions, his desire for a certain movement in Yen LIBOR and instructions to get RBS to make Yen LIBOR submissions consistent with his wishes, and Mr. Hall agreed to do this.

514.     Todd Morakis was RBS's Singapore-based head of trading for emerging markets. According to documents filed in the Singapore litigation, Mr. Morakis "orally confirmed to [Tan] around October [2011] that 'the practice of requesting to change the rate Libor is common in every rate setting environment in the banking industry.'"

515.     Further, Jezri Mohideen, RBS head of rates trading and yen products, was suspended as a result of his involvement in the manipulation of Yen-LIBOR.

### 2.  Citibank/Citigroup

516.     Christopher Cecere was the head of G10 trading and sales for Asia at Citibank. The JFSA found that Mr. Cecere ("Director A" in the FSA administrative case) "and another

Citigroup trader engaged in "seriously unjust and malicious" conduct by asking bankers to alter data they submitted while setting a benchmark Japanese lending rate [*i.e.,* Euroyen TIBOR]. Along with Cecere, Thomas Hayes was a Tokyo-based derivatives trader of yen-related products for Citibank.

517.    The *Financial Times* reported that Mr. Hayes "attempted to pressure colleagues and employees at other banks involved in the rate-setting process for the Tokyo Interbank Offered Rate, or Tibor.'"  In addition, Hayes "allegedly worked with …other traders to push submissions up or down for a benchmark interest rate called yen Libor."  Hayes was fired by Citibank in 2010.

518.    Brian McAppin was Citigroup's brokerage head in Japan.  The Japanese investigation found that McAppin "overlooked" attempts by two traders to influence interest rates despite "recognizing these actions."

519.    Citigroup Inc.'s head of Japan banking, Darren Buckley, resigned as chief executive officer of Citibank Japan Ltd., and Citigroup was forced to write off $50 million dollars in losses when it unwound positions it held in Euroyen derivatives and reported the rate setting misconduct to regulators.

520.    Thomas Hayes was fired by Citigroup less than a year after the bank hired him after an internal investigation revealed that Hayes had manipulated Yen-LIBOR.

### 3.  UBS

521.    Two former UBS traders, Thomas Hayes and Roger Darin have been criminally indicted by the DOJ.

522.    On August 8, 2012, the *Wall Street Journal* reported that UBS has fired or suspended approximately 20 traders and managers following UBS's involvement in the manipulation of Yen-LIBOR and Euroyen TIBOR.  The *Financial Times* also reported that Yvan

Ducrot, co-head of UBS's rates business, and Holger Seger, the global head of short-term interest rates trading at UBS, were both suspended by UBS.

523.    On January 9, 2013, *Bloomberg* reported that UBS has "dismissed, penalized or reprimanded" over 40 people.  About 18 people have lost their jobs and UBS has "taken action" against 40 people.

524.    Two former UBS traders in Singapore, Mukesh Kumar Chhaganlal (UBS's former co-head of macro-trading for emerging markets in Asia) and Prshant Mirpuri (a former UBS executive director) each claimed in separate lawsuits against UBS that they were fired in a bid by UBS to cover up its role in the manipulation of Yen-LIBOR and Euroyen TIBOR.

### 4.  **JPMorgan**

525.    Paul Glands was a derivatives trader with JPMorgan Chase in London.  He was named in CCB Officer Elliott's May 18, 2011 affidavit as one of the traders believed to be involved in the manipulation of Yen-LIBOR.  According to the affidavit, Trader A communicated to Mr. Glands his trading positions, his desire for a certain movement in Yen LIBOR and instructions to get JPMorgan Chase to make Yen LIBOR submissions consistent with his wishes, and Mr. Glands agreed to do so.

526.    Stewart Wiley was a derivatives trader with JPMorgan Chase in London.  He was named in CCB Officer Elliott's May 18, 2011 affidavit as one of the traders believed to be involved in the manipulation of Yen-LIBOR.  According to the affidavit, Trader A communicated to Mr. Wiley his trading positions, his desire for a certain movement in Yen-LIBOR and instructions to get JPMorgan Chase to make Yen-LIBOR submissions consistent with his wishes, and Mr. Wiley agreed to do so.  According to the Canadian Competition Law Officer Brian Elliott's May 18, 2011 affidavit, the Cooperating Party's Trader A also asked if

Paul Glands or Stewart Wiley required certain Yen-LIBOR submissions to aid their trading positions.

### 5.  **Deutsche Bank**

527.    Guillaume Adolph was a Deutsche derivatives trader who was named in CCB Officer Elliott's May 18, 2011 affidavit as one of the traders believed to be involved in the manipulation of Yen-LIBOR.  According to the affidavit, Trader A communicated to Mr. Adolph his trading positions, his desire for a certain movement in Yen-LIBOR and instructions to get Deutsche to make Yen-LIBOR submissions consistent with his wishes, and Mr. Adolph agreed to do so.  Further, according to the affidavit, Mr. Adolph shared his trading positions with Trader A.  Trader A also aligned his trading positions with Mr. Adolph to align their interests in respect of Yen-LIBOR.   Mr. Adolph was fired by Deutsche in December 2011 for conspiring with former UBS Trader Tom Hayes to manipulate Yen-LIBOR.

528.    In January 2013, Deutsche Bank announced that it fired at least two traders in connection with LIBOR-rigging.

529.    On November 28, 2012, *The Wall Street Journal* reported that Deutsche had admitted to the German Parliament that it failed to uphold interest rate reporting standards.

### 6.  **HSBC**

530.    Peter O'Leary was a HSBC derivatives trader who was named in CCB Officer Elliott's May 18, 2011 affidavit as one of the traders believed to be involved in the manipulation of Yen-LIBOR.  According to the affidavit, Mr. O'Leary was instructed by Trader A at UBS "to get HSBC to make Yen-LIBOR submissions consistent with his wishes."

### 7.  **Barclays**

531.    Following the announcement of the Barclays Settlement, Chairman Marcus Agius, Chief Executive Officer Robert Diamond, and Chief Operating Officer Jerry Del Missier resigned. On November 28, 2012, *The Wall Street Journal* reported that Defendant Barclays had disciplined 13 members of its staff for their involvement in LIBOR rate-fixing.

### 8.  **Bank of Tokyo-Mitsubishi UFJ/Mitsubishi UFJ Financial Group**

532.    Christian Schluep was suspended by Defendant Bank of Tokyo-Mitsubishi UFJ. Schluep joined Bank of Tokyo-Mitsubishi UFJ after serving as a derivatives trader at Rabobank from December 2003 until October 2008.

533.    Paul Robson was suspended by Defendant Bank of Tokyo-Mitsubishi UFJ for his alleged involvement in the manipulation of Yen-LIBOR and the prices of Euroyen-based derivatives.  Robson was a former derivatives trader at Defendant Rabobank for eight years (from approximately 2001 through August 2009).  As alleged above, Robson was criminally charged with conspiracy to commit wire fraud and bank fraud as well as wire fraud by the DOJ in connection with the manipualtion of Yen-LIBOR from May 2006 through early 2011.

534.    In August 2012, Defendant Mitsubishi UFJ Financial Group Inc. suspended a third London-based banker who was in charge of submitting Defendant Mitsubishi UFJ Financial Group Inc.'s LIBOR rates.

### 9.  **Rabobank**

535.    On July 27, 2012, *Reuters* reported that Defendant Rabobank fired four of its LIBOR submitters between 2008 and 2011 for their involvement in rate manipulation. The DOJ charged three former Rabobank traders, Paul Robson, Paul Thompson and Tetsuya Motomura with conspiracy to commit wire fraud and bank fraud, as well as wire fraud, all in connection

with the manipulation of Yen-LIBOR from May 2006 through early 2011. *See* Complaint filed in *United States of America v. Paul Robson, Paul Thompson, and Tetsuya Motomura*, 14 MAG 0069 (Jan. 13, 2014). Another former Rabobank Yen derivatives trader, Takayuki Yagami, plead guilty to conspiracy to commit wire fraud and bank fraud for his role in the manipulation of Yen-LIBOR.

### 10. R.P. Martin

536.     Terry Farr and Jim Gilmour, two former employees of interdealer broker R.P. Martin Holdings Ltd., have been arrested by the U.K. Serious Fraud Office and City of London police "in connection with the investigation into the manipulation of LIBOR."

### 11. ICAP

537.     As alleged above, three former ICAP brokers, Darrell Read, Daniel Wilkinson and Colin Goodman have been criminally charged by the DOJ with conspiracy to commit wire fraud and wire fraud in connection with the manipulation of Yen-LIBOR.

### 12. Tullett Prebon

538.     Noel Cryan was dismissed in September 2013 following Tullett Prebon's internal disciplinary hearings for gross misconduct and the manipulation of Yen-LIBOR. Cryan admitted "he had arranged [the trades]" with UBS. According to Cryan, managers at Tullett Prebon were aware of and encouraged the manipulation.

539.     Cryan said that Tullett senior managers encouraged him to enter wash trades to generate illicit revenue for Tullett after Tullett saw commissions at a rival broker reach £100,000. One allegedly told him to "get involved."

540.     Cryan also said that some of the wash trades were conducted after conversations by another Tullett Prebon broker with an RBS trader.

**E.**     **The BBA's and JBA's Re-Evaluation of Rate Setting Process**

541.     The rate-setting manipulation has prompted both the JBA and the BBA to re-evaluate the Euroyen TIBOR and Yen-LIBOR rate-setting process.

542.     In July 2012, the JBA requested that all banks that submit Euroyen TIBOR rates review the status of compliance with the guidelines for the publication of Euroyen TIBOR and is considering reforming the rate-setting process.   According to public reports, the JBA is in the process of drafting measures to ensure the legitimacy of Euroyen TIBOR.

543.     In connection with the JBA's review of the Euroyen TIBOR setting process, the JFSA announced that because "the illegal manipulation of interest rates is an important matter that could undermine trust in the fairness and transparency of the financial market, [the] FSA will also keep a close watch on the JBA's activities with strong consciousness of this matter." The JFSA also reminded market participants that the JFSA "will continue to check individual financial institutions' internal control systems related to the submission of interest rates through inspection and supervision, and if a problem is recognized, [the JFSA] will take appropriate action in light of laws and regulations."

544.     Remarking on an August 2012 review of allegations of LIBOR-rigging by the FSA, the managing director of the FSA, Martin Wheatley, said that maintaining the current system for setting LIBOR "was not a viable option."

545.     On September 24, 2012, CFTC Chairman Gary Gensler told a hearing of the European Parliament's Economic and Monetary Affairs Committee that the current rate setting process, in which there was no supervision or overview by regulators, left LIBOR "open to manipulation."

546.     On September 25, 2012, it was announced that the BBA's governing council voted on September 13 to give up its role in setting LIBOR, reportedly opening the door for government involvement in the rate-setting process.

547.     On February 25, 2013, the BBA formally voted to relinquish its role in the setting of LIBOR.

548.     On March 14, 2013, the JBA said that, beginning in April 2013, it would set up a committee of banks and specialists to review the setting of Euroyen TIBOR amid global scrutiny into benchmark lending rates.

549.     On November 27, 2013, *Reuters* reported that the JFSA convened a twelve (12) member advisory panel to study the credibility of Euroyen TIBOR and other financial indicators.

a.     A few of the advisory panel's proposals included: (a) stripping oversight for setting Euroyen TIBOR from the JBA, (b) shifting responsibility to the JFSA, or (c) setting up a new organization within its ranks to administer Euroyen TIBOR.

550.     On February 1, 2014, the administration of LIBOR was transferred from the BBA to the Intercontinental Exchange Group ("ICE") to address the need for a new administrator of LIBOR highlighted by the Wheatley review.

551.     On May 19, 2014, *The Financial Times*, reported that Mikishi Daimon, an upper-house member of the Japanese parliament said that banks could still be keeping Euroyen TIBOR artificially high.  The *Financial Times* also reported "gaps between Tibor rates and rates in actual interbank transactions" revealing that in the first part of 2014, the actual market rate for three-month funds was .14% whereas three-month Euroyen TIBOR was significantly higher at .215%.  The same report also revealed price anomalies in the spread between Yen-LIBOR and Euroyen TIBOR, showing that the average spread was 14 basis points between 2009 and 2012.  However,

this "gap narrowed sharply in the first three months of 2013" following criminal probes and allegations by former Barclays and Deutsche trader Eddy Takata that Japanese banks were conspiring to keep Euroyen TIBOR artificially high.

## VI.    A DRAMATIC DECREASE IN VARIABILITY BETWEEN THE QUOTES AMONG ALL REPORTING CONTRIBUTOR BANK DEFENDANTS EVIDENCES COLLUSION DURING THE CLASS PERIOD

552.    Early on in Class Period, the variability and volatility among individual Euroyen TIBOR and Yen-LIBOR Defendant panel banks' quotes began to decline significantly.  The decline in volatility and variability accelerated further into the Class Period. This decrease and lack of volatility and variability supports the already revealed evidence of rate-setting collusion among the Contributor Bank Defendants.  Dramatic decreases in variability and volatility in rate submissions, especially during times of financial crisis when uncertainty is high, is strongly indicative of collusion.  *See* Rosa M. Abrantes-Metz *et al.*, *A Variance Screen for Collusion*, 24 Int'l J. Ind. Org. 467 (2006); Commission of the European Communities, Commission Staff Working Document, *Implementing the New Methodology for Product Market and Sector Monitoring: Results of a First Sector Screening*, (Nov. 11, 2007).

553.    Figures 1 and 2 below are Intraday Coefficient of Variation analyses which measure the standard deviation divided by the mean of all daily quotes for Euroyen TIBOR and/or Yen-LIBOR submitted to the JBA and BBA, respectively.  The intraday coefficient of variation analyses measure the variability of the quotes submitted by the  Euroyen TIBOR and/or Yen-LIBOR Defendant panel banks, *i.e.*, how different (or how similar) the Contributor Bank Defendants' Euroyen TIBOR and/or Yen-LIBOR daily quotes are from each other on a given day when compared against each other.  Figures 1 and 2 below measure all quotes submitted by the Defendant panel banks to the JBA and BBA, respectively ("All-Quotes"), including quotes in the compilation of Euroyen TIBOR and Yen-LIBOR rates ("Deciding Quotes").

554.    Figures 1 and 2 demonstrate that during the pre-Class Period of January 2003 to December 2005, the variability of Euroyen TIBOR and/or Yen-LIBOR quotes submitted by Contributor Bank Defendants was high.  Beginning with the start of the Class Period, the variability and volatility among the quotes submitted by Contributor Bank Defendants declined and thereafter declined forcefully and materially, as compared to the period prior to the Class Period.

555.    For example, on November 14, 2005, the coefficient of variation for Contributor Bank Defendants' Euroyen TIBOR quotes was 0.128 (all-quotes) and 0.0375 across the Deciding Quotes.  By contrast, on June 27, 2006, the All-Quote coefficient of variation declined to 0.0262, while the deciding-quote coefficient of variation declined to 0.015. Throughout the remainder of the Class Period, the coefficient of variation for Euroyen TIBOR quotes, especially Deciding Quotes, remained significantly and materially lower than the coefficient of variation values that persisted prior to the Class Period.

556.    The same held true for Yen-LIBOR.  For example, on November 14, 2005, the coefficient of variation for Yen-LIBOR quotes was 0.2815 (all-quotes) and 0.0941 across the Deciding Quotes.   By contrast, on June 27, 2006, the All-Quote coefficient of variation declined to 0.0547, while the Deciding-Quote coefficient of variation declined to 0.0149. Throughout the remainder of the Class Period, the coefficient of variation for Contributor Bank Defendants' Yen-LIBOR quotes remained significantly and materially below the values that persisted prior to the Class Period.

557.    Furthermore, the variability and volatility of Contributor Bank Defendants' Euroyen TIBOR and Yen-LIBOR quotes stayed well below their pre-Class Period values during times of severe financial crisis.

558.   For example, on August 9, 2007, a series of news stories came out representing the "official start" of the financial crisis.  This news related to a liquidity and subprime mortgage crisis comprised of several key events, including:  (1) a "coordinated intervention" by the European Central Bank, the Federal Reserve Bank, and the Bank of Japan; (2) a warning by AIG that defaults were spreading beyond the subprime sector; and (3) a suspension by BNP Paribas of three funds that held mortgage-backed securities.

559.   These events, which raised expected borrowing costs and expected interest rates and introduced a high level of financial uncertainty in the market place, should have caused an increase in the coefficient of variation among the Euroyen TIBOR and/or Yen-LIBOR submitted rates.  That did not occur.  Instead, the coefficient of variation among the quotes submitted by the Contributor Panel Banks remained suspiciously low.

560.   In particular, on August 7, 2007, the coefficient of variation for the Contributor Panel Banks' Euroyen TIBOR All Quotes and Deciding Quotes was 0.0317 and 0.0111, respectively.   On August 14, 2007, these values stood at 0.0357 and 0.0186, and then decreased to 0.0238 and 0.0098 on September 6, 2007.  These values further decreased to 0.0167 and 0.0085 on September 12, all during a time of greater economic uncertainty and anxiety.  For Yen-LIBOR, the coefficient of variation for the Yen-LIBOR All Quotes and Deciding Quotes was 0.0121 and 0.0055, respectively, on August 8, 2007.  These values remained substantially the same throughout August 2007, for example standing at 0.0178 and 0.005 on August 13, 2007 and 0.0258 and 0.0158 on August 14, 2007, again all during a time of great economic uncertainty and anxiety in which these values should have increased considerably.

561.   With the fall of Lehman Brothers in September 2008, the default risk of the Defendant panel banks significantly increased, not only because each became more likely to

default due to severely impaired financial conditions, but also because of systemic risk (the risk of collapse of the overall financial system). Yet such drastic financial changes were not reflected in an increased variability of Contributor Panel Banks' Euroyen TIBOR and/or Yen-LIBOR quotes. Instead, the coefficient of variation for the Euroyen TIBOR and/or Yen-LIBOR quotes remained suspiciously low and unresponsive to Lehman's collapse. For example, on September 11, 2008, the coefficient of variation for the Euroyen TIBOR and Yen-LIBOR Deciding Quotes was 0.0094 and 0.0127, respectively. On September 18, 2008, following the collapse of Lehman, these values actually decreased to 0.0091 and almost zero, respectively, and when considering all of the quotes these values were 0.22 and 0.017 for Euroyen TIBOR and Yen-LIBOR, respectively. *See* Figures 1 and 2 below.

### FIGURE 1



Intraday Coefficient of Variation of Contributing Bank Quotes
3 Month EuroYen TIBOR

Data Source: Bloomberg.
Note: The coefficient of variation on each day is computed as the standard deviation divided by the mean of the banks' quotes submitted on that day. The deciding group of quotes corresponds to those quotes which effectively entered into the calculation of the TIBOR on each given day.

**FIGURE 2**



562.    Plaintiffs conducted analyses to assess the contribution of each Contributor Panel Bank who has not yet settled for its part in the conspiracy.  This economic evidence reveals that each such Defendant's rate submissions to the Euroyen TIBOR and Yen-LIBOR panels lowered the collective coefficient of variation of all panel banks.  That their contribution reduced the coefficient of variation provides strong economic indicia that these Defendants participated in collusive rate setting during the Class Period.  For each such Contributor Panel Bank, Plaintiffs' economic analyses compared the difference between the intraday coefficient of variation for all of the Contributor Panel Bank quotes to the same measure when excluding one particular bank at a time, call it, Bank A.  Where the comparator coefficient of variation is zero, adding Bank A's quote keeps the intraday coefficient of variation for all of the quotes at the same value.  This result is evidence that Bank A behaved in accordance with the conspiracy by quoting rates

equivalent to those of the colluding banks.  The results of this analysis for these Contributor Panel Banks are shown in Figures 3-24, below.

563.    When this comparison results in a negative value, the intraday coefficient of variation for all quotes excluding Bank A is larger than the intraday coefficient of variation for all of the quotes.  Stated differently, when the quote for Bank A is added, the coefficient of variation is reduced, *i.e.*, the bank's rate submissions reduce the overall quote variability.  This result is consistent with Bank A being part of the collusion that has been demonstrated by the economic and non-economic evidence described above.

564.    From a statistical perspective, these individual studies of each Contributor Panel Bank yield results that are in consistent with independent action during the Class Period, given the reduced variation and unresponsiveness to various relevant market events.  This evidence strongly suggests that each of these Contributing Panel Banks acted in a coordinated matter.

**FIGURE 3**



Contribution of Bank of Tokyo-Mitsubishi to the Intraday Coefficient of Variation of 3 Month EuroYen TIBOR Quotes
January 2006 -- December 2010

**FIGURE 4**



Contribution of Bank of Yokohama to the Intraday Coefficient of
Variation of 3 Month EuroYen TIBOR Quotes
January 2006 -- December 2010

**FIGURE 5**



Contribution of Chuo Mitsui Trust to the Intraday Coefficient of
Variation of 3 Month EuroYen TIBOR Quotes
January 2006 -- December 2010



**FIGURE 6**

**Contribution of Mitsubishi UFJ Trust to the Intraday Coefficient of Variation of 3 Month EuroYen TIBOR Quotes**

January 2006 -- December 2010



**FIGURE 7**

**Contribution of Mizuho Bank to the Intraday Coefficient of Variation of 3 Month EuroYen TIBOR Quotes**

January 2006 -- December 2010

213

**FIGURE 8**



**FIGURE 9**



**FIGURE 10**



Contribution of Norinchukin Bank to the Intraday Coefficient of
Variation of 3 Month EuroYen TIBOR Quotes
January 2006 -- December 2010

**FIGURE 11**



Contribution of Resona Bank to the Intraday Coefficient of Variation of 3
Month EuroYen TIBOR Quotes
January 2006 -- December 2010

**FIGURE 12**



Contribution of Shinkin Central Bank to the Intraday Coefficient of
Variation of 3 Month EuroYen TIBOR Quotes
January 2006 -- December 2010

**FIGURE 13**



Contribution of Shoko Chukin Bank to the Intraday Coefficient of
Variation of 3 Month EuroYen TIBOR Quotes
January 2006 -- December 2010

**FIGURE 14**



**Contribution of Sumitomo Mitsui Banking Corp to the Intraday
Coefficient of Variation of 3 Month EuroYen TIBOR Quotes**
January 2006 -- December 2010

**FIGURE 15**

**Contribution of Sumitomo Trust & Banking to the Intraday Coefficient of
Variation of 3 Month EuroYen TIBOR Quotes**
January 2006 -- December 2010

217

**FIGURE 16**

**Contribution of Bank of Tokyo-Mitsubishi to the Intraday Coefficient of Variation of 3 Month Yen LIBOR Quotes**

January 2006 -- December 2010



**FIGURE 17**

**Contribution of Barclays to the Intraday Coefficient of Variation of 3 Month Yen LIBOR Quotes**

January 2006 -- December 2010



**FIGURE 18**



**Contribution of HSBC to the Intraday Coefficient of Variation of 3 Month Yen LIBOR Quotes**

January 2006 -- December 2010

**FIGURE 19**



**Contribution of Mizuho Corporate Bank to the Intraday Coefficient of Variation of 3 Month Yen LIBOR Quotes**

January 2006 -- December 2010



**FIGURE 20**

**Contribution of Norinchukin Bank to the Intraday Coefficient of Variation of 3 Month Yen LIBOR Quotes**

January 2006 -- December 2010

**FIGURE 21**



**Contribution of Rabobank to the Intraday Coefficient of Variation of 3 Month Yen LIBOR Quotes**

January 2006 -- December 2010

**FIGURE 22**



**Contribution of Societe Generale to the Intraday Coefficient of Variation of 3 Month Yen LIBOR Quotes**

January 2006 -- December 2010

**FIGURE 23**

**Contribution of Sumitomo Mitsui Banking Corp to the Intraday Coefficient of Variation of 3 Month Yen LIBOR Quotes**
January 2006 -- December 2010



**FIGURE 24**

**Contribution of Lloyds Banking Group to the Intraday Coefficient of Variation of 3 Month Yen LIBOR Quotes**
January 2006 -- December 2010



**VII.     PLAINTIFFS' ECONOMIC ANALYSES SHOW THAT YEN-LIBOR IMPACTED EUROYEN TIBOR DURING THE CLASS PERIOD**

565.    Plaintiffs' economic analyses show that Yen-LIBOR impacted Euroyen TIBOR prices during the Class Period.  In particular, Plaintiffs' economic analyses show that price discovery in the Euroyen market begins with the daily setting of Yen-LIBOR such that movements in Yen-LIBOR, specifically yesterday's Yen-LIBOR fix, impact changes in the following day's Euroyen TIBOR fix.  As a result, the reporting of false and inaccurate Yen-LIBOR rates can (and did) cause artificial Euroyen TIBOR rates, and thus artificial Euroyen TIBOR futures contract prices, during the Class Period.

566.    There is one active financial market for Euroyen-based derivatives and that market uses Euroyen TIBOR and Yen-LIBOR interchangeably.  This highly synchronized and highly correlated relationship between Euroyen TIBOR and Yen-LIBOR is expected because "[i]n theory, the two rates should be very similar because they are both used as a reference for borrowing the same currency. … Credit-market specialists agree that Tibor and yen Libor rates should be similar…."  Financial Times, February 6, 2013, *Japanese Banks Accused of Tibor Fixing*.  As noted in ¶ 594 and Figures 66-67, during the 36-month period of January 2003 and December 2005, the average spread of Euroyen TIBOR with respect Yen-LIBOR was a positive 0.024.  Historical research indicates that integration in money markets is especially strong and that the Tokyo and London markets are almost completely integrated and the correlation between rates in similar currencies (including Yen) is extremely high.[22]  Even during crises, when liquidity and other risks widened observed spreads due to liquidity factors, co-movement between the rates remained very high (correlation of changes remained high).[23]  Various

---

[22] Fukuda, Shin-ichi "Financial Crises and Risk Premiums in International Interbank Markets" Policy Research Institute, Ministry of Finance, Japan, Public Policy Review, Vol. 9, No. 1, January 2013.

[23] Fukuda, Shin-ichi "Regional and Global Short-term Financial Integration in Asia: Evidence From the Interbank

studies[24] show movement correlations as high as 99% even when there existed a spread between the two Euroyen rates.

567.    Due to the integration and correlation of Yen money markets, traders, investors and other users of Yen interest rates will use either Euroyen TIBOR or Yen-LIBOR interchangeably depending on the time of day as the reference to fix or set the rate underlying their Euroyen derivative.  During New York and London trading hours, investors, and traders will generally use the Yen-LIBOR rate as the reference to fix or set the interest rate and during Tokyo trading hours traders and investors will generally use Euroyen TIBOR.  The choice between Euroyen TIBOR and Yen-LIBOR is driven by when in the trading day the reference is made.  Traders and investors have no expectation of a systematic difference between Euroyen TIBOR and Yen LIBOR and investors and traders in Euroyen derivatives are indifferent to the underlying rate (Euroyen TIBOR or Yen-LIBOR) as long as both parties to the trade agree to the reference source.  This indifference by traders and investors to use Euroyen TIBOR and Yen-LIBOR in a transaction exists because during the Class Period there existed a stable and continuous relationship and price transmission mechanism between Yen-LIBOR and Euroyen TIBOR.  Without this relationship, there would have been systematic opportunities for risk free arbitrage between the two rates, a situation which did not exist. Arbitrage is the ability of traders and investors to take advantage of the same asset trading at different prices in different markets in a risk free manner.  Traders and investors would naturally seek to erase opportunities for arbitrage and, in effect, arbitrage is kept out of markets by 'reflective trading' *e.g.* quoted prices for the same asset moving in tandem across different markets.  As such, arbitrage opportunities

---

Markets Under The Crises" in M. Devereux, P.R. Lane, C.Y. Park, S.J. Wei eds.,  The Dynamics of Asian Financial Integration : Fact and Analytics, Routledge, 2011.

[24] Batten, Jonathan "Japanese Credit Risk and Trading Opportunities in the Euroyen Market" 2000.

are prevented before they can even exist.   In particular, market analysts have noted that even when there existed a spread between Yen-LIBOR and Euroyen TIBOR, it was a) systematically very low and b) very stable.

568.    Historical analysis also shows that the Yen-LIBOR rate fix leads and indicates the Euroyen TIBOR fix in the following trading session and that this relationship is very stable. Furthermore, trading in Euroyen TIBOR futures are also driven by the Yen-LIBOR rate fix directly.   Banks, investors and traders are fully cognizant of this relationship and rely on it.

569.    When futures exchanges are open at the same time, similar exchange traded futures contracts will exhibit similar pricing patterns (after accounting for tax or other "frictions") that erase the arbitrage opportunities.  As such, the prices of exchange traded futures contracts move in tandem.  In the case where there is not a futures markets, implied forward markets exist, such as those for currency.   Interest rate futures on Euroyen TIBOR and interest rate forwards on Yen-LIBOR trade reflective of the other, while the two markets are open, in order to prevent arbitrage from taking place between the two contracts.  There is an active Yen-LIBOR forward market (particularly in currency forwards) that result in a seamless transmission of the Yen-LIBOR rate into Euroyen TIBOR and Euroyen TIBOR futures. Otherwise, traders and investors would be able to extract risk free returns between the two contracts.   The absence of an active futures contract for Yen-LIBOR means active trading in Euroyen money market rates is dominated by Euroyen TIBOR futures which directly reflect and follow Yen-LIBOR.  A 3-month Yen-LIBOR futures contract exists but it is not used by the market reinforcing the fact that the markets view the Euroyen TIBOR futures market as completely integrated and interlocked with Yen-LIBOR such that the Euroyen TIBOR futures market is used as a hedging tool for Yen-LIBOR exposure.

570.     Changes in Yen-LIBOR will be immediately reflected in Euroyen TIBOR rates (futures, etc.) once Euroyen TIBOR opens (after Yen-LIBOR trading closes) and the subsequent Euroyen TIBOR JBA rate.  If they did not, there would be opportunities for arbitrage. Since the currency forwards reflect Yen-LIBOR, Yen-LIBOR rates are seamlessly transmitted to Euroyen TIBOR despite the time difference that exists between the London and Tokyo markets (currencies trade between the two market opening times).  Because Yen currency forwards embody the changes in Yen-LIBOR, and transmit those changes to Euroyen TIBOR, arbitrage is effectively prevented from happening between Yen-LIBOR and TIBOR.  Otherwise, there would be opportunities for arbitrage between Yen-LIBOR rates and currency forwards and/or Euroyen TIBOR rates and currency forwards.

571.     Plaintiffs' economic analyses show that price discovery in the Euroyen market begins with the daily setting of Yen-LIBOR such that movements in Yen-LIBOR, specifically yesterday's Yen-LIBOR rate fix, impact changes in the following day's Euroyen TIBOR fix.  As a result, the reporting of false and inaccurate Yen-LIBOR rates can (and did) cause artificial Euroyen TIBOR rates and artificial Euroyen TIBOR futures prices, during the Class Period. Euroyen TIBOR futures are the principal mechanism for active trading of Yen money market futures, for investment and hedging purposes such that any Yen-LIBOR reporting bank would know that a false Yen-LIBOR rate fix would impact Euroyen TIBOR futures prices.  TIBOR futures (and TIBOR) themselves are seamless to the Yen-LIBOR fixing rates for the reasons stated (Yen-LIBOR is the dominant rate).

572.     Figure 25 below demonstrates that changes in yesterday's Three-month Yen-LIBOR fix impacts by 70% the change in the next day Euroyen TIBOR rate.



**FIGURE 25**

**Contribution of Past Changes in 3 Month EuroYen TIBOR and Yen LIBOR to Current EuroYen TIBOR given Last EuroYen TIBOR**
1/1/2006 -- 12/31/2010

Data Source: Bloomberg.
Notes: This decomposition is based on an econometric model in which the change in the 3 Month EuroYen TIBOR on current day (from day t-1 to day t) is explained as a function of past changes in the LIBOR on the day prior (from t-2 to t-1) and on 2 days prior (from t-3 to t-2), and also as a function of past changes in the 3 Month EuroYen TIBOR on day prior (from t-2 to t-1) and on 2 days prior (from t-3 to t-2).

573.     Yen-LIBOR is set during hours that US Dollar and Euro interest rate futures are also trading.  Far more banks, and from many more countries, fix their funding rates during Yen-LIBOR hours than during Euroyen TIBOR hours and since more banks and other financial institutions that deal in many currencies set their effective rates during the Yen-LIBOR fix (when a majority of their home markets are open and when the largest volume of transactions occur), Yen-LIBOR is effectively set at that time.  Euroyen TIBOR then reflects those changes after it opens.

574.     Besides the dominance of interbank rate setting, London and New York dominate currency trading in the U.S. dollar, Euro and Japanese yen; currency forward rates are effectively set on Japanese yen in London trading hours when Yen-LIBOR is set (and are derived from Yen-

LIBOR).  As a result of the dominant volumes of trading in Yen currency forwards, interbank interest rates and money markets during the London/New York market hours, Yen-LIBOR is the dominant rate, and effectively leads and predicts Euroyen TIBOR.

## VIII.       INDEPENDENT ANALYSES DEMONSTRATE THAT EUROYEN TIBOR AND YEN-LIBOR WERE ARTIFICIAL DURING THE CLASS PERIOD

575.     Plaintiffs' analyses demonstrate that Euroyen TIBOR and Yen-LIBOR were artificial throughout the Class Period.

### Euroyen TIBOR and Yen-LIBOR Diverged Dramatically From their Historical Relationship with the Euroyen Deposit Rate

576.     Throughout the Class Period, Euroyen TIBOR and Yen-LIBOR diverged dramatically from their historical relationship with the Euroyen Deposit Rate (the "EYDR").

577.     The EYDR is comprised of quotes for bids and asks of financial institutions seeking to transact in the 3-month Euroyen market.  The EYDR is calculated on a daily basis by Bloomberg.  Bloomberg collects actual transactions in 3-month Euroyen by a group of financial institutions, including banks and brokerages.  Bloomberg published on a daily basis throughout the Class Period the lowest composite EYDR ask rate offered by active, contributing banks as well as a composite EYDR bid rate which is the highest bid rate offered by active, contributing banks.  Bloomberg also publishes the mid-point between the composite ask and composite bid rates.

578.     The EYDR is similar to Euroyen TIBOR and Yen-LIBOR except that the set of participating financial institutions is larger than the number of banks participating on the Euroyen TIBOR and Yen-LIBOR panels.  Important market and financial fundamentals, such as day-to-day changes in monetary policy, market risk and interest rates, as well as risk factors facing the contributing banks should (absent manipulation) be reflected similarly in Euroyen

TIBOR, Yen-LIBOR and the EYDR, and therefore not cause the historical relationship between these rates to diverge.  Significant de-linkages in the historical relationship between Euroyen TIBOR, Yen-LIBOR and the EYDR (as demonstrated in Figures 26 through 29 below) during the Class Period strongly indicates that Euroyen TIBOR and Yen-LIBOR rates were artificial.

579.    Figures 26 and 27 below show the relationship, including spread relationship, between Euroyen TIBOR and the EYDR for the period of January 2003 through June 2012.[25]

580.    As demonstrated therein, before the start of the Class Period, between January 2003 and December 2005, the Euroyen TIBOR and the EYDR moved closely together with Euroyen TIBOR remaining slightly higher than the EYDR, causing the Euroyen TIBOR/EYDR spread to be slightly positive.  In particular, during the 36-month period of January 2003 to December 2005, the average spread of Euroyen TIBOR with respect to the EYDR was a positive 0.0940.

581.    Early on in the Class Period, this historical relationship starts to fracture as EYDR begins to increase at a much higher rate than Euroyen TIBOR thereby causing a collapse and eventual inversion of the spread between Euroyen TIBOR and the EYDR (i.e., the spread turns negative as Euroyen TIBOR becomes higher than the EYDR).   By July 3, 2006 the Euroyen TIBOR/EYDR spread stood at negative -0.031, and by February 21, 2007 the spread reached -0.092.

582.    Further into the Class Period, the negative (inverted) spread between Euroyen TIBOR and the EYDR becomes larger and stays negative (inverted) until the end of April 2009, with a period of extraordinarily negative (inverted) spreads during the period of July 2008 through April 2009.   In particular, by December 11, 2007, the Euroyen TIBOR/EYDR spread

---

[25] In Figure 27, the spread is calculated as the 3-Month Euroyen TIBOR minus the 3-Month EYDR.

had decreased to -0.216.  An even lower point was reached on October 2, 2008, when the Euroyen TIBOR/EYDR spread reaches -0.879.

583.    Further, from January 3, 2003 through December 31, 2005, there were 713 days with both a Euroyen TIBOR fix and an EYDR fix, and on no days was the spread negative during this time period.  In contrast, and strongly evidencing Euroyen TIBOR artificiality, from January 1, 2006 through April 30, 2009, there were 796 days total of which 334 days (42.0%) had a negative spread.  Further, from January 1, 2006 to April 30, 2009, there were 730 days out of the 796 days with spreads below the pre-Class Period historical average spread of 0.0940 (or 91.7% of the days).

584.    Following April 2009, and continuing through to the end of the Class Period, the relationship between Euroyen TIBOR and the EYDR remained delinked from its pre-Class Period historical relationship, thereby evidencing Euroyen TIBOR artificiality.  For example, from May 1, 2009 through December 31, 2010, there were 398 days with data available, 378 of which saw a spread greater than the Euroyen TIBOR/EYDR pre-Class Period historical spread average of 0.0940 (or 95.0% of the days).   Further, on November 10, 2009, the Euroyen TIBOR/EYDR spread reached as high as 0.338, and on July 21, 2009, it reached as high as 0.335.

## FIGURE 26



## FIGURE 27



585.    Similar breakdowns in the historical spread relationship between Yen-LIBOR and the EYDR occurred during the Class Period.  Figures 28 and 29 below show the relationship, including spread relationship, between Yen-LIBOR and the EYDR for the period of January 2003 through June 2012.[26]

586.    As demonstrated therein, from January 2003 through December 2005, Yen-LIBOR and the EYDR moved closely together with Yen-LIBOR remaining consistently and slightly higher than the EYDR, causing the Yen-LIBOR/EYDR spread to be slightly positive.  The average spread of Yen-LIBOR with respect to the EYDR ask rate for the 36 months prior to the Class Period (January 3, 2003 to December 31, 2005) was a positive 0.0480.  During this pre-Class Period, there were 698 days of Yen-LIBOR submissions with EYDR ask quotes available.  On only 22 days out of 698 days (or 3.2%) did a slightly negative spread between Yen-LIBOR and EYDR exist.

587.    As demonstrated in Figures 28 and 29 below, by the start of the Class Period, the historical relationship between Yen-LIBOR and the EYDR begins to change.  Further into the Class Period, the relationship becomes further materially de-linked, providing strong evidence of artificiality.  For example, on December 11, 2007 the Yen-LIBOR/EYDR spread was -0.081; on October 2, 2008 it was -0.968; on July 14, 2009 it was -0.216, and on June 1, 2010 it was -0.108, or more than 100 basis points negative (and far from the historical slightly positive Yen-LIBOR/EYDR average spread of 0.0480 that existed during the 36 months that preceded the Class Period).

---

[26] In Figure 29, the spread is calculated as follows: the spread equals the 3 Month Yen-LIBOR minus the 3 Month EYDR.

**FIGURE 28**



**FIGURE 29**



**Analyses of the Defendant Banks' Euroyen TIBOR and/or Yen-LIBOR Quotes Submitted During the Class Period, as Compared to the then Prevailing EYDR, Further Demonstrates Artificiality**

### 1. Euroyen TIBOR

588.    Figure 30 below presents examples of quotes submitted by Defendant Euroyen TIBOR panel banks that were significantly lower than the-then prevailing EYDR, often by 75 basis points, and on certain instances nearly half the EYDR rate, further supporting Euroyen TIBOR artificiality during the Class Period.

589.    For example, as illustrated in Figure 30, below, on October 2, 2008, Defendants Mizuho Trust & Banking, Resona Bank, and Sumitomo Trust & Banking submitted Euroyen TIBOR quotes of 0.81, 0.85, and 0.85, which were respectively lower than the prevailing EYDR of 1.75 by -0.94, -0.90, and -0.90.   On November 11, 2008, Defendants Bank of Tokyo Mitsubishi, Bank of Yokohama, and Mizuho Bank submitted Euroyen TIBOR quotes of 0.77, 0.78, and 0.78, which were respectively lower than the prevailing EYDR of 1.55 by -0.78, -0.77, and -0.77.  On November 12, 2008, Defendant Deutsche submitted a Euroyen TIBOR quote of 0.85 which was lower than the prevailing EYDR of 1.55 by -0.70.  On November 17, 2008, Defendants JPMorgan and UBS submitted Euroyen TIBOR quotes of 0.82 and 0.81, which were respectively lower than the EYDR of 1.55 by -0.73 and -0.74.   Each of the foregoing rate submissions resulted in negative spreads which diverged materially from the historical, pre-Class Period positive spread of 0.0940 between the Euroyen TIBOR and EYDR.

## FIGURE 30

**3 Month EuroYen TIBOR Quotes, EuroYen Deposit Rate and Associated Spread for Each Bank on Selected Days**

| | 10/2/2008 | | | 11/11/2008 | | | 11/12/2008 | | | 11/14/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread |
| Bank of Tokyo-Mitsubishi | 0.87 | 1.75 | -0.88 | 0.77 | 1.55 | -0.78 | 0.78 | 1.55 | -0.77 | 0.80 | 1.55 | -0.75 |

| | 10/2/2008 | | | 11/11/2008 | | | 11/12/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread |
| Bank of Yokohama | 0.86 | 1.75 | -0.89 | 0.78 | 1.55 | -0.77 | 0.78 | 1.55 | -0.77 | 0.80 | 1.55 | -0.75 |

| | 10/2/2008 | | | 10/8/2008 | | | 11/11/2008 | | | 11/12/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread |
| Chuo Mitsui Trust | 0.88 | 1.75 | -0.87 | 0.88 | 1.60 | -0.72 | 0.81 | 1.55 | -0.74 | 0.81 | 1.55 | -0.74 |

| | 6/21/2010 | | | 7/6/2010 | | | 2/1/2011 | | | 2/8/2011 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread |
| Citibank | 0.37 | 0.26 | 0.12 | 0.34 | 0.23 | 0.11 | 0.32 | 0.23 | 0.09 | 0.32 | 0.23 | 0.09 |

| | 10/2/2008 | | | 10/7/2008 | | | 10/9/2008 | | | 11/12/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread |
| Deutsche Bank | 0.87 | 1.75 | -0.88 | 0.87 | 1.60 | -0.73 | 0.87 | 1.60 | -0.73 | 0.85 | 1.55 | -0.70 |

| | 10/2/2008 | | | 10/9/2008 | | | 11/14/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread |
| JP Morgan Chase | 0.90 | 1.75 | -0.85 | 0.90 | 1.60 | -0.70 | 0.83 | 1.55 | -0.72 | 0.82 | 1.55 | -0.73 |

| | 10/2/2008 | | | 10/6/2008 | | | 10/9/2008 | | | 11/11/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread |
| Mitsubishi UFJ Trust | 0.86 | 1.75 | -0.89 | 0.86 | 1.60 | -0.74 | 0.86 | 1.60 | -0.74 | 0.80 | 1.55 | -0.75 |

| | 10/2/2008 | | | 11/11/2008 | | | 11/12/2008 | | | 11/14/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread |
| Mizuho Bank | 0.86 | 1.75 | -0.89 | 0.78 | 1.55 | -0.77 | 0.78 | 1.55 | -0.77 | 0.79 | 1.55 | -0.76 |

| | 10/2/2008 | | | 11/11/2008 | | | 11/12/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread |
| Mizuho Corporate Bank | 0.87 | 1.75 | -0.88 | 0.79 | 1.55 | -0.76 | 0.79 | 1.55 | -0.76 | 0.80 | 1.55 | -0.75 |

| | 10/2/2008 | | | 10/7/2008 | | | 10/9/2008 | | | 11/12/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread |
| Mizuho Trust & Banking | 0.81 | 1.75 | -0.94 | 0.83 | 1.60 | -0.77 | 0.80 | 1.60 | -0.80 | 0.81 | 1.55 | -0.74 |

| | 10/2/2008 | | | 10/6/2008 | | | 11/11/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread |
| Norinchukin Bank | 0.85 | 1.75 | -0.90 | 0.85 | 1.60 | -0.75 | 0.80 | 1.55 | -0.75 | 0.80 | 1.55 | -0.75 |

| | 10/2/2008 | | | 10/7/2008 | | | 11/11/2008 | | | 11/14/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread |
| Resona Bank | 0.85 | 1.75 | -0.90 | 0.85 | 1.60 | -0.75 | 0.77 | 1.55 | -0.78 | 0.79 | 1.55 | -0.76 |

| | 6/1/2010 | | | 2/1/2011 | | | 2/8/2011 | | | 5/22/2012 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread |
| Royal Bank of Scotland | 0.36 | 0.26 | 0.10 | 0.31 | 0.23 | 0.08 | 0.31 | 0.23 | 0.08 | 0.30 | 0.20 | 0.10 |

| | 10/2/2008 | | | 10/8/2008 | | | 11/12/2008 | | | 11/14/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread |
| Shinkin Central Bank | 0.91 | 1.75 | -0.84 | 0.90 | 1.60 | -0.70 | 0.84 | 1.55 | -0.71 | 0.84 | 1.55 | -0.71 |

| | 10/2/2008 | | | 10/6/2008 | | | 11/12/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread |
| Shoko Chukin Bank | 0.90 | 1.75 | -0.85 | 0.88 | 1.60 | -0.72 | 0.78 | 1.55 | -0.77 | 0.80 | 1.55 | -0.75 |

| | 10/2/2008 | | | 11/11/2008 | | | 11/12/2008 | | | 11/14/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread |
| Sumitomo Mitsui Banking Corp | 0.88 | 1.75 | -0.87 | 0.79 | 1.55 | -0.76 | 0.79 | 1.55 | -0.76 | 0.81 | 1.55 | -0.74 |

| | 10/2/2008 | | | 10/8/2008 | | | 11/12/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread |
| Sumitomo Trust & Banking | 0.85 | 1.75 | -0.90 | 0.86 | 1.60 | -0.74 | 0.79 | 1.55 | -0.76 | 0.79 | 1.55 | -0.76 |

| | 10/2/2008 | | | 11/11/2008 | | | 11/12/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread | TIBOR | EYDR | Spread |
| UBS AG | 0.94 | 1.75 | -0.81 | 0.80 | 1.55 | -0.75 | 0.79 | 1.55 | -0.76 | 0.81 | 1.55 | -0.74 |

Data Source: Bloomberg.
Note: "TIBOR" denotes the bank's 3 month EuroYen TIBOR quote for that day, and "EYDR" denotes the 3 month Yen EuroYen Deposit Rate. The spread is calculated as 3 Month EuroYen TIBOR quote minus the 3 Month EuroYen Deposit Rate. The EuroYen Deposit Rate is provided by Bloomberg and computed as an average of bid and ask prices. All figures are in percentage points.

590.    Figures 31 through 49 below, measure the spread between the EYDR and each Euroyen TIBOR Contributor Panel Bank's submitted Euroyen TIBOR quote to the JBA during the period from January 2003 through June 2012.  As shown in Figures 31 through 49, beginning in 2009, the Euroyen TIBOR quotes as compared to the EYDR, on average, became significantly higher, thereby causing significant increases in the Euroyen/TIBOR spread (and resulting in spreads well above the historical Euroyen/TIBOR/EYDR spreads that existed in the pre-Class Period).                       **FIGURE 31**

# Average Spreads of Banks' EuroYen TIBOR Quotes to the EuroYen Deposit Rate

| | 1/3/2003 -- 12/31/2005 | 1/1/2006 -- 4/30/2009 | 5/1/2009 -- 12/31/2010 |
|---|---|---|---|
| **Bank of Tokyo-Mitsubishi** | 0.0931 | -0.0307 | 0.1681 |
| **Bank of Yokohama** | -- | -0.0994 | 0.1879 |
| **Chuo Mitsui Trust** | 0.0800 | -0.0575 | 0.2081 |
| **Citibank** | -- | | 0.1598 |
| **Deutsche Bank** | -- | -0.0931 | 0.1906 |
| **JP Morgan Chase** | 0.0553 | -0.0216 | 0.0546 |
| **Mitsubishi UFJ Trust** | 0.0948 | -0.0220 | 0.1964 |
| **Mizuho Bank** | 0.0943 | -0.0293 | 0.2042 |
| **Mizuho Corporate Bank** | 0.0950 | -0.0197 | 0.2025 |
| **Mizuho Trust & Banking** | 0.0945 | -0.0421 | 0.1686 |
| **Norinchukin Bank** | 0.0870 | -0.0252 | 0.1964 |
| **Resona Bank** | 0.0950 | -0.0218 | 0.2051 |
| **Royal Bank of Scotland** | -- | -- | 0.1483 |
| **Shinkin Central Bank** | 0.0976 | -0.0127 | 0.2066 |
| **Shoko Chukin Bank** | 0.0962 | -0.0270 | 0.1983 |
| **Sumitomo Mitsui Banking Corp** | 0.0948 | -0.0220 | 0.2031 |
| **Sumitomo Trust & Banking** | 0.0947 | -0.0237 | 0.1981 |
| **UBS AG** | 0.0747 | -0.0121 | 0.1999 |

Data Source: Bloomberg.

Notes: Underlined banks overlap across LIBOR & TIBOR panels.  The 3 Month EuroYen Deposit Rate is provided by Bloomberg and is the midpoint of the bid and ask quotes. All figures are in percentage points.

**FIGURE 32**



**3 Month EuroYen Deposit Rate and
Bank of Tokyo Mitsubishi UFJ 3 Month EuroYen TIBOR Quote Spread**
January 2003 -- June 2012

Data Source: Bloomberg.
Note: The EuroYen Deposit Rate is provided by Bloomberg and computed as an average of bid and ask prices. All figures are in percent.

**FIGURE 33**



**3 Month EuroYen Deposit Rate and
Mizuho Bank 3 Month EuroYen TIBOR Quote Spread**
January 2003 -- June 2012

Data Source: Bloomberg.
Note: The EuroYen Deposit Rate is provided by Bloomberg and computed as an average of bid and ask prices. All figures are in percent.

**FIGURE 34**



**FIGURE 35**



**FIGURE 36**



**FIGURE 37**



**FIGURE 38**



**FIGURE 39**



**FIGURE 40**



**FIGURE 41**



**FIGURE 42**



**FIGURE 43**







Data Source: Bloomberg.
Note: The EuroYen Deposit Rate is provided by Bloomberg and computed as an average of bid and ask prices. All figures are in percent.



**FIGURE 46**



**FIGURE 47**



**FIGURE 48**



**FIGURE 49**

### 2. __Yen-LIBOR__

591.    Figure 50 below presents examples of quotes submitted by Defendant Yen-LIBOR panel banks that were significantly lower than the prevailing EYDR, often by 75 basis points, and on certain instances more than 100 basis points (or a full percentage point) below the the-then prevailing EYDR, further supporting Yen-LIBOR artificiality during the Class Period.

592.    For example, as illustrated in Figure 50, below, on October 8, 2008, Defendants Bank of Tokyo Mitsubishi, Sumitomo Mitsui Banking Corp. and Norinchukin Bank submitted Yen-LIBOR quotes of 0.98, 0.99, and 0.97, which were respectively lower than the prevailing EYDR of 2.00 by -1.02, -1.01, and -1.03.  On November 17, 2008, Defendants JPMorgan Chase, Deutsche, and UBS all submitted a Yen-LIBOR quote of 0.85, three of the banks named in the Canadian Competition Bureau's Euroyen manipulation investigation, lower than the prevailing EYDR of 1.80 by -0.95.   Each of the foregoing rate submissions resulted in negative spreads which diverged materially from the historical, pre-Class Period average positive spread of 0.0480 between Yen-LIBOR and the EYDR.

# FIGURE 50

**3 Month Yen LIBOR Quotes, EuroYen Deposit Rate (ask) and Associated Spread for Each Bank on Selected Days**

| Bank of Tokyo-Mitsubishi | 10/8/2008 | | | 10/10/2008 | | | 10/14/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| | 0.98 | 2.00 | -1.02 | 1.02 | 1.90 | -0.88 | 1.02 | 1.80 | -0.78 | 0.88 | 1.80 | -0.92 |

| Barclays | 10/10/2008 | | | 10/14/2008 | | | 11/14/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| | 1.25 | 1.90 | -0.65 | 1.35 | 1.80 | -0.45 | 1.14 | 1.80 | -0.66 | 1.16 | 1.80 | -0.64 |

| Citibank | 10/10/2008 | | | 11/11/2008 | | | 11/14/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| | 1.15 | 1.90 | -0.75 | 0.88 | 1.80 | -0.92 | 0.89 | 1.80 | -0.91 | 0.90 | 1.80 | -0.90 |

| Deutsche Bank | 10/10/2008 | | | 10/14/2008 | | | 11/14/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| | 1.03 | 1.90 | -0.87 | 1.00 | 1.80 | -0.80 | 0.85 | 1.80 | -0.95 | 0.85 | 1.80 | -0.95 |

| HSBC | 10/10/2008 | | | 10/14/2008 | | | 10/15/2008 | | | 10/16/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| | 1.14 | 1.90 | -0.76 | 1.13 | 1.80 | -0.67 | 1.12 | 1.80 | -0.68 | 1.10 | 1.70 | -0.60 |

| JP Morgan Chase | 11/12/2008 | | | 11/13/2008 | | | 11/14/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| | 0.86 | 1.80 | -0.94 | 0.86 | 1.70 | -0.84 | 0.85 | 1.80 | -0.95 | 0.85 | 1.80 | -0.95 |

| Lloyds Banking Group | 11/12/2008 | | | 11/13/2008 | | | 11/14/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| | 0.90 | 1.80 | -0.90 | 0.90 | 1.70 | -0.80 | 0.91 | 1.80 | -0.89 | 0.90 | 1.80 | -0.90 |

| Mizuho Corporate Bank | 10/10/2008 | | | 10/14/2008 | | | 11/14/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| | 1.07 | 1.90 | -0.83 | 1.07 | 1.80 | -0.73 | 0.88 | 1.80 | -0.92 | 0.88 | 1.80 | -0.92 |

| Norinchukin Bank | 10/8/2008 | | | 10/10/2008 | | | 10/14/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| | 0.97 | 2.00 | -1.03 | 0.99 | 1.90 | -0.91 | 0.99 | 1.80 | -0.81 | 0.87 | 1.80 | -0.93 |

| Rabobank | 10/10/2008 | | | 10/14/2008 | | | 10/16/2008 | | | 10/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| | 0.80 | 1.90 | -1.10 | 0.80 | 1.80 | -1.00 | 0.80 | 1.70 | -0.90 | 0.80 | 1.70 | -0.90 |

| Royal Bank of Scotland | 10/10/2008 | | | 10/14/2008 | | | 11/14/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| | 1.08 | 1.90 | -0.82 | 1.06 | 1.80 | -0.74 | 0.86 | 1.80 | -0.94 | 0.86 | 1.80 | -0.94 |

| Societe Generale | 10/8/2008 | | | 10/9/2008 | | | 10/14/2008 | | | 10/15/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| | 1.25 | 2.00 | -0.75 | 1.25 | 2.00 | -0.75 | 1.20 | 1.80 | -0.60 | 1.20 | 1.80 | -0.60 |

| Sumitomo Mitsui Banking Corp | 10/8/2008 | | | 10/9/2008 | | | 10/10/2008 | | | 10/14/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| | 0.99 | 2.00 | -1.01 | 0.99 | 2.00 | -1.01 | 1.02 | 1.90 | -0.88 | 1.02 | 1.80 | -0.78 |

| UBS AG | 10/10/2008 | | | 10/14/2008 | | | 11/14/2008 | | | 11/17/2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread | LIBOR | EY(Ask) | Spread |
| | 1.03 | 1.90 | -0.87 | 1.03 | 1.80 | -0.77 | 0.85 | 1.80 | -0.95 | 0.85 | 1.80 | -0.95 |

Data Source: Bloomberg.

Note: "LIBOR" denotes the bank's 3 month Yen LIBOR quote for that day, and "EY(ask)" denotes the 3 month Yen EuroYen Deposit Rate ask. The spread is calculated as 3 Month Yen LIBOR quote minus ask price of the 3 Month EuroYen Deposit Rate. The ask price of the EuroYen Deposit Rate is provided by Bloomberg. All figures are in percentage points.

593.    Figures 51 through 65 below, measure the spread between the EYDR and each Yen-LIBOR Defendant panel bank's submitted Yen-LIBOR quote to the BBA during the period from January 2003 through June 2012.

## FIGURE 51

## Average Spreads of Banks' Yen LIBOR Quotes to the EuroYen Deposit Rate (Ask Quote)

| | 1/3/2003 – 12/31/2005 | 1/1/2006 – 4/30/2009 | 5/1/2009 – 12/31/2010 |
|---|---|---|---|
| Bank of Tokyo-Mitsubishi | 0.0556 | -0.0502 | -0.0046 |
| Barclays | 0.0427 | -0.0014 | -0.0155 |
| Citibank | 0.0487 | -0.0345 | -0.0071 |
| Deutsche Bank | 0.0482 | -0.0526 | -0.0407 |
| HSBC | 0.0546 | -0.0254 | -0.0125 |
| JP Morgan Chase | 0.0370 | -0.0428 | -0.0146 |
| Lloyds Banking Group | 0.0158 | -0.0284 | -0.0079 |
| Mizuho Corporate Bank | 0.0655 | -0.0349 | -0.0032 |
| Norinchukin Bank | 0.0732 | -0.0422 | -0.0034 |
| Rabobank | 0.0365 | -0.0378 | -0.0346 |
| Royal Bank of Scotland | -0.0046 | -0.0504 | -0.0152 |
| Societe Generale | 0.0384 | -0.0053 | -0.0186 |
| Sumitomo Mitsui Banking Corp | 0.0642 | -0.0416 | -0.0031 |
| UBS AG | 0.0429 | -0.0514 | -0.0151 |

Data Source: Bloomberg.

Notes: Underlined banks overlap across LIBOR & TIBOR panels. The 3 Month EuroYen Deposit Rate ask quote is provided by Bloomberg. All figures are in percentage points.

**FIGURE 52**



**3 Month EuroYen Deposit Rate Ask Price and
Bank of Tokyo Mitsubishi UFJ 3 Month Yen LIBOR Quote Spread**
January 2003 -- June 2012

**FIGURE 53**



**3 Month EuroYen Deposit Rate Ask Price and
Deutsche Bank 3 Month Yen LIBOR Quote Spread**
January 2003 -- June 2012

**FIGURE 54**



**FIGURE 55**



**FIGURE 56**



**FIGURE 57**



**FIGURE 58**



**FIGURE 59**



**FIGURE 60**



**FIGURE 61**

