# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

JEFFREY LAYDON, on behalf of himself and all
others similarly situated,

                    Plaintiff,

          – against –

MIZUHO BANK, LTD., THE BANK OF TOKYO-
MITSUBISHI UFJ, LTD., THE SUMITOMO
TRUST AND BANKING CO., LTD., THE
NORINCHUKIN BANK, MITSUBISHI UFJ
TRUST AND BANKING CORPORATION,
SUMITOMO MITSUI BANKING
CORPORATION, RESONA BANK, LTD., J.P.
MORGAN CHASE & CO., J.P. MORGAN CHASE
BANK, NATIONAL ASSOCIATION, J.P.
MORGAN SECURITIES PLC, MIZUHO
CORPORATE BANK, LTD., DEUTSCHE BANK
AG, MIZUHO TRUST AND BANKING CO.,
LTD., THE SHOKO CHUKIN BANK, LTD.,
SHINKIN CENTRAL BANK, UBS AG, UBS
SECURITIES JAPAN CO. LTD., THE BANK OF
YOKOHAMA, LTD., SOCIÉTÉ GÉNÉRALE SA,
THE ROYAL BANK OF SCOTLAND GROUP
PLC, ROYAL BANK OF SCOTLAND PLC, RBS
SECURITIES JAPAN LIMITED, BARCLAYS
BANK PLC, CITIBANK, NA, CITIGROUP, INC.,
CITIBANK, JAPAN LTD., CITIGROUP GLOBAL
MARKETS JAPAN, INC., COÖPERATIEVE
CENTRALE RAIFFEISEN-BOERENLEENBANK
B.A., HSBC HOLDINGS PLC, HSBC BANK PLC,
ICAP PLC, R.P. MARTIN HOLDINGS LIMITED
AND JOHN DOE NOS. 1-50,

                    Defendants.

Docket No. 12-cv-3419 (GBD) (HBP)

ECF Case

## MEMORANDUM OF LAW IN OPPOSITION TO CERTAIN DEFENDANTS'
## MEMORANDUM IN SUPPORT OF MOTION FOR ORDER
## SUSTAINING OBJECTIONS TO DISCOVERY UNDER
## DATA PRIVACY LAWS OF THE UNITED KINGDOM

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ......................................................................................................................... 2

I.   THE DPA AND DUTY OF CONFIDENTIALITY DO NOT BAR MOVING-
     DEFENDANTS FROM PRODUCING DOCUMENTS. ................................................... 2

     A.   U.K. government regulators and courts do not object to disclosure. ......................... 4

     B.   Moving-Defendants do not meet their burden of showing that the DPA applies. ...... 5

     C.   The Duty of Confidentiality does not apply to Moving-Defendants' documents. ...... 8

II.  IF THE COURT CONCLUDES A COMITY ANALYSIS IS NEEDED, COMITY
     REQUIRES APPLICATION OF THE FEDERAL RULES ........................................... 9

     A.   Discovery through the Hague Convention will be futile. ........................................... 10

     B.   Analysis of the *First American* factors weighs heavily in favor of applying the
          Federal Rules. ........................................................................................................ 12

CONCLUSION ..................................................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**

*Adidas Ltd. v. SS Seatrain Bennington,*
No. 80 Civ. 1911, 1984 U.S. Dist. LEXIS 16300 (S.D.N.Y. May 30, 1984) .................. 13

*Alfadda v. Fenn,*
149 F.R.D. 28 (S.D.N.Y. 1993) ........................................................................ 5

*Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.,*
297 F.R.D. 55 (S.D.N.Y. 2013) ....................................................................... 2

*Bodner v. Banque Paribas,*
202 F.R.D. 370 (E.D.N.Y. 2000) ................................................................ 7, 14

*Durant v. Financial Services Authority,*
[2003] EWCA Civ. 1746 ................................................................................. 6

*First Am. Corp. v. Price Waterhouse LLP,*
154 F.3d 16 (2d Cir. 1998)............................................................. 9, 10, 12, 15

*First Am. Corp. v. Price Waterhouse LLP,*
988 F. Supp. 353 (S.D.N.Y. 1997) ................................................................ 8, 9

*Fundacion Museo de Arte Contemporaneo de Caracas-Sofia Imber v.*
*CBI-TDB Union Bancaire Privee,*
No. 93-cv-6870, 1996 U.S. Dist. LEXIS 1482 (S.D.N.Y. Feb. 9, 1996)......................... 12

*Garpeg, Ltd. v. United States,*
583 F. Supp. 789 (S.D.N.Y. 1984) ................................................................. 12

*In re Air Cargo Shipping Servs. Antitrust Litig.,*
278 F.R.D. 51 (E.D.N.Y. 2010) ..................................................................... 12

*In re Amaranth Natural Gas Commodities Litig.,*
No. 07 Civ. 6377, ECF No. 135 (S.D.N.Y. 2009) ................................................. 14

*In re Baycol Products Litig.,*
No. 1431, 2003 WL 22023449 (D. Minn. Mar. 21, 2003)................................................. 11

*In re Platinum and Palladium Commodities Litig.,*
No. 10 Civ. 3617, 2010 U.S. Dist. LEXIS 145183 (S.D.N.Y. Nov. 30, 2010) ............... 14

*In re Vitamins Antitrust  Litig.,*
120 F. Supp. 2d 45 (D.D.C. 2000) ................................................................. 15

*In re Vitamins Antitrust Litig.*,
    No. 99-197, 2001 U.S. Dist. LEXIS 8904 (D.D.C. June 20, 2001)................................... 3

*In re Vivendi Universal, S.A. Sec. Litig.*,
    No. 02 Civ. 5571, 2006 U.S. Dist. LEXIS 85211 (S.D.N.Y. Nov. 13, 2006) ............. 9, 12

*Lloyd's Register of Shipping v. Hyundai Mipo Dockyard*,
    [2001] WL 1422850.................................................................................. 11

*Minnesota v. Philip Morris*,
    [1998] I.L.Pr. 170.................................................................................... 11

*Minpeco, S.A. v. ContiCommodity Servs., Inc.*,
    116 F.R.D. 517 (S.D.N.Y. 1987) .......................................................... 12

*Property Alliance Group v. Royal Bank of Scotland PLC*,
    [2015] EWHC 321 (Ch)............................................................................ 5

*Ratliff v. Davis Polk & Wardwell*,
    354 F.3d 165 (2d Cir. 2003)....................................................................... 7

*Reino De Espana v. American Bureau of Shipping*,
    No. 03 Civ. 3573, 2005 U.S. Dist. LEXIS 15685 (S.D.N.Y. Aug. 1, 2005) .................... 12

*SEC v. Banca Della Svizzera Italiana*,
    92 F.R.D. 111 (S.D.N.Y. 1981) .............................................................. 12

*SEC v. Gib. Global Sec., Inc.*,
    No. 13 Civ. 2575, 2015 U.S. Dist. LEXIS 43773 (S.D.N.Y. Apr. 1, 2015)...................... 8

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*,
    482 U.S. 522 (1987)................................................................................ 9

*Tansey v. Cochlear Ltd.*,
    No. 13 Civ. 4628, 2014 U.S. Dist. LEXIS 132021 (E.D.N.Y. Sept. 18, 2014).. 4, 8, 10, 12

*Tiffany (NJ) LLC v. Qi Andrew*,
    276 F.R.D. 143 (S.D.N.Y. 2011) ............................................................ 10

*Tournier v. Nat'l Provincial & Union Bank of England*,
    [1924] 1 KB 461 .................................................................................... 8

*U.S. v. Chase Manhattan Bank, N.A.*,
    No. M-18-304, 1984 U.S. Dist. LEXIS 17677 (S.D.N.Y. 1984)........................... 9

*U.S. v. First National City Bank*,
    396 F.2d 897 (2d Cir. 1968)...............................................................................................4

*Volkswagen, A.G. v. Valdez*,
    909 S.W.2d 900 (Tex. 1995).............................................................................................11

**Rules**

S.D.N.Y. R. 26.2................................................................................................................3

Nine Defendants ("Moving-Defendants") move to force Plaintiff to pursue discovery through the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Convention").  ECF No. 496 ("*Defs. Br.*").  Because the Hague Convention would be unduly time consuming and ineffective, discovery should proceed under the Federal Rules.

## PRELIMINARY STATEMENT

At the Rule 16 Conference, Judge Daniels expressed concerns about "efficiently and quickly moving forward with discovery," stating that the parties should "identify [] issues early and not have the kind of conversation we were having today a year from now . . . ."  Tr. of April 28, 2014 Conf. at 28.  Plaintiff chose to proceed efficiently, propounding a request for documents concerning Yen-LIBOR and Euroyen TIBOR that Defendants already reviewed and produced in connection with various regulatory investigations ("Plaintiff's Request").[1]  Over a year later, Moving-Defendants (except Deutsche Bank) have not produced a single document.  Instead they raise non-specific, categorical objections, contending that production would violate the United Kingdom's Data Protection Act of 1998 ("DPA") and the bankers' common law duty of confidentiality ("Duty of Confidentiality").  Tellingly, Moving-Defendants do not point to a single document that would violate these laws.

Other defendants recognize that various data privacy laws do not bar production and have withdrawn and waived their data privacy objections—six defendants under U.K. law, four

---

[1] Plaintiff limited his request after meeting and conferring to: "All documents produced by you to any regulatory body or government agency . . . concerning Yen-LIBOR and/or Euroyen TIBOR."  *Conston Declaration* ("*Conston*"), Ex. 1, at 5-6.  Moving-Defendants incorrectly state that Plaintiff's Request "seeks all documents produced to foreign regulators without limitation."  *Id.* at 7.  However, Plaintiff's targeted request only seeks documents relevant to Moving-Defendants' manipulation of Yen-LIBOR, Euroyen TIBOR, and the prices of Euroyen-based derivatives.  Moving-Defendants' experts overstate the status of Plaintiff's Request, which undercuts their analysis of the applicability of U.K. law from the outset.  *See Declaration of Dr. Mark Watts and Professor Christopher Millard*, ECF No. 497 ("*Watts*"), ¶ 2.

defendants under Swiss law, and thirteen defendants agreed to defer their Japanese data privacy law objection until after Plaintiff reviews their documents.  U.K. banks, like Barclays Bank plc and The Royal Bank of Scotland plc ("RBS"), are producing their U.K. documents in redacted form.

Moving-Defendants' own experts acknowledge that the DPA "is not a complete bar to the production of the relevant documents" and permits the Moving-Defendants to produce documents that "contain personal data which is strictly necessary for these proceedings."  *Watts* ¶ 5.2.  Moving-Defendants' experts do not say that the Duty of Confidentiality applies.  *Id.* ¶ 10.1-10.2.  Even the U.K. regulators agree that Moving-Defendants can produce documents, which substantially undermines any comity concerns.  Thus, Moving-Defendants failed to meet their burden of showing U.K. laws bar production of responsive documents.

Moving-Defendants propose issuing a Letter of Request ("Letter"), which would be rejected, as Plaintiff could not feasibly individually describe the potential "millions" of documents with enough specificity for the U.K. courts to honor the Letter.  Should the Court adopt this proposal, Plaintiff will undoubtedly be back before the Court years later, arguing that he needs these documents to prosecute his case.  Such a roundabout means of conducting discovery is neither warranted nor contemplated by the Federal Rules.

## ARGUMENT

### I.   THE DPA AND DUTY OF CONFIDENTIALITY DO NOT BAR MOVING-DEFENDANTS FROM PRODUCING DOCUMENTS.

Parties asserting discovery objections are required to "provide[] information about the nature of the withheld documents sufficient to enable the receiving party to make an intelligent determination about the validity of the assertion of the privilege."  *Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, 297 F.R.D. 55, 59 (S.D.N.Y. 2013).  For example, courts have

required parties asserting a privacy law objection to file a privacy log describing the implicated documents to determine whether foreign law applied.  *In re Vitamins Antitrust Litig.*, No. 99-197, 2001 U.S. Dist. LEXIS 8904, at *21 (D.D.C. June 20, 2001).  Moving-Defendants raise U.K. privacy law objections; however, they offer no specificity about the type, subject matter, or even categories of documents that are purportedly protected.  *See* S.D.N.Y. R. 26.2.  On this basis alone, Moving-Defendants cannot meet their burden.

Moving-Defendants' experts did not review the requested documents to determine whether they contain "personal data," and if so, the extent of the personal data within these documents or the amount of time it would take to redact any personal data.  Moving-Defendants' experts speculate that "it is **possible**, and indeed **likely** that **certain** Documents, such as emails, **may** contain **some** sensitive personal data."  *Watts* at 11 (emphasis added).  Moving-Defendants' counsel is equally vague: "some of these Documents will **likely** refer to customers' accounts and/or transactions."  *Defs. Br.* at 10 (emphasis added).  These equivocal and speculative statements do not justify withholding otherwise responsive material from discovery.

Should U.K. privacy law apply, there are reasonable measures to ensure compliance.  The Protective Order in place permits Moving-Defendants to designate materials as "Highly Confidential" **"where such Discovery Material includes information for which applicable law—foreign or domestic—requires confidential treatment."**  ECF No. 349 ¶ 4.  This type of Protective Order was endorsed by the Sedona Conference, the legal research and educational institute, for "use by parties and courts to better protect litigation-related data subject to data protection laws" involved in U.S. litigation.  *Conston*, Ex. 2; *Tomlinson Declaration* ("*Tomlinson*") ¶ 32.  Under the DPA Principle 8, contracts are regarded as "adequate safeguards" for the transfer of personal data outside the European Economic Area.  *Casamento Declaration*,

ECF No. 498 ("*Casamento*"), Ex. F at 84, 88.

Further, Moving-Defendants can redact their documents to comply with U.K. privacy laws.  Moving-Defendants' experts acknowledge that "the personal data could be protected by redacting it prior to production."  *Watts* ¶ 11.2; *Tomlinson* ¶ 28.  But, because they did not look at the documents, Moving-Defendants' experts "are not in a position to offer an opinion as to whether such redaction" is feasible here.  *Id.*  Moving-Defendants' attorneys argue that redaction is not feasible because of the volume of documents involved, ignoring other defendants' agreement to produce documents in redacted form.  *Defs. Br.* at 9, n.14.  For example, Barclays "will make appropriate redactions from its production on the basis of U.K. and Japanese data privacy laws."  *Conston*, Ex. 6.  Without any evidentiary support, Moving-Defendants argue that "the set of documents that would have to be produced from the U.K. is on a vastly different scale and potentially includes millions of pages of documents that contain protected information."  *Defs. Br*. at 9, n.14.  This speculative assertion is unsupported by a declaration of anyone who reviewed the requested materials to determine the scope of any allegedly protected data.[2]  Moving-Defendants' failure to identify allegedly protected data is particularly stark given that these documents were already reviewed prior to their production to regulators.

### A.  U.K. government regulators and courts do not object to disclosure.

Generally, "when foreign governments . . . have considered the vital national interests threatened, they have not hesitated to make known their objections[.]"  *U.S. v. First National City Bank*, 396 F.2d 897, 904 (2d Cir. 1968).  Here, the U.K.'s Financial Conduct Authority

---

[2] *Tansey v. Cochlear Ltd.*, No. 13 Civ. 4628, 2014 U.S. Dist. LEXIS 132021, at *16 (E.D.N.Y. Sept. 18, 2014) recognized that the volume of documents located abroad does not shift the comity analysis in defendants' favor to "warrant circumvention of the Federal Rules of Civil Procedure in favor of the Hague Convention."

("FCA") and Serious Fraud Office ("SFO") do not object to production of the requested

documents.  *See* ECF No. 374, Ex. A. ("All of the underlying material collated as the result of

the SFO's investigation can be produced before your Court, and it is these contemporaneous

documents which will be of assistance in deciding the Proceedings."); *see also* ECF No. 488.

U.K. courts are more concerned with obtaining justice in LIBOR actions than in

protecting the anonymity of dishonest employees.  Recently, a U.K. court ordered Barclays to

disclose over 200 employees' names and positions that were identified during the government

regulators' LIBOR investigations.  *Conston*, Ex. 5.[3]  The court held that "[t]he public has

legitimate interest in learning who in the banking community is alleged to have been implicated

in the manipulation of Libor."  *Id.* Exs. 3, 4.

The U.K. government's consent to disclosure and the U.K. court's ordering the public

disclosure of documents (which goes further than what Plaintiff seeks here with the Protective

Order in place) indicate that responsive documents are not subject to the DPA and Duty of

Confidentiality.

### B.  Moving-Defendants do not meet their burden of showing that the DPA applies.

When asserting a foreign law objection, "the party relying on foreign law bears the

burden of demonstrating that such law actually bars the production or testimony at issue."

*Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y. 1993).  Moving-Defendants "must provide the

Court with information of sufficient particularity and specificity to allow the Court to determine

whether the discovery sought is indeed prohibited by foreign law."  *Id.*  Moving-Defendants do

not satisfy the threshold question as to whether the foreign law even applies to their production.

---

[3] In *Property Alliance Group v. Royal Bank of Scotland PLC*, [2015] EWHC 321 (Ch), a U.K. court conducted a comity analysis and ordered RBS to disclose an attachment to its DOJ deferred prosecution agreement pertaining to LIBOR, over RBS' objection that it would be at risk of being held in criminal contempt of a District of Connecticut order.  *Conston*, Ex. 9.

Their experts' opinions are nothing more than a barebones overview of U.K. law, without any application of the DPA and Duty of Confidentiality to Moving-Defendants' documents.

*First,* Moving-Defendants do not establish that their documents contain "personal data." Under Section 1(1) of the Act, "personal data" must "*relate to a living individual who can be identified . . . and includes any expression of opinion about the individual and any indication of the intentions of the data controller or any other person in respect of that individual*." *Watts* at 5. Moving-Defendants' experts cite *Durant v. Financial Services Authority* [2003] EWCA Civ. 1746, which narrowed the definition of "personal data," holding that "[n]ot all information retrieved from a computer search against an individual's name or unique identifier was 'personal data' within the Act." *Casamento*, Ex. R, at 576.

Moving-Defendants assert that "[i]t is undisputed that Plaintiff's Document Request seeks Documents containing personal data within the meaning of the statute." *Defs. Br.* at 3. But it is certainly disputed and Moving-Defendants do not address why "[a]ny document with an individual employee's name, particularly in combination with an email address" satisfies the "expressions of opinion and indications of intention" requirement under the DPA. *Id.*[4]

*Second,* Moving-Defendants do not show that if their documents did contain personal information subject to the DPA, they would actually be "processed" in violation of the Act. The documents were "processed" when they were reviewed and disclosed to regulators. As Moving-Defendants note, processing and transferring are two separate acts, *Defs. Br.* at 5, and here, they have already been processed. To the extent that these documents were processed in connection with these investigations and are now located within the U.S., they are not subject to the DPA.

---

[4] Moving-Defendants suggest that documents may contain sensitive personal data. *Defs. Br.* at 3 n.5. Moving-Defendants' experts state that "it is not known in the present situation to what extent the Documents contain sensitive personal data" but conclude that "it is fairly commonplace" that the documents could have sensitive personal data. *Watts* ¶ 5.4. These speculative assertions fall short of meeting Moving-Defendants' burden.

*See Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165, 170-71 (2d Cir. 2003) (any protection afforded to documents that a foreign entity sent to its U.S. law firm's office for obtaining legal advice is subsequently forfeited "when the client voluntarily discloses the documents to a . . . government agency."); *id.* at 171 n.7 ("The Hague Convention has no application to documents sought from Davis Polk in the United States.").  To the extent responsive documents are or were located in the U.S., originated from the U.S., or were forwarded to U.S. counsel and produced to a U.S. government regulator, the DPA does not shield them from production.

        *Third,* Moving-Defendants do not meet their burden of showing that an order from this Court is insufficient to insulate them from violating the DPA.  Under the DPA's exceptions, processing data does not contravene the Act if "[t]he processing is necessary for compliance with any legal obligation to which the data controller is subject . . . ."  *Watts* ¶ 6.1.2.  Moving-Defendants' experts state that "there is considerable uncertainty regarding whether this may include a court order from a court outside of the U.K., including a United States court."  *Id.* "Considerable uncertainty" falls far short of meeting their burden of showing that the DPA actually bars production.  To the contrary, this Court's order requiring production would adequately ensure that Moving-Defendants' "personal data," if any, would remain confidential and comply with the DPA.  *See id.* ¶ 6.1.2; *Tomlinson* ¶ 10; *Bodner v. Banque Paribas*, 202 F.R.D. 370, 376 (E.D.N.Y. 2000) ("the use of an appropriate protective order should address the confidentiality concerns of defendants[.]").

        *Fourth,* Moving-Defendants do not identify which documents are housed in the U.K. and thus potentially subject to the DPA.  To be "processed in the context of [] establishment," the documents must be created in connection with the Moving-Defendants' U.K. operations and stored in the U.K.  *Watts* ¶ 5.5.  Moving-Defendants provide no evidence that the responsive

documents were created and stored at their U.K. branches, rather, Moving-Defendants' experts make the conclusory statement that "there is little doubt that the Defendants' handling of the Documents . . . are in the context of the Defendants' U.K. establishment and so subject to the Act." *Id.*  Such a conclusory assertion fails, particularly in light of the fact that Moving-Defendants' experts did not review the documents.

### C.  The Duty of Confidentiality does not apply to Moving-Defendants' documents.

Moving-Defendants provide even less specificity that the Duty of Confidentiality will be violated if they respond to Plaintiff's Request, only taking the noncommittal stance that "Documents will likely refer to customers' accounts and/or transactions." *Defs. Br.* at 10. Moving-Defendants' argument hinges on *Tournier v. Nat'l Provincial & Union Bank of England*, [1924] 1 KB 461, which is routinely rejected.  *See SEC v. Gib. Global Sec., Inc.*, No. 13 Civ. 2575, 2015 U.S. Dist. LEXIS 43773, at *8 (S.D.N.Y. Apr. 1, 2015); *see also See First Am. Corp. v. Price Waterhouse LLP*, 988 F. Supp. 353, 365 (S.D.N.Y. 1997), *aff'd*, 154 F.3d 16 (2d Cir. 1998).

Even if *Tournier* applied, it carved out four exceptions, which Moving-Defendants' experts overlook (*Watts* ¶ 10.1), including "where the disclosure is under compulsion by law" or "where there is an independent duty to the public to disclose."  *Gib. Global*, 2015 U.S. Dist. LEXIS 43773, at *7-8.  "[A]n order from this court constitutes legal compulsion that would insulate [the defendant] from liability."  *Id.*  Moving-Defendants do not cite a single instance in which a party producing documents pursuant to a U.S. court order was prosecuted under U.K. law, rendering this concern entirely speculative.  *See Tomlinson* ¶ 25; *Tansey,* 2014 U.S. Dist. LEXIS 132021, at *15 ("[d]efendants have failed to establish that responding to [p]laintiff's

discovery requests would create a meaningful likelihood of any type of prosecution, or even a violation of Australian law[.]").

Alternatively, this case, involving one of the largest financial frauds in history, surely requires disclosure to protect the public interest. *See First Am.*, 988 F. Supp. at 365 (citing an English court and holding that "the duty of confidentiality is outweighed by a countervailing public interest in disclosure of fraud, the very issue at stake in this action."); *id.* at 365 n.6 ("courts have, however, always refused to uphold the right to confidence when to do so would be to cover up wrongdoing"); *U.S. v. Chase Manhattan Bank, N.A.*, No. M-18-304, 1984 U.S. Dist. LEXIS 17677, at *13-14 (S.D.N.Y. 1984) (ordering disclosure because there was "a sufficiently strong charge of fraud, if not public danger, to require disclosure.").  Because Moving-Defendants failed to meet their burden of showing that producing responsive documents would violate the DPA and/or Duty of Confidentiality, the Federal Rules apply.

## II.     IF THE COURT CONCLUDES A COMITY ANALYSIS IS NEEDED, COMITY REQUIRES APPLICATION OF THE FEDERAL RULES.

If the Court concludes U.K. law applies to certain documents, Moving-Defendants bear the burden of demonstrating that discovery should proceed under the Hague Convention, rather than the Federal Rules. *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571, 2006 U.S. Dist. LEXIS 85211, at *11 (S.D.N.Y. Nov. 13, 2006).  "The Hague Convention is not the exclusive means for obtaining discovery from a foreign entity.  Nor is the Convention necessarily the means of first resort." *First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 20 (2d Cir. 1998) (internal citation omitted).  The Hague Convention procedures often are "unduly time consuming and expensive, as well as less certain to produce needed evidence than direct use of the Federal Rules." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 542 (1987).

9

Courts consider: "(i) the competing interests of the nations whose laws are in conflict; (ii) the hardship that compliance would impose on the party or witness from whom discovery is sought; (iii) the importance to the litigation of the information and documents requested; and (iv) the good faith of the party resisting discovery." *First Am.*, 154 F.3d at 22.

**A. Discovery through the Hague Convention will be futile.**

The U.K. signed the Hague Convention with reservation under Article 23, declaring that it "will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents." *Conston*, Ex. 8. Remarkably, Moving-Defendants overlook the controlling Second Circuit decision in *First American*, which found that "the U.K. permits pretrial discovery only if each document sought is separately described. Because First American very plausibly contends that such specificity is impossible in the present case, the Hague Convention would prove an ineffective tool for First American's purpose." *First Am.*, 154 F.3d at 23. Courts in this Circuit routinely reject defendants' attempts to resort to the Hague Convention when such level of specificity is unattainable. *See Tansey*, 2014 U.S. Dist. LEXIS 132021, at *10-11 (plaintiff unable to specify documents "as all of the documents" were solely in defendants' possession);[5] *see also Tomlinson* ¶ 22 (Article 29 Working Party described the Hague Convention as "severely outdated").

Plaintiff cannot attain this level of specificity because of the highly-secretive nature of Moving-Defendants' scheme. Many of the Moving-Defendants have yet to settle with regulators, so the documents establishing their specific involvement in the conspiracy have not been disclosed publicly. As Plaintiff alleges, defendants utilized secretive chatrooms, closed to

---

[5] *Tiffany (NJ) LLC v. Qi Andrew*, 276 F.R.D. 143, 157 (S.D.N.Y. 2011) is markedly different from the present case. *Tiffany* involved a non-party and the court observed that this status required an order compelling production of documents in violation of foreign law "only in extreme circumstances."

the public, to perpetrate their manipulation.  ECF No. 150 ¶ 712.  Defendants concocted false stories to avoid detection, lied to their own attorneys, used code words, enacted long-term manipulative campaigns, and destroyed evidence to ensure the secrecy of their manipulation.  *Id.* It is therefore impossible for Plaintiff to identify the relevant documents during the decade-long period.

Moving-Defendants' own arguments establish why Plaintiff cannot issue Letters with the specificity required by U.K. law: "the set of documents that would have to be produced from the UK is on a vastly different scale and potentially includes millions of pages of documents . . . ." *Defs. Br.* at 9 n.14.  If true, Plaintiff will not be able to "separately describe[]" each document in a Letter.[6]  Indeed, Moving-Defendants' experts cite U.K. cases which equate standard document requests under the Federal Rules with what the U.K. courts consider to be "fishing expeditions." *Watts* ¶ 11.1.1; *see also Tomlinson* ¶¶ 34, 35.  Moving-Defendants' exhibits confirm this tension, with the U.K. stating that U.S. requests are "not specific enough."  *Casamento*, Ex. O.[7]

---

[6] Moving-Defendants' reliance on *In re Baycol Products Litig.*, No. 1431, 2003 WL 22023449 (D. Minn. Mar. 21, 2003) is misplaced, as *Baycol* held that plaintiffs made no showing of the need for the information and did not argue that they could not get the information elsewhere.  Likewise, in *Volkswagen, A.G. v. Valdez,* 909 S.W.2d 900, 902 (Tex. 1995), alternative methods for obtaining the information existed and "[p]laintiff simply desire[d the information] . . . so they might double check the information provided in previous requests."  Here, the information is critical to Plaintiff's claims (*see* pp. 14-15, *infra*) and Plaintiff will not be able to obtain the requested documents through the Hague Convention or elsewhere.

[7] Moving-Defendants' experts' cases show that U.K. Courts and law are inimical to "American style discovery." *See Minnesota v. Philip Morris*, [1998] I.L.Pr. 170, 179 (*Casamento*, Ex. X) and *Lloyd's Register of Shipping v. Hyundai Mipo Dockyard*, [2001] WL 1422850, at 4 (*Casamento*, Ex. W).  Any effort by the U.K. courts to blue pencil a Letter to allow it to proceed under U.K. law would fail, given the complexities of this case and the volume of documents involved.  *See Minnesota*, [1998] I.L.Pr. at 187 (*Casamento*, Ex. X).

11

**B. Analysis of the *First American* factors weighs heavily in favor of applying the Federal Rules.**

    **i.   The U.S. interest in efficiently enforcing its antitrust and commodities laws outweighs the U.K.'s interest in anonymity.**

The competing interests of the nations implicated in this case, a factor which courts consider the most important to the analysis, weigh in favor of applying the Federal Rules. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, 278 F.R.D. 51, 54 (E.D.N.Y. 2010). As evidenced by extensive DOJ and CFTC investigations into "the events which lie at the heart" of this case, in addition to the DOJ's intervention into this action, the U.S. has a compelling interest in enforcing its antitrust and commodities laws. *Minpeco, S.A. v. ContiCommodity Servs., Inc.*, 116 F.R.D. 517, 523 (S.D.N.Y. 1987). "It would be a travesty of justice to permit a foreign company to invade American markets, violate American laws . . . withdraw profits and resist accountability for itself and its principals by claiming their anonymity under foreign law." *SEC v. Banca Della Svizzera Italiana*, 92 F.R.D. 111, 119 (S.D.N.Y. 1981). Congress intended civil enforcement suits of the antitrust, commodities, and racketeering statutes to have the effect of enforcing the law by means of "private attorney generals." *See Minpeco*, 116 F.R.D. at 523. Courts in this Circuit have repeatedly held that the foreign nations' laws do not block discovery in U.S. courts. *See First Am.*, 154 F.3d at 21 (ordering production notwithstanding U.K. confidentiality laws).[8]

Further, the U.S. has an "obvious interest" in having its own procedural rules applied to discovery. *Tansey,* 2014 U.S. Dist. LEXIS 132021*; see also Reino De Espana v. American Bureau of Shipping,* No. 03 Civ. 3573, 2005 U.S. Dist. LEXIS 15685, at *11-12 (S.D.N.Y. Aug. 1, 2005) (the U.S. has a "substantial interest in fully and fairly adjudicating matters before its

---

[8] *See also Vivendi,* 2006 U.S. Dist. LEXIS 85211, at *14; *Fundacion Museo de Arte Contemporaneo de Caracas-Sofia Imber v. CBI-TDB Union Bancaire Privee*, No. 93-cv-6870, 1996 U.S. Dist. LEXIS 1482 (S.D.N.Y. Feb. 9, 1996); *Tansey*, 2014 U.S. Dist. LEXIS 132021, at *14-15; *Garpeg, Ltd. v. United States*, 583 F. Supp. 789 (S.D.N.Y. 1984).

courts, which is only possible with complete discovery").  The interest is more pronounced when

the evidence at issue is "key" to the litigation and the deprivation of which would put the parties

on unequal footing and impede a full and fair adjudication on the merits.  *Id.* at *12-13; *see also*

*Adidas Ltd. v. SS Seatrain Bennington,* No. 80 Civ. 1911, 1984 U.S. Dist. LEXIS 16300, at *6-7

(S.D.N.Y. May 30, 1984) (forcing plaintiff to proceed through Hague Convention would give the

foreign party an "extraordinary and unfair advantage.").

      Proceeding through the Hague Convention will contravene this interest.  Moving-

Defendants' reliance on an outdated survey (*Casamento* Ex. O) to argue the efficiency of the

Hague Convention falls flat.  The current Hague Convention website states: "For documentary

evidence, the time taken is usually between six and 12 months."  *Conston*, Ex. 7 at 3.  This does

not include the second round of delays that will follow: "For oral evidence, the time taken to

process a request is usually up to 12 months."[9]  Thus, even if Plaintiff is somehow able to obtain

meaningful documentary discovery through the Hague Convention procedures, he will then be

forced to go through a second round of Letters once he is able to identify witnesses, and then go

through the cumbersome and highly dubious process of obtaining meaningful deposition

discovery from witnesses in the U.K.

      Based on these figures, the average case will take from eighteen months to two years to

obtain documents and testimony.  This action is far from average, in terms of the complexity of

the claims asserted, the stakes involved, the number of defendants, and the breadth of arguments

defendants raise at every step, and would take far longer than the average case.  Hague

Convention procedures will prove futile, will delay the case for years, and Plaintiff will be back

---

[9] Plaintiff will be forced to question witnesses – in a case of this magnitude and complexity – through the
cumbersome and ineffective method of writing out all questions in advance, with no opportunity for follow-up.  *Id.*
That will not provide Plaintiff with the ability to effectively examine these witnesses.

before this Court years from now seeking the same discovery he now seeks, again asking the Court to allow "American-style" discovery under the Federal Rules.  Proceeding in such a manner would be detrimental to the Court's time and resources.

Conversely, the U.K. does not have a strong interest in this discovery dispute, as the U.K. government, including the FCA and SFO, does not object to discovery proceeding.  *See* p. 5, *supra*.  Thus, this factor favors application of the Federal Rules.

> ii.    **Moving-Defendants will not be harmed by proceeding under the Federal Rules.**

The supposed hardship that compliance would impose on Moving-Defendants does not warrant application of the Hague Convention.  Moving-Defendants' arguments that redacting the requested documents prior to production would be too time-consuming are unsupported speculation and factually incorrect.  Other defendants with similarly large volumes of documents agreed to produce redacted documents.  *See* pp. 2, 4, *supra*.  Also, there is no real threat of injury to Moving-Defendants.  *See* pp. 7-8, *supra*; *Tomlinson* ¶ 7, 25.  Moving-Defendants' burden in complying with Plaintiff's Request "will not be overwhelming relative to the particular interests served by that discovery," *Bodner,* 202 F.R.D. at 376, particularly because Moving-Defendants have already turned over the requested documents to various regulatory authorities, reviewing them for privilege and relevance.  *See* pp. 4, 6-7, *supra* (the SFO recognizes the relevance of the requested documents).

> iii.    **Plaintiff's Request seeks documents and audio recordings that are relevant and critical to litigating this action.**

Documents produced to regulators are routinely produced during the first phase of discovery.  *See In re Platinum and Palladium Commodities Litig.*, No. 10 Civ. 3617, 2010 U.S. Dist. LEXIS 145183 (S.D.N.Y. Nov. 30, 2010); *In re Amaranth Natural Gas Commodities Litig.*, No. 07 Civ. 6377, ECF No. 135 (S.D.N.Y. 2009).  Moving-Defendants fail to argue this prong in

their comity analysis, evincing that they agree that Plaintiff's Request is highly relevant to this matter.  Moving-Defendants' productions to regulators are relevant because these documents formed the basis of guilty pleas to antitrust violations, making "a substantial likelihood that the documents will prove to be important to the prosecution of [P]laintiff['s] claims."  *See In re Air Cargo*, 278 F.R.D. at 53; *see also In re Vitamins Antitrust Litig.*, 120 F. Supp. 2d 45, 52 (D.D.C. 2000) ("of considerable importance . . . in analyzing the facts of this case were . . . the criminal pleas and leniency agreements entered into by all six [defendants.]").

Under the Federal Rules, discovery is liberally permitted, allowing parties to obtain non-privileged information "which is relevant to the subject matter involved in the pending action" that "appears reasonably calculated to lead to the discovery of admissible evidence."  FED. R. CIV. P. 26(b).  Plaintiff's Request complies with this standard—it is narrowly tailored and only seeks information concerning Yen-LIBOR and Euroyen TIBOR manipulation.  These internal documents are not available elsewhere.  The limited and redacted materials that various regulators released are a small fraction of the documents produced, and as fiduciaries to the putative class, Plaintiff and lead counsel have the right and obligation to review Moving-Defendants' complete productions.

### iv.    Moving-Defendants have not acted in good faith.

As to the fourth *First American* factor, Moving-Defendants cannot establish that they are acting in good faith, especially considering that they ignore the fact that the Second Circuit in *First American* ruled the Hague Convention is ineffective to obtain discovery in the U.K. Moreover, as a party to this action, rather than a third party like in much of the case law they rely on, Moving-Defendants cannot overcome the fact that they are required under the Federal Rules to produce discovery in this action.  *See First Am.*, 154 F.3d at 21 ("[defendant] is on firmer

15

ground in urging that its non-party status is a consideration in the comity analysis").  By immediately resorting to the futile Hague Convention procedures, instead of other viable alternatives like a contract, the Protective Order, or redacting relevant documents (which may have already been done prior to producing to government regulators), Moving-Defendants cannot argue that they are acting in good faith.  At a minimum, this factor is neutral.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Moving-Defendants' request to conduct discovery under the Hague Convention and issue an order requiring Moving-Defendants to comply with discovery under the Federal Rules.

Dated: September 11, 2015
      White Plains, New York

LOWEY DANNENBERG COHEN
& HART, P.C.

By: /s/    Vincent Briganti
    Vincent Briganti
    Geoffrey M. Horn
    Peter D. St. Phillip
    Thomas Skelton
    Raymond Girnys
    Christian Levis
    Michelle Conston
    One North Broadway, 5th Floor
    White Plains, New York 10601
    Telephone: (914) 997-0500
    vbriganti@lowey.com
    ghorn@lowey.com
    pstphillip@lowey.com
    tskelton@lowey.com
    rgirnys@lowey.com
    clevis@lowey.com
    mconston@lowey.com

    *Interim Lead Class Counsel*

    Nicole Lavallee
    Todd A. Seaver
    **BERMAN DEVALERIO**

16

One California Street, Suite 900
San Francisco, CA  94111
Telephone: (415) 433-3200
Facsimile:  (415) 433-6282
Email:  nlavallee@bermandevalerio.com
          tseaver@bermandevalerio.com

Patrick T. Egan (PE-6812)
**BERMAN DEVALERIO**
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
Email: pegan@bermandevalerio.com

*Additional Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

In accordance with the Court's June 26, 2015 Order, ECF No. 483, I certify that the

document was generated by a computer using Microsoft Word 2013, which indicates that the

word count of this document is 4971 words, excluding the pages containing the caption,

signature block, table of contents, table of authorities, appendices, and certificates of counsel.

Executed on September 11, 2015
White Plains, New York

> /s/    Vincent Briganti
> VINCENT BRIGANTI