UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

JEFFREY LAYDON, on behalf of          :
himself and all others similarly
situated,                             :          12 Civ. 3419 (GBD)(HBP)

                   Plaintiff,         :          OPINION
                                                 AND ORDER
     -against-                        :

MIZUHO BANK, LTD., et al.,            :

                   Defendants.        :

----------------------------------X

          PITMAN, United States Magistrate Judge:


I.   Introduction


          By Notice of Motion, dated August 6, 2015 (Docket Item

("D.I.") 495), defendants HSBC Holdings plc, HSBC Bank plc,

JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan

Securities plc, Société Générale, Sumitomo Mitsui Banking Corpo-

ration, Mizuho Corporate Bank, Ltd., and Deutsche Bank AG (the

"Moving Defendants") move for an Order sustaining their objec-

tions to Plaintiff's First Request for Production of Documents

(the "Document Requests") under the data privacy laws of the

United Kingdom (the "UK") and directing that plaintiff pursue

discovery of documents located in the UK through the procedures

set forth in the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters (the "Hague Convention").

For the reasons set forth below, the motion is denied.

II.  Background

This case arises out of defendants' alleged manipulation of the Tokyo Interbank Offered Rate ("Euroyen TIBOR"), the London Interbank Offered Rate for Japanese Yen ("Yen-LIBOR") and the prices of EuroYen TIBOR futures contracts during the period from January 1, 2006 through June 30, 2011 (Third Amended Complaint, dated Feb. 29, 2016 (D.I. 580), ¶ 1).  Defendants, including the Moving Defendants, are various banks and financial institutions.  Plaintiff, on behalf of himself and all those similarly situated, seeks to recover for losses he suffered in connection with his short positions in Euroyen TIBOR Futures contracts, which he alleges were proximately caused by defendants' unlawful manipulation.  Specifically, plaintiff alleges manipulation and aiding-and-abetting claims under the Commodity Exchange Act, 7 U.S.C. §§ 1, et seq. (the "CEA").[1]

---

[1]Plaintiff initially asserted five claims against defendants:  (1) manipulation in violation of the CEA; (2) principal-agent liability in violation of the CEA; (3) aiding and abetting manipulation in violation of the CEA; (4) violation of Section 1 of the Sherman Act, 15 U.S.C. §§ 1, et seq., and (5)
(continued...)

The Document Requests in issue seek (1) requests for documents, subpoenas or requests for information defendants received from various domestic and foreign government agencies and regulators, including the UK's Financial Conduct Authority[2] and the European Commission, concerning Yen-LIBOR and/or EuroYen TIBOR; (2) responses, objections, stipulations, privilege logs or agreed upon parameters for document productions defendants provided to those same agencies and regulators concerning Yen-LIBOR and/or EuroYen TIBOR; (3) documents produced to those agencies and regulators concerning Yen-LIBOR and/or EuroYen TIBOR; (4) sworn statements and testimony concerning Yen-LIBOR and/or EuroYen TIBOR provided to those agencies and regulators and (5) documents sufficient to identify all individuals who were questioned or provided testimony concerning Yen-LIBOR and/or EuroYen TIBOR to those agencies and regulators (Casamento Decl.,

---

[1](...continued)
unjust enrichment.  On March 28, 2014, the Honorable George B. Daniels, United States District Judge, issued a Memorandum Decision and Order dismissing plaintiff's vicarious liability, antitrust and unjust enrichment claims.  Laydon v. Mizuho Bank, Ltd., 12 Civ. 3419 (GBD), 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014).  Familiarity with Judge Daniels' Decision, which more fully details plaintiff's factual allegations, is assumed.

[2]The Financial Conduct Authority was known as the Financial Services Authority until April 1, 2013.  Plaintiff requests documents given to the agency under either name (Declaration of Gregory T. Casamento, dated Aug. 6. 2015 (D.I. 498) ("Casamento Decl.".), Ex. A, at 5 n.1).

Ex. A, at 5-6).[3]   The Moving Defendants object to the Document

Requests, claiming that "compliance with Plaintiff's requests

would risk violating the UK's Data Protection Act ("DPA") and/or

the English common law banker's duty of confidentiality" and

argue that plaintiff should be required to seek his discovery

pursuant to the procedures of the Hague Convention (Defs. Memo,

at 1-2).

III.  <u>Analysis</u>

"[W]here the alleged obstacle to production is foreign

law, the burden of proving what that law is and demonstrating why

it impedes production falls on the party resisting discovery."

<u>S.E.C. v. Gibraltar Glob. Sec., Inc.</u>, 13 Civ. 2575 (GBD)(JCF),

2015 WL 1514746 at *2 (S.D.N.Y. Apr. 1, 2015) (Francis, M.J.);

<u>accord</u> <u>Alfadda v. Fenn</u>, 149 F.R.D. 28, 34 (S.D.N.Y. 1993) (Katz,

---

[3]At this time, plaintiff seeks only documents defendants
produced to regulators and governmental agencies concerning Yen-
LIBOR and/or EuroYen TIBOR (Memorandum of Law in Opposition to
Certain Defendants' Memorandum in Support of Motion for Order
Sustaining Objections to Discovery Under Data Privacy Laws of the
United Kingdom, dated Sept. 11, 2015 (D.I. 512) ("Pl. Opp."), at
1 n.1; Certain Defendants' Memorandum in Support of Motion for
Order Sustaining Objections to Discovery Under Data Privacy Laws
of the United Kingdom, dated Aug. 6, 2015 (D.I. 496) ("Defs.
Memo"), at 1 n.2).  However, as the Moving Defendants note,
plaintiff has not withdrawn his other requests (Defs. Memo, at 1
n.2).  Accordingly, this Opinion and Order addresses the Document
Requests in their entirety.

M.J.).  "In order to meet that burden, the party resisting discovery must provide the Court with information of sufficient particularity and specificity to allow the Court to determine whether the discovery sought is indeed prohibited by foreign law."  Alfadda v. Fenn, supra, 149 F.R.D. at 34.

Once a foreign law is found to conflict with domestic law, "courts perform a comity analysis to determine the weight to be given to the foreign jurisdiction's law."  Tiffany (NJ) LLC v. Andrew, 276 F.R.D. 143, 151 (S.D.N.Y. 2011) (Pitman, M.J.), aff'd, 2011 WL 11562419 (S.D.N.Y. Nov. 14, 2011) (Pauley, D.J.); accord Wultz v. Bank of China Ltd., 910 F. Supp. 2d 548, 552-53 (S.D.N.Y. 2012) (Scheindlin, D.J.).

Both the Moving Defendants and plaintiff have submitted expert declarations in support of their respective interpretations of the DPA and the duty of confidentiality.  The Moving Defendants submitted a declaration by Dr. Mark Watts, a UK solicitor who "has advised on data protection matters extensively for over twenty years" and "has been consistently ranked as one of the top data protection practitioners in the UK," and Professor Christopher Millard, a professor of Privacy and Information Law in the Centre for Commercial Law Studies, Queen Mary University of London (Declaration of Dr. Mark Watts and Professor Christopher Millard, dated Aug. 5, 2015 (D.I. 497) ("Watts

Decl."), ¶ 1).  Plaintiff has submitted the declaration of Hugh
Tomlinson, QC, who has been practicing law in the UK for more
than 30 years and specializes in "media and information law,
including data protection, . . . privacy and . . . human rights
law" (Declaration of Hugh Tomlinson, QC, dated Sept. 10, 2015
(D.I. 513) ("Tomlinson Decl."), ¶ 2).

    A.   Whether the Discovery
       Sought Is Prohibited by UK Law

      1.  The DPA

    In October 1995, the European Union Council of Minis-
ters adopted Directive 95/46/EC of the European Parliament and
the Council of 24 October 1995 "on the protection of individuals
with regard to the processing of personal data and the free
movement of such data" (the "EU Directive") (Watts Decl., ¶ 4.2).
The EU Directive is binding on all European Union Member States,
including the UK, and serves the purpose of providing "equivalent
levels of protection of the rights and freedoms of individuals
with regard to the processing of personal data" (Watts Decl., ¶
4.2).  The EU Directive was implemented in the UK by the DPA
(Watts Decl., ¶ 4.3).

The DPA regulates the "processing" of personal data by "data controllers"[4] (Watts Decl., ¶ 5).  Under the DPA, "processing" is defined as "obtaining, recording or holding the information or data or carrying out any operation or set of operations on the information or data," and includes "disclosure of the information or data by transmission, dissemination or otherwise making available" (Watts Decl., ¶ 5.2).

The DPA contains eight Data Protection Principles; the Moving Defendants argue that four of the Principles -- the First, Second, Third and Eighth -- prohibit the production of documents responsive to the Document Requests (Watts Decl., ¶ 6; Defs. Memo, at 4).  The First Data Protection Principle prohibits the processing of "personal data" or "sensitive personal data"[5] by

---

[4]The DPA defines a "data controller" as "a person who (either alone or jointly or in common with other persons) determines the purposes for which and the manner in which any personal data are, or are to be, processed" (Casamento Decl., Ex. B, § 1(1)).  Specifically, the DPA applies to data controllers that either (1) are established in the UK and process data in the context of their establishment in the UK or (2) use equipment in the UK for processing data for a purpose other than transit through the UK (Casamento Decl., Ex. B, § 5).

[5]The DPA defines "personal data" as "data which relate to a living individual who can be identified . . . (a) from those data, or (b) from those data and other information which is in the possession of, or is likely to come into the possession of, the data controller, and includes any expression of opinion about the individual and any indication of the intentions of the data controller or any other person in respect of the individual" (Casamento Decl., Ex. B, § 1(1)).  "Sensitive personal data" is

(continued...)

data controllers unless the processing is done "fairly and lawfully" and certain other conditions are met (Casamento Decl., Ex. B, Schedules 1-3). The Second Data Protection Principle provides that personal data "shall be obtained and identified only for one or more specified and lawful purposes, and shall not be further processed in any manner incompatible with that purpose or those purposes" (Casamento Decl., Ex. B, Schedule 1). The Third Data Protection Principle provides that personal data "shall be adequate, relevant and not excessive in relation to the purpose or purposes for which they are processed" (Casamento Decl., Ex. B, Schedule 1). Finally, the Eighth Data Protection Principle provides that personal data "shall not be transferred to a country or territory outside the European Economic Area unless that country or territory ensures an adequate level of protection for the rights and freedoms of data subjects in relation to the processing of personal data" (Casamento Decl., Ex. B, Schedule 1).

Section 35 of the DPA provides a partial exemption to the First Data Protection Principle and a full exemption to the Second and Third Data Protection Principles where "the disclosure

---

[5](...continued)
defined as, among other things, information concerning an individual's race, ethnicity, political opinions and/or religion (Casamento Decl., Ex. B, § 2).

is required by . . . any rule of law or by the order of a court"
or where the disclosure is "necessary . . . for the purpose of,
or in connection with, any legal proceedings . . . or for the
purposes of establishing, exercising or defending legal rights"
(Watts Decl., ¶ 6.5; Casamento Decl., Ex. B, § 35).  In order to
be fully exempt from the First Data Protection Principle, the
processing of documents containing "personal data" must also
satisfy one of the conditions contained in Schedule 2 of the DPA
and, if the documents contain "sensitive personal data," one of
the conditions contained in Schedule 3 of the DPA must also be
satisfied (Watts Decl., ¶ 6.5).

      The Schedule 2 conditions relevant to this motion
provide that the processing of "personal data" is permissible if
(1) "[t]he data subject has given his consent to the processing,"
(2) "[t]he processing is necessary for compliance with any legal
obligation to which the data controller is subject, other than an
obligation imposed by contract," or (3) "[t]he processing is
necessary . . . for the administration of justice" (Casamento
Decl., Ex. B, Schedule 2).  The Schedule 3 conditions relevant to
this motion provide that the processing of "sensitive personal
data" is permissible if (1) "[t]he data subject has given his
explicit consent," (2) "[t]he processing . . . is carried out
with appropriate safeguards for the rights and freedoms of data

subjects," (3) "[t]he processing . . . is necessary for the purpose of, or in connection with, any legal proceedings" or "for the purposes of establishing, exercising or defending legal rights" or (4) "[t]he processing is necessary . . . for the administration of justice" (Casamento Decl., Ex. B, Schedule 3).

Schedule 4 of the DPA provides similar exemptions to the Eighth Data Protection Principle's prohibition on transferring personal data to countries outside of the European Economic Area that do not ensure adequate data protection.[6]  The relevant Schedule 4 exemptions to this motion provide that the transfer of "personal data" or "sensitive personal data" is permissible if (1) "[t]he data subject has given his consent to the transfer" or (2) "[t]he transfer . . . is necessary for the purpose of, or in connection with, any legal proceedings" or "for the purposes of establishing, exercising or defending legal rights" (Casamento Decl., Ex. B, Schedule 4).

Plaintiff and his expert, Mr. Tomlinson, point to these various exemptions and conditions -- specifically the Schedule 2, Schedule 3 and Schedule 4 conditions concerning legal proceedings, legal obligations and legal rights, and the Section 35 exemptions concerning legal rights, legal proceedings and an

---

[6]The United States is not considered to provide an adequate level of data protection by the UK (Defs. Memo, at 8 n.12).

"order by a court" -- to argue that compliance with an order by this court requiring production of the documents requested would not violate the DPA (Tomlinson Decl., ¶ 23).  In support of their interpretation of the DPA, plaintiff and his expert cite to In re Madoff Investment Securities LLC, ([2009] EWHC 442 (Ch) [10]), in which the UK High Court held that the transfer of personal data to the United States for use in liquidation proceedings satisfied the exceptions to the Eighth Data Protection Principle contained in Schedule 4 concerning legal proceedings and/or "establishing, exercising or defending legal rights" (Declaration of Michelle E. Conston, dated 11 Sept. 2015 (D.I. 514) ("Conston Decl."), Ex. 10, ¶¶ 9-10).

Plaintiff also cites to the website of the UK's Information Commissioner's Office -- the office that enforces the DPA -- which states that certain "contractual arrangements" can constitute "adequate safeguards" under the Eighth Data Protection Principle (Pl. Opp., at 3-4; Casamento Decl., Ex. F, at 84, 88). Plaintiff relies on these statements to argue that the protective order in place in this action, which permits the Moving Defendants to designate disclosed materials as "Highly Confidential",

11

constitutes an adequate contractual safeguard under the Eighth Data Protection Principle (Pl. Opp., at 3-4).[7]

The Moving Defendants and their experts disagree with plaintiff's interpretation of the DPA for two principal reasons. First, the Moving Defendants argue that the exemptions in Schedule 2 and Schedule 3 concerning legal proceedings, legal obligations and legal rights apply only to UK legal proceedings or obligations imposed by UK law (Watts Decl., ¶¶ 6.1.2, 6.5; Defs. Memo, at 6-7).  Second, they argue that the Schedule 4 conditions concerning legal proceedings and legal rights apply only where the person seeking discovery utilizes the Hague Convention (Defs. Memo, at 14; Watts Decl., ¶ 6.4).  In support of these arguments, the Moving Defendants and their experts cite to one written opinion and two working documents issued by the European Commis-

---

[7]Plaintiff also argues that the Moving Defendants could redact personal data contained within the requested documents to ensure compliance with the DPA (Pl. Opp., at 4).  The Moving Defendants dispute that redaction is a practical alternative, noting that there are potentially millions of pages of documents responsive to the Document Requests (Certain Defendants' Reply in Support of Motion For Order Sustaining Objections to Discovery under Data Privacy Laws of the United Kingdom, dated Sept. 23, 2015 (D.I. 519) ("Defs. Reply"), at 6-7).

sion's Article 29 Working Party[8] (Watts Decl., ¶¶ 6.1.2, 6.4;
Defs. Memo, at 9 n.14).[9]

The first Article 29 Working Party source cited by the
Moving Defendants is the "Working document on a common interpre-
tation of Article 26(1) of Directive 95/46/EC of 24 October
1995."  In this document, the Article 29 Working Party expresses
the opinion that Article 26(1)(d) of the EU Directive, which is
the basis for, and uses language similar to, the Schedule 4
conditions that permit transfer outside of the European Economic
Area,[10] can only be applied where the procedures of the Hague

---

[8]The Article 29 Working Party is a body that was established
under Article 29 of the EU Directive and which the Moving
Defendants' experts describe as "highly influential and regarded
as a good indication of [member countries'] data protection
authorities' views on important issues" (Watts Decl., ¶ 5.3).
Moving defendants' experts cite no authority for this
proposition, however, and acknowledge that the Article 29 Working
Party's "opinions have no formal legal effect" (Watts Decl., ¶
5.3).

[9]The Moving Defendants also dispute plaintiff's assertion
that the Section 35 exemptions apply.  With respect to the
exemption on the basis of "an order of a court," the Moving
Defendants' experts opine that "the reference to a court order is
generally regarded as limited to a UK court."  With respect to
the exemptions for documents necessary for legal proceedings, or
for establishing, exercising or defending legal rights, the
Moving Defendants' experts opine that this exemption does not
apply because "the personal data contained in the documents (as
opposed to the documents themselves) must be necessary to the
legal proceedings" (Watts Decl., ¶ 6.5; Defs. Memo, at 6).

[10]Schedule 4 of the DPA provides an exemption to Eighth Data
Principle where the transfer of personal data "is necessary for
                                        (continued...)

13

Convention have been followed (Casamento Decl., Ex. H, ¶ 2.4).
Additionally, this document "emphasises that the concept of
'establishment, safeguarding or defence of legal claims' must . .
. be subject to strict interpretation" (Casamento Decl., Ex. H, ¶
2.4).

The second Article 29 Working Party source the Moving
Defendants cite is the Article 29 Working Party's "Opinion
10/2006 on the processing of personal data by the Society for
Worldwide Interbank Financial Communications (SWIFT)."  In this
opinion, the Article 29 Working Party addressed whether SWIFT, a
worldwide financial messaging service based in Belgium, breached
the EU Directive when it complied with a subpoena issued by the
Department of Treasury seeking documents containing personal
data.  First, the Article 29 Working Party concluded that the
United States' subpoena, unlike an order based in EU or Belgian
law, did not qualify as a "legal obligation" under the EU Direc-
tive such that the processing of personal data -- i.e., the

---

[10] (...continued)
the purpose of, or in connection with, any legal proceedings" or
"for the purposes of establishing, exercising or defending legal
rights" (Casamento Decl., Ex. B, Schedule 4).  Article 26(1)(d)
of the EU Directive similarly provides that transfer of data to a
country that does not ensure an adequate level of data protection
is permissible if "the transfer is necessary or legally required
on important public interest grounds, or for the establishment,
exercise or defence of legal claims" (Casamento Decl., Ex. H, ¶
1.1.3).

disclosure of the data to the Department of Treasury -- would be permissible (Casamento Decl., Ex. J, at 17-18).  Second, the Article 29 Working Party concluded that the transfer of the documents to the United States was not permissible because "the transfer [was] not necessary or legally required on important public interest grounds of an EU Member State" (Casamento Decl., Ex. J, at 25).  In sum, the Article 29 Working Party concluded that

> the lack of transparency and adequate and effective control mechanisms that surrounds the whole process of transfer of personal data first to the US, and then to the UST represents a serious breach in light of the Directive.  In addition, the guarantees for the trans-fer of data to a third country as defined by the Direc-tive and the principles of proportionality and neces-sity are violated.

(Casamento Decl., Ex. J, at 26).

Finally, the most recent Article 29 Working Party document that the Moving Defendants cite is the "Working Document 1/2009 on pre-trial discovery for cross border civil litigation."  In this document, the Article 29 Working Party opines that "[a]n obligation imposed by a foreign legal statute or regulation may not qualify as a legal obligation by virtue of which data pro-cessing in the EU would be made legitimate" (Casamento Decl., Ex. U, at 9).  This document also expresses the opinion that "[w]here it is possible for The Hague Convention to be used, the Working

15

Party urges that this approach should be considered first as a method for providing for the transfer of information for litigation purposes" (Casamento Decl., Ex. U, at 14).

The Moving Defendants argue that these sources, in combination with the DPA's requirement that processing and transferring personal data be "necessary," demonstrate that, because the Hague Convention is an available and preferred alternative to obtaining discovery through the Federal Rules, a UK court would find that proceeding through the Federal Rules would violate the DPA (Defs. Memo, at 5-6).

While both plaintiff and the Moving Defendants (and their respective experts) offer persuasive interpretations of the DPA, the Article 29 Working Party sources cited by the Moving Defendants, and the SWIFT decision in particular, sufficiently demonstrate that a UK court or regulator may not consider an Order from this Court sufficient to exempt the Moving Defendants from the DPA's prohibitions on the processing and transferring of personal data.  Moreover, although the UK High Court's decision in In re Madoff Investment Securities LLC supports plaintiff's interpretation, that decision only discussed the Schedule 4 conditions concerning the transfer of documents outside of the European Economic Area and did not discuss whether an order from a United States court would exempt the Moving Defendants from the

16

DPA's processing limitations.  Additionally, district court decisions from this Circuit and other Circuits have found that Germany's data protection laws, which also implemented the EU Directive, warranted a comity analysis.  E.g., St. Jude Med. S.C., Inc. v. Janssen-Counotte, 104 F. Supp. 3d 1150, 1161-68 (D. Or. 2015); BrightEdge Techs., Inc. v. Searchmetrics, GmbH., No. 14CV01009WHOMEJ, 2014 WL 3965062 at *4-*6 (N.D. Cal. Aug. 13, 2014); In re Baycol Prods. Litig., No. MDL1431, 2003 WL 22023449 at *6 (D. Minn. Mar. 21, 2003); Salerno v. Lecia, Inc., No. 97-CV-973S(H), 1999 WL 299306 at *3 (W.D.N.Y. Mar. 23, 1999); see also In re Activision Blizzard, Inc., 86 A.3d 531, 543-50 (Del. Ch. 2014) (conducting comity analysis with respect to France's Data Protection Act).  Accordingly, the Moving Defendants have sufficiently established that production of the documents responsive to plaintiff's Document Requests puts them at risk of violating the DPA and that a comity analysis is, therefore, appropriate to determine whether plaintiff should pursue his document requests through the Hague Convention.[11]

---

[11]Plaintiff also argues that the Moving Defendants and their experts, who acknowledge that they have not yet reviewed the Moving Defendants' documents (Defs. Reply, at 2 & n.2), have failed to establish that the requested documents are either located in the UK or contain personal data such that they are subject to the DPA (Pl. Opp., at 6-8).  With respect to the location of the documents, plaintiff specifically requested

(continued...)

2.   Banker's Duty of Confidentiality

The Moving Defendants also argue that the Document Requests seek documents protected by the UK common law's banker's duty of confidentiality.

The banker's duty of confidentiality was established by the UK Court of Appeal in Tournier v National Bank, [1924] 1 KB 461 (CA).  According to both sides' experts, the banker's duty of confidentiality protects from disclosure the state of a cus-

---

[11](...continued)
documents that UK banks produced to UK regulators.  It is therefore highly probable that many of the documents requested are located in the UK.  With respect to the issue of whether the documents contain "personal data," the Document Requests seek all documents produced to regulators and government agencies concerning Yen-LIBOR and Euroyen TIBOR, as well as "sworn statements or testimony provided to any regulatory body or government agency . . . concerning Yen-LIBOR and/or Euroyen TIBOR" and "[d]ocuments sufficient to identify all individuals who were questioned or provided sworn statements or testimony to any regulatory body or government agency . . . concerning Yen-LIBOR and/or Euroyen TIBOR" (Casamento Decl., Ex. A, at 6 (emphasis added)).  Additionally, according to the Moving Defendants, "many responsive emails will include signature lines containing the sender's full name, email address, job title, and other personal content" (Defs. Memo, at 4).  The Moving Defendants' representations, in combination with the language of plaintiff's requests, establish that the Document Requests seek documents that contain "personal data" as defined by the DPA.

tomer's bank account and any information derived from the account
(Watts Decl., ¶ 10.1; Tomlinson Decl., ¶ 26).

Plaintiff disputes the Moving Defendants' conclusion
that the duty of confidentiality applies here, arguing that an
exception to the duty of confidentiality permits disclosure where
"a banker is compelled to do so by order of a court" (Tomlinson
Decl., ¶ 26).  Plaintiff also cites to a recent decision in this
District where the Magistrate Judge stated, in <u>dicta</u>, that a
United States court order "would insulate [the bank] from liabil-
ity."  <u>S.E.C. v. Gibraltar Glob. Sec., Inc.</u>, <u>supra</u>, 2015 WL
1514746 at *3.  The Moving Defendants contend, however, that
"[f]oreign demands for production are not necessarily sufficient
to implicate the compulsion by law exception," citing a UK case
in which the court held that the compulsion-by-law exception did
not apply to an <u>ex-parte</u> United States court order compelling a
bank to comply with a grand jury subpoena (Defs. Memo, at 10,
<u>citing</u> X AG v A Bank, [1983] 2 All ER 464, annexed as Ex. M to
Casamento Decl.; <u>see</u> <u>also</u> <u>In re State of Norway's Application</u>, 1
All ER 746, 762 (Q.B. 1989) (stating that "the question of confi-
dentiality can only be answered by the court undertaking a bal-
ancing exercise" in an opinion discussing whether to grant a
Norwegian court's request to depose bankers in the UK), annexed
as Ex. L to Casamento Decl.).

Again, both the Moving Defendants and plaintiff offer persuasive interpretations of the breadth of the duty of confidentiality.  Nonetheless, the Moving Defendants have sufficiently demonstrated that a UK court could find that the production of the requested documents violates the duty of confidentiality; a comity analysis, therefore, is warranted.

B.  Comity Analysis[12]

In Société Nationale Industrielle Aérospatiale v. United States District Court for the Southern District of Iowa, 482 U.S. 522, 539-40 (1987), the Supreme Court established that the procedures set forth in the Hague Convention are optional, not mandatory, and that "the Hague Convention d[oes] not deprive [a] District Court of the jurisdiction it otherwise possesse[s] to order a foreign national party before it to produce evidence

---

[12]Comity is defined,

> in the legal sense, [a]s neither a matter of absolute
> obligation, on the one hand, nor of mere courtesy and
> good will, upon the other.  But it is the recognition
> which one nation allows within its territory to the
> legislative, executive or judicial acts of another
> nation, having due regard both to international duty
> and convenience, and to the rights of its own citizens,
> or of other persons who are under the protection of its
> laws.

Hilton v. Guyot, 159 U.S. 113, 163-64 (1895).

physically located within a signatory nation."  Accord First Am.
Corp. v. Price Waterhouse LLP, 154 F.3d 16, 21 (2d Cir. 1998).
"At the same time, the Supreme Court emphasized that 'interna-
tional comity' . . . 'requires in this context a . . . particu-
larized analysis of the respective interests of the foreign
nation and the requesting nation.'"  Wultz v. Bank of China Ltd.,
supra, 910 F. Supp. 2d at 552, quoting Société Nationale
Industrielle Aérospatiale v. United States District Court for the
Southern District of Iowa, supra, 482 U.S. at 543-44 & n.27.

      When determining whether to issue an order directing
the production of information or documents in contravention of
foreign law, courts in the Second Circuit follow the Restatement
(Third) of Foreign Relations Law § 442(1)(c) and consider:

> (1) the importance to the investigation or litigation
> of the documents or other information requested;
>
> (2) the degree of specificity of the request;
>
> (3) whether the information originated in the United
> States;
>
> (4) the availability of alternative means of securing
> the information; and
>
> (5) the extent to which noncompliance with the request
> would undermine important interests of the United
> States, or compliance with the request would undermine
> the important interests of the state where the informa-
> tion is located.

Wultz v. Bank of China Ltd., supra, 910 F. Supp. 2d at 552-53
(citations omitted).  Courts in the Second Circuit also consider
two additional factors:

> (6) the hardship of compliance on the party or witness
> from whom discovery is sought; and

> (7) the good faith of the party resisting discovery.

Wultz v. Bank of China Ltd., supra, 910 F. Supp. 2d at 553 (cita-
tions omitted); accord Gucci America, Inc. v. Curveal Fashion, 09
Civ. 8459 (RJS)(THK), 2010 WL 808639 at *2 (S.D.N.Y. Mar. 8,
2010) (Katz, M.J.); Minpeco, S.A. v. Conticommodity Servs., Inc.,
116 F.R.D. 517, 522-23 (S.D.N.Y. 1987) (Lasker, D.J.).

Courts also often consider whether the person resisting
discovery is a party to the litigation and, "[w]here the issue is
the application of another country's privacy laws, . . . whether
such privacy requirements are absolute."  Tansey v. Cochlear
Ltd., No. 13-CV-4628 SJF SIL, 2014 WL 4676588 at *2 (E.D.N.Y.
Sept. 18, 2014), citing First Am. Corp. v. Price Waterhouse LLP,
supra, 154 F.3d at 22.

"The burden of persuasion is on the party seeking
application of the Hague Convention."  Tansey v. Cochlear Ltd.,
supra, 2014 WL 4676588 at *3; accord Eikenberry v. Celsteel Ltd.,
13 Civ. 4661 (AT), 2013 WL 5308028 *4 (S.D.N.Y. Sept. 19, 2013)
(Torres, D.J.); In re Vivendi Universal, S.A. Sec. Litig., 02

Civ. 5571 (RJH)(HBP), 2006 WL 3378115 at *2 (S.D.N.Y. Nov. 16, 2006) (Pitman, M.J.) ("The party seeking to displace the Federal Rules of Civil Procedure in favor of the Hague Convention bears the burden of demonstrating that it is more appropriate for the Court to follow the Hague Convention.") (collecting cases).

### 1.   Importance of the Information

As noted above, the discovery that plaintiff seeks is, or relates to, information the Moving Defendants provided to regulators concerning the alleged manipulation of Yen-LIBOR and Euroyen TIBOR.  Plaintiff argues that these documents "are critical to litigating this action" (Pl. Opp., at 15).

Plaintiff's argument is persuasive.  The discovery sought relates directly to plaintiff's claims that defendants engaged in a scheme to manipulate Euroyen TIBOR and Yen-LIBOR and, therefore, "there is a substantial likelihood that the documents will prove to be important to the prosecution of the plaintiffs' claims."  In re Air Cargo Shipping Servs. Antitrust Litig., 278 F.R.D. 51, 53 (E.D.N.Y. 2010); see also In re Platinum & Palladium Commodities Litig., 10 Civ. 3617 (WHP), 2010 US Dist LEXIS 145183 at *2 (S.D.N.Y. Nov. 30, 2010) (Pauley, D.J.) (ordering the production of documents that had previously been

disclosed to the Commodities Futures Trading Commission while a motion to dismiss was pending).

Indeed, the Moving Defendants do not directly contest this point, stating that they "do not seek to bar production of the documents that Plaintiff has requested" but rather "seek only to produce the required documents in a way that comports with their obligations under the UK's data privacy laws" (Defs. Reply, at 7). Accordingly, this factor weighs in plaintiff's favor.

### 2. The Requests' Specificity

The Moving Defendants next argue that plaintiff's Document Requests "cast a wide net that is likely to snare documents wholly irrelevant to his claims" and call for "extremely broad responses" (Defs. Memo, at 8-9, 14-15 (citation omitted)). In support of this assertion, the Moving Defendants mischaracterize plaintiff's requests as seeking "all documents produced to foreign regulators without limitation" (Defs. Memo, at 7). As drafted, plaintiff's request for documents produced to regulators is not so broad; it only seeks documents produced to regulators and government agencies "concerning Yen-LIBOR and/or Euroyen-TIBOR" (Casamento Decl., Ex. A, at 5). Nonetheless, citing a case that dealt with an entirely different type of document request, the Moving Defendants contend that plaintiff's

request "is 'not [a] narrowly tailored inquir[y] designed solely to target discreet [sic] and material information'" (Defs. Memo, at 14-15 (alterations in original), quoting In re Perrier Bottled Water Litig., 138 F.R.D. 348, 355 (D. Conn. 1991)).

The Moving Defendants' argument fails.  As discussed above, plaintiff does not request all documents that defendants produced to regulators and government agencies; nor does he request all documents in the Moving Defendants' possession, custody or control that relate to Yen-LIBOR or Euroyen TIBOR.  Rather, plaintiff requests only documents that are important to litigating his claims -- i.e., documents that directly relate to whether the Moving Defendants engaged in unlawful manipulation of Yen-LIBOR or Euroyen TIBOR.  Accordingly, this factor too weighs in plaintiff's favor.  See In re Air Cargo Shipping Servs. Anti-trust Litig., supra, 278 F.R.D. at 53 ("[T]he specificity of [a request for documents produced to the Department of Justice] is also not seriously disputed since it identifies precisely the group of documents sought.").

3.   Whether Information
     Originated in the United States

The Moving Defendants argue that their objections "relate to Documents originated, located, processed and/or stored in the UK" (Defs. Memo, at 13).  Plaintiff does not seriously dispute this point, arguing only that, as noted in footnote 11, supra, with respect to whether UK law and United States law actually conflict, the Moving Defendants have not satisfied their burden of proving the documents are located in the UK.

Given that the Document Requests relate to documents turned over to UK regulators, and which are in the possession, custody or control of banks that are located in the UK, it is likely that much, if not all, of the requested information origi-nated outside of the United States.  Accordingly, this factor favors the Moving Defendants.  Linde v. Arab Bank, PLC, 262 F.R.D. 136, 150 (E.D.N.Y. 2009); Gucci America, Inc. v. Curveal Fashion, supra, 2010 WL 808639 at *3.[13]

---

[13]At least one recent district court decision has stated that this factor "is of limited benefit to this analysis" because "when this factor was set forth by the Supreme Court in Societe Nationale in 1987, movement of documents from other parts of the world was not accomplished electronically the way it is today, which now limits or eliminates much of the attendant costs, both in terms of the time and money associated with producing remotely located evidence."  Tansey v. Cochlear Ltd., supra, 2014 WL
(continued...)

4.   Alternative Means for
     Securing the Information

The Moving Defendants argue that the Hague Convention constitutes an adequate alternative means of conducting discovery.  In support of their argument, the Moving Defendants assert that the UK "routinely acts on Hague Convention discovery requests" and note that "approximately all of the 222 [letters of] request[] received in 2012 were executed in two to four months" (Defs. Memo, at 13).[14]  Additionally, the Moving Defendants argue that because many of the requested documents are located in the UK, the Hague Convention should be utilized (Defs. Memo, at 13).

Plaintiff, however, argues that the Hague Convention is not a viable alternative because "the U.K. will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents" (Pl. Opp., at 10, quoting Conston Decl., Ex. 8).  Additionally, plaintiff cites the Second Circuit's decision in First Am. Corp. v. Price Waterhouse LLP, supra, in

---

[13](...continued)
4676588 at *3.

[14]Plaintiff disputes that the UK acts on such requests so quickly, noting that in September 2015, the Hague Convention's website stated that UK document requests are executed within six to 12 months and that the time to process a deposition request is usually up to 12 months (Pl. Opp., at 13; Conston Decl., Ex. 7, at 3).

which that Court found that "the U.K. permits pretrial discovery only if each document sought is separately described."  154 F.3d at 23; see also Tansey v. Cochlear Ltd., supra, 2014 WL 4676588 at *3 (finding the Hague Convention is not an adequate alternative for obtaining documents located in Australia because "it appears that Australia would not honor a letter of request directed toward obtaining pretrial discovery").[15]  Plaintiff argues that such specificity is impossible due to the "highly-secretive nature of Moving-Defendants' scheme" and the fact that the requested documents "have not yet been disclosed publicly" (Pl. Opp., at 10-11).

        Plaintiff's argument is not without merit.  Indeed, the Moving Defendants' experts agree that a UK court may refuse to execute a letter of request made pursuant to the Hague Convention unless the request is "narrow, setting out specific documents that are required, or specific questions for an identified witness, as opposed to setting out a general description of the types of evidence required" (Watts Decl., ¶ 11.1.1).   Therefore,

---

        [15]In further support of this argument, plaintiff also cites two UK cases in which UK courts refused to execute letters of request seeking American-style "pre-trial discovery" (Minnesota v Philip Morris Inc., [1998] I.L.Pr. 170, annexed as Ex. 16 to Conston Decl.; Lloyd's Register of Shipping v Hyundai Mipo Dockyard, [2001] WL 1422850, annexed as Ex. W to Casamento Decl.).

there is a real possibility that plaintiff would not be able to obtain the discovery he seeks through the Hague Convention. See First Am. Corp. v. Price Waterhouse LLP, supra, 154 F.3d at 23 ("Because First American very plausibly contends that [separately identifying each of the documents sought] is impossible in the present case, the Hague Convention would prove an ineffective tool for First American's purpose."); Wultz v. Bank of China Ltd., supra, 910 F. Supp. 2d at 558 (stating that if a foreign country decides not to execute a letter of request seeking pre-trial discovery, "the Hague Convention would definitively not represent a reasonable alternative means for . . . obtain[ing] discovery.").[16]  Accordingly, this factor appears to favor plaintiff and is, at best, neutral.

### 5. Interests of the Sovereigns

"The fifth factor -- the balancing of national interests -- is the most important, as it directly addresses the

---

[16]The two cases the Moving Defendants cite in support of their argument that the Hague Convention provides an adequate alternative are inapposite for the simple reason that neither case discusses the Hague Convention.  Volkswagen, A.G. v. Valdez, 909 S.W.2d 900, 903 (Tex. 1995) (stating that the discovery sought could be obtained from other parties or individuals); In re Baycol Prods. Litig., supra, 2003 WL 22023449 at *6 (stating that the discovery sought could be obtained from deposition witnesses).

relations between sovereign nations." S.E.C. v. Gibraltar Glob. Sec., Inc., supra, 2015 WL 1514746 at *5, quoting Madanes v. Madanes, 186 F.R.D. 279, 286 (S.D.N.Y. 1999) (Francis, M.J.); accord Tansey v. Cochlear Ltd., supra, 2014 WL 4676588 at *4; In re Air Cargo Servs. Antitrust Litig., supra, 278 F.R.D. at 54.

As an initial matter, "it has been repeatedly recognized that the United States has an 'obvious interest' in having its own procedural rules applied to discovery." Tansey v. Cochlear Ltd., supra, 2014 WL 4676588 at *4 (citations omitted); accord St. Jude Med. S.C., Inc. v. Janssen-Counotte, supra, 104 F. Supp. 3d at 1162 ("The United States has a substantial interest in vindicating the rights of American plaintiffs, and an overriding interest in the just, speedy, and inexpensive determination of litigation in [its] courts." (citations and internal quotation marks omitted; brackets in original)). This interest is even stronger where the discovery sought is "vital to the litigation." Tansey v. Cochlear Ltd., supra, 2014 WL 4676588 at *4 (citations omitted).

Further, "the United States has a strong national interest in enforcing its . . . commodities fraud laws to ensure the integrity of its financial markets." Minpeco, S.A. v. Conticommodity Servs., Inc., supra, 116 F.R.D. at 523 (internal citation omitted).

> Moreover, although the interest of the United States in criminal and civil enforcement suits is normally stronger than its interest in private disputes, the formal posture of th[is] cases is less significant in that the plaintiff[] here [is] asserting private rights of action under the . . . commodities . . . statute[] that ha[s] the effect . . . of enforcing the law by means of "private attorney generals."

Minpeco, S.A. v. Conticommodity Servs., Inc., supra, 116 F.R.D. at 523.

The Moving Defendants, however, contend that the United States' interests are outweighed by the UK's interest in enforcing the DPA and the banker's duty of confidentiality.  The Moving Defendants argue that the UK has an interest "in the enforcement of its financial privacy and data protection laws" (Defs. Memo, at 14).  The Moving Defendants are correct on this point; courts have repeatedly held that European nations bound by the EU Directive have an interest "in protecting the privacy rights of [their] citizens."  In re Activision Blizzard, Inc., supra, 86 A.3d at 550 ("[France's] Data Protection Act . . . reflects both France's interest in protecting the privacy rights of its citizens and its interest in complying with the directives of the European Union."); Pershing Pac. W., LLC v. MarineMax, Inc., No. 10-CV-1345-L DHB, 2013 WL 941617, at *9 (S.D. Cal. Mar. 11, 2013) (noting that Germany's Federal Data Protection Act reflects "Germany's interests in nondisclosure of personal data"), on

reconsideration in part, 2013 WL 1628938 (S.D. Cal. Apr. 16,
2013); see also Linde v. Arab Bank, PLC, supra, 262 F.R.D. at 151
(stating that "maintaining the privacy rights of bank clientele"
is an important sovereign interest with respect to Israel's bank-
client privilege laws).

      Nonetheless, two additional considerations weigh
against the UK's interest.  First, as is discussed in Section
III.A, supra, whether the DPA and duty of confidentiality are
actually implicated here -- and, therefore, whether any UK inter-
est is actually threatened -- is not entirely clear.  Alfadda v.
Fenn, supra, 149 F.R.D. at 35 (finding the United States' inter-
est outweighed Switzerland's interest in bank secrecy where "the
applicability of the Swiss secrecy laws to the facts involved in
the instant motion is not at all clear"); see also St. Jude Med.
S.C., Inc. v. Janssen-Counotte, supra, 104 F. Supp. 3d at 1162-64
("[T]he variety of . . . provisions [in Germany's Federal Data
Protection Law] permitting disclosure -- several of which appear
on their face to encompass disclosure under court order for
litigation purposes -- demonstrate that [Germany's data privacy]
interest is not all-consuming."); Tansey v. Cochlear Ltd., supra,
2014 WL 4676588 at *5 (the fact that the Australian Data Privacy
Act "contains an exception for conduct required by the 'applica-
ble law of a foreign country'" weighed in favor of finding that

the Unites States' interest outweighed Australia's); In re Activision Blizzard, Inc., supra, 86 A.3d at 550 (ordering that discovery proceed pursuant to the Federal Rules because "[s]teps can readily be taken to accommodate the French interests reflected in the Data Protection Act," including redacting personal information and using a confidentiality order).

In this regard, courts also often look to whether the foreign government has raised an objection to the discovery sought. Alfadda v. Fenn, supra, 149 F.R.D. at 34 ("[W]hen foreign governments . . . have considered their vital national interest threatened, they have not hesitated to make known their objections . . . ."), quoting United States v. First National City Bank, 396 F.2d 897, 904 (2d Cir. 1968). "[A] foreign government's failure to express a view that the disclosure at issue threatens its national interests militates against a finding that strong national interests of the foreign country are at stake." Alfadda v. Fenn, supra, 149 F.R.D. at 34; accord S.E.C. v. Gibraltar Glob. Sec., Inc., supra, 2015 WL 1514746 at *5 ("The Bahamian government . . . voiced no objection to the requested discovery, a fact that 'militates against a finding that strong national interests of the foreign country are at stake.'" (citation omitted)); Gucci America, Inc. v. Curveal Fashion, supra, 2010 WL 808639 at *6 (finding the United States' interest out-

weighed Malaysia's interests where "the Malaysian government has not voiced any objections to disclosure in this case").

Plaintiff argues that the fact that the UK government has not raised any objections to production in this case on the basis of either the DPA or the duty of confidentiality weighs in plaintiff's favor (Pl. Opp., at 4-5). While it is unclear which specific UK governmental agencies have been contacted by the parties, plaintiff correctly notes that the UK Serious Fraud Office (the "SFO"), in response to a letter from former defendant Mizuho Bank Ltd., stated that it "raises no objection to the production . . . of any underlying materials provided to it by Mizuho and other financial institutions as the result of its investigations" (Letter from SFO to Judge Daniels, dated 12 Sept. 2014 (D.I. 374, Ex. A)).[17] Additionally, the UK's Financial Conduct Authority (the "FCA") -- the only UK governmental agency expressly specified in the Document Requests as having received responsive documents -- was contacted by non-moving defendant Barclay's Bank PLC regarding whether it wished to raise objec-

---

[17]Although the SFO did object to disclosing any correspondence between itself and any financial institutions it investigated, it did not make this objection on the basis of the DPA or the duty of confidentiality. Rather, it did so on the basis of (1) relevance, (2) the risk of harm to its ability to carry out its investigations and (3) the risk of harm to its ability to coordinate with law enforcement in other countries.

34

tions to the Document Requests.  In its response, the FCA did not raise any objections under either the DPA or the duty of confidentiality (Letter to the Undersigned from William A. Isaacson, dated July 17, 2015 (D.I. 488)).  Finally, JPMorgan Chase & Co. has submitted a letter explaining that it had contacted the European Commission -- another entity specified in the Document Requests, as well as the body that first proposed the introduction of the EU Directive (Watts Decl., ¶ 4.2) -- and the European Commission did not raise any objection to JPMorgan Chase & Co.'s producing the documents it had previously provided to regulators and government agencies (Letter to the Undersigned from Paul C. Gluckow, dated July 16, 2015 (D.I. 487)).  These responses indicate that the UK (and European) interest in the non-disclosure of the information sought is not as great as the Moving Defendants urge.  Further, these responses appear to indicate that the United States' interest in preventing manipulation of the commodities markets is shared by the UK.

Second, the UK's interest in protecting the privacy of its citizens is mitigated by the protective order in place in this case, which permits the Moving Defendants to designate disclosed materials as "Highly Confidential" (Pl. Opp., at 3). See St. Jude Med. S.C., Inc. v. Janssen-Counotte, supra, 104 F. Supp. 3d at 1164 (denying application for use of the Hague Con-

vention and directing that "all documents containing personal
data be restricted to attorneys' eyes only unless otherwise
agreed upon by all affected parties"); <u>Pershing Pac. W., LLC v.
MarineMax, Inc.</u>, <u>supra</u>, 2013 WL 941617 at *9 ("Any personal
information of German citizens contained in any documents for
which Defendant cannot obtain can be redacted, subject to a
subsequent in camera review if necessary.  Alternatively, a
protective order can be requested."); <u>Bodner v. Paribas</u>, 202
F.R.D. 370, 376 (E.D.N.Y. 2000) ("[T]he use of an appropriate
protective order should address the confidentiality concerns of
defendants (and any concerns expressed by French law) with regard
to the materials produced.").

Accordingly, the United States' national interests in
this matter outweigh the national interests of the UK.

6.  <u>Nature of the Hardship</u>

The Moving Defendants argue that this factor weighs in
their favor because producing the documents requested "could
expose Defendants to fines, enforcement action, and potential
prosecution for breaching the DPA and potentially substantial
damages for violations of the banker's duty of confidentiality"
(Defs. Memo, at 15).  Notably, however, the Moving Defendants are
unable to cite a single instance in which a UK enforcement action

36

was taken against an entity for violating the DPA by complying

with discovery demands in the United States; nor have they pro-

vided an instance where a UK financial institution was found

liable for damages for producing otherwise confidential customer

information pursuant to an order by a United States court.[18]

Additionally, as discussed at length in Section III.A, supra, it

is far from certain that producing the requested documents would

actually cause the Moving Defendants to violate either the DPA or

the duty of confidentiality.  Tansey v. Cochlear Ltd., supra,

2014 WL 4676588 at *5 (finding minimal hardship where defendants

---

[18]While the Moving Defendants do cite a UK decision in which
a UK court held that a bank's compliance with a United States
court order violates the duty of confidentiality (X AG v A Bank,
[1983] 2 All ER 464; Casamento Decl., Ex. M), that case does not
support the Moving Defendant's argument under this factor.
First, in X AG, the UK Court did not impose any money damages;
rather, it simply enjoined the bank from complying with the
United States court order (Casamento Decl., Ex. M).  Second, the
facts of X AG are distinguishable from this case because, among
other things, (1) the court order in X AG was issued "'ex parte
and in camera' without any 'evidence about what material, if any,
was available to the district judge when the order was made,'"
and (2) X AG concerned a grand jury subpoena and "there was
evidence that information obtained by grand jury subpoenas
frequently was leaked to newspapers." United States v. Chase
Manhattan Bank, N.A., 584 F. Supp. 1080, 1084 (S.D.N.Y. 1984)
(internal citations omitted).  Here, in contrast, both sides have
had a full opportunity to address each others' arguments, and
there is no evidence that a "leak" of the information requested
is likely.  See United States v. Chase Manhattan Bank, N.A.,
supra, 584 F. Supp. at 1084 ("[T]he Court concludes that X AG
offers Chase less than firm support for its argument that this
case does not fall within the [compulsion-by-law] exception
outlined in Tournier.")

"failed to establish that responding to Plaintiff's discovery requests would create a meaningful likelihood of any type of prosecution, or even a violation of Australian law in the first instance."); BrightEdge Techs., Inc. v. Searchmetrics, GmbH., supra, 2014 WL 3965062 at *5 ("Searchmetrics has not provided any argument as to whether parties in its position have been fined or prosecuted for disclosing personal data under similar circum- stances, this factor weighs in favor of compliance."); In re Vivendi Universal, S.A. Sec. Litig., supra, 2006 WL 3378115 at *3 (finding no hardship where there was a lack of past prosecution even where the party resisting discovery "ha[d] been threatened with prosecution by two French agencies"); see also S.E.C. v. Gibraltar Glob. Sec., Inc., supra, 2015 WL 1514746 at *3 ("[A]n order from this court constitutes legal compulsion that would insulate Gibraltar from liability" under the UK banker's duty of confidentiality.)

The Moving Defendants nonetheless argue that plaintiff should seek its discovery through the Hague Convention "regard- less of the number of recent prosecutions for unauthorized pro- cessing or transfer" because "requiring production without the process guaranteed by the Hague Convention would force Defendants to risk violating UK law -- a result the US Supreme Court has instructed should be avoided" (Pl. Reply, at 6 (emphasis added)).

38

The Moving Defendants' argument fails.  If the mere risk of
violating UK or European data protection regimes were sufficient
to preclude the use of the Federal Rules of Civil Procedure,
"then for discovery from European parties the Convention would in
fact be a 'pre-emptive replacement' for the Federal Rules.  Such
an outcome is inconsistent with Aérospatiale's declaration that
comity requires a particularized, case-by-case analysis of the
interests at stake."  St. Jude Med. S.C., Inc. v.
Janssen-Counotte, supra, 104 F. Supp. 3d at 1164, citing Société
Nationale Industrielle Aérospatiale v. United States District
Court for Southern District Of Iowa, supra, 482 U.S. at 536.[19]

---

[19]The two district court decisions cited by the Moving
Defendants in discussing this factor are inapposite to this case.
In Tiffany (NJ) LLC v. Andrew, supra, the parties resisting
discovery were non-parties, upon whom "an order [compelling
production of documents in violation of foreign law] should be
imposed . . . only in extreme circumstances."  276 F.R.D. at 158-
59 (internal quotation marks and citations omitted).  In Minpeco,
S.A. v. Conticommodity Servs., Inc., supra, the experts for both
sides agreed that conducting discovery through the Federal Rules
would violate foreign law.  116 F.R.D. at 525.  Additionally, the
Minpeco court found that the discovery sought was of a "reduced
degree of importance" and noted that the party from whom
discovery was sought was "no longer a primary defendant" and
instead "st[ood] vis-a-vis plaintiffs in the position of a
witness, a mere source of information."  Minpeco, S.A. v.
Conticommodity Servs., Inc., supra, 116 F.R.D. at 526, 529.
Here, in contrast, the Moving Defendants are named parties, the
discovery sought is important to the litigation and "there is a
significant dispute in this case between the parties' experts as
to whether any [UK] law prohibits disclosure of the information
sought."  Alfadda v. Fenn, supra, 149 F.R.D. at 35

(continued...)

Thus, the Moving Defendants have failed to establish that they would suffer a hardship so significant to displace the Federal Rules in favor of the Hague Convention.

7.   Good Faith of the
     Party Resisting Discovery

The Moving Defendants argue that they have acted in good faith because they "raised this issue promptly so as to minimize any delays and any inconvenience to the Court or Plaintiff" (Defs. Memo, at 15).  Plaintiff disputes that the Moving Defendants have acted in good faith, arguing that, "[b]y immediately resorting to the futile Hague Convention procedures, instead of other viable alternatives like a contract, the Protective Order, or redacting relevant documents, Moving-Defendants cannot argue that they were acting in good faith" (Pl. Opp., at 15).  While the Moving Defendants' instant motion is hardly evidence that they are not acting in good faith as plaintiff urges, I "decline[] to engage in a substantial analysis of this point given that analysis of the other factors already weighs against application of the Hague Convention." Tansey v. Cochlear Ltd., supra, 2014 WL 4676588 at *5.

---

[19](...continued)
(distinguishing Minpeco).

40

8.   <u>Summary</u>

A review of the relevant factors shows that the only factor that clearly favors the Moving Defendants is the location of the documents at issue.  Accordingly, the Moving Defendants have failed to meet their burden of establishing that, in the interest of comity, plaintiff should, in the first instance, be compelled to pursue discovery pursuant to the procedures established by the Hague Convention.

IV.   <u>Conclusion</u>

For all the foregoing reasons, defendants HSBC Holdings plc, HSBC Bank plc, JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities plc, Société Générale, Sumitomo Mitsui Banking Corporation, Mizuho Corporate Bank, Ltd., and Deutsche Bank AG's motion for an Order sustaining their objections to Plaintiff's First Request for Productions of Documents and requiring that plaintiff pursue discovery of documents con-

tained in the United Kingdom through the procedures set forth in
the Hague Convention is denied.

Dated:   New York, New York
         April 29, 2016

                              SO ORDERED,

                              _____
                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to:
All Counsel

42