**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *Laydon v. Mizuho Bank, Ltd., et al.* | No. 12-cv-3419 (GBD) |
| *Sonterra Capital Master Fund Ltd., et al. v. UBS AG, et al.* | No. 15-cv-5844 (GBD) |

**MEMORANDUM OF LAW IN SUPPORT OF CLASS COUNSEL'S**
**MOTION FOR AWARD OF ATTORNEYS' FEES AND EXPENSES**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................................................................ii

INTRODUCTION .......................................................................................................................1

THE WORK UNDERTAKEN BY CLASS COUNSEL ...........................................................2

    A.   Settlement Negotiations with BTMU and MUTB ...................................................3

    B.   Expert-Related Work and Analysis .........................................................................4

    C.   Ongoing Discovery Efforts .....................................................................................4

    D.   Class Counsel's Earlier Work ..................................................................................5

        1.   Initial Case Investigation and the *Laydon* Complaints ...................................5

        2.   The *Sonterra* Complaint ...........................................................................7

        3.   *Laydon* TAC ............................................................................................8

        4.   Motion to Dismiss Ruling in the *Sonterra* Action ......................................9

        5.   Earlier Discovery Efforts in the *Laydon* Action ......................................10

        6.   Expert Work and Developing a Plan of Allocation.....................................11

        7.   Prior Mediations and Settlements................................................................12

ARGUMENT..............................................................................................................................13

I.    CLASS COUNSEL'S FEE REQUEST IS FAIR AND REASONABLE................................13

    A.   The Request is Consistent with the Fee Scale Negotiated by CalSTRS ...............13

    B.   Class Counsel's Request is Well Within the Range Used Under the Second Circuit's Preferred Percentage-Based Methodology......................................................15

    C.   The Requested Fees are Supported by the *Goldberger* Factors .............................16

        1.   The Risk of the Litigation...........................................................................16

        2.   The Magnitude and Complexity of the Case ..............................................18

        3.   Quality of Representation............................................................................20

        4.   The Fee is Reasonable in Relation to the Settlements.................................21

        5.   Public Policy Supports Approval................................................................22

    D.   The Lodestar Cross-Check Supports the Requested Fee ......................................23

II.   CLASS COUNSEL'S EXPENSES AND LITIGATION FUND................................................24

CONCLUSION...........................................................................................................................25

**Cases**

*Alderman v. Pan Am World Airways,*
  169 F.3d 99 (2d Cir. 1999).........................................................................................................23

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections,*
  522 F.3d 182 (2d Cir. 2008)......................................................................................................13

*Beckman v. KeyBank N.A.,*
  293 F.R.D. 467 (S.D.N.Y. 2013)...............................................................................................24

*Brunson v. City of New York,*
  No. 94 Civ. 4507, 2000 WL 1876910 (S.D.N.Y. Dec. 22, 2000) ..............................................25

*Carpenter v. Paige Hospitality Grp., LLC,*
  No. 13-cv-4009(GBD), 2015 U.S. Dist. LEXIS 82771 (S.D.N.Y. June 2, 2015)......................25

*City of Omaha Police & Fire Ret. Sys. v. LHC Grp.,*
  No. 12 cv 1609, 2015 WL 965696, at *11 (W.D. La. Mar. 3, 2015) ........................................24

*City of Providence v. Aeropostale, Inc.,*
  No. 11 Civ. 7132 (CM)(GWG), 2014 WL 1883494 (S.D.N.Y. May 9, 2014) ..........................16

*Flanagan, Lieberman, Hoffman & Swaim v. Ohio Pub. Employees Ret. Sys.,*
  814 F.3d 652 (2d Cir. 2016)......................................................................................................14

*Gelboim v. Bank of America Corporation,*
  823 F.3d 759 (2d Cir. 2016)......................................................................................................17

*Goldberger v. Integrated Res., Inc.,*
  209 F.3d 43 (2d Cir. 2000) ........................................................................................ 13, 16, 20, 23

*Hall v. Children's Place Retail Stores Inc.,*
  669 F. Supp. 2d 399 (S.D.N.Y. 2009) .......................................................................................15

*In re Amaranth Natural Gas Commodities Litig.,*
  No. 07 Civ. 6377 (SAS), 2012 WL 2149094 (S.D.N.Y. Jun. 11, 2012) ...................................16

*In re Arakis Energy Corp. Sec. Litig.,*
  No. 95 CV 3431(ARR), 2001 WL 1590512 (E.D.N.Y. Oct. 31, 2001).....................................24

*In re Beacon Assoc. Litig.,*
  No. 09 Civ. 777(CM), 2013 WL 2450960 (S.D.N.Y. May 9, 2013).........................................15

*In re Colgate-Palmolive Co. ERISA Litig.,*
  36 F. Supp. 3d 344 (S.D.N.Y. 2014) ...................................................................................22, 23

*In re Credit Default Swaps Antitrust Litig.*,
　No. 13-md-2476, 2016 WL 2731524 (S.D.N.Y. April 26, 2016) ..................................... 13, 14, 22, 24

*In re Holocaust Victim Assets Litig.*,
　No. CV 06-0983 (FB)(JO), 2007 WL 805768 (E.D.N.Y. Mar. 15, 2007) ..........................................19

*In re Merrill Lynch Tyco Research Sec. Litig.*,
　249 F.R.D. 124 (S.D.N.Y. 2008) ..................................................................................................20

*In re NASDAQ Market-Makers Antitrust Litig.*,
　187 F.R.D. 465 (S.D.N.Y. 1998) ..........................................................................................15, 18, 21

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
　991 F. Supp. 2d 437 (E.D.N.Y. 2014) ............................................................................. 16, 18, 21, 22

*In re Platinum and Palladium Commodities Litig.,* No. 10 CV 3617,
　2014 WL 3500655 (S.D.N.Y. July 15, 2014) ................................................................................. 17, 18

*In re Sumitomo Copper Litig.*,
　74 F. Supp. 2d 393 (S.D.N.Y. 1999) ............................................................................................16

*In re Telik, Inc. Sec. Litig.*,
　576 F. Supp. 2d 570 (S.D.N.Y. 2008) ..........................................................................................15

*In re Vitamin C Antitrust Litig.*,
　No. 06 MD 1738 (BMC)(JO), 2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) ..................................18

*In re WorldCom Sec. Litig.*,
　388 F. Supp. 2d 319 (S.D.N.Y. 2005) ..........................................................................................14

*Maley v. Del Global Techns. Corp.*,
　186 F. Supp. 2d. 358 (S.D.N.Y. 2002) ..................................................................................... 21, 24

*McDaniel v. County of Schenectady*,
　595 F.3d 411 (2d Cir. 2010) ......................................................................................................13

*Meredith Corp. v. SESAC, LLC*,
　87 F. Supp. 3d 650 (S.D.N.Y. 2015) ..................................................................................... 15, 17, 18, 21

*Pillsbury Co. v. Conboy*,
　459 U.S. 248 (1983) ..................................................................................................................23

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG*,
　No. 15-cv-00871, 2017 WL 4250480 (S.D.N.Y. Sept. 25, 2017) ..........................................................17

*Sonterra Capital Master Fund, Ltd. v. UBS AG*,
　No. 15-cv-5844, 2017 WL 1091983 (S.D.N.Y. Mar. 10, 2017) ...............................................................9

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini,*
   258 F. Supp. 2d 254 (S.D.N.Y. 2003) ...................................................................15

*Teachers' Ret. Sys. of Louisiana v. A.C.L.N., Ltd.,*
   No. 01-cv-11814, 2004 WL 1087261 (S.D.N.Y. May 14, 2004) ........................................25

*Vizcaino v. Microsoft Corp.,*
   290 F.3d 1043 (9th Cir. 2002) ...................................................................24

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,*
   396 F.3d 96 (2d Cir. 2005) ...................................................................15, 19

Pursuant to this Court's March 8, 2018 order preliminarily approving the settlement with BTMU[1] and MUTB,[2] Plaintiffs,[3] through Lowey Dannenberg, P.C. ("Class Counsel") respectfully move under Rule 23(h) of the Federal Rules of Civil Procedure for an award of attorneys' fees of $6.9 million, or 23% of the $30,000,000 common fund established by Plaintiffs' settlements with BTMU and MUTB in the related cases *Laydon v. Mizuho Bank, Ltd., et al.*, No. 12-cv-3419 (GBD) (S.D.N.Y.) ("*Laydon*") and *Sonterra Capital Master Fund Ltd., et al. v. UBS AG, et al.*, No. 15-cv-5844 (GBD) (S.D.N.Y.) ("*Sonterra*"). The requested fees are consistent with the negotiated fee agreement with CalSTRS, one of the largest public pension systems in the world. Further, the fees are within the percentage found reasonable in this circuit and are less than the total lodestar incurred in litigating these cases to date.

## INTRODUCTION

Class Counsel have litigated on behalf of investors in Euroyen-Based Derivatives as sole Lead Counsel for over six years on a fully-contingent basis. They have achieved significant results, including a total of $236,000,000 and valuable cooperation, while facing top-tier antitrust lawyers and the vast resources of 44 of the world's largest financial institutions. Class Counsel's ability to successfully recover for the Settlement Class is a testament to the quality work and resources devoted to these massive cases, which have involved multiple amended pleadings, more than 17 motions and 53 separate memoranda, and almost eleven million pages in discovery. The *Laydon* Third Amended Complaint's ("TAC") (*Laydon*, ECF No. 580) and *Sonterra* Amended Class Action Complaint's (ECF No. 121) detailed allegations describing, *inter alia*, the structure of Defendants'

---

[1] "BTMU" means The Bank of Tokyo-Mitsubishi UFJ, Ltd. (now known as MUFG Bank, Ltd.).

[2] "MUTB" means Mitsubishi UFJ Trust and Banking Corporation.

[3] The "Plaintiffs" are Jeffrey Laydon, Sonterra Capital Master Fund, Ltd., Hayman Capital Master Fund, L.P. and Japan Macro Opportunities Master Fund, L.P. (collectively, "Hayman"), and California State Teachers' Retirement System ("CalSTRS"). Unless otherwise noted, ECF citations are to the docket in the *Sonterra* Action, and internal citations and quotation marks are omitted. Unless otherwise defined, capitalized terms herein have the same meaning as in the BTMU and MUTB Settlement Agreement. *See* ECF Nos. 399-1.

conspiracy and its economic impact on the Euroyen-Based Derivatives market represent just a portion of the effort expended to date.

The Plan of Allocation is similarly representative of this effort. Class Counsel developed this data-driven approach over several months with a leading commodities manipulation expert, advancing all costs. The same approach used here has also been accepted by a sister court in this District for allocating settlements relating to the manipulation of the Euro Interbank Offered Rate ("Euribor") and Euribor-based derivatives. *See Sullivan v. Barclays plc*, No. 13-cv-2811 (S.D.N.Y. May 18, 2018), ECF No. 424 ¶ 21. As this Court has previously held, this invaluable process resulted in a damages model capable of fairly allocating settlement funds.

Having devoted more than six years of work to this litigation and having borne all of the risk, Class Counsel should now be awarded a fair and reasonable fee of $6.9 million, or 23% of the Settlement Fund. This request is objectively fair and reasonable because it is consistent with the graduated fee scale that Plaintiff CalSTRS negotiated with Class Counsel before joining this case. *See* Part I.A *infra*. It is qualitatively reasonable because it satisfies all six *Goldberger* factors used to evaluate attorneys' fees in this Circuit (*see* Part I.C-D *infra*) and is consistent with fee awards in other similarly complex class actions. *See* Part I.B *infra*.

## THE WORK UNDERTAKEN BY CLASS COUNSEL

This additional settlement in *Laydon* and *Sonterra* is the product of the continued investigation, diligence and skill of some of the country's most experienced commodity manipulation lawyers and experts. Class Counsel have shouldered the financial risk of litigating these actions and continued to productively use their resources to generate beneficial results for Plaintiffs and the Class. Class Counsel's work is fully described in previous filings with the Court (*see* ECF Nos. 188-89, 261-63, 278-79, 281-87, 337-38, 370-79, 397-98) and the accompanying declaration of Vincent Briganti ("Briganti Decl."). Below is a summary of Class Counsel's work since

the last settlements and an overview of Class Counsel's earlier work in these actions.

### A. Settlement Negotiations with BTMU and MUTB

Settlement negotiations with BTMU and MUTB, the first Japanese Bank Defendants to settle, took place over seven months starting approximately in June 2017 and continuing until the Settlement Agreement was executed in January 2018. Briganti Dec. ¶ 4. After an initial phone call from BTMU and MUTB's counsel, Plaintiffs held a teleconference with BTMU and MUTB's counsel on August 29, 2017 for preliminary settlement discussions, which did not result in a settlement. *Id.* ¶ 5. On October 4, 2017, settlement discussions resumed, and Class Counsel and counsel for BTMU and MUTB held a series of teleconferences over the following weeks. *Id.* ¶¶ 6-7. During these calls, the parties discussed, among other issues, Plaintiffs' view on BTMU and MUTB's liability and BTMU and MUTB's arguments against finding them liable for claims in these Actions. *Id.* ¶ 7. On November 17, 2017, Plaintiffs and BTMU and MUTB reached an agreement in principle to settle the claims in the Actions and immediately began drafting a Term Sheet. *Id.*

On December 4, 2017, Class Counsel and counsel for BTMU and MUTB executed a binding Term Sheet setting forth the settlement terms. *Id.* ¶ 8. At the time the Term Sheet was executed, Class Counsel was well-informed about the legal risks, factual uncertainties, potential damages, and other aspects of the strengths and weaknesses of the Actions. *Id.* Class Counsel, on behalf of Plaintiffs, and BTMU and MUTB executed the Settlement on January 23, 2018. *Id.* ¶ 9. On February 6, 2018, Plaintiffs moved the Court under Rule 60 to further amend its March 10, 2017 *Sonterra* judgment, as modified June 19, 2017, to exclude BTMU and MUTB for the purposes of considering approval of the Settlement. ECF No. 394. The Court granted Plaintiffs' motion on February 7, 2018 and further amended the judgment. ECF No. 396. On February 9, 2018, Plaintiffs filed their motion for preliminary approval of the Settlement (ECF Nos. 397-99), and on March 8, 2018, the Court granted the preliminary approval motion. ECF No. 402.

### B. Expert-Related Work and Analysis

Class Counsel have engaged leading commodities manipulation experts to dissect the Yen money market and Euroyen-Based Derivatives data produced by Defendants. Briganti Decl. ¶ 12. The data will be used to assess potential class-wide damages and market artificiality, and to develop economic models of these effects. *Id.* Class Counsel have worked closely with the experts to identify, collect, and understand the data produced, and have made supplemental requests to Defendants for missing data, data dictionaries, etc. to obtain the correct data set on which to perform the requisite analyses. *Id.* As they receive the relevant data, Plaintiff's experts undertake the tremendous task of normalizing the data collected from the Class Period, constructing relevant tables and regression models, and analyzing risk reports detailing Defendants' exposure in the Euroyen-Based Derivatives market. *Id.*

### C. Ongoing Discovery Efforts

Class Counsel continues to pursue discovery of critical information and has obtained documents that will be important to establishing liability and damages. After several months of negotiations, Class Counsel reached agreements with several Defendants concerning transaction data involving Euroyen-Based Derivatives and Yen money market transactions. *Id.* ¶¶ 13-15. Negotiations with certain Defendants concerning Euroyen-Based Derivatives transaction data are ongoing, and any remaining disputes may be brought before the Court. *Id.* ¶ 14. Class Counsel also negotiated and enforced compliance with a Court order requiring four Japanese Bank Defendants to produce documents from a set of their Euroyen-Based Derivatives traders. *Id.* ¶ 15. In addition to ongoing management and processing of almost 11,000,000 pages of documents received and thousands of audio files using its in-house application of Relativity, Class Counsel has constructed timelines of Defendants' manipulation of Yen-LIBOR, Euroyen TIBOR, and Euroyen-based Derivatives, uncovering thousands of instances of manipulation throughout the Class Period. *Id.* ¶

20. Information uncovered during discovery is being organized and compiled for use in depositions to begin shortly. *Id.* ¶ 22.

### D.  Class Counsel's Earlier Work

#### 1.  Initial Case Investigation and the *Laydon* Complaints

Class Counsel began investigating the alleged manipulative conduct in the Euroyen-Based Derivatives market more than six years ago, after UBS revealed it had entered the Department of Justice's "ACPERA"[4] leniency program by self-reporting criminal cartel activity involving Yen-LIBOR and Euroyen TIBOR. *See* Briganti Decl. ¶ 23.

Class Counsel filed the initial Class Action Complaint ("CAC") (*Laydon,* ECF No. 1) on behalf of Jeffrey Laydon on April 30, 2012, asserting claims under the Sherman Act, Commodity Exchange Act ("CEA"), and several states' laws against twenty-five Defendants that were members of the Yen-LIBOR and/or Euroyen TIBOR panels. *Id.* ¶ 25. Class Counsel filed the First Amended Complaint ("FAC") on December 3, 2012. The FAC incorporated information from Barclays' June 2012 government settlements and expanded the CAC's allegations by more than 100 pages with 48 charts, graphs, and tables reflecting new economic evidence from a leading expert in benchmark manipulation retained by Class Counsel. *Id.* ¶ 32. Based on information from UBS's and RBS's government settlements, Class Counsel filed an enhanced Second Amended Complaint ("SAC"), replete with detailed allegations describing a conspiracy to manipulate Yen-LIBOR, Euroyen TIBOR, and the prices of Euroyen-Based Derivatives, including the Euroyen TIBOR futures contracts that Plaintiff Laydon traded on the Chicago Mercantile Exchange ("CME"). *Id.* ¶¶ 34-35.

Defendants filed thirteen separate memoranda of law in support of their motions to dismiss the SAC on June 14, 2013. *Id.* ¶ 38. Class Counsel filed an omnibus opposition to Defendants' motions to dismiss the SAC on August 13, 2013. *Id.* On March 28, 2014, the Court granted-in-part

---

[4] Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. 108-237.

and denied-in-part Defendants' motion to dismiss, dismissing Plaintiff's antitrust claims but sustaining CEA claims. *Id.* ¶ 40.

Class Counsel moved for leave to amend and filed a Proposed Third Amended Complaint ("PTAC") on June 17, 2014. *Id.* ¶ 42. The PTAC reflected Class Counsel's continuing investigation and sought to add four newly-identified Defendants. It also sought to add two named plaintiffs, renew claims for unjust enrichment, and add new claims for breach of the implied covenant of good faith and fair dealing and for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") based in part on guilty pleas by Rabobank traders to wire fraud relating to the manipulation of Yen-LIBOR and Euroyen TIBOR. *Id.* ¶ 42-44.

On August 7, 2014, fourteen Defendants filed eight new motions to dismiss the SAC under Rule 12(b)(2), arguing that the Supreme Court's seven-month old decision in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), created a previously-unavailable personal jurisdiction defense. *Id.* ¶ 45. Class Counsel opposed these motions arguing, *inter alia*, that Defendants had waived their personal jurisdiction defenses by not raising them sooner. *Id.* ¶ 47.

Defendants filed their opposition to Plaintiff's motion for leave to amend four days later. *Id.* ¶ 46. While preparing Plaintiff's response, Class Counsel were retained by CalSTRS to prosecute claims based on CalSTRS's Euroyen-Based Derivatives transactions with certain Defendants. *Id.* ¶ 48. As described fully in the accompanying declaration of CalSTRS's general counsel, Brian J. Bartow ("Bartow Decl."), CalSTRS negotiated a graduated fee schedule with Class Counsel that provided for a 25% fee on the first $100 million recovered, 23% on the next $200 million recovered, and lower fee percentages on subsequent settlement amounts. Bartow Decl. ¶ 7. The fee agreement also limited the amount of fees Class Counsel could request to 3.5 times the aggregate lodestar of all Plaintiffs' Counsel. *Id.* Class Counsel then drafted detailed allegations, including examples of how Defendants' misconduct impacted CalSTRS's transactions. These new allegations were included with

Plaintiff's reply brief to avoid the need for an additional round of motion to amend briefing. *See* Briganti Decl. ¶ 48.

On March 31, 2015, the Court partially granted Plaintiff's motion for leave to amend the complaint to add the four new Defendants, but denied leave to include the new plaintiffs and the RICO and state law claims. *Id.* ¶ 49. CalSTRS's request to join the action was also denied but it was permitted to renew its application by letter within 30 days. The Court denied ten Defendants' motions to dismiss the SAC, holding they had waived their personal jurisdiction defenses. *Id.*

### 2. The *Sonterra* Complaint

CalSTRS filed a letter motion to intervene in *Laydon* on April 29, 2015. *Id.* ¶ 50. While that motion was pending, Class Counsel initiated the *Sonterra* action on behalf of two U.S.-based investment funds—Sonterra and Hayman Capital Management L.P. ("Hayman Management"). *Id.* ¶ 52.[5] Like CalSTRS, Sonterra and Hayman Management transacted in over-the-counter Euroyen-Based Derivatives, including Yen-LIBOR-based interest rate swaps and Yen foreign exchange forward agreements, directly with several Defendants. *Id.* Class Counsel related this new case to *Laydon* and quickly moved to consolidate the actions. *Id.*

The Court addressed both motions on October 8, 2015. *Id.* ¶ 55. First, the Court denied Plaintiff's motion to consolidate *Laydon* and *Sonterra* without prejudice. *Id.* Next, the Court denied CalSTRS's motion to intervene and instructed CalSTRS to file its own complaint. *Id.* ¶ 56. To avoid unnecessarily spending resources on a new complaint and a round of motion to dismiss briefing, Class Counsel suggested adding CalSTRS to the *Sonterra* action. *Id.*. The Court agreed and ordered an amended *Sonterra* complaint including CalSTRS be filed by December 1, 2015. After a brief extension, the *Sonterra* amended complaint was filed on December 18, 2015. *Id.* ¶ 57.

---

[5] Hayman was later substituted in to the case for Hayman Management. Briganti Decl. ¶66.

### 3. *Laydon* TAC

Plaintiff filed his TAC in *Laydon* on December 18, 2015. *Id.* Defendants subsequently moved to strike the TAC on the ground that it did not comply with the Court's order granting leave to amend because, *inter alia*, it included claims that were previously dismissed in order to preserve those claims for appeal. *Id.* ¶ 59. The Court granted this motion, instructing Class Counsel to submit a new PTAC with a letter seeking leave to file that complaint. *Id.* Plaintiff filed his motion for leave to file the new PTAC, which Defendants opposed, arguing that it too violated the Court's order granting leave to amend and that the amendment was futile because it added time-barred claims. *Id.* The Court granted Plaintiff's motion and Class Counsel filed a new TAC on February 29, 2016. Defendants' subsequent attempts to strike that complaint were denied. *Id.*

Twenty-one Defendants (the "Legacy Defendants") filed 16 answers to the TAC on May 16, 2016 totaling over 2,000 pages. *Id.* ¶ 61. Four Defendants later filed amended answers on November 14, 2016. *Id.* On May 16, 2016, the Legacy Defendants filed a motion to partially dismiss claims in the TAC arising during the last six months of the Class Period (January 1, 2011 through June 30, 2011) as time-barred. *Id.* ¶ 63. After the motion was fully briefed and argued, the Court granted the Legacy Defendants' motion on March 10, 2017. *Id.*

Also on May 16, 2016, three Defendants added to the TAC ("Newly-Added *Laydon* Defendants") filed motions to dismiss for lack of personal jurisdiction. *Id.* ¶ 62. Plaintiff filed his opposition on July 18, 2016 and the Newly-Added *Laydon* Defendants filed their reply on August 16, 2016. *Id.* After the parties completed briefing, but before oral argument, the Second Circuit decided *Waldman v. Palestine Liberation Org.*, 835 F.3d 317 (2d Cir. 2016). The parties submitted letter briefing concerning *Waldman*'s impact on the pending motion. *Id.* After oral argument, the Court granted the Newly-Added *Laydon* Defendants' motions to dismiss on March 10, 2017. *Id.*

Based on *Waldman*, certain Defendants filed motions seeking revision and relief from the Court's November 10, 2014 and March 31, 2015 Orders finding certain Defendants waived their personal jurisdiction defense, or, alternatively certification of the Orders to the Second Circuit. *Id.* ¶ 64. Plaintiffs opposed the motions. *Id.* The Court denied these motions on May 19, 2017. *Id.*

### 4. Motion to Dismiss Ruling in the *Sonterra* Action

On February 1, 2016, the *Sonterra* Defendants filed at least five briefs and more than 30 declarations in support of their motions to dismiss arguing, *inter alia*, that the Court should dismiss Plaintiffs' claims for lack of personal jurisdiction, lack of antitrust standing and antitrust injury, and because they involve an extraterritorial application of United States law. *Id.* ¶ 65.

After the motions were fully briefed, the Court entered a Memorandum Decision and Order on March 10, 2017 dismissing the claims against the non-settling Defendants for lack of subject matter jurisdiction and declining to exercise supplemental jurisdiction over the *Sonterra* Plaintiffs' state law claims. *Sonterra Capital Master Fund, Ltd. v. UBS AG*, No. 15-cv-5844, 2017 WL 1091983 (S.D.N.Y. Mar. 10, 2017) (the "Opinion"). In the Opinion, the Court acknowledged that Deutsche Bank and JPMorgan had withdrawn their motions to dismiss. *Id.* at *1 n.1. The Court also entered judgment on the same day, closing the case. Briganti Decl. ¶ 68. Class Counsel filed a timely notice of appeal to the United States Court of Appeals for the Second Circuit. *Id.* ¶ 69. On May 2, 2017, the Second Circuit placed the appeal on its Expedited Calendar, with briefing due June 6, 2017.

*Sonterra*'s dismissal in its entirety, entry of judgment and appeal created uncertainty among the settling parties about the Court's ability to entertain a motion for seeking approval of the recent settlements with Deutsche Bank and JPMorgan. Briganti Decl. ¶ 70. Plaintiffs, with consent from Deutsche Bank and JPMorgan, filed a motion for an indicative ruling pursuant to Federal Rule 62.1. *Id.* On May 24, 2017, the Court granted the motion for an indicative ruling under Rule 62.1 in *Sonterra*, indicating that it intended to "amend the Judgment (ECF No. 315) entered in this action on

March 10, 2017, pursuant to Federal Rule of Civil Procedure 60, to exclude Deutsche Bank and JPMorgan from the Judgment, and retain and exercise jurisdiction over Deutsche Bank and JPMorgan in order to consider approval in this action [of] their settlements with Plaintiffs." ECF No. 324, at 2; Briganti Decl. ¶ 70.

Class Counsel then filed a motion on consent of Deutsche Bank and JPMorgan for remand pursuant to FED. R. APP. P. 12.1 in the Second Circuit. *Sonterra Capital Master Fund, Ltd., et al. v. UBS AG, et al.*, No. 17-944 (2d Cir. May 25, 2017), ECF No. 140. The Second Circuit granted the motion and stayed the appeal on June 13, 2017. *Sonterra Capital Master Fund, Ltd., et al. v. UBS AG, et al.*, No. 17-944 (2d Cir. June 13, 2017), ECF No. 151.[6] On June 19, 2017, this Court amended the Judgment to exclude Deutsche Bank and JPMorgan. ECF No. 335, at 2.

### 5. Earlier Discovery Efforts in the *Laydon* Action

Plaintiff served his first discovery request on Defendants in June 2014, shortly after the Court's March 28, 2014 decision in *Laydon*. Briganti Decl. ¶ 72. Immediately, Class Counsel began negotiating for all documents produced by Defendants in the course of global regulatory investigations into Yen-LIBOR and Euroyen TIBOR manipulation. *Id.* These preliminary conferences produced the Joint Initial Report and discovery plan filed on August 4, 2014. *Id.* ¶ 73. That discovery plan was delayed first by a stay issued on account of Defendants' second Rule 12 motions, then by the Department of Justice's ("DOJ") request that that the Court extend the stay of discovery for at least eight months to protect the ongoing grand jury investigation. *Id.*

Meeting and conferring with Defendants about their responses and objections to Plaintiff's first discovery request lasted months and involved more than 45 conferences with 20 Defendants. By the summer of 2015, the parties had isolated a single issue for resolution by the Court: whether

---

[6] Pursuant to the June 13, 2017 Order, Plaintiffs have been updating the Second Circuit every 30 days on the status of this Court's proceedings consistent with the indicative ruling. *See* e.g. *Sonterra Capital Master Fund L v. UBS AG*, 17-944, ECF Nos. 176-80.

foreign data privacy and bank secrecy laws prohibited disclosure of certain documents. *Id.* ¶ 75. After extensive briefing and expert submissions, Class Counsel defeated certain Defendants' first motion to withhold documents under U.K. data privacy and bank secrecy laws, substantially accelerating discovery. *Id.* Class Counsel negotiated agreements with certain other Defendants to address data privacy objections. *Id.* ¶ 76.

Plaintiff served his second discovery request on Defendants between March and July 2016. *Id.* ¶ 77. Beginning in August 2016 and continuing to the present, Plaintiff has held at least 75 conferences and exchanged numerous letters with individual Defendants to address objections and responses to the second document request, negotiate search terms, address data privacy law objections and reach agreement on the relevant custodians to search. *Id.* ¶ 78. After certain Defendants refused to produce documents held by employees who traded Euroyen-Based Derivatives ("Euroyen-Based Derivatives traders"), Plaintiff asked the Court for a pre-motion conference in advance of moving to compel certain Defendants to produce these documents. *Id.* ¶ 79. Magistrate Judge Pitman issued an order requiring these Defendants to produce the non-privileged, responsive documents and communications from 10% of each Defendants' Euroyen-Based Derivatives traders, without prejudice to Plaintiff's right to compel the production of additional documents from traders. *Id.*; *Laydon*, ECF No. 802.

### 6. Expert Work and Developing a Plan of Allocation

Class Counsel worked with Dr. Craig Pirrong to develop evidence of impact and damages. To determine the amount of artificiality, Class Counsel and Dr. Pirrong built a model using actual Euroyen market transactions to analyze the rates Defendants actually paid to borrow Yen during the Class Period in relation to what they reported. Briganti Decl. ¶ 96. This model is being used to carry out the Plan of Allocation and to ensure a fair claims process.

To develop a damages model, Class Counsel used their technological expertise to leverage various datasets, which collectively included millions of records. Class Counsel developed proprietary software to traverse the datasets and extract the appropriate information. *Id.* Class Counsel deputized a separate team to track down all cost of funding data. *Id.* This group utilized Relativity's analytics tools to segregate documents containing this transactional data and converted thousands of trade confirmations from images and PDFs into a machine-readable database by manually inputting all necessary data fields. *Id.* These additional data points supplemented the transactional records received as settlement cooperation to produce a credible model capable of calculating, on a formulaic basis, the damages suffered by each member of the Class.

### 7. Prior Mediations and Settlements

Class Counsel achieved settlements with Deutsche Bank, JPMorgan, HSBC, Citi, and R.P. Martin after many months of arm's-length negotiations, at which counsel on both sides presented the strengths and weaknesses of the claims and defenses. Briganti Decl. ¶¶ 80-95. In Deutsche Bank's and HSBC's case, this process culminated for each in a full-day mediation with CalSTRS present. Briganti Decl. ¶¶ 84, 89; Bartow Decl. ¶ 11. As a result, Class Counsel was well informed about the legal risks, factual uncertainties, potential damages, and other aspects of the case when each settlement was executed. Briganti Decl. ¶¶ 80-95.

The Deutsche Bank, JPMorgan, Citi and HSBC settlements created a common fund of $206,000,000 providing monetary compensation for the Class's otherwise uncompensated injuries and additional transaction data, communications, and other documents that have greatly assisted (and will continue to greatly assist) Class Counsel in prosecuting the case. *Id.* ¶ 95-96.

Kenneth Feinberg, Esq., oversaw the allocation process and ensured a fair and reasonable distribution of settlement funds to the Class. *See* ECF No. 287 (Declaration of Kenneth R. Feinberg) ¶ 20. As part of this process, Class Counsel appointed separate allocation counsel to represent the

interests of Class members that transacted in different types of Euroyen-Based Derivatives. *Id.* ¶ 12. In August 2016, Mr. Feinberg led a two-day mediation among allocation counsel to determine if any legal discounts should be applied to the value of Class members' claims. *Id.* ¶ 15.

## ARGUMENT

### I. CLASS COUNSEL'S FEE REQUEST IS FAIR AND REASONABLE

"Attorneys whose work created a common fund for the benefit of a group of plaintiffs may receive 'reasonable' attorneys' fees from the fund." *In re Credit Default Swaps Antitrust Litig.*, No. 13-md-2476, 2016 WL 2731524, at *16 (S.D.N.Y. April 26, 2016) ("*CDS Litig.*"). Courts "may award attorneys' fees in common fund cases under either the 'lodestar' method or the 'percentage of the fund' method" although "the trend in this Circuit is toward the percentage method." *McDaniel v. County of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010). Class Counsel's request is reasonable under either approach because it: (1) is consistent with the fee schedule that CalSTRS negotiated at arm's-length when it first retained Class Counsel in connection with this action; (2) is within this Circuit's range of "percentage method" fee awards; and (3) satisfies all six factors from *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000) ("*Goldberger*"), including the lodestar "cross-check."

### A. The Request is Consistent with the Fee Scale Negotiated by CalSTRS

The touchstone of "reasonableness" when evaluating attorneys' fees is "what a reasonable, paying client would be willing to pay" for counsel's services. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections,* 522 F.3d 182, 184 (2d Cir. 2008); *see also Goldberger*, 209 F.3d at 52 ("market rates, where available, are the ideal proxy for [class counsel's] compensation."). "[W]hen class counsel in a [ ] lawsuit have negotiated an arm's-length agreement with a sophisticated lead plaintiff possessing a large stake in the litigation, and when that lead plaintiff endorses the application following close supervision of the litigation, the court should give the terms of that agreement great weight." *In re WorldCom Sec. Litig.*, 388 F. Supp. 2d 319, 356

(S.D.N.Y. 2005). There is a well-recognized rebuttable "presumption of correctness"[7] given to an *ex ante* fee agreement between class counsel and lead plaintiffs applied in antitrust cases where the fee was negotiated by a "sophisticated benefits fund with fiduciary obligations to its members and where that fund has a sizeable stake in the litigation." *CDS Litig.*, 2016 WL 2731524, at \*16 (citing *Flanagan*, 814 F.3d at 659 and *In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001)).

The attorneys' fee requests of 23% of the common fund is based directly on the retainer agreement that CalSTRS negotiated with Class Counsel before moving to join *Laydon* in September 2014. *See* Bartow Decl. ¶ 18. CalSTRS is a "sophisticated benefits fund," the second-largest pension fund in the United States and the largest educator-only pension fund in the world with an investment portfolio of approximately $224.8 billion. *Id.* ¶ 4. CalSTRS owes a fiduciary duty to its 930,000 members and beneficiaries, a duty that not only motivated CalSTRS to negotiate at arm's-length a fair and reasonable fee arrangement with Class Counsel, but also to remain an active participant in the litigation. *Id.* ¶¶ 7-14. For example, CalSTRS's general counsel Brian Bartow personally approved the settlement with BTMU and MUTB. *Id.* ¶ 12. He also traveled from California to New York to participate in both the HSBC and Deutsche Bank settlement mediations. *Id.* ¶ 11. CalSTRS's high level of involvement is commensurate with its "sizable stake in the litigation" having engaged in tens of thousands of Euroyen-Based Derivatives transactions with nine Defendants. *Id.* ¶ 6. CalSTRS's *ex ante* judgment about an appropriate attorneys' fee in this case, therefore, satisfies the *CDS* factors.

CalSTRS supports the fee request based on its active monitoring of Class Counsel's work and the results Class Counsel achieved. *Id.* ¶ 18. As a result of its involvement in the case, CalSTRS has an intimate understanding of this litigation's complexity and difficulty. Its *ex post* support of this

---

[7] *See Flanagan, Lieberman, Hoffman & Swaim v. Ohio Pub. Employees Ret. Sys.*, 814 F.3d 652, 659 (2d Cir. 2016).

fee request demonstrates that it is fair and reasonable. In another action, a court in this District cited CalSTRS's hands-on management of the case as "an important, helpful tool in evaluating the reasonableness of the . . . fee award." *See* May 18, 2018 Conf. Tr. at 14:18-25, *Sullivan v. Barclays plc*, no. 13-cv-2811 (PKC) (S.D.N.Y.). CalSTRS's judgment, expertise and involvement support a presumption of correctness applying to the negotiated fee agreement.

**B. Class Counsel's Request is Well Within the Range Used Under the Second Circuit's Preferred Percentage-Based Methodology**

The reasonableness of the requested fee is confirmed by cases applying the "percentage method" of fee calculation favored in this Circuit. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("The trend in this Circuit is toward the percentage method") (citation omitted); *see also In re Beacon Assoc. Litig.*, No. 09 Civ. 777(CM), 2013 WL 2450960, at *5 (S.D.N.Y. May 9, 2013) (explaining that "percentage of recovery" is "the preferred method of calculating the award for class counsel in common funds cases"). Courts prefer the "percentage method" because it is easy to administer and avoids the "dubious merits of the lodestar approach." *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003); *see also In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 586 (S.D.N.Y. 2008) (noting that it absolves district courts from taking on the cumbersome task of computing a lodestar); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 485 (S.D.N.Y. 1998) ("*NASDAQ III*") (same). It "aligns the interests of the class and its counsel" while incentivizing "the efficient prosecution and early resolution of litigation." *Hall v. Children's Place Retail Stores Inc.*, 669 F. Supp. 2d 399, 401 (S.D.N.Y. 2009) (citation omitted). Furthermore, the reasonableness of the requested fee can be ensured by cross-checking the percentage fee against counsel's lodestar. *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 667-68 (S.D.N.Y. 2015). *See* Part I.D, *infra*.

Pursuant to the graduated fee structure with CalSTRS, Class Counsel requests 23% of the common fund. Bartow Decl. ¶ 7. This percentage is well within the range of reasonable attorneys'

fees approved in other complex class actions in this Circuit. *See, e.g., City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132 (CM)(GWG), 2014 WL 1883494, at *10-12 (S.D.N.Y. May 9, 2014) (awarding 33% in attorneys' fees); *In re Amaranth Natural Gas Commodities Litig.*, No. 07 Civ. 6377 (SAS), 2012 WL 2149094, at *2 (S.D.N.Y. Jun. 11, 2012) (awarding 30% attorneys' fees in a complex CEA class action); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393 (S.D.N.Y. 1999) (awarding 27.5% attorneys' fees in a complex CEA and RICO class action). It is particularly significant that the fee here is a lesser percentage than many of the approved fees in complex common fund class actions where "courts have sometimes awarded contingency fees exceeding 30% of the overall fund." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 447 n.11 (E.D.N.Y. 2014) ("*Interchange Fee Litig.*").

## C. **The Requested Fees are Supported by the *Goldberger* Factors**

The requested fees are supported by the application of the six-factor reasonableness test set forth in *Goldberger*. Under that standard, courts must consider: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation . . . ; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Goldberger,* 209 F.3d at 50. As the time and labor Class Counsel expended is detailed above (*see supra* at 3-13) and in the supporting declarations, factors 2 through 6 will be addressed.

### 1. *The Risk of the Litigation*

The risk of the litigation is the preeminent *Goldberger* factor. *See Interchange Fee Litig.*, 991 F. Supp. 2d at 440 ("The most important *Goldberger* factor is often the case's risk"); *Goldberger,* 209 F.3d at 54 ("We have historically labeled the risk of success as 'perhaps the foremost' factor to be considered in determining whether to award an enhancement.") (citation omitted). While all cases involve some level of risk, this case involved a particularly high level of risk for several reasons.

**Risk of Prosecuting the Case as Sole Lead Counsel**: Class Counsel are the sole Lead Counsel bringing claims on behalf of the Euroyen-Based Derivatives investors represented here. The choice to litigate against 44 of the world's largest financial institutions, which have significant resources and could continue this case for years at the trial and appellate levels, presented a substantial risk that Class Counsel were and remain prepared to shoulder. *See Meredith Corp.*, 87 F. Supp. 3d at 670 (noting "substantial risk" where counsel bore the "risk of defeat").

**Risk of Establishing Liability**: When *Laydon* and *Sonterra* were filed, no court had ruled that conspiring to fix LIBOR was an antitrust violation. Defendants argued (and several courts in this District initially agreed) that, because of the allegedly "cooperative" nature of the LIBOR rate-setting process, manipulating LIBOR did not cause antitrust injury. Class Counsel litigated this case for more than four years before the Second Circuit rejected Defendants' competing arguments and validated Plaintiffs' legal theory that fixing Yen-LIBOR and Euroyen TIBOR, which serve as a component of price in the derivatives Plaintiffs traded, is a *per se* antitrust violation. *See Gelboim v. Bank of America Corporation*, 823 F.3d 759 (2d Cir. 2016). Further, prior to the recent decisions in *Charles Schwab* and *Swiss Franc LIBOR*, no court in this District had ruled that foreign-based financial institutions who conspire to manipulate "IBOR" rates are subject to personal jurisdiction when they trade derivatives priced based on those manipulated rates with investors in the United States. *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 78 (2d Cir. 2018); *Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG*, No. 15-cv-00871, 2017 WL 4250480, at *50 (S.D.N.Y. Sept. 25, 2017) ("*Swiss Franc LIBOR*"). Additionally, this Court dismissed the *Sonterra* Action, finding Plaintiffs lacked standing. ECF Nos. 314. The decision is currently on appeal to the Second Circuit.

**Risk of Establishing Damages**: There were also risks associated with establishing a class-wide damages model. *See In re Platinum and Palladium Commodities Litig.*, No. 10 CV 3617, 2014 WL 3500655, at *12 (S.D.N.Y. July 15, 2014) ("[I]n any market manipulation or antitrust case, [p]laintiffs

face significant challenges in establishing liability and damages."). For example, Plaintiffs' case depended on showing what Yen-LIBOR and Euroyen TIBOR would have been absent Defendants' alleged manipulation. While both rates are intended to reflect Defendants' cost of borrowing Yen in the interbank money market, data reflecting these funding transactions is not public and was unavailable at the start of the litigation. Class Counsel had to develop the data necessary to build a credible damages model through settlements and discovery. *See supra* at 10-12.

In spite of these risks, Plaintiffs' Counsel took this case on a fully-contingent basis, with Class Counsel itself devoting more than 79,000 hours and substantial firm resources to litigating this case for over six years. As Judge Gleeson aptly noted: "Counsel should be rewarded for undertaking [the above noted risks] and for achieving substantial value for the class. If not for the attorneys' willingness to endure for many years the risk that their extraordinary efforts would go uncompensated, the settlement would not exist." *Interchange Fee Litig.*, 991 F. Supp. 2d at 441.

### 2. *The Magnitude and Complexity of the Case*

"Class actions have a well-deserved reputation as being most complex," *NASDAQ III*, 187 F.R.D. at 477, with antitrust and commodities cases standing out as some of the most "'complex, protracted, and bitterly fought.'" *Meredith Corp.*, 87 F. Supp. 3d at 670 (citations omitted); *see also In re Platinum and Palladium Commodities Litig.,* 2014 WL 3500655 at *12 (noting that commodities cases are "complex and expensive" to litigate); *In re Vitamin C Antitrust Litig.*, No. 06 MD 1738 (BMC)(JO), 2012 WL 5289514, at *4 (E.D.N.Y. Oct. 23, 2012). This case is no exception.

**Complexity**: *Laydon* and *Sonterra* involve a conspiracy among multiple banks and interdealer brokers to fix Euroyen-Based Derivatives prices over a five-and-a-half year Class Period through multiple means, including, *inter alia*: (1) making false Yen-LIBOR and Euroyen TIBOR submissions; (2) "spoofing" the market with false bids and offers; (3) sending fake run-throughs with artificial Yen cash prices; (4) publishing false rates on electronic screens maintained by interdealer brokers;

and (5) rewarding co-conspirators through an intricate kickback and bribery system. Third Amended Complaint, *Laydon*, ECF No. 580 ¶¶ 31-33, 387, 715, 965. *See Wal-Mart Stores*, 396 F.3d. at 122 (noting that the case was particularly large and complicated as it involved nearly every U.S. bank and over five million class members). Defendants often used multiple means to achieve the goal of their conspiracy. *See, e.g., Laydon*, ECF No. 580 ¶¶ 647-654 (describing the "Turn Campaign"). The amount of work required to reverse-engineer the inner workings of this sophisticated cartel was "extraordinary" in both its "complexity and scope" and required Class Counsel to master the properties of complex financial instruments and markets by working with seasoned experts. *See In re Holocaust Victim Assets Litig.*, No. CV 06-0983 (FB)(JO), 2007 WL 805768, at *46 (E.D.N.Y. Mar. 15, 2007).

**Magnitude**: This is a massive case. Over the course of six years of litigation involving 44 Defendants, the parties in *Laydon* and *Sonterra* have produced hundreds of docket entries associated with four amended complaints, including more than 53 memoranda and reply memoranda of law in support of and in opposition to at least 17 motions as well as 16 answers. There have been numerous contentious discovery objections, including, *inter alia*, to the relevant time period, phases of discovery, foreign bank secrecy and data privacy laws, and confidentiality and privilege objections. These objections have led to more than 120 meet-and-confers, at least three discovery motions, and dozens of letters. The scope of discovery produced to date is just as large. The *Laydon* Defendants have now produced close to 11,000,000 pages of documents, including over 100,000 audio files, and transaction records from hundreds of custodians. This number is likely to grow as certain Defendants are still producing data, documents from their Yen-LIBOR and Euroyen-TIBOR submitters and Euroyen-Based Derivatives traders, and certain documents pursuant to foreign data privacy laws. The global nature, duration, and size of the case, complexity of the financial

instruments, and the sophistication and the depth of the conspiracy weigh heavily in favor of approving the requested fee.

### 3. *Quality of Representation*

"[T]he quality of representation is best measured by results," *Goldberger*, 209 F.3d at 55, which are evaluated in light of "the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 141 (S.D.N.Y. 2008).

**Results Obtained**: In addition to the $30,000,000 recovered from the Settlement, Class Counsel have obtained a total of $206,000,000 in monetary compensation from Deutsche Bank, JPMorgan, Citi and HSBC. Class Counsel's ability to recover for the Class highlights the extraordinary nature of the results reached here. These funds will provide Class members with an immediate recovery and ensure funding of the litigation so that Class Counsel can continue to pursue claims against the remaining Defendants in the *Laydon* and *Sonterra* actions.

Beyond monetary compensation, Class Counsel also secured significant cooperation from the Settling Defendants. *See supra* at 1; Briganti Decl. ¶ 4. The R.P. Martin deal produced one of the most valuable pieces of information obtained to date—the "BOSS" transaction database—which contained millions of records, including the "wash trades" R.P. Martin brokered on behalf of Defendants UBS, RBS, and JPMorgan. *See, e.g.*, ECF No. 580 (TAC) ¶¶ 392-94. The transaction data and information contained in Defendants' documents produced so far have helped Class Counsel specifically identify the names of Yen traders and submitters who were active participants in the alleged manipulation and aided the development of a class-wide damages model and Plan of Allocation. *See supra* at 11-12.

**Background of Lawyers Involved**: Class Counsel have extensive experience prosecuting some of the largest commodities manipulation cases, including what were at the time, the first,

second, third, and fourth largest class action recoveries in the history of the CEA.[8] This includes

specific expertise in benchmark manipulation as demonstrated by Class Counsel's current tenure as

lead counsel in cases alleging anticompetitive and manipulative conduct for several "IBOR" rates

and the London Silver Fix.[9] Additional examples of Class Counsel's more than 50 years of

experience with complex litigation are detailed in Lowey's firm resume.[10]

Another consideration for assessing the quality of the representation is "[t]he quality of

opposing counsel" in the case. *See Maley v. Del Global Techns. Corp.*, 186 F. Supp. 2d. 358, 373

(S.D.N.Y. 2002). The valuable settlement that Class Counsel secured cannot be understated given

the caliber of defense counsel in this action. *See Meredith Corp.*, 87 F. Supp. 3d at 670 (noting that

counsel's achievement in "obtaining valuable recompense . . . for its clients is particularly

noteworthy given the caliber and vigor of its adversaries"); *NASDAQ III*, 187 F.R.D. at 488

(approving attorneys' fee award where defendants were represented by "several dozen of the

nation's biggest and most highly regarded defense law firms."). The fact that Class Counsel was able

to successfully prosecute this action for six years against such formidable opponents further reflects

the quality of representation provided.

### 4. *The Fee is Reasonable in Relation to the Settlements*

Courts evaluate the requested fee in relation to the settlement by looking to "comparable

cases" for "guideposts." *See Interchange Fee Litig.*, 991 F. Supp. 2d at 443-44 (evaluating a fee request

in case where a class of merchants alleged that large credit card companies and banks conspired to

fix certain rules and fees against other "large class cases with court-set fees"). This approach

---

[8] ECF No. 399-6, at 2-4.

[9] *See, e.g., Sonterra Capital Master Fund Ltd. et al. v. Credit Suisse Group AG et al.*, No. 15-cv-871 (SHS) (S.D.N.Y.) (Swiss franc LIBOR); *Sullivan et al. v. Barclays PLC et al.*, No. 13-cv-2811 (PKC) (S.D.N.Y.) (Euribor); and *In re: London Silver Fixing Ltd., Antitrust Litig.*, No. 14-md-2573 (VEC) (S.D.N.Y.).

[10] ECF No. 399-6.

prevents "unwarranted disparities in outcomes" and provides greater predictability for counsel. *Id.* at 446-47. The fee requested here is reasonable in relation to the settlement for at least two reasons:

*First*, Class Counsel's request for 23% of the common fund comes directly from the graduated fee scale that CalSTRS negotiated before joining the action. *See* Bartow Decl. ¶ 7. This satisfies a key legal "guidepost" that Judge Gleeson identified in large class action cases—that "the percentage of the fund awarded should scale back as the size of the fund increases"—and supports the reasonableness of Class Counsel's request. *See Interchange Fee Litig.*, 991 F. Supp. 2d at 444.

*Second*, the graduated fee CalSTRS negotiated is between the fees that were approved in two recent "guidepost" cases. *See id.* at 443. In both *CDS Litig.*, 2016 WL 2731524, at *17 n.24, and *Interchange Fee Litig.*, 991 F. Supp. 2d at 445, courts in this District approved fee awards in large class cases based on a graduated fee scale. The fee agreement approved in *Interchange Fee Litig.*, awarded counsel an average percentage fee of 23.9% for the first $200 million recovered, greater than the 23% requested here.[11] The requested fee is reasonable in relation to the settlement achieved here and compares favorably to other concrete "guideposts" such as the fees awarded in analogous cases.

## 5. *Public Policy Supports Approval*

Had Class Counsel not taken on the risk of this lawsuit in April 2012, before any Defendant had entered into government settlements, the Class would have been left without recompense for their losses. Despite the subsequent government investigations and certain Defendants' admissions of wrongdoing, most investors who were actually harmed by the alleged conspiracy would not have received any money at all. *See e.g., In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 352 (S.D.N.Y. 2014) ("providing lawyers with sufficient incentive to bring common fund cases that serve the public interest") (citations omitted).

---

[11] In *CDS Litig.*, the court approved a fee award based on a graduated fee structure that started with payment of 18% of the first $200 million of the common fund as attorneys' fees. 2016 WL 2731524, at *17.

Public policy encourages enforcement of the antitrust laws through private civil suits to deter infringing conduct in the future. *See Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983) ("This Court has emphasized the importance of the private action as a means of furthering the policy goals of certain federal regulatory statutes, including the federal antitrust laws."). Awarding a reasonable percentage of the common fund further ensures that Class Counsel retain the ability and incentive to pursue antitrust violations through trial, at their own expense and while recovery is uncertain. *See Goldberger*, 209 F.3d at 51 ("There is . . . commendable sentiment in favor of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest.").

### D. The Lodestar Cross-Check Supports the Requested Fee

Class Counsel's fee request is also reasonable under the lodestar method, which has "fallen out of favor because it encourages bill-padding and discourages early settlements." *In re Colgate-Palmolive*, 36 F. Supp. 3d at 353. In light of these deficiencies, the lodestar calculation "works best as a sanity check to ensure that an otherwise reasonable percentage fee would not lead to a windfall," for example, if the multiplier is too large and "grossly disproportionate to the percentage fee award . . ." *Id.* There is no windfall here.

*First*, in negotiating a graduated fee scale, CalSTRS capped any fee request by Class Counsel to 3.5 times the aggregate lodestar incurred by Plaintiffs' Counsel in the case. As with the percentage fee method, this negotiated rate should be given great weight in evaluating attorneys' fees. *Alderman v. Pan Am World Airways*, 169 F.3d 99, 103 (2d Cir. 1999) ("[A] court should seek to enforce the parties' intentions in a contingent fee agreement, as with any contract."). Plaintiffs' Counsel have spent 115,468.66 hours working on *Laydon* and *Sonterra* as of April 30, 2018, for an aggregate lodestar of $60,124,044.50. *See* Briganti Decl. ¶ 108. The $6.9 million fee requested, when combined with the $49.38 million in fee awards previously received, compensates Plaintiffs' Counsel for approximately 93.6% of their aggregate lodestar and does not implicate the 3.5 times multiplier cap

in the CalSTRS's agreement, demonstrating that a full fee will not result in an "unwarranted windfall." *Goldberger v. Integrated Res., Inc.*, 209 F.3d at 49.

In continuing their work to prosecute the cases since Plaintiffs settled with Deutsche Bank and JPMorgan, and in achieving the settlements with BTMU and MUTB, Plaintiffs' Counsel have worked 9,696.65 hours, reflecting a lodestar value of $4,528,303.00. *Id.* ¶ 108. The product of Plaintiffs' Counsel's continued diligence is evident in the $30,000,000 settlement with BTMU and MUTB, which is more than the amount for which BTMU and MUTB would have argued they were liable had they not settled.

*Second*, the 3.5 times multiplier CalSTRS negotiated is reasonable because it is consistent with the range of multipliers approved in this and other circuits. *See, e.g.*, *CDS Litig.*, 2016 WL 2731524, at *17 (approving a lodestar multiplier of "just over 6" in a complex antitrust class action); *Beckman v. KeyBank N.A.,* 293 F.R.D. 467, 481 (S.D.N.Y. 2013) (approving a multiplier of 6.3 in class action, explaining that "[c]ourts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers."); *Maley*, 186 F. Supp. 2d at 371 (holding that a 4.65 lodestar multiplier is modest, fair, and reasonable); *see also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002) (listing nationwide class action settlements where the lodestar multiplier ranged up to 8.5). The Court should approve the requested fee as the parties intended a lodestar multiplier of no more than 3.5 and this intended multiplier is lower than that in similarly complex class action cases.

## II.     CLASS COUNSEL'S EXPENSES AND LITIGATION FUND

"An attorney who has created a common fund . . . is entitled to reimbursement of reasonable expenses from that fund." *City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*, No. 12 cv 1609, 2015 WL 965696, at *11 (W.D. La. Mar. 3, 2015); *see also In re Arakis Energy Corp. Sec. Litig.*, No. 95 CV 3431(ARR), 2001 WL 1590512, at *17 n.12 (E.D.N.Y. Oct. 31, 2001) ("Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course."). As

detailed in the accompanying declarations, Plaintiffs' Counsel incurred $185,568.92 in expenses prosecuting this case between October 1, 2017 and April 30, 2018. *See* Briganti Decl. ¶¶ 109-11; Horn Decl. ¶ 6; Egan Decl. ¶ 10; Jaccarino Decl. ¶ 10. These expenses have been or will be paid from the litigation expense fund established upon the entry of the Citi and HSBC settlements. Briganti Decl. ¶ 112.

These costs and expenses were "incidental and necessary to the representation of the Class," and should be reimbursed. *See Carpenter v. Paige Hospitality Grp., LLC*, No. 13-cv-4009(GBD), 2015 U.S. Dist. LEXIS 82771, at *5 (S.D.N.Y. June 2, 2015). Since October 1, 2017, $171,273.46 (or 92.3% of the Plaintiffs' Counsel's total costs) went towards hosting and utilizing Relativity software for discovery and expert work.

Class Counsel requests $500,000, as provided in the mailed notice, to cover ongoing expenses associated with the continued prosecution of these actions. *See* Affidavit of Eric J. Miller, Ex. A, Mailed Notice at 8. A total of $62,693.73 will remain in the litigation expense fund, and expenses are expected to accumulate as depositions and expert discovery move forward. An award to support future litigations expenses is reasonable. *See Teachers' Ret. Sys. of Louisiana v. A.C.L.N., Ltd.*, No. 01-cv-11814, 2004 WL 1087261, at *5-6 (S.D.N.Y. May 14, 2004) (awarding "$250,000 to defray the ongoing costs incurred in connection with the continuing prosecution of the Action"); *Brunson v. City of New York*, No. 94 Civ. 4507, 2000 WL 1876910, at *4 (S.D.N.Y. Dec. 22, 2000) (awarding future expenses).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court approve Plaintiffs' application for attorneys' fees expenses in the amount set forth above.

Dated: June 4, 2018          **LOWEY DANNENBERG, P.C.**
       White Plains, New York

By: */s/ Vincent Briganti*
Vincent Briganti
Geoffrey M. Horn
Peter D. St. Phillip
44 South Broadway, Ste. 1100
White Plains, New York 10601
Tel.: 914-997-0500
Fax: 914- 997-0035
vbriganti@lowey.com
ghorn@lowey.com
pstphillip@lowey.com

*Class Counsel*

Joseph J. Tabacco, Jr.
Todd A. Seaver
**BERMAN TABACCO**
44 Montgomery Street, Ste. 650
San Francisco, CA 94104
Tel.: 415-433-3200
Fax: 415-433-6282

Patrick T. Egan
**BERMAN TABACCO**
One Liberty Square
Boston, MA 02109
Telephone: 617-542-8300
Facsimile: 617-542-1194

Christopher Lovell
Gary S. Jacobson
**LOVELL STEWART HALEBIAN
        JACOBSON LLP**
61 Broadway, Suite 501
New York, NY 10006
Tel.: 212-608-1900
Fax: 212-719-4677

*Additional Counsel for Plaintiffs*