# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY LAYDON, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>- against -<br><br>THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., THE SUMITOMO TRUST AND BANKING CO., LTD., THE NORINCHUKIN BANK, MITSUBISHI UFJ TRUST AND BANKING CORPORATION, SUMITOMO MITSUI BANKING CORPORATION, J.P. MORGAN CHASE & CO., J.P. MORGAN CHASE BANK, NATIONAL ASSOCIATION, J.P. MORGAN SECURITIES PLC, MIZUHO CORPORATE BANK, LTD., DEUTSCHE BANK AG, THE SHOKO CHUKIN BANK, LTD., SHINKIN CENTRAL BANK, UBS AG, UBS SECURITIES JAPAN CO. LTD., THE BANK OF YOKOHAMA, LTD., SOCIÉTÉ GÉNÉRALE SA, THE ROYAL BANK OF SCOTLAND GROUP PLC, THE ROYAL BANK OF SCOTLAND PLC, RBS SECURITIES JAPAN LIMITED, BARCLAYS BANK PLC, CITIBANK, NA, CITIGROUP, INC., CITIBANK, JAPAN LTD., CITIGROUP GLOBAL MARKETS JAPAN, INC., COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., HSBC HOLDINGS PLC, HSBC BANK PLC, LLOYDS BANKING GROUP PLC, ICAP EUROPE LIMITED, R.P. MARTIN HOLDINGS LIMITED, MARTIN BROKERS (UK) LTD., TULLETT PREBON PLC, AND JOHN DOE NOS. 1-50,<br><br>Defendants. | Docket No. 12-cv-3419 (GBD) (HBP) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................ii

ARGUMENT ........................................................................................................................4

I.   The Court Should Certify the Class Under FED. R. CIV. P. 23. ...................................4

   A.   The Class Satisfies the Requirements of Rule 23(a) ...............................................5

      1.   Rule 23(a)(1): The Hundreds of Geographically Dispersed Members of the Class
Make Joinder Impractical. ................................................................................5

      2.   Rule 23(a)(2): Questions of Law or Fact Are Common to the Class. ...........................6

      3.   Rule 23(a)(3): Plaintiff's Claims Are Typical of Class Member Claims Because
Plaintiff and Class Members All Transacted in Standardized Contracts, in the
Same Centralized Market. ...................................................................................7

      4.   Rule 23(a)(4): Plaintiff Is an Adequate Class Representative and Will Fairly Represent
the Class. ........................................................................................................8

         a.   Plaintiff's interests are aligned with those of the Class. ...........................................9

         b.   Plaintiff's counsel are qualified to represent the Class and should be appointed
Class Counsel under Rule 23(g). ...................................................................12

   B.   The Class Satisfies Rule 23(b)(3). .......................................................................13

      1.   Common Questions Predominate Because the Same Evidence Will Be Used to
Establish Each Class Member's CEA claims. ........................................................13

         a.   CEA price manipulation. ..............................................................................14

            i.   Defendants' ability to influence prices is clearly subject to common, class-
wide proof. ...........................................................................................14

            ii.   Defendants' conduct and communications show their intent. .........................14

            iii.   Expert testimony confirms Defendants violated industry standards, customs
and practices, further providing common evidence by which the Court
can infer Defendants' manipulative intent. ..................................................18

            iv.   The existence of artificial prices has been shown using a common
methodology. ........................................................................................19

            v.   Damages will be demonstrated using standard formulae that are common to
all Class members. ..................................................................................22

         b.   CEA aiding and abetting claim will similarly rely on common evidence. ............22

      2.   A Class Action Is Superior to Other Methods of Adjudicating This Action. ............23

## TABLE OF AUTHORITIES

<u>Cases</u>

*Amchem Prods. Inc. v. Windsor,*
   521 U.S. 591 (1997) ................................................................................................23

*Amgen Inc. v. Conn. Ret. Plans and Tr. Funds,*
   568 U.S. 455 (2013) ....................................................................................... 4, 12, 13

*Audet v. Fraser,*
   No. 3:16-CV-0940 (MPS), 2019 WL 2562628 (D. Conn. June 21, 2019) ...........................23

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg,*
   290 F.R.D. 409 (S.D.N.Y. 2012) ....................................................................................7

*Cargill Inc. v. Hardin,*
   452 F.2d 1154 (8th Cir. 1971) .....................................................................................15

*Carnegie v. Household Int'l, Inc.,*
   376 F.3d 656 (7th Cir. 2004) .......................................................................................23

*Connecticut Ret. Plans & Tr. Funds v. Amgen, Inc.,*
   No. CV07-2536PSG, 2009 WL 2633743 (C.D. Cal. Aug. 12, 2009) ................................12

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.,*
   502 F.3d 91 (2d Cir. 2007) ...........................................................................................8

*Ebin v. Kangadis Food Inc.,*
   297 F.RD. 561 (S.D.N.Y. 2014) ....................................................................................6

*In re Amaranth Nat. Gas Commodities Litig.,*
   730 F.3d 170 (2d Cir. 2013) ........................................................................................15

*In re Amaranth Natural Gas Commodities Litig.,*
   269 F.R.D. 366 (S.D.N.Y. 2010) ................................................................ 1, 5, 6, 8, 10, 24

*In re Flag Telecom Hldgs. Ltd. Secs. Litig.,*
   574 F. 3d 29 (2d Cir. 2009) .......................................................................................8, 9

*In re Global Crossing Secs. and ERISA Litig.,*
   225 F.R.D. 436 (S.D.N.Y. 2004) ....................................................................................9

*In re JPMorgan Chase & Co. Sec. Litig.,*
   No. 12-cv-03852 (GBD), 2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015) ..................... 4, 5, 8, 13, 22

*In re LIBOR-Based Fin. Instruments Antitrust Litig.,*
   299 F. Supp. 3d 430 (S.D.N.Y. 2018) ......................................................................5, 11, 19

*In re Mun. Derivatives Antitrust Litig.*,
    252 F.R.D. 184 (S.D.N.Y. 2008) ..........................................................................................12

*In re Natural Gas Commodities Litig.*,
    231 F.R.D. 171 (S.D.N.Y. 2005) ........................................................... 1, 5, 6, 20, 22

*In re Petrobras Secs.*,
    862 F.3d 250 (2d Cir. 2017) ................................................................................................6

*In re Prudential Secs. Inc. Ltd. P'ships Litig.*,
    163 F.R.D. 200 (S.D.N.Y. 1995) ........................................................................................7

*In re Sumitomo Copper Litig.*,
    182 F.R.D. 85 (S.D.N.Y. 1998) ....................................................... 1, 6, 8, 9, 10, 13

*In re Sumitomo Copper Litig.*,
    262 F.3d 134 (2d Cir. 2001) ....................................................................................... 9, 10

*In the Matter of Indiana Farm Bureau Coop. Ass'n, Inc.*,
    CFTC Dkt. No. 75-14, 1982 WL 30249 (CFTC Dec. 17, 1982) ........................15

*Kohen v. Pacific Inv. Mgmt. Co.*,
    244 F.R.D. 469 (N.D. Ill. 2007) ......................................................................................15

*Kohen v. Pacific Inv. Mgmt. Co.*,
    571 F.3d 672 (7th Cir. 2009) ..............................................................................................1

*Laydon v. Mizuho Bank, Ltd.*,
    No. 12-cv-3419 GBD, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ......... 13, 14, 15, 19, 20, 21, 23

*Moreno v. Deutsche Bank Americas Holding Corp.*,
    15-cv-9936-LGS, 2017 WL 3868803 (S.D.N.Y. Sept. 5, 2017) ..........................7

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015) ....................................................................................... 4, 13

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993) ................................................................................................5

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*,
    No. 14-cv-4394 (AJN), 2017 WL 1331288 (S.D.N.Y. Apr. 4, 2017) ..................6

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
    659 F.3d 234 (2d Cir. 2011) ................................................................................................5

*Stinson v. City of NY*,
    282 F.R.D. 360 (S.D.N.Y. 2012) ........................................................................................7

*Sykes v. Mel S. Harris and Associates LLC,*
    780 F.3d 70 (2d Cir. 2015) .................................................................................. 13, 23

*Teachers' Ret. Sys. of Louisiana v. ACLN Ltd.,*
    No. 01 CIV. 11814 (LAP), 2004 WL 2997957 (S.D.N.Y. Dec. 27, 2004) .......................... 8

*Waggoner v. Barclays PLC,*
    875 F.3d 79 (2d Cir. 2017) ..................................................................................... 4

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) .......................................................................................... 6, 7

## Statutes

7 U.S.C. § 25(a)(1)(D) ............................................................................................14

## Other Authorities

Peter Davis and Eliana Garcés, Quantitative Techniques for Competition and Antitrust Analysis,
    Princeton University Press, 2009 ...........................................................................20

## Rules

FED. R CIV. P. 23(g)(l)(A). ......................................................................................12

FED. R. CIV. P. 23(a)(2) ..........................................................................................6

FED. R. CIV. P. 23(a)(3) ..........................................................................................7

FED. R. CIV. P. 23(a)(4) ..........................................................................................8

FED. R. CIV. P. 23(b)(3) .........................................................................................13

# INTRODUCTION

Plaintiff Jeffrey Laydon moves under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure to certify the following Class to pursue claims for manipulation and aiding and abetting in violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*:

> All persons or entities that purchased or sold a Euroyen TIBOR futures contract on the Chicago Mercantile Exchange ("CME") during the period of at least January 1, 2006 through at least December 31, 2010, inclusive (the "Class Period"). Excluded from the Class are the Defendants and any parent, subsidiary, affiliate, or agent of any Defendant.

This case stems from Defendants'[1] admitted widespread conspiracy to manipulate the London Interbank Offered Rate for the Japanese Yen ("Yen-LIBOR"), the Euroyen Tokyo Interbank Offered Rate ("Euroyen TIBOR"), and the prices of financial instruments priced based on those rates, including Euroyen TIBOR futures contracts traded domestically on the CME.

CEA cases are ideally suited for class treatment as they involve hundreds of investors in standardized contracts on centralized domestic markets, such as the CME, and allege an overarching, common course of unlawful conduct by defendants. *See, e.g., In re Sumitomo Copper Litig.*, 182 F.R.D. 85 (S.D.N.Y. 1998) (Pollack, J.) (certifying class of copper futures traders over a two-year class period); *In re Natural Gas Commodities Litig.*, 231 F.R.D. 171 (S.D.N.Y. 2005) (Marrero, J.) (certifying class of natural gas futures traders over three-year class period); *Kohen v. Pacific Inv. Mgmt. Co.*, 571 F.3d 672 (7th Cir. 2009) (affirming certification of class of 10-year U.S. Treasury note futures traders) (Posner, J.); *In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366 (S.D.N.Y. 2010) (Scheindlin, J.) (certifying class of natural gas futures traders).

---

[1] "Defendants" means Barclays Bank plc ("Barclays"), Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. (n/k/a Coöperatieve Rabobank U.A.) ("Rabobank"), The Royal Bank of Scotland Group plc, The Royal Bank of Scotland plc and RBS Securities Japan Limited (collectively, "RBS"), Société Générale, and UBS AG and UBS Securities Japan Co. Ltd. (collectively, "UBS").

This case is no different than the CEA manipulation class actions previously certified by Judges Pollack, Marrero, and Scheindlin.  Plaintiff easily satisfies each requirement for certification under Rule 23(a): the proposed Class includes hundreds of investors; many questions of law and fact are common to the Class; the named Plaintiff is a typical Class member and adequate Class representative, and Plaintiff and his counsel will continue to pursue and protect the interests of Class members, as they have done for the last seven-and-a-half years.

Plaintiff also satisfies Rule 23(b)(3)'s predominance and superiority requirements.  Plaintiff will prove that Defendants violated the CEA with common evidence of Defendants' admitted manipulation of Yen-LIBOR and Euroyen TIBOR.  All five of the Defendants that remain in this case have collectively paid billions in fines and admitted to manipulating Yen-LIBOR and/or Euroyen TIBOR on a daily basis to benefit their derivatives trading positions and those of their co-conspirators.  The U.S. Commodity Futures Trading Commission ("CFTC"), the regulator responsible for policing the commodities markets, found that UBS alone *made 2,000 written requests* to manipulate Yen-LIBOR or Euroyen TIBOR, covering approximately 75% of all trading days in a three-year period.[2]  Other Defendants, likewise, made hundreds (if not thousands) of documented requests to manipulate.[3]

Plaintiff's motion is bolstered by the gold standard in expert opinion offered by one of the leading commodity manipulation experts in the world, Dr. Craig Pirrong. Applying well-established economic principles, Dr. Pirrong developed a model to (1) show what Yen-LIBOR and Euroyen TIBOR would have been in the absence of (or "but for") Defendants' widespread, admitted manipulation, and (2) calculate damages using a formulaic, class-wide approach that can be applied to each Class member's trades over the entire Class Period.  Plaintiff's industry expert, Dr. Nicholas

---

[2] *See* Declaration of Raymond P. Girnys ("Girnys Decl.") Ex. 1 (UBS CFTC Order, at 3).

[3] *See* Girnys Decl. Ex. 2 (RBS CFTC Order, at 8); Girnys Decl. Ex. 3 (Rabobank CFTC Order, at 12).

Motson, demonstrates through a robust (and unrebutted) analysis of hundreds of communications that Defendants violated the customs, standards, and practices designed to prevent manipulation in the financial markets—including rules promulgated by the British Bankers' Association ("BBA") and Japanese Bankers Association ("JBA") specifically designed to protect the integrity of Yen-LIBOR and Euroyen TIBOR, respectively.

Class treatment is the superior method of adjudicating these claims.  Plaintiff has already secured over $300 million in class-wide settlements, while not a single investor has pursued individual litigation.  More to the point, Plaintiff has on four occasions notified Class members of the settlements reached to date, including the facts of Defendants' widespread conspiracy, Plaintiff's methodology for estimating artificiality and calculating Class members' damages based on their individual trading records, and Plaintiff Laydon's request to serve as Class representative. Not one investor, from a group that included some of the most sophisticated investors in the world, has ever objected.

Finally, the Court should appoint Lowey Dannenberg, P.C. ("Lowey") as Class Counsel. The Court has already found that Lowey has the qualifications, experience, and ability to prosecute this case.  *See* ECF No. 99.  Through the seven-and-a-half years of litigating this case, Lowey has zealously represented Plaintiff and the putative Class and is prepared to litigate this case through trial against the remaining five Defendants.

Accordingly, Plaintiff respectfully requests that the Court: (a) certify this action as a class action pursuant to Rule 23(a) and (b)(3); (b) appoint Plaintiff as Class Representative; and (c) appoint Lowey as Class Counsel pursuant to Rule 23(g).

## ARGUMENT

**I.    The Court Should Certify the Class Under FED. R. CIV. P. 23.**

A plaintiff seeking class certification must show by a preponderance of the evidence that each of the prerequisites identified in Federal Rule of Civil Procedure 23(a) and one of the bases for certification identified in Rule 23(b) are satisfied. *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017), *cert. denied*, No. 17-1209, 2018 WL 1116150 (U.S. Apr. 30, 2018).[4] Rule 23(a) provides that a class may be certified if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law [or] fact common to the class; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). Under Rule 23(b)(3), a case may proceed as a class action "if questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Waggoner*, 875 F.3d at 93.

Courts in this Circuit apply Rule 23 liberally with any doubts being resolved in favor of certification. *In re JPMorgan Chase & Co. Sec. Litig.*, No. 12-cv-03852 (GBD), 2015 WL 10433433, at *2 (S.D.N.Y. Sept. 29, 2015) ("*JPM Secs.*") ("The Second Circuit has construed Rule 23 liberally and directed district courts to err on the side of granting class certification."). While this still requires a rigorous analysis of Rule 23's factors, it "grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Id.* at *2. Merits issues are considered only to the extent "they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 466 (2013); *see also Shahriar v. Smith & Wollensky*

---

[4] Unless otherwise noted, all internal citations and quotations are omitted.

*Rest. Grp., Inc.,* 659 F.3d 234, 251 (2d Cir. 2011) (explaining that "in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement").

### A.  The Class Satisfies the Requirements of Rule 23(a)

#### 1.  Rule 23(a)(1): The Hundreds of Geographically Dispersed Members of the Class Make Joinder Impractical.

Rule 23(a)(1) requires that the Class be "so numerous that joinder of all members is impracticable." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 460 (S.D.N.Y. 2018) ("*LIBOR VII*").  Courts presume numerosity for "classes larger than forty members." *JPM Secs.*, 2015 WL 10433433, at *3.  "Evidence of exact class size or identity of class members to satisfy the numerosity requirement" is not required.  *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).

Here, numerosity is satisfied because of the large volume of CME Euroyen TIBOR futures contracts traded during the Class Period. CME data and the U.S. Department of Justice's ("DOJ") multi-year investigation into the manipulation of Yen-LIBOR and Euroyen TIBOR show that more than 700,000 CME Euroyen TIBOR futures contracts were traded during the Class Period.[5] As is common in securities cases, the high volume of trades during the Class Period satisfies the numerosity requirement here. *JPM Secs.*, 2015 WL 10433433, at *3 ("the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period."); *In re Nat. Gas*, 231 F.R.D. at 179 (numerosity satisfied where "400,000 natural gas futures contracts were open at the end of the proposed class period").[6] ███████████

███████████████████████████████████████████████████████████████████

████.[7]

---

[5] *See* Girnys Decl. Ex. 4 (UBS - DOJ Statement of Facts, at 5).

[6] An additional way to show numerosity is through large trader reports.  *See Amaranth*, 269 F.R.D. at 379.

[7] ███████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████

In addition to being numerous, the members of the Class are objectively ascertainable. The Class definition satisfies the "modest threshold requirement" that a class be "defined using objective criteria [to] establish a membership with definite boundaries." *In re Petrobras Secs.*, 862 F.3d 250, 269 (2d Cir. 2017).[8]  Courts have consistently found CEA manipulation classes of "purchasers and sellers of any contract relating to a specific underlying commodity" to be ascertainable. *Amaranth*, 269 F.R.D. at 381; *see also In re Nat. Gas*, 231 F.R.D. at 180 (finding class of "[a]ll persons, other than defendants and their employees . . . who purchased and/or sold NYMEX natural gas futures between January 1, 2000 and December 31, 2002" to be "readily ascertainable"); *Sumitomo*, 182 F.R.D. at 88 (certifying class of "[a]ll persons who purchased COMEX copper futures contracts between June 24, 1994 and June 15, 1996").

This case is no different.  The Class definition provides definite boundaries for Class membership, including limits relating to: (a) type of futures contract covered (*i.e.*, Euroyen TIBOR futures contracts), (b) location of Class member transactions (*i.e.*, on the CME), and timeframe (*i.e.*, between January 1, 2006 and December 31, 2010).

### 2.   Rule 23(a)(2): Questions of Law or Fact Are Common to the Class.

Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  FED. R. CIV. P. 23(a)(2).  This threshold is satisfied when there is a "common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011). This standard "is not demanding," *Brooklyn Ctr. for Indep. of the Disabled v.*

---

[8] Ascertainability does not require plaintiffs to "identify a comprehensive roster of putative class members at the certification stage." *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*, No. 14-cv-4394 (AJN), 2017 WL 1331288, at *8 (S.D.N.Y. Apr. 4, 2017). Rather, they only must show that "class members will be, at some point, readily identifiable without resort to individualized hearings." *Id.* This is standard is "not demanding and is designed only to prevent the certification of a class whose membership is truly indeterminable." *Ebin v. Kangadis Food Inc.,* 297 F.RD. 561, 567 (S.D.N.Y. 2014).

*Bloomberg,* 290 F.R.D. 409, 418 (S.D.N.Y. 2012), and poses "a 'low hurdle" to certification. *In re Prudential Secs. Inc. Ltd. P'ships Litig.,* 163 F.R.D. 200, 206 n.8 (S.D.N.Y. 1995). Even "a single [common] question will do." *Wal-Mart,* 564 U.S. at 359 (brackets in original).

Commonality is met where, like here, "the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members." *Moreno v. Deutsche Bank Americas Holding Corp.*, 15-cv-9936-LGS, 2017 WL 3868803, at *4 (S.D.N.Y. Sept. 5, 2017).  This "does not mean that all issues must be identical as to each [class] member," *id.*, at *5, or "that all class members make identical claims and arguments, only that common issues of fact or law affect all class members." *Stinson v. City of NY*, 282 F.R.D. 360, 369 (S.D.N.Y. 2012). As a result, "[a] court may find a common issue of law even though there exists some factual variation among class members' specific grievances." *Id.*

Here, Plaintiff's allegations of widespread conspiracy to manipulate Yen-LIBOR and Euroyen TIBOR raise multiple common questions, including:

1. What constitutes a false or manipulative submission by a Yen-LIBOR or Euroyen TIBOR panel bank?
2. Which of the Defendants were engaged in manipulative conduct involving Yen-LIBOR and Euroyen TIBOR, and for what period(s) were they involved in the same?
3. What would the non-manipulated Yen-LIBOR and Euroyen TIBOR be in the "but-for" world for each day of the Class Period?

Each of these questions raise a "common contention" among all Class members and satisfies Rule 23(a)(2). *Wal-Mart,* 564 U.S. at 350.

### 3.  Rule 23(a)(3): Plaintiff's Claims Are Typical of Class Member Claims Because Plaintiff and Class Members All Transacted in Standardized Contracts, in the Same Centralized Market.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). This requirement is "not demanding" and is satisfied where "each class member's claim arises from the same course of

7

events, and each class member makes similar legal arguments to prove the defendant's liability." *JPM Secs.*, 2015 WL 10433433, at *3.

The focus of the typicality inquiry is not on the plaintiffs' behavior, but rather on the defendant's actions, *Teachers' Ret. Sys. of Louisiana v. ACLN Ltd.*, No. 01 CIV. 11814 (LAP), 2004 WL 2997957, at *1 (S.D.N.Y. Dec. 27, 2004), and "may be satisfied where 'injuries derive from a unitary course of conduct by a single system.'" *Amaranth*, 269 F.R.D. at 376. Accordingly, "[f]actual differences in the amount of damages, date, size or manner of purchase, the type of purchaser . . . and other such concerns will not defeat class certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class." *Sumitomo*, 182 F.R.D. at 92.

Here, Plaintiff and the Class assert claims arising from the same single course of conduct—Defendants' misconduct rigged Yen-LIBOR, Euroyen TIBOR and the market for CME Euroyen TIBOR futures contracts in which Plaintiff and all Class members transacted. Plaintiff transacted in the same, standardized CME Euroyen TIBOR futures contracts as all other Class members and was impacted by Defendants' violation of the CEA in the same, formulaic way. Plaintiff's claims, therefore, are typical of the Class because they turn on the same legal theories of liability and arguments as those of other Class members. *See In re Flag Telecom Hldgs. Ltd. Secs. Litig.,* 574 F. 3d 29, 35 (2d Cir. 2009) (typicality satisfied where "each class member makes similar legal arguments to prove defendant's liability").

### 4. Rule 23(a)(4): Plaintiff Is an Adequate Class Representative and Will Fairly Represent the Class.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). The adequacy determination focuses on whether: "'1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'" *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007); *see also Flag Telecom*, 574 F.3d at 35.

While the focus of the adequacy inquiry is to uncover "conflicts of interest between named parties and the class they seek to represent," only a "fundamental" conflict—*i.e.*, one that goes to the heart of the litigation—will defeat a motion for certification. *Flag Telecom*, 574 F.3d at 35.

### a. Plaintiff's interests are aligned with those of the Class.

Here, Plaintiff satisfies the adequacy requirement because he shares with all members of the Class the same interest in prosecuting this action. Defendants' admitted manipulation rigged Yen-LIBOR, Euroyen TIBOR and the market for CME Euroyen TIBOR futures contracts in which Plaintiff and all Class members transacted. Plaintiff and all members of the Class seek the same relief—monetary damages—reflecting the amount of losses each incurred as a result of Defendants' conduct. Moreover, Plaintiff has demonstrated to date that he shares the same interests as the Class by vigorously pursuing Class member's claims and obtaining $307 million in compensatory settlements from 15 defendants on their behalf. *See In re Global Crossing Secs. and ERISA Litig.*, 225 F.R.D. 436, 453 (S.D.N.Y. 2004) ("There is no conflict between the class representatives and the other class members. All share the common goal of maximizing recovery.").

The Second Circuit has held that a class of buyers and sellers of futures contracts does not create a fundamental conflict that defeats class certification. *In re Sumitomo Copper Litig.*, 262 F.3d 134, 141 (2d Cir. 2001) (rejecting argument that "buying and selling class members have inherently conflicting interests"). In *Sumitomo*, plaintiffs alleged that the defendants manipulated copper prices artificially higher by hoarding physical copper supplies. *Sumitomo*, 182 F.R.D. at 87. Plaintiffs moved to certify a class of all investors who purchased and sold COMEX copper futures contracts between June 24, 1994 and June 15, 1996. *Id.* at 88. The *Sumitomo* defendants argued that the proposed class failed Rule 23(a)(4)'s adequacy requirement because the buyers of copper futures contracts, who would have lost money when they paid more as a result of alleged misconduct, had different incentives when compared to sellers of copper futures contracts, who would have

benefited from the alleged price inflation. *Id.* at 91-92.  The Second Circuit rejected this argument,

denying the *Sumitomo* defendants' Rule 23(f) petition for review of the district court's order certifying

a class of both buyers and sellers of copper futures. *Sumitomo*, 262 F.3d at 143. Similarly, in

*Amaranth*, defendants argued that there was a conflict among proposed class representatives and the

class because each class member had a conflicting "Optimal Start Date" or the date each class

member would want the class period to start to maximize their losses. *Amaranth*, 269 F.R.D. at 380–

81.  Judge Scheindlin, like Judge Pollack in *Sumitomo*, rejected this argument holding that individual

class member trading patterns did not defeat class certification.  *Id.  See also Sumitomo*, 182 F.R.D. at

94 ("the simple fact that Class members may have purchased and sold copper futures at different

times, for different purposes, does not detract from the fact that every class member purchased or

sold the same fungible futures contract in the same centralized Comex market.").  This Court should

hold the same.

Further, any speculation that Class members may have conflicting interests has already been

disproven. From the outset of this case, Plaintiff has alleged that Defendants conspired to

persistently manipulate Yen-LIBOR and Euroyen TIBOR by making submissions that benefited

their trading positions.[9] Class members have been repeatedly apprised of the scope and nature of the

alleged conspiracy, including that Defendants manipulated Yen-LIBOR and/or Euroyen TIBOR up

on some days and down on others, during the seven years this case has been pending. Notice of this

action has been sent to Class members in connection with each of the previous four rounds of

settlements approved by the Court thus far.[10] Each time, the notice program informed Class

members of the facts regarding the alleged conspiracy.[11] It also informed Class members of Dr.

---

[9] *See generally,* ECF No. 580 (Plaintiff's Third Amended Class Action Complaint ("TAC")).

[10] *See* Notices of Proposed Class Action Settlements, ECF Nos. 657-3, 775-4, 851-3. A fourth round of notice is presently being distributed to potential Class members. *See* ECF No. 965-3.

[11] *See* Notices of Proposed Class Action Settlements, ECF Nos. 657-3, at 2; 775-4, at 2-3; 851-3, at 2; 965-3, at 2-3.

Pirrong's methodology for estimating artificiality daily and calculating Class member's damages based on their individual trading records.[12] No Class member has objected to Laydon's adequacy as a Class representative or claimed that differences among his CME Euroyen TIBOR trading positions and its own created a conflict that precluded Laydon from adequately representing the Class's interests. Accordingly, any attempt by Defendants to claim that such a conflict exists now is not even hypothetical, but unfounded speculation and must be rejected.

Finally, even the recent decision in *LIBOR VII* supports Plaintiff's adequacy to serve as Class representative. Plaintiff alleges (and expert testimony confirms) that Defendants' conspiracy was widespread throughout the Class Period and *not the episodic* conspiracy courts found created conflicts in proving liability on a day-by-day basis in *LIBOR VII*. For example, *LIBOR VII*'s class certification ruling was driven by the fact that the court had previously limited plaintiff's claims to 13 days during the proposed five-and-half year class period when written communications quoted in plaintiffs' complaint indicated that USD LIBOR was manipulated. *LIBOR VII*, 299 F. Supp. 3d at 536-38. This forced the *LIBOR VII* plaintiffs to prove that USD LIBOR was manipulated separately for each of these 13 days. *Id.* The *LIBOR VII* court found that the need for separate proof on each of these 13 days created conflicts among class members, who would be incentivized to pursue claims only on the days when they traded Eurodollar futures contracts.  *Id.* at 538.

That argument simply does not apply here. Unlike in *LIBOR VII*, Defendants' conspiracy is not cabined to 13 discrete days identified in written communications but is alleged to have persisted throughout the Class Period. All Class members are incentivized to prove—consistent with Plaintiff's allegations and Dr. Pirrong's model—that Defendants caused Yen-LIBOR and Euroyen TIBOR to be set at artificial non-competitive levels throughout the Class Period. In fact, any other

---

[12] *See* Notices of Proposed Class Action Settlements, ECF Nos. 657-3, at 5; 775-4, at 5; 851-3, at 5; 959-3, at 5.

conclusion is inconsistent with the evidence uncovered to date and inappropriately resolves a merits

question regarding Plaintiff's allegations in favor of Defendants' counter-narrative that the

manipulation was episodic and limited to a discrete number of days. *See Connecticut Ret. Plans & Tr.*

*Funds v. Amgen, Inc.*, No. CV07-2536PSG, 2009 WL 2633743, at *7 (C.D. Cal. Aug. 12, 2009) ("The

record shows that the antagonism that supposedly exists between equity holders and non equity

holders is not at the very heart of the suit.  Rather, it is peripheral to the Class' overriding common

interest in establishing the existence and materiality of misrepresentations."), *aff'd*, 660 F.3d 1170

(9th Cir. 2011), *aff'd*, 568 U.S. 455 (2013). Thus, *LIBOR VII* has no applicability to Plaintiff's well

supported allegations of widespread and persistent manipulation of Yen-LIBOR and Euroyen

TIBOR, and the prices of Euroyen TIBOR futures contracts.

### b.  Plaintiff's counsel are qualified to represent the Class and should be appointed Class Counsel under Rule 23(g).

Plaintiff also requests that the Court appoint Lowey as Class Counsel. The Court appointed

Lowey as Interim Lead Class Counsel in August 2012 (Dkt. No. 99). The same considerations that

guided the Court's selection of interim co-lead Class counsel apply. *See In re Mun. Derivatives Antitrust*

*Litig.,* 252 F.R.D. 184, 186 (S.D.N.Y. 2008).[13]  The Court has already found that Lowey has the

qualifications, experience, and ability to prosecute this case.  *See* ECF No. 99.[14]  Lowey has zealously

represented Plaintiff and the putative Class for over seven years and is prepared to litigate this case

through trial against the remaining five defendants.

---

[13] The mandatory factors are: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." FED. R CIV. P. 23(g)(l)(A).

[14] *See* ECF Nos. 567-5, 775-7, 851-6, 959-6, 965-6 (Lowey Firm Resume); ECF Nos. 567, 656, 775, 851, 959, 965 (Declarations of Vincent Briganti in Support of Motion for Settlement of Preliminary Approval of Class Action Settlements).

### B.  The Class Satisfies Rule 23(b)(3).

Rule 23(b)(3) requires that (1) "questions of law or fact common the class members predominate over any questions affecting only individual class members," and (2) "a class action is superior to other available methods for fairly and effectively adjudicating the controversy." FED. R. CIV. P. 23(b)(3).  "Rule 23(b) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen*, 568 U.S. at 459.  Moreover, "individual questions need not be absent. . . .  The rule requires only that those questions not predominate over the common questions affecting the class as a whole." *Sykes v. Mel S. Harris and Associates LLC,* 780 F.3d 70, 81 (2d Cir. 2015).  Predominance is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Roach*, 778 F.3d at 405.  This action involves, as did *Sumitomo*, *Nat. Gas*, and *Amaranth*, claims under the CEA, and therefore "[t]he [Rule 23(b)(3)] inquiry  . . . begins with the elements of the alleged claim for relief, and requires an examination of the proof required to substantiate plaintiffs' allegations." *Sumitomo*, 182 F.R.D. at 89; *accord In re JPM Secs.*, 2015 WL 10433433, at *4. And like *Sumitomo*, *Nat. Gas.*, and *Amaranth*, Plaintiff's CEA claims can be proven by the same class-wide evidence and methodology, and such evidence and methodology will predominate over any individual issues.

### 1.  Common Questions Predominate Because the Same Evidence Will Be Used to Establish Each Class Member's CEA claims.

In *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419 GBD, 2014 WL 1280464, at *4 (S.D.N.Y. Mar. 28, 2014) ("*Laydon I*"), this Court sustained two causes of action under the CEA:

- Price manipulation in violation of the CEA which requires showing: (1) "the accused had the ability to influence market prices; (2) "[he] specifically intended to do so"; (3) "artificial prices existed"; and (4) "the accused caused the artificial prices." *Id.* at *4 (quoting *DiPlacido v. Commodity Futures Trading Comm'n*, 364 F. App'x 657, 661 (2d Cir. 2009)); and

- Aiding and abetting, for which "a Plaintiff must prove that the Defendant: (1) had knowledge of the principal's intent to violate the CEA; (2) intended to further that violation; and (3) committed some act in furtherance of the principal's objective." *Id.* (citing *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 599 (S.D.N.Y. 2011)).

### a. CEA price manipulation.

Section 22(a) provides litigants a private right of action to sue for manipulation of either (i) the price of a commodity futures contract; or (ii) "the price of the commodity underlying" such futures contract. 7 U.S.C. § 25(a)(1)(D). The price of a Euroyen TIBOR futures contract reflects the value of the underlying commodity, in this case, Yen-LIBOR and Euroyen TIBOR. *See Laydon I*, 2014 WL 1280464, at *4 ("Furthermore, Section 22(a) of the CEA provides Plaintiff with standing to sue under the CEA . . . for manipulation of the price of (*i.e.,* interest on) that commodity (deposit) [Euroyen TIBOR futures contracts], which is none other than Euroyen TIBOR and Yen–LIBOR."). The CFTC has also found that Yen-LIBOR and Euroyen TIBOR are themselves commodities that trade in interstate commerce. *See id.* at *4 ("The CFTC has repeatedly found that Yen–LIBOR and Euroyen TIBOR are each a 'commodity' within the meaning of the CEA").

### i. Defendants' ability to influence prices is clearly subject to common, class-wide proof.

The first element of a CEA price manipulation claim—Defendants' ability to influence prices—is subject to common, classwide proof. Here, Defendants were all Yen-LIBOR and/or Euroyen TIBOR panel banks. As a result, Defendants were the only ones allowed to make submissions that were used to determine Yen-LIBOR and Euroyen TIBOR. This gave Defendants exclusive control over Yen-LIBOR and Euroyen TIBOR and thus the ability to influence CME Euroyen TIBOR futures prices.

### ii. Defendants' conduct and communications show their intent.

The second element of a CEA price manipulation claim—Defendants' manipulative intent—is also subject to common, classwide proof. CEA manipulative intent is "conduct [which]

14

has been intentionally engaged in which has resulted in a price which does not reflect basic forces of supply and demand." *Cargill Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971); *In the Matter of Indiana Farm Bureau Coop. Ass'n, Inc.,* CFTC Dkt. No. 75-14, 1982 WL 30249, at *7 (CFTC Dec. 17, 1982) ("[I]n order to prove the intent element of manipulation . . . it must be proven that the accused acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that does not reflect legitimate forces of supply and demand[.]").  In prior CEA manipulation cases, proof of intent has depended on the totality of the circumstances. *See, e.g.*, *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 180 (2d Cir. 2013); *Kohen v. Pacific Inv. Mgmt. Co.*, 244 F.R.D. 469, 482 (N.D. Ill. 2007).

Manipulative intent may be shown through facts that the defendants had both the motive and the opportunity or ability to manipulate.  *See Laydon I*, 2014 WL 1280464, at *5.  Manipulative intent can also be shown through Defendants' conscious misbehavior or recklessness.  *Id.* at *5.  As the Court held in connection with Defendants' motion to dismiss, Defendants' admissions in their government settlements and Defendants' communications show that the same common facts can be used to infer Defendants manipulative intent.  *Id.* at *5-6.

For example, Defendant UBS AG admitted that it "engaged in sustained, wide-ranging, and systematic efforts to manipulate Yen-LIBOR and, to a lesser extent, Euroyen TIBOR, to benefit UBS's trading positions."[15] Defendants RBS,[16] Rabobank,[17] Barclays,[18] and Société Générale,[19] (among others) also admitted to manipulating Yen-LIBOR to collectively benefit their own

---

[15] Girnys Decl. Ex. 5. (UBS DOJ Plea Agreement, Statement of Facts, at 8). The DOJ revoked UBS's non-prosecution agreement in May 2015 after uncovering evidence that UBS continued to engage in criminal conduct, including the collusive manipulation of foreign exchange benchmark rates The DOJ required UBS plead guilty to felony wire fraud for manipulating Yen-LIBOR as a result.  *See id.,* at 1-2.

[16] *See* Girnys Decl. Ex. 6 (RBS Deferred Prosecution Agreement).

[17] *See* Girnys Decl. Ex. 7 (Rabobank Deferred Prosecution Agreement).

[18] *See* Girnys Decl. Ex. 8 (Barclays Non-Prosecution Agreement).

[19] *See* Girnys Decl. Ex. 9 (Société Générale Deferred Prosecution Agreement).

derivatives trading positions and those of their co-conspirators. More than $7 billion in criminal fines and penalties have been paid by Defendants and others related to the manipulation of interbank offered rates.

Regulatory settlements depict a common course of conduct by which Defendants routinely manipulated Yen-LIBOR and Euroyen TIBOR to increase the profitability of their Euroyen-based derivatives positions during the Class Period.[20] For example, the CFTC found that UBS alone *made 2,000 written requests* to manipulate Yen-LIBOR or Euroyen TIBOR, covering approximately 75% of the trading days in a three-year period between late 2006 and late 2009.[21]  Other Defendants, likewise, made hundreds (if not thousands) of documented requests for false submissions at the same time.[22]

Defendants' public settlements do not reveal the full extent of Defendants' manipulation of Yen-LIBOR and Euroyen TIBOR. UBS trader Tom Hayes explained that Defendants conspired to fix derivatives prices by coordinating their Yen-LIBOR and Euroyen TIBOR submissions on a daily basis.[23]  Discovery has confirmed Hayes's description of a pervasive conspiracy to manipulate Yen-LIBOR and Euroyen TIBOR, exposing standing orders from supervisors and managers to align the bank's submissions with its derivatives positions in violation of BBA and JBA rules.[24]  Some requests for false submissions were made by simply shouting across the trading desk or during

---

[20] *See generally,* ECF No. 580 (TAC).

[21] *See* Girnys Decl. Ex. 1 (UBS CFTC Order, at 3).

[22] *See* Girnys Decl. Ex. 2 (RBS CFTC Order, at 8); Girnys Decl. Ex. 3 (Rabobank CFTC Order, at 12).

[23] ████████████████████████████████████████████████████████
████████████████████████████████████████████████              *See*
Girnys Decl. Ex. 11 (*Ex-trader Hayes jailed for 14 years by London court for Libor Rigging,* Kristin Ridley, Reuters, Aug 3. 2015).

[24] ████████████████████████████████████████████████████████████
████████████████████████.

meetings.[25] Put simply, common evidence shows that Defendants' manipulated Yen-LIBOR and Euroyen TIBOR for the common purpose of increasing the profitability of their derivatives positions.[26]

While there is ample evidence of Defendants' manipulation, Defendants also communicated through means which were not, or could not, be detected, including via text message, unrecorded telephone lines and in person.[27] Documents also show that Defendants instructed each other to destroy copies of their communications so there would be no record of any misconduct.[28]

Defendants knew that when they manipulated Yen-LIBOR and Euroyen TIBOR they directly impacted the prices of Euroyen-based derivatives, including CME Euroyen TIBOR futures contracts. UBS expressly admitted in DOJ settlements that CME Euroyen TIBOR futures contracts



[25] *See, e.g.,* Girnys Decl. Ex. 2 (RBS CFTC Order. at 6, 15) (referencing RBS' reorganization of employees to facilitate in-person communication), ████████████████████████

[26] ████████████████████████████████████████████████████████████

[27] *See, e.g.,* Girnys Decl. Ex. 2 (RBS CFTC Order at pp. 6, 15) (referencing RBS' reorganization of employees to facilitate in-person communication), ████████████████████████

[28] ████████████████████████████████████████████████████████████

were impacted by their misconduct.[29]  This is consistent with admissions made by Rabobank Yen-

LIBOR submitter Paul Robson and Euroyen-based derivatives traders Takayuki Yagami, Paul

Robson and Lee Stewart.[30]  As part of their allocutions after pleading guilty to conspiracy to commit

wire fraud and bank fraud for their role in the manipulation of Yen-LIBOR, Robson and Yagami

admitted that their conduct was intended to harm investors in the United States and benefit

Rabobank's Euroyen-based derivatives positions.[31]

> ### iii.   Expert testimony confirms Defendants violated industry standards, customs and practices, further providing common evidence by which the Court can infer Defendants' manipulative intent.



---

[29] *See* Girnys Decl. Ex. 4 (UBS – DOJ Statement of Facts, ¶¶ 14, 97).

[30] *See* Girnys Decl. Exs. 27-29 (Lee Stewart, Paul Robson, Takayuki Yagami DOJ Plea Allocutions).

[31] *See* Girnys Decl. Ex. 29 (Takayuki Yagami DOJ Plea Allocution). Yagami: "I knew Rabobank regularly settled trades with certain counter-parties located in the United States. It was foreseeable to me that the settlement forces involving those U.S. counter-parties for trades involving instruments that set an interest rates referring LIBOR involved international wire transfers beginning or ending within the United States including some of my own trades." The Court: "So, when you were manipulating the LIBOR rate, it was to your advantage and the advantage of your co-conspirators but you knew it would be to the disadvantage of others including institutions in the United States, yes?" Yagami: "Yes."

[32] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[33] ▮▮▮▮▮▮▮

[34] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮



#### iv.    The existence of artificial prices has been shown using a common methodology.

The existence of artificial prices is established by showing "a causal relationship between the purportedly manipulative conduct and the alleged market response." *Laydon I*, 2014 WL 1280464, at *5.  Common evidence of the existence of artificial prices is demonstrated where a reliable class-wide methodology is available to determine what Yen-LIBOR and Euroyen TIBOR would have been absent manipulation, and what effect such artificiality had on the prices of Euroyen TIBOR futures contracts.  *See LIBOR VII*, 299 F. Supp. 3d at 541 ("Exchange plaintiffs must establish that classwide methodologies are available to determine (1) what LIBOR submissions panel banks would have made (and by extension, what LIBOR would have been) absent trader-based manipulation and (2) what impact a change from actual published LIBOR to but-for published LIBOR would have had on EDF prices.").

---

Plaintiff's expert economist, Dr. Craig Pirrong—a leading expert on commodity manipulation and futures markets—has demonstrated that the impact of Defendants' admitted manipulation of Yen-LIBOR and Euroyen TIBOR on the market for CME Euroyen TIBOR futures prices (discussed *infra*) can be estimated using a single, common model for all Class members.

████████████████████████████████████████████

████████████████████████████████████████.[37]   Regression analyses like this are commonly used in academic literature and securities, commodities, and antitrust litigation, to measure the impact of misconduct (*e.g.*, collusion, fraud, or manipulation) on market prices.[38] ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████.[39]

*See also Laydon I*, 2014 WL 1280464 at *5 (finding that analysis "comparing the Euroyen TIBOR and Yen-LIBOR submissions with the prevailing Euro Yen Deposit Rate demonstrates artificiality."). This type of approach, which relies on objective, historical data, has been accepted time and again because "all class members had a common interest in compiling the 'objective, historical facts of the prices' and in the 'largely mathematical enterprise of establishing correlations between these positions and prices.'" *In re Nat. Gas*, 231 F.R.D. at 183.

---

[37] ███████████████████████████████████████████████████

[38] *See, e.g.*, Peter Davis and Eliana Garcés, Quantitative Techniques for Competition and Antitrust Analysis, Princeton University Press, 2009.

[39] ████████████████████████████████





[REDACTED][46]

Courts routinely accept such VAR models in commodities futures cases to show impact on a classwide basis. *See In re Nat. Gas*, 231 F.R.D. at 182 (accepting the VAR methodology to determine the impact of spot natural gas prices on the prices of NYMEX natural gas futures prices). [REDACTED]

[REDACTED]

### v.    Damages will be demonstrated using standard formulae that are common to all Class members.

It is "well-established Second Circuit precedent that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification' under Rule 23(b)(3)." *JPM Secs.*, 2015 WL 10433433, at *7. Here, because all Class members transacted the same, standardized CME Euroyen TIBOR futures contract during the Class Period, [REDACTED]

[REDACTED][47].

### b.   CEA aiding and abetting claim will similarly rely on common evidence.

CEA aiding and abetting is shown when a plaintiff proves that the Defendant: "(1) had knowledge of the principal's intent to violate the CEA; (2) intended to further that violation; and (3)

---

[46] [REDACTED].

[47] [REDACTED]
[REDACTED]

committed some act in furtherance of the principal's objective." *See Laydon*, 2014 WL 1280464, at
*4. Here, Defendants' words capture how they aided and abetted each other to manipulate Yen-
LIBOR and Euroyen TIBOR throughout the Class Period.[48]  Plaintiff's CEA aiding and abetting
claim will rely on such common evidence and is ideal for class treatment.

### 2.   A Class Action Is Superior to Other Methods of Adjudicating This Action.

The superiority inquiry under Rule 23(b)(3) is "explicitly comparative in nature" and calls for
"a comparison between a class action and other available methods of adjudication." *Audet v. Fraser*,
No. 3:16-CV-0940 (MPS), 2019 WL 2562628, at *26 (D. Conn. June 21, 2019) (citing *In re Petrobras*,
862 F.3d at 268).  The court considers four factors in evaluating superiority: (1) "individual control
of the litigation;" (2) "prior actions involving the parties;" (3) "desirability of the forum;" and (4)
"manageability."  *Sykes,* 780 F.3d at 82. Courts have certified a class where the class device will
"achieve economies of time, effort, and expense, and promote…uniformity of decision as to
persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable
results." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

Here, Class members have little interest in maintaining separate actions because the cost and
effort required to pursue CEA claims against the Defendants on an individual basis is likely greater
than the value of their individual claim. *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir.
2004) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero individual
suits, as only a lunatic or a fanatic sues for $30").  If forced to litigate individually, Class members'
claims would have "negative value" (*i.e.*, the litigation costs would be greater than any possible

---

[48] ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████

recovery) indicating that a class action is superior in this case. *See Amaranth*, 269 F.R.D. at 386 and n.135.

Even if Class members had expressed an interest in controlling the litigation, the management difficulties that would be created by the individual cases would be extraordinary. The complications would include the establishment of numerous discovery orders, negotiations concerning discovery of information subject to foreign data privacy laws, among others, and coordination with the DOJ, which continues to investigate claims related to manipulation of benchmark rates and remains interested in this action. Such problems would only grow if individual actions were commenced in other courts.

Accordingly, it is desirable to consolidate the litigation of the claims in this forum. Permitting the Class to pursue this case as a certified class action will promote judicial economy and uniformity of decision. It is most efficient to concentrate the Class's claims where the claims of hundreds of Class members can be adjudicated in a single forum. Difficulties, if any, in prosecuting the claims as a class action are manageable because the proof of the Defendants' manipulation is the same for all Class members, the proof of the impact is the same, and a claims proceeding involving the submission of records may be supervised by the Court.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court: (a) certify this action as a class action pursuant to Rule 23(a) and (b)(3); (b) appoint Plaintiff as Class Representative; and (c) appoint Lowey as Class Counsel.

Dated: September 27, 2019
White Plains, New York

**LOWEY DANNENBERG, P.C.**

By: /s/ Vincent Briganti
Vincent Briganti
Geoffrey M. Horn
Sitso W. Bediako
Raymond Girnys
44 South Broadway, Suite 1100
White Plains, New York 10601
Tel.: 914-997-0500
Fax: 914- 997-0035
vbriganti@lowey.com
ghorn@lowey.com
sbediako@lowey.com
rgirnys@lowey.com

*Interim Lead Class Counsel*

Joseph J. Tabacco, Jr.
Todd A. Seaver
**BERMAN TABACCO**
44 Montgomery Street, Ste. 650
San Francisco, CA 94104
Tel.: 415-433-3200
Fax: 415-433-6282

Patrick T. Egan
**BERMAN TABACCO**
One Liberty Square
Boston, MA 02109
Telephone: 617-542-8300
Facsimile: 617-542-1194

Christopher Lovell
Gary S. Jacobson
**LOVELL STEWART HALEBIAN
JACOBSON LLP**
500 5th Avenue, Suite 2440
New York, NY 10110
Tel.: 212-608-1900
Fax: 212-719-4677

*Additional Counsel*